## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

**LOUIS J. PEARLMAN,** *et al*

     **Debtor.**

_____/

**Case No. 6:07-bk-00761-ABB**
**Jointly Administered**
**Chapter 11**

**SONEET KAPILA, Chapter 11 Trustee**
**for TRANS CONTINENTAL TELEVISION**
**PRODUCTIONS, INC.,**

                **Plaintiffs,**

v.

**MTV NETWORKS COMPANY,**

                **Defendant.**

_____/

**Adv. No.: 6:08-ap-00157-ABB**

## TRANS CONTINENTAL'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS AND THINGS

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, Middle District of Florida, Local Rule 3.01 and Rule 7037-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, Soneet Kapila, as the Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental"), hereby moves this Court to compel defendant, MTV Networks ("MTV"), to provide documents responsive to Trans Continental's First Request for Production of Documents and Things ("First Request"), and to award Trans Continental its attorneys' fees and costs reasonably incurred in bringing this motion pursuant to Federal Rule of Civil Procedure 37(a)(4)(A).

## I.      INTRODUCTION

MTV's responses to Trans Continental's First Request evince the same cavalier disregard

for the Federal Rules of Civil Procedure, as do MTV's responses to Trans Continental's Interrogatory Requests.[1]  MTV has, for example: (a) refused to produce a privilege log in connection with its alleged attorney-client communications; (b) failed to provide any explanation for its redaction of more than two hundred pages; (c) failed to produce documents in response to Request Nos. 54 and 56 through 63, despite the fact that its own witness unequivocally testified as to the existence of responsive documents; and (d) raised spurious objections to a number of the requests.

This is a simple case: either MTV owes Trans Continental money in connection with the television series, *Making the Band*, or it does not.[2]  MTV strenuously professes it is the latter. Yet, despite this protestation, MTV is unwilling to offer any financial transparency.  MTV failed, for example, to provide the Excel spreadsheets which are presently stored on its shared drive and which were relied upon in preparing the participation statements that it submitted to Trans Continental, claiming that no money was owed to Trans Continental.  These documents lie at the very heart of Trans Continental's claim, as they evidence the amount of money which MTV received in connection with the DVD sales, home video sales, print publishing, music publishing, foreign distribution and international program sales relating to *Making the Band*, *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.  MTV has also failed to produce documents evidencing the revenue it earned in connection with: (a) the licensing and distribution of *Making the Band* (Request Nos. 67-69), and (b) the artists who were featured on the respective seasons of *Making the Band* (Request Nos. 40-44, 46-49, and 51-53).

---

[1]    MTV's deficient responses to Trans Continental's Interrogatory Requests resulted in the filing of Trans Continental's Motion to Compel Better Interrogatory Responses and For Expedited Consideration ("Motion to Compel Better Interrogatory Responses") [D.E. 19].

[2]    Trans Continental hereby incorporates by reference the Factual Background section contained in its original Motion to Compel [D.E. 19].

Moreover, MTV objects to producing any documents which evidence: (a) the payments it has made to Sean Combs (*p/k/a* "Diddy") (Request Nos. 11-13, 16); (b) the production costs of season three of *Making the Band* and each season of *Making the Band 2* (seasons 1, 2 and 3); *Making the Band 3* (seasons 1, 2 and 3); and *Making the Band 4* (seasons 1, 2 and 3) (Request Nos. 25-29); and (c) the amount of advertising revenue it received in connection with each season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4.*

Without these documents, Trans Continental is bereft of any meaningful opportunity to evaluate the amount of money which it is owed.   This Motion – and, indeed, this ***entire*** case – can be easily resolved if MTV produces documents evidencing the revenue, expenses, production costs, and profits relating to *Making the Band*.   For as much as it would like to, MTV is not entitled to hide these documents.

## II.    <u>MEMORANDUM OF LAW</u>

### 1.    <u>Discovery Rules Are to Be Afforded "Broad and Liberal Construction."</u>

The Federal Rules of Civil Procedure establish a liberal system of discovery "meant to insure that no relevant fact remain[s] hidden." *Crawford v. Dominic*, 469 F. Supp. 260, 262 (D.C. Pa. 1979).   The Federal Rules of Civil Procedure mandate the disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, therefore ensuring a fair and just result. *See United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958).   As long-ago explained by the United States Supreme Court:

> No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.   Mutual knowledge of all of the relevant facts gathered by both parties is essential to proper litigation.   To that end, either party may compel the other to disgorge whatever facts he has in his possession.   The deposition-discovery procedure

simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.

*Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

"The concept of trial by ambush has long ago fallen into desuetude in both state and federal courts." *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 331, 342 (N.D. Ill. 2005); *Proctor & Gamble*, 356 U.S. at 682 (The federal rules were intended to "make trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.") To this end, Rule 34 of the Federal Rules of Civil Procedure allows any party to serve on any other party a request for production of any designated documents or electronically stored information concerning matters within the scope of Fed. R. Civ. P. 26(b).

The scope of discovery under Rule 26(b) is broad: "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Under Rule 26, relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc., v. Sanders,* 437 U.S. 340, 351 (1978); *Jeld-Wen, Inc., v. Nebula Glass Int'l, Inc.,* 2007 WL 1526649, * 2 (S.D. Fla. May 22, 2007) ("Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action.") *See also, Rhone-Poulenc Rorer, Inc., v. Aetna Casualty & Surety Co.,* 1992 WL 394425, * 3 (E.D. Pa. Dec. 28, 1992) ("[D]iscovery requests may be relevant if there is any possibility that the information may be relevant to the general subject matter of the action. As a result, discovery rules are to be accorded broad and liberal construction.")

Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues." *Oppenheimer Fund,* 437 U.S. at 352.

Information can be relevant and therefore discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. *Dunbar v. United States*, 502 F.2d 506, 509-10 (5th Cir. 1974). *See Farnsworth v. Proctor & Gamble Co.,* 758 F.2d 1545, 1547 (11th Cir. 1985) ("The Federal Rules of Civil Procedure strongly favor full discovery whenever possible."); *Canal Authority v. Froehlke,* 81 F.R.D. 609, 611 (M.D. Fla. 1991) (same).

The party resisting discovery bears the burden of establishing facts sufficient to justify its objections:

> The party resisting discovery bears the burden of demonstrating that its objections should be sustained, and pat, generic, non-specific objections, intoning the same boilerplate language, are inconsistent with both the letter and the spirit of the Federal Rule of Civil Procedure. An objection to a [discovery] request must clearly set forth the specifics of the objection and how that objection relates to the [discovery] being demanded. The objecting party must do more than intone the familiar litany that the [discovery is] burdensome, oppressive or overly broad. Instead, the objecting party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [discovery request] is not relevant or how each [discovery request] is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.

*Financial Bus. Equip. Solutions, Inc., v. Quality Data Systems, Inc.*, 2008 WL 4663277, * 2 (S.D. Fla. October 21, 2008). *See also*, Fed. R. Civ. P. 33(b)(4); *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000) ("The party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information.")

Conclusory recitation of "expense and burdensome" without specificity provides no basis for the court to order limitations upon the discovery sought. *Panola Land Buyers Ass'n v. Shuman*, 762 F. 2d 1550, 1559 (11th Cir. 1985). Instead, to even merit consideration, "an objection must show specifically how a discovery request is overly broad, burdensome or

oppressive, by submitting evidence or offering evidence which reveals the nature of the burden." *Oliver v. City of Orlando*, 2007 WL 3232227, * 2 (M.D. Fla. Oct. 31, 2007) (Baker, J.) (citing *Coker v. Duke & Co.*, 177 F.R.D. 682, 686 (M.D. Ala. 1998)); *Action Nissan, Inc., v. Hyundai Motor America, Inc.*, 2008 WL 1113071, * 1 (M.D. Fla. Jan. 8, 2008) (Spaudling, J); *Etienne v. Wolverine Tube, Inc.*, 185 F.R.D. 653, 656 (D. Kan. 1999) (mere assertion of "overbroad" does not adequately state an objection).

### 2. MTV'S Inexcusable Failure To Provide a Privilege Log Results in a Waiver of the Privilege.

#### A. MTV Offers No Explanation for its Redaction of 200 Pages of its Production.

Despite redacting over two hundred (200) pages of its production, MTV failed to provide any explanation for the redaction. This is insufficient. While a party may, under certain circumstances, redact proprietary or privileged information,[3] it is required to furnish an accompanying log detailing the basis for the redaction. *See Roger Kennedy Construction, Inc., v. Amerisure Ins. Co.*, 2007 WL 2028859 (M.D. Fla. July 9, 2007) at * 1 (Spaudling, J.) (ordering that "any information redacted from a document produced in discovery must be reflected on a privilege log served *simultaneously* with the production of each redacted document") (emphasis added); *Floeter v. City of Orlando*, 2006 WL 1000306 (M.D. Fla. April 14, 2006) (Spaudling, J.) (same); *In re Duque*, 177 B.R. 397 (S.D. Fla. 1994) (ordering that if the respondents believed that any portion of the letters should be redacted, full copies of the letters should be submitted to the court along with an explanation for the proposed redaction). *See also, Goshawk Dedicated Ltd., v. American Viatical Services, LLC*, 2008 WL 2901864 (N.D. Ga. July 23, 2008) (finding that the plaintiff failed to meet their burden of demonstrating the appropriateness of redacting

---

[3]    MTV's redaction is all the more puzzling in light of the fact that the parties have agreed to a Confidentiality Agreement, which permits the designation of proprietary or commercially sensitive documents as "Attorneys' Eyes Only."

certain documents).

Consequently, MTV must produce a privilege log explaining the basis for its redaction of the following documents: MTVN 00289 through 00360, MTVN 001609 through 001680, MTVN 002038 through 002045, MTVN 002493 through 002501, MTVN 002658, MTVN 002726 through 002735, MTVN 002739 through MTVN 002751, and MTVN 002989 through MTVN 002998.

### B.    MTV's Failure to Produce a Log in Connection with its Attorney-Client Privileged Documents.

Additionally, MTV's responses to the vast majority of Trans Continental's requests provides that MTV will produce all "responsive, *non-privileged* documents" that are in its possession, control and custody. In the event that MTV actually withheld the production of any responsive documents on the basis of the attorney-client privilege, it is required to provide a privilege log. Indeed, countless courts have made it clear that a naked objection of privilege is legally insufficient. "[The] limitation as to privileged documents is not self-executing." *Ritacca v. Abbott Laboratories*, 203 F.R.D. 332, 334-35 (N.D. Ill. 2001); *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 696 (M.D. Fla. 2005) ("Many courts interpreting these rules have found a blanket claim of privilege to be insufficient and that a log or index of materials withheld under claim of privilege must be produced."); *McKesson Information Solutions LLC v. Epic Systems Corp.*, 242 F.R.D. 689, 694 (N.D. Ga. 2007) (directing the plaintiff to either provide a privilege log or produce discovery.).

A party asserting an objection to discovery on the grounds of privilege "must present that objection in a timely and proper manner." *Id.* at 335 (citing *Peat Marwick, Mitchell & Co., v. W.*, 748 F.2d 540, 542 (10th Cir. 1984)). As explained in *Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12 (1st Cir. 1991), "[t]he burden is on the party asserting a privilege to do so in a timely

and proper manner and to establish the existence and applicability of the privilege." *See also, Peat Marwick,* 748 F.2d at 542 ("The applicability of the privilege turns on the adequacy and timeliness of the showing as well as on the nature of the document."). The Committee Notes to Rule 26 make clear that the privilege log "*is not an after-thought to claiming privilege or protection, it is the claim of privilege or protection.*" *Hobley v. Burge,* 2005 WL 121738, * 9 (N.D. Ill. July 12, 2005) (emphasis added).

Having failed to timely assert the privilege, as well as to cure this failure upon Trans Continental's demand, this Court should deem the privilege waived and order MTV to immediately produce these documents.

### 3.    MTV's Failure to Produce Responsive Documents Which Undeniably Exist.

#### A.    Request Nos. 54 and 56 through 63.

MTV's production is deficient according to the sworn testimony of its *own* witness. Despite indicating that it "will produce (subject to the parties' confidentiality agreement) responsive, non-privileged documents to the extent such documents exist and are in its possession, custody or control," MTV failed to produce any documents responsive to Request Nos. 54 and 56-63. Collectively, these requests seek all documents evidencing the funds received by MTV in connection with the DVD sales, home video sales, print publishing rights, music publishing, web-site, foreign distribution and international program sales relating to *Making the Band, Making the Band 2, Making the Band 3* or *Making the Band 4*.[4]

The recent deposition of Karen Abdul confirmed the existence of documents responsive to Request Nos. 54 and 56-63. Specifically, Ms. Abdul testified that there is a "shared drive" in the Participations Management Department where documents which contain the financial

---

[4]    In that MTV has not raised any objections to these Requests, these Requests are listed in full in **Exhibit A**, as opposed to the main body of the Motion.

information relating to *Making the Band* and its subsequent seasons are stored. (A true and correct copy of Ms. Abdul's January 12, 2009 deposition transcript is attached hereto as **Exhibit B**, pp. 14-17). Specifically, Ms. Abdul testified that the numbers utilized in the preparation of the participation statements sent by MTV to Trans Continental were received from other departments by e-mail with Excel spreadsheets attached. (*Id.* at pp. 37-40). Neither these e-mails nor the Excel spreadsheets were produced. MTV is required to produce both.

Similarly, the documents used in the preparation of these Excel spreadsheets by MTV's respective departments are also responsive to Request Nos. 54 and 56-63, but were not produced in either electronic or paper form. (*Id.*) These documents must also be produced (in both electronic and paper form).

### B. Request Nos. 24, 40-44, 51-53, 67-69 and 86-92.

Despite providing that "(subject to the parties' confidentiality agreement) [it will produce] responsive, non-privileged documents to the extent such documents exist and are in its possession, custody or control," MTV has similarly failed to produce a single document that can be fairly characterized as responsive to Request Nos. 24, 40-44, 51-53, 67-69, and 86-92.[5] An exacting review of MTV's produced document reveals that there is not a single document relating to the production costs for the season three of *Making the Band* (Request No. 24); MTV's receipt of funds in connection with *Da Band, Danity Kane, Donnie Klang* and *Day 26*'s respective albums (Request Nos. 40-44) or related merchandise (Request Nos. 51-53). MTV has also not produced any documents evidencing: the license and distribution agreements which it entered into relating to *Making the Band* (Request Nos. 67-69); or the number of times any season (or episode) of *Making the Band* (season three); *Making the Band 2, Making the Band 3* or *Making the Band* 4 has been re-broadcast or re-run (Request Nos. 86-92).

---

[5] These Requests – which, again, were not objected to – are also listed in full on Exhibit A.

As reflected by MTV's lack of objections, these requests seek documents which are indisputably relevant.   It stretches the imagination that MTV does not possess these documents. Indeed, in all likelihood, the documents responsive to these requests are likely stored in the aforementioned "shared drive."  Either way, MTV shall be compelled to search for and produce documents responsive to Request Nos. 40-44, 51-53, 67-69, and 86-92.

### III.    MTV'S OBJECTIONS TO TRANS CONTINENTAL'S SPECIFIC REQUESTS FOR PRODUCTION.

In addition to failing to produce responsive documents, MTV has raised a number of spurious objections to Trans Continental's specific requests for production, including:

#### A.    Requests for Production 11, 12, 13 and 16

**Request No. 11**

Any and all documents that refer, relate to, reflect, concern or evidence any and all payments made by MTV to Diddy in connection with any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

**Request No. 12**

Any and all documents that refer, relate to, reflect, concern or evidence any and all account statements rendered by MTV to Diddy in connection with any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

**Request No. 13**

Any and all documents that refer, relate to, reflect, concern or evidence any and all account statements rendered by MTV to any entity affiliated with or controlled/owned by Diddy in connection with any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

**Request No. 16**

All copies of any account statements rendered by MTV to Diddy in connection with any

season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

**MTV'S RESPONSE**

In response to Request Nos. 11, 12, 13 and 16, MTV provided the same response:

"MTVN objects to this request because it is overburdensome [sic] and seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's breach of contract and accounting claims concern whether or not MTVN owes *Plaintiff* any Net Proceeds for *Making the Band 2*, *Making the Band 3*, and *Making the Band 4*. (Pursuant to Paragraph 9 of the Amended Agreement, *Making the Band 2, Making the Band 3*, and *Making the Band 4* are governed by the Net Proceeds formula). Plaintiff's claims do not concern the payments made by MTVN to Diddy. Indeed, payments made to Diddy by MTVN are not included in the Net Proceeds calculation, as defined in Schedule A of the Amended Agreement."

**The Basis for the Motion to Compel**:

MTV's burdensome objection fails in that MTV has failed to offer any evidence revealing the nature of the alleged burden. *See Panola Land Buyers*, 762 F.2d at 1559 (conclusory recitation of "expense and burdensome" without specificity provides no basis for the court to order limitations upon the discovery sought); *Oliver*, 2007 WL 3232227 at * 2 ("[to even merit consideration] an objection must show specifically how a discovery request is overly broad, burdensome or oppressive, by submitting evidence or offering evidence which reveals the nature of the burden.").

MTV's relevancy objection must similarly be rejected out-of-hand as these requests are directly targeted towards discovering the veracity of MTV's contention that no money is due and owing to Trans Continental. MTV has argued that it is entitled to recoup the costs incurred in

connection with the production of *Making the Band*.   MTV must, therefore, produce documents evidencing these production costs, including the amounts paid to Diddy.   This is particularly true given that MTV's own documents reveal that MTV treated the amounts paid to Diddy as part of the production costs. (*See* MTVN 003129-3131, MTVN 003193, MTVN 003259 and MTVN 003580).[6]

While MTV has produced copies of its contracts with Diddy (*see* MTVN 00598 through MTVN 00694), these contracts do not enable Trans Continental to verify that MTV actually paid the expenses which it is claiming as an offset to income.   These contracts merely indicate the amount which MTV was ***obligated*** to pay Diddy, not the amounts it ***actually*** paid Diddy. Moreover, by themselves, the Diddy-MTV contracts do not reveal whether the specified bonuses were paid.   The Diddy-MTV contracts provide for the payment of a completion bonus, a ratings bonus, plus a specified percentage of the modified adjusted gross receipts ("MAGR") received by MTV in connection with the exploitation of *Making the Band*.   The MAGR bonuses are particularly important because the thresholds needed to trigger these bonuses are the same thresholds which would necessarily eliminate any doubt that money is due and owing to Trans Continental.    Stated simply, MTV's payments to Diddy provide an objective point of comparison.

For all these reasons, MTV's production of the Diddy contracts is insufficient. MTV must also produce the accounting statements it previously rendered to Diddy in connection with any season of *Making the Band*, responsive to Request Nos. 11, 12, 13 and 16.

---

[6]    True and correct copies of these documents were previously filed, under seal, as Exhibit G to Trans Continental's Motion to Compel Better Interrogatory Responses. [D.E. 19]   To avoid both needless duplication and burdening this Court with another Motion for Permission to File Under Seal, to the extent necessary, this motion will refer to the previously-filed exhibits.

B.    <u>**Requests for Production 25 through 29**</u>[7]

<u>**Request No. 25**</u>

Any and all documents that refer, relate to, reflect, concern or evidence the production costs for each of the three seasons of *Making the Band 2*.

<u>**Request No. 26**</u>

Any and all documents that refer, relate to, reflect, concern or evidence the production costs for each of the three seasons of *Making the Band 3*.

<u>**Request No. 27**</u>

Any and all documents that refer, relate to, reflect, concern or evidence the production costs for each of the three seasons of *Making the Band 4*.

<u>**MTV'S RESPONSE**</u>

MTVN objects to this request as burdensome to the extent it requests MTVN to produce documents regarding production costs on a season-by-season basis, which is not required by the Net Proceeds calculation. Without waiving the foregoing objection, MTVN will produce (subject to the parties' confidentiality agreement) responsive, non-privileged documents to the extent such documents exist and are in its possession, custody or control.

<u>**Request No. 28**</u>

Any and all documents that refer, relate to, reflect, concern or evidence the final production costs for each of the three seasons of *Making the Band*.

<u>**Request No. 29**</u>

Any and all documents that refer, relate to, reflect, concern or evidence the final production costs for each of the three seasons for *Making the Band 2*.

---

[7]    In that they are thematically-related, Requests 25 through 29 are grouped together, despite MTV's slightly varied objections to the Requests.

**MTV'S RESPONSE**

MTVN objects to this request to the extent that it can see no reasonable distinction between "production costs" and "final production costs." Without waiving the foregoing objection, MTVN will produce (subject to the parties' confidentiality agreement) responsive, non-privileged documents to the extent such documents exist and are in its possession, custody or control.

**The Basis for the Motion to Compel**:

MTV's "burdensome" objection to Request Nos. 25-27 is misplaced given that MTV's own documents reveal that MTV did, in fact, budget the production cost of each season of *Making the Band* on a season-by-season basis. MTV has, for example, produced documents evidencing the per season production costs for season 2 of *Making the Band 3*, as well as seasons 1, 2 and 3 of *Making the Band 4*. (*See*, *e.g.,* MTVN 002619 through MTVN 002650 and MTV 002518 through MTVN002524, true and correct copies of which were previously filed, under seal, as Exhibit J to Trans Continental's Motion to Compel Better Interrogatory Responses). [D.E. 19]

MTV has also produced other documents in which its personnel is discussing and/or comparing the per-episode cost of particular seasons of *Making the Band*. (*See, e.g.,* Exhibit K to Trans Continental's Motion to Compel Better Interrogatory Responses). [D.E. 19]  These documents indisputably reveal that the documents responsive to Request Nos. 24-31 exist. Consequently, MTV must produce documents evidencing the per season production costs for season 3 of *Making the Band*; seasons 1, 2 and 3 of *Making the Band 2*; and seasons 1 and 3 of *Making of the Band 3*.

MTV's objection with respect to Request Nos. 28 and 29 as to its supposed inability to

distinguish between "production costs" and "final costs" fails in that MTV's own documents underscore the need for Trans Continental's request for both the original budgets and the final production costs of each season of *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4*. Indeed – while insufficient – the documents which MTV has produced to date reveal that the production costs for *Making the Band* were constantly evolving, and that it was not uncommon for the final production costs to dwarf the original production budgets.[8]

Trans Continental is entitled to receive all documents evidencing both the original budgets and the final production costs for any season of *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4*, as well as all documents discussing the basis for the overage. Consequently, MTV should be compelled to produce all documents responsive to Request Nos. 25 through 29.

### C.    Requests for Production 46 through 49

**Request No. 46**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with any other work featuring Da Band's music, including but not limited, any funds received from iTunes, downloads, ring tones, streaming media, print publishing, synchronization licenses and the like.

**Request No. 47**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with any other work featuring Danity Kane's music, including

---

[8]    *See* MTVN 000472 (discussing the overage in connection with an unidentified season of *Making the Band 3*); MTVN 002035 (highlighting that the final budget for Season Two of *Making the Band 4* was nearly twice as much as the original projection); MTVN 002471 (same) and MTVN 002987-002988 (discussing the significant disparity between the final and original budgets for an unidentified season of *Making the Band 4*), true and correct copies of which were previously filed, under seal, as composite Exhibit L to Trans Continental's Motion to Compel Better Interrogatory Responses.

but not limited, any funds received from iTunes, downloads, ring tones, streaming media, print publishing, synchronization licenses and the like.

**Request No. 48**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with any other work featuring Donnie Klang's music, including but not limited, any funds received from iTunes, downloads, ring tones, streaming media, print publishing, synchronization licenses and the like.

**Request No. 49**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with any other work featuring Day 26's music, including but not limited, any funds received from iTunes, downloads, ring tones, streaming media, print publishing, synchronization licenses and the like.

**MTV'S RESPONSE**

In response to Request Nos. 46 through 49, MTV provided the same response:

MTVN objects to this request to the extent it is overbroad and vague (with respect to, but not limited to, the term "any other work").    Subject to and without waiving the foregoing objections, MTVN will produce (subject to the parties' confidentiality agreement) responsive, non-privileged documents to the extent such documents exist and are in its possession, custody or control.    MTVN reserves the right to supplement this response upon clarification of this request.

**The Basis for the Motion to Compel**:

MTV's "vagueness" objection fails as a matter of law.    Like "burdensome" objections, a blanket statement that the request is vague is "not adequate to voice a successful objection."   *See*

*ABM Financial Services, Inc. v. Express Consolidation, Inc.*, 2007 WL 2572322 (S.D. Fla. Sept. 5, 2007) (standing alone, objections that state that a discovery request is "vague, overly broad, or unduly burdensome," is meaningless); *Josephs v. Harris Corp.*, 677 F. 2d 985, 992 (3d Cir. 1982) (the mere statement by a party that the discovery sought is overly broad, burdensome, oppressive, vague or irrelevant is "not adequate to voice a successful objection.") Instead, MTV is obligated to explain the specific and particular way in which Request Nos. 46 through 49 are vague before this objection can even be entertained.

With that said, there is a certain hint of irony in MTV objecting as to the supposed "vagueness" of what constitutes a "musical work." Truth be told, there is nothing ambiguous about Trans Continental's request: it inquires into the amount of revenue which MTV received in connection with the musical works of the artists (*O-Town, Da Band, Day 26, Danity Kane* and *Donnie Klang*) (the "Artists"), whose careers were launched by their respective appearances on *Making the Band*. The request even guides MTV to contemplate the streams of revenue received from: the digital downloads of the artists' music, publishing rights, touring, merchandise, as well as any management fee. Had MTV had any genuine interest in responding to this Request, it could have: (a) merely glanced at the parties' original Agreement – a contract which it drafted – which contemplates and defines many of the same terms which MTV now claims to be vague; or (b) it could have attempted to clarify its alleged confusion during the parties' conference call which was intended to amicably resolve MTV's objections. MTV did neither, a reality which displays MTV's true intent: to thwart Trans Continental's legitimate discovery attempts.

Given that the revenue received from these Artists' musical works factors into the total amount that MTV owes Trans Continental, MTV has no viable basis for refusing to provide a

response to this request.    Consequently, MTV should be directed to produce all documents responsive to Request Nos. 46 through 49.

### D.    Request for Production 55

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with product placement or product integrations agreements relating to *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

**MTV'S RESPONSE**

"MTVN objects to this request because it is overburdensome [sic] and seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. Pursuant to Paragraph 9 of the Amended Agreement, 'with respect to the third season [of Making the Band 1]  and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A.'  In turn, Schedule A of the Amended Agreement excludes advertising revenue from the Net Proceeds calculation; specifically, Schedule A defines 'Net Proceeds', in part, as 'all non-refundable revenues … (excluding exhibition of MTVN worldwide programming service)'"

**The Basis for the Motion to Compel**:

As was previously the case, MTV's "burdensome" objection fails in that MTV offers no explanation as to the alleged burden that it would incur in producing documents responsive to this request.   MTV's irrelevancy objection fares no better.

First, while MTV is certainly permitted to argue that Trans Continental is not entitled to share in the advertising revenues, there has been no finding that this is the proper interpretation of the Net Proceeds Definition.   The proper interpretation of this provision remains subject to

debate, as it is not the model of clarity that MTV professes.    To this end, it is worth noting that the term "advertising" is never actually used in the Net Proceeds Definition.    Additionally, in citing the definition of "Net Proceeds," MTV conveniently glosses over the fact that the first sentence actually reads: "For purposes of the Agreement, 'Net Proceeds' shall mean all non-refundable revenues *actually received in the United States* from all sources worldwide by MTV Networks … in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming service)" (emphasis added).    Thus, even if MTV's interpretation of this provision was correct, the definition contains an unmistakable limitation: the revenue must have been actually received in the United States.    Accordingly, if MTV Denmark received direct payment for the advertising placed during the episode of *Making the Band* which aired in Denmark, this revenue stream would not be excluded under MTV's interpretation of the Net Proceeds Definition and would properly be considered as part of the calculation as to what is owed to Trans Continental.

