IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.*                        Case No. 6:07-bk-00761-ABB
                                                   Jointly Administered
        Debtor.                                    Chapter 11
_____/

SONEET KAPILA, Chapter 11 Trustee
for TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,                                 Adv. No.:  6:08-ap-00157-ABB

                Plaintiff,

v.

MTV NETWORKS COMPANY,

                Defendant.
_____/


**DEFENDANT MTV NETWORKS' RESPONSE IN OPPOSITION TO TRANS
CONTINENTAL'S MOTIONS TO COMPEL FILED ON JANUARY 7 AND 21, 2009
<u>AND INCORPORATED MEMORANDUM OF LAW</u>**

        Defendant MTV Networks, a division of Viacom International Inc. ("MTVN"),[1] by and

through its undersigned counsel and pursuant to Rule 37 of the Federal Rules of Civil Procedure,

respectfully submits its Response in Opposition to Trans Continental's ("TC") Motion to Compel

Better Interrogatory Responses, Initial Disclosure Documents and Request for Expedited

Consideration filed on January 7, 2009 ("First Motion to Compel") and Trans Continental's

Motion to Compel the Production of Documents and Things filed on January 21, 2009 ("Second

_____
[1] MTVN has been improperly sued in this action as MTV Networks Company.

Case No. 6:07-bk-00761-ABB
Adv. No.:  6:08-ap-00157-ABB

Motion to Compel," collectively, the "Motions to Compel").  In support thereof, MTVN states as follows:

## I.    INTRODUCTION

TC's Motions to Compel are both premature and dubious given the landscape of this matter and MTVN's cooperative efforts to streamline discovery.

With over one hundred (100) discovery requests, the discovery propounded by TC in this matter is aptly described as sweeping and voluminous.  From October 31 – December 23, 2008, TC served MTVN with a total of twenty-five (25) interrogatories, the maximum number permitted under the Federal Rules of Civil Procedure without leave of Court, and also propounded one hundred and eight (108) requests for production, many of which endeavor to probe into matters not within the scope of this litigation, nor ever contemplated to be within the purview of the underlying agreements: the January 7, 2000 Agreement ("2000 Agreement") and November 15, 2001 Agreement ("2001 Agreement," collectively, the "Agreements"), attached to the Complaint as Exhibits A and B.[2]  Not only are the discovery requests numerous, but the requests seek information relating to television series spanning over a decade.

Despite TC's numerous discovery requests and the expedited nature of this case, MTVN has to date[3]: reviewed approximately one hundred fifteen thousand and five hundred (115, 500) pages of documents; produced tens of thousands of pages of responsive documents to TC;

---

[2] While not the subject of TC's instant motions to compel, TC has also served MTVN with an additional thirty one (31) Requests for Production and twelve (12) Requests for Admissions.

[3] In support of MTVN's instant opposition, MTVN attaches, as Exhibit A, the affidavit of Warren Solow, Vice President of Information Management Systems for Viacom Inc., which outlines MTVN's efforts to comply with its obligations to locate and produce responsive documents.

responded to all of TC's interrogatories; provided amended responses to these interrogatories;[4] and produced several witnesses for depositions, including one witness who served as a corporate representative for a portion of TC's seventy-five topics in its Third Re-Notice of Deposition of a 30(b)(6) witness.[5]   In addition, MTVN has made every effort to comply with its discovery obligation by supplementing its document production as quickly as it can even when faced with the unexpected reduction in force, the preparation of multiple deponents for numerous 30(b)(6) topics and as fact witnesses, and review of tens of thousands of pages of documents in response to TC's over 100 discovery requests within five months since the action commenced, and within three months since the discovery phase began.[6]

Due to medical circumstances beyond the control of MTVN's counsel, the deposition of Brad Hazzard, MTVN's administrative manager for the Department of Business and Legal Affairs, which was set for February 6, 2009 had to be rescheduled.  MTVN and TC have agreed to set Mr. Hazzard's deposition for February 18, 2009.  Additionally, the parties had set the deposition of Laura Dorson, MTVN's Senior Director in the Participations Department for February 10, 2009.  The Court, however, scheduled an evidentiary hearing on TC's two motions to compel and MTVN's motion for extension of time to respond to the First Motion to Compel. Because the hearing could likely require the parties to submit evidence and testimony, MTVN and TC have agreed to schedule Ms. Dorson's deposition for February 25, 2009.  Both Mr. Hazzard and Ms. Dorson also will address several of the seventy-five topics for which TC has requested a corporate representative.

---

[4] During the evidentiary hearing, MTVN will provide the Court with an outline identifying produced documents with its correspondent discovery request.
[5] A true and correct copy of TC's Third Re-Notice of Deposition is attached hereto as Exhibit "B."
[6] Discovery in this matter commenced in October 2008.

Against this backdrop, MTVN has worked tirelessly and cooperatively to facilitate discovery and resolve any discovery disputes arising between the parties.  MTVN's counsel has conferred with TC's counsel on several occasions to reach a compromise on discovery disagreements and to focus TC's broad discovery on relevant matters to better expedite production.  As evidence of MTVN's cooperation, in addition to originally producing tens of thousands of documents to TC on December 3, 2008, MTVN supplemented its discovery responses on December 16, 2008, and then again on February 4 and 6, 2009.  At all times, TC's counsel appeared to understand the magnitude of TC's document requests and the massive scope of the document production as well as the difficulties in producing tens of thousands of pages of documents.  It is a surprise to MTVN that TC has adopted an aggressive and misleading description of how discovery issues were discussed among counsel.  Aside from where MTVN has provided appropriate objections, MTVN has not declined, nor refused, nor withheld any responsive documents.

The subject discovery requests are irrelevant and/or moot.  But for ease of reference, MTVN will address each discovery request in the order that they were raised in TC's Motions to Compel.

## II.    SPECIFIC REQUESTS

### INTERROGATORY NO. 6

Interrogatory number 6 (referenced on pages 16-17 of the First Motion to Compel) requests the identity of every individual and entity involved in the distribution of all four series of *Making the Band*.  In its original and/ or supplemental production, MTVN produced documents responsive to this interrogatory.  Therefore, TC's motion to compel as to Interrogatory number 6 is moot and should be denied.

**INTERROGATORY NO. 7**

Interrogatory number 7 (referenced on pages 17-19 of the First Motion to Compel) seeks the identity of every individual and entity that has been involved in the licensing of all four series of *Making the Band* and any merchandising, ancillary, allied or after-market products relating to the aforementioned series.

By its very language, Interrogatory number 7 merely seeks the *identity* of certain individuals and entities involved in licensing.  MTVN supplied this information in both its original and supplemental answers.

Contrary to TC's suggestion, this interrogatory does not "endeavor[] to learn the mechanism by which VH-1 acquired the rights to broadcast these episodes of *Making the Band*, as well as whether this broadcast resulted in revenue for MTV."  See First Motion to Compel, page 19.  Indeed, it was explained to TC's counsel that VH-1 is a division of MTVN and as such, there is no mechanism by which VH-1 acquired rights to broadcast *Making the Band*.  Equally misplaced is TC's position that this interrogatory seeks "information about the money which MTVN made for licensing episodes of *Making the Band*."  See id.  It is curious how TC arrived at these conclusions when it failed to make a single mention of "VH-1," "revenues," "money," or any like words, in this interrogatory.  TC is not entitled to obtain information that it failed to request.  Accordingly, the Court should deny TC's motion to compel as to Interrogatory number 7.

