## IN THE UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**In re**:

**LOUIS J. PEARLMAN,** *et al*

     **Debtor.**

_____/

**SONEET KAPILA, Chapter 11 Trustee**
**for TRANS CONTINENTAL TELEVISION**
**PRODUCTIONS, INC.,**

                   **Plaintiffs,**

    v.

**MTV NETWORKS COMPANY,**

                   **Defendant.**

_____/

**Case No. 6:07-bk-00761-ABB**
**Jointly Administered**
**Chapter 11**

**Adv. No.: 6:08-ap-00157-ABB**

---

### TRANS CONTINENTAL'S MEMORANDUM OF LAW IN OPPOSITION TO MTV NETWORKS' MOTION FOR PROTECTIVE ORDER REGARDING 30(B)(6) CORPORATE REPRESENTATIVE DEPOSITION

Pursuant to Rule 26 of the Federal Rules of Civil Procedure and Rule 7026 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, Soneet Kapila, as the Chapter 11 Trustee ("Trustee") for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental"), hereby files his Memorandum of Law in Opposition to the Motion for Protective Order [D.E. 29] filed by the defendant, MTV Networks ("MTV"), in connection with topics 50 through 59 of Trans Continental's Third Re-Notice of Taking Deposition of MTV's Corporate Representative pursuant to Fed. R. Civ. P. 30(b)(6).

### I.      <u>INTRODUCTION</u>

At issue in this action is the amount of money which MTV owes to Trans Continental in

connection with the television franchise, *Making the Band*.[1]    Despite this fact, MTV is attempting to cloak the profitability of *Making the Band* in complete secrecy.    MTV's Motion for Protective Order seeks to preclude the Trustee's counsel from so much as even inquiring into the advertising revenue earned by MTV in relation to the show during the deposition of MTV's corporate representative(s).[2]

In an attempt to justify this extraordinary demand, MTV posits that public disclosure of information relating to the profitability of *Making the Band* and its advertising revenue in general will place MTV at a competitive disadvantage.    In making this argument MTV conspicuously overlooks that, in truth, there is absolutely ***no risk of public disclosure***.  Trans Continental is not a competitor and the Trustee's counsel has already agreed to a Confidentiality Agreement, which limits the disclosure of this information to the Trustee's counsel and its experts.    This reality nullifies any claim that disclosure will result in the required "clearly defined and very serious injury," and mandates the denial of MTV's Motion, without further inquiry.

Even if MTV was capable of demonstrating the requisite harm (which it is not), the information relating to *Making the Band's* profitability and advertising revenue is indisputably relevant.  Trans Continental claims it is entitled to a portion of the advertising revenue.    MTV disputes this contention.    Either way, the advertising revenue generated from *Making the Band* lies at the very heart of Trans Continental's damages claim – a claim which, worth noting, is buttressed by the sworn testimony of MTV's Senior Vice President of Business and Legal Affairs, which directly refutes MTV's present contention that the agreements reserve all

---

[1]    In total, there has been twelve seasons of *Making the Band,* which have packaged as follows: *Making the Band* (seasons 1, 2 and 3), *Making the Band 2* (seasons 1, 2 and 3), *Making the Band 3* (seasons 1, 2 and 3), and *Making the Band 4* (seasons 1, 2 and 3).  Unless otherwise indicated, *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4* are collectively referred to as "*Making the Band.*"

[2]    To date, MTV has not identified the individual or individuals who would will be serving as its corporate representative on topics 50 through 59 should this Court deny its Motion for Protective Order.

advertising revenue unto MTV.

Regardless, MTV's Motion misses the point and focuses on the wrong inquiry.    At this juncture in discovery, the pertinent inquiry is not whether Trans Continental is entitled to share in the advertising revenue, but whether the advertising revenue has any possible bearing on any issue in this case.  In addition to being one of the principal issues in dispute, the advertising revenue gives needed context to the parties' diametrically opposed interpretations of the underlying agreements.  Without this information, the Court will have only one side of the story and be bereft of a true understanding of the underlying economics, while Trans Continental will be precluded from fully developing its damages claim.

## II.    BRIEF FACTUAL BACKGROUND

On November 11, 2008, Trans Continental propounded its Notice of Taking MTV's Fed. R. Civ. P. 30(b)(6) Corporate Representative's Deposition ("Notice of Taking Deposition"), which scheduled the deposition of MTV's corporate representative for December 15, 2008.    On December 5, 2008, Trans Continental reluctantly agreed to temporarily postpone several long-scheduled depositions, including the deposition of MTV's corporate representative, based on MTV's counsel's representation that unexpected lay-offs, left MTV incapable of producing the scheduled witnesses.  In exchange for Trans Continental's professional courtesy, MTV promised that the depositions would be re-scheduled later that month.    MTV failed to honor this promise.

Instead thereafter, the parties engaged in substantial wrangling over both the date and scope of the corporate representative deposition.  MTV initially balked, but eventually conceded to, producing multiple witnesses in satisfaction of its Fed. R. Civ. P. 30(b)(6) obligations.  Trans Continental, in turn, agreed to narrow the scope of several of the designated topic areas. Subsequent jockeying and the health of MTV's counsel resulted in two additional postponements

of the corporate representative deposition.[3]

On February 6, 2009 – nearly two months after the initial Notice of Taking Deposition – MTV filed its Motion for Protective Order [D.E. 29], seeking a protective order from preventing Trans Continental's counsel from inquiring into any areas which even remotely thread upon the profitability of the *Making the Band* franchise, or the advertising revenue generated therefrom. Specifically, MTV seeks to preclude all questions in connection with topics 50 through 59 of Trans Continental's Third Re-Notice of Taking Deposition:

50.    Any and all documents that refer, relate to, reflect, concern or evidence the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, has made in connection with *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4.*

51.    The amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received in connection with the broadcast of *Making the Band 2* in the United States or any other country, territory or province.

52.    The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during season three of *Making the Band.*

53.    The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during any season of *Making the Band 2, Making the Band 3* and *Making the Band 4.*

54.    The average revenue amount generated by MTV in connection with a single episode of season three of *Making the Band.*

55.    The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 2.*

56.    The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 3.*

---

[3]   Jackie French – who is one of only three individuals deposed to date – served as MTV's corporate representative on topics numbers 7, 18, 20, and 63 through 69. Brad Hazzard, who was scheduled for deposition of February 6, 2009, which was cancelled due to the health of MTV's counsel, had been designated as MTV's corporate representative on topics: 16-17 and 45 through 49.

57.     The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 4*.

58.     The individuals or entities responsible for selling advertisement spots in connection with season three of *Making the Band*, or any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

59.     The software program used by MTV to track and manage its advertising inventory.

(A true and correct copy of Trans Continental's Third Re-Notice of Taking Deposition is attached hereto as **Exhibit 1**).

## III.    <u>MEMORANDUM OF LAW</u>

### A.    <u>Discovery Rules Are to Be Afforded "Broad and Liberal Construction."</u>

The Federal Rules of Civil Procedure establish a liberal system of discovery "meant to insure that no relevant fact remain[s] hidden." *Crawford v. Dominic*, 469 F. Supp. 260, 262 (D.C. Pa. 1979).   The Federal Rules of Civil Procedure mandate the disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, therefore ensuring a fair and just result. *See United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682 (1958).   As long-ago explained by the United States Supreme Court:

> No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.   Mutual knowledge of all of the relevant facts gathered by both parties is essential to proper litigation.    To that end, either party may compel the other to disgorge whatever facts he has in his possession.    The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.

*Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

"The concept of trial by ambush has long ago fallen into desuetude in both state and federal courts." *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 331, 342 (N.D. Ill. 2005); *Proctor & Gamble*, 356 U.S. at 682 ("[The federal rules were intended to] make trial less a game

of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.")

The scope of discovery under Rule 26(b) is broad: "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Under Rule 26, relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc., v. Sanders,* 437 U.S. 340, 351 (1978); *Jeld-Wen, Inc., v. Nebula Glass Int'l, Inc.,* 2007 WL 1526649, * 2 (S.D. Fla. May 22, 2007) ("Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action."). *See also, Rhone-Poulenc Rorer, Inc., v. Aetna Casualty & Surety Co.,* 1992 WL 394425, * 3 (E.D. Pa. Dec. 28, 1992) ("[D]iscovery requests may be relevant if there is any possibility that the information may be relevant to the general subject matter of the action.   As a result, discovery rules are to be accorded broad and liberal construction.").

Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues." *Oppenheimer Fund,* 437 U.S. at 352. Information can be relevant and therefore discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. *Dunbar v. United States,* 502 F.2d 506, 509-10 (5th Cir. 1974). *See Farnsworth v. Proctor & Gamble Co.,* 758 F.2d 1545, 1547 (11th Cir. 1985) ("The Federal Rules of Civil Procedure strongly favor full discovery whenever possible."); *Canal Authority v. Froehlke,* 81 F.R.D. 609, 611 (M.D. Fla. 1991) (Bechtle, J.) (same).

**B.    MTV Has the Burden of First Demonstrating that Disclosure of the Documents Will Work a "Clearly Defined and Very Serious Injury."**

Notwithstanding the broad discovery principles espoused above, courts are empowered to issue protective orders to temper the scope of discovery under appropriate circumstances. Rule 26(c)(7) of the Federal Rules of Civil Procedure provides that the court may enter an order that "a trade secret or other confidential research, development, or commercial information not be revealed or revealed only in a designated way." Fed.R.Civ.P. 26(c)(7). The party seeking a protective order has the burden of demonstrating that good cause exists for the issuance of the order. *See American Standard, Inc. v. Humphrey*, 2007 WL 1186654, * 2 (M.D. Fla. 2007) (Richardson, J.) ("One seeking a protective order carries the burden of showing good cause and/or the right to be protected.") (citing *United States v. Garrett*, 571 F.2d 1323, 1326, n. 3 (5th Cir. 1978)). *See also Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.,* 231 F.R.D. 426, 429-30 (M.D. Fla. 2005) (Presnell, J.); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3rd Cir. 1994) (a showing of "good cause" is a prerequisite to the issuance of a protective order). *Compare Empire of Carolina, Inc. v. Mackle*, 108 F.R.D. 323, 326 (S.D. Fla. 1985) (noting that "there is no absolute privilege that immunizes trade secrets and confidential information from discovery.").

"Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not satisfy the Rule 26(c) test." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3rd Cir. 1986). Instead, "[t]o satisfy the burden of showing good cause, the moving party must demonstrate that 'disclosure will work a clearly defined and very serious injury.'" *Uniroyal Chem. Co. v. Syngenta Corp. Protection*, 224 F.R.D. 53, 56 (D. Conn. 2004) (citing *Cuno, Inc. v. Pall Corp.*, 117 F.R.D. 506, 508 (E.D.N.Y. 1987)). *See also Garrett*, 571 F.2d at 1326, n. 3 ("[This burden] contemplates a particular and specific demonstration of fact as distinguished

from stereotyped and conclusory statements."); *United States v. Dentsply Int'l, Inc.,* 187 F.R.D. 152, 158 (D. Del. 1999) ("The litigant seeking the protective order must articulate the injury with specificity.").

Accordingly, as the party resisting discovery, MTV bears the burden of demonstrating that the information is confidential[4] and that disclosure would be harmful. *See Goober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000) (Jones, J). "***Only after*** such a showing is made does the burden shift to the party seeking discovery to show that the information is relevant and necessary." *American Standard*, 2007 WL 1186654 at *3 (emphasis added).

If the party seeking discovery demonstrates the relevance of the sought materials, it is for the court to balance the risk of disclosure against the risk that a protective order will impair prosecution or defense of the claims. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir.1992). The court has wide discretion in determining both the need for, and the scope of, protective orders. The need for the information is ordinarily held paramount, but reasonable protective measures are supplied to minimize the effect on the party making the disclosure. Disclosure may, for example, be ordered to opposing party's trial attorney only, and not to the opposing party. *See Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.,* 682 F. Supp. 20, 22 (D. Del. 1998).

Indeed, as noted in *Vesta Corset Co., Inc. v. Carmen Found, Inc.,* 1999 WL 13257 (S.D.N.Y. Jan. 13, 1999) – a case in which MTV relies heavily – "Protective orders that limit

---

[4]    Trans Continental is not challenging MTV's contention that the information relating to its advertising revenue or the profitability of *Making the Band* is commercially sensitive.

With that said, MTV is taking an overly expansive view as to the proprietary nature of its advertising revenue. By way of example, some of the advertising information which Trans Continental is seeking dates back several years. It is little secret that advertising rates have dramatically changed since the advent of Tivo™ and similar DVR devices. Consequently, a large portion of the information which MTV is claiming to be proprietary is no longer commercially viable.

access to certain documents to counsel and experts are *commonly* entered into in litigation involving trade secrets and other confidential [information]." *Id.* at * 3 (emphasis added). *See also, Autotech Technologies Limited Partnership v. Automationdirect.com, Inc.,* 237 F.R.D. 405, 406-07 (N.D. Ill. 2006) (noting that "attorneys' eyes' only protective orders "have become *de rigeur*, at least where outside counsel are to have access to the information") (emphasis in orginal).   In fact, as noted by the United States Supreme Court:

> Actually, orders forbidding any disclosure of trade secrets or confidential information are rare.  More commonly, the trial court will enter a protective order restricting disclosure to counsel or to the parties.

*Federal Open Market Committee v. Merrill*, 99 S. Ct. 2800, 2813, n. 24 (1979).

Protective orders which restrict disclosure to counsel and their experts represent judicial efforts to strike a proper balance between the "philosophy of full disclosure of relevant information" and the need for "reasonable protection against harmful side effects," such as the risk that disclosure will result in competitive harm. *Nutratech, Inc. v. Syntech (SSPF) International, Inc.,* 242 F.R.D. 552, 555 (C.D. Cal. 2007) (citing *Davis v. AT &T Corp.,* 1998 WL 912012, * 2 (W.D.N.Y. 1998)).

