UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.*

Debtor.

_____ /

SONEET KAPILA, Chapter 11 Trustee for
TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,

Plaintiff,

v.

Case No. 6:10-cv-181-Orl-28-DAB

MTV NETWORKS, a division of Viacom,
International, Inc.

Defendant.

_____ /

TRANS CONTINENTAL'S MOTION TO COMPEL BETTER TESTIMONY FROM
MTV NETWORKS' RULE 30(B)(6) CORPORATE REPRESENTATIVES, MOTION
FOR SANCTIONS AND INCORPORATED
MEMORANDUM OF LAW

KASOWITZ, BENSON, TORRES and FRIEDMAN LLP
Four Seasons Tower
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131

*Attorneys for plaintiff, Soneet Kapila in his capacity as the federally appointed Chapter 11
Trustee charged with administrating the bankruptcy estate of Trans Continental
Television Productions, Inc.*

## TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................................... iii

I.      INTRODUCTION ..................................................................................................1

II.     LEGAL MEMORANDUM ...................................................................................3

   A.   The Discovery Standard...................................................................................3

   B.   Rule 30(b)(6) Obligates the Corporate Deponent to Affirmatively Educate its Designated
        Corporate Representatives. .............................................................................4

III.    MTV FAILED TO COMPLY WITH ITS RULE 30(B)(6)'S OBLIGATIONS AND
        *THEN* COMPOUNDED THE MATTER BY FAILING TO HONOR ITS REPEATED
        PROMISES TO CURE ITS REPRESENTATIVES' DEFICIENT TESTIMONY. ......................6

   A.   MTV Should Be Sanctioned for Failing to Comply with its Discovery Obligations in
        Connection with Topic No. 11..........................................................................6

      1. MTV *Twice* Failed to Produce a Corporate Representative Capable of Testifying on
         Topic No. 11. ................................................................................................6

      2. MTV Has Repeatedly Failed to Honor Its Numerous Written Promises to Provide Written
         Evidence of the Diddy Payments..........................................................................12

   B.   MTV Willingly Disregarded its Discovery Obligations with Respect to Topics 24 through
        42.  14

      1. MTV Failed to Produce a Properly Prepared Corporate Representative on Topics Nos. 24
         through 42. ....................................................................................................14

      2. MTV Has Repeatedly Failed to Honor Its Promises to Provide Evidence of the Revenues
         Generated by Distribution of Making the Band and its Musical Acts. .................................17

   C.   MTV Failed to Produce a Properly Prepared Corporate Representative on Topics Nos. 43
        through 49. ...................................................................................................19

      1. MTV Made No Attempt to Prepare for Mr. Hazzard to Serve as its Corporate
         Representative..................................................................................................19

      2. MTV Has Failed to Sufficiently Cure Mr. Hazzard's Inability to Testify on Topics 43
         through 49. ....................................................................................................22

IV.     SANCTIONS ARE WARRANTED...................................................................23

i

V.      CONCLUSION..................................................................................................25

VI.     GOOD FAITH CERTIFICATION .................................................................26

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.,*
  2010 WL 55595 (M.D. Fla. Jan. 5, 2010)..........................................................23, 24

*Brazos River Auth. v. GE Ionics, Inc.,*
  469 F.3d 416 (5th Cir. 2006) ..........................................................................5

*Burns v. Thiokol Chem. Corp.,*
  483 F.2d 300 (5th Cir. 1973) ..........................................................................4

*Cal. Dive Int'l, Inc. v. M/V Tzimin,*
  127 F. R.D. 213 (S.D. Ala. 1989) ..................................................................23

*Fox v. Morris Jupiter Assoc.,*
  2007 WL 2819525 (S.D. Fla. Sept. 25, 2007) ............................................6, 24

*Hunter's Ridge Golf Co. v. Georgia-Pacific Corp.,*
  233 F.R.D. 678 (M.D. Fla. 2006) (Richardson, J.) ........................................4

*In re Indep. Servs. Orgs. Antitrust Litig.,*
  168 F.R.D. 651 (D. Kan. 1996)........................................................................4

*Lapenna v. UpJohn Co.,*
  110 F.R.D. 15 (E.D. Pa. 1986)........................................................................5

*Marcelle v. American Nat'l Delivery, Inc.,*
  2009 WL 4349985 (M.D. Fla. Nov. 24, 2009) ..............................................23

*Omega Patents, LLC v. Fortin Auto Radio, Inc.,*
  2006 WL 2038534 (M.D. Fla. July 19, 2006) ............................................5, 24

*Otero v. Vito, D.P.M.,*
  2006 WL 3535149 (M.D. Ga. Dec. 7, 2006) ....................................20, 21, 22, 24

*Quantachrome Corp. v. Micromeritics Instrument Corp.,*
  189 F.R.D. 697 (S.D. Fla. 1999)..........................................................5, 19, 24

*Resolution Trust Corp. v. S. Union Co.,*
  985 F.2d 196 (5th Cir. 1993) ..........................................................................12

*Stelor Prods. v. Google, Inc.*,
  2008 WL 4218107 (S.D. Fla. Sept. 15, 2008) .......................................................................4

**RULES**

Fed. R. Civ. P. 37(c)(1) ........................................................................................................24

Rule 30(b)(6) of the Federal Rules of Civil Procedure ..............................................................4

Rules 30(b)(6) and 37 of the Federal Rules of Civil Procedure ..................................................1

Local Rule 3.04 ........................................................................................................................6

Rules 3.01 and 3.04 ..................................................................................................................1

Rule 30(b)(6) ................................................................................................................... passim

Rule 30(b)(6)'s ......................................................................................................................4, 6

Rule 37 ..................................................................................................................6, 18, 23, 24

Rule 37(d) ...........................................................................................................................6, 12

Pursuant to Rules 30(b)(6) and 37 of the Federal Rules of Civil Procedure and Rules 3.01 and 3.04 of the Local Rules for the Middle District of Florida, plaintiff, Soneet Kapila, as the Chapter 11 Trustee ("Trustee") for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental"), by and through counsel, hereby files this Motion to Compel Better Testimony from MTV Networks' ("MTV") Rule 30(b)(6) corporate representative on topics 11, 23-42 and 43-49 of Trans Continental's Fourth Re-Notice of Taking Deposition Pursuant to Federal Rule of Civil Procedure 30(b)(6) (hereinafter, the "30(b)(6) Notice").

