## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

**LOUIS J. PEARLMAN,** *et al.*

                **Debtor.**

_____ /

**SONEET KAPILA, Chapter 11 Trustee for
TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,**

                **Plaintiff,**

v.

**MTV NETWORKS, a division of Viacom,
International, Inc.**

                **Defendant.**

**Case No. 6:10-cv-181-Orl-28-DAB**

_____ /

## TRANS CONTINENTAL'S MOTION TO COMPEL BETTER INTERROGATORY RESPONSES, INITIAL DISCLOSURE DOCUMENTS AND REQUEST FOR <u>EXPEDITED CONSIDERATION</u>

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, Middle District of Florida, Local Rule 3.01 and Rule 7037-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, Soneet Kapila, as the Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental"), hereby moves this Court to compel defendant, MTV Networks, to provide better answers to Interrogatory Requests Nos. 6-8, 10-18, 20-22 of Trans Continental's First Set of Interrogatory Requests and Interrogatory Requests Nos. 23 through 25 of Trans Continental's Second Set of Interrogatory Requests, as well as MTV's promised Initial Disclosures documents as required by Fed. R. Civ. 26, and to award Trans Continental its attorneys' fees and costs reasonably incurred in bringing

this motion pursuant to Federal Rule of Civil Procedure 37(a)(4)(A).

## I.   **INTRODUCTION**

*The Federal Rules of Civil Procedure establish a liberal system of discovery "meant to insure that no relevant fact remain[s] hidden."* [1]

*"The concept of trial by ambush has long ago fallen into desuetude in both state and federal courts."* [2]

Loaded terms such as "stonewalling" or "obstructionist" are often too casually lobbed during the course of heated advocacy.   These are not words that the undersigned treats lightly. Regrettably, this is one such instance where the terms are appropriate.  In a transparent attempt to evade the vast majority of Trans Continental's Interrogatory Requests, MTV inappropriately seeks refuge behind Fed. R. Civ. 33(d), and attempts to point Trans Continental to documents which purport to contain the information requested by the Interrogatory Requests.   In so doing, MTV ignores the important, and well-defined, limitations placed on a parties' ability to invoke Fed. R. Civ. P. 33(d) – including that: (a) the burden of deriving the answer must be substantially the same for the party serving the interrogatory as for the party served; (b) that if an answer is readily available in a more convenient form, Rule 33(d) cannot be used to avoid giving the ready information to the requesting party; and (c) most importantly, that the produced documents must actually contain information which completely and fully answers the interrogatory requests.

Here, MTV's identified documents amount to no more than a prohibited "document dump," and do not come even remotely close to answering the Interrogatory Requests.   Any claim to the contrary is self-discrediting.   Highlighting this fact are the documents which MTV identified as responsive to Request Nos. 8, 10 and 11.   MTV claims that Trans Continental's

---

[1]   *Crawford v. Dominic*, 469 F. Supp. 260, 262 (E.D. Pa. 1979).

[2]   *In re Sulfuric Acid AntiTrust Litigation*, 231 F.R.D. 331, 342 (N.D. Ill. 2005).

request as to the amount of net and gross profit that MTV made in connection with *Making the Band 2, 3* and *4* can be ascertained from a review of MTVN-000289-000360 and MTVN-001609-001680. *Of these 142 pages, 126 have been redacted in full – without any explanation. MTV's proposed response is, thus, to produce 126 blank pages.*    The remainder of the identified documents fare no better in that they are either redacted to the point of being incapable of communicating any meaningful information; or expressly limited to seasons one and two of *Making the Band* – the only two seasons *not* in dispute.    Simply stated, not a single page of the identified documents evidences the profit earned from *Making the Band 2, 3* and *4*.

This is a simple case: either MTV owes Trans Continental money in connection with the television series, *Making the Band*, or it does not.    MTV strenuously professes it is the latter. Yet, despite this protestation, MTV offers no financial transparency, refusing to answer even the most basic financial questions relating to *Making the Band*.    MTV refuses, for example, to state how much revenue was realized from the licensing (Request No. 7) and distribution (Request Nos. 6, 16-18) of *Making the Band* or the advertising contained therein (Request Nos. 13-15, 20, 22).    MTV also refuses to state how much profit (Interrogatory Nos. 8, 10, and 11) has been earned as whole in connection with *Making the Band*.    MTV also fails to state the costs of producing the show (Request Nos. 23-25) – despite the fact that its own documents (however sporadic, and incomplete) reveal that this information has already been computed and is readily available.

This Motion – and, indeed, this *entire* case – can be easily resolved if MTV simply states the revenue, expenses, production costs, and profits relating to *Making the Band*.    Curiously, MTV proposed to do just this in its Initial Disclosures, promising to provide "[a] Summary of Net Proceeds on a season-by-season basis since *Making the Band I,* Season Three."    Apparently,

MTV thought better of this (presumably, because these summaries do not support its position that no profits were realized), as it has since refused to provide the promised Summaries despite four (4) written requests to do so (true and correct copies of the undersigned's requests are attached hereto as composite **Exhibit A**).

Trans Continental is undeniably entitled to discover *Making the Band*'s revenue, expenses, production costs and profits, and it is entitled to receive this information in a narrative form. Anything short of ordering MTV to provide this information in narrative form places Trans Continental at a severe disadvantage, and leaves it susceptible to trial by ambush.

## II.    FACTUAL BACKGROUND

On January 7, 2000, Trans Continental and MTV belatedly memorialized their contractual agreement to ***jointly develop*** and ***co-produce*** an episodic television series about the making of a boy-band. (A true and correct of the January 7, 2000 letter agreement is attached hereto as **Exhibit B**). The series, ultimately titled, *Making the Band*, was to air on American Broadcasting Company ("ABC").

The first season of *Making the Band* aired in late 1999, and was broadcast on Friday night as part of ABC's prime-time programming. The show was centered upon Trans Continental's president, Louis J. Pearlman's – the then indisputable king of boy bands – search for the next boy band. In what has become typical reality-show fashion, the show chronicled the real-life competition between young men vying to become members of the band. As the season unfolded, the pool of contestants was narrowed to eight young men and, then, ultimately to the five winners. The final five men formed a band entitled "O-Town." In addition to capturing the initial competition, Season One of *Making the Band* tracked O-Town's early development, including the recording of O-Town's self-titled debut CD, *O-Town*.

Boosted by the popularity of the television series, *O-Town* sold more than two million copies. Its first single, *Liquid Dreams*, was the first song to ever reach Number One on the Billboards single sales chart without making the airplay chart. Almost overnight, O-Town had become the next great boy band. In turn, *Making the Band* was a smashing success. *Making the Band's* ratings were strong enough to warrant a second season, which further tracked the band's development and struggles, including O-Town's tours, performances, the creation of their second CD, *O2*, and their transition to a new record label. Season Two of *Making the Band* was ground-breaking in that it marked the first time the main cast of a reality show returned for a second season.

Worth emphasizing is that *Making the Band* was not merely a show made by MTV about Lou Pearlman and O-Town. It was a co-production between MTV and Trans Continental. Trans Continental invested money in the development of the idea, the story line, and the production of the television series. Trans Continental was a co-owner of the show and had a financial interest in all of the products that originated from the program.

In recognition of this fact, the Agreement stipulated that MTV and Trans Continental "will *jointly* exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation." (*See* Exhibit B at ¶ 14) (emphasis added). The Agreement also provided that "all business deals relating to the Series and Band and ancillary rights therefrom must be approved by both parties." (*Id.* at ¶ 15).

*Making the Band* was scheduled to run for a third season on ABC, when Walt Disney World, Inc. ("Walt Disney") acquired ABC. Walt Disney is a direct competitor of Viacom, MTV's parent company. As a consequence, MTV objected to renewing the licensing agreement

with ABC, and approached Trans Continental about amending the agreement to permit the broadcast of Season Three of *Making the Band* on MTV's television station.

Trans Continental was understandably reticent to make the switch.    Seasons One and Two of *Making the Band* had achieved substantial ratings during prime time on a major network. For all its success, MTV was not (and is not) ABC.    It does not have the same drawing power. Moreover, ABC's airing of *Making the Band* was tremendously profitable for Trans Continental.[3]  Nonetheless, MTV successfully cajoled Trans Continental to amend the parties' Agreement.

On November 15, 2001, Trans Continental and MTV entered into an amended agreement (the "Amended Agreement"), a true and correct copy of which is attached hereto as **Exhibit C**. The Amended Agreement altered a number of the original Agreement's provisions.    In particular, the Amended Agreement provided that *Making the Band* was to be aired on MTV Networks; specified a new mechanism by which Trans Continental was to be compensated; and required MTV to account to Trans Continental on a semi-annual basis. "Except as amended [by the Amended Agreement], all of terms of the Agreement shall remain in full force and effect." (*See* Exhibit C, at p. 4).

With the Amended Agreement in place, a third season of *Making the Band* aired on MTV Networks in January of 2002.    Season Three of *Making the Band* followed O-Town as they opened for Britney Spears and recorded their next album.    The third season was the last season of *Making the Band* which featured O-Town.

