**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**In re:**

**LOUIS J. PEARLMAN, *et al.***

**Debtor.**

______________________________________ /

**SONEET KAPILA, Chapter 11 Trustee for TRANS CONTINENTAL TELEVISION PRODUCTIONS, INC.,**

**Plaintiff,**

**v.**

**MTV NETWORKS, a division of Viacom, International, Inc.**

**Defendant.**

______________________________________ /

**Case No. 6:10-cv-181-Orl-28-DAB**

**TRANS CONTINENTAL'S MEMORANDUM OF LAW IN OPPOSITION TO MTV NETWORKS' MOTION FOR PROTECTIVE ORDER REGARDING 30(B)(6) CORPORATE REPRESENTATIVE DEPOSITION**

Pursuant to Rule 26 of the Federal Rules of Civil Procedure and Rule 7026 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, Soneet Kapila, as the Chapter 11 Trustee ("Trustee") for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental"), hereby files his Memorandum of Law in Opposition to the Motion for Protective Order [D.E. 29] filed by the defendant, MTV Networks ("MTV"), in connection with topics 50 through 59 of Trans Continental's Third Re-Notice of Taking Deposition of MTV's Corporate Representative pursuant to Fed. R. Civ. P. 30(b)(6).

## I. INTRODUCTION

At issue in this action is the amount of money which MTV owes to Trans Continental in

connection with the television franchise, *Making the Band*.[1] Despite this fact, MTV is attempting to cloak the profitability of *Making the Band* in complete secrecy. MTV's Motion for Protective Order seeks to preclude the Trustee's counsel from so much as even inquiring into the advertising revenue earned by MTV in relation to the show during the deposition of MTV's corporate representative(s).[2]

In an attempt to justify this extraordinary demand, MTV posits that public disclosure of information relating to the profitability of *Making the Band* and its advertising revenue in general will place MTV at a competitive disadvantage. In making this argument MTV conspicuously overlooks that, in truth, there is absolutely ***no risk of public disclosure***. Trans Continental is not a competitor and the Trustee's counsel has already agreed to a Confidentiality Agreement, which limits the disclosure of this information to the Trustee's counsel and its experts. This reality nullifies any claim that disclosure will result in the required "clearly defined and very serious injury," and mandates the denial of MTV's Motion, without further inquiry.

Even if MTV was capable of demonstrating the requisite harm (which it is not), the information relating to *Making the Band's* profitability and advertising revenue is indisputably relevant. Trans Continental claims it is entitled to a portion of the advertising revenue. MTV disputes this contention. Either way, the advertising revenue generated from *Making the Band* lies at the very heart of Trans Continental's damages claim – a claim which, worth noting, is buttressed by the sworn testimony of MTV's Senior Vice President of Business and Legal Affairs, which directly refutes MTV's present contention that the agreements reserve all

---

[1] In total, there has been twelve seasons of *Making the Band*, which have packaged as follows: *Making the Band* (seasons 1, 2 and 3), *Making the Band 2* (seasons 1, 2 and 3), *Making the Band 3* (seasons 1, 2 and 3), and *Making the Band 4* (seasons 1, 2 and 3). Unless otherwise indicated, *Making the Band*, *Making the Band 2*, *Making the Band 3* and *Making the Band 4* are collectively referred to as "*Making the Band*."

[2] To date, MTV has not identified the individual or individuals who would will be serving as its corporate representative on topics 50 through 59 should this Court deny its Motion for Protective Order.

advertising revenue unto MTV.

Regardless, MTV's Motion misses the point and focuses on the wrong inquiry. At this juncture in discovery, the pertinent inquiry is not whether Trans Continental is entitled to share in the advertising revenue, but whether the advertising revenue has any possible bearing on any issue in this case. In addition to being one of the principal issues in dispute, the advertising revenue gives needed context to the parties' diametrically opposed interpretations of the underlying agreements. Without this information, the Court will have only one side of the story and be bereft of a true understanding of the underlying economics, while Trans Continental will be precluded from fully developing its damages claim.

