UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.*

                Debtor.

_____ /

SONEET KAPILA, Chapter 11 Trustee for
TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,

                Plaintiff,

v.

MTV NETWORKS, a division of Viacom,
International, Inc.

                Defendant.

_____ /

Case No. 6:10-cv-181-Orl-28-DAB

## TRANS CONTINENTAL'S THIRD AMENDED COMPLAINT

Plaintiff, Soneet Kapila, as the Chapter 11 Trustee ("Trustee" and/or "Plaintiff") for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental") in Case No. 6:07-bk-1856-ABB, by and through undersigned counsel, hereby sues defendants, MTV Networks ("MTV"), Viacom, Inc. ("Viacom"), Viacom, International, Inc. ("Viacom International"), Bad Boy Films, Inc. ("Bad Boy Films") and Bad Boy Records, LLC ("Bad Boy Records"), and alleges as follows:

## INTRODUCTION

1.    This lawsuit involves MTV's scheme to misappropriate Trans Continental's interest in the on-going hit television franchise, *Making the Band* (hereinafter, either "Making the

Band" or the "Series"),[1] as well as Bad Boy Films and Bad Boy Records' conscious decision to interest with, and profit from, Trans Continental's rights.

2.     Not satisfied with the hundreds of millions of dollars it received from the Series, MTV has grown greedy.  Without justification, MTV has totally dissociated Trans Continental from its interest in Making the Band – and has robbed Trans Continental of an amount believed to no less than *$60,000,000.00* (**sixty million dollars**), and likely significantly more.

3.     In 2000, Making the Band debuted during primetime on a major television network, ABC.  The show had strong ratings and was renewed for a second season.  Equally important, the show was profitable.  The cost to produce the show was covered by the license fee paid by ABC, enabling Trans Continental and MTV to split the millions of dollars in additional revenues generated by the show (*e.g.,* foreign license fees, domestic syndication fees, merchandising, print publication, etc.) as profit.

4.     Making the Band was scheduled to run for a third season on ABC, when MTV approached Trans Continental about amending the written joint venture agreement to permit the broadcast of season three of Making the Band on MTV's television station.  Although Trans Continental was reticent to make the switch, it ultimately agreed to amend the joint venture agreement and to permit the broadcast of Making the Band on MTV.  Trans Continental's decision to approve these decisions was based on MTV's representations that broadcasting the Series on MTV would prove considerably more profitable for the joint venture, and would afford Trans Continental greater opportunities to showcase the musical groups that it managed.

5.     After the Series was moved to MTV, MTV gradually began to cut-out Trans Continental.   In advance of the launch of Making the Band II, MTV unilaterally – and

---

[1]   To date, there have been twelve (12) seasons of Making the Band, three seasons each of Making the Band, Making the Band II, Making the Band III and Making the Band IV.  Unless otherwise noted, references to the "Series" or "Making the Band" refer to all twelve seasons.

unceremoniously – removed Trans Continental and its principal, Louis Pearlman ("Pearlman") from all involvement in the production of the program, replacing him with hip-hop star, Sean Combs *p/k/a* P. Diddy *f/k/a* Puff Daddy (hereinafter, "Diddy").

6.      MTV's decision to expel Pearlman from future involvement with Making the Band was calculated and committed with full knowledge that it transgressed Trans Continental's contractual and other rights.  Indeed, as revealed by an email unearthed during the course of this litigation, MTV's decision was to: "*f\*ck lou … keep lou off tv.*"[2]

7.      Upon Trans Continental belatedly learning that it was being unilaterally cut-out from the production of Making the Band II, Trans Continental demanded an explanation from MTV.  MTV assured Trans Continental that bringing Diddy into the fold was in joint venture's best interests, as it would bring a fresh face to Making the Band and insure the long-term profitability of the franchise to the benefit of the joint venture and Trans Continental.  MTV's representations initially proved true as, though belatedly, MTV tendered a check to Trans Continental in September of 2005 connection with Season 2.1 of *Making the Band*, the first season featuring Diddy.[3]

8.      Later, and with the benefit of hindsight, it became clear that Diddy's introduction to Making the Band II  was the first step in MTV's scheme to misappropriate Trans Continental's interest in Making the Band – and first of many lies and deceptions designed to hide MTV's plan

---

[2]   A true and correct copy of the complete copy of the e-mail chain conveying Brian Graden's sentiments has been filed, under seal, with the Court in connection with Trans Continental's Opposition to Bad Boy's Motion to Dismiss [*See* D.E. 86, Exhibit A].

[3]   This payment included amounts earned in connection with the foreign exploitation of Season 2.1 in Germany and the United Kingdom.  Thereafter, MTV tendered a subsequent, albeit, insufficient check to Trans Continental in June of 2006.  (*See, e.g.,* Exhibits H and I to D.E. 86, which was previously filed with this Court under seal).  Notably, Season 2.1 of Making the Band – like all subsequent seasons of Making the Band – was exploited in different foreign markets at different times.  There was not one singular roll-out.   By way of example, Season 2.1 aired on MTV Germany in 2003, on MTV Norway in 2005 and MTV Turkey in 2007.  Consequently, there is often a significant lag time between the foreign exploitation of a particular season and when the resulting proceeds are due.

to misappropriate Trans Continental's interest in Making the Band as well as the resulting artists and other television shows that spawned from Making the Band, including, for example, *There and Back* (hereinafter, "There and Back") and *Taquita & Kaui* (hereinafter, "Taquita & Kaui").

9.　　After excluding Trans Continental from any involvement in the production of the Series, MTV began listing itself as the sole owner of Making the Band in copyright registrations. In 2005, when Trans Continental asked for confirmation that MTV was registering Trans Continental as a co-owner in the Series, MTV responded (in writing and through MTV's in-house counsel Virginia Lazalde-McPherson), assuring Trans Continental that its ownership interest was being recognized in the copyright registrations. Ms. Lazalde-McPherson's statement was a lie. ***Nearly two years earlier***, MTV stopped listing Trans Continental as a co-owner of Making the Band (registering more than 30 episodes in Viacom International's name alone).

10.　　The parties also agreed that Trans Continental and Pearlman would receive a screen "credit," acknowledging their contributions to and relationship with Making the Band. However, when MTV broadcast the show, the Trans Continental and Pearlman's screen credits were omitted. MTV never advised Trans Continental that it was being dropped from the credit listing. Instead, MTV utilized subterfuge by forwarding an "advance" copy of the show to Trans Continental which ***included*** the required credits, which were subsequently ***removed*** when MTV broadcast the show.

11.　　As time went by, MTV stopped making payments to Trans Continental and Trans Continental began to press MTV for its share of the Making the Band revenues. MTV initially responded that Trans Continental did not have an interest in Making the Band II, Making the Band III, or Making the Band IV (hereinafter, "Making the Band II-IV"), and therefore it was not entitled to the Series' profits. Reminded that the parties' written agreement expressly provides Trans Continental and MTV were to "jointly exploit any features, spin-offs, sequels, made-for-

TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation," MTV took the position that, despite the identical format, Making the Band II-IV were not sequels to Making the Band, and, therefore, Trans Continental had no interest.

12.     Only *after* this lawsuit was filed, and only *after* Trans Continental discovered documents in which MTV explicitly acknowledged Trans Continental's interest in all versions of Making the Band, has MTV conceded that Trans Continental is a co-owner of the Series.  MTV now argues that Making the Band – a "prime time" show spanning ten seasons, airing in dozens of countries throughout the world, and at a cost of more than eighty million dollars to produce – has made no money after the first two seasons aired on ABC.  MTV has literally made hundreds of millions of dollars on the Making the Band franchise, and it is time that MTV pay Trans Continental its proportional share of all revenues due and owing.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is properly before this Court pursuant to the Court's March 3, 2010 Order granting Trans Continental's Motion to Withdraw the Reference from the United States Bankruptcy Court for the Middle District of Florida [D.E. 4].

14.     Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), because Trans Continental and the various defendants are citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of attorneys' fees and costs.

15.     Additionally, pursuant to Section 48.193(1)(a), Florida Statutes, this Court has personal jurisdiction over the defendants as the defendants purposefully operate, conduct, engage in and/or transact business in the State of Florida and/or because the defendants engage in substantial and not isolated activities within the state of Florida.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PARTIES

17.     Plaintiff is the court-appointed Chapter 11 Trustee for the bankruptcy estate of Trans Continental.   Trans Continental Television Productions was owned and operated by Pearlman, and formed with the express intent of developing motion picture and television concepts.

18.     Defendant, MTV Networks, is a division of Viacom International, Inc., a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1515 Broadway, New York, New York 10036.   MTV is a media giant, which changed the way that America's youth "listened" to its music.   While today, there are a multitude of MTV channels, including MTV Hits, MTV Jams, MTV 2, MTV Tr3s, MTV's flagship station pioneered music videos and music news.   Moreover, with the launch of the television series *The Real World* in 1992, MTV has been tabbed as the creator of reality television.

19.     Defendant, Viacom International, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1515 Broadway, New York, New York 10036.

20.     Defendant, Viacom, Inc., is a leading global entertainment content company, which engages audiences on television, motion picture, Internet, mobile and video game platforms through many of the world's best known entertainment brands.   Both MTV Networks and Viacom International, Inc. are subsidiaries of Viacom, Inc.

21.     Defendant, Bad Boy Films, is a New York corporation with its principal place of business at 1440 Broadway, New York, New York, 10018.

22.     Defendant, Bad Boy Records, LLC, is a Delaware corporation with its principal

place of business at 1440 Broadway, New York, New York, 10018.

## FACTUAL BACKGROUND

23.     On May 8, 2007, Trans Continental filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, Case No. 6:07-bk-01856, pending before the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

24.     On July 18, 2007, the Bankruptcy Court entered its Order Directing the Appointment of Chapter 11 Trustee [B.K. D.E. 11].

