# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al*　　　　　　　　Case No. 6:07-bk-00761-ABB
　　　　　　　　　　　　　　　　　　　　　　Jointly Administered
　　　Debtor.　　　　　　　　　　　　　　　Chapter 11
_____/

SONEET KAPILA, Chapter 11 Trustee
for TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,　　　　　　　　　　　Adv. No.: 6:07-ap-bk-00761-ABB

　　　Plaintiffs,

v.

MTV NETWORKS COMPANY,

　　　Defendant.
_____/

## TRANS CONTINENTAL'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS TO MTV NETWORKS

Pursuant to Rule 34, Fed. R. Civ. P., Soneet Kapila, as the Chapter 11 Trustee ("Trustee" for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental"), by and through counsel, hereby propounds his Second Request for Production of Documents and Things to defendant, MTV Networks, a division of Viacom International, Inc. (hereinafter, "MTV"), and requests that MTV serves a written response to each of the following document requests (the "Requests") and produce the documents requested herein for inspection and copying at the offices of Silverman, Cosgrove & Sammataro, One Biscayne Tower, 2 South Biscayne Boulevard, Suite 2650, Miami, Florida 33131, within the time frame specified by the Federal Rules of Civil Procedure, or as otherwise directed by the Court.

### Instructions and Definitions

The following definitions and instructions shall apply to Trans Continental's Requests:

1. "And" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these Requests all responses that might otherwise be construed to be outside of their scope.

2. The term "communication" shall mean the transmittal of information (in the form of facts, inquiries, ideas or otherwise) between or among any persons, in any medium or form, whether tangible, hard copy or electronic.

3. The term "referring or relating to" shall mean relating to, referring to, reflecting, describing, evidencing, constituting, concerning, or comprising.

4. The term "document" shall have the broadest meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure and means any writing of any kind, including originals and all non-identical copies (whether different from the original by reason of any notation made on such copies or otherwise). This shall include, without limitation, the following items, whether printed or reproduced by any process, or written or produced by hand or stored in computer memory, magnetic or hard disk or other data storage medium, and whether or not claimed to be privileged, confidential or otherwise excludable from discovery, namely, notes, letters, correspondence, communications, e-mails, telegrams, memoranda, summaries or records of telephone conversations, summaries or records of personal conversations or meetings, diaries, reports, laboratory and research reports and notebooks, recorded experiments, charts, plans, drawings, diagrams, schematic diagrams, source code, object code, illustrations, product descriptions, product analyses, requests for proposals, documents related to proposed or actual product improvements or changes, users manuals or guides, installation guides or manuals, technical descriptions or specifications, product repair manuals or guides, photographs, video

images, software flow charts or descriptions or specifications, product functional descriptions or specifications, minutes or records of meetings, summaries of interviews, reports, or investigations, opinions or reports of consultants, reports of patent searches, patent appraisals, opinions of counsel, agreements, reports or summaries of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of documents, and all other material fixed in a tangible medium of whatever kind known to you or in your possession, custody, or control.

**Warning**:  **Computer generated or stored documents and images, including computer files or data, electronic mail and information on hard disk which has been erased but is retrievable constitutes "documents and things" that are discoverable within the meaning of this definition. An inspection of your computer system may be necessary to assure compliance with the Requests contained herein.**

5. The term "person" shall mean any natural individual, in any capacity whatsoever, or any entity or organization, including divisions, departments, and other units therein, and shall include, without limitation, any public or private corporation, partnership, joint venture, voluntary or unincorporated association, organization, proprietorship, trust, estate, governmental agency, commission, bureau, or department.

6. The term "representative" shall mean any agent, employee, servant, officer, director, accountant, attorney, or other person acting or purporting to act on behalf of the person in question.

7. The terms "you," "your," and "MTV" refer to MTV Networks, a division of Viacom International, Inc., and the signatory of the November 15, 2001 agreement.

8. The term, "MTV," shall mean defendant, MTV Networks, a division of Viacom International, Inc., and its present and former agents, officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities, accountants, attorneys, predecessors, and any other person acting or purporting to act on MTV's behalf.