Second, even if MTV's interpretation of the Net Proceeds definition was correct and Trans Continental was not entitled to share in the advertising revenues, neither the Agreement nor the Amended Agreement even remotely address the issue of product placement or product integration deals.    Nowhere, for example, is it specified that the revenue generated by MTV from product placement or product integration deals is to be treated as advertising revenue.

The importance of this point cannot be understated.    Within the entertainment world, revenue received from product placement deals is typically used to off-set production costs. MTV's own documents suggest that this is precisely how MTV treated its product placement revenue.  (*See* MTVN 000287, MTVN 00364-65 and MTVN 003717-3718, true and correct copies of which were previously filed under seal as Exhibit I to Trans Continental's Motion to

Compel Better Interrogatory Responses) [D.E. 19]. Accordingly, this revenue has a direct and immediate impact on the production costs, which, in turn, have a direct and immediate impact on the ultimately profitability of the particular seasons of *Making the Band*.

Consequently, the relevancy of the documents sought by Request No. 55 lies beyond reason dispute, and MTV must produce documents responsive to this request.

### E.    Requests for Production 72, 74-75, and 80-84[9]

**Request No. 72**

Any and all documents that refer, relate to, reflect, concern or evidence the amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received in connection with the broadcast of *Making the Band 2* in the United States or any other country, territory or province.

**Request No. 74**

Any and all documents that discuss, reference, relate to or evidence the rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during season three of *Making the Band*.

**Request No. 75**

Any and all documents that discuss, reference, relate to or evidence the rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

**Request No. 80**

Any and all documents that discuss, reference, relate to or evidence any communications between MTV and any third party regarding the rate to advertise during season three of *Making*

---

[9]    In that they are thematically-related, Requests 72 and 74 through 84 are once again being grouped together, despite MTV's slightly varied objections. The basis for the Motion to Compel is identical with respect to all of these requests.

*the Band*, or any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

**Request No. 81**

Any and all documents that discuss, reference, relate to or evidence every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in selling advertisement spots in connection with season three of *Making the Band*, or any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

**Request No. 82**

Copies of all sales or advertising contracts between MTV and any third-party relating to the purchase of advertisement spots in connection with season three of *Making the Band*, or any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

**Request No. 83**

Any and all documents that discuss, reference, relate to or evidence any software program used by MTV to track and manage its advertising inventory (*e.g.,* Wide Orbit, Inventory Explorer, etc.).

**Request No. 84**

Any and all documents that discuss, reference, relate to or evidence any software program used by MTV to ensure the proper placements of its advertisements.

**MTV'S RESPONSE**

In response to Request Nos. 72, 74, 75, 80, 81, 82, 83 and 84, MTV objected as follows:

"MTVN objects to this request because it is overburdensome [sic] and seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. Pursuant to Paragraph 9 of the Amended Agreement, 'with respect to the third season [of Making the Band 1] and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount

21

equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A.'   In turn, Schedule A of the Amended Agreement excludes advertising revenue from the Net Proceeds calculation; specifically, Schedule A defines 'Net Proceeds', in part, as 'all non-refundable revenues … (excluding exhibition of MTVN worldwide programming service)'"

### F.    **Requests for Production 76-79.**

**Response No. 76**

Any and all documents that discuss, reference, relate to or evidence the average revenue amount generated by MTV in connection with a single episode of season three of *Making the Band.*

**Response No. 77**

Any and all documents that discuss, reference, relate to or evidence the average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 2.*

**Response No. 78**

Any and all documents that discuss, reference, relate to or evidence the average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 3.*

**Response No. 79**

Any and all documents that discuss, reference, relate to or evidence the average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 4.*

## MTV'S RESPONSE

In response to Request Nos. 76-79 MTV objected as follows:

"MTVN objects to this request because it is overburdensome [sic] and seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. Pursuant to Paragraph 9 of the Amended Agreement, 'with respect to the third season [of Making the Band 1] and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A.'   In turn, Schedule A of the Amended Agreement defines 'Net Proceeds', in part in a particularized manner, specifying that only certain revenues, expenses and deduction [sic] are to be included in the calculation of Net Proceeds.   Furthermore, pursuant to Schedule A of the Amended Agreement, Net Proceeds, if any, are to be accounted for on a "semi-annual basis," and not an episode-by-episode basis.   The "average revenue" per episode is therefore irrelevant and overburdensome.

## The Basis for the Motion to Compel:

Reduced to it essence, MTV's objection to Request Nos. 72 and 74 through 84 is that since Trans Continental is purportedly not entitled to share in the advertising revenues earned from *Making the Band*, it is not entitled to learn anything about these revenues.   This objection is erroneous for a number of reasons.

First, as noted above, while MTV is certainly permitted to argue that Trans Continental is not entitled to share in the advertising revenues, there has been no finding that this is the proper interpretation of the Net Proceeds Definition.   The proper interpretation of this provision remains subject to debate, as it is not the model of clarity that MTV professes.

Furthermore, even if MTV's interpretation of the Net Proceeds Definition was correct,

the mere fact that Trans Continental is not entitled to share in the advertising revenue does not mean that the advertising revenue has no bearing on, or relevance to, the claims and defenses of this action. As imparted by the United State Supreme Court, relevancy is to be construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund,* 437 U.S. at 351. At issue in this case is the amount of money which MTV owes to Trans Continental in connection with *Making the Band.* The amount of money which MTV made from *Making the Band* is undeniably relevant to this analysis, and gives context to the purpose and meaning of the other contractual provisions. Additionally, Trans Continental is entitled to review ***which*** revenues MTV is categorizing as "advertising revenue" to ensure that these revenue is properly allocated and characterized.[10]

In light of this fact, MTV should be ordered to produce all documents responsive to Request Nos. 72 and 74 through 82.

### III.    CERTIFICATE OF GOOD FAITH CONSULTATION

Pursuant to Local Rule 3.01(g), the undersigned counsel conferred with MTV's counsel on January 13, 2009 in an effort to resolve the issues raised in this motion but they were unable to reach agreement thereon. (A true and correct copy of the undersigned's January 13, 2009 correspondence is attached here to as **Exhibit C**).

---

[10]   To the extent that it truly does not exist on a per-episode basis, Trans Continental will take whatever documents that exist which reveal the amount of advertising revenue received by MTV in connection with *Making the Band.*

## IV.  CONCLUSION

Based on the foregoing, MTV should be compelled to sufficiently produce the following documents requested in Trans Continental's First Request of Production of Documents and Things: Request Nos. 11-13, 16, 24-29, 40-44, 46-49, 51-63, 67-69, 71-72, 74-84 and 86-92. Further, MTV should be required to pay Trans Continental's reasonable attorneys' fees and costs in bringing this motion.

Dated:    January 21, 2009

Respectfully submitted,

**SILVERMAN COSGROVE & SAMMATARO**
*Special Litigation Counsel for Soneet R. Kapila,*
*as Chapter 11 Trustee for the bankruptcy estate of*
*Trans Continental Television Productions, Inc.*
One Biscayne Tower
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone:  (305) 377-1666
Facsimile:  (305) 377-1664
jsammataro@scs-legal.com


By: */s/ James G. Sammataro*
     JAMES G. SAMMATARO
     Florida Bar No. 0520292

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 21, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a notice of the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF. Additionally, copies of the exhibits which are being filed under seal are being hand-delivered to:

**Carol C. Lumpkin, Esq.**
K& L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

> _/s/ James G. Sammataro_
> Attorney

# EXHIBIT A

## Exhibit "A"[1]

**Request No. 24**

      Any and all documents that refer, relate to, reflect, concern or evidence the production costs for each of the three seasons of *Making the Band*.

**Request No. 40**

      Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with Da Band's album, *Too Hot for TV*.

**Request No. 41**

      Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with Danity Kane's eponymous album, *Danity Kane*.

**Request No. 42**

      Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with Danity Kane's follow-up album, *Welcome to the Dollhouse*.

**Request No. 43**

      Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with Donnie Klang's album, *Just Like a Rolling Stone*.

**Request No. 44**

      Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with Day 26's eponymous album, *Day 26*.

---

[1]   To each and every request listed on this Exhibit, MTV provided:

    "MTVN will produce (subject to the parties' confidentiality agreement) responsive, non-privileged documents to the extent that such documents exist and are in its possession, custody or control."

**Request No. 51**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with the merchandise of either Da Band or *Making the Band 2*.

**Request No. 52**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with the merchandise of either Danity Kane or *Making the Band 3*.

**Request No. 53**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with the merchandise of Donnie Klang, Day 26 and/or *Making the Band 4*.

**Request No. 54**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with DVD sales of *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

**Request No. 56**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with home video sales of *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

**Request No. 57**

Any and all documents that refer, relate to, reflect, concern or evidence any funds

received by MTV in connection with the publishing rights (both print and music) for *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

**Request No. 58**

    Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with the publishing rights (both print and music) relating to O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26.

**Request No. 59**

    Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with the websites for the *Making the Band* web-site, including any and sites which link to or otherwise relate to *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

**Request No. 60**

    Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with the websites for the O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26.

**Request No. 61**

    Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with either the domestic or foreign distribution of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

**Request No. 62**

    Any and all documents reflecting payments made by MTV to Trans Continental

Television Productions for Trans Continental's share of the distribution rights to *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

**Request No. 63**

Any and all documents that refer, relate to, reflect, concern or evidence any funds received by MTV in connection with international program sales from *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

**Request No. 67**

Any and all documents that refer, relate to, reflect, concern or evidence any license, affiliate, program sales or distribution agreements that MTV has entered into with any party involving *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

**Request No. 68**

Any and all documents that refer, relate to, reflect, concern or evidence each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the distribution (both foreign and domestic) of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

**Request No. 69**

Any and all documents that refer, relate to, reflect, concern or evidence each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the licensing of the television programs, *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

**Request No. 86**

Any and all documents that refer, relate to, reflect, concern or evidence the number of re-runs of seasons three of *Making the Band*.

**Request No. 87**

Any and all documents that refer, relate to, reflect, concern or evidence the number of re-runs of any season of *Making the Band 2*.

**Request No. 88**

Any and all documents that refer, relate to, reflect, concern or evidence the number of times any episode of any season of *Making the Band 2* has been re-broadcast.

**Request No. 89**

Any and all documents that refer, relate to, reflect, concern or evidence the number of re-runs of any season of *Making the Band 3*.

**Request No. 90**

Any and all documents that refer, relate to, reflect, concern or evidence the number of times any episode of any season of *Making the Band 3* has been re-broadcast.

**Request No. 91**

Any and all documents that refer, relate to, reflect, concern or evidence the number of re-runs of any season of *Making the Band 4*.

**Request No. 92**

Any and all documents that refer, relate to, reflect, concern or evidence the number of

times any episode of any season of *Making the Band 4* has been re-broadcast.

# EXHIBIT B



**Page 1**

```
 1
 2    IN THE UNITED STATES BANKRUPTCY COURT
 3    MIDDLE DISTRICT OF FLORIDA
 4    ORLANDO DIVISION
 5    Case No. 6:07-bk-007651-ABB
 6    Jointly Administered
 7    Chapter 11
 8    Adv. No.:  6:08-ap-00157-ABB
 9    --------------------------------x
10    In re:
      LOUIS J. PEARLMAN, et al
11         Debtor.
      --------------------------------x
12    SONEET KAPILA, Chapter 11 Trustee for
      TRANS CONTINENTAL TELEVISION PRODUCTIONS,
13    INC.,
           Plaintiffs,
14         v.
      MTV NETWORKS COMPANY,
15         Defendant.
      --------------------------------x
16         January 12, 2009
17         10:10 a.m.
18
           Deposition of KAREN ABDUL,
19    pursuant to Notice, held at the offices of
20    K&L Gates LLP, 599 Lexington Avenue, New
21    York, New York, before Jineen Pavesi, a
22    Registered Professional Reporter,
23    Registered Merit Reporter, Certified
24    Realtime Reporter and Notary Public of the
25    State of New York.
```

**Page 2**

```
 1
 2    A P P E A R A N C E S:
 3    SILVERMAN COSGROVE & SAMMATARO, ESQS.
 4    One Biscayne Tower
 5    2 South Biscayne Boulevard, Suite 2650
 6    Miami, Florida 33131
 7         Attorneys for Soneet R.
 8         Kapila, as Chapter 11
 9         Trustee for the bankruptcy
10         estate of Trans Continental
11         Television Productions, Inc.
12    BY:    LAWRENCE SILVERMAN, ESQ.
13         lsilverman@scs-law.com
14
15    K&L GATES LLP
16    Wachovia Financial Center
17    200 South Biscayne Boulevard, Suite 3900
18    Miami, Florida 33131-2399
19         Attorneys for MTV Networks
20         Company
21    BY:    CAROL C. LUMPKIN, ESQ.
22         carol.lumpkin@klgates.com
23
24    ALSO PRESENT:
25    Lavatus Powell
```

**Page 3**

```
 1
 2         S T I P U L A T I O N S
 3
 4         IT IS HEREBY STIPULATED AND AGREED by
 5    and between the Attorneys for the
 6    respective parties hereto that filing and
 7    sealing be and the same are hereby waived.
 8         IT IS FURTHER STIPULATED AND AGREED
 9    that all objections except as to the form
10    of the question, shall be reserved to the
11    time of the trial.
12         IT IS FURTHER STIPULATED AND AGREED
13    that the within examination may be signed
14    and sworn to before any notary public with
15    the same force and effect as though signed
16    and sworn to before this Court.
17    K A R E N   A B D U L,
18    having first been duly sworn by a Notary
19    Public of the State of New York, was
20    examined and testified as follows:
21    EXAMINATION BY
22    MR. SILVERMAN:
23    Q.    Good morning.
24    A.    Morning.
25    Q.    Can you state your name for
```

**Page 4**

```
 1              ABDUL
 2    the record, please.
 3    A.    Karen Abdul.
 4    Q.    Can you give me your current
 5    place of employment.
 6    A.    MTV Networks.
 7    Q.    What's your current position?
 8    A.    Manager of international
 9    ancillary business operations.
10    Q.    How long have you held that
11    title?
12    A.    Since May of 2007.
13    Q.    Have you ever had your
14    deposition taken before?
15    A.    No, first time.
16    Q.    Let me just give you, I presume
17    your attorney has told you some of the
18    ground rules, but I will just kind of go
19    over them pretty briefly.
20         You're the guest of honor,
21    which means if you need to take a break,
22    everything stops because we take a break.
23         If I ask a question and you
24    answer the question, I am going to presume
25    that you understood the question, so if
```

**Page 5**

ABDUL

1
2  you don't understand, let me know.
3          As everything you are saying is
4  being typed out, you can't say uh-huh or
5  um-hum, you have to answer yes or no,
6  which instinctively takes a little
7  training as well.
8          And at the same time, you can't
9  nod your head, you have to answer audibly.
10         Can you give me kind of a brief
11 background of your education starting from
12 after high school.
13     A.    I went to Brooklyn College and
14 I received a bachelors of science degree
15 in accounting.
16         I have an MBA, masters of
17 business administration, in management
18 from University of Phoenix on-line.
19     Q.    When did you graduate college?
20     A.    1997.
21     Q.    What did you do after
22 graduating college?
23     A.    I started working for a record
24 company called EMI.
25     Q.    What was your position at EMI?

**Page 7**

ABDUL

1
2  called Random House.
3      Q.    What did you do at Random
4  House?
5      A.    I was a business analyst.
6      Q.    Were you a business analyst in
7  any specific line of the company's
8  operation?
9      A.    Sales and marketing.
10     Q.    Sales and marketing for any
11 specific products?
12     A.    Their books.
13     Q.    How long were you at Random
14 House?
15     A.    Eight months.
16     Q.    Where did you go next?
17     A.    Edel Entertainment.
18     Q.    What is Edel Entertainment,
19 what does it do?
20     A.    It was a record company.
21     Q.    What did you do at Edel?
22     A.    Manager of mechanical
23 royalties.
24     Q.    How long did you hold that
25 position?

**Page 6**

ABDUL

1
2      A.    Artist royalty accountant.
3      Q.    Do you have a CPA?
4      A.    No.
5      Q.    What did you do as an artist
6  royalty accountant?
7      A.    At EMI, I paid the artists
8  royalties from whatever sale of their
9  albums.
10     Q.    How long did you hold that
11 title?
12     A.    For a year-and-a-half.
13     Q.    What did you do then?
14     A.    I was promoted to supervisor.
15     Q.    Supervisor of what?
16     A.    Domestic royalties.
17     Q.    Was that domestic royalties for
18 artists?
19     A.    Artists.
20     Q.    How long did you hold that
21 title?
22     A.    For about, I want to say, eight
23 months.
24     Q.    What did you do next?
25     A.    I went to another company

**Page 8**

ABDUL

1
2      A.    A year.
3      Q.    You said one year?
4      A.    One year.
5      Q.    Why did you leave Edel?
6      A.    The company went bankrupt.
7      Q.    Where did you go next?
8      A.    Universal Music Group.
9      Q.    Do you recall what year you
10 went to Universal?
11     A.    2002.
12     Q.    What was your title at
13 Universal?
14     A.    Senior royalty administrator.
15     Q.    How long did you have that
16 title?
17     A.    A year.
18     Q.    Royalty administrator, was that
19 royalties for artists?
20     A.    Artists.
21     Q.    What happened after one year?
22     A.    I was promoted to supervisor.
23     Q.    How long were you supervisor?
24     A.    For another year.
25     Q.    As supervisor of royalty

9

ABDUL
1
2  administration?
3      A.    Yes.
4      Q.    What happened after you were
5  supervisor of royalty administration?
6      A.    I left there and went to MTV.
7      Q.    Do you recall when that was?
8      A.    2004.
9      Q.    What was your title when you
10 joined MTV?
11     A.    Manager of participation
12 account.
13     Q.    How long did you hold that
14 title?
15     A.    I left -- I held it for two
16 years, almost three.
17     Q.    2004 to 2007?
18     A.    2007.
19     Q.    How did your title change in
20 2007?
21     A.    I transitioned to a new
22 department.
23     Q.    What new department was that?
24     A.    Into our ancillary business
25 operations group.

10

ABDUL
1
2      Q.    What was your title at
3  ancillary business operations?
4      A.    Manager.
5      Q.    What were your job
6  responsibilities as manager of
7  participation?
8      A.    My responsibilities was to
9  manage the department and to make sure
10 that all participation statements were
11 sent out on a timely basis.
12     Q.    As a manager, who did you
13 report to?
14     A.    At the time when I got there, I
15 reported to Rob Harrison.
16     Q.    That's in 2004?
17     A.    2004.
18     Q.    Did that change?
19     A.    Yes, it did.
20     Q.    Who did that change to?
21     A.    It changed to Laura Dorson.
22     Q.    Do you recall when?
23     A.    2005.
24     Q.    Do you know where Mr. Harrison
25 went or how his job changed?

11

ABDUL
1
2      A.    His position was eliminated.
3      Q.    Do you recall what his position
4  was?
5      A.    Director.
6      Q.    What was Laura's position?
7      A.    Senior director.
8      Q.    They got rid of an intermediate
9  director slot?
10     A.    Yes.
11     Q.    Did anyone report to you when
12 you were manager of participation?
13     A.    Yes.
14     Q.    Who?
15     A.    Three people.
16     Q.    The same three people the whole
17 time?
18     A.    Yes.
19     Q.    Who were they.
20     A.    Charlene Simon, Millicent
21 Bennett, and Guy Lobianco.
22     Q.    Did Charlene, Millicent and Guy
23 have the same title?
24     A.    Yes.
25     Q.    What was that title?

12

ABDUL
1
2      A.    Senior participation
3  accounting.
4      Q.    Were your responsibilities only
5  for domestic participation or did it
6  include international?
7      A.    It included international.
8      Q.    Give me an example, say you
9  have a new project that you are going or
10 you were going to be administrating when
11 you were the director of participation;
12 how would a new project be started?
13     A.    Clarification; I was not the
14 director, I was the manager.
15     Q.    I apologize.
16          As the manager, a new series
17 comes on MTV and there is going to be some
18 kind of participation element.
19          Administratively, how does that
20 come to you and how do you decide who gets
21 what?
22          MS. LUMPKIN:  I object on the
23 form and I object as to speculation.
24          This is a hypothetical.
25          MR. SILVERMAN:  I want to --

13

ABDUL
1
2       MS. LUMPKIN:  Is it a
3   hypothetical as far as if something were
4   to happen, then what would happen?
5       MR. SILVERMAN:  Yes.
6       Q.    If there is a new show, tell me
7   how it comes to you and how it gets put
8   into the computer system and who takes
9   responsibility for it.
10      MS. LUMPKIN:  If you understand
11  the question, you can answer.
12      A.    If there is a new show, our
13  business and legal department will let us
14  know that there is a new show that has
15  come out, they will provide us with all of
16  the necessary legal documents in order to
17  compile the information for the
18  participation statement.
19      We will go to the different or
20  various departments that can give us the
21  information and we will get that
22  information and then compile the
23  information on our participation
24  statements.
25      Q.    Was there a specific piece of

15

ABDUL
1
2   computer system you would save that stuff?
3       A.    We would save it in our files.
4       Q.    Do you recall whether it was
5   saved on the network or whether it was
6   saved on a local PC or on a disk, do you
7   recall specifically where those files
8   would have been saved?
9       A.    It would have been saved on our
10  share drive.
11      Q.    Tell me a little bit about what
12  you recall of the computer network when
13  you were working on that.
14      Would you and your subordinates
15  be accessing the same share drive to work
16  on the Excel spreadsheets?
17      A.    Yes.
18      Q.    Do you recall whether that
19  share drive had a specific name, a
20  departmental name?
21      A.    Yes, it did.
22      Q.    What was it called?
23      A.    Participation and tax.
24      Q.    Participation and tax?
25      A.    Yes.

14

ABDUL
1
2   software that your department would use to
3   track shows and to prepare participation
4   statements?
5       A.    No.
6       Q.    What kinds of software would
7   you use?
8       A.    Our participation statements
9   were all manual, so it was all through
10  Excel spreadsheets.
11      Q.    Say you're doing four
12  participation statements a year -- again,
13  this is just as an example -- would you
14  save each quarterly participation
15  statement as a separate Excel spreadsheet
16  or would you kind of type over the
17  previous one, tell me how it is on the
18  computer you would save a participation
19  statement that you were working on?
20      MS. LUMPKIN:  I object to form,
21  but go ahead, if you can answer.
22      A.    We would save each
23  participation statement every time we did
24  the participation statement.
25      Q.    Do you recall where on the

16

ABDUL
1
2       Q.    Where does the tax part of that
3   come from?
4       A.    At the time we had someone who
5   was also in our department that dealt with
6   tax that was reporting to Rob Harrison.
7       Q.    Do you recall whether you could
8   access that share drive when you were not
9   working at your desk, could you access it
10  from home and work from home?
11      A.    No.
12      Q.    Do you recall whether you had
13  any knowledge or responsibility for the
14  backups of that share drive where those
15  Excel spreadsheets would be somewhere
16  other than on the share drive as a backup?
17      A.    I am not understanding your
18  question.
19      Q.    Did you have any responsibility
20  for backing up the share drive, the
21  contents of the data that were there?
22      A.    No.
23      Q.    Would there have been anywhere
24  else to look for one of those Excel
25  spreadsheets if for some reason it wasn't



17

ABDUL
1
2  on the share drive?
3    A.    No.
4    Q.    Just getting back on the
5  ancillary business.
6         In 2007 you transitioned as
7  manager of ancillary business; how long
8  did you have that title?
9    A.    I still have it right now.
10   Q.    Since you graduated college,
11 you took MBA courses at the University of
12 Phoenix?
13   A.    Yes.
14   Q.    Did you have any specialty or
15 specialization within your MBA?
16   A.    It was just management.
17   Q.    Have you taken any classes in
18 entertainment-related accounting or
19 specialty areas since you graduated?
20   A.    No.
21   Q.    When you were manager of
22 participation, what was the physical
23 address of your office, where were you
24 working?
25   A.    1515 Broadway.

18

ABDUL
1
2    Q.    When you worked for MTV, have
3  you always worked at 1515 Broadway?
4    A.    Yes.
5    Q.    In your jobs at MTV, do you
6  know exactly which corporate entity was
7  your employer, did you work for MTV, Inc.;
8  who is your employer?
9         MS. LUMPKIN:  Object to form.
10        Go ahead and answer.
11   A.    It is MTV Networks.
12   Q.    Has MTV Networks always been
13 your employer?
14   A.    Yes.
15   Q.    Is that the name that's always
16 appeared on your paychecks?
17   A.    Yes.
18   Q.    How is labor divided or how was
19 labor divided between your three
20 subordinates when you were working in
21 participation, who did what?
22   A.    It was based on the channel,
23 there is different channels underneath MTV
24 Networks and different shows.
25        So everyone underneath me had a

19

ABDUL
1
2  specific channel and had certain shows
3  that they had to work on.
4    Q.    Do you recall who would have
5  been responsible for the Making of the
6  Band show?
7    A.    Yes.
8    Q.    Who was that?
9    A.    Millicent Bennett.
10   Q.    Do you know whether Ms. Bennett
11 is still employed by MTV?
12        MS. LUMPKIN:  Objection, asked
13 and answered, but you can answer.
14   A.    Yes, she is.
15   Q.    Do you know what her current
16 title is?
17   A.    It is the same.
18   Q.    Do you know who the current
19 manager of participation is?
20   A.    The current manager is Laura
21 Dorson.
22   Q.    When you were in participation,
23 you reported to Ms. Dorson; the position
24 that you used to have in participation,
25 does that still exist?

20

ABDUL
1
2    A.    Yes.
3    Q.    Ms. Dorson has that position?
4    A.    No, Ms. Dorson is the
5  vice-president.
6    Q.    Who has your old position?
7    A.    Irene Stevenson.
8    Q.    Do you still interact with
9  Laura Dorson?
10   A.    Yes.
11   Q.    How often?
12   A.    Not that often.
13   Q.    Do you know whether she is
14 still at work on a regular basis?
15   A.    Yes.
16   Q.    I had understood that she had
17 been out of the office for some time; do
18 you know why that was?
19        MS. LUMPKIN:  Objection, calls
20 for speculation, unless the witness knows.
21   Q.    Obviously if you don't know,
22 you don't know; do you know?
23   A.    No.
24   Q.    Has your current group been
25 affected by Viacom layoffs?