**INTERROGATORY NOS. 8, 10 & 11**

Interrogatory numbers 8, 10 and 11 (referenced on pages 19-26 of the First Motion to Compel) requests, on a season-by-season basis, the amount of gross and net profits that MTVN, including its affiliates, has made in connection with *Making the Band 2, Making the Band 3* and

*Making the Band 4*, along with every expense deducted from gross profit to arrive at the net profit figure.

TC contends that if there is no tracking of revenue on a "season-by-season" basis, then MTVN should state so.  That is what MTVN has done.  Under the 2001 Agreement, MTVN is obligated to provide an accounting of the Net Proceeds on a "semi-annual" basis.  Moreover, MTVN does not track its revenues on a season-by-season basis but rather on a quarterly and a semi-annual basis.  The revenue and expenses that are pertinent to the Net Proceeds formula are provided in the 2001 Agreement, and specifically in the Net Proceeds definition.

TC further argues that MTVN should provide a narrative as to how MTVN calculates the amount of gross and net profits.  MTVN has answered that it does so on a semi-annual basis. But contrary to TC's assertion, TC is not entitled to the amount of MTVN's gross and net profits. The Net Proceeds formula is precisely defined in Schedule A to the 2001 Agreement and contemplates a distinct set of variables, none of which include gross profits and net profits. Therefore, any information concerning the amount of gross and net profits earned by MTVN is wholly irrelevant to TC's claim for its share of Net Proceeds.

Despite TC's improper attempt to obtain irrelevant information, MTVN has produced documents that are responsive to these interrogatories in its original and/or supplemental production.  Accordingly, the Court should deny TC's motion to compel as to Interrogatory numbers 8, 10 and 11.

**INTERROGATORY NO. 12 AND REQUEST NO. 11**

Interrogatory number 12 (referenced on pages 26-28 of the First Motion to Compel) requests the date and amount of every payment made by MTVN to Diddy, or any Diddy-related entity, in connection with any season of *Making the Band 2, Making the Band 3* and *Making the*

6

*Band 4.*  Similarly, Request number 11 (referenced on pages 10-12 of the Second Motion to Compel) seeks documents that refer to or reflect payments made by MTVN to Diddy in connection with any season of *Making the Band 2, Making the Band 3* and *Making the Band 4.*

Contrary to TC's assertion, MTVN has furnished TC with information concerning MTVN's payments to Diddy.  On January 27, 2009, TC's counsel took the deposition of Jackie French, MTVN's Vice President of Series.  In response to questioning by TC's counsel, Ms. French testified as to the amount of payments made to Diddy by MTVN for his involvement in the *Making the Band* series.  Indeed, twenty-five (25) pages of Ms. French's deposition transcript are devoted to discussion concerning Diddy's payments for the *Making the Band* series.  (J. French Depo. at 235 – 259).  Indeed, Ms. French's responses to inquiries on pages 238 (lines 14-17) and 259 (lines 11-13 and 14-21) are illustrative.  Ms. French's deposition transcript has been designated as confidential, including the portions referenced herein.  As such, MTVN cannot recite these portions in this opposition.  However, the relevant portions of Ms. French's deposition will be made available to the Court.

Not only did TC's counsel illicit testimony from Ms. French regarding MTVN's payments to Diddy, but TC's counsel directed Ms. French to review documents produced by MTVN containing the amount of payments made to Diddy.  Thus, TC's assertion that MTVN has not supplied information concerning payments to Diddy is mistaken at best, as TC showed Ms. French, and admitted into evidence, the very documents showing the amounts paid to Diddy.

MTVN produced documents, including but not limited to, the following evidencing associated production costs of Diddy's involvement in MTVN: 000586-000694; 001494-001608; and 006130-006334**.**  MTVN maintains its objection to any monies paid to Diddy that are not related to the production costs or the revenues generated by *Making the Band.*

Case No. 6:07-bk-00761-ABB
Adv. No.: 6:08-ap-00157-ABB

**REQUEST NOS. 12-13 AND 16**

Requests numbers 12 through 13 and 16 (referenced on pages 10-12 of the Second Motion to Compel) seek account statements, and documents that refer to any account statements, rendered by MTVN to Diddy, or any Diddy-related entity, in connection with any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

TC cannot even conjure up a reason to justify the production of account statements rendered by MTVN to Diddy or Diddy-related entities. Failing to provide any basis for which it seeks the production of these account statements, TC summarily concludes "MTV must also produce the accounting statements it previously rendered to Diddy in connection with any season of Making the Band." <u>See</u> Second Motion to Compel, page 12. Because account statements rendered to Diddy or Diddy-related entities have no bearing on the claims or defenses in this matter, as evidenced by TC's own lack of justification to seek these documents, the Court should deny the motion to compel as to Request numbers 12-13 and 16.

**INTERROGATORY NOS. 13-15 AND REQUEST NO. 72**

Interrogatory numbers 13 through 15 (referenced on pages 28-31 of the First Motion to Compel) request, on a season-by-season basis, the amount of advertising revenue that MTVN, and any of its affiliates, received in connection with the broadcast of *Making the Band 2, Making the Band 3* and *Making the Band 4*, in the United States or abroad. Similarly, Request number 72 (referenced on pages 20-24 of the Second Motion to Compel) seeks all documents that refer to, or reflect the amount of advertising revenue that MTVN, and MTVN affiliates, received in connection with the broadcast of *Making the Band 2* in the United States or abroad.

The parties never contemplated that TC would share in television advertising revenues. No provision in the Agreements provide that TC is entitled to receive such advertising revenues.

8

Indeed, the Net Proceeds formula under which the parties agreed to compute their share of revenues makes no mention of such advertising revenues.

Additionally, TC's own conduct reveals that it never expected to share in advertising revenues.  For almost a decade and without those protest, TC accepted participation statements and checks from MTVN including but not limited to bates stamped MTVN 00001 – 000087; 003724 - 003736, which made no accounting for advertising revenues.  In fact, TC never exercised its right to audit MTVN's records although it could have under the 2001 Agreement. Even Jeffrey Kranzdorf's letter[7] ("Kranzdorf Letter"), which purportedly outlined MTVN's obligations under the Agreements was devoid of any mention that TC was entitled to share in advertising revenues.[8]  Furthermore, absent from TC's Complaint is any allegation that TC is owed advertising revenues.  Thus, it is disingenuous for TC to now claim, after nearly ten years without complaint and acceptance of payments from MTVN, that it is entitled to advertising revenues.  Accordingly, the Court should deny the motion to compel as to Interrogatory numbers 13 through 15 and Request number 72.