**C.     In Truth, Disclosure Will Not Result in Any Harm to MTV as Trans Continental is *Not* a Competitor, and Trustee's Counsel Has Already Agreed to Limit the Disclosure of the Documents to Attorneys' Eyes Only.**

Lost in MTV's Motion for Protective Order is that there is absolutely no risk of competitive disadvantage. [*Compare* D.E. 29, pp. 7-9]   Trans Continental is *not* a competitor. It was a former joint venture partner, which by virtue of this bankruptcy action, is out of business. Moreover, and more importantly, Trustee's counsel has *already* agreed to a Confidentiality Agreement, which provides for the designation of certain confidential and

proprietary information as "attorneys' eyes only."[5]   (A true and correct copy of the parties' December 12, 2008 Confidentiality Agreement is attached hereto as **Exhibit 2**).   There is, therefore, no risk of public disclosure.

Consequently, all of MTV's professed concerns regarding the harm that would occur if its competitors or existing clients learned of its advertising rates are extinguished.   *Compare* MTV's Motion, p. 8 (noting that disclosure would: (1) "compromise [MTV's] ability to compete in that *its competitors* would use [MTV] rate structures to take existing, or potential new, business from [MTV]; and (2) compromise [MTV's] relationship with existing clients who may learn the specifics of other deals).

MTV has not – and cannot – meet its burden of demonstrating that the limited disclosure of the requested information to the Trustee's counsel would result in "a clearly defined and very serious injury."   In fact, MTV was incapable of citing a single case in which a court entered a protective order precluding opposing counsel from delving into relevant topics during deposition, on the basis that such questioning – particularly when only protected by a confidentiality agreement – would result in harm.

Instead, and as referenced above, courts that have entered protective orders have routinely found that limiting disclosure to opposing counsel and experts nullifies any valid argument that disclosure will result in competitive harm.   *See, e.g., Quotron Systems, Inc. v. Automatic Data Processing, Inc.,* 141 F.R.D. 37, 40 (S.D.N.Y. 1992) (limiting disclosure to counsel and experts); *Multi-Core, Inc. v. Southern Water Treatment Co.,* 139 F.R.D. 262 (D. Mass 1991) (ordering the disclosure of the composition of a chemical solution to plaintiff's counsel of record and its selected experts); *Davidson Pipe Co. v. Laventhal and Horwath,* 120

---

[5]   The undersigned has dutifully honored this Agreement, filing a Motion for Permission to File Certain Documents Under Seal, and giving MTV wide leeway in designating portions of the deposition transcripts confidential.

F.R.D. 455 (S.D.N.Y. 1988) (limiting disclosure of confidential information to the parties' counsel); *Spartanics, Ltd. v. Dynetics Engineering Corp.*, 54 F.R.D. 524, 526 (N.D. Ill. 1972) (ordering disclosure of trade secret to trial counsel and independent consultants).[6]

This reality mandates the denial of MTV's Motion, without further inquiry.   *See, e.g., American Standard,* 2007 WL 1186654 at *3 ("***Only after*** [a showing that disclosure would be harmful] is made does the burden shift to the party seeking discovery to show that the information is relevant and necessary.") (emphasis added).   That being said, the relevance and necessity of the information relating to the advertising revenue lie beyond reasonable dispute.

**D.**      **The Advertising Revenue Is Undeniably Relevant.**

   **1.      MTV is Not Entitled to Preclude Discovery on a Disputed Issue, Based on its Belief that It *May* Ultimately Prevail on the Issue.**

In arguing against the relevancy of the sought information, MTV posits that the agreements at issue make it clear that Trans Continental is not entitled to share in the advertising revenue.  The soundness of this position aside, this argument is appropriate for a dispositive motion, not a motion for protective order.  MTV has filed neither a Motion to Dismiss nor a Motion for Summary Judgment in connection with this professed "clear" point.  The proper interpretation of the agreements remains very much the subject of debate, and MTV cannot preclude discovery on a facially relevant topic based on a belief that it ***may*** ultimately prevail on a disputed legal issue.

This was the precise ruling recently reached by this Court in *Unlimited Resources*

---

[6]      *See also, Culligan v. Yamaha Motor Corp.,* 110 F.R.D. 122, 126 (S.D.N.Y. 1986) (limiting disclosure to plaintiff's counsel); *Stillman v. Vassileff,* 100 F.R.D. 467, 468 (S.D.N.Y. 1984) (limiting disclosure to plaintiff's counsel); *Sullivan Marketing, Inc., v. Valassis Communications, Inc.,* 1994 WL 177795, at *2 (S.D.N.Y. May 5, 1994) (limiting disclosure of documents relating to pricing and market strategies to outside counsel, their employees, and consultants retained for litigation because in-house counsel was sufficiently involved in competitive decision-making).

*Incorporated v. Deployed Resources, LLC*, 2009 WL 212188 (M.D. Fla. Jan. 29, 2009)
(Richardson, J.) – which, ironically, is a case erroneously relied upon by MTV in its Motion.    In
*Unlimited Resources*, Judge Richardson ruled: "Defendants' argument that [p]laintiff's claim
regarding the work is somehow legally insufficient is not enough to preclude discovery ...
Defendants arguments regarding the term 'procurement' are best left to a dispositive motion and
the Court will not prevent discovery on this ground." *Id.* at * 3.

A near-identical ruling was rendered in *Central Georgia Anesthetic Services, P.C. v.
Equitable Life Assur. Soc.*, 2007 WL 2128184 (M.D. Ga. July 25, 2007).  There, the court denied
the defendants' objection to producing documents, which was premised on the argument that the
plaintiff's bad faith claim was not legally viable.   In ordering the production, the *Central Georgia*
court held that the defendants' arguments as to the viability of the plaintiff's bad faith claim were
"not properly before the Court at this stage of the proceedings," "more appropriately made in a
dispositive motion," and not sufficient grounds to restrict discovery.

> **2.      Aside from Premature, MTV's Arguments As to the Professed
> Meaning of the Agreements Are Belied by the Plain Language
> of the Agreements, the Parties' Prior Behavior, and the Sworn
> Testimony of MTV's Personnel.**

MTV's argument that the agreements make clear that Trans Continental is not to share in
the advertising revenue is belied by the plain language of the agreements.   The parties' January
7, 2000 letter agreement (the "Agreement") makes clear that *Making the Band* was a ***joint
venture*** between MTV and Trans Continental.    Trans Continental invested money in the
development of the idea, the story line, and the production of the television series.   In return,
Trans Continental was a co-owner of the show.    To this end, the Agreement provided that:

> • Business matters / Creative Decisions:   All business / creative
> matters in connection with the joint venture are to be mutually
> determined ... (A true and correct copy of the parties' January 7,
> 2000 Agreement is attached hereto as **Exhibit 3**).

- MTV and Trans Continental "will jointly exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation." (*Id.* at ¶ 14).

- [A]ll business deals relating to the Series and Band and ancillary rights therefrom must be approved by both parties." (*Id.* at ¶ 15).

The clear intent of the parties' original Agreement was mutuality. The parties were to be joint venture partners, who were to share equally in the proceeds including the "***advertising/sponsorship revenues*** [7] brought in by MTV on the official [*Making the Band*] website." (*Id.* at ¶ 10) (emphasis added).[8] Had the advertising revenue for seasons 1 and 2 of *Making the Band* not already been contractually committed to ABC, MTV and Trans Continental would have likely equally shared in this revenue as well. Thus, contrary to MTV's suggestion, nowhere does the Agreement even intimate, much less make clear, that advertising revenue was to remain solely with MTV. (*Compare* MTV Motion, p. 9). Instead, the advertising revenue which was available to the parties was shared.

The parties' November 15, 2001 Amended Agreement (the "Amended Agreement") similarly does not provide the clarity which MTV suggests. (A true and correct copy of the parties' Amended Agreement is attached hereto as **Exhibit 4**). Paragraph 9 of the Amended Amendment specifies that:

> Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series.

---

[7]  MTV was entitled to first recoup its expenses and then take a fifteen percent (15%) commission prior to the fifty-fifty sharing of the advertisement revenues.

[8]  MTV and Trans Continental's indisputable agreement to share in the internet advertising revenue flatly contradicts MTV's claim that the alleged industry practice is to never share advertising revenue. (*Compare* MTV Motion, p. 2).

Exhibit A to the Amended Agreement defined "Net Proceeds" as follows: "all non-refundable revenues actually received in the United States from all sources worldwide by MTVN Networks ("MTVN") in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN's worldwide programming services)."

Despite the conspicuous absence of the term "advertising revenue," MTV argues that "exhibition" absolutely means advertising revenue and that this was the parties' clear and unmistakable intent in negotiating the Amended Agreement.   While MTV is certainly entitled to make this argument in a dispositive motion, there is absolutely no evidence that this was indeed the parties' intent.    Simply put, standing alone, MTV's suggested interpretation of the underlying agreements does not provide valid grounds to justify restricting the scope of Trans Continental's discovery efforts.

> **3.    Sworn Testimony from MTV's Personnel Confirms that Advertising Revenue Received Outside of the United States Is Properly Excluded from the Net Proceeds Calculation.**

Moreover, in citing the definition of "Net Proceeds," MTV conveniently glosses over the fact that the first sentence actually reads:  "For purposes of the Agreement, 'Net Proceeds' shall mean all non-refundable revenues *actually received in the United States* from all sources worldwide by MTV Networks … in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming service)" *Id.* (emphasis added). Therefore, even if MTV's position that "exhibition means advertising revenue" was correct, the plain language of the Net Proceeds definition contains an unmistakable limitation: the revenue must have been actually received in the United States.

Accordingly, if MTV Germany[9] received direct payment for the advertising placed

---

[9]    MTV Germany is just one of the eleven foreign countries in which seasons of *Making the Band* has been broadcast.

during the episode of *Making the Band* which aired in Germany, this revenue stream would not be excluded under MTV's interpretation of the Net Proceeds definition and *is* properly considered as part of the calculation as to what is owed to Trans Continental.

To this end, Virginia Lazalde-McPherson, Esq., Senior Vice President of MTV's Business and Legal Affairs Department, unequivocally testified that revenue *not* received in the United States is excluded from the Net Proceeds definition. (*See* pages pp. 90-93 of the deposition transcript of Virginia Lazalde-McPherson's January 26, 2009 deposition, which are attached hereto as **Exhibit 5**) (testifying that money received by MTV Germany in Germany is excluded from the Net Proceeds definition). Ms. Lazalde-McPherson's sworn testimony directly refutes MTV's conclusory statement that the "2001 specifically excludes all 'exhibition' revenues" (*Compare* MTV Motion, p. 9), and vitiates any reasonable argument as to Trans Continental's entitlement to discover the revenue generated by MTV's foreign affiliates/sister entities in connection in connection with the foreign exhibition of *Making the Band*.

Trans Continental cannot be precluded from discovering information regarding advertisement revenue which MTV's own legal counsel concedes that Trans Continental may be entitled to.

### 4. The Advertising Revenue Gives Needed Context to the Parties' Diametrically Opposed Positions.

Even in the unlikely event that MTV's interpretation of the Net Proceeds definition was correct, the fact that Trans Continental is not entitled to share in the advertising revenue does not mean that the advertising revenue has no bearing on, or relevance to, the claims and defenses of this action. As imparted by the United State Supreme Court, relevancy is to be construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund,* 437 U.S. at 351.

At issue in this case is the amount of money which MTV owes to Trans Continental in connection with *Making the Band*. The amount of money which MTV made from *Making the Band* is undeniably relevant to this analysis.

The issue as to whether Trans Continental is entitled to share in the advertising revenues generated by *Making the Band* is not the relevant inquiry. Instead, as this juncture, the pivotal question is whether the advertising revenue bears on any issue in this case. Here, not only is the advertising revenue one the principal issues in dispute, but it also gives meaning and context to the Agreements. The parties could not be any further apart. Based on recently-produced documents, Trans Continental's position is that MTV owes Trans Continental in excess of fifty million dollars ($50,000,000.00). MTV's position is that Trans Continental is not owed a single penny. In fact, to be precise, MTV's position is that Trans Continental is un-recouped in an amount in excess of twelve million dollars ($12,000,000.00).

Given this approximate sixty-two million dollar ($62,000,000.00) gap, it is obvious that the parties have fundamentally different interpretations of the Agreement. The amount of advertising revenue which MTV generated from *Making the Band* sheds light on the reasonableness of the parties' respective positions. If, as expected, MTV generated substantial advertising revenue in connection with its airing of the ten (10) seasons of *Making the Band*, then MTV's interpretation that Trans Continental remains more than twelve million dollars in the negative is all the more implausible.

In this same vein, the per episode advertising information further sheds light on the underlying economics. During her deposition Jackie French provided a chart, which revealed that the first episode of the most recent season of *Making the Band* [10] was broadcast a total of

---

[10]    Season Three of *Making the Band 4*.

forty-four (44) times.   As a one-hour episode, this provided MTV with the opportunity to broadcast any many as 1,320 commercial spots.[11]   At an average of $10,000.00 per thirty-second commercial spot – likely, a conservative number – this translates into thirteen million, two hundred dollars ($13,200,000.00) for just one of the nine episodes.   Not only does this figure relate to just one of the nine episodes, it does not factor in the advertising revenue that is generated by the foreign exhibition of *Making the Band*.   Certain seasons of *Making the Band* have aired in as many as eleven (11) countries.   This leads to a staggering number, and places Trans Continental's damages claim in context.

> ### E. The Trustee is Not Barred From Pursuing Valid Causes of Action Based on Positions which Trans Continental May or May Not Have Taken.

As a fall-back position, MTV contends that Trans Continental's pre-litigation conduct is tantamount to a concession that "advertising revenue is not within the scope of the litigation." (*See* Motion, p. 3).   Specifically, MTV contends that Trans Continental never made a demand for its percentage of the advertising revenue; never demanded an accounting after receiving the participation statements submitted by MTV; and "did not seek any information concerning advertising revenue when its [then] counsel, Jeffrey Kranzdorf, sent an inquiry for all revenue information associated with *Making the Band*." (*Id.*)

This argument badly misses the mark.   Aside from being premature,[12] unsupported by evidence[13] and factually inaccurate[14], what Trans Continental may or may not have done has no

---

[11]    As attested to by Ms. French, the standard sixty minute episode contains forty-three (43) minutes of content and two (2) minutes of promotional activities.   This leaves fifteen (15) minutes for commercial advertising, which can be further distilled into thirty (30) thirty-second commercial spots per episode.   (*See* pp. 157-158 of the January 27, 2009 deposition transcript of Jackie French, the relevant excerpt of which is attached hereto as **Exhibit 6**).