## I.    <u>INTRODUCTION</u>

*"An acre of performance is worth a whole world of promise."*

~ William Dean Howells (1837-1920)

This Motion is a last resort.  It could have entirely been avoided in that MTV has *already* conceded, in writing, that its Federal Rule of Civil Procedure 30(b)(6) corporate representatives were improperly prepared and inadequately testified on topics 11, 24-42 and 43-49 of Trans Continental's 30(b)(6) Notice.[1]  In fact, MTV has *repeatedly* agreed to voluntarily supplement its corporate representatives' deficient testimony with written responses.  Despite these promises and subsequent repeated confirmations of these promises – each of which Trans Continental relied upon with the hope of avoiding the need to burden the Court – MTV ultimately refused to voluntarily provide the requested (and indisputably relevant) discovery.

MTV has adopted a clear discovery strategy: delay.  While loaded terms such as "obstructionist" and "stone-walling" are often too casually lobbed during the course of heated advocacy, this is one instance where the terms are understated.  By design, MTV has made the

---

[1]    A true and correct copy of Trans Continental's Fourth Re-Notice of Taking Deposition Pursuant to Federal Rule of Civil Procedure 30(b)(6) is attached hereto as **Exhibit 1**.

Trustee, who is working on behalf of Trans Continental's creditors, spin his wheels and absorb significant and needless costs to acquire discovery to which both and he and MTV agree that he is indisputably entitled. Regrettably, the Bankruptcy Court's eleven month (11) stay – which neither justifies nor excuses MTV's tactics[2] – provided MTV with the opportune platform to maximize its ploy. Indeed, this Motion demonstrates just how successful MTV's discovery strategy has been. This Motion was preceded by *three* (3) separate trips to New York to take the depositions of ill-prepared corporate representatives, more than *ten* (10) correspondences in which Trans Continental attempted to resolve the outstanding disputes without Court intervention (*see, e.g.,* Composite Exhibits 6, 13 and 14), countless e-mails, and no less than *five* (5) conference calls. MTV's continued efforts to avoid its discovery obligations evidence a contumacious disregard for the rules of procedure and this Court's authority. At this point, both the requested discovery and sanctions are warranted.

MTV's repeated string of broken promises undermines the integrity of the discovery process, renders Trans Continental's good faith attempts to meet and confer meaningless, and all but ensures the continued need for heavy motion practice. Trans Continental's counsel has spent exhaustive efforts attempting to resolve these issues without Court intervention, providing MTV with every benefit of the doubt. Trans Continental's exhaustive efforts were all for naught. MTV will likely oppose this Motion by arguing that the requested relief is moot because it has agreed to comply with Trans-Continental's "self-imposed" deadlines. This is a non-starter. This "deadline," imposed by the Federal Rules of Civil Procedure (not by Trans Continental), has long passed. Moreover, history tells us that MTV's promises are empty and completely

---

[2]   Trans Continental's right to complete the depositions of MTV's 30(b)(6) corporate representatives was *expressly* exempted from the Court's discovery stay. [*See* D.E. 48, "the parties may move forward with 30(b)(6) depositions"]).

unreliable.  MTV cannot now be heard to complain of this Motion to Compel in light of its persistent failure to honor its previous commitments and adhere to the Federal Rules of Civil Procedure.

MTV's conduct transgresses both the spirit and letter of the Federal Rules of Civil Procedure and must be sanctioned.  Only an order requiring MTV to reimburse the Trustee's counsel for the costs and expenses it incurred in attempting to secure adequate 30(b)(6) testimony will deter future abusive conduct.  The issues of time and expense aside, Trans Continental has also been severely prejudiced because it has been prevented from inquiring into several properly noticed and designated areas of inquiry due to MTV's failure to adequately prepare its corporate representatives for depositions.

The Court should enter relief commensurate with MTV's conduct.  The Court should compel MTV to produce additional *prepared* corporate representatives for deposition in Miami, Florida.  Further, the Court should award the Trustee the attorneys' fees and costs incurred in moving to compel the instant discovery (including its good faith meet and confer attempts), its attorneys' fees and costs for the past futile Rule 30(b)(6) depositions, and its attorneys' fees and costs for preparing for the re-deposition of the additional corporate representatives.  MTV was required to produce prepared corporate representatives almost one year ago at the *first Rule 30(b)(6) depositions*.  Indeed, MTV agreed as much.  Based on MTV's brazen disregard for its obligations under the Federal Rules of Civil Procedure, this Court should not hesitate to sanction it.

## II.   **LEGAL MEMORANDUM**

### A.   **The Discovery Standard.**

"The overall purpose of discovery under the Federal Rules is to require the disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may

3

be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result." *Hunter's Ridge Golf Co. v. Georgia-Pacific Corp.*, 233 F.R.D. 678, 680 (M.D. Fla. 2006) (Richardson, J.). The discovery provisions of the Federal Rules of Civil Procedure are to be broadly and liberally construed to allow the parties to fully develop and crystallize concise factual issues for trial. *See Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973).

**B.      Rule 30(b)(6) Obligates the Corporate Deponent to Affirmatively Educate its Designated Corporate Representatives.**

> *"[A 30(b)(6) deponent] cannot meet its discovery obligations by sticking its head in the sand and refusing to look for the answers and then saying it does not know the answer."* [3]

Rule 30(b)(6) of the Federal Rules of Civil Procedure obligates a corporation to produce a representative competent to testify on its behalf as to matters "known or reasonably available to the corporation." Fed. R. Civ. P. 30(b)(6). Rule 30(b)(6)'s dual objective is to promote effective discovery, and "to prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and rigorous one before the trial." *Taylor*, 166 F.R.D. at 361.

In designating an individual as its corporate representative, the corporation and its counsel are charged with the affirmative duty of *preparing the witness*, such that the person has the ability to provide "complete, knowledgeable and binding answers on behalf of the corporation." *Stelor Prods. v. Google, Inc.*, 2008 WL 4218107, * 3 (S.D. Fla. Sept. 15, 2008) (citations omitted). The corporation's duty "extends beyond the mere act of presenting a human body to speak on the corporation's behalf. [It] has the additional duty to prepare the deponent ...

---

[3] *In re Indep. Servs. Orgs. Antitrust Litig.*, 168 F.R.D. 651, 653 (D. Kan. 1996).

4

so that [the witness is] able to give complete and knowledgeable answers." *Quantachrome Corp. v. Micromeritics Instrument Corp.*, 189 F.R.D. 697, 699 (S.D. Fla. 1999).