---

[3]    By way of example, on December 3, 2001, MTV provided Trans Continental with a check for $725,064.85 for Trans Continental's share of the proceeds related to seasons one and two of *Making the Band*.    According to MTV Records, this amount was comprised as follows: $87,803.00 in merchandising revenues (Trans Continental had already received a $100,000.00 advance in merchandising revenue), $458,011.85 in connection with international program sales, and $179,250.00 as part of ABC's licensing fee.    Trans Continental also separately received $330,000.00 from record advances to off-set the expenses it incurred in connection with band development and related expenses.

Season Three of *Making the Band* was also the last season in which Trans Continental was permitted to have any involvement in *Making the Band*.   Despite the success of *Making the Band*, and despite Trans Continental's interest in future seasons of *Making the Band*, MTV unilaterally – and unceremoniously – dumped Trans Continental, replacing it with hip-hop star, Sean Combs (professionally known as "Puff Daddy," "Puffy," "P-Diddy" and, most recently, "Diddy") (hereinafter, "Diddy").

*Making the Band II* chronicled Diddy's search to find the best rappers and singers from which to assemble a new hip-hop group.   When Trans Continental belatedly learned that it was being unilaterally cut-out of *Making the Band II*, it demanded an explanation from MTV.   MTV assured Trans Continental that bringing Diddy into the fold was in Trans Continental's best interests, as it would bring a fresh face to *Making the Band* and insure the long-term profitability of the franchise.   MTV was correct in its assertion that Diddy's involvement would prolong the viability of *Making the Band*.   *Making the Band 4* just completed its third season.   All told, there have been twelve (12) seasons of *Making the Band*, and plans for the first season of *Making the Band 5* are presently being hashed-out.

Trans Continental, however, did not receive the promised benefit from Diddy's involvement.   Instead, for reasons that are only known to MTV, MTV unilaterally excluded Trans Continental from the creative process and, worse, failed to pay Trans Continental a single penny in connection with Season Three of *Making the Band*, *Making the Band 2* (seasons 1, 2 and 3), *Making the Band 3* (seasons 1, 2 and 3), and *Making the Band 4* (seasons 1, 2 and 3).   In fact, MTV did not even bother to submit the contractually required accounting statements.

When pressed by the Trustee's counsel to explain its actions, MTV asserted that Trans Continental was not entitled to any proceeds from *Making the Band 2, 3* or *4*, as the contracts

were limited solely to the seasons involving O-Town.   This contention was consistent with the position that MTV had taken with Trans Continental prior to the bankruptcy.  (A true and correct copy of MTV's September 28, 2005 correspondence is attached hereto as **Exhibit D**).   Reminded that the parties' Agreement expressly provides Trans Continental and MTV were to *"jointly* exploit any *features, spin-offs, sequels*, made-for-TV-movies, direct to video, non-theatrical, radio or *other projects based on the Series* or the band, subject to good faith negotiation," (*see* Exhibit B at ¶ 14) (emphasis added), MTV quickly changed its posture. MTV's new position is that were no net proceeds for any of the ten (10) seasons in question – an incredible assertion in that it stretches the imagination that MTV would make ten (10) additional seasons of *Making the Band* and continue to commit prime-time hours to the program, if it was not profitable.

    In an attempt to delve into the accuracy of MTV's implausible contention, Trans Continental respectively propounded its First and Second Set of Interrogatory Requests, on October 31, 2008 and November 11, 2008.[4]  In response, MTV provided its respective responses to Trans Continental's Interrogatory Requests on December 3, 2008.   Thereafter, on December 12, 2008, the parties met and conferred in a good faith attempt to resolve their differences over the perceived deficiencies in MTV's response to Trans Continental's First Set of Interrogatory Requests.   As a consequence of this conference, MTV provided its Supplemental Response to Trans Continental's First Set of Interrogatory Requests on December 16, 2008.[5]   On December 15, 2008, MTV provided its Responses to Trans Continental's Second Set of Interrogatory Requests.

---

[4]    Pursuant to M.D.L.R. 3.04, each of these interrogatory requests, as well as MTV's corresponding objections and responses are quoted in full.

[5]    For the Court's convenience, in the instances where MTV provided a supplemental response, Trans Continental provided only MTV's supplemental response to the specific interrogatory request.

In contrast to what one would expect if no money was actually owed, MTV has not evinced a willingness to provide financial transparency. In fact, to the contrary as documented throughout this Motion, MTV is insistent on obfuscating the true financial picture – a reality which has necessitated the filing of this Motion.

## III.  MEMORANDUM OF LAW

### 1.  Discovery Rules Are to Be Afforded "Broad and Liberal Construction."

As an initial matter, the scope of discovery is far broader than MTV claims. The Federal Rules of Civil Procedure establish a liberal system of discovery "meant to insure that no relevant fact remain[s] hidden." *Crawford v. Dominic*, 469 F. Supp. at 262. The Federal Rules of Civil Procedure mandate the disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, therefore ensuring a fair and just result. *See United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (U.S. 1958). As long-ago explained by the United States Supreme Court:

> No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all of the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.

*Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

"The concept of trial by ambush has long ago fallen into desuetude in both state and federal courts." *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. at 342; *United States v. Proctor & Gamble*, 356 U.S. at 682 (The federal rules were intended to "make trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.")

To this end, Rule 33 of the Federal Rules of Civil Procedure allows any party to serve on any other party written interrogatories concerning matters within the scope of Fed. R. Civ. P. 26(b).    The scope of discovery under Rule 26(b) is broad: "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Under Rule 26, relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.*, 2007 WL 1526649, * 2 (S.D. Fla. May 22, 2007)  ("Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action.").  *See also, Rhone-Poulenc Rorer, Inc. v. Aetna Casualty & Surety Co.*, 1992 WL 394425, * 3 (E.D. Pa. Dec. 28, 1992) ("[D]iscovery requests may be relevant if there is any possibility that the information may be relevant to the general subject matter of the action.   As a result, discovery rules are to be accorded broad and liberal construction.")

Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues."  *Oppenheimer Fund*, 437 U.S. at 352. Information can be relevant and therefore discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. *Dunbar v. United States*, 502 F.2d 506 (5th Cir. 1974).  *See Farnsworth v. Proctor & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985) ("[t]he Federal Rules of Civil Procedure strongly favor full discovery whenever possible."); *Canal Authority v. Froehlke*, 81 F.R.D. 609, 611 (M.D. Fla. 1991) (same).

The party resisting discovery bears the burden of establishing facts sufficient to justify its

objections:

> The party resisting discovery bears the burden of demonstrating that its objections should be sustained, and pat, generic, non-specific objections, intoning the same boilerplate language, are inconsistent with both the letter and the spirit of the Federal Rule of Civil Procedure.   An objection to a [discovery] request must clearly set forth the specifics of the objection and how that objection relates to the [discovery] being demanded. The objecting party must do more than intone the familiar litany that the [discovery is] burdensome, oppressive or overly broad. Instead, the objecting party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [discovery request] is not relevant or how each [discovery request] is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.

*Financial Business Equipment Solutions, Inc. v. Quality Data Systems, Inc.*, 2008 WL 4663277, * 2 (S.D. Fla. October 21, 2008). *See also*, Fed. R. Civ. P. 33(b)(4); *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000) ("The party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information.").

Conclusory recitation of "expense and burdensome" without specificity provides no basis for the court to order limitations upon the discovery sought. *Panola Land Buyers Ass'n v. Shuman*, 762 F. 2d 1550, 1559 (11th Cir. 1985). Instead, to even merit consideration, "an objection must show specifically how a discovery request is overly broad, burdensome or oppressive, by submitting evidence or offering evidence which reveals the nature of the burden." *Oliver v. City of Orlando*, 2007 WL 3232227 (M.D. Fla. 2007), * 2 (Baker, J.) (citing *Coker v. Duke & Co.*, 177 F.R.D. 682, 686 (M.D. Ala. 1998)); *Action Nissan, Inc. v. Hyundai Motor America, Inc.*, 2008 WL 111307 (M.D. Fla. Jan. 8, 2008) (Spaudling, J). *See generally*, *Alexander v. F.B.I.*, 192 F.R.D. 50, 53 (D. D.C. 2000) (an objection to an interrogatory on the ground of "undue burden" must be coupled with a specific detailed showing as to how the interrogatory is burdensome); *Etienne v. Wolverine Tube, Inc.*, 185 F.R.D. 653, 656 (D. Kan.

1999) (mere assertion of "overbroad" does not adequately state objection); *Josephs v. Harris Corp.*, 677 F. 2d 985, 992 (3d Cir. 1982) (the mere statement by a party that the discovery sought is overly broad, burdensome, oppressive, vague or irrelevant is "not adequate to voice a successful objection.").

### 2.    MTV's Misplaced Reliance on Fed. R. Civ. P. 33(d).

Rather than provide traditional, narrative responses to Trans Continental's Interrogatory Requests, MTV attempts to rely upon Federal Rule Civil Procedure 33(d), and answer all but three (3) of the Requests[6] by pointing Trans Continental to documents which purportedly contain the requested response.    In so doing, MTV demonstrates a fundamental misunderstanding of Fed. R. Civ. P. 33(d), and ignores the important, and well-defined, limitations placed on a parties' ability to invoke Fed. R. Civ. P. 33(d).    In fact, the law is abundantly clear that Rule 33(d) is available only if several prerequisites are met.