## II. BRIEF FACTUAL BACKGROUND

On November 11, 2008, Trans Continental propounded its Notice of Taking MTV's Fed. R. Civ. P. 30(b)(6) Corporate Representative's Deposition ("Notice of Taking Deposition"), which scheduled the deposition of MTV's corporate representative for December 15, 2008. On December 5, 2008, Trans Continental reluctantly agreed to temporarily postpone several long-scheduled depositions, including the deposition of MTV's corporate representative, based on MTV's counsel's representation that unexpected lay-offs, left MTV incapable of producing the scheduled witnesses. In exchange for Trans Continental's professional courtesy, MTV promised that the depositions would be re-scheduled later that month. MTV failed to honor this promise.

Instead thereafter, the parties engaged in substantial wrangling over both the date and scope of the corporate representative deposition. MTV initially balked, but eventually conceded to, producing multiple witnesses in satisfaction of its Fed. R. Civ. P. 30(b)(6) obligations. Trans Continental, in turn, agreed to narrow the scope of several of the designated topic areas. Subsequent jockeying and the health of MTV's counsel resulted in two additional postponements

of the corporate representative deposition.[3]

On February 6, 2009 – nearly two months after the initial Notice of Taking Deposition – MTV filed its Motion for Protective Order [D.E. 29], seeking a protective order from preventing Trans Continental's counsel from inquiring into any areas which even remotely thread upon the profitability of the *Making the Band* franchise, or the advertising revenue generated therefrom. Specifically, MTV seeks to preclude all questions in connection with topics 50 through 59 of Trans Continental's Third Re-Notice of Taking Deposition:

> 50. Any and all documents that refer, relate to, reflect, concern or evidence the amount of gross and net profit that MTV, including any and all MTV-related, sister or affiliated entities, has made in connection with *Making the Band, Making the Band 2*, *Making the Band 3* and/or *Making the Band 4*.
>
> 51. The amount of advertising revenue that MTV, including any and all MTV-related, sister or affiliated entities, has received in connection with the broadcast of *Making the Band 2* in the United States or any other country, territory or province.
>
> 52. The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during season three of *Making the Band.*
>
> 53. The rate charged by MTV for advertising (be it for a :15 second or :30 second spot) during any season of *Making the Band 2, Making the Band 3* and *Making the Band 4.*
>
> 54. The average revenue amount generated by MTV in connection with a single episode of season three of *Making the Band.*
>
> 55. The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 2.*
>
> 56. The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 3.*

---

[3] Jackie French – who is one of only three individuals deposed to date – served as MTV's corporate representative on topics numbers 7, 18, 20, and 63 through 69. Brad Hazzard, who was scheduled for deposition of February 6, 2009, which was cancelled due to the health of MTV's counsel, had been designated as MTV's corporate representative on topics: 16-17 and 45 through 49.

57. The average revenue amount generated by MTV in connection with a single episode of seasons one, two and three of *Making the Band 4*.

58. The individuals or entities responsible for selling advertisement spots in connection with season three of *Making the Band*, or any season of *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

59. The software program used by MTV to track and manage its advertising inventory.

(A true and correct copy of Trans Continental's Third Re-Notice of Taking Deposition is attached hereto as **Exhibit 1**).

## III. MEMORANDUM OF LAW

### A. Discovery Rules Are to Be Afforded "Broad and Liberal Construction."

The Federal Rules of Civil Procedure establish a liberal system of discovery "meant to insure that no relevant fact remain[s] hidden." *Crawford v. Dominic*, 469 F. Supp. 260, 262 (D.C. Pa. 1979). The Federal Rules of Civil Procedure mandate the disclosure of all relevant information so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, therefore ensuring a fair and just result. *See United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958). As long-ago explained by the United States Supreme Court:

> No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all of the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.

*Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

"The concept of trial by ambush has long ago fallen into desuetude in both state and federal courts." *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 342 (N.D. Ill. 2005); *Proctor & Gamble*, 356 U.S. at 682 ("[The federal rules were intended to] make trial less a game

of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.")

The scope of discovery under Rule 26(b) is broad: "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Under Rule 26, relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc., v. Sanders,* 437 U.S. 340, 351 (1978); *Jeld-Wen, Inc., v. Nebula Glass Int'l, Inc.*, 2007 WL 1526649, * 2 (S.D. Fla. May 22, 2007) ("Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action."). *See also, Rhone-Poulenc Rorer, Inc., v. Aetna Casualty & Surety Co.,* 1992 WL 394425, * 3 (E.D. Pa. Dec. 28, 1992) ("[D]iscovery requests may be relevant if there is any possibility that the information may be relevant to the general subject matter of the action. As a result, discovery rules are to be accorded broad and liberal construction.").

Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues." *Oppenheimer Fund*, 437 U.S. at 352. Information can be relevant and therefore discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. *Dunbar v. United States*, 502 F.2d 506, 509-10 (5th Cir. 1974). *See Farnsworth v. Proctor & Gamble Co.,* 758 F.2d 1545, 1547 (11th Cir. 1985) ("The Federal Rules of Civil Procedure strongly favor full discovery whenever possible."); *Canal Authority v. Froehlke,* 81 F.R.D. 609, 611 (M.D. Fla. 1991) (Bechtle, J.) (same).

**B. MTV Has the Burden of First Demonstrating that Disclosure of the Documents Will Work a "Clearly Defined and Very Serious Injury."**

Notwithstanding the broad discovery principles espoused above, courts are empowered to issue protective orders to temper the scope of discovery under appropriate circumstances. Rule 26(c)(7) of the Federal Rules of Civil Procedure provides that the court may enter an order that "a trade secret or other confidential research, development, or commercial information not be revealed or revealed only in a designated way." Fed.R.Civ.P. 26(c)(7). The party seeking a protective order has the burden of demonstrating that good cause exists for the issuance of the order. *See American Standard, Inc. v. Humphrey*, 2007 WL 1186654, * 2 (M.D. Fla. 2007) (Richardson, J.) ("One seeking a protective order carries the burden of showing good cause and/or the right to be protected.") (citing *United States v. Garrett*, 571 F.2d 1323, 1326, n. 3 (5th Cir. 1978)). *See also Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 231 F.R.D. 426, 429-30 (M.D. Fla. 2005) (Presnell, J.); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3rd Cir. 1994) (a showing of "good cause" is a prerequisite to the issuance of a protective order). *Compare Empire of Carolina, Inc. v. Mackle*, 108 F.R.D. 323, 326 (S.D. Fla. 1985) (noting that "there is no absolute privilege that immunizes trade secrets and confidential information from discovery.").

"Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not satisfy the Rule 26(c) test." *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir. 1986). Instead, "[t]o satisfy the burden of showing good cause, the moving party must demonstrate that 'disclosure will work a clearly defined and very serious injury.'" *Uniroyal Chem. Co. v. Syngenta Corp. Protection*, 224 F.R.D. 53, 56 (D. Conn. 2004) (citing *Cuno, Inc. v. Pall Corp.*, 117 F.R.D. 506, 508 (E.D.N.Y. 1987)). *See also Garrett*, 571 F.2d at 1326, n. 3 ("[This burden] contemplates a particular and specific demonstration of fact as distinguished

from stereotyped and conclusory statements."); *United States v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 158 (D. Del. 1999) ("The litigant seeking the protective order must articulate the injury with specificity.").

Accordingly, as the party resisting discovery, MTV bears the burden of demonstrating that the information is confidential[4] and that disclosure would be harmful. *See Goober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000) (Jones, J). "***Only after*** such a showing is made does the burden shift to the party seeking discovery to show that the information is relevant and necessary." *American Standard*, 2007 WL 1186654 at *3 (emphasis added).

If the party seeking discovery demonstrates the relevance of the sought materials, it is for the court to balance the risk of disclosure against the risk that a protective order will impair prosecution or defense of the claims. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir.1992). The court has wide discretion in determining both the need for, and the scope of, protective orders. The need for the information is ordinarily held paramount, but reasonable protective measures are supplied to minimize the effect on the party making the disclosure. Disclosure may, for example, be ordered to opposing party's trial attorney only, and not to the opposing party. *See Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F. Supp. 20, 22 (D. Del. 1998).

Indeed, as noted in *Vesta Corset Co., Inc. v. Carmen Found, Inc.*, 1999 WL 13257 (S.D.N.Y. Jan. 13, 1999) – a case in which MTV relies heavily – "Protective orders that limit

---

4 Trans Continental is not challenging MTV's contention that the information relating to its advertising revenue or the profitability of *Making the Band* is commercially sensitive.