25.     On the same date, the United States Trustee filed its Notice of Appointment of Trustee [B.K. D.E. 12], appointing Plaintiff as the Chapter 11 Trustee for Trans Continental

26.     On July 20, 2007, this Court entered its Order Approving the Trustee's appointment [B.K. D.E. 15].

27.     On July 31, 2007, this Court entered its Order [B.K. D.E. 18], pursuant to which the Trans Continental bankruptcy case was jointly administered with the bankruptcy case of Louis J. Pearlman, with case number 6:07-bk-761-ABB.

28.     Thereafter, this Court granted Trans Continental's Motion to Withdraw the Reference from the United States Bankruptcy Court for the Middle District of Florida [D.E. 4].

**A.      An Idea to Create a Reality Television Show**.

29.     Making the Band was created by two iconic figures in the entertainment industry: Pearlman (the modern father of the "boy band" who created top-selling acts such as the Backstreet Boys and N'Sync) and MTV (a pioneer in music videos and music news).

30.     The idea was sparked during an N'Sync performance on MTV's Total Request Live (a/k/a "TRL"). Watching the performance, MTV executive Ken Mok was captivated by the electric atmosphere generated by the band. Teenaged fans poured out into the streets in a scene

Mok described as reminiscent of the "Beatles invasion." Intrigued by the fan frenzy, Mok set-up a meeting with Pearlman.

31.     At the meeting, Mok and Pearlman discussed how Pearlman created his bands. Pearlman conducted a preliminary talent search that brought several young men to Orlando, Florida to audition at Pearlman's Orlando compound. The candidates were then put through a rigorous selection process that graded dance ability, singing ability, appearance, and the "it" factor. After several weeks of whittling down the candidates, the final six to eight members were selected for Pearlman's band.

32.     Mok was convinced that what Pearlman described made for a great reality television show. Mok (on behalf of MTV) and Pearlman (on behalf of Trans Continental) agreed to form a joint venture to sell their idea, which they jointly pitched with great reception to American Broadcasting Company ("ABC"), Fox and among others.

**B.     The Joint Venture Between MTV and Trans Continental**.

33.     On January 7, 2000, Trans Continental and MTV Networks memorialized their joint venture agreement to *jointly develop* and *co-produce* an episodic television series about the making of a boy-band ultimately titled Making the Band, which pursuant to the parties' earlier agreement with ABC was to be broadcast on ABC. A true and correct of the Joint Venture Agreement is attached hereto as **Exhibit 1**.

34.     The Joint Venture Agreement also memorialized Trans Continental and MTV's agreement to jointly develop the all-male pop band, which was to be the end product of Making the Band.

35.     Making the Band was not merely a show made by MTV about Pearlman or the making of the boy band. Instead, as plainly memorialized by the Joint Venture Agreement, it was

a co-production between MTV and Trans Continental.  Trans Continental invested money in the development of the idea, the story line, and the production of the television series.

36.    In return, Trans Continental was a co-owner of the show and had a financial interest in all of the products that originated from the Series.  Specifically, Trans Continental was entitled to receive:

- Fifty percent of all merchandizing (after MTV's taking of a ten percent distribution fee deducted from gross revenue and recoupment of its direct, out-of-pocket expenses). (*See* Exhibit 1, ¶ 7).

- Fifty percent of all print publishing (after MTV's taking of a ten percent distribution fee deducted from gross revenue and recoupment of its direct, out-of-pocket expenses). (*Id.* at ¶ 8).

- Joint ownership with MTV of all music publishing rights (though MTV was entitled to administer a fifteen percent fee, plus re-coup its expenses). (*Id.* at ¶ 9).

- Fifty percent share of all revenues received from advertisers or sponsors in connection with the official web-site related to the television series and band (after MTV recoups expenses and takes a commission of 15%). (*Id.* at ¶ 10).

- Fifty percent share of all fees received in connection with the domestic and foreign distribution of the series (after MTV takes a ten percent fee off the top). (*Id.* at ¶ 11).

- Fifty percent share of all proceeds received from the home video market (MTV entitled to a ten percent distribution fee off the top and recoupment of its direct, out-of-pocket expenses). (*Id.* at ¶ 12).

- Twenty percent management fee for managing the band. (*Id.* at ¶ 18); and

- Fifty percent interest in all other ancillary rights. (*Id.* at ¶ 16).

37.    Notably, the Joint Venture Agreement stipulated that MTV and Trans Continental "will ***jointly*** exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation." (*Id.* at ¶ 14) (emphasis added).

38.    The Joint Venture Agreement additionally provided that "all business deals

relating to the Series and Band and ancillary rights therefrom must be approved by both parties." (*Id.* at ¶ 15).

39.    The Joint Venture Agreement further provided that "[t]he parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein. [sic]   Until such time as such formal agreement is executed, this letter shall remain binding upon the parties."

**C.    The Launch of *Making the Band* on ABC.**

40.    Making the Band originally aired on ABC in 2000, with third-party, Bunim Murray Productions, serving as the line producer for the show.

41.    The show chronicled, in what was then ground-breaking and now has become commonplace reality-style genre, the real-life competition between young men vying to become members of the next boy band group.    Midway through the initial season, the final eight contestants were narrowed to five, with these five winners ultimately forming a band entitled "O-Town."

42.    Making the Band captured the initial competition and tracked O-Town's early development, including the recording of O-Town's self-titled debut CD, *O-Town*.

43.    Boosted by the popularity of the television series, *O-Town* sold more than two million copies.  Its first single, *Liquid Dreams*, was the first song to reach # 1 on the Billboards single sales chart without making the airplay chart.

44.    Almost overnight, O-Town had become the next great boy band.

45.    Making the Band's ratings were strong enough to warrant a second season.  The second season – which was again produced by Bunim Murray – further tracked the band's development and struggles, including O-Town's tours, performances, the creation of their second CD, *O2*, and their transition to a new record label, J Records.

46.     Season Two of Making the Band was ground-breaking in that it marked the first time the main cast of a reality show returned for a second season.

47.     Making the Band was scheduled to run for a third season on ABC, when MTV's parent corporation (Viacom) objected.  Because Viacom owns and operates CBS, it did not want a CBS competitor to air a successful show.

48.     As it was so obligated by the paragraph 15 of the Joint Venture Agreement, MTV approached Trans Continental about amending the Joint Venture Agreement to permit the broadcast of season three of Making the Band on MTV's television station.

49.     Trans Continental was reticent to make the switch.  Seasons one and two of Making the Band had achieved substantial ratings during prime time on a major network.  For all its success, MTV was not (and is not) ABC.   It did not, and does not, have the same drawing power as a network.  Moreover, ABC's airing of Making the Band was tremendously profitable for Trans Continental – as, again, ABC paid for the entire production costs of the show.

**D.      The Parties Amend the Joint Venture Agreement.**

50.     Nonetheless, MTV convinced Trans Continental that amending the agreement would allow the parties to sustain the Joint Venture, and increase its profitability.  Accordingly, on November 15, 2001, Trans Continental and MTV entered into an amended agreement (the "Amended Agreement"), which altered certain provisions of the original Joint Venture Agreement.

51.     For example, the Joint Venture Agreement provided that the parties were to "negotiate in good faith a reasonable license fee for runs of the series on MTV" (¶ 13), and further provided that any "MTV deals with sister/affiliated companies shall be on customary market terms" (¶ 17).  A manifestation of the "good faith negotiations" discussed in the Joint Venture Agreement, the Amended Agreement set forth an "Imputed License Fee."

52.     The purpose of an Imputed License Fee is to prevent self-dealing in vertically integrated companies and to guarantee that an owner of a show (in MTV's words) "does not start at zero." The Amended Agreement's Imputed License Fee covers the applicable license fee for "runs of the series on MTV" and for MTV deals with foreign affiliated stations. *See* Amended Agreement ¶ 9.

53.     Because MTV controlled the distribution of the profits derived from the show, the Amended Agreement further required MTV to account to Trans Continental on a semi-annual basis. Importantly, the Amended Agreement re-affirmed MTV's obligation to split show-related revenues with Trans Continental:

> Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series.

A true and correct copy of the Amended Agreement is attached hereto as **Exhibit 2.**

54.     Notably, "[e]xcept as amended [by the Amended Agreement], all of terms of the [Joint Venture] Agreement shall remain in full force and effect."

55.     On December 3, 2001, MTV provided Trans Continental with a check for $725,064.85 for Trans Continental's share of the proceeds related to seasons one and two of Making the Band. According to MTV Records, this amount was comprised as follows: $87,803.00 in merchandising revenues,[4] $458,011.85 in connection with international program sales, and $179,250.00 as part of ABC's licensing fee.

56.     The first episode of the third season of Making the Band aired in January of 2002. Season 1.3 of Making the Band followed O-Town as they opened for Britney Spears and recorded

---

[4]     Trans Continental had already received a $100,000.00 advance in merchandising revenue. Trans Continental also separately received $330,000.00 from record advances to off-set the expenses it incurred in connection with band development and related expenses.

their next album. The third season was the last season of Making the Band which featured O-Town.

**E.      MTV's Scheme to Misappropriate Trans Continental's Ownership.**

57.    Season Three of Making the Band was also the last season in which Trans Continental was permitted to have any involvement in Making the Band.

58.    Despite the success of Making the Band, and despite Trans Continental's interest in future seasons of Making the Band, MTV unilaterally – and unceremoniously – removed Trans Continental from all involvement in the production of the program, replacing it with hip-hop star, Sean Combs *p/k/a* P. Diddy *f/k/a* Puff Daddy (hereinafter, "Diddy").