9. The term "Trans Continental" means "Trans Continental Television Productions, Inc." and all others persons acting or purporting to act on its behalf.

10. The term "Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, in connection with the development and production of an untitled Boy Band series for ABC.

11. The term, "Amended Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, on or about November 15, 2001, in connection with the MTV series featuring O-Town, entitled "Making the Band."

12. The term, "O-Town" refers to the musical act comprised of Ashley Angel, Jacob Underwood, Erik Estrada, Trevor Penick and, after the departure of Ikaika Kahoano, Dan Miller, which was the subject of the original series, Making the Band.

13. The term, "Making the Band," refers to the reality television series which initially aired on American Broadcasting Companies, Inc. and then later on MTV.

14. The term, "Making the Band," refers to the reality television series which initially aired on American Broadcasting Companies, Inc. and then later on MTV.

15. The terms, "Sean Combs," "P. Diddy," "Puff Daddy" and "Diddy" refer to the artist/entertainer that appears in *Making the Band 2*, *Making the Band 3* and *Making the Band 4* and his present and former agents and representatives, as well as his corporate entities, Bad Boy

Entertainment, Bad Boy Productions and Bad Boy Records, and their respective officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities, accountants, attorneys, predecessors, and any other person acting or purporting to act on Diddy's or Bad Boy's behalf.

16. The term, "*Making the Band 2*," refers to the television program broadcast on MTV beginning on or about October of 2002, in which Diddy sought to find the best rappers and singers from which to assemble a new hip-hop group.

17. The term, "*Making the Band 3*," refers to the television program broadcast on MTV in 2005, which featured Diddy and his search for the next all female group.

18. The term, "*Making the Band 4*," refers to television program broadcast on MTV, which features Diddy, the subsequently named band, *Day26*, and Donnie Klang, and a return of *Danity Kane*, the winners of *Making the Band 3*.

19. The term, "Da Band," refers to the musical group, which arose out of *Making the Band 2*, and which released the album, *Too Hot for TV*.

20. The term, "Danity Kane," refers to the musical group, which arose out of *Making the Band 3* and which is signed to Bad Boy Records.

21. The term, "Donnie Klang," refers to the artist who appeared on *Making the Band 4*, and recently released his album, *Just Like a Rolling Stone*.

22. The term, "Day 26," refers to the musical group formed during *Making the Band 4*, and which is signed to Bad Boy Records.

23. The term "including" shall mean including but not limited to.

24. The term "any" or "each" shall be construed to include and encompass "all."

25. The term "date" shall mean the exact day, month, and year, if ascertainable, or, if

not, the best approximation thereof.

26. The use of the word "the" shall not be construed as limiting the scope of any request.

27. The use of the singular shall be deemed to include the plural, and the use of one gender shall include the other as are appropriate in the context.

28. These Requests are continuing in nature. Any document, created or identified after service of any response to these Requests, that would have been included in the response had the document then existed or been identified shall promptly be supplied by supplemental responses whenever you find, locate, acquire, create, or become aware of such documents, up until the time of trial. Supplemental responses are to be served as soon as reasonably possible after receipt of such documents.

29. Each individual document request shall be responded to fully, unless it is in good faith objected to, in which event the reasons for the objections shall be stated with specificity. If an objection pertains to only a portion of a document request, or to a word, phrase, or clause contained therein, MTV shall state its objection to that portion only and respond to the remainder of the request.

30. If any document responsive to these Requests has been destroyed, discarded, or lost, or is otherwise not capable of being produced, identify each such document and set forth the following information: (a) the date of the document; (b) a description of the subject matter of the document; (c) the name and address of each person who prepared, received, viewed, or had possession, custody, or control of the document; (d) the date when the document was destroyed, discarded, or lost; (e) the identity of the person who directed that the document be destroyed,

who directed that the document be discarded, or who lost the document; and (f) a statement of the reasons for and circumstances under which the document was destroyed, discarded, or lost.