6 (Pages 21 to 24)

---

21

ABDUL

2   A.   Yes.
3   Q.   Tell me about that.
4   A.   Our international regional
5   departments have been affected.
6   Q.   Is there a specific percentage?
7   A.   I don't know.
8   Q.   Of the folks who report to you,
9   is anyone impacted by the layoffs?
10  A.   No.
11  Q.   Do you interact with Irene
12  Stevenson?
13  A.   Limited basis.
14  Q.   Have there ever been occasions
15  in which after you left the participation
16  group you interacted with those folks to
17  discuss things that happened while you
18  were there?
19       MS. LUMPKIN:  I object to form,
20  what folks, anybody specifically?
21       MR. SILVERMAN:  Nobody
22  specifically.
23       MS. LUMPKIN:  Just the
24  department?
25       MR. SILVERMAN:  Just the

---

22

ABDUL

2   department.
3   A.   Yes, I interact.
4   Q.   Tell me about that, to the
5   extent that you remember those occasions.
6   A.   They may ask me to just
7   remember something, a procedure that we
8   did, but nothing too extreme.
9   Q.   Other than lawyers, has anybody
10  asked you about how the participations
11  were treated for any of the Making of the
12  Band shows?
13  A.   No.
14  Q.   What did you do to prepare for
15  today's deposition?
16       MS. LUMPKIN:  Objection; if it
17  is going to approach any kind of work
18  product.
19  Q.   I am going to ask you a couple
20  of questions, for instance, I am going to
21  ask you did you meet with Ms. Lumpkin,
22  that's a yes or no question, you're not
23  allowed to talk about what you discussed,
24  but you can just say, yes, I met with that
25  person; if I ask you who did you meet

---

23

ABDUL

2   with, you can say who you met with, but
3   you are not going to say what you talked
4   about, do you understand?
5   A.   Yes.
6   Q.   Who did you speak with in
7   preparation for today's deposition?
8   A.   My attorney, Carol Lumpkin.
9   Q.   Anybody else?
10  A.   And Mr. Powell, the other
11  attorney.
12  Q.   Did you speak with anybody at
13  MTV Networks who is not an attorney?
14  A.   No.
15  Q.   Have you ever had any
16  discussions with anybody at MTV Networks
17  about this lawsuit?
18  A.   No --
19  Q.   Other than attorneys.
20  A.   No.
21  Q.   Prior to receiving notice of
22  this deposition, did you know about this
23  lawsuit?
24  A.   No.
25  Q.   Did you speak with Virginia

---

24

ABDUL

2   McPherson about this lawsuit at any point?
3   A.   No.
4   Q.   Have you ever spoken to
5   Virginia McPherson?
6       MS. LUMPKIN:  Object to form;
7   ever in the five years she has been there?
8       MR. SILVERMAN:  Yes.
9   A.   I have had contact with
10  Virginia.
11  Q.   Tell me about your business
12  contacts with Virginia?
13       MS. LUMPKIN:  I will object as
14  to any kind of attorney-client privilege
15  because Virginia is a lawyer, so anything
16  dealing with legal issues she is not to
17  address.
18       Anything else you want to
19  specifically ask about, you can.
20  Q.   In what context would you be
21  speaking with Ms. McPherson?
22  A.   In regards to the contract for
23  any of the MTV shows, if there is any
24  information that we needed from her, let's
25  say, an address or particular participant,

---

25

ABDUL
1  we will request that information from her.
2  Q.    If you were working on a
3  participation report for a specific show,
4  would the determination of what percentage
5  the participant gets, would that be a
6  decision made by your department or by
7  Ms. McPherson's department?
8  A.    It would be based on what is
9  stipulated in the agreement and that's
10  probably what compiles the information.
11  Q.    Would your department read the
12  agreement or would Ms. McPherson interpret
13  the agreement for you?
14  MS. LUMPKIN: I object with
15  regard to any kind of attorney-client work
16  product privilege.
17  A.    I am not an attorney, so based
18  on the agreement terms is what we use to
19  compile any participation information.
20  Q.    It would be fair to say you
21  read the agreement and you determined what
22  you felt the agreement said?
23  A.    Correct.
24  Q.    For the Making of the Band
25

26

ABDUL
1  shows, do you recall whether you were the
2  one who read the agreement and determined
3  what it said or whether a predecessor of
4  yours made that determination?
5  MS. LUMPKIN: I object; can you
6  clarify Making the Band, meaning all of
7  them?
8  MR. SILVERMAN: Any of them.
9  A.    Just to clarify, I worked on
10  Making the Band I and Making the Band II,
11  and we read the the agreement; based on
12  whatever the provisions were in the
13  agreement, whatever the information was
14  given in the information is what we used
15  to compile the information for the
16  participation.
17  Q.    Do you know who if anyone
18  worked on Making the Band III?
19  A.    No.
20  Q.    You took over your role as
21  manager of participation in 2004, correct?
22  A.    Correct.
23  Q.    At that time being of the
24  Making the Band shows had already been on
25

27

ABDUL
1  the air, correct?
2  A.    Correct.
3  Q.    As for the participation for
4  the shows that had already been on the
5  air, who did the participation analysis
6  for those shows?
7  MS. LUMPKIN: I am going to
8  object as to form and clarification as to
9  which Making the Band.
10  MR. SILVERMAN: Any.
11  MS. LUMPKIN: She just answered
12  that she was responsible for I and II.
13  Q.    1 and 2 had aired at the time
14  you came to MTV, correct?
15  A.    Correct.
16  Q.    Had someone prior to your
17  arrival done participation analyses and
18  participation reports for those shows?
19  MS. LUMPKIN: I object as
20  speculation; if the witness know, she can
21  answer.
22  A.    I don't know what someone did
23  prior to me coming there in 2004; I can
24  only talk about what I did from 2004 up
25

28

ABDUL
1  until the time I left in May 2007.
2  Q.    Let me show you what we're
3  going to mark as Exhibit 1.
4  ( Exhibit 1, participation
5  statement, was marked for identification,
6  as of this date.)
7  (Witness perusing document.)
8  Q.    Have you ever seen this
9  document before?
10  A.    Yes.
11  Q.    Can you describe it for me.
12  A.    This is a participation
13  statement.
14  MS. LUMPKIN: Before we go on,
15  just for clarity of the record, can we
16  make sure that it is a composite exhibit,
17  because it is a letter and participation
18  statement, I just want to make sure.
19  MR. SILVERMAN: Yes, we will
20  mark it as composite Exhibit 1.
21  MS. LUMPKIN: Thank you.
22  Q.    Take a look on the front page,
23  there is a letter dated September 28,
24  2005, and then attached to it are a number
25

8 (Pages 29 to 32)

29

ABDUL
1
2  of pages.
3          Can you tell me which of these
4  pages would have gone with the letter?
5      A.    The entire packet.
6      Q.    Take a look, there are some
7  letters attached to it as well.
8          (Witness perusing document.)
9      A.    Can I give you the numbers at
10  the bottom?
11     Q.    Yes.
12     A.    MTVN 00048 through MTVN 00056,
13  that would have went to the participant.
14          MS. LUMPKIN:  Clarification for
15  the record; I don't know if you're asking
16  this next, but can you ask the witness
17  which one of these numbers she is familiar
18  with, because when you asked, she said she
19  is familiar.
20          MR. SILVERMAN:  I am getting
21  there.
22          MS. LUMPKIN:  Thank you.
23     Q.    Which of the pages between page
24  48 and page 56 would your group have been
25  responsible for preparing?

30

ABDUL
1
2      A.    We would have compiled the
3  information from MTVN 50 through MTVN
4  0056.
5      Q.    When you say compiled the
6  information, would the actual page
7  printout here, would that have been
8  generated here by your group or would it
9  have been generated by legal based on
10  information you gave them?
11     A.    It would have been generated by
12  our group.
13     Q.    That would hold for pages 50
14  through 56, that those would have been
15  generated by your group?
16     A.    Correct.
17     Q.    Page 49 is a check; who within
18  the MTV structure actually issued the
19  checks based on participation?
20     A.    We would reach out to the
21  participation group or reach out to the
22  accounts payable department in order to
23  get an issuance of a check.
24     Q.    Would you fill out some kind of
25  check requisition form?

31

ABDUL
1
2      A.    Yes.
3      Q.    Did you keep copies of the
4  check requisition forms in the files in
5  your group?
6      A.    I don't recall.
7      Q.    The front page is a letter from
8  Virginia McPherson.
9          Was this letter, do you know,
10  whether it was generated by your group or
11  by Ms. McPherson?
12     A.    This was generated by
13  Ms. McPherson.
14     Q.    On the bottom there are ccs to
15  Jeff Kranzdorf, Karen Abdul and Brad
16  Hazzard.
17          Do you know why Mr. Kranzdorf
18  and Mr. Hazzard were cc'd?
19     A.    No, I don't.
20     Q.    You can turn to page 50, it is
21  a summary of proceeds due participant and
22  it has got a couple of entries there, the
23  first is merchandising proceeds
24  calculation.
25          Can you give me a summary of

32

ABDUL
1
2  how it is you would go about determining
3  and calculating that amount.
4      A.    We do not calculate any of
5  these numbers that are on this statement,
6  we reach out to the different departments
7  in order to get a compilation of all of
8  the merchandising revenue from these
9  different departments.
10          Once we have received them,
11  then we will compile this information into
12  our participation statement.
13     Q.    Was there a memo in your
14  department that would summarize which
15  participants get which kinds of money?
16          MS. LUMPKIN:  I am going to
17  object to form.
18     Q.    I will give you an example; for
19  instance, if you had a participation with
20  someone out there that didn't include
21  merchandise proceeds, your department
22  would calculate participation statements
23  on a periodic basis.
24          Was there a summary memo that
25  told you who got what under the



33

ABDUL

1  agreements?
2      MS. LUMPKIN: I object,
3  mischaracterization of testimony; she said
4  her department did not calculate.
5      Q.    My question is, is there a
6  memo that would memorialize or remind the
7  people in your department what the
8  participants would be getting on a regular
9  basis?
10     A.    I really don't understand your
11 question.
12     Q.    I will give you an example.
13         If MTV has a deal with a given
14 partner out there in which that partner is
15 not going to share in home video proceeds
16 and you've got another partner on a
17 different show who does share in home
18 video proceeds, was there some kind of
19 document or memo in your department where
20 you would be able to look and see that
21 this partner doesn't get that money so
22 that when you're preparing the
23 participation statements you know which
24 items are supposed to be included?

34

ABDUL

1      MS. LUMPKIN: I am going to
2  object as to compound and form, but if you
3  can answer.
4      A.    We go by the contracts and
5  that's all the information that we have.
6      Q.    So every time you do the
7  participation statements, you go back to
8  the same contract?
9      A.    Correct.
10     Q.    If you do four participation
11 statements a year, you go back to the
12 contract four times a year?
13     A.    Correct.
14     Q.    And there is no other documents
15 summarizing the terms of the contract?
16     A.    No.
17     Q.    For the partial participation
18 statement that's in front of you, there is
19 a merchandising proceeds calculation of
20 7,888; do you know what department makes
21 that calculation?
22     A.    It would have come from the
23 merchandising department.
24     Q.    The music publishing proceeds

35

ABDUL

1  calculation is 7,997; where would your
2  department get that number from?
3      A.    It would have came from the
4  music public department.
5      Q.    The last one is international
6  program sales calculation, 107,400, where
7  would you get that number?
8      A.    From the international program
9  sales department.
10     Q.    The next page is 51, it says
11 merchandising proceeds calculation; which
12 of these numbers would come from the
13 merchandising department?
14     A.    All of those numbers.
15     Q.    There is a less payments made
16 to date number of 224,225, that is listed
17 as payments made to date; who would track
18 payments made to date, your department or
19 merchandise?
20     A.    Because this is a cum
21 statement, we would have known from a
22 previous statement that we had already
23 paid $224,225.
24     Q.    So the tracking for the prior

36

ABDUL

1  payments would be from your department?
2      A.    As I stated, it would have been
3  from a previous statement.
4      Q.    But who would have been looking
5  at the previous statements, your
6  department or the merchandising proceeds
7  department?
8      A.    It would have been our
9  department.
10     Q.    There is a less expenses of
11 direct cost and O-Town shares that's
12 listed in the document; in tracking shares
13 for O-Town, would that have been the
14 responsibility of your department or
15 merchandising proceeds department?
16     A.    I am not a hundred percent
17 sure.
18     Q.    I am going to jump ahead for a
19 moment.
20         I know you worked on Making the
21 Band I and 2.
22         There are some documents that
23 refer, and I believe it is Making the Band
24 III and forward, to Guts; have you ever

37

```
 1              ABDUL
 2   heard the term Guts before?
 3       A.    No.
 4       Q.    We will get to that.
 5             Next page is music proceeds
 6   publishing calculation and there is no
 7   setoff for payments made to date on this
 8   calculation.
 9             That determination of whether
10   payments had been made to date on music
11   publishing would have been your
12   department, correct, looking at the prior
13   spreadsheets and seeing whether payments
14   had previously been made?
15       A.    Correct.
16       Q.    Turn to page 54; if you look at
17   the bottom of page 54, there looks to what
18   appears to be a file name,
19   1204boyband.xls.
20             Do you recognize that?
21       A.    Yes.
22       Q.    What is that?
23       A.    The file name.
24       Q.    So would 1204 be the fourth
25   quarter of '04?
```

38

```
 1              ABDUL
 2       A.    Correct.
 3       Q.    And then boy band, that would
 4   refer to Making the Band?
 5       A.    Correct.
 6       Q.    Would all of the Making the
 7   Band participation statement files that
 8   would have been generated while you were
 9   in the participation department, would
10   they be designated as boy band?
11       A.    At the time, yes.
12       Q.    Look at page 54 and 55;
13   starting with page 55, which lists certain
14   revenues, do you know where there were
15   revenues received for countries other than
16   Canada, Germany, Sweden, and the U.K.?
17       A.    No.
18       Q.    Do you have any memory as to
19   how many countries Making the Band I and 2
20   aired in?
21       A.    No.
22       Q.    Page 55 is a breakdown from
23   April 1, 2003, through December 31, 2004.
24             Do you know why that breakdown
25   was calculated over about an 18-month
```

39

```
 1              ABDUL
 2   period?
 3             MS. LUMPKIN:  I am going to
 4   object to form; what do you mean by
 5   calculation, she already said she didn't
 6   calculate.
 7       Q.    Do you know why this form
 8   calculates those numbers over 18 months?
 9       A.    We requested information from
10   our international syndication department
11   and this is what they provided us.
12       Q.    Do you know why it is over 18
13   months as--
14       A.    You would have to speak to the
15   international department?
16       Q.    Turn to page 54; who would
17   provide your group with the direct
18   expenses for the international program
19   sales?
20       A.    Our finance department.
21       Q.    The MTV Networks finance
22   department; you say "our"?
23       A.    MTV Networks finance
24   department.
25       Q.    So that wouldn't come from the
```

40

```
 1              ABDUL
 2   international department?
 3       A.    Yes, they do have international
 4   department where you can also get expenses
 5   as well.
 6       Q.    Do you recall where you got
 7   them from when you were doing these
 8   calculations?
 9       A.    I don't recall.
10       Q.    The same question on page 56,
11   which is, there are $190,000 in direct
12   expenses listed for home video proceeds.
13             Do you recall whether that
14   information came from the MTV Networks
15   accounting department or whether it came
16   from the home video department?
17       A.    That came from the -- would
18   have probably came from MTV Networks.
19       Q.    Again, attached here is a
20   letter from Virginia McPherson to Jeffrey
21   Kranzdorf and that letter is referred to
22   on the front page.
23             Did you ever see the letter
24   from Ms. McPherson to Mr. Kranzdorf?
25       A.    This letter?
```



41

ABDUL

1
2  Q.    No, turn to page 57.
3       (Witness perusing document.)
4  A.    No.
5  Q.    And that letter is a response
6  to a letter from Mr. Kranzdorf to
7  Ms. McPherson of February 2, 2005?
8       MS. LUMPKIN:  I object, calls
9  for speculation, she said she has never
10 seen the letter, so she doesn't know.
11      MR. SILVERMAN:  That's what I
12 am about to ask.
13 Q.    Have you ever seen the letter
14 that Ms. McPherson is responding to?
15 A.    No.
16 Q.    When you were in the
17 participation department, you had stated
18 that Millicent was the subordinate
19 responsible for the Making the Band
20 preparation of the participation
21 statements.
22      Do you have any knowledge as to
23 who is responsible now?
24 A.    No.
25 Q.    Did you ever receive written or

42

ABDUL

1
2  oral instructions from anyone as to how
3  the participation statements for Making
4  the Band I and II should be prepared?
5  A.    No.
6  Q.    Did you ever have any
7  discussions, yes or no question,
8  regarding, with Ms. McPherson, regarding
9  how the participation statements should be
10 prepared?
11 A.    No.
12 Q.    Does each television program
13 that you worked on have a different
14 mechanism or formula under which the
15 participant was to be paid?
16 A.    Each participant has their own
17 contract, so there could be completely
18 different formatting for each participant.
19 Q.    Is there a standard formula
20 among those contracts?
21 A.    No.
22 Q.    Did any other television shows
23 that you worked on have an imputed license
24 fee component?
25 A.    Correct, they have.

43

ABDUL

1
2  Q.    There were other shows besides
3  this show?
4  A.    Yes.
5       (The following testimony is
6  marked confidential.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

44

ABDUL - CONFIDENTIAL

1
2  Q.    Can you tell me the other shows
3  that had an imputed license fee component.
4       MS. LUMPKIN:  I object based on
5  not just relevance, confidentiality and
6  we're going to have to designate this
7  confidential if she is going to be
8  speaking about other customers.
9       MR. SILVERMAN:  That's fine.
10      MS. LUMPKIN:  From this point
11 on please mark it as confidential and you
12 can answer the question.
13 A.    Off of the top of my head, Jack
14 Ass.
15 Q.    Do you know how the imputed
16 license fee worked in Jack Ass?
17 A.    I cannot remember.
18      (This ends confidential
19 portion.)
20
21
22
23
24
25

---

45

ABDUL

2  Q.    What's your recollection about
3  how the imputed license fee worked for
4  Making the Band, any of the shows, any of
5  the iterations of Making the Band?
6  A.    I would have to look at the
7  contract to see what the contract is
8  indicating.
9  Q.    We will get there.
10        What was your understanding of
11  what was meant by the term imputed license
12  fee?
13  A.    Imputed license fee was to take
14  a percentage of the production cost and
15  consider it as revenue.
16  Q.    At the time that you were in
17  the participation department, was there
18  someone else who was doing the
19  participation statements for Making the
20  Band III?
21  A.    At the time that I was in the
22  department?
23  Q.    Yes.
24  A.    No, we only worked on Making
25  the Band I and Making the Band II.

---

46

ABDUL

2  Q.    Did you ever have any
3  discussions with anyone about whether you
4  would be doing the participation
5  statements for Making the Band III?
6  A.    No.
7  Q.    Were you ever instructed to
8  prepare participation statement for Making
9  the Band III?
10  A.    No.
11  Q.    In looking at the exhibit I
12  showed you, was it common for
13  Ms. McPherson to write cover letters for
14  the participation statements, that you
15  know?
16  A.    That I know, from the time that
17  I was there, this was the first time that
18  she had done that.
19  Q.    Had you ever been copied by
20  her on any other participation statements
21  that were sent out?
22  A.    No.
23  Q.    Did you ever have any
24  discussions with anyone as to why this
25  participation statement was accompanied by

---

47

ABDUL

2  a letter from Ms. McPherson?
3  A.    No.
4  Q.    At the time that you were the
5  participation manager, you didn't have
6  anyone else at MTV Networks who was also
7  at the same level as you as participation
8  manager, correct?
9  A.    No.
10  Q.    Prior to sending out
11  participation statements, who were they
12  reviewed by?
13  A.    They would be reviewed by
14  business and legal affairs department.
15  Q.    Was that Ms. McPherson or did
16  that include other people as well?
17  A.    It mostly included Brad
18  Hazzard.
19  Q.    For Making the Band, any of the
20  Making the Band seasons, do you recall
21  whether there was one specific person who
22  would review the participation statements
23  or would it have been a combination of
24  people?
25  A.    For Making the Band I and II,

---

48

ABDUL

2  that I did, it was Brad Hazzard.
3  Q.    Were there ever any occasions
4  in which a participation statement had
5  been prepared by your department, gone to
6  Mr. Hazzard and then changed after that?
7  A.    No.
8  Q.    Again, yes or no question; in
9  conjunction with Mr. Hazzard's review of
10  the participation statements that we just
11  discussed, did you have any discussions
12  with him regarding those participation
13  statements?
14  A.    We would have discussions.
15  Q.    After the participation
16  statements would have been reviewed by
17  business and legal affairs, would the
18  check, if there was a check, be requested
19  at that time?
20  A.    The participation statement
21  would come back to us and then we would
22  request a check.
23  Q.    If the participation statement
24  had been reviewed by business and legal
25  and came back to you, was there a stamp or

---

49

ABDUL
1  some other indication that it had been
2  reviewed and approved, how did you know it
3  was reviewed and approved?
4      A.      Brad Hazzard would let us know.
5      Q.      Would he let you know in
6  writing, call you?
7      A.      Mostly he would call.
8      Q.      Did your check requisition
9  process for obtaining checks if the
10  participation statement was going to
11  include a payment, whatever form you had
12  to fill out, did that include a
13  requirement that the statement had been
14  reviewed by legal and business affairs?
15      A.      No.
16      Q.      You just knew it was part of
17  the procedure that you weren't going to
18  submit a requisition until it had been
19  approved?
20      A.      Exactly.
21      Q.      Did you ever have occasion in
22  which the participant, the person on the
23  other side of the participation statement,
24  objected to a participation statement that

51

ABDUL
1      A.      No, it depends on the scope of
2  the letter; if they are coming in to
3  audit, which is the right of the
4  participant, they have it in their
5  contract, then we will prepare for the
6  audit, but we would need the scope of the
7  letter saying they were coming in to
8  audit.
9      Q.      How would the audit work if
10  someone demanded an audit;
11  administratively, would they come to your
12  office?
13      A.      Depending on the terms in the
14  contract, letting us know, we would gather
15  all the information that the auditor is
16  requesting and then they will come into
17  our office and proceed with their audit
18  based on whatever information that they
19  are requesting.
20      Q.      Just ballpark, in the years
21  that you were the participation manager,
22  do you recall how many audits there were?
23      A.      Three.
24      Q.      Do you recall whether there was

50

ABDUL
1  they had received?
2      MS. LUMPKIN:  I object to form,
3  as to any show or as to --
4      MR. SILVERMAN:  Any show.
5      A.      Yes.
6      Q.      What was the procedure if that
7  happened?
8      A.      They would send in a letter
9  letting us know that there is some
10  information that may be incorrect, but it
11  would usually be through their attorney or
12  their accountant.
13      Q.      Would that letter go to you or
14  go to business and legal?
15      A.      On most occasions it would go
16  to the legal department.
17      Q.      If such a letter came in, what
18  would then be the process between your
19  department and the business and legal
20  department?
21      A.      They would send us the letter.
22      Q.      Would business and legal tell
23  you what to do or would they let you
24  figure it out?

52

ABDUL
1  ever an audit for Making the Band?
2      A.      No.
3      (The following testimony is
4  marked confidential.)



53

ABDUL - CONFIDENTIAL

1
2   Q.    Do you recall whether there was
3   ever an audit for Jack Ass?
4         MS. LUMPKIN:  Confidential
5   again.
6   A.    I cannot remember.
7         (This ends confidential
8   portion.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

55

ABDUL

1
2         Do you know why there is a
3   four-month discrepancy between the check
4   and the letter?
5         MS. LUMPKIN:  I object, calls
6   for speculation, she knows nothing about
7   the letter, she has already said that.
8         But she can answer, if she
9   knows.
10  A.    I don't.
11  Q.    You were copied on the letter,
12  correct?
13  A.    Correct.
14  Q.    Did you actually receive the
15  letter; it says you were cc'd, did you
16  actually receive it as a cc?
17  A.    I did.
18  Q.    And the time that you received
19  the letter, did you have any discussions
20  with anyone about the fact that the check
21  had been cut several months earlier?
22  A.    No.
23  Q.    Do you know why the check was
24  cut several months earlier?
25  A.    The check would have been cut

54

ABDUL

1
2   Q.    In the audits that you were
3   involved with, did any of those audits
4   result in a change to the participation
5   statement, the amounts?
6   A.    No; it wouldn't result in the
7   change and I have only been in one audit
8   and that audit was not finalized, it was
9   finalized after I left, so I wouldn't know
10  if there was any additional changes.
11  Q.    Do you know the procedure if
12  there was a dispute after the audit that
13  the participant thought that the numbers
14  should be X and MTV thought it should be
15  Y?
16  A.    Like I said, the audit that I
17  was involved in, it was finalized after,
18  so I don't know the particulars of what
19  happened after that.
20  Q.    I point you back to the
21  exhibit; the check appears to be dated May
22  20, 2005.
23        The letter enclosing the check
24  is dated September 28, 2005, there is a
25  difference of a little over four months.