### INTERROGATORY NOS. 16-18

Interrogatory numbers 16 through 18 (referenced on pages 31-35 of the First Motion to Compel) requests, on a season-by-season basis, the amount of revenue that MTVN, including its affiliates, have received in connection with the foreign distribution of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

Unlike gross profits, net profits and advertising revenues (referenced above), revenues from the foreign distribution of the aforementioned series are specifically included in the Net Proceeds calculation.  Net Proceeds is defined as "all non-refundable revenues received in the

---

[7] It is uncertain whether Mr. Kranzendorf remains counsel to TC.
[8] A true and correct copy of the Kranzdorf Letter is attached hereto as Exhibit "C."

United States from all sources worldwide by MTV Networks ("MTVN") in connection with

Ancillary Uses . . .".  <u>See</u> 2001 Agreement, Schedule A.  Ancillary Uses includes "all

**distribution** and/or exploitation of cycles of the Series."  <u>See</u> <u>id</u> (emphasis added).  However,

MTVN does not track its revenue in connection with foreign distribution on a season-by-season

basis, nor is MTVN obligated to do so under the 2001 Agreement.  Any accounting required of

MTVN is on a semi-annual basis.

　　　　In its original and supplemental production, MTVN produced documents showing the

foreign distribution revenues received by MTVN in connection with the last three series of

*Making the Band*.  Accordingly, TC's motion to compel as to Interrogatory numbers 16

through18 is moot and should be denied.

## INTERROGATORY NO. 20 AND REQUEST NO. 55

　　　　Interrogatory number 20 (referenced on pages 35-37 of the First Motion to Compel)

requests the amount of revenue that MTVN, including its affiliates, has received from product

placement/integration deals relating to Season 3 of *Making the Band*, *Making the Band 2*,

*Making the Band 3* and *Making the Band 4*, as well as the date of any of such agreement and the

name of the contracting parties.  Similarly, Request number 55 seeks all documents that refer to

or reflect any funds received by MTVN in connection with the product placement or product

integration agreements relating to *Making the Band 2*, *Making the Band 3* and *Making the Band

4.*

　　　　The parties never contemplated that TC would receive revenues from product

placement/integration deals.  Product placement/integration revenues are *not* carved into the

Agreements or the Net Proceeds calculation.  As TC itself concedes, "neither the Agreement nor

the Amended Agreement even remotely address the issue of product placement or product

integration deals." <u>See</u> First Motion to Compel, page 36.   That is exactly MTVN's point. Product placement/integration deals are not part of the Agreements, much less the Net Proceeds formula, and therefore, have no place in discovery.

Furthermore, TC's own conduct reveals that it never expected to share in product placement/integration revenues.   For almost a decade and without complaint, TC accepted participation statements and checks from MTVN 00001 – 00087; 03724 – 003736, which made no accounting for product placement/integration revenues.  In fact, TC never exercised its right to audit MTVN's records although it could have under the 2001 Agreement.    Even Kranzendorf's Letter, which purportedly set forth MTVN's obligations under the Agreements failed to mention that TC was entitled to share in product placement/integration revenues.[9] Furthermore, TC's Complaint contains no allegation that TC is owed revenues from product placement/integration deals.  Thus, it is disingenuous for TC to now claim, after almost ten years without protest and acceptance of payments from MTVN, that it is entitled to product placement/integration revenues.

Because product placement/integration deals have no bearing on this case, as TC plainly admits, the Court should deny the motion to compel with respect to Interrogatory number 20 and Request number 55.

## <u>INTERROGATORY NO. 21</u>

Interrogatory number 21 (referenced on pages 37-39 of the First Motion to Compel) seeks the amount of revenue that MTVN and its affiliates, received in connection with the musical works of *O-Town, Da Band, Day 26, Danity Kane* and *Donnie Klang*, including

revenues from digital downloads, music publishing, touring, merchandise and any management fee.

Contradicting itself, TC claims that MTVN failed to explain its vagueness objection, but in the very next sentence acknowledges that MTVN objected to the vagueness of the term "musical work."

TC also ignored MTVN's reservation to supplement its response to this interrogatory upon receiving clarification of the interrogatory's meaning.  In an attempt to decipher TC's request, MTVN has produced responsive documents including but not limited to those bates numbered MTVN 023448 - 023483 on February 6, 2009.  Because the motion to compel has been rendered moot by MTVN's supplemental responses, the Court should deny the motion to compel as to Interrogatory number 21.

## INTERROGATORY NO. 22 AND REQUEST NO. 81

Interrogatory number 22 (referenced on pages 39-40 of the First Motion to Compel) seeks the identity of every individual and entity, including those employed or engaged by MTVN affiliates, that are involved in selling advertising spots in connection with Season 3 of *Making the Band*, *Making the Band 2, Making the Band 3* and *Making the Band 4*.  Companion Request number 81 (referenced in the Second Motion to Compel on pages 20-24)  seeks all documents that reference or relate to every individual and entity, including MTVN affiliates, which have been involved in selling advertising spots in connection with Season 3 of *Making the Band*, *Making the Band 2, Making the Band 3* and *Making the Band 4*.

Again, TC turns a blind eye to the fact that the parties never contemplated that TC would share in advertising revenues or sales.   Advertising revenues are not mentioned in the Agreements or included in Net Proceeds calculation.

12

Furthermore, TC's own conduct reveals that it never expected to share in advertising revenues.  For almost a decade and without protest, TC accepted participation statements and checks from MTVN which made no accounting for advertising revenues.  Thus, it is disingenuous for TC to now claim, after nearly ten years without complaint and acceptance of payments from MTVN, that it is entitled to advertising revenues.  Accordingly, the Court should deny the motion to compel as to Interrogatory number 22.

**INTERROGATORY NO. 23-25; AND REQUESTS NOS. 25-29**

Interrogatory numbers 23 through 25 seek the per episode production costs, on a season-by-season basis, of *Making the Band 2, Making the Band 3* and *Making the Band 4*.  Companion Requests numbers 25 through 27 seek all documents that refer to, or reflect the production costs for each season of the aforementioned series; and Request numbers 28 through 29 seek documents that refer to or reflect the final production costs for all three seasons of *Making the Band* and *Making the Band 2*.

In addition to its original production, MTVN produced eleven (11) additional documents, consisting of approximately two hundred and five (205) pages relating to the production budgets for the last three series of *Making the Band* on January 27, 2009.  Furthermore, MTVN has provided TC with additional responsive documents containing the production costs for the aforementioned series in its original and/or supplemental production.  By examining those documents, TC can readily discern the production costs for these series, as well as the itemized costs comprising the total production costs.  Therefore, TC's motion to compel as to Interrogatory numbers 23 through 25 and Request numbers 25 through 29 is moot and should be denied.

**REQUEST NOS. 54 AND 56-63**

In its original and supplemental production, MTVN provided documents responsive to Request numbers 54 and 56 through 63.  Therefore, TC's Second Motion to Compel as to these requests is moot and should be denied.

As a preliminary matter, TC erroneously claims in its Second Motion to Compel that Request numbers 54 and 56 through 57 seek documents reflecting the funds received by MTVN in connection with the DVD sales, home video sales, print publishing rights and music publishing rights relating to the first series of *Making the Band*.  In fact, TC limited its request for these categories of information to the *last three series* of *Making the Band*, and failed to include the *first* series of *Making the Band*.  MTVN produced documents responsive to this request in its original and/or supplemental production.