[12]    To date, not a single representative of Trans Continental has been deposed.

[13]    The entirety of MTV's claim that Trans Continental never made a demand for its percentage of the advertising revenue is premised on a single letter.   MTV selectively picked this correspondence.   This was *not* Trans Continental's only written communication with MTV in regards to Trans Continental's rights in and to *Making the*

bearing on the Trustee's capacity to pursue otherwise valid causes of action.    As referenced above, the parties' original Agreement provides that MTV and Trans Continental were to share in the advertising revenue from the *Making the Band* web-site.  Additionally, the testimony from MTV's Senior Vice President of Business and Legal Affairs indicates that Trans Continental has a valid claim to share in the advertising revenue generated by *Making the Band*, which was received outside of the United States.

In light of this testimony, MTV's conclusory allegations into Trans Continental's alleged actions and supposed mind-set are insufficient to preclude discovery.

## IV.  CONCLUSION

Based on the foregoing, MTV should be compelled to produce a corporate representative capable of testifying to topics 50 through 59 of Trans Continental's Third Re-Notice of Taking Deposition of MTV's Corporate Representative, and Trans Continental should be entitled to ask questions on these topics without any limitation.  Alternatively, Trans Continental shall, at a minimum, be entitled to inquire into: (a) the amount of advertising revenue which MTV has generated in connection with the *Making the Band* web-site and the internet exhibition of *Making*

---

*Band*. (*See* Exhibit 5 at pp. 169-177, where Ms. Lazalde-McPherson testifies as to her communications/correspondences she either had or exchanged with Trans Continental's principals).

Moreover, in citing this letter as an example of Trans Continental's failure to request its percentage of the advertising revenue, MTV conspicuously ignores Mr. Kranzdorf's statement that Trans Continental is a "co-owner of this Series," and demand that Trans Continental expects "to be treated in 'every' respect as a full partner." [D.E. 29, Ex. B].

[14]    MTV's argument is fraught with factual misstatements.  Karen Abdul, the individual who was in charge of preparing the participation statements for *Making the Band 2*, testified, under oath, that all of the statements prepared in connection with *Making the Band 2* were improperly premised on the original Agreement. (*See* **Exhibit 7**, pp. 78-81.  *See also* Exhibit 5, pp. 185, where Ms. Lazalde-McPherson testifies as to the uncertainty as to whether the participation statements were in regards to seasons one and two of *Making the Band*, or *Making the Band* and *Making the Band 2*).

Moreover, the first participation which MTV submitted to Trans Continental in connection with *Making the Band 3* and *Making the Band 4* was on *December 12, 2008* – a year and a half after Trans Continental filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  Thus, contrary to MTV's suggestion, Trans Continental was incapable of auditing statements which it never received.

*the Band* (which Trans Continental was contractually entitled to fifty percent (50%) pursuant to

paragraph 10 of the Agreement); and (b) the advertising revenue generated by *Making the Band*

which was received by MTV's foreign affiliates and sister stations, outside of the United States.

Dated:    February 26, 2009

                                Respectfully submitted,

                                **SILVERMAN COSGROVE & SAMMATARO**
                                *Special Litigation Counsel for Soneet R. Kapila,*
                                *as Chapter 11 Trustee for the bankruptcy estate of*
                                *Trans Continental Television Productions, Inc.*
                                One Biscayne Tower
                                2 South Biscayne Boulevard
                                Miami, Florida 33131
                                Telephone:  (305) 377-1666
                                Facsimile:  (305) 377-1664
                                jsammataro@scs-legal.com


                                By: */s/ James G. Sammataro*
                                    JAMES G. SAMMATARO
                                    Florida Bar No. 0520292

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 26, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a notice of the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

**Carol C. Lumpkin, Esq.**
K& L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

_/s/ James G. Sammataro_
Attorney

# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**In re:**

**LOUIS J. PEARLMAN,** *et al*                    **Case No. 6:07-bk-00761-ABB**
                                                  **Jointly Administered**
          **Debtor.**                             **Chapter 11**

_____/

**SONEET KAPILA, Chapter 11 Trustee**
**for TRANS CONTINENTAL TELEVISION**
**PRODUCTIONS, INC.,**                            **Adv. No.: 6:08-ap-00157-ABB**

                        **Plaintiffs,**
          v.

**MTV NETWORKS COMPANY,**

                        **Defendant.**

_____/

### TRANS CONTINENTAL'S *THIRD* RE-NOTICE OF TAKING DEPOSITION
### PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)
### (To Be Video-Taped)

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6), Federal Rules of Civil

Procedure, Soneet Kapila, as the Chapter 11 Trustee for the bankruptcy estate of Trans

Continental Television Productions, Inc. ("Trans Continental"), by and through the undersigned

counsel, will take the deposition of the corporate representative of MTV Networks, a division of

Viacom International, Inc. ("MTV") on **February 9, 2009, at 10:00 a.m.**, before a qualified

notary at the offices of: K & L Gates, 599 Lexington Avenue, New York, NY 10022-6030.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), MTV shall designate one or more

of its representatives who consent to testify on its behalf, and may set forth each person

designated, as to the matters described in the attached **Schedule A.** The oral examination will

continue from day to day until completed. This deposition is being taken for the purposes of

discovery, for use at trial or for such other purposes as are permitted under the Rules of Court. The video operator shall be provided through by Veritext National Deposition & Litigation Services.

The following definitions shall apply to Trans Continental's Notice of Taking Deposition:

1.     The term "person" shall mean any natural individual, in any capacity whatsoever, or any entity or organization, including divisions, departments, and other units therein, and shall include, without limitation, any public or private corporation, partnership, joint venture, voluntary or unincorporated association, organization, proprietorship, trust, estate, governmental agency, commission, bureau, or department.

2.     The term "representative" shall mean any agent, employee, servant, officer, director, accountant, attorney, or other person acting or purporting to act on behalf of the person in question.

3.     The terms "you," "your," and "MTV" refer to MTV Networks, a division of Viacom International, Inc., and the signatory of the November 15, 2001 agreement.

4.     The term, "MTV," shall mean defendant, MTV Networks, a division of Viacom International, Inc., and its present and former agents, officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities, accountants, attorneys, predecessors, and any other person acting or purporting to act on MTV's behalf.

5.     The term "Trans Continental" means "Trans Continental Television Productions, Inc." and all others persons acting or purporting to act on its behalf.

6.      The term "Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, in connection with the development and production of an untitled Boy Band series for ABC.

7.      The term, "Amended Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, on or about November 15, 2001, in connection with the MTV series featuring O-Town, entitled "Making the Band."

8.      The term, "O-Town" refers to the musical act comprised of Ashley Angel, Jacob Underwood, Erik Estrada, Trevor Penick and, after the departure of Ikaika Kahoano, Dan Miller, which was the subject of the original series, Making the Band.

9.      The term, "Making the Band," refers to the reality television series which initially aired on American Broadcasting Companies, Inc. and then later on MTV.

10.     The term, "Making the Band," refers to the reality television series which initially aired on American Broadcasting Companies, Inc. and then later on MTV.

11.     The terms, "Sean Combs," "P. Diddy," "Puff Daddy" and "Diddy" refer to the artist/entertainer that appears in *Making the Band 2, Making the Band 3* and *Making the Band 4* and his present and former agents and representatives, as well as his corporate entities, Bad Boy Entertainment, Bad Boy Productions and Bad Boy Records, and their respective officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities, accountants, attorneys, predecessors, and any other person acting or purporting to act on Diddy's or Bad Boy's behalf.

3

12.     The term, "*Making the Band 2*," refers to the television program broadcast on MTV beginning on or about October of 2002, in which Diddy sought to find the best rappers and singers from which to assemble a new hip-hop group.

13.     The term, "*Making the Band 3*," refers to the television program broadcast on MTV in 2005, which featured Diddy and his search for the next all female group.

14.     The term, "*Making the Band 4*," refers to television program broadcast on MTV, which features Diddy, the subsequently named band, *Day26,* and Donnie Klang, and a return of *Danity Kane*, the winners of *Making the Band 3*.

15.     The term, "Da Band," refers to the musical group, which arose out of *Making the Band 2*, and which released the album, *Too Hot for TV*.

16.     The term, "Danity Kane," refers to the musical group, which arose out of *Making the Band 3* and which is signed to Bad Boy Records.

17.     The term, "Donnie Klang," refers to the artist who appeared on *Making the Band 4*, and recently released his album, *Just Like a Rolling Stone*.

18.     The term, "Day 26," refers to the musical group formed during *Making the Band 4*, and which is signed to Bad Boy Records.

19.     The term "including" shall mean including but not limited to.

20.     The term "any" or "each" shall be construed to include and encompass "all."

21.     The term "date" shall mean the exact day, month, and year, if ascertainable, or, if not, the best approximation thereof.

22.     The use of the word "the" shall not be construed as limiting the scope of any request.

4

23.     The use of the singular shall be deemed to include the plural, and the use of one gender shall include the other as are appropriate in the context.

## Schedule "A"
### (Corporate Representative – Deposition Topics)

1.     The communications between MTV and Trans Continental regarding the Agreement.

2.     The communications between MTV and Trans Continental regarding the Amended Agreement.

3.     The negotiation of the Amended Agreement.

4.     The responsibilities of Ken Parks, Ken Mok, Michael Rappaport, Laura Dorson, Karen Abdul, Martha Tobar, Sue Langham, Jackie French, Joe Grimes, Brian Graden, Lois Curren, Ted Iredell and Perry Dance in relation to *Making the Band*, *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

5.     The communications between MTV and Trans Continental regarding *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

6.     The communications between MTV and Diddy regarding Trans Continental and/or Lou Pearlman's interest/involvement in any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

7.     The discussions between MTV and Diddy regarding Lou Pearlman's right of first opportunity to manage the artist(s) that was the focal point of season one of *Making the Band* 2.

8.     The negotiation of paragraphs 4 and 14 of the July 12, 2002 contract between MTV and Diddy

9.     The payments made by MTV to Trans Continental pursuant to the Agreement.

10.     The payments made by MTV to Trans Continental pursuant to the Amended Agreement.

11.     The payments made by MTV to Diddy in connection with any season of *Making*

*the Band 2, Making the Band 3* and *Making the Band 4.*

12.    The account statements rendered by MTV to Diddy in connection with any season of *Making the Band 2, Making the Band 3* and *Making the Band 4.*

13.    The account statements rendered by MTV to Trans Continental pursuant to the Agreement.

14.    The account statements rendered by MTV to Trans Continental pursuant to the Amended Agreement.

15.    The origin and source of the numbers contained in the Participation Statement dated December 12, 2008 (*see* MTVN 003733 through MTVN 003736).

16.    The contracts and agreements between MTV and Diddy that relate to any season of *Making the Band 2, Making the Band 3* and *Making the Band 4.*

17.    The contracts between MTV and Bad Boy Productions, Bad Boy Entertainment and/or Bad Boy Records which relate to any of the bands, individuals or artists featured in *Making the Band 2, Making the Band 3* and *Making the Band 4.*

18.    The budgets prepared for any seasons of the shows: *Making the Band, Making the Band 2, Making the Band 3* and *Making the Band 4.*

19.    The production costs for each of the three seasons of: *Making the Band, Making the Band 2, Making the Band 3,* and *Making the Band 4.*

20.    The making of future seasons of *Making the Band.*

21.    The final production costs for each of the three seasons of *Making the Band.*

22.    The final production costs, on a season-by-season basis, for each of the three seasons of *Making the Band 2, Making the Band* 3 and *Making the Band 4.*

7

23.    All funds received by MTV in connection with any tour or concert performed by *O-Town*, *Danity Kane*, *Da Band*, *Donnie Klang* and/or *Day 26*.

24.    All funds received by MTV in connection with the O-Town's albums, *O-Town*, *Liquid Dreams*, and *O2*.

25.    All funds received by MTV in connection with Da Band's album, *Too Hot for TV*.

26.    All funds received by MTV in connection with Danity Kane's albums, *Danity Kane* and *Welcome to the Dollhouse*.

27.    All funds received by MTV in connection with Donnie Klang's album, *Just Like a Rolling Stone*.

28.    All funds received by MTV in connection with Day 26's eponymous album, *Day 26*.

29.    All funds received by MTV in connection with any other work featuring O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26's music.

30.    All funds received by MTV in connection with the merchandise of either O-Town or *Making the Band*.

31.    All funds received by MTV in connection with the merchandise of either Da Band or *Making the Band 2*.

32.    All funds received by MTV in connection with the merchandise of either Danity Kane or *Making the Band 3*.

33.    All funds received by MTV in connection with the merchandise of Donnie Klang, Day 26 and/or *Making the Band 4*.

34.    All funds received by MTV in connection with DVD sales of *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

8

35.    All funds received by MTV in connection with product placement or product integrations agreements relating to *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

36.    All funds received by MTV in connection with home video sales of *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

37.    All funds received by MTV in connection with the publishing rights (both print and music) for *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

38.    All funds received by MTV in connection with the publishing rights (both print and music) relating to O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26.

39.    All funds received by MTV in connection with the websites for the *Making the Band* web-site, including any and sites which link to or otherwise relate to *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

40.    All funds received by MTV in connection with the websites for the O-Town, Da Band, Danity Kane, Donnie Klang and/or Day 26.

41.    All funds received by MTV in connection with either the domestic or foreign distribution of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

42.     All funds received by MTV in connection with international program sales from *Making the Band*, *Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

43.    All of the stations in which any season of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4* has been distributed to, broadcast or exhibited in, aired or otherwise televised on.

44.    All of the countries, territories, or provinces in which any season of *Making the*

9

*Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4* has been distributed to, broadcast or exhibited in, aired or otherwise televised on.

45.     All license, affiliate, program sales and/or distribution agreements that MTV has entered into with any party involving *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

46.     The mechanism by which any non-MTV owned station acquired the rights to televise any episode of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

47.     Each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the distribution (both foreign and domestic) of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

48.     Each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the licensing of the television programs, *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

49.     Each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the licensing of any merchandise or ancillary, allied or after-market products (*e.g.,* DVDs and other products relating to the home video market) relating to any season of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

50.     Any and all documents that refer, relate to, reflect, concern or evidence the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, has made in connection with *Making the Band, Making the Band 2, Making the Band 3*

and/or *Making the Band 4*.