Indeed, it is black letter law that the Rule 30(b)(6) corporate representative must be prepared to testify not only about facts within the corporation's knowledge, but also as to the corporation's subjective beliefs and opinions, and the corporation's interpretation of documents and events. *Taylor*, 166 F.R.D. at 361; *Lapenna v. UpJohn Co.*, 110 F.R.D. 15, 20 (E.D. Pa. 1986). "Were it otherwise, a corporation would be able to deceitfully select at trial the most convenient answer presented by a number of finger-pointing witnesses at the deposition." *Taylor*, 166 F.R.D. at 361. As such, "[th]e duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to [the] designee or to matters in which that designee was personally involved." *Id.*

The designation of an inadequately prepared witness constitutes a failure to appear. *See Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433-34 (5th Cir. 2006). Indeed, "[i]f [an] agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable and readily identifiable witness, then the appearance is, for all intents and purposes, no appearance at all." *Voyeur Dorm*, 2000 WL 34248401 at * 1.

Accordingly, sanctions are warranted if the corporate representative is not prepared to testify on the designated topics. *See, e.g., Omega Patents, LLC v. Fortin Auto Radio, Inc.,* 2006 WL 2038534, *4-5 (M.D. Fla. July 19, 2006). In *Omega,* this Court sanctioned a party for its "egregious" failure to provide a prepared corporate representative, awarding attorneys' fees for the motion to compel and for the second re-deposition. Indeed, federal courts routinely enter sanctions for failing to produce a knowledgeable Rule 30(b)(6) representative because it is tantamount to a failure to appear. *See Quantachrome*, 189 F.R.D. at 699 (quoting *King v. Pratt*

5

& *Whitney*, 161 F.R.D. 475, 476 (S.D. Fla. 1995)); *Fox v. Morris Jupiter Assoc.*, 2007 WL 2819525 (S.D. Fla. Sept. 25, 2007) ("Failure to provide a witness knowledgeable on the listed areas of inquiry is sanctionable under Rule 37(d) for failure 'to appear before the officer who is to take the deposition, after being served with proper notice.'") (quoting Fed. R. Civ. P. 37(d)). Finally, in addition to Rule 37 sanctions, the offending party must pay the total expenses associated with the mandatory second deposition of a prepared 30(b)(6) representative. *See Marker*, 125 F.R.D. at 126. ("Among the other remedies, the Court can require the corporation to re-designate its witnesses and mandate their preparation for re-deposition at the corporation's expense."). *Id.*

## III.   MTV FAILED TO COMPLY WITH ITS RULE 30(B)(6)'S OBLIGATIONS AND *THEN* COMPOUNDED THE MATTER BY FAILING TO HONOR ITS REPEATED PROMISES TO CURE ITS REPRESENTATIVES' DEFICIENT TESTIMONY.

MTV failed to sufficiently prepare its corporate representatives to testify on Topic Nos. 1-3, 5, 6, 11, 23-42 and 43 through 49 on Trans Continental's 30(b)(6) Notice.[4]  Pursuant to Local Rule 3.04, these deficiencies are addressed in turn.

### A.   MTV Should Be Sanctioned for Failing to Comply with its Discovery Obligations in Connection with Topic No. 11.

#### 1.   MTV *Twice* Failed to Produce a Corporate Representative Capable of Testifying on Topic No. 11.

Trans Continental is indisputably entitled to discover MTV's payments to Sean Combs, *p/k/a* P. Diddy or Diddy ("Diddy") relating to the *Making the Band* series, sought by Topic 11. Together with MTV, Trans Continental and its principal, Louis J. Pearlman ("Pearlman")[5]

---

[4]     While it has, as of yet, failed comply with this separate promise, MTV has already agreed "to re-produce a witness to testify as to [Trans Continental's] Rule 30(b)(6) topics 1, 2, 3, 5 and 6.  [MTV] will produce the witness in Miami at its cost ...".  (*See* Exhibit 7, *infra*).  As such, topics 1-3, 5 and 6 are the focus of this Motion,

[5]     Pearlman was widely regarded as the modern father of the "boy band," creating top-selling acts such as the Backstreet Boys and N'Sync.

created the television show, *Making the Band.* After season three (3), MTV unilaterally – and unceremoniously – dumped Trans Continental and Pearlman, prohibiting them from future involvement in *Making the Band* and replacing them with hip-hop star, Diddy, who went on to star in and produce *Making the Band II, Making the Band III and Making the Band IV.* [6] [D.E. 102 at ¶¶ 2-8, 24-58]. These allegations are at the heart of Trans Continental's case.

In response to Trans Continental's October 31, 2008 First Request for the Production of Documents and Things, MTV produced copies of its contracts with Diddy for each season of *Making the Band II, Making the Band III and Making the Band IV* (collectively, the "MTV-Diddy Contracts"). The MTV-Diddy Contracts revealed that Diddy was entitled to a series of bonuses, including a completion bonus (which was premised on the timely completion of a specific number of episodes), a ratings bonus (if the particular season of Making the Band surpassed a specified ratings threshold), and a specified percentage of the modified adjusted gross receipts ("MAGR") received by MTV in connection with the exploitation of *Making the Band.* The MAGR bonuses are particularly important because the thresholds needed to trigger these bonuses are the same thresholds which would necessarily eliminate any doubt that money is due and owing to Trans Continental. Simply put, MTV's payments to Diddy provide an objective point of comparison.

With this objective in mind, Topic No. 11 sought a corporate representative capable of testifying as to: "The payments made by MTV to Diddy in connection with any season of *Making the Band II, Making the Band III and Making the Band IV.*" MTV initially designated

---

[6]   To date, there have been twelve (12) seasons of *Making the Band*, three seasons each of Making the Band, Making the Band II, Making the Band III and Making the Band IV. For the avoidance of confusion, throughout this lawsuit, specific seasons of the show have been designated as follows: Making the Band 2.1 – which refers to season one of Making the Band II.   Season 2.1 was the first to feature Diddy.

Laura Dorson, its Vice President of Participations Management, as its Rule 30(b)(6) corporate representative on Topic No. 11.  Ms. Dorson was utterly unprepared to testify on this Topic.  By way of example, Ms. Dorson testified as follows:

> Q:   Do you know if Diddy received a modified adjusted gross receipts bonus in connection with Making the Band 2?
>
> A:   No.
>
> Q:   You don't know?
>
> A:   I don't know.
>
> Q:   Do you know whether Diddy was paid the completion bonus in connection with Season 2.3?
>
> A:   No.
>
> Q:   Do you know whether Diddy received a ratings bonus in connection with Season 2.3?
>
> A:   No.
>
> …
>
> Q:   Do you know what bonuses Diddy received in connection with seasons 4.2 and 4.3?
>
> A:   No.
>
> Q:   Do you know if Diddy received ratings bonuses in connection with season 4.1?
>
> A:   No.