### A.    Four Prerequisites Must Be Met Before a Party Can Rely Upon Rule 33(d) in Lieu of Providing Narrative Interrogatory Responses.

The first prerequisite is that responding party must affirm that the information sought by the interrogatory is, in fact, available in the specified records.    As noted in *Budget Rent-A-Car of Missouri, Inc. v. Hertz Corp.*, "Rule 33 cannot ... be used as procedural device for avoiding the duty to give information by shifting the obligation to find out whether information is ascertainable from the records that have been tendered."    55 F.R.D. 354, 357 (W.D. Mo. 1972). As further explained *In re Master Key Litigation*:

> Since a respondent is required to answer proper interrogatories, it is not plausible to assume that a response that an answer may (or may not) be found in its records, accompanied by an offer to permit their inspection is sufficient.    This is little

---

[6]    MTV relies upon Fed. R. Civ. P. 33(d) in response to nineteen (19) of the twenty-two (22) interrogatory requests, which they provided responses to.

more than an offer to play the discredited game of blindman's bluff at the threshold level of discovery. * * *

[Rule 33(d)] does not shift to the interrogatory party the obligation to find out whether sought after information is ascertainable from the files tendered, but only permits a shift of the burden to dig it out once the respondents have specified the records from "where the answer" can be derived or ascertained.

53 F.R.D. 87, 90 (D. Conn. 1971).

The second prerequisite is that the responding party must demonstrate the answering the interrogatory in the traditional manner would impose a burden on it.   As repeatedly held by countless courts, Rule 33(d) is implicitly limited to situations in which answering the interrogatory would impose a *significant burden* on the responding party.   *See Sabel v. Mead-Johnson Company, Inc.*, 110 F.R.D. 553, 556 (D. Ma. 1986) ("The next prerequisite for invoking the Rule 33(c)[7] option is that there be a burden on the interrogated party if it were required to answer the interrogatories in the traditional manner.   This prerequisite, although not explicitly contained in the rule, is implicit in its provisions."); *Budget Rent-A-Car*, 55 F.R.D. at 358 (compelling Hertz to provide a traditional interrogatory response in that the "interrogatory can be easily answered …by simple reference to materials within its possession and patently does not present a situation in which [Hertz] would be required to "engage in burdensome or expensive research into its own business records."). *Compare Concept Indus., Inc. v. Carpet Factory, Inc.*, 59 F.R.D. 546 (E.D. Wis. 1973) (where 1,000 man-hour search would be required to comply with the interrogatory request, the responding party may properly rely upon Rule 33(c)").[8]   If no

---

[7]    Rule 33(d) was formerly Rule 33(c).

[8]    *See also, Pascale v. G.D. Searle & Co.*, 90 F.R.D. 55, 61 (D. R.I. 1981) ("Before determining whether the burden of deriving information from business records is substantially the same for both parties, the first question under [Rule 33(d)] is whether there exists a 'burden' at all within the meaning of the rule.   An interrogated party can only rely on [Rule 33(d)] only if there is some burden involved in compiling or extracting the requested information."). *See generally, Continental Illinois National Bank & Trust Co. v. Caton*, 136 F.R.D. 682, 685 (D. Kan. 1991) ("All discovery requests are a burden on the party who must respond thereto.   Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the answering or producing

such burden exists, then the answering party is required to provide a narrative response.

The third prerequisite needed to invoke Rule 33(d) appears on the face of the rule: the burden of deriving or ascertaining the answer must be substantially the same for the party serving the interrogatory as for the party served.   *See Reliance Ins. Co. v. Core Carriers, Inc.,* 2008 WL 2414041 (M.D. Fla. June 11, 2008) (Richardson, J.); *Morock v. Chautauqua Airlines, Inc.,* 2007 WL 4247767 (M.D. Fla. August 23, 2007), * 2 (Pizzo, J.) (same); *Roger Kennedy Construction v. Amerisure Ins. Co.,* 2007 WL 1839394 (M.D. Fla. June 26, 2007) (Spaudling, J.) (same). The rule requires a determination that the effort necessary for the interrogatory party to obtain the information from these records would be greater than the burden on the responding party to undertake the same task.

This means that if another more convenient method for obtaining the information exists, it should be used.   *See Daiflon, Inc. v. Allied Chem. Corp.,* 534 F.2d 221, 226 (10th Cir. 1976), *cert. denied*, 97 S. Ct. 239 (U.S. 1976) ("[I]f an answer is readily available in a more convenient form, Rule 33(c) should not be used to avoid giving the ready information to a serving party."). For example, where the responding party has already culled the requested information, or already possesses such information, then this compels a finding that it would be substantially more burdensome for the inquiring party to compile the information. *See Atlanta Fixture & Sales Co. v. Bituminous Fire & Marine Ins. Co.,* 51 F.R.D. 311, 312 (N.D. Ga. 1970) ("Plaintiff's use of Rule 33(c) option implied that the proffered records were the *only source* for the requested information.   [This] Court warns that if it later appears that the plaintiff does, in fact, have available responsive information in a more convenient form that would justify sanctions.") (emphasis added).

---

party to bear that burden.").

Finally, the last prerequisite is that the responding party must specify, with sufficient detail, which records contain the information sought by the interrogatory.    This Court has repeatedly ruled that this requirement mandates an identification of the exact pages in which the answers may be found.  *See, e.g., LeBlanc v. Unifund CCR Partners, G.P.*, 2007 WL 2446900 (M.D. Fla. 2007) (McCoun, J.) * 2 (ordering the plaintiff to "supplement his response to specifically identify those documents responsive to this interrogatory"); *Reliance Ins. Co.*, 2008 WL 2414041 at * 3 ("However, in order to utilize this provision, the responding party must (I) specify 'the records that must be reviewed in sufficient detail to enable the interrogatory party to locate and identify them as readily as the responding party could'"); *Border Collie Rescue, Inc.*, 2005 WL 662724, * 2 (M.D. Fla. 2005) (Synder, J.) ("to the extent plaintiffs are to use business records as their response to this question, they must provide sufficient information to allow defendant 'to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.'")

B.    **Even When Theses Prerequisites Are Met, Reliance on Rule 33(d) is Only Appropriate in Connection with Certain Interrogatory Requests.**

Even when the above-referenced prerequisites are met, reliance on Rule 33(d) is only appropriate when the interrogatory requests objective facts that are *obvious* from the specified documents.  *See United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 419 (D. Md. 2005) (stating that Rule 33(d) is "well-suited to reply to inquiries of an intensely objective nature," but is inappropriate where "the interrogatories pose questions of fact or mixed questions of law and fact which require the exercise of particular knowledge and judgment on the part of the responding party."); *U.S. S.E.C. v. Elfindepan, S.A.*, 206 F.R.D.  574, 576-77 (M.D.N.C. 2002) ("[D]ocuments themselves rarely, if ever, reveal contentions of fact or law ... Rule 33(d) was

intended to be used in the situation where an interrogatory makes broad inquiries and numerous documents must be consulted to ascertain facts, such as identities, quantities, data, action, tests, results, etc.").

MTV has not met these prerequisites.   Moreover, as discussed below, MTV's attempt to resort to Fed. R. Civ. P. 33(d) is inappropriate in that the identified documents: (a) do not provide the requested information; and (b) are an inadequate substitute given demonstrable evidence that MTV readily possesses the requested information.

## IV.    <u>SPECIFIC INTERROGATORIES</u>

### <u>INTERROGATORY NO. 6</u>:

Identify with specificity each and every individual or entity, including any and all MTV-related, sister or affiliated entities, which have been involved, in any way, in the distribution (both foreign and domestic) of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*.

### <u>MTV'S RESPONSE</u>:

Pursuant to Federal Rule of Civil Procedure 33(d) and subject to the parties' confidentiality agreement, the answer to this interrogatory may be determined by examining the documents produced by MTVN in response to Request No. 68 of Plaintiff's First Request for Production of Documents and Things.

### <u>The Basis for the Motion to Compel</u>:

As noted above, in order to rely upon Fed. R. Civ. P. 33(d), the answering party must "specifically identify" the documents responsive to the interrogatory.  *See, e.g., LeBlanc* 2007 WL 2446900 at * 2 (ordering the plaintiff to "supplement his response to specifically identify those documents responsive to this interrogatory"); *Reliance Ins. Co.*, 2008 WL 2414041 at * 3

("However, in order to utilize this provision, the responding party must (1) specify 'the records that must be reviewed in sufficient detail to enable the interrogatory party to locate and identify them as readily as the responding party could'"); *Border Collie Rescue, Inc.*, 2005 WL 662724 at * 2 ("to the extent plaintiffs are to use business records as their response to this question, they must provide sufficient information to allow defendant 'to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.'"")