With that said, MTV is taking an overly expansive view as to the proprietary nature of its advertising revenue. By way of example, some of the advertising information which Trans Continental is seeking dates back several years. It is little secret that advertising rates have dramatically changed since the advent of Tivo™ and similar DVR devices. Consequently, a large portion of the information which MTV is claiming to be proprietary is no longer commercially viable.

access to certain documents to counsel and experts are ***commonly*** entered into in litigation involving trade secrets and other confidential [information]." *Id.* at * 3 (emphasis added). *See also, Autotech Technologies Limited Partnership v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 406-07 (N.D. Ill. 2006) (noting that "attorneys' eyes' only protective orders "have become *de rigeur*, at least where outside counsel are to have access to the information") (emphasis in orginal). In fact, as noted by the United States Supreme Court:

> Actually, orders forbidding any disclosure of trade secrets or confidential information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel or to the parties.

*Federal Open Market Committee v. Merrill*, 99 S. Ct. 2800, 2813, n. 24 (1979).

Protective orders which restrict disclosure to counsel and their experts represent judicial efforts to strike a proper balance between the "philosophy of full disclosure of relevant information" and the need for "reasonable protection against harmful side effects," such as the risk that disclosure will result in competitive harm. *Nutratech, Inc. v. Syntech (SSPF) International, Inc.*, 242 F.R.D. 552, 555 (C.D. Cal. 2007) (citing *Davis v. AT &T Corp.*, 1998 WL 912012, * 2 (W.D.N.Y. 1998)).

### C. In Truth, Disclosure Will Not Result in Any Harm to MTV as Trans Continental is *Not* a Competitor, and Trustee's Counsel Has Already Agreed to Limit the Disclosure of the Documents to Attorneys' Eyes Only.

Lost in MTV's Motion for Protective Order is that there is absolutely no risk of competitive disadvantage. [*Compare* D.E. 29, pp. 7-9] Trans Continental is ***not*** a competitor. It was a former joint venture partner, which by virtue of this bankruptcy action, is out of business. Moreover, and more importantly, Trustee's counsel has ***already*** agreed to a Confidentiality Agreement, which provides for the designation of certain confidential and

proprietary information as "attorneys' eyes only."[5] (A true and correct copy of the parties' December 12, 2008 Confidentiality Agreement is attached hereto as **Exhibit 2**). There is, therefore, no risk of public disclosure.

Consequently, all of MTV's professed concerns regarding the harm that would occur if its competitors or existing clients learned of its advertising rates are extinguished. *Compare* MTV's Motion, p. 8 (noting that disclosure would: (1) "compromise [MTV's] ability to compete in that ***its competitors*** would use [MTV] rate structures to take existing, or potential new, business from [MTV]; and (2) compromise [MTV's] relationship with existing clients who may learn the specifics of other deals).

MTV has not – and cannot – meet its burden of demonstrating that the limited disclosure of the requested information to the Trustee's counsel would result in "a clearly defined and very serious injury." In fact, MTV was incapable of citing a single case in which a court entered a protective order precluding opposing counsel from delving into relevant topics during deposition, on the basis that such questioning – particularly when only protected by a confidentiality agreement – would result in harm.

Instead, and as referenced above, courts that have entered protective orders have routinely found that limiting disclosure to opposing counsel and experts nullifies any valid argument that disclosure will result in competitive harm. *See, e.g., Quotron Systems, Inc. v. Automatic Data Processing, Inc.*, 141 F.R.D. 37, 40 (S.D.N.Y. 1992) (limiting disclosure to counsel and experts); *Multi-Core, Inc. v. Southern Water Treatment Co.*, 139 F.R.D. 262 (D. Mass 1991) (ordering the disclosure of the composition of a chemical solution to plaintiff's counsel of record and its selected experts); *Davidson Pipe Co. v. Laventhal and Horwath*, 120

---

5 The undersigned has dutifully honored this Agreement, filing a Motion for Permission to File Certain Documents Under Seal, and giving MTV wide leeway in designating portions of the deposition transcripts confidential.