59.    Without Trans Continental's knowledge or involvement, MTV commenced negotiations with Diddy and his loan-out corporation, Bad Boy Films. These negotiations – believed to be protracted – ultimately culminated in the execution of a July 12, 2002 agreement between MTV and Bad Boy Films (the "MTV/Bad Boy Films Agreement"). Again, Trans Continental was not even apprised of MTV's negotiations with Diddy and Bad Boy Films, much less allowed to participate in them.[5]

60.    As referenced above, the Joint Venture Agreement and the Amended Agreement provided Trans Continental with certain rights and interests into Making the Band, its sequels, spin-offs and other related projects, including activities relating to the resulting musical acts. Without any notice and without any return consideration, the MTV/Bad Boy Films Agreement stripped Trans Continental of its rights and provided them to Bad Boys Films, Diddy and their related record company, Bad Boy Records.   Additionally, in an effort to entice Diddy and Bad Boy Films to join Making the Band, MTV willingly agreed to limit its exploitation of Making the

---

[5]    In hindsight, and with the benefit of recently discovered documents, MTV's decision to not apprise Trans Continental of its negotiations with Diddy and Bad Boy Films is unsurprising given Bad Boy Films' position that Diddy would have nothing to do with Making the Band unless Trans Continental was if not expelled altogether, minimized greatly. (*See* Exhibits H – J, *infra*).

Band strictly to television, despite Trans Continental's right to share in and profit from DVD and home video sales.

61.    Under the Joint Venture Agreement, MTV and Trans Continental agreed that all creative decisions relating to Making the Band would be jointly made.  However, under the MTV/Bad Boy Films Agreement, MTV and Diddy were to equally split creative decisions relating to the Making the Band II, leaving Trans Continental with no input.  The Joint Venture Agreement also provided that MTV and Trans Continental would jointly enter into record company negotiations.  Again, without any notice to Trans Continental, MTV entered into at least four (4) record deals and assigned the record deals rights over to Bad Boy Records.  Similarly, pursuant to the Joint Venture Agreement, MTV and Trans Continental agreed to split merchandising sales jointly.  Once again, and without notice to Trans Continental, MTV entered into a merchandising agreement with Bad Boy Films, splitting merchandising with Bad Boy Films and Diddy.  These are just a few examples in which: (a) MTV breached the terms of the Joint Venture Agreement; and (b) which Bad Boy Films and Bad Boy Records knowingly, intentionally and unjustifiably interfered with Trans Continental's contractual rights.

62.    Upon Trans Continental belatedly learning that it was being unilaterally cut-out from the production of Making the Band II,[6] Trans Continental demanded an explanation from MTV. MTV assured Trans Continental that bringing Diddy into the fold was in Joint Venture's best interests, as it would bring a fresh face to Making the Band and insure the long-term profitability of the franchise to the benefit of the Joint Venture and Trans Continental.  At no time did MTV advise Trans Continental that it had stripped Trans Continental of its contractual and other rights and provided these same rights to Diddy, Bad Boy Films and Bad Boy Records.

---

[6]    Trans Continental did not receive any advance notice of the July 17, 2002 press conference in which MTV announced Diddy's participation in Making the Band II (*see infra* and Exhibit H) and, instead, learned of this development at the same time of the general public.

63.     Though not apparent at first, MTV's decision to cut-out Trans Continental was the first in a series of steps designed to hijack the Series and treat Making the Band as MTV's own. By way of example, and without limitation, MTV carried out its scheme to exclude Trans Continental from its ownership interest by:

a.      intentionally excluding Trans Continental as a co-owner of Making the Band when applying for copyright registrations;

b.      excluding Trans Continental from the creative process;

c.      unilaterally making all business deals relating to the Series, without consulting with Trans Continental, including, for example, (i) involving Diddy and/or his related companies in connection with Making the Band II-IV; (b) and creating and broadcasting the television series, Making His Band, There and Back and Taquita & Kaui, without Trans Continental's knowledge or involvement;

d.      running repeated broadcasts of each episode of Making the Band II-IV, without payment of an additional license fees;

e.      precluding Trans Continental, in conjunction with Bad Boy Films and Bad Boy Records, from meeting with and managing the artists/groups which arose from Making the Band II-IV;

f.      requiring the finalists to Making the Band III to contractually agree to be managed by Wright Entertainment Group as a pre-condition to appearing as a contestant on Making the Band III;

g.      engaging in repeated self-dealing by failing to market, license, distribute and/or shop the Series so as to maximize the value of the Series to the Joint Venture;

h.      acting in its own best interests at the expense of the Joint Venture;

i.      failing to account to Trans Continental regarding Trans Continental's share of revenues;

j.      failing to pay Trans Continental the amounts due and owing to it in connection with each season of Making the Band II-IV, including, without limitation, the revenue owed in conjunction with merchandising, print publishing, music publishing, internet rights, advertising and sponsorship; domestic and foreign distribution, and home video sales;

j.      threatening Trans Continental and its principal, Pearlman, when Trans Continental requested the amounts owed to it;

l.      changing the name of "Making the Band V" to "Making His Band."  MTV changed the name of "Making the Band V" to "Making His Band" so that it could argue that it is not a feature, spin-off, sequel or "other project" based on the Series;

m.     failing to recognize Pearlman and Trans Continental in the credits for Making the II-IV and Making His Band; and

n.     assigning Trans Continental's contractual rights to Diddy, Bad Boy Films and Bad Boy Records without Trans Continental's consent or knowledge.

## COUNT I
## BREACH OF CONTRACT
### (Against MTV)

64.     Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65.     Paragraph 5 of the Joint Venture Agreement entered into by and between MTV and Trans Continental provided that "all business/creative matters in connection with the joint venture are to be mutually determined …"

66.     Paragraph 10 of the Joint Venture Agreement provided that "MTV shall create and control the official web site related to the Series and Band.  In connection with advertising/sponsorship revenues brought in by MTV on the official website, MTV shall recoup its expenses and take a commission of 15% and then share revenues with TC on a 50-50 basis."

67.     Paragraph 14 of the Joint Venture Agreement similarly provided that MTV and Trans Continental were to "jointly exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the [Making the Band] or the band, subject to good faith negotiation," while Paragraph 15 stated that "[a]ll business deals relating to [Making the Band] and [O-Town] and ancillary rights therein must be approved by

***both*** parties" (emphasis added).

68.     Paragraph 15 of the Joint Venture Agreement provided that "MTV and TC will enter into record company negotiations jointly.  All business deals relating to the Series and Band and ancillary rights therein must be approved by both parties."

69.     Paragraph 5 of the Amended Agreement provides that MTV is to jointly register the copyright in the names of Trans Continental and MTV.

70.     The parties' Amended Agreement further provided that "with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series."

71.     Without limitation, MTV breached each any every one of the contractual provisions listed above and has committed multiple breaches of the Joint Venture Agreement and the Amended Agreement (hereinafter, the "Agreements") by, *inter alia*, committing the acts listed in paragraph 63, which is incorporated herein by reference.

72.     MTV has breached the above contractual provisions in connection with its production of nine (9) subsequent seasons of Making the Band, as well as its production of the related television series: Making His Band, There and Back and Taquita & Kaui.  Each breach constitutes separate, independent and continuing breaches of the parties' Joint Venture Agreement and Amended Agreement.

73.     Except to the extent that it was purposefully excluded by MTV, Trans Continental satisfied all of its obligations under both the Agreements.

74.     As a direct and proximate result of MTV's breaches of the parties' Agreements, Trans Continental has incurred actual and substantial monetary damages, and will continue to incur such damages, in an amount to be determined at the final hearing in this matter.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Against MTV)**

75.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

76.    On January 7, 2000, Trans Continental and MTV entered into the Joint Venture Agreement.

77.    The purpose of the Joint Venture Agreement was manifold, including: to establish Trans Continental and MTV's joint ownership in Making the Band; to carry-out a single business enterprise; and to mutually profit from the creation and distribution of Making the Band.

78.    As a joint venture partner, MTV owed a fiduciary duty to both Trans Continental and the Joint Venture.

79.    Trans Continental placed its trust in MTV, and MTV accepted Trans Continental's trust.

80.    As a joint venture partner, MTV was obligated to maximize revenue from the Series and to put the interests of the Joint Venture in front of its own interests.

81.    MTV breached its fiduciary duties to Trans Continental and to the Joint Venture by, among other things and without limitation:

       a.    lying to and threatening Trans Continental;

       b.    engaging in repeated self-dealing;

c.      broadcasting unlimited re-runs of Making the Band episodes without permission and without additional payment to the Joint Venture;

d.      failing to seek competitive offers and licensing the Series at fair market value;

e.      failing to negotiate with its sister and affiliated companies in good faith or on customary market terms, including in multiple instances, permitting its sister, affiliated and parent companies to broadcast the Series free of charge and without any return consideration to the Joint Venture;

f.      unilaterally registering the trademark to and copyright in Making the Band in Viacom International's name, thereby wrongfully stripping the Joint Venture of valuable intellectual property rights;

g.      failing to market, license, distribute and/or shop the Series so as to maximize the value of the Series to the Joint Venture;

h.      acting in its own best interests at the expense of the Joint Venture;

i.      acting in its own best interests at the expense of Trans Continental, its joint venture partner;

j.      sacrificing Trans Continental's interests by, among other things, agreeing to Bad Boy Films' demand to cease exploring revenue streams from the exploitation of the Making the Band through DVD and home video sales;

k.      exploiting the Series on its MTV.com domain, and refusing to account to Trans Continental for the advertising and other revenues derived therefrom;

l.      failing to properly account to Trans Continental;

m.      generally failing to maximize the Series' revenue;

n.      lying to Trans Continental that there was not market for DVD and home video sales for Making the Band (when, in truth, MTV voluntarily agreed to waive this right as an inducement to entice Diddy and Bay Boy Films);

o.      creating features, spin-offs, sequels, or and other projects based on the Making the Band Series and the related band members, including, but not limited to, Making His Band, There and Back,

and Taquita & Kaui, without consulting or otherwise negotiating with Trans Continental in good faith, and without any benefit to the Joint Venture; and

p.    requiring the finalists to Making the Band III to contractually agree to be managed by Wright Entertainment Group as a pre-condition to appearing as a contestant on Making the Band III.

82.    Owing to Trans Continental's original concept and initial efforts, MTV has realized hundreds of millions of dollars in advertising and other revenue from the Series. Yet, because of MTV's self-dealing and wrongful conduct, Trans Continental, both individually and in its capacity as a partner in the Joint Venture, has failed to receive the benefit of its bargain and the just rewards for the incredible success of Making the Band.