31. If any document responsive to these Requests is withheld under a claim of privilege (including, but not limited to, the attorney-client privilege or work-product protection) you shall identify with respect to each document: (a) the author, (b) the addressee(s); (c) all other persons to whom the document was distributed, shown or explained; (d) its present custodian; (e) the document's number of pages, and attachments or appendices; (f) the type of document (letter, report, etc.); (g) the general subject matter of the document; (h) the date of the document; and (i) the specific privilege claimed.

32. If, in responding to these Requests, you claim any ambiguity in interpreting the request, or in a definition or instruction applicable thereto, such claim shall not be utilized as a basis for refusing to respond, but you shall set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to the document request.

33. Each document request shall be construed according to its terms and not with reference to any other request.

34. All responsive documents, wherever located, that are in your possession, custody, or control, or that of any of your agents, attorneys, or representatives, shall be produced in response to these Requests.

35. The original or one copy of each document is requested to be produced. Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation or any omission, shall constitute a separate document and must be produced, whether or not the original of such document is within your possession, custody, or control.

36. Documents shall be produced as they are kept in the ordinary course of business or organized and labeled to correspond with the categories in these Requests. All documents that are physically attached to each other when located for production shall be left so attached. Documents that are segregated or separated from other documents, whether by use of binders, files, sub-files, or by dividers, tabs, or any other method, shall be left so segregated or separated. All labels or markings on any such binders, files, sub-files, dividers, tabs, or folders shall be produced.

37. Unless otherwise specified, in the event that any responsive document is maintained in electronic, magnetic, or computer-readable form, such document shall be produced: on disk or other computer storage medium, and converted into a reasonably usable form (preferably to Group IV, multi-page tiff format at 300dpi) that is completely text searchable.

38. A document request shall be deemed to include a request for all transmittal sheets, cover letters, exhibits, enclosures, and attachments to the documents in addition to the document itself, without abbreviation or expurgation.

39. If no documents exist that are responsive to a particular document request, so state in writing.

40. If no time period is specified in a request, then the relevant time period shall be from January 1, 2000 through the present.

## DOCUMENTS TO BE PRODUCED

1. Any and all documents that refer, relate to, reflect, concern or otherwise evidence communications regarding the sale and/or negotiation of the format rights in and to *Making the Band*.

2. Any and all documents that refer, relate to, reflect, concern or otherwise evidence communications regarding the sale and/or negotiation of the format rights in and to *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

3. Any and all documents that refer, relate to, reflect, concern or otherwise evidence communications regarding the exploitation of the format rights in and to *Making the Band*, *Making the Band 2*, *Making the Band 3* and *Making the Band 4*.

4. A copy of the contract entered into between MTV and Johnny Wright in connection with *Making the Band 3*.

5. All documents evidencing that MTV jointly registered the copyright of *Making the Band* in the names of MTV and Trans Continental.

6. The copyright registrations for the episodes which comprise cycle three of *Making the Band*.

7. Any and all documents that refer, relate to, reflect, concern or otherwise evidence MTV's filing of copyright registrations in connection with any episode of *Making the Making the Band 2* (cycles 1, 2 and 3), *Making the Band 3* (cycles 1, 2 and 3) and *Making the Band 4* (cycles 1, 2 and 3).

8. The copyright registrations for the episodes of *Making the Making the Band 2* (cycles 1, 2 and 3), *Making the Band 3* (cycles 1, 2 and 3) and *Making the Band 4* (cycles 1, 2 and 3).

9. Any and all documents that refer, relate to, reflect, concern or otherwise evidence MTV's negotiation of paragraph 4 of the July 12, 2002 Agreement entered into by and between MTV and Bad Boy Films, Inc. ("Bad Boy Films") (the "July 12, 2002 Agreement").

10. All documents exchanged between George Cheeks, Esq. and Bad Boys Films, Inc., including but not limited to Derek Ferguson and Kenneth Mesalias, Esq., in connection with the negotiation of the July 12, 2002 Agreement.

11. All documents exchanged between Virginia Lazalde-McPherson, Esq. and Bad Boys Films, Inc., including but not limited to Derek Ferguson and Kenneth Mesalias, Esq., in connection with the negotiation of the July 12, 2002 Agreement.