56

ABDUL

1
2   right after business and legal affairs
3   approved the number, approved the
4   participation statement.
5   Q.    When you get a participation
6   statement approved by business and legal,
7   you talked about the fact that you then
8   submit the requisition and then does the
9   check come to your department?
10  A.    It does.
11  Q.    How come in this case your
12  department didn't send out the check?
13  A.    I am not a hundred percent sure
14  why we didn't send it out.
15  Q.    Do you have any recollection of
16  a discussion with anyone about why?
17  A.    No, I cannot remember.
18  Q.    When the check would come back
19  after being requisitioned, who
20  specifically would the check come to?
21  A.    It would come to our
22  department, it would just come to us.
23  Q.    Would it come to you or to
24  Millicent?
25  A.    More than likely it would come



57

ABDUL

1  to me.
2  to me.
3      Q.     And so you would have received
4  the check at that point.
5          If you turn to the second page
6  regarding the check, it says, the entry is
7  for Making the Band and then inv date
8  which is May 19, 2005.
9          Would that refresh a
10  recollection as to when that check was
11  requested?
12      A.     It would have been requested
13  that date.
14      Q.     What was the customary lag
15  between when accounting would issue a
16  check and when you would receive it?
17      A.     I have not been in that
18  department in a long time and I just
19  cannot remember.
20      Q.     We all know in corporate
21  institutions sometimes it can take a
22  couple of days to go from the fifth floor
23  to the fourth floor.
24          Was it your recollection it
25  would take more than a couple of days to

58

ABDUL

1  get a check back from accounting after it
2  had been issued?
3      A.     Based on what I remember, it
4  could be.
5      Q.     The participation statements
6  that are attached to the letter are for
7  the period ending December 31, 2004 and
8  the check was requested May 19, 2005.
9          Was that a customary kind of
10  lag, it would take four or five months
11  after the period would end before you
12  would calculate the participation
13  statement?
14      MS. LUMPKIN:  I object again to
15  the calculation statement label, she
16  didn't do the calculation, she compiles
17  it.
18      A.     Based on compiling all the
19  information and reaching out to the
20  various different departments that we need
21  to gather the information from, it could
22  customarily sometimes take four to five
23  months.
24      Q.     Looking at the check, do you

59

ABDUL

1  have any idea who the signatures on the
2  check are?
3      A.     No.
4      Q.     It would be your experience
5  that the checks would generally be signed
6  by somebody in accounting?
7      A.     In accounts payable.
8      Q.     At the top it says vendor Trans
9  Continental Television PR and then a
10  number, 179078.
11          What is the 179078, do you
12  know?
13      A.     You would have to ask the
14  accounts payable department.
15      Q.     Did you ever have any
16  experience in looking up vendors to see
17  what their vendor number would be within
18  the MTV accounting system?
19      A.     We have.
20      Q.     Would that 170978 in your
21  experience correspond with a vendor number
22  in their accounts payable system?
23      A.     It could.
24      Q.     But you don't know one way or

60

ABDUL

1  another?
2      A.     No, I don't.
3      Q.     At the time that you were the
4  participation manager, approximately how
5  many different shows were you dealing with
6  in terms of that there were participants?
7      A.     Over 200.
8      Q.     Were the majority of those
9  shows the participation calculated on a
10  quarterly basis?
11      A.     Depending on what the contracts
12  say for each participant, we would base it
13  if it is quarterly or semiannually, but it
14  is all based on the contract.
15      Q.     Was there a majority that were
16  one or the other?
17      A.     The majority of the shows were
18  semiannual.
19      Q.     There is a reference in the
20  cover letter and in some of the pages to
21  Making the Band II, do you see in the re
22  line, it says Making the Band I and II and
23  in the international there is a reference
24  to Making the Band and the number 2, do

61

```
1              ABDUL
2   you see that?
3       A.    Yes.
4       Q.    Was it your understanding when
5   they were referring to Making the Band II,
6   they were referring to the show featuring
7   Da Band?
8       A.    Yes.
9       Q.    It was your understanding they
10  were not referring to season 2 of the
11  Making the Band I?
12      A.    No.
13      Q.    Do you recall at this time that
14  the participation statements were
15  calculated, that these payments would be
16  for Making the Band II, seasons 4 through
17  6?
18      A.    For Making the Band II; I don't
19  know if it was seasons 4 through 6.
20      Q.    If you can walk me through page
21  54, the international program sales
22  calculation.
23            What is the relationship
24  between page 54 and 55.
25            (Witness perusing document.)
```

62

```
1              ABDUL
2       A.    54 is the actual cum statement
3   for international syndication and 55 is
4   the information for just that period, from
5   July 2004 to period ending December 31,
6   2004, it is just the current activity for
7   that semiannual period.
8       Q.    So the 328,112 doesn't appear
9   on page 54?
10      A.    As I stated, this is a cum
11  number, so the 328 would be in this 2.650
12  million.
13      Q.    The previous participation
14  statement, the international syndication
15  number would have been $328,112 lower?
16      A.    Correct.
17      Q.    Turn back to page 51.
18            The merchandise proceeds that
19  are listed on 51, do you know which show
20  or shows or seasons those are for?
21      A.    The statement is for Making the
22  Band I and for II, so it more than likely
23  would be for that, but I don't want to
24  assume because I can't remember.
25      Q.    That would include both O-Town
```

63

```
1              ABDUL
2   merchandise and Da Band merchandise?
3       A.    I can't recall.
4       Q.    Do you know whether it is tour
5   merchandise or store merchandise?
6       A.    I cannot recall.
7       Q.    Would the merchandising
8   department at MTV Networks be dealing with
9   both stuff sold in stores and stuff sold
10  at tours?
11      A.    You would have to talk to the
12  merchandising department.
13      Q.    The direct costs, that comes
14  from the merchandising department?
15      A.    That comes from our finance.
16      Q.    As the participation
17  department, did your department have any
18  way of verifying the numbers that the
19  other departments would give you?
20      A.    No.
21      Q.    That wasn't your job, was it?
22      A.    No, it wasn't.
23      Q.    If I needed to verify this
24  number, what documents would I need to
25  look at?
```

64

```
1              ABDUL
2       A.    You would need to go to the
3   merchandising department.
4       Q.    Do you know what documents I
5   would need to ask for from them?
6       A.    Merchandising records.
7       Q.    Do you know, separating it
8   between revenue and cost, do you know
9   which revenue documents you would need to
10  ask for?
11      A.    No.
12      Q.    On the cost side, do you know
13  which cost documents you need to ask for?
14      A.    No.
15      Q.    Same questions for page 52,
16  which is music publishing proceeds; do you
17  know whether this is music publishing
18  proceeds for O-Town shows or Da Band
19  shows?
20      A.    No.
21      Q.    As before, it is correct that
22  it wasn't your department's job to verify
23  the numbers that the music publishing gave
24  you?
25      A.    Correct.
```



65

ABDUL

1
2    Q.    Same as before, if you were to
3  want to verify these numbers, you wouldn't
4  know what specific documents to ask for,
5  the revenue or the cost side, correct?
6    A.    Correct.
7         MR. SILVERMAN: Let's take a
8  break.
9         (Recess taken.)
10   Q.    Turning to page 54,
11 international program sales, I start with
12 the same questions I had on the previous
13 page.
14         It wasn't your job to audit or
15 verify the amounts that the international
16 department gave you for the preparation of
17 this schedule, correct?
18   A.    Correct, international provided
19 that.
20   Q.    The numbers set forth on page
21 55, what do those numbers reflect?
22   A.    You would have to ask
23 international syndication department.
24   Q.    Take the first entry, Canada,
25 Making the Band II, $45,233, and right

66

ABDUL

1
2  below it is another entry from Canada,
3  Making the Band II, for $53,457; do you
4  know what either of those entries are for?
5    A.    No.
6    Q.    Do you know whether that's
7  revenue or some other calculation?
8    A.    Based on the information that
9  was provided to us from the international
10 department, this was considered revenue
11 because this number is this part of the
12 international syndication number.
13   Q.    Do you know whether it was
14 actual revenue or calculation based on
15 some kind of formula in one of the
16 contracts?
17   A.    You would have to contact the
18 international department for that.
19   Q.    And it would be exclusively the
20 international department that would be
21 responsible for determining whether the
22 show ran in a given year and in what
23 countries it ran in a given year?
24   A.    Again, you would have to speak
25 to international about that.

67

ABDUL

1
2    Q.    Did you ever have any dealings
3  with Martha Tobar regarding the
4  preparation of these schedules for Making
5  the Band?
6    A.    No.
7    Q.    Do you know whether the dates
8  reflected on page 55 reflect whether the
9  shows ran during those periods or whether
10 that was a period in which revenue was
11 recognized?
12   A.    You would have to speak to
13 international syndication about that.
14   Q.    In conjunction with your
15 preparation of the schedules for the
16 participation statements for the Making of
17 the Band shows, did you ever see any
18 documents setting forth when Making the
19 Band ran and in which countries?
20   A.    Again, you would have to speak
21 to international department.
22   Q.    In your responsibilities, did
23 you ever see a document that set forth
24 when the show ran and where?
25   A.    No.

68

ABDUL

1
2    Q.    Do you know, in some of the
3  entries here there is Making the Band II
4  and in other entries, in the case of
5  Germany, for the same country, that say
6  Making the Band II and then in parenthesis
7  it says P. Diddy; do you know what the
8  difference between Making the Band II and
9  Making the Band II (P. Diddy) is?
10        MS. LUMPKIN: I object only
11 because it has been asked and answered;
12 with regard to everything on this
13 schedule, she says you have to go back,
14 but she can answer, if she knows.
15   Q.    If you don't know, you don't
16 know.
17   A.    I don't know.
18   Q.    Do you recall whether in the
19 documentation or work performed in your
20 department at the time, the participation
21 department, whether you referred to Making
22 the Band II and Making the Band II (P.
23 Diddy) as separate things?
24   A.    What do you mean in terms of
25 separate things?

69

ABDUL

1
2      Q.    On this sheet for Germany, at
3  one point it says for Germany, at
4  it says P. Diddy and at another point it
5  says Making the Band II.
6          Did you ever, in your
7  department, when you were dealing with the
8  preparing of the participation statements
9  for Making the Band, did you have any kind
10  of differentiation between Making the Band
11  II and Making the Band II (P. Diddy)?
12      A.    No, it is all Making the Band
13  II.
14      Q.    Do you know on what stations
15  any of these Making the Band II revenues
16  resulted from?
17      A.    International syndication
18  department.
19      Q.    Do you have any opinion as to
20  whether the numbers listed in here of
21  revenues for the various countries are
22  high or low?
23      A.    You would really have to talk
24  to international syndication department.
25      Q.    You have no opinion one way or

70

ABDUL

1
2  another?
3      A.    I have no opinion.
4      Q.    And you have no way to explain
5  why some of them are higher than others?
6      A.    No.
7      Q.    Have you ever seen the
8  licensing agreements between MTV and the
9  foreign affiliates concerning the airing
10  of Making the Band?
11      A.    No.
12      Q.    I will show you a document
13  which we will mark as Exhibit 2.
14          ( Exhibit 2, Bates MTVN 002098,
15  was marked for identification, as of this
16  date.)
17          (Witness perusing document.)
18      Q.    It is like any e-mail, you read
19  from the bottom to the top and from the
20  back to the front.
21      MR. SILVERMAN:  It is Bates
22  MTVN 002098, one page is attorneys' eyes
23  only and so we will mark both of them as
24  attorneys' eyes only.
25      Q.    Recognizing this is an e-mail

71

ABDUL

1
2  from 2002, which is two years before you
3  got to the participation department, it
4  lists on the front page, which is 2098, a
5  number of countries in which Making the
6  Band seasons 1 and 2 had been sent out to
7  the following.
8          Do you have any knowledge
9  regarding whether the show aired in any of
10  these countries and what the revenues
11  would be?
12      MS. LUMPKIN:  Objection based
13  on the fact this predates this witness and
14  you have not asked whether she can
15  identify the document.
16      MR. SILVERMAN:  I am not asking
17  whether she can identify the document; it
18  is a list of countries and I am asking if
19  she knows whether or not the shows aired.
20      Q.    You have never seen this
21  document before, correct?
22      A.    Correct.
23      Q.    Have you ever seen a list of
24  countries in which Making the Band I or II
25  aired?

72

ABDUL

1
2      A.    No.
3      Q.    Do you have any knowledge as to
4  whether it aired in the countries listed
5  on the first page?
6      A.    No.
7          (The following testimony is
8  marked confidential.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

73

```
 1        ABDUL - CONFIDENTIAL
 2     Q.    Have you ever seen as part of
 3   your role of participation manager
 4   revenues reflected on participation
 5   statements, not just for Making the Band,
 6   but for any show, for the entities listed
 7   there?
 8         MS. LUMPKIN: I am going to
 9   request confidentiality as to an answer,
10   this is business practices.
11     A.    I honestly don't know.
12     Q.    I will take them one at a time
13   since we're here and we're moving right
14   along.
15         Did you ever, in your
16   participation statements, ever reflect
17   revenues from ABS Broadcasting in the
18   Philippines?
19     A.    Not that I can recall.
20     Q.    How about Denmark?
21     A.    I don't know.
22     Q.    I am going to go through the
23   countries and would it be fair to say that
24   you don't know one way or the other on a
25   great majority of these countries?
```

74

```
 1        ABDUL - CONFIDENTIAL
 2     A.    Correct.
 3     Q.    Do you have any knowledge as to
 4   MTV Networks relationships, whether these
 5   entities are subsidiaries or not of MTV
 6   Networks?
 7     A.    I wouldn't know.
 8         (This ends confidential
 9   portion.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

75

```
 1             ABDUL
 2         MR. SILVERMAN: Let's mark this
 3   as Exhibit 3.
 4         ( Exhibit 3, MTVN 0038 Bates,
 5   was marked for identification, as of this
 6   date.)
 7         MR. SILVERMAN: It starts at
 8   MTVN 0038 Bates.
 9         MS. LUMPKIN: Is it a composite
10   also?
11         MR. SILVERMAN: I don't think
12   so, it is all as sent.
13         (Witness perusing document.)
14     Q.    Do you recognize this document?
15     A.    Yes.
16     Q.    Can you identify it for me.
17     A.    This is a cover letter with the
18   copy of the check and the participation
19   statements attached to it.
20     Q.    To the best of your
21   recollection, did all the participation
22   statements attach to the letter, were they
23   originally attached to the letter when
24   they were sent?
25     A.    Correct.
```

76

```
 1             ABDUL
 2     Q.    Do you know why this letter
 3   came from you and not from Ms. McPherson?
 4     A.    No.
 5     Q.    If you can turn to page 47,
 6   there is an entry of March '05 for
 7   Finland, Making the Band (P. Diddy),
 8   $6,930.
 9         First of all, do you know why
10   Finland is listed on this schedule and not
11   in the schedule of the previous
12   participation statement?
13     A.    You would need to contact the
14   international syndication department.
15     Q.    I think you told me earlier
16   that the actual schedules themselves were,
17   I don't know if you can call something
18   made on a computer hand-created, but they
19   were essentially created by your group.
20         Do you know who would be typing
21   in Making the Band (P. Diddy) as opposed
22   to Making the Band?
23     A.    Every information that's on
24   this schedule was received from the
25   international syndication department, so
```

77

ABDUL
1
2    it was just a matter of us compiling the
3    information and inputting it.
4        Q.    If it came from the
5    international syndication department as
6    Making the Band (P. Diddy), that's how it
7    was typed in, and if it came from Making
8    the Band and then the number II, that's
9    how it was typed in, is that a fair
10   statement?
11       A.    It was copied.
12       Q.    Do you have any knowledge or
13   recollection as to why the numbers on the
14   international syndication participation,
15   document No. 47, are considerably lower
16   than the numbers on the previous form?
17       A.    No.
18       Q.    Do you have any knowledge as to
19   whether any season of Making the Band
20   aired in a foreign territory on a TV
21   station not owned or affiliated by MTV?
22       A.    No.
23       Q.    It would be fair to say you
24   don't have any knowledge regarding how MTV
25   sets prices for licensing to affiliated

78

ABDUL
1
2    networks?
3        A.    No.
4        Q.    When you would prepare
5    schedules and there is a list for less
6    payments made to date, did you have
7    documents that had a running list for all
8    payments made less to date or would you
9    look at the last participation statement
10   and work off of that?
11       A.    Look at the last participation
12   statement.
13       Q.    The participation statement
14   that went out under your letter, is this
15   also just for Making the Band I and II?
16       A.    Yes.
17       Q.    I will show you a document
18   marked as Exhibit 4.
19       ( Exhibit 4, November 15, 2001,
20   letter agreement, was marked for
21   identification, as of this date.)
22       MR. SILVERMAN:  This is a
23   November 15, 2001, letter agreement.
24       (Witness perusing document.)
25       Q.    Have you ever seen this

79

ABDUL
1
2    document before?
3        A.    Yes.
4        Q.    Was this one of the agreements
5    that you reviewed in preparing the
6    participation statements?
7        A.    Yes.
8        Q.    Do you know whether for the
9    November 23, 2005, participation
10   statement, whether you used the formulas
11   contained in the November 15, 2001,
12   letter?
13       A.    No.
14       Q.    Can you determine it by looking
15   at it?
16       A.    We used the January 7, 2000,
17   contract.
18       Q.    Why?
19       A.    Because that was the agreement
20   that we used.
21       Q.    Was there ever a time in which
22   you switched using the January 2000
23   contract and started using the November
24   15, 2001, contract, to prepare
25   participation statements?

80

ABDUL
1
2        A.    No.
3        Q.    Did you ever have any
4    discussions with anyone at MTV, yes or no
5    question, business and legal, about which
6    contract you should use, the January 2000
7    agreement or the November 15, 2001,
8    agreement?
9        A.    For Making the Band I and II?
10       Q.    Yes.
11       A.    They provided us with the
12   January 7, 2000, agreement.
13       Q.    I just want to clarify the last
14   question.
15       Did you ever have any
16   discussions, yes or no question, with
17   business and legal about when you would
18   apply the January 2000 contract and when
19   you would apply the November 15, 2001,
20   contract?
21       A.    No.
22       Q.    Did you ever have any
23   discussions with anyone else at MTV, not
24   in the business and legal department --
25       A.    No.



81

ABDUL

1
2    Q.    About -- I just need to
3  finish.
4    A.    Sorry.
5    Q.    Did you ever have any
6  discussions with anyone else at MTV
7  regarding when you should use the January
8  2000 contract and when you should use the
9  November 15, 2001, contract?
10    A.    No.
11    Q.    So at any point did you ever
12  use the November 15, 2001, contract?
13    A.    No.
14    Q.    Did you know about the November
15  15, 2001, contract?
16    A.    Yes.
17    Q.    How did you come to know about
18  it?
19    A.    It was provided us by legal.
20    Q.    What was your understanding as
21  to how the November 15, 2001, contract
22  worked --
23        MS. LUMPKIN: Objection --
24    Q.    -- for the calculation for
25  participation?

82

ABDUL

1
2    A.    Can you rephrase it.
3    Q.    What was your understanding as
4  to how participations would be calculated
5  under the November 15, 2001, letter
6  agreement?
7    A.    Our understanding was based on
8  whatever the provisions in the contract
9  stipulated for us to use in compiling
10  information for the participation
11  statements.
12    Q.    Do you recall when you received
13  the November 15, 2001, letter agreement?
14    A.    I can't recall.
15    Q.    Do you recall whether you
16  created any kind of memos or summaries of
17  what the November 15, 2001, contract
18  provided?
19        MS. LUMPKIN: I am going to
20  object, asked and answered as to whether
21  any memos are kept with regard to the
22  application of the calculations.
23    A.    No.
24    Q.    Do you recall whether you
25  received this November 15, 2001, letter

83

ABDUL

1
2  agreement around the time you started in
3  the department in 2004?
4    A.    I cannot recall.
5    Q.    Do you recall whether you
6  received the November 15, 2001, letter
7  agreement before or after the first
8  participation statement you ever did for
9  Making the Band?
10    A.    It could be around the same
11  time.
12    Q.    What was your understanding as
13  to why the November 15, 2001, letter
14  agreement was not applicable to Making the
15  Band II?
16    A.    Because on page 3, paragraph 9,
17  it refers to with respect to the third
18  season and all subsequent seasons of the
19  series, that's what this agreement would
20  apply to.
21    Q.    Do you know how many seasons
22  Making the Band I ran?
23    A.    Can you clarify seasons.
24    Q.    O-Town, do you remember O-Town?
25    A.    Yes.

84

ABDUL

1
2    Q.    Do you remember how many
3  seasons of O-Town ran?
4        MS. LUMPKIN: Objection, she
5  asked for clarification as to the
6  definition of seasons.
7    Q.    In your work for MTV, were
8  shows generated in seasons?
9    A.    Yes.
10    Q.    How did you normally utilize
11  the term season?
12    A.    Making the Band I would be
13  considered a season, Making the Band II
14  would be considered season 2, Making the
15  Band III would be considered season 3 and
16  Making the Band IV would be considered
17  season 4.
18    Q.    In your experience, how long
19  would a season last chronologically, can a
20  season last over a year?
21    A.    It depends on what the contract
22  says.
23    Q.    Did you ever see a contract in
24  which a season ran longer than six months?
25    A.    I cannot recall.



85

ABDUL

1
2     Q.    Did you ever see a contract
3  where a season ran more than a year?
4     A.    I can't recall.
5     Q.    Did you ever have any
6  discussions with anyone at MTV -- first
7  we will start with the business and legal
8  side -- as to whether Making the Band II
9  was a different season than Making the
10  Band I?
11          MS. LUMPKIN: I object
12  regarding any kind of work product
13  conversation.
14          MR. SILVERMAN: Yes or no, I
15  thought I clarified that.
16     A.    Can you repeat the question.
17     Q.    Did you ever any discussions,
18  yes or no question, with anyone in the
19  business and legal department about
20  whether Making the Band II was a second
21  season of Making the Band I?
22     A.    No.
23     Q.    Did you have any discussion,
24  again, yes or no question, with anyone in
25  the business and legal department about

86

ABDUL

1
2  how the term "seasons" applied to Making
3  the Band, Making the Band II, Making the
4  Band III, or anything like that?
5     A.    No.
6     Q.    Did you ever have any
7  discussions with anyone at MTV -- we just
8  talked about business and legal -- about
9  how the term "season" applied when talking
10  about Making the Band and Making the Band
11  II and Making the Band III?
12     A.    No.
13     Q.    Was it your belief and
14  understanding that the letter agreement of
15  November 15, 2001, didn't apply until they
16  got to a Making the Band III?
17     A.    Correct.
18     Q.    As we said before, you were
19  never involved with the participation
20  calculation for Making the Band III?
21     A.    Correct.
22     Q.    Do you have any view as to
23  whether Trans Continental would be owed
24  more or less money if the participation
25  statements had been done under -- that

87

ABDUL

1
2  you did -- were done under the November
3  15, 2001 contract?
4     A.    I don't.
5     Q.    Did you have any occasion to
6  ever attempt to apply the formulas in the
7  November 15, 2001, letter agreement?
8     A.    No.
9     Q.    Have you ever on your own
10  tried to understand how the formulas in
11  the letter agreement of November 15, 2001,
12  would apply?
13     A.    No.
14     Q.    Was it your understanding that
15  Trans Continental was entitled to
16  participation in Making the Band II, but
17  that would be calculated under the January
18  2000 letter agreement?
19     A.    Based on the agreement for
20  January 2002, that's what we went by.
21     Q.    January 2000?
22     A.    January 2000, excuse me.
23     Q.    Let's just rephrase that, I
24  will restate it all in one.
25          It would be fair to say it was

88

ABDUL

1
2  your understanding that Trans Continental
3  would be entitled to participation
4  statements for Making the Band II, but any
5  such participation statements would be
6  calculated under the terms of the January
7  2000 letter agreement?
8     A.    For Making the Band I, Trans
9  Continental would have been calculated
10  underneath the January 2000 agreement.
11     Q.    How about for Making the Band
12  II?
13     A.    For Making the Band II.
14     Q.    Did you ever have any
15  discussion with anybody at MTV about
16  whether Trans Continental was entitled to
17  participation for Making the Band II?
18          MS. LUMPKIN: I object to form.
19     A.    I did not speak to anyone, no.
20          MR. SILVERMAN: We will mark
21  that as Exhibit 5.
22          (Exhibit 5, January 2000
23  letter agreement, was marked for
24  identification, as of this date.)
25          (Witness perusing document.)



89

ABDUL

1  Q. Do you recognize that document?
3  A. Yes.
4  Q. Is this the January 2000 letter
5  agreement that we have been discussing?
6  A. Yes.
7  MR. SILVERMAN: Mark that as
8  Exhibit 6, it is a participation statement
9  dated June 15, 2006.
10  ( Exhibit 6, Bates No. MTVN
11  00028, was marked for identification, as
12  of this date.)
13  MR. SILVERMAN: Bates No. MTVN
14  00028.
15  Q. Have you ever seen this
16  document before?
17  A. Yes.
18  Q. Is it fair to say this is a
19  participation statement for the period
20  ending December 31, 2005?
21  A. Yes.
22  Q. At the time that this document
23  was sent, were you the participation
24  manager?
25  A. Yes.

90

ABDUL

1
2  Q. How come this letter was sent
3  under Laura Dorson and not you?
4  A. Because Laura became part of
5  the department at that time.
6  Q. At that time are all letters
7  enclosing participation statements sent by
8  Ms. Dorson instead of you?
9  A. Every statement that went out
10  the door received a letter, yes.
11  Q. So this wasn't unusual that
12  this went under Ms. Dorson's name instead
13  of yours?
14  A. No.
15  Q. Did you have any discussions
16  with Ms. Dorson about how participation
17  was calculated for Making the Band, any
18  season?
19  A. For Making the Band I and II,
20  yes, we did discuss.
21  Q. What do you recall of those
22  discussions?
23  A. Just the numbers that we
24  received from the different licensing
25  groups, from the different departments,

91

ABDUL

1
2  but that was it.
3  Q. At the time that this
4  participation statement was prepared, was
5  the responsibility for determining what
6  the contract provided still yours and not
7  Ms. Dorson's?
8  A. We both.
9  Q. Do you know whether she
10  reviewed the contracts between MTV and
11  Trans Continental?
12  A. She was my second reviewer, so,
13  yes.
14  Q. Is there a second reviewer for
15  the participation statements or for the
16  contracts?
17  A. For the participation
18  statements.
19  Q. In determining how the
20  participations are calculated, we talked
21  earlier that each time you need to do a
22  participation statement, you would go back
23  to the contract; do you know whether
24  Ms. Dorson also was involved in going back
25  to the contract when these statements were

92

ABDUL

1
2  prepared?
3  A. To my recollection, I don't
4  remember, but she probably would have, but
5  I cannot say for sure.
6  Q. Do you have any recollection of
7  having any discussion with Ms. Dorson
8  about whether the January 7, 2000, letter
9  agreement applied or whether it was the
10  2001 letter agreement that applied?
11  A. No, I do not recall.
12  Q. Turn to page 36.
13  (Witness complying.)
14  Q. What is that?
15  A. It is current activity from
16  July 1, 2005, to December 31, 2005, from
17  Famous Music for our music publishing
18  revenue.
19  Q. Are these revenues to MTV or
20  were these expenses that MTV paid?
21  A. This was revenue.
22  Q. This would be some kind of
23  licensing revenue?
24  A. This is music.
25  Q. Again, this was calculated

93

ABDUL

1
2  based on the January 7, 2000, letter
3  agreement, correct?
4      A.    Correct.
5      Q.    Are we to gather from this
6  participation statement that the only
7  revenue for this period was music
8  publishing?
9      A.    Correct.
10     Q.    If you checked with the
11 international department and they told you
12 that there was zero revenue for
13 participation period, was there some kind
14 of document to that effect that would go
15 in the statements or the fact that there
16 is no statement for international revenue
17 is by implication showing that there is no
18 revenue?
19     A.    No revenue, we wouldn't have
20 any documents.
21     Q.    So there is no revenue, that
22 schedule is just not in the packet?
23     A.    Correct.
24     Q.    At the time this participation
25 statement was generated, did you have any

94

ABDUL

1
2  understanding as to whether someone else
3  at MTV was doing participation statements
4  for Making the Band III?
5      MS. LUMPKIN:  Object, asked and
6  answered, but go ahead.
7      A.    No.
8      Q.    Did you know whether Making the
9  Band III was on TV at that point?
10     A.    I believe it was.
11     Q.    Do you recall having any
12 discussions with anyone about I'm not
13 doing it, who is doing it, or something to
14 that effect?
15     A.    No.
16     Q.    Do you have any recollection as
17 to whether any iteration of Making the
18 Band was ever shown in Turkey?
19     A.    No.
20     Q.    If I wanted to find out whether
21 there were revenues for a country like
22 Turkey, I presume --
23     A.    International.
24     Q.    For the chart of music revenue,
25 do you know whether that was the O-Town

95

ABDUL

1
2  iteration or the Da Band iteration?
3      A.    I don't know.
4      Q.    It states that production name
5  is Making the Band and then paren MTV.
6      At one place, 7056, it says
7  song title, Making the Band II Qs and the
8  production name is Making the Band MTV.
9      Does that give you any
10 indication as to whether the revenues were
11 from the O-Town generation?
12     A.    No, I don't.
13     Q.    The check on the back page,
14 which is 00037, is signed by John Cucci,
15 do you know who John Cucci is?
16     A.    I believe at the time he was
17 our CFO.
18     Q.    Can I presume if checks are
19 over a certain size, they require two
20 signatures, because we have seen some
21 signatures that had two and this only has
22 one.
23     A.    I believe accounts payable has
24 that stipulation.
25     Q.    For this participation

96

ABDUL

1
2  statement, it would be fair to say your
3  department didn't do any verification that
4  there was -- other than asking the
5  departments -- that there was no revenue
6  for merchandising, print publishing,
7  Internet, et cetera?
8      A.    No, no verification.
9      MR. SILVERMAN:  Mark that as
10 Exhibit 7.
11     ( Exhibit 7, transmittal dated
12 November 14, 2006, was marked for
13 identification, as of this date.)
14     MR. SILVERMAN:  This is a
15 transmittal dated November 14, 2006.
16     (Witness perusing document.)
17     Q.    At some point did MTV switch to
18 a format whereby the participation
19 statements were sent with no cover letter
20 but with the transmittal similar to what's
21 before you?
22     A.    Yes, we did make a transition.
23     Q.    Turn to the first page, which
24 is the check.
25     The invoice number says Making

ABDUL

the Band I and II PE 83006.

Was it your understanding that again these calculations were based on Making the Band I and II, correct?

A. I and II, correct.

Q. The front page indicates that for statement inquiries or address changes, please call Laura Dorson.

Would it be fair to say the same hierarchy you described between you and Laura was applicable for this participation?

A. Correct.

Q. As in the last participation statements, the only revenue shown is for music publishing proceeds, is that correct?

A. Correct.

Q. At the time of this 2006 participation statement, did there come a time in which the schedules that were provided were more automated, because this one appears to be kind of a consistent report form while the other ones seem to



ABDUL

be custom typed?

A. No, they are all still manual.

Q. Go back to Exhibit 1, the front page says "With respect to your net participation for Making the Band III, we will be preparing a statement and sending it to you shortly," and this is the letter that you were cc'd on.

Does that refresh your recollection as to whether you had a discussion with anyone about who within MTV would be responsible for Making the Band III participation statement?

A. No.

MS. LUMPKIN: Objection, asked and answered, but, okay.

Q. Do you recall having a discussion with anyone other than Virginia McPherson about the statement in her letter that MTV would be preparing a statement and sending it to Mr. Pearlman?

MS. LUMPKIN: Same objection.

A. No.

Q. Do you recall whether on any of



ABDUL

the computer records that you dealt with there was any vendor number or file number or file subdirectory for Making the Band III participation?

A. No.

Q. Sometimes you see that there is a vendor number created but there is no entries or a subdirectory but no documents in it.

Do you recall seeing anything like that --

A. No.

Q. -- for Making the Band III in the participation department?

A. No.

Q. At any point when compiling the participation statements in 2006 that we just discussed, do you have any recollection that Ms. McPherson had stated that there would be a Making the Band III statement forthcoming?

A. No.

Q. Do you have any knowledge as to Exhibit 7, as to whether the publishing



ABDUL

revenues are for Making the Band I or Making the Band II?

A. No.

Q. The O-Town version or the Da Band version?

A. No.

Q. Do you have any knowledge where those revenues were coming from?

A. You would have to reach out to Famous Music.

Q. Is Famous Music a subsidiary of MTV Networks?

A. It used to be.

Q. In 2006, do you know whether it was or it wasn't?

A. I cannot recall.

Q. By your statement that it used to be, does that mean it is not anymore?

A. Correct.

Q. I show you a document which we will mark as Exhibit 8.

( Exhibit 8, document, was marked for identification, as of this date.)

# CONT.
# EXHIBIT B

101

ABDUL

1  
2       Q.     Have you ever seen a format --
3  first of all, do you know what the word
4  redacted means?
5       A.     Yes.
6       Q.     Most of this document has been
7  redacted.
8              Presuming it wasn't redacted
9  for a moment, do you recognize the format
10 of this document?
11      A.     No.
12      Q.     There is listed property,
13 payee, payee percentage, month, due date,
14 cycle, account type, brand, U.S. network,
15 and then cumulative gross revenue.
16             Do you have any knowledge as to
17 what this would be a printout from?
18      A.     No.
19      Q.     Do you have any knowledge as to
20 what has been redacted from this document?
21      A.     No.
22             MS. LUMPKIN: I didn't hear
23 you; did you ask her to identify this, did
24 she identify it?
25             MR. SILVERMAN: No, I asked do

102

ABDUL

1  
2  you know what this is and she said no.
3       Q.     On page 1 of -- all the
4  entries are redacted or almost all the
5  entries are redacted, and we will get to
6  that.
7              On page 1 there are entries for
8  Making the Band, Trans Continental
9  Television Productions, payee is 100
10 percent, the month is June-September, the
11 due date is 90, statement cycle is
12 semiannual and there are several account
13 types there.
14             Do you recognize those entries
15 as to what they would be, where this
16 document would come from?
17      A.     No.
18      Q.     Did your department have what
19 is sometimes referred to as a contract
20 administration database listing just the
21 contracts that you were responsible for?
22      A.     No.
23      Q.     Did you ever hear that term
24 before?
25      A.     Yes.

103

ABDUL

1  
2       Q.     If you turn to page 001617,
3  there is a couple of entries there.
4              I am presuming that you line up
5  page 09 with page 1617 because it seems to
6  be in the same format.
7              MS. LUMPKIN:  Is that a
8  question?
9              MR. SILVERMAN:  Well, it is a
10 question for you.
11             MS. LUMPKIN:  It looks like it
12 is a continuation, like a spreadsheet, but
13 I don't know.
14      Q.     Do you recognize, look at the
15 entries on the top of that form and it
16 reflects cumulative gross revenue for a
17 number of different areas, do you know
18 whether is that a form of report that you
19 were familiar with from when you were in
20 the participation department?
21      A.     This report?
22      Q.     Yes.
23      A.     No.
24      Q.     Did you ever have occasion to
25 do reports in participation's management

104

ABDUL

1  
2  where you would print out a summary of
3  annual payments to all participation for
4  all properties?
5       A.     What do you mean.
6       Q.     Say you did an end-of-the-year
7  report for someone else at MTV management
8  in participations, these are the people we
9  paid this year and this is the total that
10 we paid to all participants under the
11 various contracts that MTV has, did you
12 ever do a report like that to the
13 management?
14      A.     No.
15      Q.     Was there ever a process under
16 which participations management would
17 budget what it anticipated the payments
18 for participations to be for the upcoming
19 year or upcoming period?
20      A.     I believe so.
21      Q.     How did that work?
22      A.     Usually Laura Dorson would do
23 that, I didn't do that.
24      Q.     Did she ever ask you for
25 reports or data so that she could create

105