Second, Request numbers 58 and 60 seek all documents reflecting the funds received by MTVN in connection with the print publishing rights, music publishing and websites for *O-Town, Da Band, Danity Kane, Donnie Klang* and *Day 26*.  MTVN supplemented its response to Request numbers 58 and 60 with documents bates numbered including but not limited to those 023448 – 023483.

Third, Request numbers 59, 61 and 63 combined seek all documents relating to the websites, domestic or foreign distribution and international program sales relating to *Making the Band*, *Making the Band 2, Making the Band 3* and *Making the Band 4*.  MTVN also provided in response to these requests in its original and/or supplemental production.

Lastly, Request number 62 seeks all documents reflecting payments made by MTVN to TC for TC's share of the distribution rights to *Making the Band*, *Making the Band 2, Making the*

*Band 3* and *Making the Band 4*.  MTVN has provided documents in response to this request, in its original and/or supplemental production.

Because MTVN has adequately supplemented its response to Request numbers 54 and 56 through 63, the motion to compel as to these requests is moot and should be denied.

**REQUEST NOS. 24, 40-44, 51-53, 67-69 AND 86-92**

MTVN has produced responsive documents for the above-referenced document requests in its original and/or supplemental production.   Responsive documents were provided in response to Request number 24, which seeks the production costs for each of the three seasons of *Making the Band*.  Second, Requests numbers 40-44, relating to the funds received by MTVN in connection with the respective albums for *Da Band, Danity Kane, Donnie Klang* and *Day 26*, were supplemented with additional documents, including but not limited to those bates stamped MTVN 023448 – 023483.  Third, MTVN produced documents in response to Request numbers 51-53, which seek the funds received by MTVN in connection with the merchandise of *Da Band, Danity Kane, Donnie Klang*, *Day 26, Making the Band 2, Making the Band 3* and *Making the Band 4*.  Fourth, MTVN produced documents, in response to Requests numbers 67 through 69, which seek the license, program sales and distribution agreements that MTVN has entered into with any party involved *Making the Band 1*, *Making the Band 2, Making the Band 3* and *Making the Band 4*, as well as the individuals and entities involved with the distribution, program sales and licensing of the aforementioned series.  Finally, responsive documents were provided to TC in response to Request numbers 86 through 92, which seek all documents evidencing the number of times any season or episode of *Making the Band 1*, Season 3, *Making the Band 2, Making the Band 3* and *Making the Band 4* have been re-broadcast or re-run.

Because MTVN has adequately supplemented its response to Requests numbers 24, 40-44, 51-53, 67-69 and 86-92, the motion to compel as to these requests is moot and should be denied.

## REQUESTS NOS. 46-49

Requests numbers 46 through 49 (referenced on pages 15-18 of the Second Motion to Compel) seek all documents that refer to, or reflect any funds received by MTVN in connection with any other work featuring the music of *Da Band, Donnie Klang* and *Day 26*, including any funds received from iTunes, downloads, ring tones, streaming media, print publishing, synchronization licenses and the like.

Contradicting itself once again, TC claims that MTVN failed to explain its vagueness objection, but in the very next sentence acknowledges that MTVN objected to the vagueness of the term "musical work."  TC also ignored MTVN's reservation to supplement its response to these requests upon receiving clarification of their meaning.  In an attempt to decipher this request, MTVN produced documents in response to this request including but not limited to those bates stamped MTVN 023448 - 023483 on February 6, 2009.  The motion to compel is, therefore, moot and the Court should deny the motion to compel as to Request numbers 46 though 49.

## REQUEST NOS. 74-75, 80 AND 82

Request numbers 74 through 75 (referenced on pages 20 through 24 of the Second Motion to Compel) seek all documents that reference or relate to the rate charged by MTVN for advertising during Season 3 of *Making the Band* and any seasons of *Making the Band 2, Making the Band 3* and *Making the Band 4*.  Request number 80 (see id.) seeks all documents that reference or relate to any communications between MTVN and any third party regarding the rate

to advertise during Season 3 of *Making the Band* and any seasons of *Making the Band 2, Making the Band 3* and *Making the Band 4*.  Request number 82 (see id.)  seeks all sales or advertising contracts between MTVN and any third party relating to the purchase of advertising spots in connection with Season 3 of *Making the Band* and any seasons of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

As discussed above, the parties never contemplated that TC would share in advertising revenues.  Advertising revenues are not referenced in the Agreements and do not factor into the computation of Net Proceeds.

Furthermore, TC is betrayed by its own conduct.  For almost a decade and without protest, TC accepted participation statements and checks from MTVN including but not limited to those bates stamped MTVN 00001 – 000087; 003724 - 003736, which made no accounting for advertising revenues.  Furthermore, absent from TC's Complaint is any allegation that TC is owed advertising revenues.  Thus, it is disingenuous for TC to now claim, after almost ten years without complaint and acceptance of payments from MTVN, that it is entitled to advertising revenues.  Accordingly, the Court should deny the motion to compel as to Request numbers 74-75, 80 and 82.

**REQUEST NOS. 83-84**

Requests numbers 83 through 84 (referenced on pages 21-24 of the Second Motion to Compel) seek all documents that reference, or relate to any software program used by MTVN to track and manage its advertising inventory or ensure the proper placements of its advertisements.

Even TC cannot manufacture a reason to compel the production of documents relating to MTVN's advertising software programs.  Instead, TC has offered an explanation only as to why *other* requests (that it has lumped together with Request numbers 83-84) are relevant with the

hope that the reader will gloss over its failure to substantiate the appropriateness of seeking information about MTVN's advertising software programs.

By requesting information about MTVN's advertising software programs, TC is simply making another desperate attempt to squeeze information about MTVN's advertising revenues. But as discussed above, TC did not bargain to share in advertising revenues, nor did it voice concerns about not receiving advertising revenues.  Thus, the Court should bar TC's attempt to obtain information about MTVN's advertising software programs as a backdoor means to retrieve information about MTVN's advertising revenues.  Accordingly, the Court should deny the motion to compel as to Request numbers 83 through 84.

## REQUESTS NOS. 76-79

Request numbers 76 through 79 (referenced on pages 22 through 24 of the Second Motion to Compel) seek documents that reference or relate to the average revenue amount generated by MTVN in connection with a single episode of Season 3 of *Making the Band*, and Seasons 1 through 3 of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

Once again, TC has failed to provide any basis for the production of documents related to average revenues.  Instead, TC has clumsily lumped its request for average revenues with wholly unrelated requests (i.e., Request numbers 72, 74-75, 80-84, pertaining to MTVN software programs and advertising revenues, contracts and rates) in an attempt to obscure that it has failed to offer any basis as to why average revenues are relevant to this matter.  TC's failure is an implicit acknowledgement by TC that average revenues have no bearing on this matter as they are neither referenced in the Agreements nor used to compute Net Proceeds.

To the extent that TC is seeking information about advertising revenues by way of this request, TC is not entitled to such information as explained above.  Accordingly, the Court should deny the motion to compel as to Request numbers 76 though 79.