51.     The amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received in connection with the broadcast of *Making the Band 2* in the United States or any other country, territory or province.

52.     The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during season three of *Making the Band*.

53.     The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

54.     The average revenue amount generated by MTV in connection with a single episode of season three of *Making the Band*.

55.     The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 2*.

56.     The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 3*.

57.     The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 4*.

58.     The individuals or entities responsible for selling advertisement spots in connection with season three of *Making the Band*, or any season of *Making the Band 2, Making the Band 3* and *Making the Band 4*.

59.     The software program used by MTV to track and manage its advertising inventory.

60.     The profitability of *Making the Band 2*.

61.     The profitability of *Making the Band 3*.

11

62.    The profitability of *Making the Band 4*.

63.    The number of episodes, on a season-by-season basis, of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*, which aired on MTV.

64.    The number of times any episode of season three of *Making the Band* was re-broadcasted or re-run.

65.    The number of times any episode of any season (seasons one, two and three) of *Making the Band 2* was re-broadcasted or re-run.

66.    The number of times any episode of any season (seasons one, two and three) of *Making the Band 3* was re-broadcasted or re-run.

67.    The number of times any episode of any season (seasons one, two and three) of *Making the Band 4* was re-broadcasted or re-run.

68.    The internal discussions among MTV personnel regarding Trans Continental's interest in *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

69.    The discussions between MTV and Johnny Wright regarding Trans Continental's interest in *Making the Band 2*, *Making the Band 3* and *Making the Band 4* and/or Danity Kane, Day 26, Donnie Klang and Da Band.

70.    The intent and purpose of MTV's use of Imputed License Fees.

71.    MTV's use of Imputed Licensee Fees in connection with its other television programs.

72.    MTV's search for documents and electronic data responsive to Trans Continental's First Request for the Production of Documents and Things.

73.    MTV's production of electronic data, and compliance with its *Zubulake* discovery obligations.

12

Respectfully submitted,

**SILVERMAN COSGROVE & SAMMATARO**
*Special Litigation Counsel for Soneet R.*
*Kapila, as Chapter 11 Trustee for the*
*bankruptcy estate of Trans Continental*
*Television Productions, Inc.*
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2650
Miami, Florida 33131
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
jsammataro@scs-legal.com

By: _____
    James G. Sammataro
    Florida Bar Number: 0520292

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Trans Continental's Third Re-Notice of Taking Corporate Representative Deposition* was served via scanned e-mail and United States mail on this 19th day of January, 2009 to:

**Carol C. Lumpkin, Esq.**
K& L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

James G. Sammataro

# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:

**LOUIS J. PEARLMAN,** *et al*                                 **Case No. 6:07-bk-00761-ABB**
                                                               **Jointly Administered**
      **Debtor.**                                   **Chapter 11**

_____/

**SONEET KAPILA, Chapter 11 Trustee**
**for TRANS CONTINENTAL TELEVISION**
**PRODUCTIONS, INC.,**                                         **Adv. No.:  6:08-ap-00157-ABB**

                     **Plaintiff,**

    v.

**MTV NETWORKS COMPANY,**

                    **Defendant.**

_____/

## CONFIDENTIALITY AGREEMENT

Plaintiff Soneet Kapila, Chapter 11 Trustee for Trans Continental Television Productions, Inc. ("Trans Continental") and Defendant MTV Networks, a division of Viacom International Inc. ("MTVN") (collectively, the "parties"), by and through their respective undersigned counsel, hereby jointly and voluntarily enter into this Confidentiality Agreement.

WHEREAS, certain documents and information have been and may be sought, produced or exhibited by and between the parties to the above-styled lawsuit (the "Lawsuit"), which relate to the parties' non-public, confidential, proprietary, or commercially sensitive information; and

WHEREAS, it is anticipated that the pleadings, papers, and discovery in this matter may include references to documents or information regarded as confidential by the producing party; and

WHEREAS, the parties have agreed to protect the confidential and proprietary nature of their respective documents and information.

NOW, THEREFORE, the parties, through their respective undersigned counsel, stipulate and agree as follows:

1.    All documents and information produced by the parties in this Lawsuit shall be used by any party receiving them solely for the purposes of preparing for and conducting the above-captioned Lawsuit, including any appeals therefrom, and not for any purpose whatsoever.

2.    The terms "Confidential Information" and "Attorneys' Eyes Only" shall mean any information, document or thing so designated by any party to this Lawsuit or any third party producing information, documents or things in this Lawsuit, including (without limitation) documents, information contained in documents or other media (including any form of optical or magnetic storage media), and information revealed during a deposition, in response to a subpoena, or in an interrogatory answer or an admission.

3.    The parties and third parties shall designate as "Confidential Information" only information which is a trade secret, confidential business information, proprietary, or has previously been maintained as sensitive, non-public business and/or personal information. The parties and third parties shall designate as "Attorneys' Eyes Only" only information of such a sensitive nature that a party reasonably fears competitive injury resulting from disclosure of the information to any other party.

4.

(a)    Written information or documents, or any portion thereof, shall be designated as "Confidential Information" by placing on each page a stamp or notice stating "CONFIDENTIAL" in a manner that will not interfere with the legibility of the written information. Written information or documents, or any portion thereof, shall be designated as "Attorneys' Eyes Only" by placing on each

- 2 -

page a stamp or notice stating "ATTORNEYS' EYES ONLY" in a manner that will not interfere with the legibility of the written information.

(b)    Interrogatory responses containing "Confidential Information" or "Attorneys' Eyes Only" information shall be set forth on separate pages from interrogatory responses which do not contain such information and all pages of interrogatory responses containing "Confidential Information" or "Attorneys' Eyes Only" shall be produced in a separate package from interrogatory responses which do not contain such information.

(c)    Documents produced, filed, or served by a party and designated "Confidential Information" or "Attorneys' Eyes Only" shall be so marked by such party prior to or at the time they are produced, filed, or served. Documents produced by a third party as to which a "Confidential Information" or "Attorneys' Eyes Only" designation is claimed by any person shall be so designated within ten days after they are produced, and shall be treated as "Attorneys' Eyes Only" during the intervening time.

5.    Information disclosed at a deposition may be designated as "Confidential Information" or "Attorneys' Eyes Only" by a statement on the record that the testimony, or part of the testimony, is "Confidential Information" or "Attorneys' Eyes Only" and subject to the provisions of this Confidentiality Agreement. In addition, the transcript of such a deposition and all information exchanged in such a deposition shall be considered "Attorneys' Eyes Only" for a period of ten days after receipt of the deposition transcript. During those ten days, any party may designate any additional portion or the entire transcript as "Confidential Information" or "Attorneys' Eyes Only" and all other persons given notice of the designation shall treat the information accordingly.

6.

(a)    Documents and/or information designated as "Confidential Information" shall be used only for purposes of this Lawsuit and shall not be disclosed, given, shown, made available or communicated in any way to anyone other than the following:

(i)    outside legal counsel for the parties involved in this Lawsuit and such legal counsels' staff;

(ii)    the parties and such officers, directors, employees, testifying and non-testifying expert witnesses, or consultants of the parties, as may be necessary to provide assistance in this Lawsuit;

(a)    with respect to any documents and/or information designated as "Confidential Information" that are disclosed, given, shown, made available or communicated in any way to Plaintiff Soneet Kapila (the "Trustee"), his staff and/or any professionals employed by Kapila & Company, CPA's, which are assisting the Trustee in this Lawsuit (the "Trustee's Professionals") the following conditions apply: (1) the Trustee and the Trustee's Professionals shall first agree in writing to be bound by all of the terms of this Confidentiality Agreement by executing the Acknowledgment attached hereto as Exhibit "A"; and (2) the Trustee and the Trustee's Professionals shall not disclose, give, show, make available or communicate in any way the Confidential Information to any individual or entity, including, but not limited to, Debtor Louis J. Pearlman (and any of his employees, agents, representatives or other persons acting, or purporting to act, on his behalf, excepting the Trustee and the Trustee's Professionals).

- 4 -

(b)    with respect to any documents and/or information designated as "Confidential Information" that are disclosed, given, shown, made available or communicated in any way to Trans Continental Television Productions, Inc. and any of its organizational units, subsidiaries or affiliates, and any of such entities' directors, officers, employees, agents, representatives or other persons acting, or purporting to act, on their behalf ("Trans Continental"), the following conditions apply:  (1) Trans Continental shall first agree in writing to be bound by all the terms of this Confidentiality Agreement by executing the Acknowledgement attached hereto as Exhibit "A"; and (2) Trans Continental shall not disclose, give, show, make available or communicate in any way the Confidential Information to any individual or entity.  For purposes of this paragraph, Trans Continental includes, but is not limited to, the following:  Greg McDonald, Jeffrey Kranzdorf, Esq. and Kim Dawson.

(iii)    the Court and court personnel in the manner provided in paragraphs 8 and 9 below;

(iv)    employees of third-party contractors engaged by outside legal counsel and involved solely in one or more aspects of organization, copying, filing, coding, converting, storing, or retrieving data or designing programs for handling data in connection with this Lawsuit, including providing computerized litigation support;

(v)    any other person to whom the designating party agrees in writing; and

(vi)    stenographic and court reporters transcribing or recording testimony relating to the Lawsuit.

- 5 -

(b)     Documents and/or information designated as "Attorneys' Eyes Only " shall be used only for purposes of this Lawsuit and shall not be disclosed, given, shown, made available or communicated in any way to anyone other than the following:

(i)     outside legal counsel for the parties involved in this Lawsuit and such legal counsels' staff;

(ii)    independent expert witnesses, but only as set forth in paragraph 6(d) below;

(iii)   the Court and court personnel in the manner provided in paragraphs 8 and 9 below;

(iv)    employees of third-party contractors engaged by outside legal counsel and involved solely in one or more aspects of organization, copying, filing, coding, converting, storing, or retrieving data or designing programs for handling data in connection with this Lawsuit, including providing computerized litigation support;

(v)     any other person to whom the designating party agrees in writing; and

(vi)    stenographic and court reporters transcribing or recording testimony relating to the Lawsuit.

(c)     Only outside counsel of record in this Lawsuit may authorize the access to or disclosure of any documents or information designated as "Confidential Information" or "Attorneys' Eyes Only" to any person authorized to have access to such information pursuant to paragraphs 6(a) or (b) above, and each such person to whom any such information is disclosed or made available shall first agree in writing to be bound by all of the terms of this Confidentiality Agreement by executing the Acknowledgment attached hereto as Exhibit "A."  Outside counsel of record for the parties shall maintain the executed Acknowledgments until sixty (60) days after the conclusion of this Lawsuit.

(d)     Information or documents designated as "Attorneys' Eyes Only" may be disclosed to outside, independent, testifying and non-testifying experts retained for purposes of this Lawsuit on the following conditions:

(i)     Such an expert shall have no present or known future status as a director, officer, partner, shareholder, employee, consultant, or contractor of either party or its parents, subsidiaries, affiliates, predecessors, or successors, nor have any other form of financial interest in, or contractual relationship with, the foregoing (excepting only a customary fee in remuneration of time spent and expenses incurred acting in his or her role as an expert in this Lawsuit).

(ii)     Such an expert shall be subject to all other provisions of this Confidentiality Agreement, including, but not limited to the requirements that "Attorneys' Eyes Only" be used only for purposes of this Lawsuit, that the expert execute a confidentiality agreement as provided in paragraph 6(c) above, and that all documents and information designated "Attorneys' Eyes Only" be returned or disposed of pursuant to paragraph 11 below.

(iii)     each party who discloses any documents and/or information designated "Attorneys' Eyes Only" to an expert pursuant to this paragraph 6(d) shall keep the original confidentiality agreements described in paragraph 6(c) above along with a list of the "Attorneys' Eyes Only" document and/or information of another party provided to each recipient of such information.  Each such list shall be in sufficient detail to recreate exactly the information provided.  At the conclusion of this case, each original confidentiality agreement and each such list shall be turned over to the party

whose "Attorneys' Eyes Only" information and/or documents were provided to an expert pursuant to this paragraph 6(d).

(e)    The obligations set forth herein extend to, but is not limited to, copies, summaries, extracts, paraphrases and notes made by any person to whom such documents designated as "Confidential Information" or "Attorneys' Eyes Only" are disclosed pursuant to this Confidentiality Agreement.

7.    To the extent that any "Confidential Information" or "Attorneys' Eyes Only" documents and/or information are produced without being designated as such, that disclosure shall be deemed an inadvertent disclosure. Upon the request of any party for proper designation of an improperly designated or non-designated document, all copies of the document shall be marked with the proper designation and the document shall be retrieved by outside counsel from any person who would not have been allowed access to the document if it had been properly designated.

8.    If a party wishes to file any documents and/or information designated "Confidential Information" or "Attorneys' Eyes Only" with the Court, it shall do everything necessary to ensure that such information is impounded, kept under seal, and unavailable to the public. All "Confidential Information" or "Attorneys' Eyes Only" documents and/or information filed with the Court shall be filed in sealed envelopes or containers affixed with the following statement:

CONFIDENTIAL

This envelope (or container) contains documents, materials, or other things that are impounded until further order of the Court. The contents of this envelope (or container) shall not be displayed or revealed except by Order of the Court.

If a document or thing produced cannot conveniently be marked as required by this Confidentiality Agreement, the parties shall confer and agree in writing on an appropriate way of marking or otherwise identifying as "Confidential Information" or "Attorneys' Eyes Only" such document or thing. The party filing the "Confidential Information" or "Attorneys' Eyes Only" documents and/or

- 8 -

information shall notify the Clerk that what has been filed should be accorded the treatment required by this Confidentiality Agreement.

9.    Within sixty (60) days after the conclusion of this Lawsuit, including all appeals, any "Confidential Information" and/ or "Attorneys' Eyes Only" documents and/or information, including copies and originals (except documents in the files of the Court, and except for documents retained in counsel's files, which will continue to be subject to the provisions of this Confidentiality Agreement, and which were filed in Court, or marked as exhibits at depositions, at trial, or in affidavits, or which contain work product) shall, at the election of the party who designated the documents and/or information "Confidential Information" or "Attorneys' Eyes Only" be certified as destroyed, or returned to the designating party at the designating party's expense.