(A true and correct copy of the pertinent excerpt of Laura Dorson's April 22, 2009 deposition is attached hereto as Exhibit 2, pp. 4, 136-146).

With the goal of confirming Ms. Dorson's inability to testify capably as to MTV's payments to Diddy, Trans Continental's counsel then inquired: *"Do you have any knowledge whatsoever of any payments made by MTV to Diddy in the history of mankind?"* (*Id.* at p. 139)

8

(emphasis added). To this question, Mrs. Dorson responded, "No," thereby confirming the obvious: MTV failed to produce a sufficiently prepared corporate representative.

MTV's predecessor's counsel[7] feebly attempted to justify its failure to properly prepate Ms. Dorson. First, they argued that an earlier witness, Jackie French (who was not designated as MTV's corporate representative on Topics Nos. 11 and 12) had testified as to the topics (she did not). Second, they contended that the term "payment" was undefined and, thus, ambiguous. (*Id.* at pp. 138-145). On April 30, 2009, Trans Continental sent MTV a demand letter, highlighting that Ms. French was not asked, nor did she answer, a single question about Diddy's bonuses. (A true and correct copy of the undersigned April 30, 2009 letter is attached hereto as Exhibit 3). After this letter, MTV's counsel reconsidered its objections and agreed to produce George Cheeks, the General Counsel of MTV Networks, as a substitute witness on Topic No. 11. (*See* the June 10, 2009 deposition transcript of Mr. Cheeks, the pertinent excerpts of which are attached hereto as Exhibit 4).

Despite offering Mr. Cheeks as a qualified replacement to Ms. Dorson, MTV's counsel disclaimed Mr. Cheeks' ability to fully testify as to Topic Nos. 11 and 12 at the outset of his deposition:

> My understanding is that Mr. Cheeks is *not* prepared to address every potential payment, meaning check stub.
>
> The client has advised they are willing to do kind of, like [the foreign] licensing agreements, try to provide copies of whatever they do have once they find it, because they have some, *but in order to meet the expectation of this topic they will be happy to do something in writing if what Mr. Cheeks testifies to is not sufficient.*

(*See id.* at pp. 8-9) (emphasis added).

---

[7]   Until July 9, 2010, MTV was represented by the law firm, Kirkpatrick & Lockhart Gates ("K & L Gates").

Mr. Cheeks' testimony was, in fact, insufficient, as he was incapable of confirming whether any bonuses were *actually* paid to Diddy.  By way of example:

Q:  I am going to hand you what was previously marked as Exhibit 25 … What I would like to establish first is that this is a contract between Bad Boy Films and MTV Networks as relates to cycle 2.2 or the second season of Making the Band 2?

A:  I did not draft this, but that's correct.

Q:  You understand this to be the agreement?

A:  Yes.

Q:  This contract also does provide for a per episode fee in paragraph 2, correct?

A:  Yes.

Q:  And that's the per episodic fees of $[xxxxx], correct?[8]

A:  Correct.

Q:  It also says that MTV should pay the company, meaning Bad Boy Films, a one-time bonus of $[xxxxxx].   Do you have any reason to believe that the bonus was not paid?

A:  None.

Q:  Aside from the episodic fee and the bonus, which is specified in paragraph 2, are you aware as to whether or not Diddy received any contingent compensation in addition to the guaranteed compensation?

A:  *Not aware.*

Q:  Specifically, paragraph 3 of this January 31, 2003 agreement does provide for a rating bonus?

A:  Yes.

Q:  Do you have any understanding as to whether or not Diddy received a ratings bonus in connection with 2.2?

---

[8]   In that the Diddy contract in question has been designated by MTV as confidential, the specific contractual numbers have been redacted both herein and in the attached excerpt contained in Exhibit 4.

A:      *I do not.*

Q:      Is that something you could determine by looking at documents …

A:      Sure, but looking at ratings average for the season I could determine that.

Q:      Presumably if the ratings that are specified here in paragraph 3 were met, MTV would in fact honor its contractual obligations?

A:      Correct.

Q:      Do you know if Diddy received a completion bonus in conjunction with this cycle?

A:      *Not aware.*

Q:      Again, this is something that you could *verify*?

A:      *Yes.*

(*See* Exhibit 4, pp. 44-45) (emphasis added).

With little exception, this testimony continued *ad nauseum* on a cycle-by-cycle basis, from Season 2.3 through 4.3. (*Id.* at pp. 46-48, 55-76).  Thus, despite being designated as MTV's "make good" 30(b)(6) corporate representative, the best that Mr. Cheeks was capable of doing was acknowledging the written terms of the previously provided MTV-Diddy Contracts, averring his belief that MTV likely complied with its contractual obligations, and confirming that MTV was capable of verifying whether the completion, rating and MAGR bonuses were, in fact, paid. Of course, this verification should have been done *in advance* of Mr. Cheeks' deposition.  This simple preparation would have enabled Mr. Cheeks to do what MTV's first corporate representative on the topic failed to do:  attest to the precise amounts of the bonus payments that MTV made to Diddy, *i.e.*, Topic 11.

Sanctions are warranted for MTV's failure to adequately prepare both Ms. Dorson and Mr. Cheeks on Topic No. 11 because this failing violates the duties imposed by Rule 30(b)(6)

and renders Ms. Dorson and Mr. Cheeks' testimony tantamount to a failure to appear.   This
Court should not condone MTV's failure to prepare Ms. Doson and Mr. Cheeks' before they
appeared for their Rule 30(b)(6) depositions.   Indeed, as made clear by the excerpts of testimony,
the depositions were an exercise in futility.   Ms. Doson's and Mr. Cheeks' failure to verify the
information in advance of their depositions rendered them little more than warm bodies.   *See
Resolution Trust Corp. v. S. Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993)) ("If that agent is not
knowledgeable about relevant facts … then the appearance is, for all practical purposes, no
appearance at all."); *Dow Chemical Corp.,* 228 F.3d at 304 ("[W]hen a witness is designated by a
corporate party to speak on its behalf pursuant to Rule 30(b)(6), producing an unprepared
witness is tantamount to a failure to appear that is sanctionable under Rule 37(d).") (internal
citations omitted).

### 2.     MTV Has Repeatedly Failed to Honor Its Numerous Written Promises to Provide Written Evidence of the Diddy Payments.