Despite supplementing its Responses to, among others, Request Nos. 5, 7, 8, 10 and 11, to provide the specific bates-stamped pages where the answers could be purportedly located, MTV did *not* supplement its Response to Interrogatory No. 6.   Instead, MTV stood by its original response, which merely provided that "the answer to this interrogatory may be determined by examining the documents produced by MTVN in response to Request No. 68 of Plaintiff's First Request for Production of Documents and Things."   This is insufficient – particularly in that, in producing its documents, MTV has not segregated the documents per response.   There is not, for example, a slip of paper which identifies which documents are responsive to Request No. 68.   Nor are the documents which purport to be responsive to Request No. 68 grouped together.   As such, Trans Continental is left to sift through the 3,723 pages which MTV has produced to date and guess which one of these pages MTV believes are responsive to Request No. 68.   Having done so, Trans Continental is left with the same conclusion as MTV: there are absolutely no documents from which the answer to this Request can be ascertained.   As such, MTV should be directed to provide a narrative response to Interrogatory Request No. 6.

**INTERROGATORY NO. 7:**

Identify with specificity each and every individual or entity, including any and all MTV-

related, sister or affiliated entities, which have been involved, in any way, in the licensing of the television programs, *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*, and/or any merchandise or ancillary, allied or after-market products (*e.g.,* DVDs and other products relating to the home video market) relating to any season of *Making the Band*, *Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.

## MTV'S SUPPLEMENTAL RESPONSE:

Pursuant to Federal Rule of Civil Procedure 33(d) and subject to the parties' confidentiality agreement, the answer to this interrogatory may be determined by examining the documents produced by MTVN in response to Request No. 70 of Plaintiff's First Request for Production of Documents and Things, MTVN 000539-000572, 000587-000588, 000685-000686, 001495-001496, 001700, 001926-001927, 001965-001998.

## The Basis for the Motion to Compel:

Contrary to MTV's suggestion, an answer to Interrogatory Request No. 7 cannot be derived by an examination of the documents bates-stamped MTVN 000539-000572, 000587-000588, 000685-000686, 001495-001496, 001700, 001926-001927, 001965-001998, copies of which are attached hereto as composite **Exhibit E.**[9]   To the contrary, these documents are entirely irrelevant – so much so, as to raise serious questions as to MTV's sincerity in designating these documents.

MTVN 000539-000572, MTVN 001926-001927 and MTVN 001965-001998 do not specify which entities have paid MTV a fee in connection with the licensing of any season (or episode) of *Making the Band*.    By way of example, VH-1 has broadcast *Making the Band*

---

[9]    Pursuant to MTV's previously-filed Motion for Permission to File Certain Exhibits Under Seal [D.E. 15], Exhibits E, F, G, H, J, K and L to this Motion have been filed under seal.    Additionally, in order to protect the substance of these documents, this Motion refrains from referencing the specific information contained in these documents.

Marathons, airing multiple episodes on a consecutive basis. This Request endeavors to learn the mechanism by which VH-1 acquired the rights to broadcast these episodes of *Making the Band*, as well as whether this broadcast resulted in revenue for MTV.    The documents designated by MTV do not answer this or any similarly-related questions.

Instead, these documents detail the licenses which MTV needed to acquire in order to clear the rights to the music used by MTV in episodes of *Making the Band*.    MTVN 000587-000588, MTVN 000685-000686, MTVN 001495-001496, and MTVN 001965-001998 are equally inapplicable, as they relate to Bad Boy Records granting of a non-exclusive license to MTV to use the music owned by Bad Boy Records in episodes of *Making the Band*. MTVN001700 relates to the license fees paid by MTV to ABC.

Again, Interrogatory No. 7 seeks information about the money which MTV made from licensing episodes of *Making the Band*, not the money MTV paid in order to clear the rights in the music incorporated into the episodes.[10]  Having failed to produce any documents from which a full and complete answer to Interrogatory No. 7 can be derived, MTV should be ordered to produce a narrative response to this Request.

## INTERROGATORY NOS. 8, 10 & 11:

### Interrogatory No. 8

Identify with specificity, and on a season-by-season basis, the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, has made in connection with *Making the Band 2*, describing with specificity each and every expense or deduction which was made to gross profit in order to arrive at the net profit figure.

---

[10]    MTV cannot, in good faith, claim confusion as to what was requested by Interrogatory No. 7, as the objective of the Interrogatory was discussed in detail, and at length, during the parties' "meet and confer" conference.

**Interrogatory No. 10**

Identify with specificity, and on a season-by-season basis, the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, has made in connection with *Making the Band 3*, describing with specificity each and every expense or deduction which was made to gross profit in order to arrive at the net profit figure.

**Interrogatory No. 11**

Identify with specificity, and on a season-by-season basis, the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, has made in connection with *Making the Band 4*, describing with specificity each and every expense or deduction which was made to gross profit in order to arrive at the net profit figure.

**MTV'S SUPPLEMENTAL RESPONSE:**

In response to Interrogatory Request Nos. 8-11, MTV provided the same blanket response:

MTVN objects to this interrogatory as burdensome and seeking irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. Pursuant to Paragraph 9 of the Amended Agreement, "with respect to the third season [of Making the Band 1] and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A." In turn, Schedule A of the Amended Agreement defines "Net Proceeds" in a particularized manner, specifying that only certain revenues, expenses and deductions are to be included in the calculation of Net Proceeds. Furthermore, pursuant to Schedule A of the Amended Agreement, Net Proceeds, if any, are to be accounted for on a "semi-annual basis and not a season-by-season basis. Therefore, this interrogatory, which requests MTVN to identify "on a season-by-season basis, the amount of gross and net profit" and to describe "with specificity each and every

expense or deduction," is irrelevant to the Amended Agreement, unduly burdensome and not representative of the parties' intent behind the contract. To the extent this interrogatory does seek the relevant items of revenues, expenses and deductions under the Net Proceeds calculation, pursuant to Federal Rule of Civil Procedure 33(d) and subject to the parties' confidentiality agreement, MTVN refers to the documents produced in response to Request for Production No. 9, MTVN 000001-000087, 000289-000360, 000445-000454, 001609-001680, 001681-001685, 001686-001690, 001692-001693, 001719-001721, 001928-001932.

## The Basis for the Motion to Compel:

### A.    The Requested Documents Are Indisputably Relevant.

MTV's relevancy objection to Request Nos. 8, 10, and 11 is self-discrediting. At issue in this case is whether MTV owes money to Trans Continental in connection with season three of *Making the Band*, *Making the Band 2* (seasons 1, 2 and 3), *Making the Band 3* (seasons 1, 2 and 3) and *Making the Band 4* (seasons 1, 2 and 3). After failing to provide Trans Continental with a single account statement in relation to these ten (10) seasons, MTV is now taking the position that the shows were not profitable and that no money is due and owing to Trans Continental.

In an attempt to gauge the veracity of MTV's dubious contention, Trans Continental propounded Request Nos. 8, 10 and 11, which collectively seek a summary of the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, made in connection with *Making the Band 2, 3* and *4*, as well as summary as to which expenses or deductions were made to gross profit in order to arrive at the net profit figure. Request Nos. 8, 10 and 11, thus, go to the very heart of this case, and are plainly relevant within the meaning of Fed. R. Evidence 401 and Fed. R. Civ. 26(b)(1). MTV cannot with a straight face argue that the information sought by Request Nos. 8, 10 and 11 has "no possible bearing on the claims and

defenses of the parties or otherwise on the subject matter of the action." *Jeld-Wen*, 2007 WL 1526649 at * 1.   *See also, Panola Land Buyer*, 762 F.2d at 1559 (a party resisting discovery must show specifically how each discovery request is not relevant).

### B.    MTV's Burdensome Objection is Unsustainable.

MTV's conclusory "burdensome" objection fares no better.   *Id.* (conclusory recitation of "expense and burdensome" without specificity provides no basis for the court to order limitations upon the discovery sought).  *See also, Convertino v. U.S. Dept. of Justice*, 565 F. Supp.2d 10, 14 (D. D.C. 2008) ("This Court 'only entertains an unduly burdensome objection when the responding party demonstrates how [discovery of] the document is overly broad, burdensome or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden.'") (internal citations omitted).

The crux of MTV's objection is that responding to Request Nos. 8, 10 and 11 would be burdensome because the parties' Amended Agreement specifies a particular mechanism by which MTV was to render its accounting, and that the Interrogatory Requests seek an accounting which differs from this specified mechanism.   This objection is unsustainable as a matter of law.