F.R.D. 455 (S.D.N.Y. 1988) (limiting disclosure of confidential information to the parties' counsel); *Spartanics, Ltd. v. Dynetics Engineering Corp.*, 54 F.R.D. 524, 526 (N.D. Ill. 1972) (ordering disclosure of trade secret to trial counsel and independent consultants).[6]

This reality mandates the denial of MTV's Motion, without further inquiry. *See, e.g., American Standard*, 2007 WL 1186654 at *3 ("***Only after*** [a showing that disclosure would be harmful] is made does the burden shift to the party seeking discovery to show that the information is relevant and necessary.") (emphasis added). That being said, the relevance and necessity of the information relating to the advertising revenue lie beyond reasonable dispute.

**D. The Advertising Revenue Is Undeniably Relevant.**

**1. MTV is Not Entitled to Preclude Discovery on a Disputed Issue, Based on its Belief that It *May* Ultimately Prevail on the Issue.**

In arguing against the relevancy of the sought information, MTV posits that the agreements at issue make it clear that Trans Continental is not entitled to share in the advertising revenue. The soundness of this position aside, this argument is appropriate for a dispositive motion, not a motion for protective order. MTV has filed neither a Motion to Dismiss nor a Motion for Summary Judgment in connection with this professed "clear" point. The proper interpretation of the agreements remains very much the subject of debate, and MTV cannot preclude discovery on a facially relevant topic based on a belief that it ***may*** ultimately prevail on a disputed legal issue.

This was the precise ruling recently reached by this Court in *Unlimited Resources*

---

6 *See also, Culligan v. Yamaha Motor Corp.*, 110 F.R.D. 122, 126 (S.D.N.Y. 1986) (limiting disclosure to plaintiff's counsel); *Stillman v. Vassileff*, 100 F.R.D. 467, 468 (S.D.N.Y. 1984) (limiting disclosure to plaintiff's counsel); *Sullivan Marketing, Inc., v. Valassis Communications, Inc.*, 1994 WL 177795, at *2 (S.D.N.Y. May 5, 1994) (limiting disclosure of documents relating to pricing and market strategies to outside counsel, their employees, and consultants retained for litigation because in-house counsel was sufficiently involved in competitive decision-making).

*Incorporated v. Deployed Resources, LLC*, 2009 WL 212188 (M.D. Fla. Jan. 29, 2009) (Richardson, J.) – which, ironically, is a case erroneously relied upon by MTV in its Motion. In *Unlimited Resources*, Judge Richardson ruled: "Defendants' argument that [p]laintiff's claim regarding the work is somehow legally insufficient is not enough to preclude discovery ... Defendants arguments regarding the term 'procurement' are best left to a dispositive motion and the Court will not prevent discovery on this ground." *Id.* at * 3.

A near-identical ruling was rendered in *Central Georgia Anesthetic Services, P.C. v. Equitable Life Assur. Soc.*, 2007 WL 2128184 (M.D. Ga. July 25, 2007). There, the court denied the defendants' objection to producing documents, which was premised on the argument that the plaintiff's bad faith claim was not legally viable. In ordering the production, the *Central Georgia* court held that the defendants' arguments as to the viability of the plaintiff's bad faith claim were "not properly before the Court at this stage of the proceedings," "more appropriately made in a dispositive motion," and not sufficient grounds to restrict discovery.

**2. Aside from Premature, MTV's Arguments As to the Professed Meaning of the Agreements Are Belied by the Plain Language of the Agreements, the Parties' Prior Behavior, and the Sworn Testimony of MTV's Personnel.**

MTV's argument that the agreements make clear that Trans Continental is not to share in the advertising revenue is belied by the plain language of the agreements. The parties' January 7, 2000 letter agreement (the "Agreement") makes clear that *Making the Band* was a ***joint venture*** between MTV and Trans Continental. Trans Continental invested money in the development of the idea, the story line, and the production of the television series. In return, Trans Continental was a co-owner of the show. To this end, the Agreement provided that:

- Business matters / Creative Decisions: All business / creative matters in connection with the joint venture are to be mutually determined ... (A true and correct copy of the parties' January 7, 2000 Agreement is attached hereto as **Exhibit 3**).