83.    MTV's breaches of its fiduciaries duty to Trans Continental have proximately caused Trans Continental to suffer substantial economic damages.

84.    In breaching its fiduciaries duties to Trans Continental, MTV has acted with malice and oppression, and in conscious disregard of Trans Continental's and the Joint Venture's rights. MTV has caused and intended to cause great economic harm to Trans Continental with full knowledge of the wrongfulness and unjustified nature of its conduct.

85.    MTV's conduct was deliberate and intentional.

86.    Given the outrageousness of MTV's willful, malicious and wanton conduct, Trans Continental should be awarded punitive and exemplary damages sufficient to punish MTV for engaging in this conduct and to deter similar conduct in the future.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks for all actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest and attorneys' fees and costs, as well as punitive and exemplary damages

sufficient to punish MTV for engaging in this conduct and to deter similar conduct in the future, and such other relief as this Court deems just and proper.

## COUNT III
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against MTV)

87.     Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

88.     Included in the parties' Agreements is an implied covenant of good faith and fair dealing by which MTV agreed not the deprive Trans Continental of the full benefits of the Agreements, and not to take any action with the motive to frustrate Trans Continental's rights under the Agreements.

89.     Because the parties failed to execute follow-up long-form agreements (as is standard in the entertainment industry), a number of the Agreements' provisions lack definition and require commercially reasonable definitions as understood in the industry.

90.     By way of example, the Amended Agreement only entertains the possibility of MTV broadcasting each episode of the particular season of Making the Band once.  Nonetheless, MTV, in breach of the implied covenant of good faith and fair dealing, has aired repeated broadcasts of each episode of Making the Band I-IV, without permission and without paying an additional license fee to the Joint Venture.  For example, MTV broadcast episode one of Season 4.2 on its station a total of sixty-time (69) times, without paying either Trans Continental or the Joint Venture a license revenue or a proportional share of the advertising revenues earned in connection with these multiple broadcasts.

91.     MTV has similarly breached its implied covenant of good faith and fair dealing in that it has, in bad faith and with a motive to intentionally frustrate, destroy or injure Trans Continental's enjoyment of its rights under the Agreements by:

a. running repeated broadcasts of each episode of Making the Band II-IV, without payment of an additional license fees or sharing of the resulting advertising revenues;

b. unilaterally making all business deals relating to the Series, without consulting with Trans Continental, including, for example, involving Diddy and/or his related companies in connection with Making the Band II-IV;

c. failing to protect Trans Continental's interests in negotiating with Bad Boy Films and Bad Boy Records;

d. precluding Trans Continental, in conjunction with Bad Boy Films and Bad Boy Records, from managing the artists/groups which arose from Making the Band II-IV;

e. engaging in repeated self-dealing;

f. failing to negotiate with its sister and affiliated companies in good faith or on customary market terms, including in multiple instances, permitting its sister, affiliated and parent companies to broadcast the Series free of charge and without any return consideration to the Joint Venture;

g. unilaterally registering the trademark in Making the Band in Viacom International's name;

h. failing to market, license, distribute and/or shop the Series so as to maximize the value of the Series to the Joint Venture;

i. failing to maximize and properly account for the foreign revenue from the Series;

j acting in its own best interests at the expense of the Joint Venture;

k. threatening Trans Continental and its principal, Pearlman, when Trans Continental requested the amounts owed to it;

l. lying to and misleading Trans Continental;

m. failing to timely obtain payment from Bad Boy Records and/or Atlantic Recording Corp.;

n. permitting third-parties to become delinquent in their obligations to account and make payments in connection with sale of the Artists' albums and merchandise;

o.   improperly charging administrative overhead for certain items on the participation statements;

p.   failing to fully disclose the amount paid by MTV to Bad Boy Films for the services of Diddy;

q.   failing to negotiate with and otherwise excluding Trans Continental from any involvement in the creation and exploitation of Making His Band, There and Back, and Taquita & Kaui;

r.   failing to permit Trans Continental share in the revenues generated in connection with Making His Band, There and Back, and Taquita & Kaui; and

s.   exploiting the Series on its MTV.com domain, and refusing to account to Trans Continental for the advertising and other revenues derived therefrom.

92.   When previously confronted by Trans Continental about its unfair dealing, MTV threatened Trans Continental's then-principal, Pearlman, advising Pearlman that, if Trans Continental sought legal redress, MTV would ensure that his musical acts would never appear on TRL or any other MTV programming, and that MTV would run an expose Pearlman's purported sharp business practices and alleged inappropriate relationships with the members of his boy bands.[7]

93.   MTV's unfair dealing has frustrated the parties' agreed common purposes and vitiated not only Trans Continental's reasonable expectations, but Trans Continental's benefit of the bargain.

94.   MTV has acted in bad faith with the express goal of destroying Trans Continental's right to enjoy the benefits of the Agreements.

---

[7]   MTV is ostensibly not alone in utilizing threats as part of its business repertoire. Diddy, for example, has been accused on multiple instances of making threats or resorting to physical violence in order gain leverage. For example, in 1999, Diddy was arrested for allegedly assaulting Steve Stoute, a rival music executive, in Mr. Stoute's office with fists, champagne bottles, and a telephone. Diddy was also sued for allegedly menacing Kirk Burrowes with a baseball bat in 1996, while his attorney demanded that Mr. Burrowes sign an instrument forfeiting all ownership interest in Bad Boy Entertainment, Inc. *See Burrowes v. Combs*, 25 A.D. 3d 370, 808 N.Y.S. 2d 50 (1st Dept. 2006). Notably, in this case, Mr. Burrowes also accused Diddy of tortiously interfering with his music management contract with an artist.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

**COUNT IV**
**DECLARATORY RELIEF**
**(Against MTV and Viacom International)**
**(As to Copyright Ownership in Making the Band)**

95.     Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

96.     On February 2, 2005, Jeffrey Kranzdorf, Esq., on behalf of Trans Continental, wrote to Ms. Lazalde-McPherson to discuss, among other things, the status of the copyright registrations.  (A true and correct copy of Mr. Kranzdorf's February 2, 2005 letter to MTV is attached hereto as **Exhibit 3**).

97.     On September 28, 2005, Ms. Lazalde-McPherson responded that "MTV has and will continue to register each episode with the copyright office, and will provide [Trans Continental] copies of such registrations, as requested."  (A true and correct copy of Ms. Lazalde-McPherson's September 28, 2005 letter to **Exhibit 4**).

98.     Despite this promise, and despite MTV's clear obligation to do so, Trans Continental recently learned that, with the exception of a handful of registrations, MTV, in conjunction with Viacom, registered the vast majority of the copyrights in the Series in Viacom International's name only.

99.     MTV designated Warren Solow to testify as its corporate representative on the issue of, among other things, the copyright registrations in Making the Band.

100.   Mr. Solow is the Vice President of Information and Knowledge Management at Viacom.  He oversees, among other things, copyright compliance for many Viacom entities, including copyright registrations relating to MTV programs.

101.   Viacom uses Viacom International as the formal "owner" of copyrights associated with Viacom-related entities – despite the fact that in most, if not all, instances, Viacom International has no involvement in the authorship, creation or production of the underlying property.

102.   Mr. Solow testified that MTV erroneously registered Viacom International as the sole owner of a number of copyrights relating to Series.  (*See* **Exhibit 5**).

103.   Mr. Solow further testified that MTV should have registered Trans Continental as a joint owner of the copyrights relating to Making the Band.

104.   Mr. Solow agreed that it would be appropriate for MTV to take remedial action by notifying the United States Copyright Office of the errors and amending the registrations to reflect joint ownership.

105.   In this regard, Trans Continental has demanded that MTV immediately contact the United States Copyright Office and take the steps necessary to amend the copyright registrations to reflect Trans Continental's co-ownership in the Series. (A true and correct copy of Trans Continental's May 15, 2009 demand letter is attached hereto as **Exhibit 6**).

106.   To date, neither MTV nor Viacom International has made any effort to notify the copyright office of the error(s), and have refused to take corrective measures to cure the errors in the copyright registrations.

107.   Worse yet, as recently as March 2010, Mr. Solow filed a declaration in federal court on behalf of Viacom International, in which he claims that Viacom International is the sole owner of the Making the Band IV.  Viacom International is seeking damages against Youtube,

LLC, Youtube, Inc., and Google, Inc. premised in these incorrect copyright registrations. Thus, it is clear that Viacom, Viacom International, and MTV will not take corrective actions – and will use the false registrations for its own profit – unless the Court requires it to cure its false registrations.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter an order declaring that Trans Continental is a co-owner of the copyright in and to each and every episode which comprise Making the Band, Making the Band II, Making the Band III and Making the Band IV; mandating that MTV Networks and Viacom International, Inc. amend the copyright registrations; awarding Trans Continental's its attorneys' fees and costs, and providing such other relief as this Court deems just and proper, including all relief which Trans Continental is entitled as a consequence of MTV Network's failing to first obtain Trans Continental's consent prior to licensing Making the Band II-IV.

### COUNT V
### <u>DECLARATORY RELIEF</u>
#### (Against MTV)
#### (As to Trans Continental's Rights in and to Making His Band, There & Back and Taquita & Kaui and Future Spin-Offs)

108.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

109.    Paragraph 14 of the Joint Venture Agreement provides that MTV and Trans Continental are to "***jointly*** exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation." (emphasis added).

110.    MTV has argued that, despite the identical format and creative concept, Making the Band II- IV are not sequels to Making the Band.  MTV has intermittingly retreated from this

position.

111.     MTV is, however, firmly entrenched in its position that, despite the fact that Making His Band is a variation of Making the Band IV (and, indeed, was initially entitled Making the Band V) and employs essentially the same format, Making His Band is not a feature, spin-off, sequel or "other project" based on the Series.