12. Any and all documents that refer, relate to, reflect, concern or otherwise evidence MTV's negotiation of paragraph 7 of the June 15, 2004 Overall Development/Production Agreement entered into by and between Remote Productions, Inc. ("Remote Productions") and Bad Boy Films (the "Overall Development/Production Agreement").

13. All documents exchanged between George Cheeks, Esq. and Bad Boys Films, including but not limited to Derek Ferguson and Kenneth Mesalias, Esq., in connection with the negotiation of the Overall Development/Production Agreement.

14. All documents exchanged between MTV and Bad Boys Films, including but not limited to Derek Ferguson and Kenneth Mesalias, Esq., in connection with the negotiation of the Overall Development/Production Agreement.

15. Any and all documents that refer, relate to, reflect, concern or otherwise evidence Remote Productions and/or MTV's payment of any amounts to Bad Boys Films pursuant to paragraph 7 of the Overall Development/Production Agreement.

16. Any and all documents that refer, relate to, reflect, concern or evidence the

revenue received by MTV in connection with the *Making the Band* Tour.

17. The account statements rendered by Bad Boy Records to MTV in connection with *Da Band*.

18. The account statements rendered by Bad Boy Records to MTV in connection with *Danity Kane*.

19. The account statements rendered by Bad Boy Records to MTV in connection with *Day 26*.

20. The account statements rendered by Bad Boy Records to MTV in connection with *Donnie Klang*.

21. The accounts statements rendered by Bad Boys Records to Remote Productions, pursuant to paragraph 4 of the March 23, 2006 agreement (MTVN 000684 through 000694).

22. The accounts statements rendered by Bad Boys Records to Remote Productions, pursuant to paragraph 4 of the August 22, 2007 agreement (MTVN 000586 through 000597).

23. Any and all documents that refer, relate to, reflect, concern or evidence ABC's purported decision to either drop or not re-new *Making the Band* for a third season.

24. Any and all documents that refer, relate to, reflect, concern or memorialize the agreement between ABC and MTV permitting the airing of future seasons of *Making the Band* on MTV.

25. All documents exchanged between MTV and ABC in connection with MTV's airing of the third season[1] of *Making the Band*.

26. Any and all documents that refer, relate to, reflect, concern or evidence the production costs of the eight (8) additional episodes, which were recently pick-up in connection with cycle three of *Making the Band 4*.

---

[1] As used herein, the terms "cycle" and "season" are used interchangeably.

27. Any and all documents that refer, relate to, reflect, concern or evidence the amount of advertising revenue received by MTV (including its sister and affiliated entities) in connection with the exhibition of *Making the Band* (cycle three), *Making the Band 2* (cycles 1, 2 and 3), *Making the Band 3* (cycles 1, 2 and 3) and *Making the Band 4* (cycles 1, 2 and 3) outside of the United States.

28. Any and all documents that refer, relate to, reflect, concern or evidence the non-refundable revenues received by MTV (including its sister and affiliated entities) outside of the United States in connection with Ancillary Uses (as defined in Exhibit A to the November 15, 2001 Agreement between MTV and Trans Continental) of *Making the Band* (cycle 3), *Making the Band 2* (cycles 1, 2 and 3), *Making the Band 3* (cycles 1, 2 and 3) and *Making the Band 4* (cycles 1, 2 and 3).

29. Any and all documents that refer, relate to, reflect, concern or evidence any overages to the approved production budget incurred in connection with cycle 2 of *Making the Band 2*.

30. Any and all documents that refer, relate to, reflect, concern or evidence any overages to the approved production budget incurred in connection with cycle 3 of *Making the Band 2*.

31. Any and all documents that refer, relate to, reflect, concern or evidence any overages to the approved production budget incurred in connection with cycle 3 of *Making the Band 3*.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Trans Continental's Second Request for Production was served via scanned e-mail and hand-delivery on this 29th day of January, 2009 to:

**Carol C. Lumpkin, Esq.**
K& L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

*James G. Sammataro*
James G. Sammataro