```
 1          ABDUL
 2  that budget?
 3     A.   No.
 4     Q.   Was there ever an occasion in
 5  which you attempted to budget or predict
 6  the participation for a future year for
 7  any of the participants that you
 8  administered?
 9     A.   No.
10          MR. SILVERMAN:  Exhibit 9 is a
11  participation statement dated April 20,
12  2007.
13          ( Exhibit 9, participation
14  statement dated April 20, 2007, was marked
15  for identification, as of this date.)
16     Q.   Do you know whether as of the
17  time of this participation statement you
18  were still in the participation management
19  department?
20     A.   Yes.
21     Q.   You recall that you were at
22  that time?
23     A.   Yes.
24     Q.   Would it be fair to say this is
25  a participation statement for a period
```

106

```
 1          ABDUL
 2  ending 12/31/06?
 3     A.   Correct.
 4     Q.   Again, this is for Making the
 5  Band I and II, correct?
 6     A.   Correct.
 7     Q.   It is correct to say that as of
 8  the date of this participation statement,
 9  the only proceeds were for music
10  publishing, correct?
11     A.   Correct.
12     Q.   As of this date, April 20,
13  2007, you still had no responsibility for
14  any participation statement regarding
15  Making the Band III or beyond?
16     A.   Correct.
17     Q.   As of this date you had no
18  knowledge as to who, if anyone, was
19  working on that for MTV, correct?
20     A.   Correct.
21     Q.   Turn back to No. 8 for a
22  moment.
23          Turn to page 16 and 17 and if
24  you go to the right-hand corner, there are
25  listings for gross revenue imputed license
```

107

```
 1          ABDUL
 2  fees and gross revenue imputed license
 3  fees foreign.
 4          There are no entries for either
 5  of those, are there?
 6     A.   Correct.
 7     Q.   Do you know why not?
 8          MS. LUMPKIN:  I object, she
 9  never saw this document and doesn't know
10  what it stands for.
11     Q.   If you don't know, you don't
12  know.
13     A.   I don't know.
14     Q.   Turning back to Exhibit 9,
15  again, if you turn to the compilation, it
16  says property Making the Band, is that
17  Making the Band I or just Making the Band;
18  turn to page -- these aren't numbered.
19          If you go to the breakdown for
20  music revenues, it is the fourth from the
21  back, fifth from the back.
22          (Witness perusing document.)
23     Q.   Do you know whether these
24  revenues are for Making the Band I or II?
25     A.   I cannot distinguish if it is
```

108