## III.    INITIAL DISCLOSURES

As acknowledged by TC's counsel, MTVN's initial gesture to provide a summary of Net Proceeds on a season-by-season basis since *Making the Band I*, Season 3 was inadvertent.  While MTVN is required to provide TC with documents that are already in its possession and may be used to support its defenses, MTVN is not obligated to manufacture documents for the purpose of handing them over to TC at TC's will.  To its knowledge, MTVN does not possess a summary of Net Proceeds on a season-by-season basis.  As provided in Schedule A of the 2001 Agreement, MTVN's accounting of TC's share of Net Proceeds, **if any**, was to be conducted on a **semi-annual basis**.  Thus, MTVN had no obligation to calculate Net Proceeds by season and accordingly did not do so.  Notably however, MTVN, acting in good faith, has provided TC with an appropriate accounting of the Net Proceeds that were owed and paid to TC.

Because TC lacks any basis to obtain a season-by-season summary of Net Proceeds, the Court should deny the motion to compel as to the Initial Disclosures.

## IV.    PRIVILEGE LOG

TC's position that MTVN has waived privilege is patently disingenuous.  TC's counsel was fully aware that MTVN was preparing its privilege log and needed sufficient time to review the privileged documents.  Indeed, the privilege log contains over six hundred priviledged documents which constitute thousands of pages.

Additionally, in the midst of completing the privilege log, MTVN concurrently supplemented its answer to nine (9) of TC's interrogatories and produced hundreds of additional

responsive documents.  MTVN also prepared multiple Rule 30(b)(6) corporate representatives to

testify to the seventy-five topics designated by TC.

Furthermore, no prejudice has, or will, inure to TC as a result of MTVN's production of

its privilege log.  MTVN has already offered TC's counsel an additional opportunity to re-depose

Virginia Lazalde-McPherson and Jackie French should he desire to re-question those witnesses

based on his review of the privilege log.

Given the tens of thousands of documents that MTVN has had to review in order

to prepare its privilege log, supplement its discovery responses and prepare its witnesses for

deposition, coupled with opposing counsel's full knowledge that MTVN's privilege log was

forthcoming (and has been served), the Court should reject TC's spurious contention that MTVN

has waived its privilege.  See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 2003 WL 41996,

*at 4 (S.D.N.Y. Jan. 6 2003) (no waiver of privilege despite one year delay in producing

privilege log, where no prejudice resulted to opposing party).

As to TC's contention that redactions were not warranted, TC is undoubtedly mistaken

for the most part.  When TC brought challenges to the redactions, MTVN's counsel immediately

provided a second review of these redactions and determined that handful of redacted documents

should have the redactions removed.  MTVN did so accordingly and provided the unredacted

versions to TC on February 6, 2009.  With regard to the other redacted documents, MTVN

maintains that the redacted information is unresponsive to TC's numerous discovery requests and

unrelated to Making the Band.  For example, document bates numbered MTVN 000289 –

000360 is a chart which, kept in the ordinary course of business, reflects financial information

concerning other MTVN programs on its MTV and VH-1 channels.  This information simply is

not responsive to any of TC's 139 discovery requests nor is it within the scope of this action.

MTVN has redacted all non-Making the Band related information and specifically did **not** redact the Making the Band related information.  The Court should note that the one or two line items concerning Making the Band is located several pages within the document.  If MTVN had produced the document without any redactions, MTVN would likely have been faced with the argument that MTVN attempted to bury the Making the Band related information.  To avoid any such allegation, MTVN provided a redacted version of the chart which actually highlights the pertinent information for TC.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny TC's First Motion to Compel and Second Motion to Compel *in toto*.

Respectfully submitted,

Date:  February 6, 2009

**K&L GATES LLP**
*Attorney for Defendant*
Wachovia Financial Center – Suite 3900
200 S. Biscayne Boulevard
Miami, Florida 33131
Tel: (305) 539-3300
Fax: (305) 358-7095

By: */s/Carol C. Lumpkin*
    CAROL C. LUMPKIN
    FL Bar No. 797448
    carol.lumpkin@klgates.com

**Case No. 6:07-bk-00761-ABB**
**Adv. No.:  6:08-ap-00157-ABB**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 6, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a notice of the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF this 6th day of February, 2009 to:

Silverman Cosgrove & Sammataro, LLC
**James G. Sammataro, Esq.**
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2650
Miami, Florida 33131
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
jsammataro@scs-legal.com

*s/ Carol C. Lumpkin*_____
Carol C. Lumpkin

22

# Exhibit

# "A"

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al*                    Case No. 6:07-bk-00761-ABB
                                              Jointly Administered
         Debtor.                              Chapter 11

_____/

SONEET KAPILA, Chapter 11 Trustee
for TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,                            Adv. No.: 6:08-ap-00157-ABB

                   Plaintiff,

         v.

MTV NETWORKS COMPANY,

                   Defendant.
_____/

## DECLARATION OF WARREN SOLOW

Warren Solow makes this declaration in support of Defendant MTV Networks'
("MTVN") Response to Plaintiff Trans Continental Television Productions, Inc.'s ("Trans
Continental") Motions to Compel Filed on January 7, 2009 and January 21, 2009, and in support
states as follows:

1.     My name is Warren Solow.  I am over eighteen (18) years of age and am
otherwise *sui juris* in all respects.

2.     I have been employed by Viacom Inc., since May, 2000.  I work for Viacom, Inc.
("Viacom") as **Vice President of Information and Knowledge Management** within the
Viacom corporate legal department.  My job responsibilities include maintaining Viacom's

protocol concerning electronically stored information ("ESI") as it relates to litigation involving Viacom Inc. or any of its divisions, such as MTVN.

3.    In my role as Vice President of Information and Knowledge Management, I have personal knowledge of MTVN's information technology ("IT") systems, including its records management practices.

4.    I am personally familiar with the specific steps that MTVN took to preserve and collect the electronically stored information ("ESI") that is potentially relevant to this legal action between Trans Continental and MTVN.

5.    When my department is informed of a discovery request related to a pending litigation or to a subpoena for Viacom Inc. or one of its divisions, I and/or one of my delegees meet with the responsible in-house counsel to discuss the scope of the discovery request or subpoena. In this case, my understanding was that Stuart Kauffmann, who was the responsible in-house counsel until sometime in December 2008, handled the custodian interviews.

6.    When my department is informed of the identities of the custodians who may have relevant information to the pending litigation, we send electronically a preservation hold notice to each of these custodians. The initial preservation notice was sent ON September 2, 2008 to the following individuals: (a) George Cheeks; (b) Joseph Molko; (c) Virginia Lazalde; (d) Brad Hazzard; and (e) Laura Dorson.

7.    The preservation holds issued for this matter remain in place, and will remain in place until this lawsuit comes to an end. As additional persons were identified as custodians of potentially relevant information, additional hold notices were issue as follows: (1) on October 7, 2008, Liz Skoler, and Jackie French; (2) on November 7, 2008 to Ken Parks, and Karen Abdul;

(3) on November 10, 2008 to Michael Rapaport; and (4) on February 2, 2009 to Tony DiSanto, Joe Grimes, Michelle Klepper, Martha Tobar, and Isabel Vargas.