10.    Neither the termination of this lawsuit nor the termination of employment of any person who has had access to any "Confidential Information" or "Attorneys' Eyes Only" documents and/or information shall relieve any person from the obligation of maintaining the confidentiality of such information and/or documents.

11.    Nothing in this Confidentiality Agreement shall prohibit the use of, or reference to, any "Confidential Information" or "Attorneys' Eyes Only" documents and/or information in Court or at trial; provided, however, that the party using or planning to use such documents and/or information shall take whatever steps are necessary to eliminate or minimize the risk of disclosure. Such steps shall include bringing to the Court's attention the intention to disclose "Confidential Information" or "Attorneys' Eyes Only" documents and/or information in open court and requesting the assistance of the Court in limiting disclosure.  Prior to trial of the Lawsuit, counsel for the parties shall attempt to reach agreement on the handling of

"Confidential Information" or "Attorneys' Eyes Only" documents and/or information at trial, and shall submit such agreement, or proposals if no agreement can be reached, to the Court for consideration.

12.   Nothing in this Confidentiality Agreement shall prevent or otherwise restrict counsel from rendering advice to their clients and, in the course thereof, relying generally on their examination of "Confidential Information" or "Attorneys' Eyes Only" documents and/or information; provided, however, that in rendering such advice and otherwise communicating with such client, counsel shall not make specific disclosure of any Confidential Information or "Attorneys' Eyes Only" except as allowed by paragraph 6 above.

13.

(a)   No party concedes that any document or information designated "Confidential Information" or "Attorneys' Eyes Only" by any other person does in fact contain or reflect confidential, sensitive, or proprietary business or personal information, or has been properly designated "Confidential Information" or "Attorneys' Eyes Only".

(b)   A party shall not be obligated to challenge the propriety of the designation of documents or information as "Confidential Information" or "Attorneys' Eyes Only" at the time such designation is made, or at any other time, and failure to do so shall not preclude a subsequent challenge thereof.

(c)   Any party may move for a ruling that a document or category of documents designated as "Confidential Information" or "Attorneys' Eyes Only" is not entitled to such status and protection, but the document or category of documents shall be treated as so designated until such time as the designating party may agree otherwise, or as the Court may otherwise order. The party who designated the document or category of documents as "Confidential Information" or

"Attorneys' Eyes Only" shall bear the burden of showing that the designation is warranted. Such a motion may be filed ten days after a party serves a written request for modification upon the party who made the designation.

(d)    Nothing in this Confidentiality Agreement shall prevent any party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders.

14.    The parties to this Confidentiality Agreement, and any individuals/entities that execute Exhibit "A," understand and agree that money damages would not be an adequate remedy for any breach or threatened breach of this Confidentiality Agreement and that any of the parties shall be entitled to seek immediate injunctive relief or other equitable remedies for any such breach or threatened breach. Such remedies shall not be deemed to be the exclusive remedy for any breach or threatened breach of this Confidentiality Agreement, but shall be in addition to other remedies available, whether in law or in equity, including actual damages from such breach or threatened breach. Further, the prevailing party in any action brought as a result of a breach or threatened breach of this Confidentiality Agreement shall be entitled to all enforcement costs, including attorney's fees and costs that are incurred by such a party, and the collection of damages resulting from the breach or threatened breach of this Confidentiality Agreement.

15.    The parties hereto agree that this Confidentiality Agreement may be filed with the Court in connection with any action to enforce its terms and/or to seek relief from any breach or threatened breach of its terms.

16.    The parties agree that this Confidentiality Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute but one and the same instrument.

17.     This Confidentiality Agreement does not abrogate or diminish any contractual, statutory or other legal obligation or right of any party with respect to any information the party deems to be confidential.   Each party acknowledges that the other party may have in place binding agreements that restrict disclosure of certain information or documents.   The parties agree that this Confidentiality Agreement does not alter, supersede, waive, or otherwise compromise such agreements.

18.     The provisions of this Agreement shall remain in effect after the conclusion of the Lawsuit.

19.     This Confidentiality Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Florida.

20.     This Confidentiality Agreement sets forth the entire agreement between the parties hereto regarding the protection of non-public, confidential, proprietary, or commercially sensitive information and, and fully supersedes any and all prior agreements or understandings, both written and oral, among the parties pertaining to the subject matter hereof.   This Confidentiality Agreement may not be amended, revoked, changed, or modified in any way, except in writing executed by all parties.   This Confidentiality Agreement may be executed by counterparts.   The language of all parts of this Confidentiality Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any one of the parties.

| SILVERMAN COSGROVE & SAMMATARO | K&L GATES LLP |
|---|---|
| Attorneys for the Plaintiff, *Soneet Kapila, Chapter 11 Trustee for Trans Continental Television Productions, Inc.,* | Attorneys for the Defendant, *MTV Networks, a division of Viacom International Inc.* |
| One Biscayne Tower | Wachovia Financial Center |
| 2 South Biscayne Boulevard, Suite 2650 | 200 S. Biscayne Boulevard, Suite 3900 |
| Miami, FL 33131 | Miami, FL 33131 |
| Telephone: (305) 377-1666 | Phone: (305) 539-3300 |

Facsimile: (305) 377-1664
jsammataro@scs-legal.com

By: _James G. Sammataro_

James G. Sammataro, Esq.
Florida Bar No. 0520292

Date: _December 11, 2008_

Facsimile: (305) 358-7095
carol.lumpkin@klgates.com

By: _____

Carol C. Lumpkin, Esq.
Florida Bar No. 797448

Date: _12/12/08_

## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

**LOUIS J. PEARLMAN,** *et al*                    **Case No. 6:07-bk-00761-ABB**
                                                  **Jointly Administered**
   **Debtor.**                                    **Chapter 11**
_____/

**SONEET KAPILA, Chapter 11 Trustee**
**for TRANS CONTINENTAL TELEVISION**
**PRODUCTIONS, INC.,**                            **Adv. No.:  6:08-ap-00157-ABB**

                         **Plaintiff,**

   v.

**MTV NETWORKS COMPANY,**

                         **Defendant.**
_____/

## EXHIBIT A

The undersigned has reviewed the foregoing Confidentiality Agreement dated December

_____, 2008, understands its contents, and agrees to be personally bound and to comply with its

terms and conditions.


   Dated:  This ____ day of _____, 200____.

   Name:_____
            (Print or Type)


   Signature:_____

\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\{Client Files/43/43-1/00003064.DOC}

# EXHIBIT 3

January 7, 2000

Mark Steverson
Rudolph & Beer
432 Park Avenue South
7th Floor
New York, NY 10016

   Re: Untitled Boy Band Series

Dear Mark:

   I am writing to confirm the terms of the deal between MTV Networks, a division of Viacom International Inc. ("MTV") and Trans Continental Television Productions, Inc. ("TC") in connection with the development and production of an untitled Boy Band series for ABC (the "Series"), and the creation of a joint venture to develop an all male pop band (the "Band").

1. TC will provide to MTV written sign off from BMG that TC or an affiliated entity is free to enter into a soundtrack and exclusive recording rights deal with Hollywood Records with respect to the Band. TC will solely bear any override royalty necessary to be paid to BMG and will defend, indemnify and hold harmless MTV against any claim or action brought by BMG on account of any rights of BMG against TC in connection with producing boy band records. If TC cannot obtain sign off from BMG, TC will solely bear ABC's merchandise participation of 10% pursuant to paragraph 7 of the Agreement dated as of September 21, 1999 between MTV, TC and ABC.

2. The parties agree that the $350,000 license fee per 13 episodes provided by ABC shall be divided as follows:

  a. $310,000 per episode shall be provided to Bunim Murray Productions for production costs (included therein is a one-time $30,000 cost for the talent search). The production budget shall be approved by TC and MTV.

  b. $20,000 per episode shall be provided to TC for band development.

  c. $10,000 per episode shall be considered production pad, which shall be split between MTV and TC if unused.

  d. $8,750 per episode is paid to MTV as a production fee.

    e.  Of the remaining $1,250 per episode ($16,250 all together), $10,000 goes to TC for band development. The other $6,250 shall be used to cover part of the cost of producing flyers for the talent search.

3.  TC has agreed to contribute its own funds to match the $20,000 per episode for band development that comes out of the license fee, subject to its ability to recoup this contribution off the top (subject to audit).

4.  MTV has reserved its right to contribute to the funding, if any, needed for touring of the Band. The parties will negotiate in good faith concerning such contribution and the splitting of tour revenues.

5.  Business Matters / Creative Decisions: All business / creative matters in connection with the joint venture are to be mutually determined, except that on the Series, MTV breaks any tie over creative matters, and on the creative musical aspect of the venture, TC breaks the tie.

6.  Credit: TC has agreed that Lou Pearlman has opted not to take an Executive Producer credit or fee or a TC company credit on the first 13 episodes. After the first 13 episodes, Executive Producer credit and TC company credit is within TC's discretion. On the first 13 episodes, subject to mutual approvals, TC employees may be acknowledged in the credits. Ken Mok shall receive an Executive Producer credit on the Series.

On packaging for home video, records and on merchandising and publishing both MTV and TC shall receive credits to be mutually determined.

7.  Merchandise: Unless otherwise mutually agreed to, MTV shall control merchandise in-house. In connection therewith, MTV shall take a 10% distribution fee off the top and recoup direct, out-of-pocket expenses. After that, proceeds shall be split 50-50 by the parties. MTV shall also have the option to control tour merchandise for the same split referenced above. If MTV decides not to handle merchandise in-house, the parties may jointly approach a party such as Sony Signatures to handle the merchandise and neither party shall take a fee.

8.  Print Publishing: MTV shall control distribution of all publishing related to the Series and Band. MTV shall take a 10% distribution fee, plus direct, out-of-pocket expenses. Proceeds shall then be split 50-50 by the parties.

9.  Music Publishing: MTV (Famous Music or other MTV-designated entity) and TC shall have joint ownership of all music publishing. MTV shall administer music publishing for a 15% fee, plus expenses.

10. Internet Rights:  Subject to paragraph 5 above, MTV shall create and control the official web site related to the Series and Band.  In connection with advertising/sponsorship revenues brought in by MTV on the official website, MTV shall recoup its expenses and take a commission of 15% and then share revenues with TC on a 50-50 basis.  In addition, TC shall receive a 15% commission if it brings a sponsor/advertiser to the site. Non-advertising revenues shall be split 50-50 with TC after a 10% fee off the top and recoupment of expenses on both the official website and MTV's site.  TC can promote the Band on its corporate site, but only with MTV's approval, which will not be unreasonably withheld.  MTV can promote the Band on the MTV website.

11. Domestic and Foreign Distribution of Series:  MTV controls the rights, takes a 10% fee off the top and splits proceeds 50-50 with TC.

12. Home Video:  MTV shall control distribution, taking a 10% fee off the top and recoup direct, out-of-pocket expenses.  Proceeds shall be split 50-50.

13. The parties shall negotiate in good faith a reasonable license fee for runs of the series on MTV, if any.  If MTV is required to pay a license fee to ABC, there shall be no additional attributable license.

14. The parties will jointly exploit any features, spin-offs, sequels, made-for-TV movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation.

15. MTV and TC will enter into record company negotiations jointly.  All business deals relating to the Series and Band and ancillary rights therein must be approved by both parties.

16. Other than as explicitly set out herein, the parties have agreed to split any pre-approved Band and Series expenses and revenues 50-50, including but not limited to revenues received from any record company.

17. MTV distribution fees are not inclusive of any subdistributor fees.  MTV deals with sister/affiliated companies shall be on customary market terms.

18. TC will enter into a management deal directly with the Band outside of the joint venture and take a 20% fee.

19. TC or another TC affiliated entity (i.e. Trans Continental Records Inc.) will enter into an agreement with the Band(with terms approved by MTV) and assign over the agreement to the joint venture.

MTVN 000210

Please indicate your acceptance of these terms by signing on the line below. The parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein. Until such time as such formal agreement is executed, this letter shall remain binding upon the parties.

Trans Continental Television
Productions, Inc.

By: _____
Its: _____

MTV Networks, a division of
Viacom International Inc.

By: _____
Its: _____

MTVN 000211

# EXHIBIT 4

November 15, 2001

Lou Pearlman
Transcontinental Television Productions, Inc.
7380 Sand Lake Road
Orlando, FL 32819

     Re:    MTV's "Making the Band"

Dear Lou:

    Reference is made to the letter agreement (the "Agreement") dated January 7, 2000 between MTV Networks, a division of Viacom International Inc. ("MTV") and Transcontinental Television Productions, Inc ("TC") in connection with the MTV television series featuring O-Town (the "Artist") entitled "Making the Band" (the "Series").

    The Agreement shall be amended as follows:

1.    The parties agree that the $350,000 license fee for the back order of 9 episodes of the Series provided by ABC shall be divided as follows:

    a.    $310,000 per episode shall be provided to Bunim Murray Productions for production costs.

    b.    $20,000 per episode shall be paid to MTV as a producer fee.

    c.    $20,000 per episode shall be paid to TC toward recoupment of band development expenses.

2.    The parties agree that the $380,000 license fee for the 13 episodes of the second season of the Series provided by ABC shall be divided as follows:

    a.    $330,000 per episode shall be provided to Bunim Murray Productions for production costs.

    b.    $25,000 per episode shall be paid to the Band for band salaries.

    c.    $25,000 per episode shall be divided equally between MTV and TC, after recoupment off-the-top (prior to the division of income between TC and/or MTV) of $29,250 in payroll taxes incurred by MTV and $63,000 in band salaries incurred

137176 ver. 01

1

by TC. Of said amount, TC shall receive $179,250 promptly following full execution of this agreement.