After going 0-for-2, MTV agreed to honor the promise it made on the record at the
inception of Mr. Cheeks' deposition – *e.g.,* to provide written evidence of the Diddy payments.
Shortly after the Cheeks deposition, K & L Gates was terminated and replaced by Paul, Weiss,
Rifkind, Wharton & Garrison LLP ("Paul Weiss").   Upon stepping into the case, Paul Weiss
represented that it would dutifully honor all of K & L Gates' outstanding commitments,
including providing written evidence of the Diddy payments, and the foreign licensing
information (discussed below).   Specifically, on August 20, 2009, Paul Weiss stated that MTV
"expects to produce by Friday, September 4, [2009], evidence of payments made to Diddy." (A
true and correct copy of Paul Weiss' August 20, 2009 correspondence is attached hereto as
Exhibit 5).

Paul Weiss has repeatedly – and egregiously – failed to honor its promise.  After several months and a series of letters,[9] Paul Weiss reiterated its commitment, agreeing to "provide the requested information about payment to Diddy … by February 29, 2010."   (A true and correct copy of Paul Weiss' February 5, 2010 correspondence is attached hereto as Exhibit 7). Unfortunately, this too proved to be an empty promise.  In one final attempt to reach an amicable resolution, on March 5, 2010, Trans Continental proposed that MTV enter into Stipulation and [proposed] Agreed Order on Discovery Deadlines (the "Stipulation"). (A true and correct copy of Trans Continental's proposed Stipulation and the accompanying e-mail are attached hereto as Exhibit 8).   Once again, MTV "promised" to provide evidence of the Diddy payments by March 15, 2010, but refused to respond to the other items contained in the Stipulation, rendering Trans Continental incapable of submitting the Stipulation for the Court's entry.  (Attached hereto as Exhibit 9 is a true and correct copy of MTV's preliminary response and Trans Continental's *three* subsequent attempts to have MTV agree to the proposed Stipulation).

Sanctions are plainly warranted due to MTV's continuous and inexcusable disregard of its obligations under the Federal Rules.  As of the filing of Motion – *eleven* months after MTV first designated its corporate representative on Topic No. 11, *nine* months after MTV's predecessor counsel first promised to provide written evidence of the Diddy payments, and *seven* months after Paul Weiss first confirmed MTV's willingness to voluntarily provide evidence of the Diddy payments – Trans Continental remains bereft of this information.  MTV should be compelled to both immediately produce all evidence of the Diddy payments as well as a corporate representative in Miami, Florida, sufficiently prepared to testify as to the amounts and basis for these payments.

---

[9]    Trans Continental's September 11, 2009, January 8, 2010, January 25, 2010 and January 28, 2010 correspondences are attached hereto as **composite Exhibit 6**.

13

**B.     MTV Willingly Disregarded its Discovery Obligations with Respect to Topics
24 through 42.**

      **1.     MTV Failed to Produce a Properly Prepared Corporate
Representative on Topics Nos. 24 through 42.**

Making the Band 2-4 spawned several artists, specifically:   *O-Town*, *Da Band*, *Danity Kane*, *Day 26* and *Donnie Klang* (collectively, the "Musical Acts"), all of which are at the heart of Topics No. 24-42.   Pursuant to the terms of the parties' January 7, 2000 Joint Venture Agreement and the subsequent November 15, 2001 Amended Agreement, Trans Continental is entitled to fifty percent (50%) of the revenues received in connection with the album, merchandise and music publishing generated by the Musical Acts.   In an attempt to discover the amount of revenues generated by the Musical Acts, Trans Continental sought testimony from MTV's corporate representative on all funds received from the Musical Acts:

- Respective albums and other musical works (Topic Nos. 24-29);

- Tours and concerts (Topic Nos. 23);

- Merchandise (Topic Nos. 30-33);

- Publishing rights (Topic Nos. 37-38); and

- Websites (Topic Nos. 39-40).

Trans Continental is also contractually entitled to share in and, thus, sought testimony relating to all funds received by MTV in connection with the sales of DVDs (Topic No. 34) and home videos (Topic No. 36) of Making the Band 2-4, as well as all revenue generated from the domestic and foreign sales of Making the Band 2-4 (Topic Nos. 41 and 42).

In an effort to comply with its obligations under Rule 30(b)(6), MTV produced Roseanne Russo for deposition on May 4, 2009.  (A true and correct copy of Ms. Russo's May 4, 2009

deposition transcript is attached hereto as Exhibit 10).    As was the case with MTV's preceding corporate representative witnesses, Ms. Russo was incapable of answering the most elementary questions relating to the topics (nos. 23-42) on which she was designated to testify.    Worse yet, Ms. Russo admittedly did little to prepare for her deposition, confessing, for example, that she made no attempt to secure the updated account statements needed in order to testify as to amounts earned from the Musical Acts or the distribution of Making the Band. (*See, e.g.,* p. 83: "Q: And have you asked the Atlantic Recording Group for an accounting relating to *Danity Kane*'s second album? A: No.," and p. 140, where Ms. Russo acknowledged that she made no attempt to acquire a single account statement for Donnie Klang).

Ms. Russo knew little to nothing about the revenue generated by the Musical Acts.    For example, in connection with Danity Kane and their self-titled debut album, *Danity Kane* – which was certified by Recording Industry Association of America ("RIAA") as a platinum selling album[10] – Ms. Russo knew nothing about the albums' recording costs (*id.* at p. 77), the marketing costs (*id.*), or whether any music videos were made in connection with *Danity Kane's* songs (*id.*).    Instead, the totality of Ms. Russo's knowledge was limited to the account statement which she received from Atlantic Group Recording regarding Danity Kane's sales.    This statement, however, was on its face limited to the period of time ending *June of 2008*. (*Id.* at pp. 78-83).  Moreover, while the account statement showed that Danity Kane remained un-recouped (*i.e.,* in the negative), the account statement only revealed the sale of 670,097 units – far short than the one million plus units certified by the RIAA.[11] Even more troubling, by Ms. Russo's

---

[10]  "Platinum" certification indicates that an album or compact disc has sold a million units.   Attached hereto as **Exhibit 11** is a print-out from the RIAA's web-site explaining its Gold and Platinum Certification Requirements.