Indeed, there is no shortage of case law which holds that interrogatories are not objectionable simply because they request information in a form not readily available to the answering party.   *See, e.g., American Oil Co. v. Pennsylvania Petroleum Products Co.*, 23 F.R.D. 680 (D. R.I. 1959); *King v. Georgia Power Co.*, 50 F.R.D. 134 (N.D. Ga. 1970); *Hodgson v. Adams Drug Co.*, 1971 WL 194 (D. R.I. 1971), * 2.   Similarly, the fact that interrogatories involve some degree of work, research or expense does not automatically render them objectionable, especially if they seek information that undoubtedly would be assembled by the

responding party prior to trial in the preparation of the party's own case. *See Burns v. Imagine Films Entertainment, Inc.,* 164 F.R.D. 589, 593 (W.D.N.Y. 1996) ("the fact that answering the interrogatories will require the objecting party to expend considerable time, effort and expense consulting, reviewing and analyzing 'huge volumes of documents and information' is an insufficient basis to object"); *Alexander v. Parsons,* 75 F.R.D. 536, 539 (W.D. Mich. 1977) ("the mere fact discovery is burdensome to [the defendant] is not a sufficient objection to such discovery, providing the information sought is relevant or may lead to the discovery of admissible evidence."). *See also, U.S. v. Nysco,* 26 F.R.D. 159 (E.D.N.Y. 1960) (if interrogatories are relevant, fact that they involve some work and research is not sufficient to render them objectionable); *Seff v. General Outdoor Advertising Co.,* 11 F.R.D. 597 (N.D. Oh. 1951) (the value of the information to the plaintiff outweighed the annoyance and expense to the defendant). *See generally, United States v. Purdome,* 30 F.R.D 338, 342 (W.D. Mo. 1962) ("Defendant also protests that she 'should not be compelled to perform ... burdensome labor on behalf of the plaintiff. That sort of argument is but a protest against the rationale and the spirit of the Rules [of Civil Procedure]. Neither party is ever required to work for the other. The theory of the Rules is that counsel and the Court are jointly engaged in an orderly search for truth in accordance with the best modern procedural devices derived from our ancient heritage of due process of law.")

Additionally, even if responding to these Requests would be burdensome, this burden must be weighed against the needs of the case; the amount in controversy; the parties' respective resources; the importance of the issues at stake in the litigation; and the importance of the proposed discovery in resolving the issues. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii). All of these factors weigh decisively in favor of compelling MTV to provide the requested information.

MTV is part of a billion dollar media conglomerate; was contractually obligated to – but indisputably failed to – provide the requisite accountings; and the requested information *is* the very question of this litigation: what are the realized net profits from the ten (10) subsequent seasons of *Making the Band*? *King,* 50 F.R.D. at 136 (the interrogatories were required to be answered, even though the preparation of the correct answer would be time-consuming and probably costly, since the information was crucial to the issues of the case and was in the exclusive custody of the defendant.)

Further worth noting is MTV's objection to the Requests' description of the profits on a season-by-season is further misplaced to the extent that the request for the information on a "season-by-season" basis was added only after the parties' initial discovery conference during which MTV's counsel described that this was the type of information which MTV would be providing as part of its Initial Disclosure documents. In fact, in its Initial Disclosures MTV promised – but has not yet provided – a "Summary of Net Proceeds on a *season-by-season* basis since *Making the Band I*" (emphasis added) (*see* Exhibit M, *infra*).

### C.     MTV's Reliance Upon Fed. R. Civ. P. 33(d) is Misplaced.

Finally, MTV's attempt to respond to Request Nos. 8, 10 and 11 through the provision of MTVN 000001-000087, 000289-000360, 000445-000454, 001609-001680, 001681-001685, 001686-001690, 001692-001693, 001719-001721, 001928-001932 is not only insufficient, but laughable. As detailed in Section I(A)-(B) above, there are well-defined limitations placed on a parties' ability to invoke Fed. R. Civ. P. 33(d). In the instant case, and for the aforementioned reasons, MTV cannot demonstrate that responding to these Requests would impose a significant burden. Similarly, the burden of deriving or ascertaining the answer must be substantially the same for Trans Continental as it is for MTV. Here, this is plainly not the case. The identified

documents simply do not provide Trans Continental with any basis to determine the amount of profit which MTV is claiming was made – or not made – from the ten subsequent seasons of *Making the Band*.     Conversely, MTV possesses all of the needed information, and merely needs to consult its own books and records in order to ascertain the answers.     *See, e.g., T. N. Taube Corp. v. Midland Mort. Corp.*, 136 F.R.D. 449, 454-55 (D.C.N.C. 1991) ("it becomes clear that defendant's familiarity with its own records is the critical factor to be considered by the court.").

MTV cannot claim that no money is owed to Trans Continental and, then, when asked to substantiate this claim point to a cluster of indefinite and undecipherable documents – copies of which are attached hereto as composite **Exhibit F.**     *See Martin v. Easton Publishing Co.*, 85 F.R.D. 312, 315 (E.D. Pa. 1980) ("[d]efendants are entitled to know the factual content of plaintiff's claims with a reasonable degree of precision."); *In re Savitt/Adler Litigation*, 176 F.R.D. 44, 48 (N.D.N.Y. 1997) ("The interrogatories seek facts, not documents or tangible objects, and the proper form of a response is a narrative answer, not a reference to documents or objects where the answer might be found.")     MTV's actions are equivalent to pointing Trans Continental to a line of hay stacks and advising that the needle is "in there somewhere."     This is the precise activity which Courts have held to be unacceptable.     *See Budget Rent-A-Car of Missouri, Inc.*, 55 F.R.D. at 357     ("Rule 33 cannot … be used as procedural device for avoiding the duty to give information by shifting the obligation to find out whether information is ascertainable from the records that have been tendered").

As the Court's own review of these documents will confirm, these documents simply do not provide any indication – much less than a clear and complete response – of the realized net profits earned from the subsequent seasons of *Making the Band*.     Highlighting this fact are MTVN-000289-000360 and MTVN-001609-001680.     *Of these 142 pages, 126 have been*

*redacted in full – without any explanation.  MTV's proposed response is, thus, to produce 126 blank pages.  This smacks of bad faith, and was plainly intended to give the illusion that MTV was responding to these critical interrogatory requests.*   The remaining 26 pages have also been redacted, but for a total of 62 lines.   This redaction renders these 26 pages absolutely meaningless, as there is no context in which to consider the few numbers which are listed.   To the extent that these documents provide any meaningful information, MTV should be ordered to explain the meaning of these numbers.

The other identified documents fare no better.   On their face, MTVN 000001-000087, MTVN000445-000454, MTVN-001682-001693 and MTVN-001719-001721 are expressly limited to seasons one and two of *Making the Band* – the only two seasons which are *not* in dispute.   In sum, MTV did not provide a single document which evidences the profit earned from *Making the Band 2, 3* and *4.*   These documents confirm that MTV's true intent was to avoid responding to Trans Continental's Interrogatory Requests. and  highlight the need to have MTV espouse its factual contention with precision.

For all of these reasons, MTV should be compelled to provide narrative responses to Request Nos. 8, 10 and 11.

## INTERROGATORY NO. 12:

Identify with specificity the date and amount of each and every payment made by MTV to Diddy (or any entity or corporation affiliated with or related to Diddy) in connection with any season of *Making the Band 2, Making the Band 3* and/or *Making the Band 4.*

## MTV'S RESPONSE:

MTVN objects to this interrogatory because it is burdensome and seeks irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's breach of contract and accounting claims concern whether or not MTVN owes *Plaintiff* any Net Proceeds for *Making the Band 2, Making the Band 3, and Making the Band 4*. (Pursuant to Paragraph 9 of the Amended Agreement, *Making the Band 2, Making the Band 3, and Making the Band 4* are governed by the Net Proceeds formula.) Plaintiff's claim does not concern the payments made by MTVN to Diddy. Indeed, payments made to Diddy by MTVN are not included in the Net Proceeds calculation, as defined in Schedule A of the Amended Agreement. In response to Request for Production Nos. 18-21, and subject to the parties' confidentiality agreement, MTVN is producing contracts between itself and Diddy, which speak for themselves.

**The Basis for the Motion to Compel:**

MTV's burdensome objection fails in that MTV has, once again, failed to offer any evidence revealing the nature of the alleged burden. *See Josephs*, 677 F. 2d at 992 (the mere statement by a party that the discovery sought is overly broad, burdensome, oppressive, vague or irrelevant is "not adequate to voice a successful objection.").

MTV's relevancy objection must similarly be rejected out-of-hand as Interrogatory Request No. 12 is directly targeted towards discovering the veracity of MTV's contention that no money is due and owing to Trans Continental. MTV's espouses that Trans Continental has no need to learn what MTV paid Diddy, as this has no bearing on the amounts which MTV owes Trans Continental. Nothing could be further from the truth. The Net Proceeds formula specified in the Amended Agreement specifically contemplates that, in computing the amounts owed to Trans Continental, MTV is entitled to first recoup "all other costs incurred in connection with the development and production of the Series."

MTV's own documents reveal that MTV is treating the amounts paid to Diddy as part of

the production costs. (*See* MTVN-003129-3131, MTVN-003193, MTVN-003259 and MTVN-003580, true and correct copies of which is attached hereto as composite **Exhibit G**). In simple terms, the more MTV paid Diddy, the less money it had to pay Trans Continental. Consequently, the amounts paid to Diddy have a direct, and unmistakable, impact on the amounts owed to Trans Continental, and are indisputably relevant.

Trans Continental is, thus, entitled to verify that MTV actually paid the expense which it is claiming as an offset to income. The provided contracts between MTV and Diddy do not accomplish this purpose: they merely indicate the amount which MTV was *obligated* to pay Diddy, not the amounts it *actually* paid Diddy. Moreover, by themselves, the Diddy-MTV contracts do not reveal whether the specified bonuses were paid. The Diddy-MTV contracts provide for the payment of a completion bonus, a ratings bonus, plus a specified percentage of the modified adjusted gross receipts ("MAGR") received by MTV in connection with the exploitation of *Making the Band*. The MAGR bonuses are particularly important because the thresholds needed to trigger these bonuses are the same thresholds which would necessarily eliminate any doubt that money is due and owing to Trans Continental.