- MTV and Trans Continental "will jointly exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation." (*Id.* at ¶ 14).
- [A]ll business deals relating to the Series and Band and ancillary rights therefrom must be approved by both parties." (*Id.* at ¶ 15).

The clear intent of the parties' original Agreement was mutuality. The parties were to be joint venture partners, who were to share equally in the proceeds including the "***advertising/sponsorship revenues*** [7] brought in by MTV on the official [*Making the Band*] website." (*Id.* at ¶ 10) (emphasis added).[8] Had the advertising revenue for seasons 1 and 2 of *Making the Band* not already been contractually committed to ABC, MTV and Trans Continental would have likely equally shared in this revenue as well. Thus, contrary to MTV's suggestion, nowhere does the Agreement even intimate, much less make clear, that advertising revenue was to remain solely with MTV. (*Compare* MTV Motion, p. 9). Instead, the advertising revenue which was available to the parties was shared.

The parties' November 15, 2001 Amended Agreement (the "Amended Agreement") similarly does not provide the clarity which MTV suggests. (A true and correct copy of the parties' Amended Agreement is attached hereto as **Exhibit 4**). Paragraph 9 of the Amended Amendment specifies that:

> Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series.

---

7 MTV was entitled to first recoup its expenses and then take a fifteen percent (15%) commission prior to the fifty-fifty sharing of the advertisement revenues.

8 MTV and Trans Continental's indisputable agreement to share in the internet advertising revenue flatly contradicts MTV's claim that the alleged industry practice is to never share advertising revenue. (*Compare* MTV Motion, p. 2).

Exhibit A to the Amended Agreement defined "Net Proceeds" as follows: "all non-refundable revenues actually received in the United States from all sources worldwide by MTVN Networks ("MTVN") in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN's worldwide programming services)."

Despite the conspicuous absence of the term "advertising revenue," MTV argues that "exhibition" absolutely means advertising revenue and that this was the parties' clear and unmistakable intent in negotiating the Amended Agreement. While MTV is certainly entitled to make this argument in a dispositive motion, there is absolutely no evidence that this was indeed the parties' intent. Simply put, standing alone, MTV's suggested interpretation of the underlying agreements does not provide valid grounds to justify restricting the scope of Trans Continental's discovery efforts.

**3. Sworn Testimony from MTV's Personnel Confirms that Advertising Revenue Received Outside of the United States Is Properly Excluded from the Net Proceeds Calculation.**

Moreover, in citing the definition of "Net Proceeds," MTV conveniently glosses over the fact that the first sentence actually reads: "For purposes of the Agreement, 'Net Proceeds' shall mean all non-refundable revenues ***actually received in the United States*** from all sources worldwide by MTV Networks ... in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming service)" *Id.* (emphasis added). Therefore, even if MTV's position that "exhibition means advertising revenue" was correct, the plain language of the Net Proceeds definition contains an unmistakable limitation: the revenue must have been actually received in the United States.

Accordingly, if MTV Germany[9] received direct payment for the advertising placed

[9] MTV Germany is just one of the eleven foreign countries in which seasons of *Making the Band* has been broadcast.

during the episode of *Making the Band* which aired in Germany, this revenue stream would not be excluded under MTV's interpretation of the Net Proceeds definition and ***is*** properly considered as part of the calculation as to what is owed to Trans Continental.

To this end, Virginia Lazalde-McPherson, Esq., Senior Vice President of MTV's Business and Legal Affairs Department, unequivocally testified that revenue ***not*** received in the United States is excluded from the Net Proceeds definition. (*See* pages pp. 90-93 of the deposition transcript of Virginia Lazalde-McPherson's January 26, 2009 deposition, which are attached hereto as **Exhibit 5**) (testifying that money received by MTV Germany in Germany is excluded from the Net Proceeds definition). Ms. Lazalde-McPherson's sworn testimony directly refutes MTV's conclusory statement that the "2001 specifically excludes all 'exhibition' revenues" (*Compare* MTV Motion, p. 9), and vitiates any reasonable argument as to Trans Continental's entitlement to discover the revenue generated by MTV's foreign affiliates/sister entities in connection in connection with the foreign exhibition of *Making the Band.*

Trans Continental cannot be precluded from discovering information regarding advertisement revenue which MTV's own legal counsel concedes that Trans Continental may be entitled to.