112.     Making His Band is not the only feature, spin-off or other projects based on the Series, which has originated from the Making the Band television franchise.  There are/have been others, including the television series, There and Back, a show which chronicled the efforts of former O-Town member, Ashley Parker Angel, to launch his solo career.[8]

113.     Similarly, Taquita & Kaui is an admitted spin-off of Making the Band III.[9] Fashioned as a modern-day *Laverne & Shirley*, the show featured two of the female contestants from Making the Band III, trying to make their dreams come true in the big city.

114.     MTV has also recently announced its intention to create another spin-off, featuring former Day 26 band member, Qwanell "Que" Mosely, and former Danity Kane signer, Dawn Richard.

115.     Declaratory relief is proper in this case pursuant to 28 U.S.C. § 2201, as there is a genuine, bona fide dispute between Trans Continental and MTV as to the scope and meaning of

---

[8]   During his deposition, George Cheeks, MTV's Executive Vice President, Business Affairs, General Counsel of the MTV Networks Music Group and Entertainment Group, and co-general counsel of MTV, testified that a "spinoff" is "where you take a character from the original series and 'spin them off' into a new project."

[9]   *See* George Cheeks' June 10, 2009 deposition transcript:

> Q:     Would [Taquita & Kaui]  constitute a spinoff of Making the Band since they are characters or personalities from one show who are now being spun off to a different show?
>
> A:     Yes.

(A true and correct copy of the pertinent excerpt of Mr. Cheek's deposition transcript is attached hereto as **Exhibit 7**, p. 147).

the terms of the parties' Agreements.

116.    Additionally, there is a genuine, bona fide dispute between Trans Continental and MTV as to whether or not Making His Band constitutes a derivative work within the meaning of 17 U.S.C. §§ 101, 106, as well as whether Making His Band, There and Back, Taquita & Kaui and the yet untitled show featuring, Qwanell "Que" Mosely, and Dawn Richard (the "Untitled Show"), constitute spin-offs, sequels or other projects within the meaning of the Joint Venture Agreement.

117.    The controversy between Trans Continental and MTV rests on a present, ascertainable state of facts.

118.    Trans Continental has an actual and present interest which is directly adverse to the interest of MTV.

119.    As evidenced by its actions (*e.g.,* its failure to negotiate with Trans Continental in good faith), MTV has ostensibly taken the position that Making His Band, There and Back, Taquita & Kaui and the Untitled Show are not features, spin-offs, sequels or "other projects" based on the Series.

120.    Trans Continental disagrees with MTV's position and believes that: (i) it is a co-owner of the copyright in and to Making His Band by virtue of the fact that Making His Band constitutes a derivate work within the meaning of 17 U.S.C. §§ 101, 106; and/or (ii) entitled to "jointly exploit" and otherwise share in the revenues generated in connection with Making His Band, There and Back, Taquita & Kaui and the Untitled Show in accordance with the terms of the Joint Venture Agreement, as these shows constitute features, spin-offs, sequels or "other projects" based on the Series.

121.    Trans Continental is uncertain as to its legal rights with respect to the Making His Band, There and Back, Taquita & Kaui and the Untitled Show and is entitled to have this

uncertainty resolved.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a an order declaring (a) that Making His Band, There and Back and Taquita & Kaui are features, spin-offs, sequels or "other projects" based on the Series within the meaning of Paragraph 14 of the Joint Venture Agreement; (b) that Trans Continental is the rightful co-owner in and to the copyrights associated with Making His Band; (c) that Trans Continental is entitled to jointly share in the net proceeds received in connection with Making His Band, There and Back and Taquita & Kaui; (d) precluding MTV Networks, Viacom International, Inc. and Viacom, Inc. from unilaterally registering the copyrights in Making His Band, There and Back and Taquita & Kaui in Viacom International, Inc's name; (e) awarding Trans Continental's its attorneys' fees and costs, and (f) that Trans Continental is entitled to recover all other relief that this Court deems just and proper.

## COUNT VI
## DISSOLUTION OF THE JOINT VENTURE
### (Against MTV)

122.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, and 76 through 86 as if fully set forth herein.

123.    As referenced above, MTV and Trans Continental formed a Joint Venture wherein both parties agreed to a common purpose, contributed labor and capital to the Joint Venture, and had a mutual interest, and a common goal of mutually profiting from the creation, distribution and exploitation of Making the Band and all related projects.

124.    The parties' Joint Venture Agreement provided that "[t]he parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein. [sic]   Until such time as such formal agreement is executed, this letter shall remain binding upon the parties."

125.     Despite this fact, "a more formal joint venture agreement" was never entered into. Consequently, there is no provision for the involuntary dissociation of a partner, or for the dissolution of the Joint Venture itself.

126.     Nonetheless, as documented herein, MTV's actions constitute a willful and persistent breach of the parties' Joint Venture and, by virtue of its actions, MTV has wrongfully expelled Trans Continental from the Joint Venture and has caused the wrongful dissolution of the Joint Venture as a matter of law.

127.     Given MTV's actions, it is not reasonably practicable for the parties to carry on the business of the Joint Venture.

128.     Pursuant to governing law, upon a wrongful dissolution of a joint venture, the former joint venture partners are required to wind-up the affairs of the joint venture and to liquidate it assets.

129.     MTV's actions require a judicial dissolution of the Joint Venture.  Additionally, a dissolution of the joint venture is further required in that, according to MTV's calculations the joint venture is un-recouped in an amount in excess of $15,000,000.00.    There is no purpose in perpetuating a valueless joint venture, particularly when the Joint Ventures' assets, the intellectual properties in and to the Series, Making His Band, and its related spins-off and products, can be sold at a tremendous profit (and benefit Trans Continental and Pearlman's creditors).

130.     Given, however, that dissolving the Joint Venture is a complex undertaking, which will require an evaluation of the value of the Series, as well as an evaluation of the rights in and to Making His Band, There and Back and Taquita & Kaui and all of the attendant intellectual property rights to these properties, an appointment of a receiver is warranted to oversee the winding up of the Joint Venture and the liquidation of its assets after dissolution.

131.    Soneet Kapila has agreed to pay the undersigned counsel a reasonable fee and costs.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a decree dissolving the joint venture, appointing a receiver to oversee the winding-up of the Joint Venture's business, imposing a constructive trust for the benefit of Trans Continental upon all funds, assets, revenues and profits MTV Networks receives from the distribution and exploitation of the Series Making His Band, There and Back and Taquita & Kaui, enjoining MTV Networks (and its affiliates) from entering into any license agreements with its sister or affiliated entities without first seeking the most competitive and beneficial license deal from unaffiliated third parties in a free and open market; and awarding Trans Continental attorneys' fees and costs as provided for under governing law, and for such other relief as this Court deems just and proper.

**COUNT VII**
**DEMAND FOR EQUITABLE ACCOUNTING**
**(Against MTV and Viacom International)**

132.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

133.    Pursuant to the United States Copyright Act, joint owners of a copyright are deemed to be tenants-in-common, with each having an independent right to use or license the copyright, subject to a duty to account to the co-owner for any profits earned from the copyrighted work.

134.    Trans Continental has an ownership interest in Making the Band II, season 1 (hereinafter, "Making the Band 2.1"), through Making the Band IV, Season 3 (hereinafter, "Making the Band 4.3") as well as Making His Band, There and Back and Taquita & Kaui.

135.    MTV, through its corporate representative, has acknowledged Trans Continental's

ownership interest in the episodes of Making the Band I-IV reflected in the copyright registrations attached as Exhibit 5.

136.   Laura Dorson works for MTV and holds the position of Vice President, Participations Management.  Ms. Dorson's responsibilities include overseeing the department at MTV that prepares participation statements to those who share an interest with MTV on various projects. Ms. Dorson was designated as an MTV corporate representative, and testified that Making the Band IV, Seasons 1 through 3, are a Trans Continental property.

137.   Brad Hazzard works for MTV and holds the position of Vice President, business and legal affairs.  Mr. Hazzard, also designated as an MTV corporate representative, prepared an e-mail on March 18, 2005 noting that although Making the Band II and Making the Band III featured Diddy, the shows are a Trans Continental Property.

138.   Notwithstanding the recognition of ownership, MTV has taken the position that the Amended Agreement and the Joint Venture Agreement are not applicable subsequent to Making the Band I, Season 3.

139.   By way of example, in his capacity as a MTV corporate representative, Brad Hazzard testified, under oath, that the Agreements only apply to seasons of Making the Band involving O-Town (e.g., Making the Band I).  Mr. Hazzard explained that he reached this conclusion after the lawsuit was filed through internal discussions.

140.   George Cheeks, MTV's Executive Vice President and General Counsel and was also designated as MTV's corporate representative, also testified that the Amended Agreement was limited to Making the Band I, Season 3.

141.   Thus, according to the sworn testimony of MTV's Fed. Civ. P. 30(b)(6) corporate representatives, there is no contract which governs MTV and Trans Continental's respective rights to Making the Band II-IV, or which otherwise delineates Trans Continental's

entitlement to share in the revenues generated in connection with the television series, Making His Band, There and Back and Taquita & Kaui.

142.   Consequently, MTV and Viacom International are obligated to account to Trans Continental for the rateable share of the profits realized from the use of the Series, including all advertising revenue generated therefrom.

143.   As a joint owner in the copyright to the Series, Trans Continental is entitled to a full accounting of all the profits realized from the use of the Series, including all advertising revenue generated in connection with the broadcast of the Series.

144.   Despite Trans Continental's prior demands, MTV and Viacom International have failed to provide Trans Continental with a full accounting of the profits realized from the use of the Series.

145.   The accounting which MTV has provided to Trans Continental in connection with Making the Band II-IV is insufficient, causing Trans Continental doubt as to, among other things, whether MTV has fully compensated Trans Continental in connection with Trans Continental's interest in its on-going rights to Making the Band.