```
 1          ABDUL
 2  for Making the Band I or II.
 3     Q.   At the top left it says
 4  property name, Making the Band, and then I
 5  don't know if that's the number 1 or a
 6  vertical line.
 7     A.   I am not sure.
 8     Q.   By April 20, 2007, who would
 9  have been responsible for determining
10  whether there was international revenue,
11  would that have been you, Millicent,
12  somebody else, who made these calls to the
13  other divisions?
14     A.   We would just send out an
15  e-mail to everyone saying we're preparing.
16     Q.   Who would send out that e-mail?
17     A.   I would.
18     Q.   Would they respond via e-mail?
19     A.   Most times.
20     Q.   Would they respond with a no or
21  if they didn't get back to you that meant
22  zero?
23     A.   No, we don't just send out an
24  e-mail just for Making the Band, we have
25  other shows that we work on, so it is just
```

109

ABDUL

1     ABDUL
2  compiling the information for every show
3  that we're going to be working on.
4      Q.     In response to a request, the
5  international group would send you this is
6  the international revenue we have for this
7  period of time for all shows?
8      A.     For all shows.
9      Q.     Would you be requesting for all
10 shows or would you be requesting for a
11 subset of all MTV shows?
12     A.     All shows.
13     Q.     Let us know all shows and we
14 will figure out whether it fits within any
15 of our participations?
16     A.     Depending on the contract.
17     Q.     And that would come back via
18 e-mail as well?
19     A.     Most occasions.
20     Q.     Was the international
21 department also at 1515 Broadway?
22     A.     I don't remember.
23     Q.     But you would be sending it to
24 the international department, you wouldn't
25 be sending it to the various affiliates

110

1     ABDUL
2  around the world?
3      A.     International department.
4      Q.     I presume the same e-mail would
5  go to the music publishing division and
6  home video division and all the other
7  constituents as well, correct?
8      A.     Correct.
9      Q.     When you got the e-mail back,
10 would you save that in kind of an Outlook
11 cabinet, what would you do with those
12 e-mails once you received them?
13     A.     We would save it on the drives.
14     Q.     The e-mail presumably would
15 come back with an attachment saying this
16 is what we have, an Excel spreadsheet, and
17 you would save that spreadsheet back to
18 the share drive?
19     A.     Correct.
20     Q.     Do you have any knowledge as to
21 whether there was ever a domestic
22 syndication fee in connection with any of
23 the Making the Bands?
24     A.     No.
25     Q.     If I asked, for instance, if

111

1     ABDUL
2  VH1 ran a Making the Band marathon, would
3  this result in domestic syndication fee,
4  which department would you send me to to
5  find out?
6      A.     The domestic syndication
7  department.
8          MR. SILVERMAN:  I will show you
9  a document which we will mark as Exhibit
10 10.
11         ( Exhibit 10, document, was
12 marked for identification, as of this
13 date.)
14     Q.     Have you ever seen this
15 document before?
16         (Witness perusing document.)
17     A.     Yes.
18     Q.     Tell me in what context you
19 have seen it.
20     A.     When my attorney showed it to
21 me.
22     Q.     Other than, say, in the last
23 week or two, had you ever seen this
24 document during your term in the
25 participation management department?

112

1     ABDUL
2      A.     No.
3      Q.     The participation statements
4  that you did when you joined in 2004, you
5  stated that to determine what had already
6  been paid, you would look back at the
7  previous participation statement.
8      A.     Correct.
9      Q.     So would you look back only at
10 the previous one participation statement
11 and whatever it says there, that's the
12 number to work off of?
13     A.     Correct.
14     Q.     What's your recollection of the
15 reporting periods on the participation
16 statements under the 2000 letter
17 agreement, how often did you send
18 participation statements on the Making the
19 Band?
20     A.     Semiannual.
21     Q.     This is April 23, 2003,
22 reflecting activity from inception through
23 March 31, 2003, in connection with the
24 O-Town series.
25         Do you have any knowledge as to



113

ABDUL

1
2  whether this was a regularly prepared
3  participation statement or whether it was
4  done kind of custom, because of the fact
5  that the date is a little different than
6  all the other ones you did.
7       A.    This statement was prepared
8  prior to me getting to 2004, so I do not
9  know.
10       MR. SILVERMAN:  I will show you
11  a document we will mark as Exhibit 11.
12       ( Exhibit 11, Bates MTVN
13  003724, was marked for identification, as
14  of this date.)
15       MR. SILVERMAN:  This is Bates
16  MTVN 003724, this is a 6/12/2008
17  participation statement.
18       (Witness perusing document.)
19       Q.    Have you ever seen this
20  document before?
21       A.    No.
22       Q.    Did anyone talk to you
23  regarding the preparation of this
24  participation statement?
25       A.    No.

114

ABDUL

1
2       Q.    It is the period ending
3  December 31, 2007, it says Making the Band
4  I and II on the top.
5       Were you copied on this?
6       A.    No, because I was out of the
7  department by then.
8       Q.    Is this format the same format
9  that you were familiar with when
10  generating participation statements?
11       A.    As I stated, this was done
12  after I left the department, so I am not
13  sure.
14       Q.    Do you have any knowledge as to
15  who generated this document?
16       A.    No.
17       Q.    If you turn to page 003733, and
18  if you look at 003734, it is Making the
19  Band III and subsequent cycles.
20       Did you ever see a Making the
21  Band III participation statement or
22  portions of it before preparing for this
23  deposition?
24       A.    No.
25       Q.    Did you ever discuss this

115

ABDUL

1
2  document with anybody while MTV was
3  generating it?
4       A.    No.
5       MR. SILVERMAN:  We will go back
6  on the confidential part of this.
7       (The following testimony is
8  marked confidential.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

116

ABDUL - CONFIDENTIAL

1
2       Q.    What was your understanding of
3  how the imputed license fee was calculated
4  on Jack Ass?
5       A.    As I stated, I don't remember.
6       Q.    Do you recall whether it was a
7  percentage of production cost?
8       A.    As I stated, I don't remember.
9       Q.    If you don't know, you don't
10  know, it certainly makes these things go
11  faster.
12       Who was responsible for the
13  creation of participation statements for
14  Jack Ass?
15       A.    It would have been Millicent.
16       Q.    Were there participation
17  statements created for Jack Ass prior to
18  you coming to MTV in 2004?
19       A.    I believe so.
20       Q.    Do you recall who was
21  responsible for determining allocation of
22  participant splits for that show prior to
23  your arriving MTV?
24       MS. LUMPKIN:  Objection, calls
25  for speculation, it is before she got

117

1        ABDUL - CONFIDENTIAL
2   there.
3        A.     I don't know.
4        Q.     Do you recall when you did the
5   participation statements for Jack Ass
6   talking to anyone at MTV about how it has
7   been done so far?
8        A.     I don't remember.
9            (This ends confidential
10   portion.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

118

1               ABDUL
2        MR. SILVERMAN:  I will show you
3   a document which I will mark as Exhibit
4   12.
5        ( Exhibit 12, Bates No. MTVN
6   0001692-93, was marked for identification,
7   as of this date.)
8        (Witness perusing document.)
9        Q.     Have you ever seen this
10   document before?
11        MR. SILVERMAN:  Bates No. MTVN
12   0001692-93, both designated as attorneys
13   eyes only.
14        A.     I don't remember.
15        Q.     This is the period, the front
16   page is international program sales,
17   period ending 5/31/02 and then the next
18   page is Making the Band, period ending
19   3/31/03.
20            Do you remember or have any
21   knowledge as to where this document would
22   come from?
23        A.     No.
24        Q.     If you look at the bottom, it
25   says less production costs season 2 and

119

1               ABDUL
2   that's $3,250 million.
3        Q.     Do you know whether that refers
4   to Making the Band II or Making the Band
5   I, season 2?
6        A.     I have no idea, no.
7        MR. SILVERMAN:  I will show you
8   a document we will mark as Exhibit 13,
9   this is Bates MTVN 001719 through 001721.
10            All three pages are marked as
11   confidential, attorneys eyes only.
12        ( Exhibit 13, Bates MTVN 001719
13   through 001721, was marked for
14   identification, as of this date.)
15            (Witness perusing document.)
16        Q.     Have you ever seen these
17   documents before, these pages?
18        A.     Yes.
19        Q.     Can you tell me what they are.
20        A.     It looks to be participation
21   statements.
22        Q.     These are inception through
23   March 31, 2003.
24            Would you have seen these
25   before preparing for this deposition?

120

1               ABDUL
2        A.     No.
3        Q.     On the first page, revenue,
4   Making the Band I and Making the Band II,
5   do you know whether they are taking about
6   Making the Band II or Making the Band I,
7   season 2?
8        A.     No, I don't know.
9        Q.     If you turn to the second page,
10   001720, there is a differentiation between
11   nontour merchandising and tour
12   merchandising.
13            Do you know what the difference
14   between those is?
15        A.     No.
16        Q.     Is that a familiar term to you
17   from doing participation statements, tour
18   merchandising or nontour merchandising?
19        A.     If that's what's in the
20   contract, that's what I go by.
21        Q.     Presumably the merchandising
22   department would set these forth for you
23   as tour merchandising or nontour
24   merchandising and they would go on the
25   participation statements as such?



121

ABDUL

2  A.    Based on what the merchandise
3  department provided us, that's what is on
4  the statement.
5  Q.    It is not your job to determine
6  whether revenues are in one category or
7  another category, that's for the
8  merchandising department?
9  A.    That's for the merchandising
10 department.
11 Q.    Would the merchandising
12 department send you an Excel spreadsheet
13 with all properties, the same we talked
14 about for international syndication?
15 A.    I don't know what they sent
16 them in 2003; I can only speak on what
17 transpired between the time that I was in
18 the department and they did provide us
19 with a schedule.
20 Q.    So that was your general
21 experience, that the departments would
22 send you an Excel spreadsheet with all
23 properties and then you would figure out
24 which ones went on the participation
25 statement?

122

ABDUL

2  A.    Based on whatever contracts.
3  Q.    I show you another similar
4  document which we will mark as Exhibit 14.
5  ( Exhibit 14, Bates MTVN 000445
6  through 000454, was marked for
7  identification, as of this date.)
8  MR. SILVERMAN: This is
9  confidential, attorneys eyes only, Bates
10 MTVN 000445 through 000454.
11 Q.    Have you ever seen this
12 document before preparing for the
13 deposition?
14 (Witness perusing document.)
15 A.    No.
16 Q.    The bottom lists ABC's share as
17 25 percent; did you have any personal
18 knowledge or conversations with anyone
19 about ABC's participation in Making the
20 Band?
21 A.    These statements were prepared
22 before I started, so I do not know.
23 Q.    In your time period, did you
24 ever have a discussion with anybody about
25 what ABC's share was and how it was

123

ABDUL

2  computed and whether it is ended or not?
3  A.    No.
4  Q.    Did you ever review a contract
5  with ABC to determine whether ABC was
6  entitled to a participation?
7  A.    No.
8  Q.    If overhead was a component of
9  participation statements, did you take
10 that from whatever was in the contract
11 between the parties or did you ever
12 attempt to calculate overhead for the
13 purposes of calculating participation
14 statements?
15 A.    We only went by what was in the
16 contract.
17 Q.    Turn to page 000448, the Making
18 the Band participation statement from
19 inception to March 31, 2003.
20 I think I asked you this
21 before; it talks about Guts members, tour
22 or nontour, and then Guts percentage
23 share.
24 Do you have any knowledge of
25 who Guts is?

124

ABDUL

2  A.    No.
3  Q.    Do you know whether Guts was
4  what Da Band was called before it became
5  Da Band?
6  A.    I have no idea.
7  Q.    As part of your responsibility
8  for participation statements, were you
9  responsible for calculation of payments to
10 O-Town or Da Band?
11 A.    I am not sure what you mean by
12 that.
13 Q.    As talent in the shows, they
14 also received, I don't want to call them
15 royalties, but the band got a certain
16 percentage of certain revenue streams.
17 Was your department responsible
18 for calculation of any payments to O-Town
19 or to the members of Da Band?
20 MS. LUMPKIN: Objection, there
21 are facts not in evidence.
22 You can answer, if you know.
23 A.    No, I don't know.
24 Q.    Did your department deal with
25 what we will call royalties to talent or

125

ABDUL

1  ABDUL
2  were you just doing producers and people
3  like that?
4      A.    We were only doing participants
5  on television shows.
6      Q.    Turn to page MTVN 000450.
7      Did you ever work with this
8  document while you were in the
9  participation department?
10     A.    As I stated before, this was
11 prepared before I came to MTV in 2004.
12     Q.    Do you recall ever seeing a
13 document, if you look at the bottom of
14 this page, current amount due as of
15 3/31/03, it says Trans Continental at 50
16 percent, 2,426,894, did you ever have any
17 discussions with anyone in MTV from the
18 time you got there in 2004 regarding
19 amounts owed to Trans Continental in that
20 amount?
21     A.    No.
22     Q.    Do you recall when in 2004 you
23 came to MTV?
24     A.    November 1, 2004.
25     MR. SILVERMAN:  Let's take a

126

1      ABDUL
2  break.
3      (Recess taken.)
4      Q.    You have the right to read or
5  waive your deposition; in the last five
6  years I don't think I have seen anybody
7  actually waive, although that doesn't mean
8  that you will actually read it.
9      MS. LUMPKIN:  Before the court
10 reporter finalizes the transcript, you
11 have the right to read the transcript for
12 accuracy.
13     You can't make changes to
14 substance, just for accuracy, or you can
15 waive that right.
16     (Continued on next page.)
17
18
19
20
21
22
23
24
25

127

1      ABDUL
2      Normally we read, we're going
3  to read.
4      THE WITNESS:  We're going to
5  read.
6      (Time noted:  12:50 p.m.)
7
8
9
10
11
12    _____
13    KAREN ABDUL
14
15 Subscribed and sworn to before me
16 this      day of          , 2009.
17
18
19
20
21
22
23
24
25

128

1
2  C E R T I F I C A T I O N
3
4
5
6      I, Jineen Pavesi, a Registered
7  Professional Reporter, Registered Merit
8  Reporter, Certified Realtime Reporter and
9  a Notary Public, do hereby certify that
10 the foregoing witness, KAREN ABDUL., was
11 duly sworn on the date indicated, and that
12 the foregoing is a true and accurate
13 transcription of my stenographic notes.
14     I further certify that I am not employed
15 by nor related to any party to this
16 action.
17
18
19
20
21
22
23    JINEEN PAVESI, RPR, RMR, CRR
24
25

| | 129 |
|---|---|
| 1 | |
| 2 | E X H I B I T S |
| 3 | |
| 4 | |
| 5 | EXHIBIT    DESCRIPTION    PAGE |
| 6 | |
| 7 | Exhibit 1    participation    28 |
| 8 | statement |
| 9 | Exhibit 2    Bates MTVN 002098    70 |
| 10 | Exhibit 3    MTVN 0038 Bates    75 |
| 11 | Exhibit 4    November 15, 2001,    78 |
| 12 | letter agreement |
| 13 | Exhibit 5    January 2000 letter    88 |
| 14 | agreement |
| 15 | Exhibit 6    Bates No. MTVN    89 |
| 16 | 00028 |
| 17 | Exhibit 7    transmittal dated    96 |
| 18 | November 14, 2006 |
| 19 | Exhibit 8    document    100 |
| 20 | Exhibit 9    participation    105 |
| 21 | statement dated |
| 22 | April 20, 2007 |
| 23 | Exhibit 10    document    111 |
| 24 | Exhibit 11    Bates MTVN 003724    113 |
| 25 | Exhibit 12    Bates No. MTVN    118 |

| | 130 |
|---|---|
| 1 | |
| 2 | 0001692-93 |
| 3 | Exhibit 13    Bates MTVN 001719    119 |
| 4 | through 001721 |
| 5 | Exhibit 14    Bates MTVN 000445    122 |
| 6 | through 000454 |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | 131 |
|---|---|
| 1 | |
| 2 | LITIGATION SUPPORT INDEX |
| 3 | |
| 4 | |
| 5 | DIRECTION TO WITNESS NOT TO ANSWER |
| 6 | Page    Line    Page    Line |
| 7 | (NONE) |
| 8 | |
| 9 | |
| 10 | |
| 11 | REQUEST FOR PRODUCTION OF DOCUMENTS |
| 12 | Page    Line    Page    Line |
| 13 | (NONE) |
| 14 | |
| 15 | |
| 16 | |
| 17 | INFORMATION TO BE FURNISHED |
| 18 | Page    Line    Page    Line |
| 19 | (NONE) |
| 20 | |
| 21 | **Original exhibits were retained by Mr. |
| 22 | Silverman. |
| 23 | |
| 24 | |
| 25 | |

| | 132 |
|---|---|
| 1 | |
| 2 | ERRATA SHEET |
| 3 | |
| 4 | |
| 5 | Name of Case: MTV Networks |
| 6 | Date of Deposition: 1/12/09 |
| | Name of Deponent: Karen Abdul |
| 7 | |
| | Page  Line  Change       Reason |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | (NAME OF WITNESS) |
| 21 | |
| | SUBSCRIBED AND SWORN TO BEFORE ME |
| 22 | THIS ____ DAY OF ____, 20__. |
| 23 | |
| 24 | NOTARY PUBLIC   COMMISSION EXPIRES |
| 25 | |

| **A** | 50:13 | 77:20 | 108:8 112:21 |
|---|---|---|---|

**ABC** 123:5,5

**ABC's** 122:16,19,25

**Abdul** 1:18 4:1,3 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1,15 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 127:13 128:10 132:6

**able** 33:21

**ABS** 73:17

**access** 16:8,9

**accessing** 15:15

**accompanied** 46:25

**account** 9:12 101:14 102:12

**accountant** 6:2,6

**accounting** 5:15 12:3 17:18 40:15 57:15 58:2 59:7,19

**accounts** 30:22 59:8 59:15,23 95:23

**accuracy** 126:12,14

**accurate** 128:12

**action** 128:16

**activity** 62:6 92:15 112:22

**actual** 30:6 62:2 66:14 76:16

**additional** 54:10

**address** 17:23 24:17 24:25 97:8

**administered** 1:6 105:8

**administrating** 12:10

**administration** 5:17 9:2,5 102:20

**administratively** 12:19 51:12

**administrator** 8:14 8:18

**Adv** 1:8

**affairs** 47:14 48:17 49:15 56:2

**affiliated** 77:21,25

**affiliates** 70:9 109:25

**AGREED** 3:4,8,12

**agreement** 25:10,13 25:14,19,22,23 26:3 26:12,14 78:20,23 79:19 80:7,8,12 82:6,13 83:2,7,14 83:19 86:14 87:7,11 87:18,19 88:7,10,23 89:5 92:9,10 93:3 112:17 129:12,14

**agreements** 33:2 70:8 79:4

**ahead** 14:21 18:10 36:19 94:6

**air** 27:2,6

**aired** 27:14 38:20 71:9,19,25 72:4

**airing** 70:9

**al** 1:10

**albums** 6:9

**allocation** 116:21

**allowed** 22:23

**amount** 32:3 125:14 125:20

**amounts** 54:5 65:15 125:19

**analyses** 27:18

**analysis** 27:6

**analyst** 7:5,6

**ancillary** 4:9 9:24 10:3 17:5,7

**annual** 104:3

**answer** 4:24 5:5,9 13:11 14:21 18:10 19:13 27:22 34:4 44:12 55:8 68:14 73:9 124:22 131:5

**answered** 19:13 27:12 68:11 82:20 94:6 98:17

**anticipated** 104:17

**anybody** 21:20 22:9 23:9,12,16 88:15 115:2 122:24 126:6

**anymore** 100:19

**apologize** 12:15

**appear** 62:8

**appeared** 18:16

**appears** 37:18 54:21 97:24

**applicable** 83:14 97:12

**application** 82:22

**applied** 86:2,9 92:9 92:10

**apply** 80:18,19 83:20 86:15 87:6,12

**approach** 22:17

**approved** 49:3,4,20 56:3,3,6

**approximately** 60:5

**April** 38:23 105:11 105:14 106:12

129:22

**areas** 17:19 103:17

**arrival** 27:18

**arriving** 116:23

**artist** 6:2,5

**artists** 6:7,18,19 8:19 8:20

**asked** 19:12 22:10 29:18 68:11 71:14 82:20 84:5 94:5 98:16 101:25 110:25 123:20

**asking** 29:15 71:16 71:18 96:4

**Ass** 44:14,16 53:3 116:4,14,17 117:5

**assume** 62:24

**attach** 75:22

**attached** 28:25 29:7 40:19 58:7 75:19,23

**attachment** 110:15

**attempt** 87:6 123:12

**attempted** 105:5

**attorney** 4:17 23:8,11 23:13 25:18 50:12 111:20

**attorneys** 2:7,19 3:5 23:19 70:22,24 118:12 119:11 122:9

**attorney-client** 24:14 25:16

**audibly** 5:9

**audit** 51:4,7,9,10,11 51:18 52:2 53:3 54:7,8,12,16 65:14

**auditor** 51:16

**audits** 51:23 54:2,3

**automated** 97:23

**Avenue** 1:20

**a.m** 1:17

| **B** |
|---|

**B** 3:17 129:2

**bachelors** 5:14

**back** 17:4 34:8,12

48:21,25 54:20
56:18 58:2 62:17
68:13 70:20 91:22
91:24 95:13 98:4
106:21 107:14,21
107:21 108:21
109:17 110:9,15,17
112:6,9 115:5
**background** 5:11
**backing** 16:20
**backup** 16:16
**backups** 16:14
**ballpark** 51:21
**band** 19:6 22:12
25:25 26:7,11,11,19
26:25 27:10 36:22
36:24 38:3,4,7,10
38:19 41:19 42:4
45:4,5,20,25,25
46:5,9 47:19,20,25
52:2 57:7 60:22,23
60:25 61:5,7,11,16
61:18 62:22 63:2
64:18 65:25 66:3
67:5,17,19 68:3,6,8
68:9,22,22 69:3,5,9
69:10,11,12,15
70:10 71:6,24 73:5
76:7,21,22 77:6,8
77:19 78:15 80:9
83:9,15,22 84:12,13
84:15,16 85:8,10,20
85:21 86:3,3,4,10
86:10,11,16,20
87:16 88:4,8,11,13
88:17 90:17,19 94:4
94:9,18 95:2,5,7,8
97:2,5 98:6,14 99:4
99:14,21 100:2,3,6
102:8 106:5,15
107:16,17,17,24
108:2,4,24 111:2
112:19 114:3,19,21
118:18 119:4,4
120:4,4,6,6 122:20
123:18 124:4,5,10
124:15,19

**Bands** 110:23
**bankrupt** 8:6
**bankruptcy** 1:2 2:9
**base** 60:13
**based** 18:22 25:9,18
26:12 30:9,19 44:4
51:19 58:4,19 60:15
66:8,14 71:12 82:7
87:19 93:2 97:4
121:2 122:2
**basis** 10:11 20:14
21:13 32:23 33:10
60:11
**Bates** 70:14,21 75:4,8
89:10,13 113:12,15
118:5,11 119:9,12
122:5,9 129:9,10,15
129:24,25 130:3,5
**belief** 86:13
**believe** 36:24 94:10
95:16,23 104:20
116:19
**Bennett** 11:21 19:9
19:10
**best** 75:20
**beyond** 106:15
**Biscayne** 2:4,5,17
**bit** 15:11
**books** 7:12
**bottom** 29:10 31:14
37:17 70:19 118:24
122:16 125:13
**Boulevard** 2:5,17
**boy** 38:3,10
**Brad** 31:15 47:17
48:2 49:5
**brand** 101:14
**break** 4:21,22 65:8
126:2
**breakdown** 38:22,24
107:19
**brief** 5:10
**briefly** 4:19
**Broadcasting** 73:17
**Broadway** 17:25 18:3
109:21
**Brooklyn** 5:13

**budget** 104:17 105:2
105:5
**business** 4:9 5:17 7:5
7:6 9:24 10:3 13:13
17:5,7 24:11 47:14
48:17,24 49:15
50:15,20,23 56:2,6
73:10 80:5,17,24
85:7,19,25 86:8

**C**

**C** 2:2,21 128:2,2
**cabinet** 110:11
**calculate** 32:4,22
33:5 39:6 58:13
123:12
**calculated** 38:25
60:10 61:15 82:4
87:17 88:6,9 90:17
91:20 92:25 116:3
**calculates** 39:8
**calculating** 32:3
123:13
**calculation** 31:24
34:20,22 35:2,7,12
37:6,8 39:5 58:16
58:17 61:22 66:7,14
81:24 86:20 124:9
124:18
**calculations** 40:8
82:22 97:4
**call** 49:7,8 76:17 97:9
124:14,25
**called** 5:24 7:2 15:22
124:4
**calls** 20:19 41:8 55:5
108:12 116:24
**Canada** 38:16 65:24
66:2
**Carol** 2:21 23:8
**carol.lumpkin@kl...**
2:22
**case** 1:5 56:11 68:4
132:5
**category** 121:6,7
**cc** 55:16
**ccs** 31:14

**cc'd** 31:18 55:15 98:9
**Center** 2:16
**certain** 19:2 38:13
95:19 124:15,16
**certainly** 116:10
**Certified** 1:23 128:8
**certify** 128:9,14
**cetera** 96:7
**CFO** 95:17
**change** 9:19 10:18,20
54:4,7 132:7
**changed** 10:21,25
48:6
**changes** 54:10 97:9
126:13
**channel** 18:22 19:2
**channels** 18:23
**Chapter** 1:7,12 2:8
**Charlene** 11:20,22
**chart** 94:24
**check** 30:17,23,25
31:4 48:18,18,22
49:9 54:21,23 55:3
55:20,23,25 56:9,12
56:18,20 57:4,6,10
57:16 58:2,9,25
59:3 75:18 95:13
96:24
**checked** 93:10
**checks** 30:19 49:10
59:6 95:18
**chronologically**
84:19
**clarification** 12:13
27:9 29:14 84:5
**clarified** 85:15
**clarify** 26:7,10 80:13
83:23
**clarity** 28:16
**classes** 17:17
**college** 5:13,19,22
17:10
**combination** 47:23
**come** 12:20 13:15
16:3 34:23 35:13
39:25 48:21 51:12
51:17 56:9,11,18,20

56:21,22,23,25
81:17 90:2 97:21
102:16 109:17
110:15 118:22
**comes** 12:17 13:7
63:13,15
**coming** 27:24 51:3,8
100:9 116:18
**COMMISSION**
132:24
**common** 46:12
**company** 1:14 2:20
5:24 6:25 7:20 8:6
**company's** 7:7
**compilation** 32:7
107:15
**compile** 13:17,22
25:20 26:16 32:11
**compiled** 30:2,5
**compiles** 25:11 58:17
**compiling** 58:19 77:2
82:9 99:17 109:2
**completely** 42:17
**complying** 92:13
**component** 42:24
44:3 123:8
**composite** 28:17,21
75:9
**compound** 34:3
**computed** 123:2
**computer** 13:8 14:18
15:2,12 76:18 99:2
**concerning** 70:9
**confidential** 43:6
44:1,7,11,18 52:5
53:1,4,7 72:8 73:1
74:1,8 115:6,8
116:1 117:1,9
119:11 122:9
**confidentiality** 44:5
73:9
**conjunction** 48:9
67:14
**connection** 110:22
112:23
**consider** 45:15
**considerably** 77:15

**considered** 66:10
84:13,14,15,16
**consistent** 97:24
**constituents** 110:7
**contact** 24:9 66:17
76:13
**contacts** 24:12
**contained** 79:11
**contents** 16:21
**context** 24:20 111:18
**Continental** 1:12
2:10 59:10 86:23
87:15 88:2,9,16
91:11 102:8 125:15
125:19
**continuation** 103:12
**Continued** 126:16
**contract** 24:22 34:9
34:13,16 42:17 45:7
45:7 51:6,15 60:15
79:17,23,24 80:6,18
80:20 81:8,9,12,15
81:21 82:8,17 84:21
84:23 85:2 87:3
91:6,23,25 102:19
109:16 120:20
123:4,10,16
**contracts** 34:5 42:20
60:12 66:16 91:10
91:16 102:21
104:11 122:2
**conversation** 85:13
**conversations** 122:18
**copied** 46:19 55:11
77:11 114:5
**copies** 31:3
**copy** 75:18
**corner** 106:24
**corporate** 18:6 57:20
**correct** 25:24 26:22
26:23 27:2,3,15,16
30:16 34:10,14
37:12,15 38:2,5
42:25 47:8 55:12,13
62:16 64:21,25 65:5
65:6,17,18 71:21,22
74:2 75:25 86:17,21

93:3,4,9,23 97:5,6
97:14,18,19 100:20
106:3,5,6,7,10,11
106:16,19,20 107:6
110:7,8,19 112:8,13
**correspond** 59:22
**COSGROVE** 2:3
**cost** 36:12 45:14 64:8
64:12,13 65:5 116:7
**costs** 63:13 118:25
**countries** 38:15,19
66:23 67:19 69:21
71:5,10,18,24 72:4
73:23,25
**country** 68:5 94:21
**couple** 22:19 31:22
57:22,25 103:3
**courses** 17:11
**court** 1:2 3:16 126:9
**cover** 46:13 60:21
75:17 96:19
**CPA** 6:3
**create** 104:25
**created** 76:19 82:16
99:8 116:17
**creation** 116:13
**CRR** 128:23
**Cucci** 95:14,15
**cum** 35:21 62:2,10
**cumulative** 101:15
103:16
**current** 4:4,7 19:15
19:18,20 20:24 62:6
92:15 125:14
**custom** 98:2 113:4
**customarily** 58:23
**customary** 57:14
58:10
**customers** 44:8
**cut** 55:21,24,25
**cycle** 101:14 102:11
**cycles** 114:19

---

**D**

**D** 3:17
**Da** 61:7 63:2 64:18
95:2 100:5 124:4,5

124:10,19
**data** 16:21 104:25
**database** 102:20
**date** 28:7 35:17,18,19
37:7,10 57:7,13
70:16 75:6 78:6,8
78:21 88:24 89:12
96:13 100:25
101:13 102:11
105:15 106:8,12,17
111:13 113:5,14
118:7 119:14 122:7
128:11 132:6
**dated** 28:24 54:21,24
89:9 96:11,15
105:11,14 129:17
129:21
**dates** 67:7
**day** 127:16 132:22
**days** 57:22,25
**deal** 33:14 124:24
**dealing** 24:16 60:6
63:8 69:7
**dealings** 67:2
**dealt** 16:5 99:2
**Debtor** 1:11
**December** 38:23 58:8
62:5 89:20 92:16
114:3
**decide** 12:20
**decision** 25:7
**Defendant** 1:15
**definition** 84:6
**degree** 5:14
**demanded** 51:11
**Denmark** 73:20
**department** 9:22,23
10:9 13:13 14:2
16:5 21:24 22:2
25:7,8,12 30:22
32:14,21 33:5,8,20
34:21,24 35:3,5,10
35:14,19 36:2,7,8
36:10,15,16 37:12
38:9 39:10,15,20,22
39:24 40:2,4,15,16
41:17 45:17,22

47:14 48:5 50:17,20
50:21 56:9,12,22
57:18 59:15 63:8,12
63:14,17,17 64:3
65:16,23 66:10,18
66:20 67:21 68:20
68:21 69:7,18,24
71:3 76:14,25 77:5
80:24 83:3 85:19,25
90:5 93:11 96:3
99:15 102:18
103:20 105:19
109:21,24 110:3
111:4,7,25 114:7,12
120:22 121:3,8,10
121:12,18 124:17
124:24 125:9
**departmental** 15:20
**departments** 13:20
21:5 32:6,9 58:21
63:19 90:25 96:5
121:21
**department's** 64:22
**Depending** 51:14
60:12 109:16
**depends** 51:2 84:21
**Deponent** 132:6
**deposition** 1:18 4:14
22:15 23:7,22
114:23 119:25
122:13 126:5 132:6
**describe** 28:12
**described** 97:11
**DESCRIPTION**
129:5
**designate** 44:6
**designated** 38:10
118:12