8.    Upon learning the identities of the custodians of potentially relevant information, in addition to issuing preservation hold notices as described above, my department began to collect potentially relevant ESI where applicable by: (i) imaging each identified custodian's local computer hard drive, (ii) harvesting personal network shares assigned to each such custodian on MTVN's network, and (iii) harvesting e-mail on the Exchange server and Viacom's e-mail archive database, Enterprise Vault.

9.    After the potentially relevant ESI was collected for this matter, then, consistent with our standard practice, the ESI was stored on a dedicated disk array. Clearwell Software was then used to cull information that clearly is not related to the matter, such as custodians' personal information.

10.    After the culling process, my understanding is that, in this matter, the remaining ESI was reviewed by Viacom's corporate legal staff to identify any ESI potentially responsive to the subject discovery requests, and then was provided to outside counsel K&L Gates LLP for review and production.

11.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration is true and correct to the best of my knowledge or information and belief. I understand that this verification is made subject to the penalties of perjury under 18 U.S.C. §1621 (relating to un-sworn falsifications to authorities).

February 6, 2009.

**WARREN SOLOW**

3

# Exhibit
# "B"

# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al*

        Debtor.

_____/

Case No. 6:07-bk-00761-ABB
Jointly Administered
Chapter 11

SONEET KAPILA, Chapter 11 Trustee
for TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,

               Plaintiffs,

    v.

MTV NETWORKS COMPANY,

            Defendant.

_____/

Adv. No.:  6:08-ap-00157-ABB

## TRANS CONTINENTAL'S *THIRD* RE-NOTICE OF TAKING DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)
### (To Be Video-Taped)

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, Soneet Kapila, as the Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental"), by and through the undersigned counsel, will take the deposition of the corporate representative of MTV Networks, a division of Viacom International, Inc. ("MTV") on **February 9, 2009, at 10:00 a.m.,** before a qualified notary at the offices of:  K & L Gates, 599 Lexington Avenue, New York, NY 10022-6030.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), MTV shall designate one or more of its representatives who consent to testify on its behalf, and may set forth each person designated, as to the matters described in the attached **Schedule A.**  The oral examination will continue from day to day until completed.  This deposition is being taken for the purposes of

discovery, for use at trial or for such other purposes as are permitted under the Rules of Court. The video operator shall be provided through by Veritext National Deposition & Litigation Services.

The following definitions shall apply to Trans Continental's Notice of Taking Deposition:

1.    The term "person" shall mean any natural individual, in any capacity whatsoever, or any entity or organization, including divisions, departments, and other units therein, and shall include, without limitation, any public or private corporation, partnership, joint venture, voluntary or unincorporated association, organization, proprietorship, trust, estate, governmental agency, commission, bureau, or department.

2.    The term "representative" shall mean any agent, employee, servant, officer, director, accountant, attorney, or other person acting or purporting to act on behalf of the person in question.

3.    The terms "you," "your," and "MTV" refer to MTV Networks, a division of Viacom International, Inc., and the signatory of the November 15, 2001 agreement.

4.    The term, "MTV," shall mean defendant, MTV Networks, a division of Viacom International, Inc., and its present and former agents, officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities, accountants, attorneys, predecessors, and any other person acting or purporting to act on MTV's behalf.

5.    The term "Trans Continental" means "Trans Continental Television Productions, Inc." and all others persons acting or purporting to act on its behalf.

2

6.    The term "Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, in connection with the development and production of an untitled Boy Band series for ABC.

7.    The term, "Amended Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, on or about November 15, 2001, in connection with the MTV series featuring O-Town, entitled "Making the Band."

8.    The term, "O-Town" refers to the musical act comprised of Ashley Angel, Jacob Underwood, Erik Estrada, Trevor Penick and, after the departure of Ikaika Kahoano, Dan Miller, which was the subject of the original series, Making the Band.

9.    The term, "Making the Band," refers to the reality television series which initially aired on American Broadcasting Companies, Inc. and then later on MTV.

10.    The term, "Making the Band," refers to the reality television series which initially aired on American Broadcasting Companies, Inc. and then later on MTV.

11.    The terms, "Sean Combs," "P. Diddy," "Puff Daddy" and "Diddy" refer to the artist/entertainer that appears in *Making the Band 2, Making the Band 3* and *Making the Band 4*and his present and former agents and representatives, as well as his corporate entities, Bad Boy Entertainment, Bad Boy Productions and Bad Boy Records, and their respective officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities, accountants, attorneys, predecessors, and any other person acting or purporting to act on Diddy's or Bad Boy's behalf.

3

12.    The term, "*Making the Band 2*," refers to the television program broadcast on MTV beginning on or about October of 2002, in which Diddy sought to find the best rappers and singers from which to assemble a new hip-hop group.

13.    The term, "*Making the Band 3*," refers to the television program broadcast on MTV in 2005, which featured Diddy and his search for the next all female group.

14.    The term, "*Making the Band 4*," refers to television program broadcast on MTV, which features Diddy, the subsequently named band, *Day26,* and Donnie Klang, and a return of *Danity Kane*, the winners of *Making the Band 3*.

15.    The term, "Da Band," refers to the musical group, which arose out of *Making the Band 2*, and which released the album, *Too Hot for TV*.

16.    The term, "Danity Kane," refers to the musical group, which arose out of *Making the Band 3* and which is signed to Bad Boy Records.

17.    The term, "Donnie Klang," refers to the artist who appeared on *Making the Band 4*, and recently released his album, *Just Like a Rolling Stone*.

18.    The term, "Day 26," refers to the musical group formed during *Making the Band 4*, and which is signed to Bad Boy Records.

19.    The term "including" shall mean including but not limited to.

20.    The term "any" or "each" shall be construed to include and encompass "all."

21.    The term "date" shall mean the exact day, month, and year, if ascertainable, or, if not, the best approximation thereof.

22.    The use of the word "the" shall not be construed as limiting the scope of any request.

4

23.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include the other as are appropriate in the context.

<u>Schedule "A"</u>
**(Corporate Representative – Deposition Topics)**

1.      The communications between MTV and Trans Continental regarding the Agreement.

2.      The communications between MTV and Trans Continental regarding the Amended Agreement.

3.      The negotiation of the Amended Agreement.

4.      The responsibilities of Ken Parks, Ken Mok, Michael Rappaport, Laura Dorson, Karen Abdul, Martha Tobar, Sue Langham, Jackie French, Joe Grimes, Brian Graden, Lois Curren, Ted Iredell and Perry Dance in relation to *Making the Band*, *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

5.      The communications between MTV and Trans Continental regarding *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

6.      The communications between MTV and Diddy regarding Trans Continental and/or Lou Pearlman's interest/involvement in any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

7.      The discussions between MTV and Diddy regarding Lou Pearlman's right of first opportunity to manage the artist(s) that was the focal point of season one of *Making the Band* 2.