3.  Band development, radio tour and other out-of-pocket expenses incurred by MTV and TC for the prior two seasons of the Series may be recouped off-the-top (prior to the division of profits between TC and MTV) from ancillary monies (i.e., record and merchandise advances and royalties). The parties acknowledge that TC's expenses are $360,000 and MTV's expenses are $43,000. The parties agree that TC shall retain 100% of the record advances paid to date (i.e., $330,000) to recoup its expenses. Notwithstanding anything to the contrary contained herein, the parties have elected not to recoup their remaining expenses from ancillary monies. For the avoidance of doubt, neither TC nor MTV shall be entitled to recoup any additional expenses from ancillary monies for the prior two seasons of the Series unless both parties agree in writing.

4.  Paragraph 11 of the Agreement relating to domestic and foreign distribution shall be amended to provide that MTV shall be able to recoup direct out-of-pocket expenses related to the Series incurred in connection with such distribution.

5.  The copyright in the Series shall be held jointly by TC and MTV. MTV shall register and protect the copyright and recoup any expenses incurred in connection therewith from ancillary profits (record, merchandising, etc.) off-the-top before proceeds are split. Upon written request by TC, MTV shall provide TC with copies of copyright registration and renewal certificates.

6.  MTV and TC shall enter into an agreement with Trans Continental Records Inc. ("TRC") wherein TRC shall provide MTV and TC each with non-exclusive licenses for use of the O-Town trademark in connection with the Series and ancillary uses thereof (for example merchandising records). No other licenses shall be granted in the O-Town trademark to any third party. For the avoidance of doubt, the parties acknowledge that TC previously entered into third party non-exclusive licenses for the use of the O-Town trademark in connection with the "Live from O-Town" concert television series, the record company O-Town Records and the restaurant O-Town café. TC agrees not to exploit the O-Town trademark in any other way without the consent of MTV and MTV agrees not to exploit the O-Town trademark without the consent of TC. If the series is no longer being produced and new records are not being recorded, TC agrees not to exploit the O-Town trademark without MTV's express approval, which shall not be unreasonably withheld. TC and MTV each agree to execute any documents (for example, a security interest document) necessary to effectuate the exploitation of the Series. All trademark registration fees, annual renewal fees and costs to protect the trademark shall be recouped from ancillary profits (record, merchandising, etc.) off-the-top before proceeds are split.

7.  Unless otherwise agreed in writing, all contractual payment obligations to Artist provided in the agreement dated January 12, 2000 between Artist, on the one hand and

137176 ver. 01

2

TC and MTV, on the other, and the amendment thereto dated August 23, 2001 shall be split 50-50 between MTV and TC.

8. With respect to the first and second season of the Series, the parties agree that as of September 30, 2001, TC's profit share of merchandise revenues is $187,803. TC acknowledges that it has received $100,000 of said amount and that it shall receive $87,803 promptly following full execution of this agreement. The parties also agree that as of September 30, 2001, TC's profit share of international program sales is $458,011.85 and it shall receive said amount promptly following full execution of this agreement.

9. Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A (a copy of which is attached hereto); provided, however, the distribution fee will be capped at 20% for all Ancillary Uses.

    (a) If the initial exploitation of the Series is over MTV Networks in the US, then, in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 65% of the final production costs of the Series ("Imputed License Fee") which shall be included in the following installments:

        (i) 50% thereof shall be deemed credited as revenue upon completion of production of a Series episode, and

        (ii) 50% thereof shall be deemed credited as revenue upon the date which is six (6) months following the initial exhibition of a Series episode over MTV.

    (b) If the initial exploitation of the Series is over an MTV Networks foreign programming service, then, in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 10% of the final production costs of the Series upon the date of the initial exhibition of the Series on that foreign programming service.

10. TC has agreed that Lou Pearlman will not take an Executive Producer credit or fee in connection with the third season or any subsequent season of the Series and instead the parties shall mutually agree on a credit to Lou Pearlman similar to a "Consultant" credit. The parties agree that TC shall receive a production credit for the third season of the Series.

11. For the avoidance of doubt, and as set forth in the attached Schedule A, Artist album and merchandise revenue (other than television series related merchandise revenue) shall be excluded from Ancillary Uses and shall be split 50-50 pursuant to the terms set forth in the Agreement.

11. For the avoidance of doubt, and as set forth in the attached Schedule A, Artist album and merchandise revenue (other than television series related merchandise revenue) shall be excluded from Ancillary Uses and shall be split 50-50 pursuant to the terms set forth in the Agreement.

12. The parties agree that TC shall not be responsible for any so-called "short fall" payments in respect of the production costs for the first thirteen (13) episodes of the third season of the Series. ~~This paragraph 12 is amended as set forth on page 12(a) attached hereto and incorporated herein by reference.~~

13. The parties shall negotiate in good faith the exploitation of the format rights for the Series in Europe.

Please indicate your acceptance of these terms by signing on the line below. Except as amended herein, all other terms of the Agreement shall remain in full force and effect.

Very truly yours,

MTV NETWORKS

BY: _____

ITS: _____SVP_____

ACCEPTED AND AGREED

TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.

BY: _____

ITS: _____

137176.ver04

4

SCHEDULE A TO THE AGREEMENT ("AGREEMENT") DATED NOVEMBER 15, 2001 BETWEEN MTV
NETWORKS AND TRANSCONTINENTAL TELEVISION PRODUCTIONS, INC. ("PARTICIPANT")

### NET PROCEEDS DEFINITION

For the purposes of the Agreement, "Net Proceeds" shall mean all non-refundable revenues actually
received in the United States from all sources worldwide by MTV Networks ("MTVN") in connection with
Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming services),
less the following items in the following order: (a) first, the applicable distribution fees (as set forth below) with
respect to revenues derived from Ancillary Uses; then (b) distribution expenses paid on account of any Ancillary
Uses; then (c) any third-party participations; and then (d) MTVN's recoupment of all sums paid to Participant (if
any) and all other costs incurred in connection with the development and production of the Series, and overhead on
the foregoing (in the amount of 10%) (collectively, "Production Costs").

For the purposes of the Agreement, "Ancillary Uses" shall mean all distribution and/or exploitation of
episodes of the Series, including without limitation the trademarks and all other elements, in any manner or media
other than on MTVN worldwide programming services. Notwithstanding the foregoing, artist album and
merchandising other than television series related merchandise shall not be included in Ancillary Uses.

The distribution fees (inclusive of subdistributor fees) to be withheld and retained by MTVN are as
follows:

| | Ancillary Uses | Percentage of Gross Receipts |
|---|---|---|
| (A) | U.S. Network Television Exhibition (ABC, CBS, NBC, and/or Fox to the extent programming is sold to Fox as a network rather than on a station-by-station basis): | 20% |
| (B) | Television Exhibition in the United States (other than Network): | 20% |
| (C) | Television Exhibition outside of the United States: | 20% |
| (D) | Worldwide Videocassette and Videodisc Exhibition: | 20% |
| (E) | Worldwide Merchandising and all Other Uses: | 20% |

MTVN shall account to Participant with respect to Participant's share of Net Proceeds, if any, on a semi-annual
basis provided there are payments due Participant, and such accounting shall be accompanied by payment of
Participant's share of Net Proceeds payable for such semi-annual period. During the term of this Agreement and
for a period of one year following the last exhibition of the Series, Participant or its designated certified public
accountant may at MTVN's principle place of business and at reasonable times during regular business hours upon
reasonable advance, written notice, but no more than once per year, inspect and make copies of any relevant
portions of books and records of MTVN relating to the Series in order to determine the accuracy of MTVN's
statements of Net Proceeds rendered pursuant thereto.

# EXHIBIT 5

1

1
2 IN THE UNITED STATES BANKRUPTCY COURT ORIGINAL
MIDDLE DISTRICT OF FLORIDA
3 ORLANDO DIVISION
-----------------------------x
4 In re:                         Case No.
    LOUIS J. PEARLMAN, et al,    6:07-bk-00761-ABB
5                                Jointly Administered
              Debtors.          Chapter 11
6 -----------------------------x
SONEET KAPILA, Chapter 11 Trustee
7 for TRANS CONTINENTAL
TELEVISION PRODUCTIONS, INC.,
8
            Plaintiff,
9                                Adv. No.
      -against-                  6:08-ap-00157-ABB
10
MTV NETWORKS COMPANY,
11
            Defendant.
12 -----------------------------x
                    January 26, 2009
13                  10:48 a.m.
14
15      Videotaped Deposition of VIRGINIA
16    LAZALDE-McPHERSON, taken by the Plaintiff
17    Trustee, pursuant to Notice, at the offices of
18    K&L Gates, LLP, 599 Lexington Avenue, New
19    York, New York, before David Levy, CSR, a
20    Notary Public of the State of New York.
21
22
23
24
25

89

Lazalde-McPherson

1    Lazalde-McPherson
2    questions.
3        MS. LUMPKIN:  I have no problem with
4    that.  I have to state my objections.
5        MR. SAMMATARO:  That's fine.  I'm not
6    trying to be overly argumentative.  I'm
7    just saying she is part of the business
8    and legal affairs department.  This isn't
9    rocket science.  This is a provision that
10   presumably comes across in almost every
11   contract they deal with.  The next point
12   we'll get into involves another contract
13   that she's dealt with.  I would assume
14   she'd have some understanding of it.  And
15   if she doesn't, I'll ask a person who
16   does.  Okay.  So I'll allow your objection
17   to stand.
18       MS. LUMPKIN:  Thank you.
19       Q.  With respect to the third line,
20   there's a parentheses and it says, "Excluding
21   exhibition on MTVN worldwide programming
22   services."  What is your understanding of the
23   meaning of that phrase, the parenthetical?
24       A.  So that means what doesn't get
25   included is anything relating to a show on --

90

Lazalde-McPherson

1    Lazalde-McPherson
2    that's airing on MTVN.
3        Q.  And does this phrase in your mind
4    exclude advertising revenue?
5        A.  Yes.
6        Q.  Okay.  And what is your understanding
7    based on specifically, since the words
8    "advertising revenue" is not used?
9        A.  It's -- it's referencing all revenue,
10   excluding any revenue that arises in connection
11   with the exhibition on MTV.
12       Q.  Okay.  And what do you understand the
13   phrase, "MTV and worldwide programming services"
14   to mean?
15       A.  That means our services that are
16   branded MTVN in the U.S., outside the U.S.
17       Q.  Outside the U.S.?
18       A.  Yeah.
19       Q.  Does that also include inside the
20   U.S.?
21       A.  Yes.
22       Q.  Okay.  Now, in the beginning of the
23   second line, it says, "For purposes of the
24   agreement" -- I'm going to start from the
25   beginning, "Net proceeds should mean all

91

Lazalde-McPherson

1    Lazalde-McPherson
2    nonrefundable revenues actually received in the
3    United States."
4        A.  Um-hum.
5        Q.  Why does it matter if the revenue is
6    actually received in the United States?  Do you
7    know why that limitation was added?
8        A.  I think just from a practical --
9    excuse me, a practical perspective, that for
10   accounting purposes, you actually have to receive
11   the income in the U.S., just for purposes of
12   practically processing participations.
13       Q.  Okay.
14       A.  Because --
15       Q.  Now, if MTV owns -- we're going to
16   get to that later but if MTV owns a station in
17   Germany, for example, so it's MTV Germany, and
18   MTV Germany has advertising on the Making the
19   Band series that they air in Germany, and they
20   receive advertising dollars directly from
21   Volkswagen, for example, and that money is
22   received in Germany, how is that revenue
23   calculated?
24       A.  Well, it's excluded because it's
25   revenue that is attributable to the exhibition of

92

Lazalde-McPherson

1    Lazalde-McPherson
2    a show on an MTVN programming services.
3        Q.  Right, but it wasn't actually
4    received in the United States.
5        A.  I'm sorry, I'm not following your
6    question.
7        Q.  Okay.  You're saying that revenue
8    would be included in this net proceeds
9    definition --
10       A.  I'm saying it would be excluded.
11       Q.  It would be excluded?
12       A.  Yes.
13       Q.  Correct.  So if it's excluded from
14   this definition --
15       A.  Right.
16       Q.  -- how is it treated?  And let me ask
17   the question this way:
18       A.  Right.
19       Q.  This is complicated so I'm going to
20   try and break it down for you.
21       A.  Okay.
22       Q.  I'm MTV Germany.  And money is
23   received from an advertiser directly in Germany.
24   So Volkswagen Germany pays MTV Germany.
25       A.  Um-hum.

---

**93**

Lazalde-McPherson

1
2  Q. Does MTV Germany report that revenue
3  to MTV networks or MTV U.S.?
4  A. Not my area. But my understanding
5  is, I would think not. It's revenue received in
6  Germany.
7  Q. Okay.
8  A. So -- but again, not my area.
9  Q. Do you know, let's talk about MTV
10 Germany for a second. Does MTV actually own a
11 station in Germany?
12 A. I don't know.
13 Q. Okay.
14 A. I mean, that's complicated. There
15 are affiliates which we may have a license deal
16 with.
17 Q. Okay.
18 A. There may be a wholly owned
19 affiliate. That is really not my area.
20 Q. Okay. Whose area is that?
21 A. The person that heads up our
22 international is, I believe, Bob Bakish, but I
23 don't know who specifically would know about the
24 ownership pieces of affiliates.
25 Q. Well, let's talk about the

---

**94**

Lazalde-McPherson

1
2  arrangements that MTV could have. You mentioned
3  that you could have an affiliate agreement which
4  would be -- let me take a step back. Let's start
5  with the arrangements.
6  You could have a license agreement,
7  you can have an affiliate agreement, it could be
8  a wholly owned affiliate. What other
9  permutations are there?
10 A. I have no idea. Sorry.
11 Q. No, that's fine. That's fine.
12 Looking at this net proceeds definition, your
13 understanding is that advertising revenue
14 received in the United States in connection with
15 the exhibition of the show is carved out. That
16 is money that is not part of this definition,
17 correct?
18 A. Correct.
19 Q. Okay. Now, we're already talked
20 about that there's an imputed license fee, and
21 that imputed license fee arrives from paragraph 9.
22 Now, do you have an understanding as
23 to whether or not paragraph 9 and paragraph 9(a)
24 are dependent paragraphs? And I'm going to ask
25 you a follow-up question.