[11]  On their respective websites, MTV and Bad Boy Records have touted Danity Kane as a "platinum-selling female pop group." (*See* **composite Exhibit 12**).

own admission, the account statement from which she was reading from did not account for Danity Kane's equally successful sophomore album, *Welcome to the Dollhouse*, which itself was certified as a gold-selling album by the RIAA as of April 22, 2008. *This means that, at a minimum, the account statement from which Ms. Russo testified failed to account for over 829,903 album sales* (a minimum of 329,903 units of the eponymous album, *Danity Kane*, and a minimum of 500,000 units of *Welcome to the Dollhouse*).[12]  With this type of accounting, it is little wonder that MTV professes that Making the Band has never made any money!

The outdated account statement, and by extension Ms. Russo's reading from the outdated account statement, provided an incomplete picture of Danity Kane's financial standing.   Ms. Russo even conceded the limited extent of her knowledge: *"I can only – the only knowledge that I would have is what Atlantic Group is reporting to me as of June 08."* (*Id.* at p. 83) (emphasis added).   This is patently insufficient.   Based on MTV's defense that no amount of money was presently due to Trans Continental in relation to Danity Kane or the other Musical Acts, Trans Continental was entitled to testimony from a corporate representative capable of providing accurate and current information relating to the sales made by the Musical Acts.

Ms. Russo's lack of knowledge was not limited to Danity Kane.   She lacked current information for all of the Musical Acts.   By way of example, Ms. Russo did not even have a single account statement relating to Donnie Klang. (*Id.* at p. 140).   The totality of Ms. Russo's two hour and fifty-seven minute deposition can be succinctly described as follows:   she read from outdated and incorrect account statements and was unable to provide the slightest insight as

---

[12]   Compounding matters is that in a motion to the Bankruptcy Court, MTV *falsely* represented to the Court that it provided Trans Continental "with statements from the Atlantic Group, which indicate that none of the *Making the Band* groups have recouped production costs, let alone generated a profit."   [D.E. 112, p. 11].   In making this statement, MTV failed to note that the account statements which it provided represent a slight fraction of the total sales made by the Musical Acts.   Indeed, the account statements that MTV supplied to the Bankruptcy Court – like the one which Ms. Russo testified from – stop as of June of 2008 and, in the case of Danity Kane, are limited to"LP1," Danity Kane's first album.   [*See* D.E. 112, Ex. G].

to whether, based on activity after June of 2008, any positive revenue had been generated.  Ms. Russo's deposition was an utter waste of Trans Continental's time and the Trustee's resources – and yet another example of MTV's flagrant disregard of its obligations under the Federal Rules of Civil Procedure.

For its part, MTV wisely made no attempt to justify the sufficiency of Ms. Russo's deposition testimony.   Instead, but only *after* Trans Continental made *three* (3) written demands,[13] on August 20, 2009, MTV confirmed its offer to supplement Ms. Russo's deficient testimony with a written response:

> [W]ith respect to [Trans Continental's] corporate representative deposition topics 23 through 42, we proposed that [MTV] respond *initially* through a writing, which may obviate the need for a deposition.  We understand that you reserve your rights to take a deposition on these topics, and we would not object to such a deposition, but believe that the topics may be more efficiently addressed through a writing in the first instance.

(*See* Exhibit 5) (emphasis added).

### 2.    MTV Has Repeatedly Failed to Honor Its Promises to Provide Evidence of the Revenues Generated by Distribution of Making the Band and its Musical Acts.

Despite making this promise, MTV failed to deliver yet again.   In an attempt to spur MTV to comply with its promise, Trans Continental wrote no less than eight (8) additional

---

[13]    Copies of Trans Continental's May 8, 2009, May 21, 2009 and August 7, 2009 correspondences are attached hereto as **Composite Exhibit 13**.

correspondences, plus countless e-mails.[14]  MTV took no action whatsoever, ostensibly hiding behind the Bankruptcy Court's discovery stay.[15]

Upon the Bankruptcy Court's lifting of discovery stay [D.E. 96], MTV *again* confirmed its intention to honor its commitment.  Specifically, in a letter dated February 5, 2010, Paul Weiss memorialized the terms of the parties' latest good faith discovery conference:  "*I advised you that [MTV] would provide the requested information about payments to Diddy, and a written response to [Trans Continental's] 30(b)(6) topics 23-42, by February 29, 2010.*"  (*See* Exhibit 7) (emphasis added).  Not surprisingly, February 29, 2010 came and went without MTV complying with its own self-imposed deadline.

In one final attempt to resolve the matter without involving the Court, on March 5, 2010, Trans Continental provided MTV with the aforementioned Stipulation, with the hope that an agreed order would compel MTV to perform its promised obligations.  (*See* Exhibit 8).   While MTV partially responded on March 8, 2010, its failure to respond in any fashion to Trans Continental's three (3) subsequent attempts to finalize the Stipulation precluded Trans Continental from submitting the Stipulation for Court approval.  Even with respect to the few dates that MTV suggested for inclusion in the Stipulation, it wholly failed to comply.

Sanctions are now appropriate.  Given its failure to properly produce a prepared corporate representative on Topics No. 23 through 42 as well as its unwillingness to voluntarily redress its admitted failings, MTV should be compelled to substitute another individual capable of sufficiently testifying on these topics and should, pursuant to Rule 37, bear the costs: (i) incurred

---

[14]     Copies of Trans Continental's September 11, 2009, October 26, 2009, January 8, 2010, January 13, 2010, January 14, 2010, January 22, 2010, January 25, 2010, and January 28, 2010 correspondences are attached hereto as **Composite Exhibit 14**.

[15]     Trans Continental's right to take the deposition of MTV's 30(b)(6) corporate representatives was expressly exempted from the discovery stay.  (*See* the March 16, 2009 hearing transcript and [D.E. 48, "the parties may move forward with 30(b)(6) depositions"]).

by Trans Continental in preparing for and taking Ms. Russo's deposition; (ii) this Motion and its good faith attempts to resolve these issues; and (iii) the costs to be incurred in connection for the re-taking of the deposition. *See Quantachrome*, 189 F.R.D. at 701 ("Because [defendant] caused the need for further depositions, the Court finds that the [defendant] should bear the costs of bringing this Motion to Compel and of retaking the depositions.").

### C.      MTV Failed to Produce a Properly Prepared Corporate Representative on Topics Nos. 43 through 49.

Though difficult to fathom, the Rule 30(b)(6) corporate representative produced by MTV in connection with Topics Nos. 43 through 49 was even less prepared than Ms. Russo.