Simply stated, MTV's payments to Diddy provide an objective point of comparison. These payments establish a baseline of the amount of money which MTV – in a non-litigation environment – claimed were made from the subsequent seasons of *Making the Band*.

## INTERROGATORY NOS. 13-15:

## Interrogatory No. 13

Identify with specificity, and on a season-by-season basis, the amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received

in connection with the broadcast of *Making the Band 2* in the United States or any other country, territory or province.

## Interrogatory No. 14

Identify with specificity, and on a season-by-season basis, the amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received, in connection with any broadcast of *Making the Band 3* in the United States or any other country, territory or province.

## Interrogatory No. 15

Identify with specificity, and on a season-by-season basis, the amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received, in connection with any broadcast of *Making the Band 4* in the United States or any other country, territory or province.

## RESPONSE:

In response to Interrogatory Request Nos. 13-15, MTV provided the same response:

MTVN objects to [this Interrogatory] as burdensome and seeking irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence.   Pursuant to Paragraph 9 of the Amended Agreement, "with respect to the third season [of Making the Band 1] and all subsequent seasons of the Series, MTV shall pay TC an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A."   In turn, Schedule A of the Amended Agreement excludes advertising revenue from the Net Proceeds calculation; specifically, Schedule A defines "Net Proceeds", in part, as "all non-refundable revenues ... (excluding exhibition on MTVN worldwide programming service)."

**The Basis for the Motion to Compel:**

Reduced to it essence, MTV's objection to Request Nos. 13-15 is that since Trans Continental is purportedly not entitled to share in the advertising revenues earned from *Making the Band*, it is not entitled to learn anything about these revenues. This objection is erroneous for a number of reasons.

First, while MTV is certainly permitted to argue that Trans Continental is not entitled to share in the advertising revenues, there has been no finding that this is the proper interpretation of the Net Proceeds Definition. The proper interpretation of this provision remains subject to debate, as it is not the model of clarity that MTV professes. To this end, it is worth noting that the term "advertising" is never actually used in the Net Proceeds Definition. Additionally, in citing the definition of "Net Proceeds," MTV conveniently glosses over the fact that the first sentence actually reads: "For purposes of the Agreement, 'Net Proceeds' shall mean all non-refundable revenues *actually received in the United States* from all sources worldwide by MTV Networks ... in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming service)" (emphasis added). Thus, even if MTV's interpretation of this provision was correct, the definition contains an unmistakable limitation: the revenue must have been actually received in the United States. Accordingly, if MTV Denmark received direct payment for the advertising placed during the episode of *Making the Band* which aired in Denmark, this revenue stream would not be excluded under MTV's interpretation of the Net Proceeds Definition and would properly be considered as part of the calculation as to what is owed to Trans Continental.

Furthermore, even if MTV's interpretation of the Net Proceeds Definition was correct, the mere fact that Trans Continental is not entitled to share in the advertising revenue does not

mean that the advertising revenue has no bearing on, or relevance to, the claims and defenses of this action.  As imparted by the United State Supreme Court, relevancy is to be construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund,* 437 U.S. at 351. At issue in this case is the amount of money which MTV owes to Trans Continental in connection with *Making the Band.*  The amount of money which MTV made from *Making the Band* is undeniably relevant to this analysis.   At a minimum, Trans Continental is entitled to review *which* revenues MTV is categorizing as "advertising revenue" to ensure that these revenue is properly allocated and characterized.

In light of this fact, MTV should be ordered to provide narrative responses to Request Nos. 13, 14 and 15.

## INTERROGATORY NOS. 16-18:

### Interrogatory No. 16

Identify with specificity, and on a season-by-season basis, the amount of revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received, in connection with the foreign distribution of *Making the Band 2.*

### Interrogatory No. 17

Identify with specificity, and on a season-by-season basis, the amount of revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received, in connection with the foreign distribution of *Making the Band 3.*

### Interrogatory No. 18

Identify with specificity, and on a season-by-season basis, the amount of the amount of revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received,

in connection with the foreign distribution of *Making the Band 4.*

**MTV'S SUPPLEMENTAL RESPONSE:**

In response to Interrogatory Request Nos. 16-18, MTV provided the same response:

MTVN objects to this interrogatory to the extent it is burdensome and overbroad, as it requests MTVN to identify the amount of revenue on a "season-by-season basis." However, the Amended Agreement does not require MTVN to provide such a detailed accounting. Notwithstanding the foregoing, pursuant to Federal of Civil Procedure 33(d) and subject to the parties' confidentiality agreement, MTVN refers to the documents it is producing in response to Request for Production No.61, MTVN 000289-000360, 000450-00451, 000453, 001609-001680, 001685, 001690, 001692, 001719, 002037, 001928-001932.

**The Basis for the Motion to Compel:**

A. **MTV's Burdensome Objection is Unsustainable.**

MTV's conclusory claim that responding to Request Nos. 16, 17 and 18 is "burdensome," is, by itself, insufficient to state an adequate objection. *Panola Land Buyer*, 762 F.2d at 1559 (conclusory recitation of "expense and burdensome" without specificity provides no basis for the court to order limitations upon the discovery sought); *Oliver*, 2007 WL 3232227 at *2 ("[to even merit consideration] an objection must show specifically how a discovery request is overly broad, burdensome or oppressive, by submitting evidence or offering evidence which reveals the nature of the burden.")

The crux of MTV's objection is that responding to Request Nos. 16, 17 and 18 would be burdensome because the parties' Amended Agreement specifies a particular mechanism by which MTV was to render its accounting, and that the Interrogatory Requests seek an accounting which differs from this specified mechanism.    This objection is unsustainable as a matter of

law.

Indeed, as referenced in greater detail above (in connection with Request Nos. 8, 10 and 11), there is no shortage of case law which holds that interrogatories are not objectionable simply because they request information in a form not readily available to the answering party. *See, e.g., American Oil Co.,* 23 F.R.D. 680; *King,* 50 F.R.D. 134. Similarly, the fact that interrogatories involve some degree of work, research or expense does not automatically render them objectionable, especially if they seek information that undoubtedly would be assembled by the responding party prior to trial in the preparation of the party's own case. *See Burns,* 164 F.R.D. at 593 ("the fact that answering the interrogatories will require the objecting party to expend considerable time, effort and expense consulting, reviewing and analyzing 'huge volumes of documents and information' is an insufficient basis to object."). *See generally, United States v. Purdome,* 30 F.R.D at 342 ("Defendant also protests that she 'should not be compelled to perform . . . burdensome labor on behalf of the plaintiff. That sort of argument is but a protest against the rationale and the spirit of the Rules [of Civil Procedure]. Neither party is ever required to work for the other. The theory of the Rules is that counsel and the Court are jointly engaged in an orderly search for truth in accordance with the best modern procedural devices derived from our ancient heritage of due process of law.")

Additionally, even if responding to these Requests would be burdensome, this burden must be weighed against the needs of the case; the amount in controversy; the parties' respective resources; the importance of the issues at stake in the litigation; and the importance of the proposed discovery in resolving the issues. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii). As previously discussed, all of these factors weigh decisively in favor of compelling MTV to provide the requested information. MTV is part of a billion dollar media conglomerate; was contractually

obligated to – but indisputably failed to – provide the requisite accountings; and the requested information *is* the very question of this litigation:  what are the realized net profits from the ten subsequent seasons of *Making the Band*?

### B.    MTV's Reliance Upon Fed. R. Civ. P. 33(d) is Misplaced.

Finally, MTV's attempt to respond to Request Nos. 16, 17 and 18 through the provision of MTVN 000289-000360, 000450-000451, 000453, 001609-001680, 001685, 001690, 001692, 001719, 002037, 001928-001932 is insufficient.   There are well-defined limitations placed on a parties' ability to invoke Fed. R. Civ. P. 33(d).   MTV has not - and cannot – demonstrate that responding to these Requests would impose a significant burden.  Similarly, in order to rely upon Fed. R. Civ. P. 33(d), MTV must further demonstrate that the burden of deriving or ascertaining the answer must be substantially the same for Trans Continental as it is for MTV.   This is plainly not the case, as MTV possesses all of the needed information, and merely needs to consult its own books and records in order to ascertain the answers.   *See, e.g., T. N. Taube Corp.*, 136 F.R.D. at 454-55 ("it becomes clear that defendant's familiarity with its own records is the critical factor to be considered by the court.").

MTV cannot claim that no money is owed to Trans Continental and, then, when asked to substantiate this claim point to the same cluster of redacted and undecipherable documents. Indeed, with the sole exception of MTVN-002037 (attached hereto as **Exhibit H)**, MTV is relying upon the same documents which it produced in responses to Request Nos. 8, 10 and 11. Yet, these documents simply do not provide any indication – much less than a clear and complete response – of the revenue which MTV earned from the foreign distribution of *Making the Band 2, 3* and *4*.   Instead, the bulk of these documents are absolutely blank, and those which have not been redacted in full, have either: (a) been redacted to the point of being rendered

meaningless; or (b) like, MTVN-002037, are expressly limited to seasons one and two of *Making the Band* – which, again, are not in dispute.   MTV has not identified, or produced, a single document from which Trans Continental can derive the amount of revenue which MTV earned from the foreign distribution of *Making the Band 2, 3* and *4*.   Consequently, MTV should be compelled to provide narrative responses to Request Nos. 16, 17 and 18.