**4. The Advertising Revenue Gives Needed Context to the Parties' Diametrically Opposed Positions.**

Even in the unlikely event that MTV's interpretation of the Net Proceeds definition was correct, the fact that Trans Continental is not entitled to share in the advertising revenue does not mean that the advertising revenue has no bearing on, or relevance to, the claims and defenses of this action. As imparted by the United State Supreme Court, relevancy is to be construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund,* 437 U.S. at 351.

At issue in this case is the amount of money which MTV owes to Trans Continental in connection with *Making the Band*. The amount of money which MTV made from *Making the Band* is undeniably relevant to this analysis.

The issue as to whether Trans Continental is entitled to share in the advertising revenues generated by *Making the Band* is not the relevant inquiry. Instead, as this juncture, the pivotal question is whether the advertising revenue bears on any issue in this case. Here, not only is the advertising revenue one the principal issues in dispute, but it also gives meaning and context to the Agreements. The parties could not be any further apart. Based on recently-produced documents, Trans Continental's position is that MTV owes Trans Continental in excess of fifty million dollars ($50,000,000.00). MTV's position is that Trans Continental is not owed a single penny. In fact, to be precise, MTV's position is that Trans Continental is un-recouped in an amount in excess of twelve million dollars ($12,000,000.00).

Given this approximate sixty-two million dollar ($62,000,000.00) gap, it is obvious that the parties have fundamentally different interpretations of the Agreement. The amount of advertising revenue which MTV generated from *Making the Band* sheds light on the reasonableness of the parties' respective positions. If, as expected, MTV generated substantial advertising revenue in connection with its airing of the ten (10) seasons of *Making the Band*, then MTV's interpretation that Trans Continental remains more than twelve million dollars in the negative is all the more implausible.

In this same vein, the per episode advertising information further sheds light on the underlying economics. During her deposition Jackie French provided a chart, which revealed that the first episode of the most recent season of *Making the Band* [10] was broadcast a total of

[10] Season Three of *Making the Band 4*.

forty-four (44) times. As a one-hour episode, this provided MTV with the opportunity to broadcast any many as 1,320 commercial spots.[11] At an average of $10,000.00 per thirty-second commercial spot – likely, a conservative number – this translates into thirteen million, two hundred dollars ($13,200,000.00) for just one of the nine episodes. Not only does this figure relate to just one of the nine episodes, it does not factor in the advertising revenue that is generated by the foreign exhibition of *Making the Band*. Certain seasons of *Making the Band* have aired in as many as eleven (11) countries. This leads to a staggering number, and places Trans Continental's damages claim in context.

### E. The Trustee is Not Barred From Pursuing Valid Causes of Action Based on Positions which Trans Continental May or May Not Have Taken.

As a fall-back position, MTV contends that Trans Continental's pre-litigation conduct is tantamount to a concession that "advertising revenue is not within the scope of the litigation." (*See* Motion, p. 3). Specifically, MTV contends that Trans Continental never made a demand for its percentage of the advertising revenue; never demanded an accounting after receiving the participation statements submitted by MTV; and "did not seek any information concerning advertising revenue when its [then] counsel, Jeffrey Kranzdorf, sent an inquiry for all revenue information associated with *Making the Band*." (*Id.*)

This argument badly misses the mark. Aside from being premature,[12] unsupported by evidence[13] and factually inaccurate[14], what Trans Continental may or may not have done has no

---

[11] As attested to by Ms. French, the standard sixty minute episode contains forty-three (43) minutes of content and two (2) minutes of promotional activities. This leaves fifteen (15) minutes for commercial advertising, which can be further distilled into thirty (30) thirty-second commercial spots per episode. (*See* pp. 157-158 of the January 27, 2009 deposition transcript of Jackie French, the relevant excerpt of which is attached hereto as **Exhibit 6**).

[12] To date, not a single representative of Trans Continental has been deposed.