146.   Also, to date, MTV has failed to provide Trans Continental with an accounting for Making His Band, There and Back and Taquita & Kaui, as well as any other undisclosed (and to be discovered) television programs, series and shows that are features, spin-offs, sequels or "other projects" based on the Making the Band Series

147.   As described in greater detail above, through MTV's wanton actions, Trans Continental have been deprived of its share of the on-going revenues relating to Making the Band; as well as its share of the revenues relating to Making the Band II-IV, Making His Band, There and Back, Taquita & Kaui and potentially other television shows.

148.   All of the information relating to the on-going revenues relating to *Making the*

*Band*; the revenues relating to Making the Band II-IV, and the revenues relating to Making His Band, There and Back and Taquita & Kaui lie exclusively in MTV's possession.

149.    Trans Continental is in need of an accounting in order to determine the exact amount of money which it is owed by MTV. Plaintiff's remedy at law will not be full and adequate absent an extensive accounting and Plaintiff is, thus, entitled to the equitable remedy of an accounting.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a decree ordering MTV Networks and Viacom International, Inc. to provide Trans Continental with a full accounting of all the profits which MTV Networks has realize from the exploitation of the entirety of the Making the Band Series, including all advertising revenues, as required by law; together with the costs of suit herein incurred, as well as for such other and further relief as this Honorable Court may deem just and proper.

## COUNT VIII
## DEMAND FOR ACCOUNTING
### (Against MTV)
### (Pursuant to the terms of the Amended Agreement)

150.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

151.    This is a demand for an accounting pursuant to the terms of the Amended Agreement.

152.    Schedule A to the Amended Agreement provides:

During the term of this Agreement and for a period of one year following the last exhibition of the Series, [Trans Continental] or its designated certified public accountant may at [MTV's] principle [sic] place of business and at reasonable times during regular business hours upon reasonable advance, written notice … inspect and make copies of any relevant portions of books and records of [MTV]

relating to the Series in order to determine the accuracy of [MTV's] statement of Net Proceeds rendered pursuant thereto.

153.    MTV has refused, and continues to refuse, to provide Trans Continental with an accounting.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a decree ordering an accounting of all revenues relating to the Series in accordance with the terms of the Amended Agreement, as well as for such other and further relief as this Honorable Court may deem just and proper.

## COUNT IX
## CONVERSION
### (Against MTV, Viacom and Viacom International)

154.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

155.    Trans Continental is a co-owner of Making the Band (the "property"), which includes and consists of, but is not limited to, its unique, special and novel idea, all underlying copyright and trademark registrations, physical embodiments including masters and any unauthorized and unlicensed copies, all monies garnered from unauthorized and unlicensed possession, use or distribution, and all wrongfully obtained management contracts; and Trans Continental has a right to possess the property.

156.    Despite not having any involvement in the creation or development of Making the Band, Viacom International and Viacom, together with MTV, have each, individually and collectively, exercised unauthorized and wrongful dominion and control over Trans Continental's property rights in Making the Band; specifically:

> a.  MTV, Viacom and Viacom International have intentionally excluded Trans Continental as a co-owner of Making the Band in

applying for copyright registrations – an act which has limited Trans Continental's right to itself license Making the Band;

b. MTV, Viacom and Viacom International have restricted Trans Continental access to the masters and/or physical tapes containing the recordings of the Making the Band episodes and refused to grant Trans Continental access to the same;

c. MTV, in conjunction with Viacom entities, Remote Productions and New Remote Productions, excluded Trans Continental from exerting its ownership rights and control over the property by unilaterally making business deals with Bad Boy Films and Bad Boy Records, which had the additional effect of depriving Trans Continental of its ownership rights in connection with the management of the artists/groups which arose from Making the Band II-IV, and related revenue generated from album sales, music publishing, and artist-related merchandising;

d. MTV, Viacom, and Viacom International engaged in repeated self-dealing by failing to market, license, distribute and/or shop the Series so as to maximize the value of the Series to the Joint Venture;

e. MTV and Viacom unilaterally registered the trademark to Making the Band solely in Viacom International's name;

f. Viacom, wrongfully and without authorization, ran repeated broadcasts of each episode of Making the Band II-IV, on Viacom owned television stations, including VH1, without payment of an additional license fees to Trans Continental or the Joint Venture, thereby depriving Trans Continental of the ability to use the property via licensing arrangements for said broadcasts;

g. Viacom and Viacom International, wrongfully and without authorization, negotiated for agreements permitting third parties to broadcast Making the Band without payment to Trans Continental, thereby depriving Trans Continental of the ability to use the property via licensing arrangements for said broadcasts.

h. Viacom, wrongfully and without authorization, permitted its affiliates, including by way of example, MTV Networks AB, MTV Networks GmbH, and Nickelodeon Australia, to broadcast Making the Band free of charge, wrongly depriving the Joint Venture of license fees and prospective revenue as well as the ability to use the property as consideration in exchange for license fees and prospective revenue in connection with such broadcasts; and

        i.   Viacom severely limited or destroyed the value the property to Trans Continental or the Joint Venture by usurping prospective markets in which Trans Continental or the Joint Venture could have itself sought to license the Series.

157.    Defendants' numerous acts of conversion have deprived Trans Continental of its property rights in Making the Band.  Indeed, by way of example, Trans Continental presently has no access to the physical masters which contain episodes of Making the Band.

158.    As a direct and proximate result of Defendants' actions, Trans Continental has incurred actual and substantial monetary damages, and will continue to incur such damages, in an amount to be determined at the final hearing in this matter.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, Viacom International, Inc. and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

**COUNT X**
**UNJUST ENRICHMENT**
**(Against MTV, Viacom International and Viacom)**

159.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, and 133 to 149 as if fully set forth herein.

160.    As referenced above, according to the sworn testimony of MTV's Fed. R. Civ. P. 30(b)(6) corporate representatives, there is no contract which governs MTV and Trans Continental's respective rights to Making the Band II-IV, or which otherwise delineates Trans Continental's entitlement to share in the revenues generated in connection with the television series, Making His Band, There and Back and Taquita & Kaui.

161.    Trans Continental conferred a benefit on MTV, Viacom International and Viacom in the form of its interests in the television series: Making the Band II-IV, Making His Band, There and Back and Taquita & Kaui (collectively, the "Television Shows").

162.    MTV, Viacom International, and Viacom all had knowledge of Trans Continental's interest in the Television Shows and the benefit conferred upon them in the form of the Television Shows.

163.    MTV, Viacom International, and Viacom have exploited the Television Shows, without providing compensation to Trans Continental for its share of the revenues.  MTV specifically profited from Trans Continental's interest by airing the Television Shows domestically on MTV-owned stations.  Viacom similarly profited from Trans Continental's interest in the Television Show by, among other things, permitting the broadcast of Making the Band II-IV and Making His Band on numerous Viacom-owned stations, including VH-1, Nickelodeon Australia, Nickelodeon Latin America, MTV Networks GmbH, MTV Networks AB),  without any compensation to Trans Continental or the Joint Venture.  Viacom International has similarly entered into license agreements with third-parties, such as Veoh.com and Centric TV, for the broadcast of some or all of the Television Shows without any compensation to Trans Continental or the Joint Venture.

164.    By virtue of their exploitation of some or all of the Television Shows, MTV, Viacom International and Viacom have been unjustly enriched and have received a benefit without paying for same.

165.    It would be inequitable under the circumstances to allow MTV, Viacom International and Viacom to retain the full benefit of the exploitation of some or all of the Television Shows without paying Trans Continental for its fair share.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of

Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, Viacom International, Inc. and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

**COUNT XI**
**UNFAIR COMPETITION UNDER § 43(a) OF THE LANHAM ACT**
**(Against MTV, Viacom International and Viacom)**

166.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

167.    Certain MTV corporate representatives have testified that the Amended Agreement is limited solely to Season 3 of Making the Band.

168.    Brad Hazzard, George Cheeks and Jackie French have each testified that Making the Band 2.1 through Making the Band 4.3, constitute new and unrelated television series in which Trans Continental possesses no ownership interest.[10]

169.    According to the testimony of Messrs. Hazzard, Cheeks, and Ms. French, Making the Band II-IV are each new, television series which do not constitute "sequels," "spin-offs" or "other projects" within the meaning of the Joint Venture Agreement and are otherwise unrelated to Making the Band.

170.    MTV, Viacom International and Viacom have violated Section 43(a) of the Lanham Act by naming Making the Band II-IV with a title (Making the Band) that has caused and is likely to cause confusion as to origin, source, sponsorship and/or affiliation.

---

[10]   Undermining the testimony of MTV's representatives is Viacom's updating of the Making the Band trademark file to include specimens of the digital mark as it appears on-line, and which contains an image of Making the Band IV.

171.     The use of the title, Making the Band, in connection with Making the Band II-IV has caused and is likely to continue to cause public deception and lead the viewing public to believe that there is a relationship, or some form of connection, between Making the Band and Making the Band II-IV.

172.     The first two seasons of the original television series, Making the Band, were originally broadcast on prime time on Friday nights on ABC.  Millions of viewers watched the show.  The third season of Making the Band was broadcast on MTV.  As a consequence of this wide-spread broadcast, Making the Band acquired secondary meaning.  Through publicity and use, Making the Band attained notoriety such that the show's title became associated in the minds of the public with a particular show that possessed a unique format (*e.g.,* elimination, reality-style format) and a specific creative focus (the creation of a band).

173.     MTV, Viacom International and Viacom's use of the title, Making the Band, in connection with Making the Band II-IV creates a likelihood of public confusion – *i.e.*, misleading the viewing public into believing that Making the Band II, Making the Band III and Making the Band IV originated with, or were sponsored by, the same creators (Trans Continental and MTV) of Making the Band.

174.     MTV, Viacom International and Viacom's use of the title, Making the Band, in connection with Making the Band II-IV was done with the deliberate goal of capturing the audience base from Making the Band and capitalizing on the good will, which was created by and belongs to the Joint Venture, and which existed in connection with the original television series, Making the Band.

175.     MTV and Viacom named Making the Band II-IV with the wrongful intent of inducing the public to believe that there was a relationship between Making the Band and Making the Band II-IV.  MTV and Viacom naming of Making the Band II-IV constitutes a false

designation of origin.