**desk** 16:9
**determination** 25:5
26:5 37:9
**determine** 79:14
112:5 121:5 123:5
**determined** 25:22
26:3
**determining** 32:2
66:21 91:5,19 108:9

116:21
**Diddy** 68:7,9,23 69:4
69:11 76:7,21 77:6
**difference** 54:25 68:8
120:13
**different** 13:19 18:23
18:24 32:6,9 33:18
42:13,18 58:21 60:6
85:9 90:24,25
103:17 113:5
**differentiation** 69:10
120:10
**direct** 36:12 39:17
40:11 63:13
**DIRECTION** 131:5
**director** 11:5,7,9
12:11,14
**discrepancy** 55:3
**discuss** 21:17 90:20
114:25
**discussed** 22:23
48:11 99:19
**discussing** 89:5
**discussion** 56:16
85:23 88:15 92:7
98:12,19 122:24
**discussions** 23:16
42:7 46:3,24 48:11
48:14 55:19 80:4,16
80:23 81:6 85:6,17
86:7 90:15,22 94:12
125:17
**disk** 15:6
**dispute** 54:12
**distinguish** 107:25
**DISTRICT** 1:3
**divided** 18:18,19
**division** 1:4 110:5,6
**divisions** 108:13
**document** 28:8,10
29:8 33:20 36:13
41:3 61:25 67:23
70:12,17 71:15,17
71:21 75:13,14
77:15 78:17,24 79:2
88:25 89:2,16,22
93:14 96:16 100:21

100:23 101:6,10,20
102:16 107:9,22
111:9,11,15,16,24
113:11,18,20
114:15 115:2 118:3
118:8,10,21 119:8
119:15 122:4,12,14
125:8,13 129:19,23
**documentation** 68:19
**documents** 13:16
34:15 36:23 63:24
64:4,9,13 65:4
67:18 78:7 93:20
99:9 119:17 131:11
**doing** 14:11 40:7
45:18 46:4 94:3,13
94:13 120:17 125:2
125:4
**domestic** 6:16,17
12:5 110:21 111:3,6
**door** 90:10
**Dorson** 10:21 19:21
19:23 20:3,4,9 90:3
90:8,16 91:24 92:7
97:9 104:22
**Dorson's** 90:12 91:7
**drive** 15:10,15,19
16:8,14,16,20 17:2
110:18
**drives** 110:13
**due** 31:21 101:13
102:11 125:14
**duly** 3:18 128:11

——————————
            **E**
——————————
**E** 2:2,2 3:17 128:2
129:2
**earlier** 55:21,24
76:15 91:21
**Edel** 7:17,18,21 8:5
**education** 5:11
**effect** 3:15 93:14
94:14
**eight** 6:22 7:15
**either** 66:4 107:4
**element** 12:18
**eliminated** 11:2

**EMI** 5:24,25 6:7
**employed** 19:11
128:14
**employer** 18:7,8,13
**employment** 4:5
**enclosing** 54:23 90:7
**ended** 123:2
**ends** 44:18 53:7 74:8
117:9
**end-of-the-year**
104:6
**Entertainment** 7:17
7:18
**entertainment-rela...**
17:18
**entire** 29:5
**entities** 73:6 74:5
**entitled** 87:15 88:3
88:16 123:6
**entity** 18:6
**entries** 31:22 66:4
68:3,4 99:9 102:4,5
102:7,14 103:3,15
107:4
**entry** 57:6 65:24 66:2
76:6
**ERRATA** 132:2
**ESQ** 2:12,21
**ESQS** 2:3
**essentially** 76:19
**estate** 2:10
**et** 1:10 96:7
**evidence** 124:21
**exactly** 18:6 49:21
**examination** 3:13,21
**examined** 3:20
**example** 12:8 14:13
32:18 33:13
**Excel** 14:10,15 15:16
16:15,24 110:16
121:12,22
**exclusively** 66:19
**excuse** 87:22
**exhibit** 28:4,5,17,21
46:11 54:21 70:13
70:14 75:3,4 78:18
78:19 88:21,22 89:8

89:10 96:10,11 98:4
99:25 100:22,23
105:10,13 107:14
111:9,11 113:11,12
118:3,5 119:8,12
122:4,5 129:5,7,9
129:10,11,13,15,17
129:19,20,23,24,25
130:3,5
**exhibits** 131:21
**exist** 19:25
**expenses** 36:11 39:18
40:4,12 92:20
**experience** 59:5,17
59:22 84:18 121:21
**EXPIRES** 132:24
**explain** 70:4
**extent** 22:5
**extreme** 22:8
**eyes** 70:22,24 118:13
119:11 122:9
**e-mail** 70:18,25
108:15,16,18,24
109:18 110:4,9,14
**e-mails** 110:12

**F**

**F** 128:2
**fact** 55:20 56:7 71:13
93:15 113:4
**facts** 124:21
**fair** 25:21 73:23 77:9
77:23 87:25 89:18
96:2 97:10 105:24
**familiar** 29:17,19
103:19 114:9
120:16
**Famous** 92:17 100:11
100:12
**far** 13:3 117:7
**faster** 116:11
**featuring** 61:6
**February** 41:7
**fee** 42:24 44:3,16
45:3,12,13 110:22
111:3 116:3
**fees** 107:2,3

**felt** 25:23
**fifth** 57:22 107:21
**figure** 50:25 109:14
121:23
**file** 37:18,23 99:3,4
**files** 15:3,7 31:4 38:7
**filing** 3:6
**fill** 30:24 49:13
**finalized** 54:8,9,17
**finalizes** 126:10
**finance** 39:20,21,23
63:15
**Financial** 2:16
**find** 94:20 111:5
**fine** 44:9
**finish** 81:3
**Finland** 76:7,10
**first** 3:18 4:15 31:23
46:17 65:24 72:5
76:9 83:7 85:6
96:23 101:3 120:3
**fits** 109:14
**five** 24:7 58:11,23
126:5
**floor** 57:22,23
**Florida** 1:3 2:6,18
**folks** 21:8,16,20
**following** 43:5 52:4
71:7 72:7 115:7
**follows** 3:20
**force** 3:15
**foregoing** 128:10,12
**foreign** 70:9 77:20
107:3
**form** 3:9 12:23 14:20
18:9 21:19 24:6
27:9 30:25 32:17
34:3 39:4,7 49:12
50:3 77:16 88:18
97:25 103:15,18
**format** 96:18 101:2,9
103:6 114:8,8
**formatting** 42:18
**forms** 31:4
**formula** 42:14,19
66:15
**formulas** 79:10 87:6

87:10
**forth** 65:20 67:18,23
120:22
**forthcoming** 99:22
**forward** 36:25
**four** 14:11 34:11,13
54:25 58:11,23
**fourth** 37:24 57:23
107:20
**four-month** 55:3
**front** 28:23 31:7
34:19 40:22 70:20
71:4 97:7 98:4
118:15
**FURNISHED** 131:17
**further** 3:8,12 128:14
**future** 105:6

**G**

**Gates** 1:20 2:15
**gather** 51:15 58:22
93:5
**general** 121:20
**generally** 59:6
**generated** 30:8,9,11
30:15 31:10,12 38:8
84:8 93:25 114:15
**generating** 114:10
115:3
**generation** 95:11
**Germany** 38:16 68:5
69:2
**getting** 17:4 29:20
33:9 113:8
**give** 4:4,16 5:10 12:8
13:20 29:9 31:25
32:18 33:13 63:19
95:9
**given** 26:15 33:14
66:22,23
**go** 4:18 7:16 8:7
13:19 14:21 18:10
28:15 32:2 34:5,8
34:12 50:14,15,16
57:22 64:2 68:13
73:22 91:22 93:14
94:6 98:4 106:24

107:19 110:5 115:5
116:10 120:20,24
**going** 4:24 12:9,10,17
22:17,19,20 23:3
27:8 28:4 32:16
33:16 34:2 36:19
39:3 44:6,7 49:11
49:18 73:8,22 82:19
91:24 109:3 127:2,4
**Good** 3:23
**graduate** 5:19
**graduated** 17:10,19
**graduating** 5:22
**great** 73:25
**gross** 101:15 103:16
106:25 107:2
**ground** 4:18
**group** 8:8 9:25 20:24
21:16 29:24 30:8,12
30:15,21 31:5,10
39:17 76:19 109:5
**groups** 90:25
**guest** 4:20
**Guts** 36:25 37:2
123:21,22,25 124:3
**Guy** 11:21,22

**H**

**H** 129:2
**hand-created** 76:18
**happen** 13:4,4
**happened** 8:21 9:4
21:17 50:8 54:19
**Harrison** 10:15,24
16:6
**Hazzard** 31:16,18
47:18 48:2,6 49:5
**Hazzard's** 48:9
**head** 5:9 44:13
**hear** 101:22 102:23
**heard** 37:2
**held** 1:19 4:10 9:15
**hereto** 3:6
**hierarchy** 97:11
**high** 5:12 69:22
**higher** 70:5
**hold** 6:10,20 7:24

9:13 30:13
**home** 16:10,10 33:16
  33:18 40:12,16
  110:6
**honestly** 73:11
**honor** 4:20
**House** 7:2,4,14
**hundred** 36:17 56:13
**hypothetical** 12:24
  13:3

---

**I**

**idea** 59:2 119:6 124:6
**identification** 28:6
  70:15 75:5 78:21
  88:24 89:11 96:13
  100:24 105:15
  111:12 113:13
  118:6 119:14 122:7
**identify** 71:15,17
  75:16 101:23,24
**II** 26:11 27:13 42:4
  45:25 47:25 60:22
  60:23 61:5,16,18
  62:22 65:25 66:3
  68:3,6,8,9,22,22
  69:3,5,11,11,13,15
  71:24 77:8 78:15
  80:9 83:15 84:13
  85:8,20 86:3,11
  87:16 88:4,12,13,17
  90:19 95:7 97:2,5,6
  100:3 106:5 107:24
  108:2 114:4 119:4
  120:4,6
**III** 26:19 36:25 45:20
  46:5,9 84:15 86:4
  86:11,16,20 94:4,9
  98:6,14 99:5,14,21
  106:15 114:19,21
**impacted** 21:9
**implication** 93:17
**imputed** 42:23 44:3
  44:15 45:3,11,13
  106:25 107:2 116:3
**inception** 112:22
  119:22 123:19

**include** 12:6 32:20
  47:16 49:12,13
  62:25
**included** 12:7 33:25
  47:17
**incorrect** 50:11
**INDEX** 131:2
**indicated** 128:11
**indicates** 97:7
**indicating** 45:8
**indication** 49:2 95:10
**information** 13:17,21
  13:22,23 24:24 25:2
  25:11,20 26:14,15
  26:16 30:3,6,10
  32:11 34:6 39:9
  40:14 50:11 51:16
  51:19 58:20,22 62:4
  66:8 76:23 77:3
  82:10 109:2 131:17
**inputting** 77:3
**inquiries** 97:8
**instance** 22:20 32:19
  110:25
**instinctively** 5:6
**institutions** 57:21
**instructed** 46:7
**instructions** 42:2
**interact** 20:8 21:11
  22:3
**interacted** 21:16
**intermediate** 11:8
**international** 4:8
  12:6,7 21:4 35:6,9
  39:10,15,18 40:2,3
  60:24 61:21 62:3,14
  65:11,15,18,23 66:9
  66:12,18,20,25
  67:13,21 69:17,24
  76:14,25 77:5,14
  93:11,16 94:23
  108:10 109:5,6,20
  109:24 110:3
  118:16 121:14
**Internet** 96:7
**interpret** 25:13
**inv** 57:7

**invoice** 96:25
**involved** 54:3,17
  86:19 91:24
**Irene** 20:7 21:11
**issuance** 30:23
**issue** 57:15
**issued** 30:18 58:3
**issues** 24:16
**items** 33:25
**iteration** 94:17 95:2,2
**iterations** 45:5
**IV** 84:16

---

**J**

**J** 1:10
**Jack** 44:13,16 53:3
  116:4,14,17 117:5
**January** 1:16 79:16
  79:22 80:6,12,18
  81:7 87:17,20,21,22
  88:6,10,22 89:4
  92:8 93:2 129:13
**Jeff** 31:15
**Jeffrey** 40:20
**Jineen** 1:21 128:6,23
**job** 10:5,25 63:21
  64:22 65:14 121:5
**jobs** 18:5
**John** 95:14,15
**joined** 9:10 112:4
**Jointly** 1:6
**July** 62:5 92:16
**jump** 36:19
**June** 89:9
**June-September**
  102:10

---

**K**

**K** 3:17
**Kapila** 1:12 2:8
**Karen** 1:18 4:3 31:15
  127:13 128:10
  132:6
**keep** 31:3
**kept** 82:21
**kind** 4:18 5:10 12:18
  14:16 22:17 24:14
  25:16 30:24 33:19

58:10 66:15 69:9
  82:16 85:12 92:22
  93:13 97:24 110:10
  113:4
**kinds** 14:6 32:15
**knew** 49:17
**know** 5:2 10:24 13:14
  18:6 19:10,15,18
  20:13,18,21,22,22
  21:7 23:22 26:18
  27:21,23 29:15 31:9
  31:17 33:24 34:21
  36:21 38:14,24 39:7
  39:12 41:10 44:15
  46:15,16 49:3,5,6
  50:10 51:15 54:9,11
  54:18 55:2,23 57:20
  59:13,25 61:19
  62:19 63:4 64:4,7,8
  64:12,17 65:4 66:4
  66:6,13,6 7 68:2,7
  68:15,16,17 69:14
  73:11,21,24 74:7
  76:2,9,17,20 79:8
  81:14,17 83:21 91:9
  91:23 94:8,25 95:3
  95:15 100:15 101:3
  102:2 103:13,17
  105:16 107:7,9,11
  107:12,13,23 108:5
  109:13 113:9 116:9
  116:10 117:3 119:3
  120:5,8,13 121:15
  122:22 124:3,22,23
**knowledge** 16:13
  41:22 71:8 72:3
  74:3 77:12,18,24
  99:24 100:8 101:16
  101:19 106:18
  110:20 112:25
  114:14 118:21
  122:18 123:24
**known** 35:22
**knows** 20:20 55:6,9
  68:14 71:19
**Kranzdorf** 31:15,17
  40:21,24 41:6

**K&L** 1:20 2:15

---

**L**

**L** 3:2,17
**label** 58:16
**labor** 18:18,19
**lag** 57:14 58:11
**Laura** 10:21 19:20
  20:9 90:3,4 97:9,12
  104:22
**Laura's** 11:6
**Lavatus** 2:25
**LAWRENCE** 2:12
**lawsuit** 23:17,23 24:2
**lawyer** 24:15
**lawyers** 22:9
**layoffs** 20:25 21:9
**leave** 8:5
**left** 9:6,15 21:15 28:2
  54:9 108:3 114:12
**legal** 13:13,16 24:16
  30:9 47:14 48:17,24
  49:15 50:15,17,20
  50:23 56:2,6 80:5
  80:17,24 81:19 85:7
  85:19,25 86:8
**letter** 28:18,24 29:4
  31:7,9 40:20,21,23
  40:25 41:5,6,10,13
  47:2 50:9,14,18,22
  51:3,8 54:23 55:4,7
  55:11,15,19 58:7
  60:21 75:17,22,23
  76:2 78:14,20,23
  79:12 82:5,13,25
  83:6,13 86:14 87:7
  87:11,18 88:7,23
  89:4 90:2,10 92:8
  92:10 93:2 96:19
  98:8,21 112:16
  129:12,13
**letters** 29:7 46:13
  90:6
**letting** 50:10 51:15
**let's** 24:24 65:7 75:2
  87:23 125:25
**level** 47:7

**Lexington** 1:20
**license** 42:23 44:3,16
  45:3,11,13 106:25
  107:2 116:3
**licensing** 70:8 77:25
  90:24 92:23
**Limited** 21:13
**line** 7:7 60:23 103:4
  108:6 131:6,6,12,12
  131:18,18 132:7
**list** 71:18,23 78:5,7
**listed** 35:17 36:13
  40:12 62:19 69:20
  72:4 73:6 76:10
  101:2
**listing** 102:20
**listings** 106:25
**lists** 38:13 71:4
  122:16
**LITIGATION** 131:2
**little** 5:6 15:11 54:25
  113:5
**LLP** 1:20 2:15
**Lobianco** 11:21
**local** 15:6
**long** 4:10 6:10,20
  7:13,24 8:15,23
  9:13 17:7 57:18
  84:18
**longer** 84:24
**look** 16:24 28:23 29:6
  33:21 37:16 38:12
  45:6 63:25 78:9,11
  103:14 112:6,9
  114:18 118:24
  125:13
**looking** 36:5 37:12
  46:11 58:25 59:17
  79:14
**looks** 37:17 103:11
  119:20
**LOUIS** 1:10
**low** 69:22
**lower** 62:15 77:15
**lsilverman@scs-la...**
  2:13
**Lumpkin** 2:21 12:22

13:2,10 14:20 18:9
  19:12 20:19 21:19
  21:23 22:16,21 23:8
  24:6,13 25:15 26:6
  27:8,12,20 28:15,22
  29:14,22 32:16 33:3
  34:2 39:3 41:8 44:4
  44:10 50:3 53:4
  55:5 58:15 68:10
  71:12 73:8 75:9
  81:23 82:19 84:4
  85:11 88:18 94:5
  98:16,23 101:22
  103:7,11 107:8
  116:24 124:20
  126:9

---

**M**

**majority** 60:9,16,18
  73:25
**Making** 19:5 22:11
  25:25 26:7,11,11,19
  26:25 27:10 36:21
  36:24 38:4,6,19
  41:19 42:3 45:4,5
  45:19,24,25 46:5,8
  47:19,20,25 52:2
  57:7 60:22,23,25
  61:5,11,16,18 62:21
  65:25 66:3 67:4,16
  67:18 68:3,6,8,9,21
  68:22 69:3,5,9,10
  69:11,12,15 70:10
  71:5,24 73:5 76:7
  76:21,22 77:6,7,19
  78:15 80:9 83:9,14
  83:22 84:12,13,14
  84:16 85:8,9,20,21
  86:2,3,3,10,10,11
  86:16,20 87:16 88:4
  88:8,11,13,17 90:17
  90:19 94:4,8,17
  95:5,7,8 96:25 97:5
  98:6,13 99:4,14,21
  100:2,3 102:8 106:4
  106:15 107:16,17
  107:17,24 108:2,4

108:24 110:23
  111:2 112:18 114:3
  114:18,20 118:18
  119:4,4 120:4,4,6,6
  122:19 123:17
**manage** 10:9
**management** 5:17
  17:16 103:25 104:7
  104:13,16 105:18
  111:25
**manager** 4:8 7:22
  9:11 10:4,6,12
  11:12 12:14,16 17:7
  17:21 19:19,20
  26:22 47:5,8 51:22
  60:5 73:3 89:24
**manual** 14:9 98:3
**marathon** 111:2
**March** 76:6 112:23
  119:23 123:19
**mark** 28:4,21 44:11
  70:13,23 75:2 88:20
  89:7 96:9 100:22
  111:9 113:11 118:3
  119:8 122:4
**marked** 28:6 43:6
  52:5 70:15 72:8
  75:5 78:18,20 88:23
  89:11 96:12 100:24
  105:14 111:12
  113:13 115:8 118:6
  119:10,13 122:6
**marketing** 7:9,10
**Martha** 67:3
**masters** 5:16
**matter** 77:2
**MBA** 5:16 17:11,15
**McPherson** 24:2,5,21
  25:13 31:8,11,13
  40:20,24 41:7,14
  42:8 46:13 47:2,15
  76:3 98:20 99:20
**McPherson's** 25:8
**mean** 39:4 68:24
  100:19 104:5
  124:11 126:7
**meaning** 26:7

**means** 4:21 101:4
**meant** 45:11 108:21
**mechanical** 7:22
**mechanism** 42:14
**meet** 22:21,25
**members** 123:21
  124:19
**memo** 32:13,24 33:7
  33:20
**memorialize** 33:7
**memory** 38:18
**memos** 82:16,21
**merchandise** 32:21
  35:20 62:18 63:2,2
  63:5,5 121:2
**merchandising** 31:23
  32:8 34:20,24 35:12
  35:14 36:7,16 63:7
  63:12,14 64:3,6
  96:6 120:11,12,18
  120:18,21,23,24
  121:8,9,11
**Merit** 1:23 128:7
**met** 22:24 23:2
**Miami** 2:6,18
**MIDDLE** 1:3
**Millicent** 11:20,22
  19:9 41:18 56:24
  108:11 116:15
**million** 62:12 119:2
**mischaracterization**
  33:4
**moment** 36:20 101:9
  106:22
**money** 32:15 33:22
  86:24
**month** 101:13 102:10
**months** 6:23 7:15
  39:8,13 54:25 55:21
  55:24 58:11,24
  84:24
**morning** 3:23,24
**moving** 73:13
**MTV** 1:14 2:19 4:6
  9:6,10 12:17 18:2,5
  18:7,11,12,23 19:11
  23:13,16 24:23

27:15 30:18 33:14
  39:21,23 40:14,18
  47:6 54:14 59:19
  63:8 70:8 74:4,5
  77:21,24 80:4,23
  81:6 84:7 85:6 86:7
  88:15 91:10 92:19
  92:20 94:3 95:5,8
  96:17 98:13,21
  100:13 104:7,11
  106:19 109:11
  115:2 116:18,23
  117:6 125:11,17,23
  132:5
**MTVN** 29:12,12 30:3
  30:3 70:14,22 75:4
  75:8 89:10,13
  113:12,16 118:5,11
  119:9,12 122:5,10
  125:6 129:9,10,15
  129:24,25 130:3,5
**music** 8:8 34:25 35:5
  37:5,10 64:16,17,23
  92:17,17,24 93:7
  94:24 97:17 100:11
  100:12 106:9
  107:20 110:5

 

**N**

**N** 2:2 3:2,17 128:2
**name** 3:25 15:19,20
  18:15 37:18,23
  90:12 95:4,8 108:4
  132:5,6,20
**necessary** 13:16
**need** 4:21 51:7 58:21
  63:24 64:2,5,9,13
  76:13 81:2 91:21
**needed** 24:24 63:23
**net** 98:5
**network** 15:5,12
  101:14
**networks** 1:14 2:19
  4:6 18:11,12,24
  23:13,16 39:21,23
  40:14,18 47:6 63:8
  74:4,6 78:2 100:13

132:5
**never** 41:9 71:20
  86:19 107:9
**new** 1:20,21,25 3:19
  9:21,23 12:9,12,16
  13:6,12,14
**nod** 5:9
**nontour** 120:11,18,23
  123:22
**normally** 84:10 127:2
**notary** 1:24 3:14,18
  128:9 132:24
**noted** 127:6
**notes** 128:13
**notice** 1:19 23:21
**November** 78:19,23
  79:9,11,23 80:7,19
  81:9,12,14,21 82:5
  82:13,17,25 83:6,13
  86:15 87:2,7,11
  96:12,15 125:24
  129:11,18
**number** 28:25 35:3,8
  35:17 56:3 59:11,18
  59:22 60:25 62:11
  62:15 63:24 66:11
  66:12 71:5 77:8
  96:25 99:3,3,8
  103:17 108:5
  112:12
**numbered** 107:18
**numbers** 29:9,17
  32:5 35:13,15 39:8
  54:13 63:18 64:23
  65:3,20,21 69:20
  77:13,16 90:23

 

**O**

**O** 3:2 128:2
**object** 12:22,23 14:20
  18:9 21:19 24:6,13
  25:15 26:6 27:9,20
  32:17 33:3 34:3
  39:4 41:8 44:4 50:3
  55:5 58:15 68:10
  82:20 85:11 88:18
  94:5 107:8

**objected** 49:25
**objection** 19:12
  20:19 22:16 71:12
  81:23 84:4 98:16,23
  116:24 124:20
**objections** 3:9
**obtaining** 49:10
**Obviously** 20:21
**occasion** 49:22 87:5
  103:24 105:4
**occasions** 21:14 22:5
  48:3 50:16 109:19
**office** 17:23 20:17
  51:13,18
**offices** 1:19
**okay** 98:17
**old** 20:6
**once** 32:10 110:12
**ones** 97:25 113:6
  121:24
**on-line** 5:18
**operation** 7:8
**operations** 4:9 9:25
  10:3
**opinion** 69:19,25
  70:3
**opposed** 76:21
**oral** 42:2
**order** 13:16 30:22
  32:7
**Original** 131:21
**originally** 75:23
**ORLANDO** 1:4
**Outlook** 110:10
**overhead** 123:8,12
**owed** 86:23 125:19
**owned** 77:21
**O-Town** 36:12,14
  62:25 64:18 83:24
  83:24 84:3 94:25
  95:11 100:5 112:24
  124:10,18

 

**P**

**P** 2:2,2 3:2 68:7,9,22
  69:4,11 76:7,21
  77:6

**packet** 29:5 93:22
**page** 28:23 29:23,24
  30:6,17 31:7,20
  35:11 37:5,16,17
  38:12,13,22 39:16
  40:10,22 41:2 57:5
  61:20,24 62:9,17
  64:15 65:10,13,20
  67:8 70:22 71:4
  72:5 76:5 83:16
  92:12 95:13 96:23
  97:7 98:5 102:3,7
  103:2,5,5 106:23
  107:18 114:17
  118:16,18 120:3,9
  123:17 125:6,14
  126:16 129:5 131:6
  131:6,12,12,18,18
  132:7
**pages** 29:2,4,23 30:13
  60:21 119:10,17
**paid** 6:7 35:24 42:15
  92:20 104:9,10
  112:6
**paragraph** 83:16
**paren** 95:5
**parenthesis** 68:6
**part** 16:2 49:17 66:11
  73:2 90:4 115:6
  124:7
**partial** 34:18
**participant** 24:25
  25:6 29:13 31:21
  42:15,16,18 49:23
  51:5 54:13 60:13
  116:22
**participants** 32:15
  33:9 60:7 104:10
  105:7 125:4
**participation** 9:11
  10:7,10 11:12 12:2
  12:5,11,18 13:18,23
  14:3,8,12,14,18,23
  14:24 15:23,24
  17:22 18:21 19:19
  19:22,24 21:15 25:4
  25:20 26:17,22 27:4

27:6,18,19 28:5,13
  28:18 30:19,21
  32:12,19,22 33:24
  34:8,11,18 38:7,9
  41:17,20 42:3,9
  45:17,19 46:4,8,14
  46:20,25 47:5,7,11
  47:22 48:4,10,12,15
  48:20,23 49:11,24
  49:25 51:22 54:4
  56:4,5 58:6,13 60:5
  60:10 61:14 62:13
  63:16 67:16 68:20
  69:8 71:3 73:3,4,16
  75:18,21 76:12
  77:14 78:9,11,13
  79:6,9,25 81:25
  82:10 83:8 86:19,24
  87:16 88:3,5,17
  89:8,19,23 90:7,16
  91:4,15,17,22 93:6
  93:13,24 94:3 95:25
  96:18 97:13,15,21
  98:6,14 99:5,15,18
  103:20 104:3 105:6
  105:11,13,17,18,25
  106:8,14 111:25
  112:3,7,10,15,18
  113:3,17,24 114:10
  114:21 116:13,16
  117:5 119:20
  120:17,25 121:24
  122:19 123:6,9,13
  123:18 124:8 125:9
  129:7,20
**participations** 22:10
  82:4 91:20 104:8,16
  104:18 109:15
**participation's**
  103:25
**particular** 24:25
**particulars** 54:18
**parties** 3:6 123:11
**partner** 33:15,15,17
  33:22
**party** 128:15
**Pavesi** 1:21 128:6,23

**payable** 30:22 59:8
  59:15,23 95:23
**paychecks** 18:16
**payee** 101:13,13
  102:9
**payment** 49:12
**payments** 35:16,18
  35:19 36:2 37:7,10
  37:13 61:15 78:6,8
  104:3,17 124:9,18
**PC** 15:6
**PE** 97:2
**Pearlman** 1:10 98:22
**people** 11:15,16 33:8
  47:16,24 104:8
  125:2
**percent** 36:17 56:13
  102:10 122:17
  125:16
**percentage** 21:6 25:5
  45:14 101:13 116:7
  123:22 124:16
**performed** 68:19
**period** 39:2 58:8,12
  62:4,5,7 67:10
  89:19 93:7,13
  104:19 105:25
  109:7 114:2 118:15
  118:17,18 122:23
**periodic** 32:23
**periods** 67:9 112:15
**person** 22:25 47:21
  49:23
**personal** 122:17
**perusing** 28:8 29:8
  41:3 61:25 70:17
  75:13 78:24 88:25
  96:16 107:22
  111:16 113:18
  118:8 119:15
  122:14
**Philippines** 73:18
**Phoenix** 5:18 17:12
**physical** 17:22
**piece** 13:25
**place** 4:5 95:6
**Plaintiffs** 1:13

**please** 4:2 44:11 97:9
**point** 24:2 44:10
  54:20 57:4 69:3,4
  81:11 94:9 96:17
  99:17
**portion** 44:19 53:8
  74:9 117:10
**portions** 114:22
**position** 4:7 5:25
  7:25 11:2,3,6 19:23
  20:3,6
**Powell** 2:25 23:10
**PR** 59:10
**practices** 73:10
**predates** 71:13
**predecessor** 26:4
**predict** 105:5
**preparation** 23:7
  41:20 65:16 67:4,15
  113:23
**prepare** 14:3 22:14
  46:8 51:6 78:4
  79:24
**prepared** 42:4,10
  48:5 91:4 92:2
  113:2,7 122:21
  125:11
**preparing** 29:25
  33:23 69:8 79:5
  98:7,21 108:15
  114:22 119:25
  122:12
**PRESENT** 2:24
**presumably** 110:14
  120:21
**presume** 4:16,24
  94:22 95:18 110:4
**presuming** 101:8
  103:4
**pretty** 4:19
**previous** 14:17 35:23
  36:4,6 62:13 65:12
  76:11 77:16 112:7
  112:10
**previously** 37:14
**prices** 77:25
**print** 96:6 104:2

printout 30:7 101:17
prior 23:21 27:17,24
  35:25 37:12 47:10
  113:8 116:17,22
privilege 24:14 25:17
probably 25:11 40:18
  92:4
procedure 22:7 49:18
  50:7 54:11
proceed 51:18
proceeds 31:21,23
  32:21 33:16,19
  34:20,25 35:12 36:7
  36:16 37:5 40:12
  62:18 64:16,18
  97:17 106:9
process 49:10 50:19
  104:15
producers 125:2
product 22:18 25:17
  85:12
production 45:14
  95:4,8 116:7 118:25
  131:11
Productions 1:12
  2:11 102:9
products 7:11
Professional 1:22
  128:7
program 35:7,9
  39:18 42:12 61:21
  65:11 118:16
project 12:9,12
promoted 6:14 8:22
properties 104:4
  121:13,23
property 101:12
  107:16 108:4
provide 13:15 39:17
  121:18
provided 39:11 65:18
  66:9 80:11 81:19
  82:18 91:6 97:23
  121:3
provisions 26:13 82:8
public 1:24 3:14,19
  35:5 128:9 132:24

publishing 34:25
  37:6,11 64:16,17,23
  92:17 93:8 96:6
  97:17 99:25 106:10
  110:5
purposes 123:13
pursuant 1:19
put 13:7
p.m 127:6

## Q

Qs 95:7
quarter 37:25
quarterly 14:14
  60:11,14
question 3:10 4:23,24
  4:25 13:11 16:18
  22:22 33:6,12 40:10
  42:7 44:12 48:8
  80:5,14,16 85:16,18
  85:24 103:8,10
questions 22:20
  64:15 65:12

## R

R 2:2,7 3:17 128:2
ran 66:22,23 67:9,19
  67:24 83:22 84:3,24
  85:3 111:2
Random 7:2,3,13
reach 30:20,21 32:6
  100:10
reaching 58:20
read 25:12,22 26:3
  26:12 70:18 126:4,8
  126:11 127:2,3,5
really 33:11 69:23
Realtime 1:24 128:8
reason 16:25 132:7
recall 8:9 9:7 10:22
  11:3 14:25 15:4,7
  15:12,18 16:7,12
  19:4 26:2 31:6 40:6
  40:9,13 47:20 51:23
  51:25 53:2 61:13
  63:3,6 68:18 73:19
  82:12,14,15,24 83:4
  83:5 84:25 85:4

90:21 92:11 94:11
  98:18,25 99:11
  100:17 105:21
  116:6,20 117:4
  125:12,22
receive 41:25 55:14
  55:16 57:16
received 5:14 32:10
  38:15 50:2 55:18
  57:3 76:24 82:12,25
  83:6 90:10,24
  110:12 124:14
receiving 23:21
Recess 65:9 126:3
recognize 37:20
  75:14 89:2 101:9
  102:14 103:14
recognized 67:11
Recognizing 70:25
recollection 45:2
  56:15 57:10,24
  75:21 77:13 92:3,6
  94:16 98:11 99:20
  112:14
record 4:2 5:23 7:20
  28:16 29:15
records 64:6 99:2
redacted 101:4,7,8
  101:20 102:4,5
refer 36:24 38:4
reference 60:20,24
referred 40:21 68:21
  102:19
referring 61:5,6,10
refers 83:17 119:3
reflect 65:21 67:8
  73:16
reflected 67:8 73:4
reflecting 112:22
reflects 103:16
refresh 57:9 98:10
regard 25:16 68:12
  82:21
regarding 42:8,8
  48:12 57:6 67:3
  71:9 77:24 81:7
  85:12 106:14

113:23 125:18
regards 24:22
regional 21:4
Registered 1:22,23
  128:6,7
regular 20:14 33:9
regularly 113:2
related 128:15
relationship 61:23
relationships 74:4
relevance 44:5
remember 22:5,7
  44:17 53:6 56:17
  57:19 58:4 62:24
  83:24 84:2 92:4
  109:22 116:5,8
  117:8 118:14,20
remind 33:7
repeat 85:16
rephrase 82:2 87:23
report 10:13 11:11
  21:8 25:4 97:25
  103:18,21 104:7,12
reported 10:15 19:23
reporter 1:22,23,24
  126:10 128:7,8,8
reporting 16:6
  112:15
reports 27:19 103:25
  104:25
request 25:2 48:22
  73:9 109:4 131:11
requested 39:9 48:18
  57:11,12 58:9
requesting 51:17,20
  109:9,10
require 95:19
requirement 49:14
requisition 30:25
  31:4 49:9,19 56:8
requisitioned 56:19
reserved 3:10
respect 83:17 98:5
respective 3:6
respond 108:18,20
responding 41:14
response 41:5 109:4

**responsibilities** 10:6
  10:8 12:4 67:22
**responsibility** 13:9
  16:13,19 36:15 91:5
  106:13 124:7
**responsible** 19:5
  27:13 29:25 41:19
  41:23 66:21 98:13
  102:21 108:9
  116:12,21 124:9,17
**restate** 87:24
**result** 54:4,6 111:3
**resulted** 69:16
**retained** 131:21
**revenue** 32:8 45:15
  64:8,9 65:5 66:7,10
  66:14 67:10 92:18
  92:21,23 93:7,12,16
  93:18,19,21 94:24
  96:5 97:16 101:15
  103:16 106:25
  107:2 108:10 109:6
  120:3 124:16
**revenues** 38:14,15
  69:15,21 71:10 73:4
  73:17 92:19 94:21
  95:10 100:2,9
  107:20,24 121:6
**review** 47:22 48:9
  123:4
**reviewed** 47:12,13
  48:16,24 49:3,4,15
  79:5 91:10
**reviewer** 91:12,14
**rid** 11:8
**right** 17:9 51:4 56:2
  65:25 73:13 126:4
  126:11,15
**right-hand** 106:24
**RMR** 128:23
**Rob** 10:15 16:6
**role** 26:21 73:3
**royalties** 6:8,16,17
  7:23 8:19 124:15,25
**royalty** 6:2,6 8:14,18
  8:25 9:5
**RPR** 128:23

**rules** 4:18
**running** 78:7

———————

**S**

**S** 2:2 3:2,2 129:2
**sale** 6:8
**sales** 7:9,10 35:7,10
  39:19 61:21 65:11
  118:16
**SAMMATARO** 2:3
**save** 14:14,18,22 15:2
  15:3 110:10,13,17
**saved** 15:5,6,8,9
**saw** 107:9
**saying** 5:3 51:8
  108:15 110:15
**says** 35:11 55:15 57:6
  59:9 60:23 68:7,13
  69:3,4,5 84:22 95:6
  96:25 98:5 107:16
  108:3 112:11 114:3
  118:25 125:15
**schedule** 65:17 68:13
  76:10,11,24 93:22
  121:19
**schedules** 67:4,15
  76:16 78:5 97:22
**school** 5:12
**science** 5:14
**scope** 51:2,7
**sealing** 3:7
**season** 61:10 77:19
  83:18 84:11,13,14
  84:15,17,19,20,24
  85:3,9,21 86:9
  90:18 118:25 119:5
  120:7
**seasons** 47:20 61:16
  61:19 62:20 71:6
  83:18,21,23 84:3,6
  84:8 86:2
**second** 57:5 85:20
  91:12,14 120:9
**see** 33:21 40:23 45:7
  59:17 60:22 61:2
  67:17,23 84:23 85:2
  99:7 114:20

**seeing** 37:13 99:11
  125:12
**seen** 28:9 41:10,13
  70:7 71:20,23 73:2
  78:25 89:15 95:20
  101:2 111:14,19,23
  113:19 118:9
  119:16,24 122:11
  126:6
**semiannual** 60:19
  62:7 102:12 112:20
**semiannually** 60:14
**send** 50:9,22 56:12
  56:14 108:14,16,23
  109:5 111:4 112:17
  121:12,22
**sending** 47:10 98:7
  98:22 109:23,25
**Senior** 8:14 11:7 12:2
**sent** 10:11 46:21 71:6
  75:12,24 89:23 90:2
  90:7 96:19 121:15
**separate** 14:15 68:23
  68:25
**separating** 64:7
**September** 28:24
  54:24
**series** 12:16 83:19
  112:24
**set** 65:20 67:23
  120:22
**setoff** 37:7
**sets** 77:25
**setting** 67:18
**share** 15:10,15,19
  16:8,14,16,20 17:2
  33:16,18 110:18
  122:16,25 123:23
**shares** 36:12,13
**sheet** 69:2 132:2
**shortly** 98:8
**show** 13:6,12,14 19:6
  25:4 28:3 33:18
  43:3 50:4,5 61:6
  62:19 66:22 67:24
  70:12 71:9 73:6
  78:17 100:21 109:2

  111:8 113:10
  116:22 118:2 119:7
  122:3
**showed** 46:12 111:20
**showing** 93:17
**shown** 94:18 97:16
**shows** 14:3 18:24
  19:2 22:12 24:23
  26:2,25 27:5,7,19
  42:22 43:2 44:2
  45:4 60:6,10,18
  62:20 64:18,19 67:9
  67:17 71:19 84:8
  108:25 109:7,8,10
  109:11,12,13
  124:13 125:5
**side** 49:24 64:12 65:5
  85:8
**signatures** 59:2 95:20
  95:21
**signed** 3:13,15 59:6
  95:14
**Silverman** 2:3,12
  3:22 12:25 13:5
  21:21,25 24:8 26:9
  27:11 28:20 29:20
  41:11 44:9 50:5
  65:7 70:21 71:16
  75:2,7,11 78:22
  85:14 88:20 89:7,13
  96:9,14 101:25
  103:9 105:10 111:8
  113:10,15 115:5
  118:2,11 119:7
  122:8 125:25
  131:22
**similar** 96:20 122:3
**Simon** 11:20
**six** 84:24
**size** 95:19
**slot** 11:9
**software** 14:2,6
**sold** 63:9,9
**somebody** 59:7
  108:12
**Soneet** 1:12 2:7
**song** 95:7

Sorry 81:4
South 2:5,17
speak 23:6,12,25
    39:14 66:24 67:12
    67:20 88:19 121:16
speaking 24:21 44:8
specialization 17:15
specialty 17:14,19
specific 7:7,11 13:25
    15:19 19:2 21:6
    25:4 47:21 65:4
specifically 15:7
    21:20,22 24:19
    56:20
speculation 12:23
    20:20 27:21 41:9
    55:6 116:25
splits 116:22
spoken 24:4
spreadsheet 14:15
    103:12 110:16,17
    121:12,22
spreadsheets 14:10
    15:16 16:15,25
    37:13
stamp 48:25
standard 42:19
stands 107:10
start 65:11 85:7
started 5:23 12:12
    79:23 83:2 122:22
starting 5:11 38:13
starts 75:7
state 1:25 3:19,25
stated 36:3 41:17
    62:10 99:20 112:5
    114:11 116:5,8
    125:10
statement 13:18
    14:15,19,23,24 28:6
    28:14,19 32:5,12
    34:19 35:22,23 36:4
    38:7 46:8,25 48:4
    48:20,23 49:11,14
    49:24,25 54:5 56:4
    56:6 58:14,16 62:2
    62:14,21 76:12

77:10 78:9,12,13
79:10 83:8 89:8,19
90:9 91:4,22 93:6
93:16,25 96:2 97:8
97:21 98:7,14,20,22
99:22 100:18
102:11 105:11,14
105:17,25 106:8,14
112:7,10 113:3,7,17
113:24 114:21
121:4,25 123:18
129:8,21
statements 10:10
    13:24 14:4,8,12
    32:22 33:24 34:8,12
    36:6 41:21 42:3,9
    45:19 46:5,14,20
    47:11,22 48:10,13
    48:16 58:6 61:14
    67:16 69:8 73:5,16
    75:19,22 79:6,25
    82:11 86:25 88:4,5
    90:7 91:15,18,25
    93:15 94:3 96:19
    97:16 99:18 112:3
    112:16,18 114:10
    116:13,17 117:5
    119:21 120:17,25
    122:21 123:9,14
    124:8
states 1:2 95:4
station 77:21
stations 69:14
stenographic 128:13
Stevenson 20:7 21:12
stipulated 3:4,8,12
    25:10 82:9
stipulation 95:24
stops 4:22
store 63:5
stores 63:9
streams 124:16
structure 30:18
stuff 15:2 63:9,9
subdirectory 99:4,9
submit 49:19 56:8
subordinate 41:18