8.      The negotiation of paragraphs 4 and 14 of the July 12, 2002 contract between MTV and Diddy

9.      The payments made by MTV to Trans Continental pursuant to the Agreement.

10.     The payments made by MTV to Trans Continental pursuant to the Amended Agreement.

11.     The payments made by MTV to Diddy in connection with any season of *Making*

the Band 2, *Making the Band 3* and *Making the Band 4*.

12.    The account statements rendered by MTV to Diddy in connection with any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

13.    The account statements rendered by MTV to Trans Continental pursuant to the Agreement.

14.    The account statements rendered by MTV to Trans Continental pursuant to the Amended Agreement.

15.    The origin and source of the numbers contained in the Participation Statement dated December 12, 2008 (*see* MTVN 003733 through MTVN 003736).

16.    The contracts and agreements between MTV and Diddy that relate to any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

17.    The contracts between MTV and Bad Boy Productions, Bad Boy Entertainment and/or Bad Boy Records which relate to any of the bands, individuals or artists featured in *Making the Band 2, Making the Band 3* and *Making the Band 4*.

18.    The budgets prepared for any seasons of the shows: *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4*.

19.    The production costs for each of the three seasons of: *Making the Band, Making the Band 2, Making the Band 3*, and *Making the Band 4*.

20.    The making of future seasons of *Making the Band*.

21.    The final production costs for each of the three seasons of *Making the Band*.

22.    The final production costs, on a season-by-season basis, for each of the three seasons of *Making the Band 2, Making the Band* 3 and *Making the Band 4*.

23.     All funds received by MTV in connection with any tour or concert performed by *O-Town*, *Danity Kane*, *Da Band*, *Donnie Klang* and/or *Day 26*.

24.     All funds received by MTV in connection with the O-Town's albums, *O-Town*, *Liquid Dreams*, and *O2*.

25.     All funds received by MTV in connection with Da Band's album, *Too Hot for TV*.

26.     All funds received by MTV in connection with Danity Kane's albums, *Danity Kane* and *Welcome to the Dollhouse*.

27.     All funds received by MTV in connection with Donnie Klang's album, *Just Like a Rolling Stone*.

28.     All funds received by MTV in connection with Day 26's eponymous album, *Day 26*.

29.     All funds received by MTV in connection with any other work featuring O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26's music.

30.     All funds received by MTV in connection with the merchandise of either O-Town or *Making the Band*.

31.     All funds received by MTV in connection with the merchandise of either Da Band or *Making the Band 2*.

32.     All funds received by MTV in connection with the merchandise of either Danity Kane or *Making the Band 3*.

33.     All funds received by MTV in connection with the merchandise of Donnie Klang, Day 26 and/or *Making the Band 4*.

34.     All funds received by MTV in connection with DVD sales of *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

8

35.    All funds received by MTV in connection with product placement or product integrations agreements relating to *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

36.    All funds received by MTV in connection with home video sales of *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

37.    All funds received by MTV in connection with the publishing rights (both print and music) for *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

38.    All funds received by MTV in connection with the publishing rights (both print and music) relating to O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26.

39.    All funds received by MTV in connection with the websites for the *Making the Band* web-site, including any and sites which link to or otherwise relate to *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

40.    All funds received by MTV in connection with the websites for the O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26.

41.    All funds received by MTV in connection with either the domestic or foreign distribution of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

42.    All funds received by MTV in connection with international program sales from *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

43.    All of the stations in which any season of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4* has been distributed to, broadcast or exhibited in, aired or otherwise televised on.

44.    All of the countries, territories, or provinces in which any season of *Making the*

*Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4* has been distributed to, broadcast or exhibited in, aired or otherwise televised on.

45.    All license, affiliate, program sales and/or distribution agreements that MTV has entered into with any party involving *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

46.    The mechanism by which any non-MTV owned station acquired the rights to televise any episode of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

47.    Each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the distribution (both foreign and domestic) of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

48.    Each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the licensing of the television programs, *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

49.    Each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the licensing of any merchandise or ancillary, allied or after-market products (*e.g.*, DVDs and other products relating to the home video market) relating to any season of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

50.    Any and all documents that refer, relate to, reflect, concern or evidence the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, has made in connection with *Making the Band*, *Making the Band 2*, *Making the Band 3*

10

and/or *Making the Band 4*.

51.     The amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received in connection with the broadcast of *Making the Band 2* in the United States or any other country, territory or province.

52.     The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during season three of *Making the Band*.

53.     The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

54.     The average revenue amount generated by MTV in connection with a single episode of season three of *Making the Band*.

55.     The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 2*.

56.     The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 3*.

57.     The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 4*.

58.     The individuals or entities responsible for selling advertisement spots in connection with season three of *Making the Band*, or any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

59.     The software program used by MTV to track and manage its advertising inventory.

60.     The profitability of *Making the Band 2*.

61.     The profitability of *Making the Band 3*.

11

62.    The profitability of *Making the Band 4*.

63.    The number of episodes, on a season-by-season basis, of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*, which aired on MTV.

64.    The number of times any episode of season three of *Making the Band* was re-broadcasted or re-run.

65.    The number of times any episode of any season (seasons one, two and three) of *Making the Band 2* was re-broadcasted or re-run.

66.    The number of times any episode of any season (seasons one, two and three) of *Making the Band 3* was re-broadcasted or re-run.

67.    The number of times any episode of any season (seasons one, two and three) of *Making the Band 4* was re-broadcasted or re-run.

68.    The internal discussions among MTV personnel regarding Trans Continental's interest in *Making the Band 2, Making the Band 3* and *Making the Band 4*.

69.    The discussions between MTV and Johnny Wright regarding Trans Continental's interest in *Making the Band 2, Making the Band 3* and *Making the Band 4* and/or Danity Kane, Day 26, Donnie Klang and Da Band.

70.    The intent and purpose of MTV's use of Imputed License Fees.

71.    MTV's use of Imputed Licensee Fees in connection with its other television programs.

72.    MTV's search for documents and electronic data responsive to Trans Continental's First Request for the Production of Documents and Things.

73.    MTV's production of electronic data, and compliance with its *Zubulake* discovery obligations.

12

Respectfully submitted,

**SILVERMAN COSGROVE & SAMMATARO**
*Special Litigation Counsel for Soneet R.
Kapila, as Chapter 11 Trustee for the
bankruptcy estate of Trans Continental
Television Productions, Inc.*
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2650
Miami, Florida 33131
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
jsammataro@scs-legal.com

By: _____
    James G. Sammataro
    Florida Bar Number: 0520292

13

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Trans Continental's Third Re-Notice of Taking Corporate Representative Deposition* was served via scanned e-mail and United States mail on this 19th day of January, 2009 to:

**Carol C. Lumpkin, Esq.**
K& L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

James G. Sammataro

# Exhibit

## "C"

Law Offices of
# JEFFREY P. KRANZDORF
Admitted in California and New York

18410 St. Moritz Drive
Tarzana, California 91356
♦ Telephone: (818) 343-1875 ♦
♦ Facsimile: (818) 343-1876 ♦
E-mail: jkranzdorf@earthlink.net

<u>VIA E-MAIL</u>

Four (4) Page[s] (including this one)

February 2, 2005

VIRGINIA LAZALDE-McPHERSON, ESQ.
Senior Counsel
MTV NETWORKS- a division of Viacom International
e-mail: Virginia.Lazalde@mtvstaff.com

Re:    <u>TRANS CONTINENTAL TELEVISION PRODUCTIONS, INC. –w- MTV
PRODUCTIONS, a division of Viacom International, Inc.</u>

Dear Virginia:

As you know, I represent Trans Continental Television Productions, Inc. ("TCTV")  I am
writing you in regard to the above-referenced television series   There are a number of
extremely important issues of mutual interest to MTV and TCTV, which need to be
addressed as soon hereafter as possible.   As per Lou Pearlman's prior request to you,
these matters should be  discussed with Greg McDonald acting on TCTV's behalf.  Some
of the unresolved issues have been outstanding for several seasons of the series and TCTV
believes that it would be in both its and MTV's best interests to resolve them now.