---

**95**

Lazalde-McPherson

1
2  MR. SAMMATARO: So you can save your
3  objection, compound.
4  MS. LUMPKIN: And same objection from
5  before.
6  MR. SAMMATARO: That's fine.
7  Q. But my question to you is, do you
8  have an understanding as to whether or not
9  paragraph 9 and 9(a) are read together or if they
10 are independent of each other?
11 A. Well, this top part of paragraph 9,
12 not 9(a), but the first paragraph, references the
13 net proceeds definition.
14 Q. Um-hum.
15 A. A copy of which is attached. So my
16 sense would be it's dependent.
17 Q. Your sense is, that paragraph --
18 okay. So your sense is that paragraph 9 and 9(a)
19 is dependent because 9 references a net proceeds
20 definition.
21 A. Yes.
22 Q. So is it also your understanding that
23 once you get the imputed license fee, that you
24 then run this through the net proceeds
25 definition?

---

**96**

Lazalde-McPherson

1
2  A. I don't know how -- I don't know what
3  the process is --
4  Q. Okay.
5  A. -- to get to the net proceeds income.
6  Q. Okay.
7  A. So when you say to run it through, I
8  don't know how they do it on the balance sheet to
9  get to the sum.
10 Q. Okay. We talked about, that the
11 general purpose of an imputed license fee is that
12 you don't start from zero.
13 A. Um-hum.
14 Q. Now, with that premise in mind, do
15 you understand that once you take the number, the
16 imputed license fee, whether or not you would
17 then deduct the entire production cost?
18 And I'll tell you why. If you look
19 at the net proceeds definition, subparagraph (d),
20 we're talking about, okay, how do you get to the
21 net proceeds definition, you say, okay, well,
22 we're going to minus the applicable distribution
23 fees. That's in subparagraph (a). Subparagraph
24 (b) is the distribution expenses. Subparagraph
25 (c) is third party participations, and then

185

Lazalde-McPherson

1         Lazalde-McPherson
2    the corresponding payment."
3         The Making the Band II that you're
4    referencing in this paragraph, are you referring
5    to season 2 O-Town, or are you referring to
6    Making the Band II, featuring Da Band?
7         A.  Um -- (reading) -- I'm not quite
8    sure.  I was probably referencing the statements.
9    So I would have just attached whatever the
10   statements were that were given to me.
11        Q.  Okay.  And did you have a discussion
12   with anyone about what the statements were that
13   were given to you?
14        A.  I don't recall having a conversation.
15        Q.  Okay.  Well, given the statement here
16   that the series in paragraph 1 is limited to --
17   I'm sorry.  Given the statement in paragraph 1
18   that Trans Continental's interest is limited to
19   Making the Band O-Town, would there have been any
20   reason that you would have submitted statements
21   in with respect to Making the Band II in which
22   Diddy was involved?
23        A.  No, other than probably confusion on
24   my part.
25        Q.  Okay.  And then here, also in the

186

Lazalde-McPherson

1         Lazalde-McPherson
2    last sentence, paragraph 2, you said, "We are
3    currently preparing the accounting statement to
4    Making the Band III and will send it to Lou
5    shortly."
6         Again, do you have a recollection as
7    to whether you're referring to season III O-Town,
8    or Making the Band III in which Diddy was
9    involved?
10        A.  I don't recall.
11        Q.  Would there be any reason why, as of
12   September 28th, 2005, MTV had still not given a
13   participation statement in connection with Making
14   the Band III O-Town?
15        A.  I don't know, other than, we
16   generally don't prepare statements if there is no
17   money due.  So again, a question for the profit
18   participation department.
19        Q.  Okay.  Would it surprise you to learn
20   that there was no money due from season III
21   O-Town?
22        A.  Would it surprise me?  Not my area.
23   So I don't -- would it surprise me if there was
24   no money due?  It would not surprise me.
25        Q.  Okay.  Would you make that

187

Lazalde-McPherson

1         Lazalde-McPherson
2    statement -- would you still feel that way if you
3    learned that Trans Continental was paid
4    approximately $750,000 in connection with season
5    I of O-Town, and the same amount of money for
6    season II of O-Town?
7         A.  I'd have to see the income as to
8    where they were coming -- where the income was
9    coming from in order to...
10        Q.  Okay.  Well, let's look at the
11   statements that are part of this package.  Let's
12   go to the very first page of Composite Exhibit 1.
13   This is MTV 48.  And in your cover letter you
14   write, "Please find the participation statement
15   for Trans Continental television productions for
16   the period ending 12/31/04 for Making the Band I
17   and II."
18        In summary there's a calculated
19   payment due in the amount of $123,265.
20        Did you look at the participation
21   statement?
22        A.  I don't recall looking at them.
23        Q.  Do you typically write cover letters
24   in conjunction with participation statements?
25        A.  No, it's not something that I

188

Lazalde-McPherson

1         Lazalde-McPherson
2    typically do.
3         Q.  Okay.  Are there participation
4    statements normally just mailed out by whatever
5    participation manager is working on it?
6         A.  I don't know the process.
7         Q.  Okay.  So typically, you would not
8    write a cover letter.
9         A.  Correct.
10        Q.  Why did you write one in this
11   particular instance?
12        A.  I don't think I got to answer your
13   question.  Correct, I normally don't write
14   down --
15        Q.  Okay.
16        A.  -- and I was probably just asked to
17   do it.
18        Q.  Okay.  And who would have asked you
19   to do it?
20        A.  I don't recall who asked me.  But
21   probably somebody on the cc, which either would
22   be Karen Abdul or Brad Hazard.
23        Q.  Okay.  And if you look through the
24   documents that are Bates-stamped MTV 49 through
25   MTV 56, I'm going to ask you the question, then

169

Lazalde-McPherson
1
2 Greg, I am in receipt of your letter dated
3 October 2nd, 2002 regarding the above show," and
4 the "re" line states, "Making the Band II."
5        Second sentence says, "I was very
6 surprised by your assertion that Lou was never
7 told anything about the show. As you know, you
8 and I have spoken numerous times over the last
9 three months where I've give you detailed updates
10 about the show."
11        Now, does this document refresh your
12 recollection as to the types of conversations
13 that you had with either Mr. McDonald or Lou
14 Pearlman?
15        A. It doesn't really do much by way of
16 refreshing conversation -- about conversations.
17        Q. But it does here say that you've
18 spoken to Greg numerous times over the last few
19 months, or you've given him material updates
20 about the show?
21        A. Yes, the letter says that.
22        Q. And do you have reason to believe
23 that what you wrote was untrue?
24        A. At this particular point in time, no.
25        Q. Okay. And typically, when you write

170

Lazalde-McPherson
1
2 letters, you aspire to write truthful, factual
3 statements in your letters?
4        A. Absolutely, yes.
5        Q. Okay. And the next sentence is, you
6 essentially welcome Greg and Lou to come to New
7 York so you can discuss the issues in person.
8        Did either Greg McDonald, Lou
9 Pearlman, or both of them come to New York to
10 discuss these issues with you?
11        A. They came to New York and I'm not
12 quite sure of the exact time frame. I don't have
13 the date for you. But they did come to New York,
14 Greg and Lou. And we talked about the fact that
15 Lou wanted to pitch shows to the network.
16        Q. Okay. Did either Greg or Lou or
17 anyone else for Trans Continental for that point
18 express any dismay over the fact that Making the
19 Band II was being made without their inclusion?
20        A. I don't recall.
21        Q. You testified previously that Lou
22 Pearlman was given an opportunity to meet the
23 Da Band, and that that meeting occurred during
24 production. Do you know if the meeting that Lou
25 Pearlman had with the band members occurred

171

Lazalde-McPherson
1
2 before or after October 18th of 2002?
3        A. I don't recall.
4        Q. Okay. What were you telling
5 Mr. McDonald about the status of the show?
6        A. I don't recall.
7        Q. Presumably you were telling him that
8 Trans Continental was not involved and Mr. Diddy
9 is involved, correct?
10        A. I don't think that's a fair
11 presumption. I don't -- I can't recall a
12 conversation from seven years ago.
13        Q. Did Trans Continental ever express
14 any concern over whether or not they were going
15 to be compensated in conjunction with Making the
16 Band II, since they weren't involved with it?
17        A. I don't recall a specific request for
18 compensation.
19        Q. Okay. Here's my question:
20        I'm trying to put myself in Trans
21 Continental's position and I have an agreement
22 with MTV and I'm part of Making the Band O-Town.
23 And this agreement, and we can look at it,
24 provides that all business and creative decisions
25 are going to be mutually determined. It also

172

Lazalde-McPherson
1
2 says that "all decisions about the show to be
3 mutually determined," and it also says I have an
4 interest --
5        A. I'm sorry, which agreement --
6        Q. Referring to the original agreement,
7 the January 7th, 2000 agreement.
8        A. Okay. I wasn't at the company at the
9 time.
10        Q. I understand.
11        A. So --
12        Q. What I'm trying to focus on is the
13 likelihood of the substance of the communications
14 you had with Mr. McDonald or Lou Pearlman in
15 October of 2002. And I'm putting myself in Trans
16 Continental's position, and what I know is, I
17 made some money off O-Town, in fact, I made a lot
18 of money off that show and suddenly there's a new
19 show called Making the Band II that shares a
20 similar format, and I'm not receiving anything.
21 And as of October of 2002, I haven't met with the
22 band, presumably.
23        My question is, do you remember them
24 expressing any dismay over the occurrences that
25 were happening?

173

Lazalde-McPherson

1
2      MS. LUMPKIN: I'm going to object to
3   the first portion of that, which was a
4   narrative, and not a question. And -- go
5   ahead with the actual question.
6      A. Okay, so I'm sorry, 'cause you lost
7   me. And the question was at the tail end, but
8   you lost me.
9      Q. My question is, did Trans Continental
10  express any dismay over the occurrences happening
11  with Making the Band II?
12     A. I don't recall.
13     Q. Okay.
14     MS. LUMPKIN: And I'm going to
15  request that last, for the record, there's
16  no Bates stamp on this Plaintiff's Exhibit
17  21. Do you know what --
18     MR. SAMMATARO: I do know where this
19  document came from.
20     MS. LUMPKIN: It doesn't have an MTV
21  Bates stamp on it. Is this document
22  yours?
23     MR. SAMMATARO: Yes.
24     MS. LUMPKIN: That is part of the
25  production that's coming to us and has not

174

Lazalde-McPherson

1
2   yet been produced?
3      MR. SAMMATARO: It's not yet due --
4      MS. LUMPKIN: I'm just don't see an
5   MTV Bates number --
6      MR. SAMMATARO: It's a document that
7   Soneet acquired during the course of --
8      MS. LUMPKIN: Thank you.
9      MR. SAMMATARO: -- taking over the
10  estate. And it will be produced to you.
11     MS. LUMPKIN: Thank you.
12     Q. You cc'd George Eichen, we know who
13  that is, also Jackie French, John Miller, Ken
14  Parks and Lou Pearlman. Why did you cc Ken
15  Parks?
16     A. Oh, I can't, I don't even know. I
17  don't know.
18     Q. Who is Ken Parks?
19     A. He's another lawyer in the
20  department.
21     Q. Okay. Is he still presently at MTV?
22     A. Yes, he is.
23     Q. Okay. And does he work in the New
24  York office?
25     A. Yes, he does.

175

Lazalde-McPherson

1
2      Q. And where does Ken fit in the
3   hierarchy? Is he your colleague, is he senior to
4   you?
5      A. He's my colleague.
6      Q. Okay. And why did you cc Jackie
7   French?
8      A. I would have assumed I cc'd her
9   because she was the creative point person.
10     Q. When did Jackie French become the
11  creative point person of Making the Band?
12     A. I don't know.
13     Q. Do you know if she was involved one
14  way or the other with respect to season III
15  O-Town?
16     A. I don't recall specifically.
17     Q. Okay. So I know you don't recall the
18  specifics of your communications. Can you give
19  me a description of what the state of the
20  relationship between Trans Continental and MTV
21  was at this point? This was October of 2002.
22     A. From my vantage point, my limited
23  perspective? It was fine.
24     Q. Okay.
25     MR. SAMMATARO: I'm going to hand you

176

Lazalde-McPherson

1
2   what I just marked as Plaintiff's Exhibit
3   22.
4      (Plaintiff Exhibit 22, unsigned draft
5   letter dated 10/2/02, McDonald to
6   Lazalde-McPherson, marked for
7   identification, as of this date.)
8      MR. SAMMATARO: This is an unsigned
9   letter. It indicates it's a draft. It's
10  dated October 2nd, 2002 and it's from Greg
11  McDonald to you. And I will emphasize
12  that it does say it's a draft.
13     (Handing document to witness.)
14     Q. Your first, and your facsimile is the
15  one that we marked as Plaintiff's Exhibit 21. It
16  says, "I'm in receipt of your letter dated
17  October 2nd, 2002."
18     Have you ever seen this letter?
19     A. I don't recall.
20     Q. Okay. Is it possible that this is a
21  letter that you received from Mr. McDonald in
22  October of 2002?
23     A. I do not recall.
24     Q. Have you ever seen a similar letter
25  from Mr. McDonald?