#### 1.      MTV Made No Attempt to Prepare for Mr. Hazzard to Serve as its Corporate Representative.

The amount of money owed by MTV to Trans Continental in connection with the foreign exploitation of Making the Band is a key disputed issue in this case.   With the goal of quantifying this amount, Trans Continental sought testimony from MTV's corporate representative on Topics 43 through 49, specifically:  the exact stations, countries and territories in which Making the Band has been distributed, broadcast, exhibited or otherwise televised (Topic Nos. 43 and 44), the license, affiliate, program sales and/or distribution agreements that MTV has entered into involving Making the Band (Topic No. 45), the mechanism by which any non-MTV owned station acquired the rights to televise episodes of Making the Band (Topic No. 46), and the identity of the individuals or entities which have been involved in the distribution and licensing of Making the Band and its related merchandise (Topic Nos. 47 through 49).

MTV designated Brad Hazzard, its Vice President of Business and Legal Affairs, as its corporate representative on Topic Nos. 43 through 49.   As is the case with Ms. Dorson, Mr. Cheeks (on Topic No. 11) and Ms. Russo, MTV has *already* conceded that Mr. Hazzard was improperly prepared.   MTV's concession was unavoidable, as even a cursory glance at Mr.

19

Hazzard's deposition transcript reveals that he was woefully unprepared and incapable of answering the most fundamental questions on the designated topics.  Mr. Hazard was designated to identify the specific stations, countries and territories in which Making the Band had been broadcast and exhibited (Topic Nos. 43 and 44).   Yet, when asked:

> Q:      As you sit here today, you can't tell me on a season-by-season basis, and then within the season-by-season or cycle-by-cycle basis every country that Making the Band aired in?
>
> A:      *No one could*, unless they were to move their offices into this room.

(A true and correct copy of the pertinent excerpt of Brad Hazzard's June 9, 2009 deposition is attached hereto as Exhibit 15, p. 201) (emphasis added).

Mr. Hazzard then clarified that it is in fact possible to determine in which countries and on which stations Making the Band has aired:

> Q:      But do you believe that the [International Programming Enterprises], if charged with the task of completing a full list, could likely do that?
>
> A:      They could prepare a full list for you.

Thus, with even a modicum of diligence, Mr. Hazzard could have had MTV's International Programming Enterprises create this list in advance of his deposition.  MTV and Mr. Hazzard's failure to even so much as attempt to acquire this information is sanctionable. *See, e.g. Otero v. Vito, D.P.M.,* 2006 WL 3535149, *3-*4 (M.D. Ga. Dec. 7, 2006) (explaining "the Court was immediately struck by how little time – three hours – [the 30(b)(6) representative] spent preparing for the deposition," imposing sanctions against the party whose 30(b)(6) witness was unable to testify as to "over half of the areas of inquiry noticed by Plaintiff.").

Mr. Hazzard's testimony on Topic Nos. 45 through 49 was equally deficient.   With respect to Topic No. 46, the best that Mr. Hazzard could do was hazard a guess as to MTV's ownership interest in the foreign stations which broadcasted Making the Band:

Q:  I am going to ask you questions about the relationship between these specific entities, if you know them. MTV Arabia, do you know if that station, I am going to use the term station, do you know if that station is wholly-owned by MTV Networks?

A.  No, there are certain channels that are MTV-branded channels, where a certain block of programming is branded MTV or branded Nickelodeon or VH 1.

Q.  Does MTV wholly own any station in any foreign country?

A.  MTV has ownership in certain countries; Germany, I believe, definitely U.K. But in some of the smaller regions you're looking at branded programming blocks.

Q.  From one end of the spectrum we have MTV Germany and U.K., which is an MTV wholly-owned station or an MTV-owned station?

A.  MTV-owned station or MTV has that majority interest, yes.

Q.  On the other end of the spectrum we have MTV-branded?

A.  Yes.

Q.  Does MTV have stations where they have a co-ownership interest, where they are the minority owner?

A.  Yes.

Q.  *What countries are those?*

A.  *I can't stay which countries they are in; we have over 75 or a hundred relationships, channel relationships, in the foreign market.*

(*Id.* at pp. 203-05).

21

From there, Mr. Hazzard wagered a number of guesses, but was unable to testify with any certainty as to which stations MTV owned or to provide any meaningful testimony on these topics. (*Id.* at pp. 205-213).

### 2.   MTV Has Failed to Sufficiently Cure Mr. Hazzard's Inability to Testify on Topics 43 through 49.

MTV – as it had to – conceded that it failed to comply with its Rule 30(b)(6) obligations and that Mr. Hazzard was ill-prepared.   In an attempt to cure its deficiency, MTV agreed, both on the record (*id.* at pp. 240-41) and in subsequent written correspondences, to provide Trans Continental with a complete list, documenting:  (a) each and every country in which Making the Band aired as well as (b) whether the program was aired by an MTV affiliate or a third-party. (*See, e.g.,* MTV's predecessor counsel's July 28, 2009 e-mail, which is attached hereto as Exhibit 16, and MTV's present counsel's August 20, 2009 correspondence, *see* Exhibit 5 *supra*). MTV further agreed to supplement its earlier production by furnishing Trans Continental with copies of any license, affiliate, program sales and/or distribution agreement relating to Making the Band.[16]

On August 28, 2009, MTV endeavored to honor its promise, by providing Trans Continental with a list detailing each country which aired Making the Band. (*See* the attachment to MTV's counsel's August 28, 2009 correspondence, a true and correct copy of which is attached hereto as Exhibit 18).  There are three notable shortcomings in MTV's furnished list.

First, the list does not detail when or where seasons 1 through 3 of the original Making the Band were broadcast.  Second, while the list documents the countries in which subsequent

---

[16]   On January 14, 2010, MTV advised that it had "already searched for and produced" all of the foreign licensing contracts in its possession. (*See* **Exhibit 17**).  Should this prove true, then MTV should be required to produce a corporate representative capable of explaining why there have apparently been over 100 foreign broadcasts of Making the Band without any corresponding contracts.

seasons of Making the Band were exhibited, it does not specify whether the broadcast was by an MTV affiliate or a third-party. Third, the list does not identify the station or foreign programming service which broadcast the show. This information was sought in Trans Continental's Notice of Taking Deposition and should have been provided by a properly prepared corporate representative. Trans Continental needs and is entitled to discover this information.

Having failed to sufficiently cure the deficiencies in Mr. Hazzard's deposition testimony, MTV should be compelled to produce a properly prepared corporate representative capable of fully answering questions relating to topics 43 through 49.