## INTERROGATORY NO. 20:

Identify with specificity the amount of revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received in connection with any product placement/integration deals with season three of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4*, including the date of the agreement and the name of the contracting parties.

## MTV'S RESPONSE:

MTVN objects to Interrogatory 20 as seeking irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence because it relates to advertising revenue, which is not part of the parties' contract.   Pursuant to Paragraph 9 of the Amended Agreement, "with respect to the third season [of Making the Band 1] and all subsequent seasons of the Series, MTV shall pay TC an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A."   In turn, Schedule A of the Amended Agreement excludes advertising revenue from the Net Proceeds calculation; specifically, Schedule A defines "Net Proceeds", in part, as "all non-refundable revenues ... (excluding exhibition on MTVN worldwide programming service)."

## The Basis for the Motion to Compel:

MTVs irrelevancy objection fails for the many of the same reasons its objections to

Request Nos. 13-15 fail.    First, while MTV is certainly permitted to argue that advertising revenue is not part of the parties' contract, there has be no finding that Trans Continental is not entitled to share in the advertising revenues.    As espoused above (*see* pgs. 30-31), the proper interpretation of the Net Proceeds definition contained in Schedule A to the Amended Agreement remains subject to debate, and is far from the model of clarity that MTV professes. Additionally, in citing the definition of "Net Proceeds," MTV conveniently glosses over the fact that the first sentence actually reads:    "For purposes of the Agreement, "Net Proceeds" shall mean all non-refundable revenues *actually received in the United States* from all sources worldwide by MTV Networks ... in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming service)" (emphasis added). Thus, even if MTV's interpretation of this provision was correct, the definition contains an unmistakable limitation: the revenue must have been actually received in the United States. Accordingly, if MTV Denmark received direct payment for the advertising placed during the episode of *Making the Band* which aired in Denmark, this revenue stream would not be excluded under MTV's interpretation of the Net Proceeds Definition and would properly be considered as part of the calculation as to what is owed to Trans Continental.

Second, even if MTV's interpretation of the Net Proceeds Definition was correct and Trans Continental was not entitled to share in the advertising revenues, neither the Agreement nor the Amended Agreement even remotely address the issue of product placement or product integration deals.    Nowhere, for example, is it specified that the revenue generated by MTV from product placement or product integration deals is to be treated as advertising revenue.

The importance of this point cannot be understated.    Within the entertainment world, revenue received from product placement deals are used to off-set production costs. *See, e.g.,*

Naomi Mezey, Mark Niles, *Screening the Law: Ideology and Law in American Popular Culture*, 28 Colum. J.L. & Arts 91 (Winter, 2005); *Land that Brand*, Daily Variety, Nov. 15, 2002, at 1 (discussing how major film studios use product placement as a means to offset production costs); Marc Graser, *Strike up the Brand*, Daily Variety, June 21, 2002, at 1 (noting the extensive use of product placement in Minority Report, which earned the studio $25 million towards its budget).

In fact, MTV's own documents suggest that this is precisely how MTV treated in product placement revenue. (*See* MTVN-000287, discussing MTV's active pursuit "of tradeouts" to decrease production costs; MTVN-00364-65 (same) and MTVN-003717-3718 (discussing the financial impact of the "vehicle tradeout"), true and correct copies of which are attached hereto as composite **Exhibit I**). Accordingly, this revenue has a direct and immediate impact on the production costs, which, in turn, have a direct and immediate impact on the ultimately profitability of the particular seasons of *Making the Band*. Consequently, the relevancy of Request No. 20 lies beyond reason dispute, and MTV should be ordered to provide a narrative response to this Request, detailing all of the revenue which MTV has received from product placement/integration deals in connection with season three of *Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4.*

## INTERROGATORY NO. 21:

Identify with specificity the amount of revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received in connection with the musical works of *O-Town, Da Band, Day 26, Danity Kane* and *Donnie Klang*, including any and all revenues received from digital downloads, music publishing, touring, merchandise, as well as any management fee.

## MTV'S RESPONSE:

MTVN object to this interrogatory to the extent it is vague (specifically, but not limited to

the definition of "musical works"), overbroad and asks for multiple categories of revenues that are unrelated to each other. MTVN reserves the right to supplement its response to this interrogatory upon receiving clarification of this interrogatory's meaning pursuant to the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure.

**The Basis for the Motion to Compel:**

MTV's "vagueness" objection fails as a matter of law.   Like "burdensome" objections, a blanket statement that the request is vague is "not adequate to voice a successful objection." *See ABM Financial Services, Inc. v. Express Consolidation, Inc.*, 2007 WL 2572322 (S.D. Fla. 2007) (standing alone, objections that state that a discovery request is "vague, overly broad, or unduly burdensome," is meaningless); *Josephs*, 677 F. 2d at 992.   Instead, MTV is obligated to explain the specific and particular way in which Request No. 21 is vague before this objection can even be entertained.

With that said, there is a certain hint of irony in MTV objecting as to the supposed "vagueness" of what constitutes a "musical work."   Truth be told, there is nothing ambiguous about Trans Continental's request:  it inquires into the amount of revenue which MTV received in connection with the musical works of the artists (*O-Town, Da Band, Day 26, Danity Kane* and *Donnie Klang*) (the "Artists"), whose careers were launched by their respective appearances on *Making the Band*.   The request even guides MTV to contemplate the streams of revenue received from:   the digital downloads of the artists' music, publishing rights, touring, merchandise, as well as any management fee.   Had MTV had any genuine interest in responding to this Request, it could have: (a) merely glanced at the parties' original Agreement – a contract which it drafted – which contemplates and defines many of the same terms which MTV now claims to be vague; or (b) it could have attempted to clarify its alleged confusion during the

parties' conference call which was intended to amicably resolve MTV's objections.    MTV did neither, a reality which displays MTV's true intent: to thwart Trans Continental's legitimate discovery attempts.

Given that the revenue received from these Artists' musical works factors into the total amount that MTV owes Trans Continental, MTV has no viable basis for refusing to provide a response to this request.   Consequently, MTV should be directed to provide a narrative response to Request No. 21.

**INTERROGATORY NO. 22:**

Identify with specificity each and every individual or entity, including those employed or engaged by any and all MTV-related, sister or affiliated entities, which are involved, in any way, in selling advertisement spots in connection with season three of *Making the Band,, Making the Band, Making the Band 2, Making the Band 3* and/or *Making the Band 4,*

**MTV'S RESPONSE:**

MTVN objects to interrogatory No. 22 as seeking irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence because it relates to advertising revenue, which is not part of the parties' contract. Pursuant to Paragraph 9 of the Amended Agreement, "with respect to the third season [of Making the Band 1] and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A." In turn, Schedule A of the Amended Agreement excludes advertising revenue from the Net Proceeds calculation; specifically, Schedule A defines "Net Proceeds," in part, as "all nonrefundable revenues... (excluding exhibition on MTVN worldwide programming service)."

**The Basis for the Motion to Compel**:

As noted in detail in connection with Request Nos. 13-15 and Request No. 20, MTV's contention that advertising revenue is not part of the contract is far from clear.    Additionally, even if MTV is correct in that Trans Continental is not entitled to share in the advertising revenue, this does not mean that Trans Continental is wholly incapable of discovering any information pertaining to the advertising revenue.    *See Oppenheimer Fund, Inc.,* 437 U.S. at 351 (courts construe relevancy "broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case.")    *See also, Rhone-Poulenc Rorer, Inc.,* 1992 WL 394425 at * 3 ("[D]iscovery requests may be relevant if there is any possibility that the information may be relevant to the general subject matter of the action.    As a result, discovery rules are to be accorded broad and liberal construction.")

Instead, the Rules of Civil Procedure expressly grant Trans Continental broad latitude to discover such things as: whether MTV has properly classified the advertising revenue; or whether the advertising revenue impacts any other streams of revenue which Trans Continental is indisputable entitled to share in.    Request No. 22 is Trans Continental's attempt to discover this information and is, therefore, entirely permissible.    Consequently, MTV should be ordered to provide a narrative response to Request No. 22.

## INTERROGATORY NO. 23-25:

### Interrogatory No. 23:

Identify with specificity, and on a season-by-season basis, the per episode production cost of *Making the Band 2*.

**Interrogatory No. 24**:

      Identify with specificity, and on a season-by-season basis, the per episode production cost of *Making the Band 3*.

**Interrogatory No. 25**:

      Identify with specificity, and on a season-by-season basis, the per episode production cost of *Making the Band 4*.