[13] The entirety of MTV's claim that Trans Continental never made a demand for its percentage of the advertising revenue is premised on a single letter. MTV selectively picked this correspondence. This was ***not*** Trans Continental's only written communication with MTV in regards to Trans Continental's rights in and to *Making the*

bearing on the Trustee's capacity to pursue otherwise valid causes of action. As referenced above, the parties' original Agreement provides that MTV and Trans Continental were to share in the advertising revenue from the *Making the Band* web-site. Additionally, the testimony from MTV's Senior Vice President of Business and Legal Affairs indicates that Trans Continental has a valid claim to share in the advertising revenue generated by *Making the Band*, which was received outside of the United States.

In light of this testimony, MTV's conclusory allegations into Trans Continental's alleged actions and supposed mind-set are insufficient to preclude discovery.

## IV. CONCLUSION

Based on the foregoing, MTV should be compelled to produce a corporate representative capable of testifying to topics 50 through 59 of Trans Continental's Third Re-Notice of Taking Deposition of MTV's Corporate Representative, and Trans Continental should be entitled to ask questions on these topics without any limitation. Alternatively, Trans Continental shall, at a minimum, be entitled to inquire into: (a) the amount of advertising revenue which MTV has generated in connection with the *Making the Band* web-site and the internet exhibition of *Making*

---

*Band*. (*See* Exhibit 5 at pp. 169-177, where Ms. Lazalde-McPherson testifies as to her communications/correspondences she either had or exchanged with Trans Continental's principals).

Moreover, in citing this letter as an example of Trans Continental's failure to request its percentage of the advertising revenue, MTV conspicuously ignores Mr. Kranzdorf's statement that Trans Continental is a "co-owner of this Series," and demand that Trans Continental expects "to be treated in 'every' respect as a full partner." [D.E. 29, Ex. B].

[14] MTV's argument is fraught with factual misstatements. Karen Abdul, the individual who was in charge of preparing the participation statements for *Making the Band 2*, testified, under oath, that all of the statements prepared in connection with *Making the Band 2* were improperly premised on the original Agreement. (*See* **Exhibit** 7, pp. 78-81. *See also* Exhibit 5, pp. 185, where Ms. Lazalde-McPherson testifies as to the uncertainty as to whether the participation statements were in regards to seasons one and two of *Making the Band*, or *Making the Band* and *Making the Band 2*).

Moreover, the first participation which MTV submitted to Trans Continental in connection with *Making the Band 3* and *Making the Band 4* was on ***December 12, 2008*** – a year and a half after Trans Continental filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. Thus, contrary to MTV's suggestion, Trans Continental was incapable of auditing statements which it never received.

*the Band* (which Trans Continental was contractually entitled to fifty percent (50%) pursuant to paragraph 10 of the Agreement); and (b) the advertising revenue generated by *Making the Band* which was received by MTV's foreign affiliates and sister stations, outside of the Untied States.

Dated: April 1, 2010

Respectfully submitted,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for plaintiff, *Soneet Kapila in his capacity as the federally appointed Chapter 11 Trustee charged with administrating the bankruptcy estate of Trans Continental Television Productions, Inc.*
The Four Seasons Tower
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131-1704
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
jsammataro@kasowitz.com

**By: /s/ James G. Sammataro**
James G. Sammataro
Florida Bar Number: 0520292
Courtney Caprio
Florida Bar Number 0933961

## CERTIFICATE OF SERVICE

Pursuant to the Court's March 25, 2010 Order [D.E. 25], I hereby certify that on April 1, 2010, I electronically re-filed the foregoing document with the Clerk of the Court using CM/ECF: (This document was originally filed with the Bankruptcy Court [BK D.E. 38] on February 26, 2009). I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF to:

**Andrew J. Ehrlich, Esq.**
aehrlich@paulweiss.com
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

**Jonathan Davis, Esq.**
Jonathan D. Davis, P.C.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
99 Park Avenue, Suite 1600
New York, New York 10016
Telephone: (212) 687-5464
Facsimile: (212) 557-0565

**Brian A. McDowell, Esq.**
brian.mcdowell@hklaw.com
Holland & Knight, LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
200 South Orange Avenue
Suite 2600
Orlando, Florida 32801
Telephone: (407) 425-8500
Facsimile: (407) 244-5288

**Steven J. Solomon, Esq.**
Gray Robinson, P.A.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
1221 Brickell Avenue, Suite 1650
Miami, Florida
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

/s/ James G. Sammataro
Attorney