176.    Evidence of MTV, Viacom International, and Viacom' intention – their position that Making the Band II-IV are each new, television series unrelated to Making the Band notwithstanding – to create a connection in the viewing public mind's between Making the Band and Making the Band II is found in the press releases issued by MTV in announcing Diddy's participation in Making the Band II.  Specifically, John Miller, MTV's then senior vice-president of original programming and series development, stated:

> Once we committed to a new season of Making the Band, the first person who came to mind was P. Diddy.  He's a star maker who has created and produced numerous number one musical acts.  *He is the perfect person to take Making the Band to the next level*.

(*See* **Exhibit 8**) (emphasis added).

177.    Similarly, evidence of the fact that the public was confused as to Making the Band II's association with Making the Band can be found in Entertainment Weekly's original description of Making the Band II:

> Welcome to Making the Band II, the Diddified sequel.  On October 19, MTV will revive the reality show (responsible for the boy band O-Town), as a vehicle for Mr. Diddy, who'll handpick a hip-hop dream team and hand them a contract with his Bad Boy label, all while the cameras roll.

(*See* **Exhibit 9**) (emphasis added).[11]

178.    Moreover, since this time, MTV and Viacom have both on MTV's website and in press releases consistently referred to Making the Band as a continuing series.  These actions have resulted in public deception and led the viewing public to believe that there is a relationship, or some form of connection, between Making the Band and Making the Band II-IV.

---

[11]   Worth noting is the United States Patent and Trademark Office ("PTO") refused to furnish a trademark in the name, *The Making of a Country Band*, in connection with a television program that featured musicians being chosen for a country band, based on its belief that the requested mark was likely to create confusion, and create "a similar commercial impression" given that both television series chronicled music auditions and the creation of a band

179.    As referenced herein, Trans Continental and MTV entered into a Joint Venture Agreement to jointly develop and co-produce, Making the Band.

180.    The good will which exists in the title, Making the Band, belongs to the Joint Venture and is not a divisible asset, as a matter of law.   Similarly, the use which spawned the right to trademark the term, Making the Band, was the Joint Venture's use.[12]

181.    The Joint Venture possesses an indivisible interest in the trademark, Making the Band, and the related goodwill.   Viacom did not possess the right to unilaterally trademark, Making the Band, and does not possess the right to use the mark, separate and apart from the Joint Venture.[13]

182.    Viacom International is a company that holds the registrations for Viacom's copyright and trademark registrations.

183.    Viacom made the decision to register the Making the Band trademark in Viacom International's name.

184.    Viacom instructed the United States Patent and Trademark Office to register the Making the Band trademark in Viacom International's name.

185.    Consequently, the wrongful registration of Making the Band in Viacom International's name does not immunize Defendants' use of the terms, Making the Band II, Making the Band III and Making the Band IV, or the resulting confusion it has caused as to origin, source or affiliation.

---

[12]    The specimen which Viacom submitted to the PTO as evidence of first use contained the image of the O-Town band members.   Moreover, Viacom claimed that the date of first use in commerce was January 13, 2001 – a date which coincided with season 3 of Making the Band.

[13]    Notably, pursuant to paragraph 6 of the Amended Agreement, Trans Continental and MTV agreed: "[Trans Continental] agrees not to exploit the O-Town trademark in any other way without the consent of MTV, and MTV agrees not to exploit the O-Town trademark without the consent of [Trans Continental]."   There is no express mention as to how the trademark in and to Making the Band was to be handled.

186.    MTV possessed a legal duty not to use the Joint Venture's asset in the goodwill in and to the mark, Making the Band, for its individual benefit.   MTV's breach of its legal duty has resulted in harm to Trans Continental, and gives rise to a cause of action for the unfair misappropriation of good will and consumer confusion under the Lanham Act.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, Viacom International, Inc. and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.   Plaintiff further requests that MTV and Viacom be precluded from unilaterally using the mark, Making the Band, and that the trademark be sold as part of the dissolution of the Joint Venture.

## COUNT XII
## AIDING AND ABETTING OR INDUCING BREACH OF FIDUCIARY DUTY
### (Against Viacom)

187.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

188.    Pursuant to the Joint Venture Agreement, Trans Continental and MTV formed a Joint Venture for the purposes of creating, producing and exploiting the Making the Band series, all sequels, spin-offs and other related projects, and any resulting Musical Acts.

189.    Viacom had knowledge of MTV's Joint Venture Agreement and Joint Venture relationship with Trans Continental.

190.    With full knowledge of the Joint Venture Agreement and MTV's Joint Venture relationship with Trans Continental, Viacom induced and/or aided and abetted MTV's breach of its fiduciary duties to Trans Continental, its Joint Venture Partner by: (a) intentionally excluding

Trans Continental as co-owner of the Series in registering the copyrights for Making the Band; (b) unilaterally registered the trademark to Making the Band solely in Viacom International's name; (c) directing MTV to license the Series to Viacom entities, including but not limited to VH1, MTV Networks AB, MTV Networks GmbH, Nickelodeon Australia, Nickelodeon Australia, either free of charge, on less than customary market terms and without adequate consideration to the Joint Venture or Trans Continental; and (d) directing and/or assisting MTV to self-deal at the expense of the Joint Venture.

191.    Viacom, both directly and through its affiliates, has been intimately involved in the Making the Band franchise and has profited from the Series.

192.    Viacom induced MTV to breach its fiduciary duties, and substantially participated in such breaches.  By way of example, Viacom's employees orchestrated many of the breaches of fiduciary duty, including but not limited to, the registration of copyrights and trademark solely in the name of Viacom International.

193.    By way of further example, Viacom's affiliates, subsidiaries and related entities aired multiple broadcasts of the Series while paying no or almost no licensing fees to Trans Continental or the Joint Venture, despite knowledge of the value of licensing fees for similar shows, and for the Series in particular.

194.    Trans Continental has suffered damages as a result of Viacom's inducement or aiding and abetment of MTV's breaches of fiduciary duties, including but not limited to: the loss of licensing fees for repeated broadcasts of Making the Band on MTV and Viacom's affiliated channels; the loss of licensing opportunities in foreign markets usurped by Viacom's broadcast of Making the Band (for free and/or on less than fair market terms); and losses attributable to the registration of the trademark and copyrights in Viacom International's sole name.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of

Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XIII
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Against Bad Boy Films and Bad Boys Records)

195.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

196.    As referenced above, Trans Continental and MTV enjoyed a contractual and business relationship, which was memorialized in part by the Joint Venture Agreement.    The Joint Venture was formed to create, produce and exploit the Making the Band series, its sequels, spin-offs and other related projects, including any resulting musical acts which were spawned from the Making the Band franchise.

197.    Trans Continental, as co-owner of the Series and pursuant to the Joint Venture Agreement and Amended Agreement, was entitled to various rights in connection with the Series, including, for example and without limitation, the rights to: (a) share in the creative vision and production of the show; (b) share in the proceeds from the television program and its ancillary revenue streams; (c) manage the artists and/or bands that originated from the show; and (d) enter into record company negotiations.

198.    After three successful seasons of the Series, and without consulting Trans Continental, MTV sought to install Diddy as the new face of the Series.  MTV's initial plan was ostensibly to have Diddy play the lead role as the "band maker," and to have Mr. Pearlman serve in a secondary capacity, as the band manager.

199.    With this goal in mind, MTV approached Bad Boy Films to gauge Diddy's interest

in getting involved with Making the Band. Specifically, Ms. Lazalde-McPherson, Esq. broached the topic with Bad Boy Films and began entering into negotiations with, among others, Bad Boy Films' agents (Peter Safran and Amy Weiss of Brillstein Grey Management)[14] and with Phil Robinson, Diddy's music manager.

200.    As part of these negotiations, Bad Boy Films and Bad Boy Records were made aware of the business relationship and contract between Trans Continental and MTV, as well as Trans Continental and Pearlman's contractual, joint venture and co-ownership rights and interests in and to Making the Band and its sequels, spin-offs and other related projects, and the resulting Musical Acts. Indeed, Bad Boy Films and its agents were provided with written contractual overviews of Trans Continental and Pearlman's contractual rights by Ms. Lazalde-McPherson, Esq., MTV's in-house counsel.[15]

201.    These contractual summaries delineated Trans Continental and Pearlman's rights to the minutiae, advising Bad Boy Films and Bad Boy Records of, among things, Trans Continental and Pearlman's rights to record royalties, creative consulting and production credit; financial participation; and the first opportunity to negotiate to manage any of the artists or bands that originated from Making the Band II or its sequels. (*See, e.g.,* **Exhibit 10**).

202.    Despite such knowledge, Bad Boy Films, both directly and through its agents (Peter Safran and Amy Weiss) and representatives (Phil Robinson) demanded that Trans Continental and Pearlman be cast aside. By way of example, Bad Boy Films, through its agents, repeatedly made the following demands:

- *"... that puffy would not do the show if Pearlman [sic] had first opportunity to manage the band"* (*see* **Exhibit 11**) (emphasis added);

---

[14]  Brillstein Grey Management now operates as Brillstein Entertainment Partners (hereinafter, "Brillstein").

[15]  In that MTV has designated this contractual overview as "Confidential-Attorney's Eyes Only," this document (bates stamped MTVN 024184 through MTVN 024185) is not attached as an exhibit to this complaint.

- ***"I expressed to MTV the need to put in language that make it clear that [Pearlman] is not involved with this production in any way other than getting a credit and piece of the backend from MTV (e.g. Sean will not have to deal with him)"*** (*see* **Exhibit 12**) (emphasis added);  and

- ***"Sean will not permit Lou to be on-air without his approval"*** (*see* **Exhibit 13**) (emphasis added).

203.   Acceding to Bad Boy Films' demand, MTV – in its ***own*** words – made the decision to "***f\*ck lou***" and "***keep lou off tv***."