subordinates 15:14
    18:20
Subscribed 127:15
    132:21
subsequent 83:18
    114:19
subset 109:11
subsidiaries 74:5
subsidiary 100:12
substance 126:14
Suite 2:5,17
summaries 82:16
summarize 32:14
summarizing 34:16
summary 31:21,25
    32:24 104:2
supervisor 6:14,15
    8:22,23,25 9:5
SUPPORT 131:2
supposed 33:25
sure 10:9 28:17,19
    36:18 56:13 92:5
    108:7 114:13
    124:11
Sweden 38:16
switch 96:17
switched 79:22
sworn 3:14,16,18
    127:15 128:11
    132:21
syndication 39:10
    62:3,14 65:23 66:12
    67:13 69:17,24
    76:14,25 77:5,14
    110:22 111:3,6
    121:14
system 13:8 15:2
    59:19,23

---

T

T 3:2,2 128:2,2 129:2
take 4:21,22 28:23
    29:6 45:13 57:21,25
    58:11,23 65:7,24
    73:12 123:9 125:25
taken 4:14 17:17 65:9
    126:3

takes 5:6 13:8
talent 124:13,25
talk 22:23 27:25
    63:11 69:23 113:22
talked 23:3 56:7 86:8
    91:20 121:13
talking 86:9 117:6
talks 123:21
tax 15:23,24 16:2,6
television 1:12 2:11
    42:12,22 59:10
    102:9 125:5
tell 13:6 14:17 15:11
    21:3 22:4 24:11
    29:3 44:2 50:23
    111:18 119:19
term 37:2 45:11
    84:11 86:2,9 102:23
    111:24 120:16
terms 25:19 34:16
    51:14 60:7 68:24
    88:6
territory 77:20
testified 3:20
testimony 33:4 43:5
    52:4 72:7 115:7
Thank 28:22 29:22
things 21:17 68:23,25
    116:10
think 75:11 76:15
    123:20 126:6
third 83:17
thought 54:13,14
    85:15
three 9:16 11:15,16
    18:19 51:24 119:10
time 3:11 4:15 5:8
    10:14 11:17 14:23
    16:4 20:17 26:24
    27:14 28:2 34:7
    38:11 45:16,21
    46:16,17 47:4 48:19
    55:18 57:18 60:4
    61:13 68:20 73:12
    79:21 83:2,11 89:22
    90:5,6 91:3,21
    93:24 95:16 97:20

97:22 105:17,22
109:7 121:17
122:23 125:18
127:6
**timely** 10:11
**times** 34:13 108:19
**title** 4:11 6:11,21
8:12,16 9:9,14,19
10:2 11:23,25 17:8
19:16 95:7
**Tobar** 67:3
**today's** 22:15 23:7
**told** 4:17 32:25 76:15
93:11
**top** 44:13 59:9 70:19
103:15 108:3 114:4
**total** 104:9
**tour** 63:4 120:11,17
120:23 123:21
**tours** 63:10
**Tower** 2:4
**track** 14:3 35:18
**tracking** 35:25 36:13
**training** 5:7
**Trans** 1:12 2:10 59:9
86:23 87:15 88:2,8
88:16 91:11 102:8
125:15,19
**transcript** 126:10,11
**transcription** 128:13
**transition** 96:22
**transitioned** 9:21
17:6
**transmittal** 96:11,15
96:20 129:17
**transpired** 121:17
**treated** 22:11
**trial** 3:11
**tried** 87:10
**true** 128:12
**Trustee** 1:12 2:9
**Turkey** 94:18,22
**turn** 31:20 37:16
39:16 41:2 57:5
62:17 76:5 92:12
96:23 103:2 106:21
106:23 107:15,18

114:17 120:9
123:17 125:6
**Turning** 65:10
107:14
**TV** 77:20 94:9
**two** 9:15 71:2 95:19
95:21 111:23
**type** 14:16 101:14
**typed** 5:4 77:7,9 98:2
**types** 102:13
**typing** 76:20

———————— **U** ————————
**U** 3:2,17
**uh-huh** 5:4
**um-hum** 5:5
**underneath** 18:23,25
88:10
**understand** 5:2 13:10
23:4 33:11 87:10
**understanding** 16:17
45:10 61:4,9 81:20
82:3,7 83:12 86:14
87:14 88:2 94:2
97:3 116:2
**understood** 4:25
20:16
**UNITED** 1:2
**Universal** 8:8,10,13
**University** 5:18
17:11
**unusual** 90:11
**upcoming** 104:18,19
**use** 14:2,7 25:19 80:6
81:7,8,12 82:9
**usually** 50:12 104:22
**utilize** 84:10
**U.K** 38:16
**U.S** 101:14

———————— **V** ————————
**v** 1:14
**various** 13:20 58:21
69:21 104:11
109:25
**vendor** 59:9,18,22
99:3,8
**vendors** 59:17

**verification** 96:3,8
**verify** 63:23 64:22
65:3,15
**verifying** 63:18
**version** 100:5,6
**vertical** 108:6
**VH1** 111:2
**Viacom** 20:25
**vice-president** 20:5
**video** 33:16,19 40:12
40:16 110:6
**view** 86:22
**Virginia** 23:25 24:5
24:10,12,15 31:8
40:20 98:19

———————— **W** ————————
**Wachovia** 2:16
**waive** 126:5,7,15
**waived** 3:7
**walk** 61:20
**want** 6:22 12:25
24:18 28:19 62:23
65:3 80:13 124:14
**wanted** 94:20
**wasn't** 16:25 63:21
63:22 64:22 65:14
90:11 100:16 101:8
**way** 59:25 63:18
69:25 70:4 73:24
**week** 111:23
**went** 5:13 6:25 8:6,10
9:6 10:25 29:13
78:14 87:20 90:9,12
121:24 123:15
**weren't** 49:18
**we're** 28:3 44:6 73:13
73:13 108:15 109:3
127:2,4
**witness** 20:20 27:21
28:8 29:8,16 41:3
61:25 70:17 71:13
75:13 78:24 88:25
92:13 96:16 107:22
111:16 113:18
118:8 119:15
122:14 127:4

128:10 131:5
132:20
**word** 101:3
**work** 15:15 16:10
18:7 19:3 20:14
22:17 25:16 51:10
68:19 78:10 84:7
85:12 104:21
108:25 112:12
125:7
**worked** 18:2,3 26:10
26:19 36:21 42:13
42:23 44:16 45:3,24
81:22
**working** 5:23 14:19
15:13 16:9 17:24
18:20 25:3 106:19
109:3
**world** 110:2
**wouldn't** 39:25 54:6
54:9 65:3 74:7
93:19 109:24
**write** 46:13
**writing** 49:7
**written** 41:25

———————— **X** ————————
**x** 1:9,11,15 54:14
129:2

———————— **Y** ————————
**Y** 54:15
**year** 8:2,3,4,9,17,21
8:24 14:12 34:12,13
66:22,23 84:20 85:3
104:9,19 105:6
**years** 9:16 24:7 51:21
71:2 126:6
**year-and-a-half** 6:12
**York** 1:21,21,25 3:19

———————— **Z** ————————
**zero** 93:12 108:22

———————— **$** ————————
**$190,000** 40:11
**$224,225** 35:24
**$3,250** 119:2

**$328,112** 62:15
**$45,233** 65:25
**$53,457** 66:3
**$6,930** 76:8

---

**0**

**0001692-93** 118:6,12
  130:2
**00028** 89:11,14
  129:16
**00037** 95:14
**000445** 122:5,10
  130:5
**000448** 123:17
**000450** 125:6
**000454** 122:6,10
  130:6
**00048** 29:12
**00056** 29:12
**001617** 103:2
**001719** 119:9,12
  130:3
**001720** 120:10
**001721** 119:9,13
  130:4
**002098** 70:14,22
  129:9
**003724** 113:13,16
  129:24
**003733** 114:17
**003734** 114:18
**0038** 75:4,8 129:10
**0056** 30:4
**04** 37:25
**05** 76:6
**09** 103:5

---

**1**

**1** 27:14 28:4,5,21
  38:23 71:6 92:16
  98:4 102:3,7 108:5
  125:24 129:7
**1/12/09** 132:6
**10** 111:10,11 129:23
**10:10** 1:17
**100** 102:9 129:19
**105** 129:20
**107,400** 35:7

**11** 1:7,12 2:8 113:11
  113:12 129:24
**111** 129:23
**113** 129:24
**118** 129:25
**119** 130:3
**12** 1:16 118:4,5
  129:25
**12/31/06** 106:2
**12:50** 127:6
**1204** 37:24
**1204boyband.xls**
  37:19
**122** 130:5
**13** 119:8,12 130:3
**14** 96:12,15 122:4,5
  129:18 130:5
**15** 78:19,23 79:11,24
  80:7,19 81:9,12,15
  81:21 82:5,13,17,25
  83:6,13 86:15 87:3
  87:7,11 89:9 129:11
**1515** 17:25 18:3
  109:21
**16** 106:23
**1617** 103:5
**17** 106:23
**170978** 59:21
**179078** 59:11,12
**18** 39:8,12
**18-month** 38:25
**19** 57:8 58:9
**1997** 5:20

---

**2**

**2** 2:5 27:14 36:22
  38:19 41:7 60:25
  61:10 70:13,14 71:6
  84:14 118:25 119:5
  120:7 129:9
**2,426,894** 125:16
**2.650** 62:11
**20** 54:22 105:11,14
  106:12 108:8
  129:22 132:22
**200** 2:17 60:8
**2000** 79:16,22 80:6

80:12,18 81:8 87:18
  87:21,22 88:7,10,22
  89:4 92:8 93:2
  112:16 129:13
**2001** 78:19,23 79:11
  79:24 80:7,19 81:9
  81:12,15,21 82:5,13
  82:17,25 83:6,13
  86:15 87:3,7,11
  92:10 129:11
**2002** 8:11 71:2 87:20
**2003** 38:23 112:21,23
  119:23 121:16
  123:19
**2004** 9:8,17 10:16,17
  26:22 27:24,25
  38:23 58:8 62:5,6
  83:3 112:4 113:8
  116:18 125:11,18
  125:22,24
**2005** 10:23 28:25
  41:7 54:22,24 57:8
  58:9 79:9 89:20
  92:16,16
**2006** 89:9 96:12,15
  97:20 99:18 100:15
  129:18
**2007** 4:12 9:17,18,20
  17:6 28:2 105:12,14
  106:13 108:8 114:3
  129:22
**2009** 1:16 127:16
**2098** 71:4
**224,225** 35:17
**23** 79:9 112:21
**25** 122:17
**2650** 2:5
**28** 28:24 54:24 129:7

---

**3**

**3** 75:3,4 83:16 84:15
  129:10
**3/31/03** 118:19
  125:15
**31** 38:23 58:8 62:5
  89:20 92:16 112:23
  114:3 119:23

123:19
**328** 62:11
**328,112** 62:8
**33131** 2:6
**33131-2399** 2:18
**36** 92:12
**3900** 2:17

---

**4**

**4** 61:16,19 78:18,19
  84:17 129:11
**47** 76:5 77:15
**48** 29:24
**49** 30:17

---

**5**

**5** 88:21,22 129:13
**5/31/02** 118:17
**50** 30:3,13 31:20
  125:15
**51** 35:11 62:17,19
**52** 64:15
**54** 37:16,17 38:12
  39:16 61:21,24 62:2
  62:9 65:10
**55** 38:12,13,22 61:24
  62:3 65:21 67:8
**56** 29:24 30:14 40:10
**57** 41:2
**599** 1:20

---

**6**

**6** 61:17,19 89:8,10
  129:15
**6/12/2008** 113:16
**6:07-bk-007651-A...**
  1:5
**6:08-ap-00157-ABB**
  1:8

---

**7**

**7** 79:16 80:12 92:8
  93:2 96:10,11 99:25
  129:17
**7,888** 34:21
**7,997** 35:2
**70** 129:9
**7056** 95:6

15

**75** 129:10
**78** 129:11

―――――――――― **8** ――――――――――
**8** 100:22,23 106:21
  129:19
**83006** 97:2
**88** 129:13
**89** 129:15

―――――――――― **9** ――――――――――
**9** 83:16 105:10,13
  107:14 129:20
**90** 102:11
**96** 129:17

# EXHIBIT C



SILVERMAN COSGROVE
& SAMMATARO

January 13, 2009

**Via Facsimile & U.S. Mail**
Carol C. Lumpkin, Esq.
Annie T. Zaffuto, Esq.
K& L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

Re:    **In re**: Louis J. Pearlman, et al.
         ***Trans Continental Television Productions v. MTV Networks***

Dear Carol and Annie:

We write in accordance with M.D.L.R. 3.01(g) in a good faith effort to confer with MTV Networks ("MTV") to secure better discovery responses without relief of the Court.   While the balance of MTV's responses to Trans Continental's First Request for the Production of Documents and Things ("First Request") are substantively insufficient, at this time, Trans Continental requests that MTV consider the following:

**A.    MTV's Inexcusable Failure to Produce a Privilege Log.**

As an initial matter, we would note that MTV redacted a fair amount of its documents,[1] without providing any explanation for the redaction.   This is insufficient.   While a party may be entitled to redact proprietary or privileged information, it is required to furnish an accompanying log detailing the basis for the redaction. *See Roger Kennedy Construction, Inc. v. Amerisure Ins. Co.*, 2007 WL 2028859 (M.D. Fla. July 9, 2007) at * 1 (Spaudling, J.) (ordering that "any information redacted from a document produced in discovery must be reflected on a privilege log served *simultaneously* with the production of each redacted document") (emphasis added); *Floeter v. City of Orlando*, 2006 WL 1000306 (M.D. Fla. April 14, 2006) (Spaudling, J.) (same); *In re Duque*, 177 B.R. 397 (S.D. Fla. 1994) (ordering that if the respondents believed that any portion of the letters should be redacted, full copies of the letters should be submitted to the court

---

[1]    Specifically, MTVN-001609 through 001680, MTVN-002038 through002045, MTVN002493 through 002501, MTVN002658, MTVN002726 through 002735, MTVN002739 through MTVN002751 and MTVN 002989 through MTVN 002998.

ne Biscayne Tower | 2 South Biscayne Boulevard, Suite 2650 | Miami, FL 33131 | T 305.377.1666 | F 305.377.1664 | www.scs-legal.com

along with an explanation for the proposed redaction). *See also, Goshawk Dedicated Ltd. v. American Viatical Services, LLC*, 2008 WL 2901864 (N.D. Ga. July 23, 2008) (finding that the plaintiff failed to meet their burden of demonstrating the appropriateness of redacting certain documents). In light of this law, MTV must produce a privilege log explaining the basis for its redaction of the following documents: MTVN-001609 through 001680, MTVN-002038 through 002045, MTVN002493 through 002501, MTVN002658, MTVN002726 through 002735, MTVN002739 through MTVN002751, and MTVN 002989 through MTVN 002998.

Additionally, MTV's responses to the vast majority of Trans Continental's requests provides that MTV will produce all "responsive, *non-privileged* documents" that are in its possession, control and custody. In the event that MTV actually withheld the production of any responsive documents on the basis of the attorney-client privilege, it is obligated to provide a privilege log.

Federal Courts have made it clear that a naked objection of privilege is legally insufficient. "[The] limitation as to privileged documents is not self-executing." *Ritacca v. Abbott Laboratories*, 203 F.R.D. 332, 334-35 (N.D. Ill. 2001). A party asserting an objection to discovery on the grounds of privilege "must present that objection in a timely and proper manner." *Id.* at 335 (citing *Peat Marwick, Mitchell & Co. v. W.*, 748 F.2d 540, 542 (10th Cir. 1984)). As explained in *Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12 (1st Cir. 1991), "[t]he burden is on the party asserting a privilege to do so in a timely and proper manner and to establish the existence and applicability of the privilege." *See also, Peat Marwick*, 748 F.2d at 542 ("The applicability of the privilege turns on the adequacy and timeliness of the showing as well as on the nature of the document."). The Committee Notes to Rule 26 make clear that the privilege log "*is not an after-thought to claiming privilege or protection, it is the claim of privilege or protection.*" *Hobley v. Burge*, 2005 WL 121738, * 9 (N.D. Ill. 2005) (emphasis added).

## B.    MTV's Specific Objections to the Requests for Production.

MTV has objected to a number of Trans Continental's specific requests for production. For the reasons outlined below, we believe that these objections are baseless and respectfully request that MTV reconsider its objections:

### 1.    Request Nos. 11, 12, 13 and 16

Collectively, Request Nos. 11, 12, 13 and 16 seek all documents evidencing the payments made by MTV to Sean Combs (*p/k/a* "Diddy") in connection with any season of *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4*. MTV objected to each of these requests as "over burdensome" and "irrelevant."

MTV's burdensome objection fails in that MTV has failed to offer any evidence revealing the nature of the alleged burden. *See Panola Land Buyers Ass'n v. Shuman*, 762 F. 2d 1550, 1559 (11th Cir. 1985) (conclusory recitation of "expense and burdensome" without specificity provides no basis for the court to order limitations upon the discovery sought); *Oliver v. City of Orlando*, 2007 WL 3232227 (M.D. Fla. 2007), * 2 (Baker, J.) ("[to even merit consideration] an objection must show specifically how a discovery request is overly broad,

burdensome or oppressive, by submitting evidence or offering evidence which reveals the nature of the burden."

MTV's relevancy objection must similarly be rejected out-of-hand as these requests are directly targeted towards discovering the veracity of MTV's contention that no money is due and owing to Trans Continental. MTV has argued that it is entitled to recoup the costs incurred in connection with the production of *Making the Band*. MTV must, therefore, produce documents evidencing these production costs, including the amounts paid to Diddy. This is particularly true given that MTV's own documents reveal that MTV treated the amounts paid to Diddy as part of the production costs. (*See* MTVN-003129-3131, MTVN-003193, MTVN-003259 and MTVN-003580).

While MTV has produced copies of its contracts with Diddy (*see* MTVN-00598 through MTVN-00694), these contracts do not enable Trans Continental to verify that MTV actually paid the expenses which it is claiming as an offset to income. These contracts merely indicate the amount which MTV was **obligated** to pay Diddy, not the amounts it **actually** paid Diddy. Moreover, by themselves, the Diddy-MTV contracts do not reveal whether the specified bonuses were paid. The Diddy-MTV contracts provide for the payment of a completion bonus, a ratings bonus, plus a specified percentage of the modified adjusted gross receipts ("MAGR") received by MTV in connection with the exploitation of *Making the Band*. The MAGR bonuses are particularly important because the thresholds needed to trigger these bonuses are the same thresholds which would necessarily eliminate any doubt that money is due and owing to Trans Continental. Stated simply, MTV's payments to Diddy provide an objective point of comparison.

For all these reasons, MTV's production of MTVN-00598 through MTVN-00694 is not sufficient. MTV must produce all of the documents, including all of the accounts statements previously rendered to Diddy and his corporate entities, evidencing MTV's payments to Diddy in connection with any season of *Making the Band*.

## 2.    Request Nos. 23-31

Request Nos. 23 through 31 collectively seek copies of all documents evidencing both the initial projected budgets and final production costs for any season of *Making the Band*, *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

In response to these requests, MTV raised two principal objections: (1) that the requests were burdensome in that requests MTV "to produce documents regarding the production costs on a season-by-season basis, which is not required by the Net Proceeds calculation;" and (2) that "it can see no reasonable distinction between 'production costs' and 'final production costs.'" Each of these objections fails.

MTV's "burdensome" objection is misplaced given that MTV's own documents reveal that MTV did, in fact, budget the production cost of each season of *Making the Band* on a season-by-season basis. MTV has, for example, already produced documents evidencing the per season production costs for season 2 of *Making the Band 3* as well as seasons 1, 2 and 3 of *Making the Band 4*. (*See, e.g.,* MTVN-002619 through MTVN-002650, which is the budget for Season Three of *Making the Band 4*, and MTV-002518 through MTVN-002524, which is a cost

summary for Season Two of *Making the Band 4*).

Additionally, MTV has produced other documents in which its personnel is discussing and/or comparing the per-episode cost of particular seasons of *Making the Band*. (*See, e.g.*, MTVN-000415, MTVN-000480, MTVN-003913, MTVN-003259, MTVN-003293-003294, MTVN-003483-003484, MTVN-003578, MTVN-003580, MTVN-003610 and MTVN-003698). These documents indisputably reveal that the documents responsive to Request Nos. 23-31 exist. Consequently, MTV must produce documents evidencing the per season production costs for season 3 of *Making the Band*; seasons 1, 2 and 3 of *Making the Band 2*; and seasons 1 and 3 of *Making of the Band 3*.

MTV's objection as to its supposed inability to distinguish between "production costs" and "final costs" fails in that MTV's own documents underscore the need for Trans Continental's request for both the original budgets and the final production costs of each season of *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4*. Indeed – while insufficient - the documents which MTV has produced to date reveals  that the production costs for *Making the Band* were constantly evolving, and that it was not uncommon for the final production costs to dwarf the original production budgets. *See* MTVN-000472 (discussing the overage in connection with an unidentified season of *Making the Band 3*); MTVN-002035 (highlighting that the final budget for Season Two of *Making the Band* 4 was nearly twice as much as the original projection); MTVN-002471 (same) and MTVN-002987-002988 (discussing the significant disparity between the final and original budgets for an unidentified season of *Making the Band 4*).

Trans Continental is entitled to receive all documents evidencing both the original budgets and the final production costs for any season of *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4*, as well as all documents discussing the basis for the overage.

### 3.    <u>Request Nos. 72 and 74 through 84.</u>

Request Nos. 72 and 74-84 collectively inquire into the amount of advertising revenue that MTV received in connection in *Making the Band 2, Making the Band 3* and *Making the Band*; the specific advertising rates charged; and the individuals and software involved in the selling and managing of the advertising spots.

MTV objects to each of these requests on relevancy grounds.   We dispute this objection. While MTV is certainly permitted to argue that Trans Continental is not entitled to share in the advertising revenues, there has been no finding that this is the proper interpretation of either paragraph nine of the Amended Agreement or the Net Proceeds definition contained in Schedule A thereto.   The proper interpretation of this provision remains subject to debate, as it is not the model of clarity that MTV professes.   To this end, it is worth noting that the term "advertising" is never actually used in the Net Proceeds definition.   Additionally, in citing the definition of "Net Proceeds," MTV conveniently glosses over the fact that the first sentence actually reads: "For purposes of the Agreement, 'Net Proceeds' shall mean all non-refundable revenues ***actually received in the United States*** from all sources worldwide by MTV Networks ... in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming service)" (emphasis added).   Thus, even if MTV's interpretation of this provision

was correct, the definition contains an unmistakable limitation: the revenue must have been actually received in the United States. Accordingly, if MTV Denmark received direct payment for the advertising placed during the episode of *Making the Band* which aired in Denmark, this revenue stream would not be excluded under MTV's interpretation of the Net Proceeds definition and would properly be considered as part of the calculation as to what is owed to Trans Continental.

Furthermore, even if MTV's interpretation of the Net Proceeds definition was correct, the mere fact that Trans Continental is not entitled to share in the advertising revenue does not mean that the advertising revenue has no bearing on, or relevance to, the claims and defenses of this action. As imparted by the United State Supreme Court, relevancy is to be construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). *See also, Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.*, 2007 WL 1526649, * 2 (S.D. Fla. May 22, 2007) ("Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action."). *See also, Rhone-Poulenc Rorer, Inc. v. Aetna Casualty & Surety Co.,* 1992 WL 394425, * 3 (E.D. Pa. Dec. 28, 1992) ("[D]iscovery requests may be relevant if there is any possibility that the information may be relevant to the general subject matter of the action. As a result, discovery rules are to be accorded broad and liberal construction.")

At issue in this case is the amount of money which MTV owes to Trans Continental in connection with *Making the Band*. The amount of money which MTV made from *Making the Band* is undeniably relevant to this analysis. Indeed, the amount of money which MTV garnered from the advertising revenues generated from *Making the Band* provide the appropriate context in which the view the intent and purpose of the Amended Agreement. Furthermore, at a minimum, Trans Continental is entitled to inquire **which** revenues MTV is categorizing as "advertising revenue" to ensure that this revenue is properly allocated and characterized.

For all these reasons, we respectfully request that MTV reconsider it relevancy objection and produce documents responsive to Request Nos. 72 and 74 through 84.

### 4.    Request No. 55.

Request No. 55 seeks all documents which evidences the funds received by MTV in connection with product placement or product integration agreements relating to *Making the Band 2, Making the Band 3* and *Making the Band 4*.

MTV objected to this request because it was "overburdensome [sic]" and "seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence." As previously the case, MTV "burdensome" objection fails in that MTV offers no explanation as to the alleged burden that it would incur in producing documents responsive to this request. MTV's irrelevancy objection fails for the many of the same reasons its objections to Request Nos. 72 and 74 through 84 fail.

First, as referenced above, while MTV is certainly permitted to argue that Trans

Continental is not entitled to share in the advertising revenues, there has been no finding that this is the proper interpretation of the Net Proceeds Definition. The proper interpretation of this provision remains subject to debate, as it is not the model of clarity that MTV professes.

Second, even if MTV's interpretation of the Net Proceeds definition was correct and Trans Continental was not entitled to share in the advertising revenues, neither the Agreement nor the Amended Agreement even remotely address the issue of product placement or product integration deals. Nowhere, for example, is it specified that the revenue generated by MTV from product placement or product integration deals is to be treated as advertising revenue.

The importance of this point cannot be understated. As you are likely aware, within the entertainment world, revenue received from product placement deals is typically used to off-set production costs. MTV's own documents suggest that this is precisely how MTV treated its product placement revenue. (*See* MTVN-000287, discussing MTV's active pursuit "of tradeouts" to decrease production costs; MTVN-00364-65 (same) and MTVN-003717-3718 (discussing the financial impact of the "vehicle tradeout"). Accordingly, this revenue has a direct and immediate impact on the production costs, which, in turn, have a direct and immediate impact on the ultimately profitability of the particular seasons of *Making the Band*.

Consequently, the relevancy of the documents sought by Request No. 55 lies beyond reason dispute, and MTV must produce documents responsive to this request.

## C.    The Inadequacy of MTV's Production.

MTV's spurious objections aside, the most troubling aspect is the overall deficient nature of MTV's production. MTV has not produced a single document that can be fairly characterized as responsive to Request Nos. 40-44, 46-49, 51-53, 54, 56-63, 67-69, 71, 86-92 and 94-100.

An exacting review of MTV's produced document reveals that there is not a single document relating to MTV's receipt of funds in connection with *Da Band, Danity Kane, Donnie Klang* and *Day 26*'s respective albums (Request Nos. 40-44), music (Request Nos. 46-49) or related merchandise (Request Nos. 51-53). MTV has also not produced any documents evidencing: the license and distribution agreements which it entered into relating to *Making the Band* (Request Nos. 67-69); or the number of times any season (or episode) of *Making the Band* (season three); *Making the Band 2, Making the Band 3* or *Making the Band 4* has been re-broadcast or re-run (Request Nos. 86-92). MTV has further failed to produce any documents evidencing its communications, either internally or with third parties, regarding Trans Continental's interest in any sequels, spin-offs, or other projects based on *Making the Band*. (Request Nos. 94-100).

However, most troubling of all is MTV's refusal to provide documents responsive to Request Nos. 54 and 56-63. These Requests seek all documents evidencing the funds received by MTV in connection with DVD sales, home video sales, print publishing rights, music publishing, web-site, foreign distribution and international program sales relating to *Making the Band, Making the Band 2, Making the Band 3* or *Making the Band 4*.

Yesterday's deposition of Karen Abdul confirmed the existence of documents responsive to Request Nos. 54 and 56-63. Ms. Abdul testified that there is a "shared drive" in the

Participations Management Department where responsive documents are stored.   Despite this fact, none of these documents were produced in either electronic or paper form.   MTV is required to produce both.    Ms. Abdul further testified that the numbers utilized in the preparation of the participation statements sent by MTV to Trans Continental were received from other departments (*i.e.,* the international program sales department) by e-mail with Excel spreadsheets attached.   Neither these e-mails nor the Excel spreadsheets were produced. Similarly, the documents used in the preparation of these Excel spreadsheets by MTV's respective departments are also responsive to Request Nos. 54 and 56-63, but were not produced in either electronic or paper form.    Given the lack of electronic data produced, we will be adding an additional topic to our Rule 30(b)(6) Deposition Notice to explore MTV's compliance with its *Zubulake* duties.

While it is our hope that this matter can be resolved without needlessly entangling the Court, barring a resolution by 12:00 on January 20, 2009, we intend on filing our Motion to Compel. This short timeframe is regrettably necessary due to the truncated discovery period.

I look forward to hearing from you and, as always, please call me with any questions or concerns.

Very truly yours,

**Silverman Cosgrove & Sammataro, LLC**

James G. Sammataro, Esq.

cc:    Lawrence Silverman, Esq.