There are number of items of significant interest that merit our immediate attention   I
refer to the agreement ("Agreement") entered into between TCTV and MTV on January
7, 2000 as amended November 15, 2001 (the "Amendment").

Please note.

Paragraph 5 of the Agreement provides that "All business/creative matters in connection
with the joint venture are to be  mutually determined, except that on the Series, MTV
breaks any tie over creative matters, and on the creative musical aspects of the venture,
TC(TV) breaks the tie".

I

MTVN 000268

To date TCTV has been told nothing at all about the last several season's Series episodes and the involvement of Sean Combs. To date TCTV's participation and input as required by the foregoing Paragraph 5 has been excluded. It is TCTV's position that no creative musical matters relating to these or any other, further or future episodes may proceed with TCTV's input and TCTV's full and active participation in the creative process. TCTV's require an immediate meeting be scheduled with all creative participants so that we can all get acquainted and commence to plan for additional episodes.

Paragraph 11 of the Agreement provides for a 50/50 split of Domestic and Foreign Distribution of Series, subject to MTV taking 10% "off the top". This was amended to include MTV's ability to further recoup its "direct out-of-pocket expenses related to the Series in connection with such distribution" (see paragraph 4 of the Amendment).

TCTV still does not have an up-to-date accounting of such revenues and TCTV believes that both an accounting and monies that would be indicated thereby are presently due us. In this regard the last thing TCTV has seen was the payment of $512,000.00 paid in April 2003, representing a payment of TCTV's share of international program licensing fees then due to date. To the extent that there are substantial international net revenues to be divided, that should occur immediately. The involvement of Mr. Combs and his company in Making The Band did not change the terms of the MTV-TCTV's deal and we are at a complete loss to understand why it is that MTV has seen fit to totally disregard its obligations to TCPT as if the Agreement (and the Amendment) does not exist.

Paragraph 15 of the Agreement provides in pertinent part that "All business deals relating the Series and Band and ancillary rights therefrom must be approved by both parties."

To date we STILL have no idea or understanding of what business deals or agreements have been struck between MTV and Sean Combs or with "Band" members pertaining to the 4th season and/or beyond. We need to gain an immediate understanding of what those may consist of. TCTV should be a party to all such agreements and all further and future deals must be entered into in the names of, approved by and signed off on, by both MTV and TCTV.

Paragraph 18 of the agreement provides that: "TC(TV) will enter into a management deal directly with the Band outside of the joint venture and take a 20% fee."

Since this Agreement pertains not only to the initial program but also to any "...spin-offs, sequels,...etc. in accordance with paragraph 14 thereof, it is our position that Trans Con is entitled to enter into such a management agreement with the artists who are the subject of the current Series episodes production. To date, though we have requested it, no one from MTV has even so much as introduced Lou and TCTV to any artist since O-Town. This needs to be rectified immediately.

2

MTVN 000269

The November 15, 2001 Amendment provides in paragraph 5 that the Series is to be copyrighted in the joint names of TCTV and MTV and that MTV was(is) to be responsible for effecting all such registrations.

To date we have no copies of any such registrations. Please make arrangement to have copies of all registrations filed with the Office of the U.S. Registrar of Copyrights (or elsewhere) furnished to us and as please ensure that as a matter of course copies of all further and future registrations are sent to TCTV promptly following their receipt from the Copyright Office (and/or other foreign registries). TCTV's co-ownership of these programs, their copyrights and all other rights therein constitute valuable assets of TCTV and into which TCTV has made substantial investment of its money, time and other resources. TCTV expect to be treated in "every" respect as a full partner. Making certain that the copyright registrations are in apposite with the Agreement and the Amendment is not only in the interests of both parties; it's the right thing to do!

Paragraph 9 of the Amendment references our agreement to a continuing "all in" 50/50 split of net proceeds derived from the third season and subsequent seasons. in accordance with and subject to the MTV Net Proceeds definition set forth as Schedule "A" to the Amendment. We need an immediate assessment of where we stand under this provision based on the imputed license fee based on the initial exploitation of the Series (3rd season going forward) on MTV Networks in the US. As indicated in paragraph 9(a) the Imputed License Fee (i.e. 65% of the final production cost of the Series") is to be credited as follows:

"(i) 50% thereof shall be credited as a revenue upon completion of production of a Series episode. and ........ "

As early as the 4th season of "Making The Band" TCTV requested copies of the production budgets in order to determine what the Imputed License Fee would be. My clients are ENTITLED to participate in all business and creative processes Virginia. TCTV is ENTITLED to review these budgets. TCTV is entitled to offer its meaningful input. TCTC has a substantial investment at stake here Based on the Agreement and Amendment TCTV is a co-owner of this Series (including its sequels). There is no reason why TCTV should not have been provided with the production budgets as and when requested. TCTV expects that all budgets both actual and proposed with a view forward to the production of additional episodes, will be furnished to it promptly.

Paragraph 10 of the Amendment provides that Lou Pearlman will receive a "Consultant credit" and that TC(TV) shall receive a continuing production credit for the Series. We would like to know what credits are continuing to be used and affixed to Series episodes and why TCTV has not been given the opportunity to review and approve of these items. The TCTV electronic logo should appear in the credits. If that has not occurred in the past. that mistake should certainly not continue into the future.

MTVN 000270

It is absolutely imperative that all of the aforementioned matters are addressed without delay. TCTV has traditionally enjoyed a warm, mutually respectful and productive relationship with MTV and they certainly hope to continue to do so. My clients believe that it would be instructive for all concerned to meet together at a mutually convenient time and location as soon as possible in order to resolve these issues in a matter that is both amicable and designed to resolve all outstanding items in an immediate and comprehensive manner. I would encourage you to contact me or, if you like, contact Greg McDonald directly at the TCTV office (gregm@t-con.com; phone: 407-345-0004 ext. 5229) to get things back on track.

TCTV continues to be thrilled with the unprecedented success that Making The Band continues to enjoy on MTV

Please give me a call on receipt of this letter to arrange for the same

Warmest regards,

*Jeff* /s/

JEFFREY P. KRANZDORF

Cc: Louis J. Pearlman- via e-mail
      Greg McDonald-via e-mail

MTVN 000271