177

Lazalde-McPherson

1
2    A. I don't recall.
3    Q. Mr. McDonald's draft review says, "I
4  understand that you spoke with Lou earlier
5  today."
6        Do you have a recollection as to
7  whether or not you spoke with Mr. Pearlman as of
8  October 2nd, 2002?
9    A. No, I do not.
10   Q. Okay. In fact, what you testified
11 previously was that your only recollection of
12 your communications with Mr. Pearlman was about
13 other television programs.
14   A. We met in person. And I remember
15 that meeting.
16   Q. Okay.
17   A. Where he wanted to pitch television
18 shows to MTV.
19   Q. Okay.
20   A. So that's what I was referring to.
21   Q. But do you have any recollection of
22 discussing Making the Band with Lou Pearlman?
23   A. I don't have a recollection.
24   Q. Okay. Do you know if, aside from
25 yourself, if there's a point person from MTV who

179

Lazalde-McPherson

1
2  mean by "financial point person."
3    Q. Okay. If Trans Continental believed
4  that they were owed money in connection with the
5  show, who would they have spoken to?
6    A. You'd have to ask Trans Continental.
7    Q. Who should they have spoken to?
8  Whose job at MTV was to handle the financial
9  matters related to Making the Band?
10   A. We have the profit participation
11 department. We have business legal affairs. We
12 have finance. So if anybody's asking for any
13 payments that are due or outstanding -- and we
14 have the creative department that's responsible
15 for creating programming.
16       So if you're saying that if they are
17 looking -- if Trans Continental were looking for
18 monies due under an agreement, chances are they
19 would have contacted me. I would have put them
20 in charge -- I mean, in contact with our profit
21 participation department.
22       If there was a claim that there was
23 accounting due or monies due in terms of
24 somebody's back end, so that -- so I'm unclear on
25 your question. If there was a financial concern,

178

Lazalde-McPherson

1
2  was communicating with Trans Continental?
3        MS. LUMPKIN: I'm going to object as
4    to the form. What time period? When?
5    There's no point of reference.
6        MR. SAMMATARO: Between -- the time
7    frame beginning on or about this letter.
8    And I'm going to point out that it says,
9    "I was very prized by your assertion that
10   Lou was never told anything about the
11   show. As you know, you and I have spoken
12   numerous times over the last three
13   months."
14   Q. Working back three months from
15 October, beginning in July of 2002, were you the
16 point person from MTV speaking with Trans
17 Continental?
18   A. I was not the creative point person
19 for MTV.
20   Q. But were you the point person on
21 financial issues?
22   A. I was not.
23   Q. Okay, who was that person?
24   A. I was -- I was the production
25 attorney for the show. So I don't know what you

180

Lazalde-McPherson

1
2  you're going to have to ask Trans Continental
3  because I don't know who they would have spoken
4  to about the financial piece of an agreement.
5        So I'm unclear as to --
6    Q. What my question was, did MTV
7  designate an individual who they want to be the
8  representative to speak to Trans Continental? I
9  presume -- let me take a step back, that MTV
10 wouldn't want someone from creative, someone from
11 production, someone from profit participation, or
12 someone from legal/business appears obviously
13 speaking to the same person.
14       MS. LUMPKIN: I'm going to object.
15   You've asked this and she answered it, she
16   would be the person they would contact and
17   she would --
18   Q. Is that your testimony?
19   A. Yes.
20   Q. Good enough. I'm going to hand you
21 what was marked as Composite Exhibit 1 -- .
22       (Handing document to witness.)
23   Q. -- during Ms. Abdul's deposition.
24 This document, again, was marked as a Composite
25 Exhibit 1. There are multiple documents attached

# EXHIBIT 6

CONFIDENTIAL

1

```
 1
 2   IN THE UNITED STATES BANKRUPTCY COURT
 3   MIDDLE DISTRICT OF FLORIDA
 4   ORLANDO DIVISION
 5   Case No. 6:07-bk-007651-ABB
 6   Jointly Administered                ORIGINAL
 7   Chapter 11
 8   Adv. No.:   6:08-ap-00157-ABB
 9   -------------------------------------x
10   In re:
     LOUIS J. PEARLMAN, et al
11              Debtor.
     -------------------------------------x
12   SONEET KAPILA, Chapter 11 Trustee for
     TRANS CONTINENTAL TELEVISION PRODUCTIONS,
13   INC.,
              Plaintiff,
14        v.
     MTV NETWORKS COMPANY,
15        Defendant.
     -------------------------------------x
16              January 27, 2009
17              10:20 a.m.
18
19              CONFIDENTIAL TRANSCRIPT
20
              Deposition of JACQUELYN FRENCH,
21   pursuant to Notice, held at the offices of
     K&L Gates LLP, 599 Lexington Avenue, New
22   York, New York, before Jineen Pavesi, a
     Registered Professional Reporter,
23   Registered Merit Reporter, Certified
     Realtime Reporter and Notary Public of the
24   State of New York.
25
```

CONFIDENTIAL

40 (Pages 157 to 160)

---

157

FRENCH - CONFIDENTIAL
1
2    Q.    When you say look at a format,
3  what do you mean?
4    A.    Just the format that tells you
5  how long each act is and how long your
6  commercial break is.
7    Q.    Is there a minimum or maximum
8  amount of time that MTV devotes to MTV
9  promotionals s?
10   A.    Yes, that's the number I can't
11 pull out of there.
12        I would -- probably at least a
13 minute of that is its own promo time, but
14 that's a guess and you shouldn't write
15 that down.
16   Q.    If I'm talking about a
17 60-minute episode, am I just doubling the
18 math?
19   A.    60-minute is 43 minutes of
20 content.
21   Q.    Probably 2 minutes or a little
22 bit more of promotional?
23   A.    Again, only a guess on my part,
24 I am not sure.
25   Q.    In terms of the ad spots that

---

158

FRENCH - CONFIDENTIAL
1
2  MTV sells, they are 30-second commercial,
3  correct?
4    A.    Yes, I think so.
5    Q.    Do you know if there are
6  60-second commercials?
7    A.    I don't know.
8    Q.    How about 15-second
9  commercials?
10   A.    I don't know that either.
11   Q.    Do you know if there is any
12 other increment of commercial time that
13 MTV sells?
14   A.    Not that I know of.
15   Q.    Do you have any understanding
16 what the commercial rate of a 30-second
17 spot would go for?
18   A.    I don't.
19   Q.    Who would know that?
20   A.    Salespeople.
21   Q.    Do you have any understanding
22 as to, optimal conditions, how much money
23 MTV could generate from a specific
24 60-minute episode in ad revenue?
25   A.    I don't; I know virtually

---

159

FRENCH - CONFIDENTIAL
1
2  nothing about ad sales and how all that
3  works.
4    Q.    Moving away from ad sales, but
5  still focusing on how you monetize or
6  profit off of a cycle, what other streams
7  of revenue are there that you're aware of?
8    A.    I guess DVD sales, I don't know
9  if we even do that anymore.
10        Besides ad sales and
11 download --
12   Q.    How about licensing agreements?
13   A.    I don't know about licensing.
14   Q.    How about merchandising?
15   A.    Sure; I don't know that there
16 is -- there has ever been any
17 merchandising associated with Making the
18 Band.
19   Q.    What about international
20 program sales?
21   A.    I don't know how that works.
22   Q.    Do you understand DVD sales to
23 be synonymous with home video sales?
24   A.    Yes.
25   Q.    To the best of your

---

160

FRENCH - CONFIDENTIAL
1
2  understanding, were there particular
3  cycles of the show which were sold on DVD?
4    A.    I believe there were, I don't
5  know which ones.
6    Q.    Do you know if that currently
7  is going on?
8    A.    No, it is not.
9    Q.    You indicated that --
10   A.    You know what, let me qualify
11 that; a broader term that we used, too, is
12 download to own, but I still don't know if
13 we're doing that.
14   Q.    Download to own would be --
15   A.    Like ITunes.
16   Q.    Does MTV have download to own
17 off its own web site?
18   A.    No.
19   Q.    Other than ITunes, is there any
20 other provider that you could go to to try
21 to get a particular episode?
22   A.    I don't know.
23   Q.    Do you know if there is a
24 particular department at MTV that tracks
25 the volume or frequency of the downloads?

---

# EXHIBIT 7

1

```
 1
 2   IN THE UNITED STATES BANKRUPTCY COURT
 3   MIDDLE DISTRICT OF FLORIDA
 4   ORLANDO DIVISION              ORIGINAL
 5   Case No. 6:07-bk-007651-ABB
 6   Jointly Administered
 7   Chapter 11
 8   Adv. No.:  6:08-ap-00157-ABB
 9   ------------------------------------x
10   In re:
     LOUIS J. PEARLMAN, et al
11           Debtor.
     ------------------------------------x
12   SONEET KAPILA, Chapter 11 Trustee for
     TRANS CONTINENTAL TELEVISION PRODUCTIONS,
13   INC.,
             Plaintiffs,
14       v.
     MTV NETWORKS COMPANY,
15           Defendant.
     ------------------------------------x
16              January 12, 2009
17              10:10 a.m.
18
                Deposition of KAREN ABDUL,
19   pursuant to Notice, held at the offices of
20   K&L Gates LLP, 599 Lexington Avenue, New
21   York, New York, before Jineen Pavesi, a
22   Registered Professional Reporter,
23   Registered Merit Reporter, Certified
24   Realtime Reporter and Notary Public of the
25   State of New York.
```

77

```
1              ABDUL
2  it was just a matter of us compiling the
3  information and inputting it.
4      Q.     If it came from the
5  international syndication department as
6  Making the Band (P. Diddy), that's how it
7  was typed in, and if it came from Making
8  the Band and then the number II, that's
9  how it was typed in, is that a fair
10 statement?
11     A.     It was copied.
12     Q.     Do you have any knowledge or
13 recollection as to why the numbers on the
14 international syndication participation,
15 document No. 47, are considerably lower
16 than the numbers on the previous form?
17     A.     No.
18     Q.     Do you have any knowledge as to
19 whether any season of Making the Band
20 aired in a foreign territory on a TV
21 station not owned or affiliated by MTV?
22     A.     No.
23     Q.     It would be fair to say you
24 don't have any knowledge regarding how MTV
25 sets prices for licensing to affiliated
```

78

```
1              ABDUL
2  networks?
3      A.     No.
4      Q.     When you would prepare
5  schedules and there is a list for less
6  payments made to date, did you have
7  documents that had a running list for all
8  payments made less to date or would you
9  look at the last participation statement
10 and work off of that?
11     A.     Look at the last participation
12 statement.
13     Q.     The participation statement
14 that went out under your letter, is this
15 also just for Making the Band I and II?
16     A.     Yes.
17     Q.     I will show you a document
18 marked as Exhibit 4.
19         ( Exhibit 4, November 15, 2001,
20 letter agreement, was marked for
21 identification, as of this date.)
22         MR. SILVERMAN:  This is a
23 November 15, 2001, letter agreement.
24         (Witness perusing document.)
25     Q.     Have you ever seen this
```

79

```
1              ABDUL
2  document before?
3      A.     Yes.
4      Q.     Was this one of the agreements
5  that you reviewed in preparing the
6  participation statements?
7      A.     Yes.
8      Q.     Do you know whether for the
9  November 23, 2005, participation
10 statement, whether you used the formulas
11 contained in the November 15, 2001,
12 letter?
13     A.     No.
14     Q.     Can you determine it by looking
15 at it?
16     A.     We used the January 7, 2000,
17 contract.
18     Q.     Why?
19     A.     Because that was the agreement
20 that we used.
21     Q.     Was there ever a time in which
22 you switched using the January 2000
23 contract and started using the November
24 15, 2001, contract, to prepare
25 participation statements?
```

80

```
1              ABDUL
2      A.     No.
3      Q.     Did you ever have any
4  discussions with anyone at MTV, yes or no
5  question, business and legal, about which
6  contract you should use, the January 2000
7  agreement or the November 15, 2001,
8  agreement?
9      A.     For Making the Band I and II?
10     Q.     Yes.
11     A.     They provided us with the
12 January 7, 2000, agreement.
13     Q.     I just want to clarify the last
14 question.
15         Did you ever have any
16 discussions, yes or no question, with
17 business and legal about when you would
18 apply the January 2000 contract and when
19 you would apply the November 15, 2001,
20 contract?
21     A.     No.
22     Q.     Did you ever have any
23 discussions with anyone else at MTV, not
24 in the business and legal department --
25     A.     No.
```

**81**

ABDUL
2  Q.    About -- I just need to
3  finish.
4  A.    Sorry.
5  Q.    Did you ever have any
6  discussions with anyone else at MTV
7  regarding when you should use the January
8  2000 contract and when you should use the
9  November 15, 2001, contract?
10  A.    No.
11  Q.    So at any point did you ever
12  use the November 15, 2001, contract?
13  A.    No.
14  Q.    Did you know about the November
15  15, 2001, contract?
16  A.    Yes.
17  Q.    How did you come to know about
18  it?
19  A.    It was provided us by legal.
20  Q.    What was your understanding as
21  to how the November 15, 2001, contract
22  worked --
23  MS. LUMPKIN: Objection --
24  Q.    -- for the calculation for
25  participation?

**82**

ABDUL
2  A.    Can you rephrase it.
3  Q.    What was your understanding as
4  to how participations would be calculated
5  under the November 15, 2001, letter
6  agreement?
7  A.    Our understanding was based on
8  whatever the provisions in the contract
9  stipulated for us to use in compiling
10  information for the participation
11  statements.
12  Q.    Do you recall when you received
13  the November 15, 2001, letter agreement?
14  A.    I can't recall.
15  Q.    Do you recall whether you
16  created any kind of memos or summaries of
17  what the November 15, 2001, contract
18  provided?
19  MS. LUMPKIN: I am going to
20  object, asked and answered as to whether
21  any memos are kept with regard to the
22  application of the calculations.
23  A.    No.
24  Q.    Do you recall whether you
25  received this November 15, 2001, letter

**83**

ABDUL
2  agreement around the time you started in
3  the department in 2004?
4  A.    I cannot recall.
5  Q.    Do you recall whether you
6  received the November 15, 2001, letter
7  agreement before or after the first
8  participation statement you ever did for
9  Making the Band?
10  A.    It could be around the same
11  time.
12  Q.    What was your understanding as
13  to why the November 15, 2001, letter
14  agreement was not applicable to Making the
15  Band II?
16  A.    Because on page 3, paragraph 9,
17  it refers to with respect to the third
18  season and all subsequent seasons of the
19  series, that's what this agreement would
20  apply to.
21  Q.    Do you know how many seasons
22  Making the Band I ran?
23  A.    Can you clarify seasons.
24  Q.    O-Town, do you remember O-Town?
25  A.    Yes.

**84**

ABDUL
2  Q.    Do you remember how many
3  seasons of O-Town ran?
4  MS. LUMPKIN: Objection, she
5  asked for clarification as to the
6  definition of seasons.
7  Q.    In your work for MTV, were
8  shows generated in seasons?
9  A.    Yes.
10  Q.    How did you normally utilize
11  the term season?
12  A.    Making the Band I would be
13  considered a season, Making the Band II
14  would be considered season 2, Making the
15  Band III would be considered season 3 and
16  Making the Band IV would be considered
17  season 4.
18  Q.    In your experience, how long
19  would a season last chronologically, can a
20  season last over a year?
21  A.    It depends on what the contract
22  says.
23  Q.    Did you ever see a contract in
24  which a season ran longer than six months?
25  A.    I cannot recall.