## IV.    SANCTIONS ARE WARRANTED

MTV's blatant disregard for the discovery process should not go unchecked.  Federal courts in the Eleventh Circuit are authorized to deal harshly with parties who refuse to comply with their discovery obligations. *See Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.*, 2010 WL 55595, *2 (M.D. Fla. Jan. 5, 2010) (awarding $75,000.00 in attorneys' fees and costs and striking plaintiff's claim for damages).  Rule 37 sanctions are imposed to ensure the integrity of the discovery process and to prevent unfair prejudice to the litigants. *Marcelle v. American Nat'l Delivery, Inc.*, 2009 WL 4349985, *1 (M.D. Fla. Nov. 24, 2009) (awarding sanctions for corporate representative's failure to appear for deposition).   "A reading of [Rule 37] leads to the inescapable conclusion that the award of expenses is mandatory as a party whose conduct necessitated a motion to compel discovery ..., unless the courts finds that the opposition to the motion was substantially justified." *Cal. Dive Int'l, Inc. v. M/V Tzimin*, 127 F. R.D. 213, 217 (S.D. Ala. 1989) (quoting *Merritt v. Int'l Brotherhood of Boilermakers*, 649 F.2d 1013, 1019 (5th Cir. 1981)).  A court may award fees and costs, strike pleadings, dismiss the action, or

render a default judgment against the disobedient party for failure to abide by Rule 30(b)(6). Fed. R. Civ. P. 37(c)(1).

MTV unquestionably cannot present the Court with any "substantial justification" to excuse its blatant contravention of Rule 30(b)(6). Even if there were "substantial justification" to pardon MTV's obstructionist behavior during the discovery stay (which there is not), MTV's behavior over the past two (2) months is itself an affront to the integrity of the discovery process and cannot be "substantially justified" under any reasonable interpretation. The Court should not condone MTV's persistent noncompliance with the discovery requirements of the Federal Rules of Civil Procedure and should sanction it accordingly. Indeed, sanctions "serve as an adequate reminder of the obligations of litigants and their counsel to conduct litigation in this Court in a spirit of cooperation and not obfuscation." *Omega Patents,* 2006 WL 2038534 at *5. Rule 37, at its core, protects a court's institutional values. *Bray & Gillepsie,* 2010 WL 55595 at *2.

MTV's dilatory tactics have needlessly driven up the costs of this litigation and can neither be condoned nor permitted to continue. Though the Court is plainly authorized to strike MTV's answer and affirmative defenses, Trans Continental does not request such a harsh remedy at this time. *See* Fed. R. Civ. P. 37(c)(1). Instead, to deter MTV's abusive tactics, Trans Continental requests that the Court sanction MTV for its repeated violation of the Federal Rules of Civil Procedure by requiring MTV to reimburse: (1) Trans Continental for the costs incurred in preparing this Motion (including the good faith conferences); (2) for the futile depositions it has already taken; and (3) for preparing for the re-deposition of the additional Rule 30(b)(6) corporate representatives. *See Quantachrome,* 189 F.R.D. at 699; *Fox,* 2007 WL 2819525 at *2-*3; *Otero,* 2006 WL 3535149 at *3-*4.

24

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Trans Continental respectfully requests that this Court enter an

order:

(a)    Granting its Motion to Compel Better Testimony from MTV's Federal
Rule of Civil Procedure 30(b)(6) corporate representative on Topic Nos.
11, 23-42 and 43-49;

(b)    Compelling MTV to re-designate additional corporate representatives
capable of providing full, complete and binding answers on Topic Nos. 11,
23-42 and 43-49;

(c)    Directing that these additional corporate representatives be produced for
deposition in Miami, Florida;

(d)    Ordering MTV to produce all written evidence of the payments it made to
Diddy in advance of the deposition of the corporate representative on
Topic No. 11;

(e)    Ordering MTV to produce the most recent account statements in its
possession relating to the Musical Acts, and the foreign and domestic
distribution of Making the Band in advance of the deposition of the
corporate representative on Topic Nos. 23-42;

(f)    Ordering MTV to produce any license, affiliate, program sales and/or
distribution agreement relating to Making the Band, which it has not yet
produced in advance of the deposition of the corporate representative on
Topic Nos. 43 through 49 (alternatively, to the extent that MTV's
counsel's representation that all of the licensing and distribution
agreements relating to Making the Band have been produced is true, MTV
should be compelled to provide a verified explanation as to why there
have apparently been over one hundred (100) foreign broadcasts of
Making the Band without any corresponding contracts);

(g)    Mandating that MTV pay for the substantial costs incurred by Trans
Continental's in connection with its good faith efforts to resolve this
matter without motion practice, in preparing this Motion, for preparing
and taking the past futile Rule 30(b)(6) depositions, and for preparing for
the re-deposition of these additional corporate representatives; and

(h)    Granting such other and further relief as the Court deems is just and
proper.

## VI.   **GOOD FAITH CERTIFICATION**

As reflected in the letters and e-mails attached hereto, Trans Continental has tirelessly attempted to resolve the discovery issues raised in this Motion with MTV's counsel.   These efforts led to MTV's provision of un-tethered and, ultimately, unfulfilled promises.  When MTV refused to fully agree with Trans Continental's proposed Stipulation or respond, in any way, to Trans Continental's March 10, March 12 and March 16, 2010 overtures (*see* Exhibit 9), Trans Continental had no choice but to file this Motion.

Respectfully submitted,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for plaintiff, *Soneet Kapila in his capacity as the federally appointed Chapter 11 Trustee charged with administrating the bankruptcy estate of Trans Continental Television Productions, Inc.*
The Four Seasons Tower
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131-1704
Telephone:  (305) 377-1666
Facsimile:  (305) 377-1664
jsammataro@kasowitz.com


By:  /s/ James G. Sammataro
     James G. Sammataro
     Florida Bar Number: 0520292
     Courtney Caprio
     Florida Bar Number 0933961

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 29, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a notice of the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF to:

Andrew J. Ehrlich, Esq.
aehrlich@paulweiss.com
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile: (212) 757-3990

Brian A. McDowell, Esq.
brian.mcdowell@hklaw.com
Holland & Knight, LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
200 South Orange Avenue
Suite 2600
Orlando, Florida 32801
Telephone:  (407) 425-8500
Facsimile: (407) 244-5288

Jonathan Davis, Esq.
Jonathan D. Davis, P.C.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
99 Park Avenue, Suite 1600
New York, New York 10016
Telephone: (212) 687-5464
Facsimile: (212) 557-0565

Steven J. Solomon, Esq.
Gray Robinson, P.A.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
1221 Brickell Avenue, Suite 1650
Miami, Florida
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

/s/ James G. Sammataro
*Attorney*