**MTV'S RESPONSE**:

In response to Interrogatory Request Nos. 22-25, MTV provided the same blanket response:

      MTVN objects to this interrogatory as burdensome and seeking irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence. Pursuant to Paragraph 9 of the Amended Agreement, "with respect to the third season [of Making the Band 1] and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A." In turn, Schedule A of the Amended Agreement defines "Net Proceeds" in a particularized manner, specifying that only certain revenues, expenses and deduction are to be included in the calculation of Net Proceeds. The Net Proceeds definition does not entail accounting for production costs on a season-by-season basis or a per-episode basis. Furthermore, pursuant to Schedule A of the Amended Agreement, Net Proceeds, if any, are to be accounted for on a "semi-annual basis and not a season-by-season basis. Therefore, this interrogatory, which requests MTVN to identify "on a season-by-season basis, the per episode production cost" is irrelevant to the Amended Agreement, unduly burdensome and not representative of the parties' intent behind the contract. Pursuant to Federal Rule of Civil Procedure 26 and Federal Rule of Bankruptcy 7026, MTVN reserves the right to supplement this response if necessary.

**The Basis for the Motion to Compel**:

MTV's objections to Interrogatory Request Nos. 23 through 25 are, at best, disingenuous. As an initial matter, MTV's relevance objection can be rejected out of hand.    Schedule A of the Amended Agreement expressly contemplates that production costs are one type of expense that is to be considered in determining the amount of the Net Proceeds owed to Trans Continental. ("…and all other costs incurred in connection with the development and production of the Series."). Consequently, the amount of the production costs purportedly incurred by MTV in connection with *Making the Band* lies at the very heart of this dispute.

MTV's "unduly burdensome" objection is equally misplaced, given that MTV's own documents reveal that MTV did, in fact, budget the production cost of each season of *Making the Band* on a season-by-season basis.    MTV has, for example, produced documents evidencing the per season production costs for Season 2 of *Making the Band 3* as well as Seasons 1, 2 and 3 of *Making the Band 4* – but *not* for any other season.[11]    (By way of example, attached hereto as composite **Exhibit J** are: MTVN-002619-MTVN-002650, which is the budget for Season Three of *Making the Band 4*, and MTV-002518 through MTVN-002524, which is a cost summary for Season Two of *Making the Band 4*).

Additionally, there are countless other documents in which MTV's personnel are discussing and/or comparing the per-episode cost of particular seasons of *Making the Band*. (*See, e.g.,* MTVN-000415, MTVN-000480, MTVN-003913, MTVN-003259, MTVN-003293-003294, MTVN-003483-003484, MTVN-003578, MTVN-003580, MTVN-003610 and MTVN-003698), true and correct copies of which are attached hereto as composite **Exhibit K**)    These documents indisputably reveal that this work contemplated by Request Nos. 23-25 has *already* been

---

[11]    MTV also produced MTVN-002187 through MTVN-002456, which is a production cost report that seems to relate to Season 2 of *Making the Band 2*.   It is unclear, however, if this is the precise season in question, as there are some vague references to "Making the Band 5."

completed by MTV. This reality vitiates MTV's burdensome objection and obligates MTV to provide narrative responses to Request Nos. 23-25, as a matter of law.   *See Daiflon, Inc.* 534 F.2d at 226 ("[I]f an answer is readily available in a more convenient form, Rule 33(c) should not be used to avoid giving the ready information to a serving party."); *Petroleum Ins. Agency, Inc. v. Hartford Acc. & Indem. Co.*, 111 F.R.D. 318, 322 (D. Ma. 1983) ("[T]he fact is that as of this time, the defendants have done considerable work to gather the information requested by [the interrogatory requests] and, it therefore follows that it is not equally burdensome for the parties to search the records to come up with answers since the defendants have already done so."

A narrative response is further necessary in that, as referenced above, MTV has not produced documents evidencing the production costs for any season of *Making the Band*, other than seasons 1, 2 and 3 of *Making the Band 4*.   Moreover, even with these documents, there is nothing on their face which indicate whether the listed production costs are, in fact, the final production costs for the season.   The production costs for *Making the Band* were constantly evolving.   Indeed, the words of MTV's own executives best explain why merely producing the budgets of the production costs is not enough.   In attempting to inquire as to which was the final budget for Season One of *Making the Band 4*, the executive explained that the confusion was understandable, given that "... there are about 4,987,654 versions of this [budget].   One hours, half hours, 18 episodes, 8 episodes ... oh my god.   A nightmare." (*See* MTVN002926, a true and correct of which is attached hereto as composite **Exhibit L**).   A nightmare indeed.   In fact, as further evidenced by MTV documents, it was not uncommon for the final production costs to dwarf the original production budgets. *See* MTVN-000472 (discussing the overage in connection with an unidentified season of *Making the Band 3*); MTVN-002035 (highlighting that the final

budget for Season Two of *Making the Band* 4 was nearly twice as much as the original projection); MTVN-002471 (same) and MTVN-002987-002988 (discussing the significant disparity between the final and original budgets for an unidentified season of *Making the Band* 4), true and correct copies of which are included as part of composite Exhibit L).

Given the inconstant nature of this information, as well as the fact that this information lies at MTV's fingerprints, MTV should be ordered to provide a narrative response to Request Nos. 23-25.

## V.    <u>INITIAL DISCLOSURE DOCUMENTS</u>

Fed. R. Civ. P. 26(a)(1) expressly requires that a party, without awaiting a discovery request, must voluntarily provide the other party with copies of all documents that it has in "its possession, custody or control and may use to support its claims or defenses."   In its Initial Disclosures, MTV promised to provide "[a] Summary of Net Proceeds on a season-by-season basis since *Making the Band I,* Season Three."  (A true and correct copy of MTV's Initial Disclosures is attached hereto as **Exhibit M**).   MTV further provided that it "anticipates that the Summary of Net Proceeds will be completed by Wednesday, November 26, 2008, and will thereafter be available [to Trans Continental], subject to the execution of a confidentiality agreement." *Id.*

Since the parties' execution of the Confidentiality Agreement, Trans Continental has requested the production of the Summary of Net Proceeds on *no less than four* (4) *occasions.* (True and correct copies of the undersigned's written requests for the production of the Summary of Net Proceeds are attached hereto as Exhibit A).   MTV has refused to produce these Summaries.  Instead, on January 5, 2009, MTV provided its First Supplement to its Initial Disclosures and produced MTVN-003724 through MTVN-003736.   (A true and correct of

MTV's First Supplement to its Initial Disclosures is attached hereto as Exhibits N.  MTV's First Supplement states that its promise to provide these Summaries was "inadvertent" and not required.  Trans Continental respectfully disagrees.

## V.   REQUEST FOR EXPEDITED CONSIDERATION

To the extent that this Court's busy schedule permits, Trans Continental respectfully requests expedited consideration of this Motion, as the discovery period in this case is exceeding short (four months in total), and the information requested by this Motion to Compel is necessary in order to effective take the forthcoming depositions of MTV's personnel.

## VII.   CERTIFICATE OF GOOD FAITH CONSULTATION

Pursuant to Local Rule 3.01(g), counsel conferred on multiple occasions, including on December 12, 2008 (via telephone) and December 18, 2008 (via e-mail) in an effort to resolve the issues raised in this motion but were unable to reach agreement thereon.

## VIII.   CONCLUSION

Based on the foregoing, MTV should be compelled to provide narrative responses to Interrogatory Requests Nos. 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22 of Trans Continental's First Set of Interrogatory Requests and Interrogatory Requests Nos. 23, 24 and 25 to Trans Continental's Second Set of Interrogatory Requests, as well as the required Initial Disclosure documents.   Further, MTV should be required to pay Trans Continental's reasonable attorneys' fees and costs in bringing this motion.

Dated:   April 1, 2010

Respectfully submitted,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for plaintiff, *Soneet Kapila in his capacity as the federally appointed Chapter 11 Trustee charged with administrating the bankruptcy estate of Trans Continental Television Productions, Inc.*
The Four Seasons Tower
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131-1704
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
jsammataro@kasowitz.com


By: **/s/ James G. Sammataro**
     James G. Sammataro
     Florida Bar Number: 0520292
     Courtney Caprio
     Florida Bar Number 0933961

## CERTIFICATE OF SERVICE

Pursuant to the Court's March 25, 2010 Order [D.E. 25], I hereby certify that on April 1, 2010, I electronically re-filed the foregoing document with the Clerk of the Court using CM/ECF: (This document was originally filed with the Bankruptcy Court [BK D.E. 19] on January 7, 2009). I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF to:

**Andrew J. Ehrlich, Esq.**
aehrlich@paulweiss.com
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

**Brian A. McDowell, Esq.**
brian.mcdowell@hklaw.com
Holland & Knight, LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
200 South Orange Avenue
Suite 2600
Orlando, Florida 32801
Telephone: (407) 425-8500
Facsimile: (407) 244-5288

**Jonathan Davis, Esq.**
Jonathan D. Davis, P.C.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
99 Park Avenue, Suite 1600
New York, New York 10016
Telephone: (212) 687-5464
Facsimile: (212) 557-0565

**Steven J. Solomon, Esq.**
Gray Robinson, P.A.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
1221 Brickell Avenue, Suite 1650
Miami, Florida
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

/s/ James G. Sammataro
Attorney