204.   Bad Boy Films' knowledge of Trans Continental and Pearlman's existing rights in the Series and related musical acts is also explicit on the face of the very first contract which Bad Boy Films entered into with MTV.  Paragraph 14 of this contract is entitled, "***Lou Pearlman***" and provides: "***[Bad Boy] acknowledges that Lou Pearlman has the right of first opportunity to manage Artist***."[16]

205.   Thus, in addition to having contractual knowledge of Trans Continental's rights by virtue of the broadcast of the first three seasons of Making the Band, Bad Boy Films and Bad Boy Records had actual (and constructive) knowledge of Trans Continental's contractual, joint venture and co-owner rights in and to Making the Band and its related projects, including the rights to receive revenues in connection with the to-be-formed musical acts.

206.   Despite having been expressly advised and indisputably aware of Trans Continental's contractual rights, Bad Boy Films, through a series of continuing, successive, synergistic, cumulative acts, knowingly, intentionally, and unjustifiably interfered with Trans Continental's contractual rights and advantageous business relationships.

207.   By way of example, Bad Boy Films entered into a series of separate agreements

---

[16] This Agreement has been previously filed with this Court under seal and is incorporated herein by reference.  [*See* D.E. 86, Exhibit G].

with MTV or its affiliates, each of which undermined, transgressed and interfered with Trans Continental's rights. The first of Bad Boy Films' agreements was signed on July 12, 2002. Thereafter, Bad Boy Films entered into eight (8) separate, successive agreements with MTV, respectively dated: January 31, 2003; October 2, 2003; June 15, 2004; February 3, 2006; March 14, 2006; January 17, 2007; October 16, 2007; and February 28, 2008. (*See* D.E. 86, Exhibit G).

208.    Each of the resulting agreements between MTV and Bad Boy Films impacted and interfered with Trans Continental's contractual rights and prospective business relations.  In simple terms, the more that Bad Boy Films sought to and successfully increased its interests, the more Trans Continental's rights and interests suffered as a result.  Bad Boy Film's gains came at Trans Continental's expense.

209.    Bad Boy Films' damage-causing behavior did not cease, if at all, until 2009, when Season 4.3 of the Making the Band completed its broadcast.

210.    Notably, in certain instances, Bad Boy Films ensured the lessening of Trans Continental's interests even if Bad Boy Films did not serve to gain any economic benefit.  By way of example, in one instance, Bad Boy Films insisted that MTV's exploitation of Making the Band be limited on a forward-going basis strictly to television (*e.g.,* no DVDs, videos or related ancillary uses).  Bad Boy's insistence upon this term interfered with Trans Continental's rights to share in DVD and home video sales.  Similarly, Bad Boy Films, in conjunction with Bad Boy Records, sought to exclude Trans Continental and Pearlman from their contractual rights to manage the musical acts, even though Bad Boy Films and Bad Boy Records had no intention of themselves managing the musical acts.

211.    These acts were, in part, malicious in nature or derivative of independently wrongful acts.

212.    Separately, Bad Boy Films and Bad Boy Records tortiously interfered with Trans

Continental's rights with the later-to-be-formed musical acts, including, without limitation, Da Band, Danity Kane, Chopper (*a/k/a* "Young City" and "Chopper Young City," hereinafter, "Young City"), Danity Kane, Day 26 and Donnie Klang (hereinafter, the "Musical Acts"). This interference occurred over a period of at least several years, starting in 2003 and continuing until at least 2008.

213.   As noted above and pursuant to the Joint Venture Agreement, Trans Continental also enjoyed separate, prospective advantageous business relationships with each of the Musical Acts that were originated from the Series.

214.   Bad Boy Films, in conjunction with Bad Boy Records, separately interfered with each of the prospective advantageous business relationships between Trans Continental and Pearlman, on one hand, and the Musical Acts, on the other.

215.   By way of example, and without limitation, Bad Boy Films and/or Bad Boy Records, either in conjunction with MTV or by and amongst themselves, ensured that Trans Continental and Pearlman did not have access to the artists that originated from Making the Band II-IV (*e.g.,* Da Band, Young City, Danity Kane, Day 26 and Donnie Klang).

216.   Despite having no intention of themselves managing the Musical Acts, Bad Boy Films and Bad Boy Records ensured, for example, that Pearlman was never even so much as permitted to meet with Danity Kane, Young City, Day 26 and Donnie Klang.

217.   With Da Band, Pearlman was only permitted to meet with Da Band after Bad Boy Records and its preferred manager were first able to cement a relationship with the band. Da Band's manager was Phil Robinson, who just so happened to be Diddy's manager.

218.   Bad Boy Films and Bad Boy Records' interference with Trans Continental's relationships with the Musical Acts occurred at separate points in time – years apart. By way of

example, Da Band was not formed until 2003; Danity Kane was created in late 2005; and Day 26 and Donnie Klang originated from Making the Band IV and were formed in 2007.

219.   As part of its agreements with MTV, Bad Boy Films and MTV agreed that any artists that originated from Making the Band II (and beyond) would be signed to Bad Boy Records.   In accordance with these contractual provisions, MTV (via its affiliate Remote Productions, Inc.) assigned the Recording Agreements and Recording Options for the Musical Acts at separate points in time:  March 23, 2006 (as to Danity Kane); August 22, 2007 (as to Day 26); and some point after February of 2007 (as to Donnie Klang).  (*See* D.E. 86, Exhibits J-L).

220.   Thus, even if Pearlman had been afforded the right to manage the Musical Artists, Trans Continental's ability to manage and monetize the artists would have been severely limited given that the artist was contractually obligated to sign with Bad Boy Records (and, thus, not able to shop for a more lucrative deal).

221.   The damages suffered by Trans Continental in connection with Bad Boy Films and Bad Boy Records' interference with Trans Continental's relationships with the Musical Acts are continuing, as their albums – which were released at various points in point, including September 30, 2003 and November 24, 2003 (Da Band); August 22, 2006, March 18, 2008 and July 1, 2008 (Danity Kane); March 25, 2008 and April 14, 2009 (Day 26); and August 26, 2008 (Donnie Klang) – remain available for purchase in the marketplace.[17]

222.   Bad Boy Films and Bad Boy Records' interference with Trans Continental's contractual rights and advantageous business relationships was intentional, malicious, carried out through dishonest, fraudulent, unfair, wrongful and/or improper means, and was specifically

---

[17]   As a general rule, there is a substantial lag time between when a musical act is created, their musical works released and, most importantly, when (or if) their musical works become profitable.  Consequently, and by way of example, while Da Band's album, *Too Hot for TV*, was initially released in September of 2003, this is not the date in which Trans Continental's damages necessarily occurred.  The same is equally true for the other Musical Act's subsequently-released albums.

designed to injure, if not outright eliminate, Trans Continental's rights.

223.    As a direct, natural and proximate result of Bad Boy Films and Bad Boy Records' knowing, intentional and unjustifiable interference with Trans Continental's contractual rights and advantageous business relationships, Trans Continental has suffered damages which would not have occurred but for Bad Boy Films and Bad Boy Records' interference.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against Bad Boy Films, Inc. and Bad Boy Records, LLC for actual and compensatory damages in an amount to be determined at the final hearing in this matter, including but not limited to the monetary amounts which Trans Continental lost from: (i) being denied the opportunity to manage the Musical Acts, as well as the lost of management fees, album revenues and related revenue streams from other musical acts that may have been interested in being managed by Trans Continental and Pearlman; (ii) lost album and merchandise revenue relating to the Musical Acts;  (iii) being excluding from active participation in Making the Band II-IV, and the resulting diminishment in the Trans Continental brand; (iv) Bad Boy's refusal to permit the exploitation of Making the Band in DVDs and home videos; (v) being denied the opportunity to further exploit the creation of spin-offs, sequels and related projects; (vi) attorneys' fees, costs and expenses incurred in protecting Trans Continental and Pearlman's interests, including those incurred with respect to the claims brought against MTV and Bad Boy; (vii) punitive and exemplary damages based on Bad Boy Films and Bad Boy Records' willful, malicious and wanton conduct in an amount sufficient to punish Bad Boy Films and Bad Boy Records for engaging in this conduct and to deter similar conduct in the future, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

### Demand for Jury Trial

Plaintiff hereby reiterates its earlier demand for a trial by jury of all issues so triable.


Dated:   June 11, 2010

Respectfully submitted,

**KASOWITZ, BENSON, TORRES**
**& FRIEDMAN, LLP**
*Special Litigation Counsel for Soneet R. Kapila,*
*as Chapter 11 Trustee for the bankruptcy estate of*
*Trans Continental Television Productions, Inc.*
Four Seasons Tower
1441 Brickell Avenue, Suite 1420
Miami, Florida  33131
Telephone:  (305) 377-1666
Facsimile:  (305) 377-1664
jsammataro@kasowitz.com


By: */s/* James G. Sammataro _____
       James G. Sammataro
       Florida Bar Number: 0520292

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 11, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

**Andrew J. Ehrlich, Esq.**
aehrlich@paulweiss.com
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
*Counsel for MTV Networks, Viacom, Inc and
Viacom International, Inc.*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile: (212) 757-3990

**Jonathan D. Davis, Esq.**
Jonathan D. Davis, P.C.
*Counsel for Bad Boy Films, Inc. and Bad
Boy Records, LLC*
99 Park Avenue, Suite 1600
New York, New York 10016
Telephone: (212) 687-5464
Facsimile: (212) 557-0565

**Brian A. McDowell, Esq.**
brian.mcdowell@hklaw.com
Holland & Knight, LLP
*Counsel for MTV Networks, Viacom, Inc and
Viacom International, Inc.*
200 South Orange Avenue
Suite 2600
Orlando, Florida 32801
Telephone:  (407) 425-8500
Facsimile: (407) 244-5288

**Daniel E. Traver, Esq.**
Gray Robinson, P.A.
*Counsel for Bad Boy Films, Inc. and Bad
Boy Records, LLC*
301 E. Pine Street, Suite 1400
Orlando, Florida
Telephone: (407) 843-8880
Facsimile: (407) 244-5690

 _/s/_ James G. Sammataro
Attorney