# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.*

             Debtor.

_____ /

SONEET KAPILA, Chapter 11 Trustee for
TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,

             Plaintiff,

v.

MTV NETWORKS, a division of Viacom,
International, Inc.

             Defendant.

Case No. 6:10-cv-181-Orl-28-DAB

_____ /

## TRANS CONTINENTAL'S THIRD AMENDED COMPLAINT

    Plaintiff, Soneet Kapila, as the Chapter 11 Trustee ("Trustee" and/or "Plaintiff") for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental") in Case No. 6:07-bk-1856-ABB, by and through undersigned counsel, hereby sues defendants, MTV Networks ("MTV"), Viacom, Inc. ("Viacom"), Viacom, International, Inc. ("Viacom International"), Bad Boy Films, Inc. ("Bad Boy Films") and Bad Boy Records, LLC ("Bad Boy Records"), and alleges as follows:

## INTRODUCTION

    1.    This lawsuit involves MTV's scheme to misappropriate Trans Continental's interest in the on-going hit television franchise, *Making the Band* (hereinafter, either "Making the

Band" or the "Series"),[1] as well as Bad Boy Films and Bad Boy Records' conscious decision to interest with, and profit from, Trans Continental's rights.

2.      Not satisfied with the hundreds of millions of dollars it received from the Series, MTV has grown greedy.  Without justification, MTV has totally dissociated Trans Continental from its interest in Making the Band – and has robbed Trans Continental of an amount believed to no less than *$60,000,000.00* (**sixty million dollars**), and likely significantly more.

3.      In 2000, Making the Band debuted during primetime on a major television network, ABC.  The show had strong ratings and was renewed for a second season.  Equally important, the show was profitable.  The cost to produce the show was covered by the license fee paid by ABC, enabling Trans Continental and MTV to split the millions of dollars in additional revenues generated by the show (*e.g.*, foreign license fees, domestic syndication fees, merchandising, print publication, etc.) as profit.

4.      Making the Band was scheduled to run for a third season on ABC, when MTV approached Trans Continental about amending the written joint venture agreement to permit the broadcast of season three of Making the Band on MTV's television station.  Although Trans Continental was reticent to make the switch, it ultimately agreed to amend the joint venture agreement and to permit the broadcast of Making the Band on MTV.  Trans Continental's decision to approve these decisions was based on MTV's representations that broadcasting the Series on MTV would prove considerably more profitable for the joint venture, and would afford Trans Continental greater opportunities to showcase the musical groups that it managed.

5.      After the Series was moved to MTV, MTV gradually began to cut-out Trans Continental.  In advance of the launch of Making the Band II, MTV unilaterally – and

---

[1]   To date, there have been twelve (12) seasons of Making the Band, three seasons each of Making the Band, Making the Band II, Making the Band III and Making the Band IV.  Unless otherwise noted, references to the "Series" or "Making the Band" refer to all twelve seasons.

uncergeniously -- removed Trans Continental and its principal, Louis Pearlman ("Pearlman") from all involvement in the production of the program, replacing him with hip-hop star, Sean Combs p/k/a P. Diddy f/k/a Puff Daddy (hereinafter, "Diddy").

6.     MTV's decision to expel Pearlman from future involvement with Making the Band was calculated and committed with full knowledge that it transgressed Trans Continental's contractual and other rights.  Indeed, as revealed by an email unearthed during the course of this litigation, MTV's decision was to: "*f\*ck lou ... keep lou off tv*."[2]

7.     Upon Trans Continental belatedly learning that it was being unilaterally cut-out from the production of Making the Band II, Trans Continental demanded an explanation from MTV.  MTV assured Trans Continental that bringing Diddy into the fold was in joint venture's best interests, as it would bring a fresh face to Making the Band and insure the long-term profitability of the franchise to the benefit of the joint venture and Trans Continental.  MTV's representations initially proved true as, though belatedly, MTV tendered a check to Trans Continental in September of 2005 connection with Season 2.1 of *Making the Band*, the first season featuring Diddy.[3]

8.     Later, and with the benefit of hindsight, it became clear that Diddy's introduction to Making the Band II  was the first step in MTV's scheme to misappropriate Trans Continental's interest in Making the Band -- and first of many lies and deceptions designed to hide MTV's plan

---

[2]   A true and correct copy of the complete copy of the e-mail chain conveying Brian Graden's sentiments has been filed, under seal, with the Court in connection with Trans Continental's Opposition to Bad Boy's Motion to Dismiss [*See* D.E. 86, Exhibit A].

[3]   This payment included amounts earned in connection with the foreign exploitation of Season 2.1 in Germany and the United Kingdom.  Thereafter, MTV tendered a subsequent, albeit, insufficient check to Trans Continental in June of 2006.  (*See, e.g.*, Exhibits H and I to D.E. 86, which was previously filed with this Court under seal). Notably, Season 2.1 of Making the Band – like all subsequent seasons of Making the Band – was exploited in different foreign markets at different times.  There was not one singular roll-out.  By way of example, Season 2.1 aired on MTV Germany in 2003, on MTV Norway in 2005 and MTV Turkey in 2007.  Consequently, there is often a significant lag time between the foreign exploitation of a particular season and when the resulting proceeds are due.

to misappropriate Trans Continental's interest in Making the Band as well as the resulting artists and other television shows that spawned from Making the Band, including, for example, *There and Back* (hereinafter, "There and Back") and *Taquita & Kaui* (hereinafter, "Taquita & Kaui").

9.    After excluding Trans Continental from any involvement in the production of the Series, MTV began listing itself as the sole owner of Making the Band in copyright registrations. In 2005, when Trans Continental asked for confirmation that MTV was registering Trans Continental as a co-owner in the Series, MTV responded (in writing and through MTV's in-house counsel Virginia Lazalde-McPherson), assuring Trans Continental that its ownership interest was being recognized in the copyright registrations.  Ms. Lazalde-McPherson's statement was a lie. *Nearly two years earlier*, MTV stopped listing Trans Continental as a co-owner of Making the Band (registering more than 30 episodes in Viacom International's name alone).

10.    The parties also agreed that Trans Continental and Pearlman would receive a screen "credit," acknowledging their contributions to and relationship with Making the Band. However, when MTV broadcast the show, the Trans Continental and Pearlman's screen credits were omitted.  MTV never advised Trans Continental that it was being dropped from the credit listing.  Instead, MTV utilized subterfuge by forwarding an "advance" copy of the show to Trans Continental which *included* the required credits, which were subsequently *removed* when MTV broadcast the show.

11.    As time went by, MTV stopped making payments to Trans Continental and Trans Continental began to press MTV for its share of the Making the Band revenues.  MTV initially responded that Trans Continental did not have an interest in Making the Band II, Making the Band III, or Making the Band IV (hereinafter, "Making the Band II-IV"), and therefore it was not entitled to the Series' profits.  Reminded that the parties' written agreement expressly provides Trans Continental and MTV were to "jointly exploit any features, spin-offs, sequels, made-for-

TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation," MTV took the position that, despite the identical format, Making the Band II-IV were not sequels to Making the Band, and, therefore, Trans Continental had no interest.

12.     Only *after* this lawsuit was filed, and only *after* Trans Continental discovered documents in which MTV explicitly acknowledged Trans Continental's interest in all versions of Making the Band, has MTV conceded that Trans Continental is a co-owner of the Series.  MTV now argues that Making the Band – a "prime time" show spanning ten seasons, airing in dozens of countries throughout the world, and at a cost of more than eighty million dollars to produce – has made no money after the first two seasons aired on ABC.  MTV has literally made hundreds of millions of dollars on the Making the Band franchise, and it is time that MTV pay Trans Continental its proportional share of all revenues due and owing.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is properly before this Court pursuant to the Court's March 3, 2010 Order granting Trans Continental's Motion to Withdraw the Reference from the United States Bankruptcy Court for the Middle District of Florida [D.E. 4].

14.     Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), because Trans Continental and the various defendants are citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of attorneys' fees and costs.

15.     Additionally, pursuant to Section 48.193(1)(a), Florida Statutes, this Court has personal jurisdiction over the defendants as the defendants purposefully operate, conduct, engage in and/or transact business in the State of Florida and/or because the defendants engage in substantial and not isolated activities within the state of Florida.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PARTIES

17.     Plaintiff is the court-appointed Chapter 11 Trustee for the bankruptcy estate of Trans Continental.   Trans Continental Television Productions was owned and operated by Pearlman, and formed with the express intent of developing motion picture and television concepts.

18.     Defendant, MTV Networks, is a division of Viacom International, Inc., a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1515 Broadway, New York, New York 10036.   MTV is a media giant, which changed the way that America's youth "listened" to its music.   While today, there are a multitude of MTV channels, including MTV Hits, MTV Jams, MTV 2, MTV Tr3s, MTV's flagship station pioneered music videos and music news.   Moreover, with the launch of the television series *The Real World* in 1992, MTV has been tabbed as the creator of reality television.

19.     Defendant, Viacom International, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1515 Broadway, New York, New York 10036.

20.     Defendant, Viacom, Inc., is a leading global entertainment content company, which engages audiences on television, motion picture, Internet, mobile and video game platforms through many of the world's best known entertainment brands.   Both MTV Networks and Viacom International, Inc. are subsidiaries of Viacom, Inc.

21.     Defendant, Bad Boy Films, is a New York corporation with its principal place of business at 1440 Broadway, New York, New York, 10018.

22.     Defendant, Bad Boy Records, LLC, is a Delaware corporation with its principal

place of business at 1440 Broadway, New York, New York, 10018.

## FACTUAL BACKGROUND

23.     On May 8, 2007, Trans Continental filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, Case No. 6:07-bk-01856, pending before the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

24.     On July 18, 2007, the Bankruptcy Court entered its Order Directing the Appointment of Chapter 11 Trustee [B.K. D.E. 11].

25.     On the same date, the United States Trustee filed its Notice of Appointment of Trustee [B.K. D.E. 12], appointing Plaintiff as the Chapter 11 Trustee for Trans Continental

26.     On July 20, 2007, this Court entered its Order Approving the Trustee's appointment [B.K. D.E. 15].

27.     On July 31, 2007, this Court entered its Order [B.K. D.E. 18], pursuant to which the Trans Continental bankruptcy case was jointly administered with the bankruptcy case of Louis J. Pearlman, with case number 6:07-bk-761-ABB.

28.     Thereafter, this Court granted Trans Continental's Motion to Withdraw the Reference from the United States Bankruptcy Court for the Middle District of Florida [D.E. 4].

A.     **An Idea to Create a Reality Television Show.**

29.     Making the Band was created by two iconic figures in the entertainment industry: Pearlman (the modern father of the "boy band" who created top-selling acts such as the Backstreet Boys and N'Sync) and MTV (a pioneer in music videos and music news).

30.     The idea was sparked during an N'Sync performance on MTV's Total Request Live (a/k/a "TRL"). Watching the performance, MTV executive Ken Mok was captivated by the electric atmosphere generated by the band. Teenaged fans poured out into the streets in a scene

Mok described as reminiscent of the "Beatles invasion." Intrigued by the fan frenzy, Mok set-up a meeting with Pearlman.

31.     At the meeting, Mok and Pearlman discussed how Pearlman created his bands. Pearlman conducted a preliminary talent search that brought several young men to Orlando, Florida to audition at Pearlman's Orlando compound. The candidates were then put through a rigorous selection process that graded dance ability, singing ability, appearance, and the "it" factor. After several weeks of whittling down the candidates, the final six to eight members were selected for Pearlman's band.

32.     Mok was convinced that what Pearlman described made for a great reality television show. Mok (on behalf of MTV) and Pearlman (on behalf of Trans Continental) agreed to form a joint venture to sell their idea, which they jointly pitched with great reception to American Broadcasting Company ("ABC"), Fox and among others.

**B.     The Joint Venture Between MTV and Trans Continental.**

33.     On January 7, 2000, Trans Continental and MTV Networks memorialized their joint venture agreement to ***jointly develop*** and ***co-produce*** an episodic television series about the making of a boy-band ultimately titled Making the Band, which pursuant to the parties' earlier agreement with ABC was to be broadcast on ABC.  A true and correct of the Joint Venture Agreement is attached hereto as **Exhibit 1.**

34.     The Joint Venture Agreement also memorialized Trans Continental and MTV's agreement to jointly develop the all-male pop band, which was to be the end product of Making the Band.

35.     Making the Band was not merely a show made by MTV about Pearlman or the making of the boy band. Instead, as plainly memorialized by the Joint Venture Agreement, it was

a co-production between MTV and Trans Continental.  Trans Continental invested money in the

development of the idea, the story line, and the production of the television series.

36.    In return, Trans Continental was a co-owner of the show and had a financial

interest in all of the products that originated from the Series.  Specifically, Trans Continental was

entitled to receive:

- Fifty percent of all merchandizing (after MTV's taking of a ten percent distribution fee deducted from gross revenue and recoupment of its direct, out-of-pocket expenses). (*See* Exhibit 1, ¶ 7).

- Fifty percent of all print publishing (after MTV's taking of a ten percent distribution fee deducted from gross revenue and recoupment of its direct, out-of-pocket expenses). (*Id.* at ¶ 8).

- Joint ownership with MTV of all music publishing rights (though MTV was entitled to administer a fifteen percent fee, plus re-coup its expenses). (*Id.* at ¶ 9).

- Fifty percent share of all revenues received from advertisers or sponsors in connection with the official web-site related to the television series and band (after MTV recoups expenses and takes a commission of 15%). (*Id.* at ¶ 10).

- Fifty percent share of all fees received in connection with the domestic and foreign distribution of the series (after MTV takes a ten percent fee off the top). (*Id.* at ¶ 11).

- Fifty percent share of all proceeds received from the home video market (MTV entitled to a ten percent distribution fee off the top and recoupment of its direct, out-of-pocket expenses). (*Id.* at ¶ 12).

- Twenty percent management fee for managing the band. (*Id.* at ¶ 18); and

- Fifty percent interest in all other ancillary rights. (*Id.* at ¶ 16).

37.    Notably, the Joint Venture Agreement stipulated that MTV and Trans Continental

"will *jointly* exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-

theatrical, radio or other projects based on the Series or the band, subject to good faith

negotiation." (*Id.* at ¶ 14) (emphasis added).

38.    The Joint Venture Agreement additionally provided that "all business deals

relating to the Series and Band and ancillary rights therefrom must be approved by both parties." (*Id.* at ¶ 15).

39.     The Joint Venture Agreement further provided that "[t]he parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein. [sic]   Until such time as such formal agreement is executed, this letter shall remain binding upon the parties."

**C.     The Launch of *Making the Band* on ABC.**

40.     *Making the Band* originally aired on ABC in 2000, with third-party, Bunim Murray Productions, serving as the line producer for the show.

41.     The show chronicled, in what was then ground-breaking and now has become commonplace reality-style genre, the real-life competition between young men vying to become members of the next boy band group.   Midway through the initial season, the final eight contestants were narrowed to five, with these five winners ultimately forming a band entitled "O-Town."

42.     *Making the Band* captured the initial competition and tracked O-Town's early development, including the recording of O-Town's self-titled debut CD, *O-Town.*

43.     Boosted by the popularity of the television series, *O-Town* sold more than two million copies.  Its first single, *Liquid Dreams*, was the first song to reach # 1 on the Billboards single sales chart without making the airplay chart.

44.     Almost overnight, O-Town had become the next great boy band.

45.     *Making the Band*'s ratings were strong enough to warrant a second season.  The second season – which was again produced by Bunim Murray – further tracked the band's development and struggles, including O-Town's tours, performances, the creation of their second CD, *O2*, and their transition to a new record label, J Records.

46.     Season Two of Making the Band was ground-breaking in that it marked the first time the main cast of a reality show returned for a second season.

47.     Making the Band was scheduled to run for a third season on ABC, when MTV's parent corporation (Viacom) objected.  Because Viacom owns and operates CBS, it did not want a CBS competitor to air a successful show.

48.     As it was so obligated by the paragraph 15 of the Joint Venture Agreement, MTV approached Trans Continental about amending the Joint Venture Agreement to permit the broadcast of season three of Making the Band on MTV's television station.

49.     Trans Continental was reticent to make the switch.  Seasons one and two of Making the Band had achieved substantial ratings during prime time on a major network.  For all its success, MTV was not (and is not) ABC.  It did not, and does not, have the same drawing power as a network.  Moreover, ABC's airing of Making the Band was tremendously profitable for Trans Continental – as, again, ABC paid for the entire production costs of the show.

**D.      The Parties Amend the Joint Venture Agreement.**

50.     Nonetheless, MTV convinced Trans Continental that amending the agreement would allow the parties to sustain the Joint Venture, and increase its profitability.  Accordingly, on November 15, 2001, Trans Continental and MTV entered into an amended agreement (the "Amended Agreement"), which altered certain provisions of the original Joint Venture Agreement.

51.     For example, the Joint Venture Agreement provided that the parties were to "negotiate in good faith a reasonable license fee for runs of the series on MTV" (¶ 13), and further provided that any "MTV deals with sister/affiliated companies shall be on customary market terms" (¶ 17).  A manifestation of the "good faith negotiations" discussed in the Joint Venture Agreement, the Amended Agreement set forth an "Imputed License Fee."

52.     The purpose of an Imputed License Fee is to prevent self-dealing in vertically integrated companies and to guarantee that an owner of a show (in MTV's words) "does not start at zero." The Amended Agreement's Imputed License Fee covers the applicable license fee for "runs of the series on MTV" and for MTV deals with foreign affiliated stations. *See* Amended Agreement ¶ 9.

53.     Because MTV controlled the distribution of the profits derived from the show, the Amended Agreement further required MTV to account to Trans Continental on a semi-annual basis. Importantly, the Amended Agreement re-affirmed MTV's obligation to split show-related revenues with Trans Continental:

> Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series.

A true and correct copy of the Amended Agreement is attached hereto as **Exhibit 2**.

54.     Notably, "[e]xcept as amended [by the Amended Agreement], all of terms of the [Joint Venture] Agreement shall remain in full force and effect."

55.     On December 3, 2001, MTV provided Trans Continental with a check for $725,064.85 for Trans Continental's share of the proceeds related to seasons one and two of Making the Band. According to MTV Records, this amount was comprised as follows: $87,803.00 in merchandising revenues,[4] $458,011.85 in connection with international program sales, and $179,250.00 as part of ABC's licensing fee.

56.     The first episode of the third season of Making the Band aired in January of 2002. Season 1.3 of Making the Band followed O-Town as they opened for Britney Spears and recorded

---

[4]     Trans Continental had already received a $100,000.00 advance in merchandising revenue. Trans Continental also separately received $330,000.00 from record advances to off-set the expenses it incurred in connection with band development and related expenses.

their next album.  The third season was the last season of Making the Band which featured O-Town.

### E.    MTV's Scheme to Misappropriate Trans Continental's Ownership.

57.    Season Three of Making the Band was also the last season in which Trans Continental was permitted to have any involvement in Making the Band.

58.    Despite the success of Making the Band, and despite Trans Continental's interest in future seasons of Making the Band, MTV unilaterally – and unceremoniously – removed Trans Continental from all involvement in the production of the program, replacing it with hip-hop star, Sean Combs *p/k/a* P. Diddy *f/k/a* Puff Daddy (hereinafter, "Diddy").

59.    Without Trans Continental's knowledge or involvement, MTV commenced negotiations with Diddy and his loan-out corporation, Bad Boy Films.  These negotiations – believed to be protracted – ultimately culminated in the execution of a July 12, 2002 agreement between MTV and Bad Boy Films (the "MTV/Bad Boy Films Agreement").  Again, Trans Continental was not even apprised of MTV's negotiations with Diddy and Bad Boy Films, much less allowed to participate in them.[5]

60.    As referenced above, the Joint Venture Agreement and the Amended Agreement provided Trans Continental with certain rights and interests into Making the Band, its sequels, spin-offs and other related projects, including activities relating to the resulting musical acts. Without any notice and without any return consideration, the MTV/Bad Boy Films Agreement stripped Trans Continental of its rights and provided them to Bad Boys Films, Diddy and their related record company, Bad Boy Records.  Additionally, in an effort to entice Diddy and Bad Boy Films to join Making the Band, MTV willingly agreed to limit its exploitation of Making the

---

[5]    In hindsight, and with the benefit of recently discovered documents, MTV's decision to not apprise Trans Continental of its negotiations with Diddy and Bad Boy Films is unsurprising given Bad Boy Films' position that Diddy would have nothing to do with Making the Band unless Trans Continental was if not expelled altogether, minimized greatly.  (*See* Exhibits H – J, *infra*).

Band strictly to television, despite Trans Continental's right to share in and profit from DVD and home video sales.

61.   Under the Joint Venture Agreement, MTV and Trans Continental agreed that all creative decisions relating to Making the Band would be jointly made.   However, under the MTV/Bad Boy Films Agreement, MTV and Diddy were to equally split creative decisions relating to the Making the Band II, leaving Trans Continental with no input.   The Joint Venture Agreement also provided that MTV and Trans Continental would jointly enter into record company negotiations.   Again, without any notice to Trans Continental, MTV entered into at least four (4) record deals and assigned the record deals rights over to Bad Boy Records.   Similarly, pursuant to the Joint Venture Agreement, MTV and Trans Continental agreed to split merchandising sales jointly.   Once again, and without notice to Trans Continental, MTV entered into a merchandising agreement with Bad Boy Films, splitting merchandising with Bad Boy Films and Diddy.   These are just a few examples in which: (a) MTV breached the terms of the Joint Venture Agreement; and (b) which Bad Boy Films and Bad Boy Records knowingly, intentionally and unjustifiably interfered with Trans Continental's contractual rights.

62.   Upon Trans Continental belatedly learning that it was being unilaterally cut-out from the production of Making the Band II,[6] Trans Continental demanded an explanation from MTV. MTV assured Trans Continental that bringing Diddy into the fold was in Joint Venture's best interests, as it would bring a fresh face to Making the Band and insure the long-term profitability of the franchise to the benefit of the Joint Venture and Trans Continental.   At no time did MTV advise Trans Continental that it had stripped Trans Continental of its contractual and other rights and provided these same rights to Diddy, Bad Boy Films and Bad Boy Records.

---

[6]   Trans Continental did not receive any advance notice of the July 17, 2002 press conference in which MTV announced Diddy's participation in Making the Band II (*see infra* and Exhibit H) and, instead, learned of this development at the same time of the general public.

63.     Though not apparent at first, MTV's decision to cut-out Trans Continental was the first in a series of steps designed to hijack the Series and treat Making the Band as MTV's own. By way of example, and without limitation, MTV carried out its scheme to exclude Trans Continental from its ownership interest by:

    a.    intentionally excluding Trans Continental as a co-owner of Making the Band when applying for copyright registrations;

    b.    excluding Trans Continental from the creative process;

    c.    unilaterally making all business deals relating to the Series, without consulting with Trans Continental, including, for example, (i) involving Diddy and/or his related companies in connection with Making the Band II-IV; (b) and creating and broadcasting the television series, Making His Band, There and Back and Taquita & Kaui, without Trans Continental's knowledge or involvement;

    d.    running repeated broadcasts of each episode of Making the Band II-IV, without payment of an additional license fees;

    e.    precluding Trans Continental, in conjunction with Bad Boy Films and Bad Boy Records, from meeting with and managing the artists/groups which arose from Making the Band II-IV;

    f.    requiring the finalists to Making the Band III to contractually agree to be managed by Wright Entertainment Group as a pre-condition to appearing as a contestant on Making the Band III;

    g.    engaging in repeated self-dealing by failing to market, license, distribute and/or shop the Series so as to maximize the value of the Series to the Joint Venture;

    h.    acting in its own best interests at the expense of the Joint Venture;

    i.    failing to account to Trans Continental regarding Trans Continental's share of revenues;

    j.    failing to pay Trans Continental the amounts due and owing to it in connection with each season of Making the Band II-IV, including, without limitation, the revenue owed in conjunction with merchandising, print publishing, music publishing, internet rights, advertising and sponsorship; domestic and foreign distribution, and home video sales;

j. threatening Trans Continental and its principal, Pearlman, when Trans Continental requested the amounts owed to it;

l. changing the name of "Making the Band V" to "Making His Band." MTV changed the name of "Making the Band V" to "Making His Band" so that it could argue that it is not a feature, spin-off, sequel or "other project" based on the Series;

m. failing to recognize Pearlman and Trans Continental in the credits for Making the II-IV and Making His Band; and

n. assigning Trans Continental's contractual rights to Diddy, Bad Boy Films and Bad Boy Records without Trans Continental's consent or knowledge.

## COUNT I
## BREACH OF CONTRACT
### (Against MTV)

64. Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65. Paragraph 5 of the Joint Venture Agreement entered into by and between MTV and Trans Continental provided that "all business/creative matters in connection with the joint venture are to be mutually determined ..."

66. Paragraph 10 of the Joint Venture Agreement provided that "MTV shall create and control the official web site related to the Series and Band. In connection with advertising/sponsorship revenues brought in by MTV on the official website, MTV shall recoup its expenses and take a commission of 15% and then share revenues with TC on a 50-50 basis."

67. Paragraph 14 of the Joint Venture Agreement similarly provided that MTV and Trans Continental were to "jointly exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the [Making the Band] or the band, subject to good faith negotiation," while Paragraph 15 stated that "[a]ll business deals relating to [Making the Band] and [O-Town] and ancillary rights therein must be approved by

*both* parties" (emphasis added).

68.    Paragraph 15 of the Joint Venture Agreement provided that "MTV and TC will enter into record company negotiations jointly.  All business deals relating to the Series and Band and ancillary rights therein must be approved by both parties."

69.    Paragraph 5 of the Amended Agreement provides that MTV is to jointly register the copyright in the names of Trans Continental and MTV.

70.    The parties' Amended Agreement further provided that "with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series."

71.    Without limitation, MTV breached each any every one of the contractual provisions listed above and has committed multiple breaches of the Joint Venture Agreement and the Amended Agreement (hereinafter, the "Agreements") by, *inter alia*, committing the acts listed in paragraph 63, which is incorporated herein by reference.

72.    MTV has breached the above contractual provisions in connection with its production of nine (9) subsequent seasons of Making the Band, as well as its production of the related television series: Making His Band, There and Back and Taquita & Kaui.  Each breach constitutes separate, independent and continuing breaches of the parties' Joint Venture Agreement and Amended Agreement.

73.    Except to the extent that it was purposefully excluded by MTV, Trans Continental satisfied all of its obligations under both the Agreements.

74.    As a direct and proximate result of MTV's breaches of the parties' Agreements, Trans Continental has incurred actual and substantial monetary damages, and will continue to incur such damages, in an amount to be determined at the final hearing in this matter.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

<div align="center">

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Against MTV)**

</div>

75.     Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

76.     On January 7, 2000, Trans Continental and MTV entered into the Joint Venture Agreement.

77.     The purpose of the Joint Venture Agreement was manifold, including: to establish Trans Continental and MTV's joint ownership in Making the Band; to carry-out a single business enterprise; and to mutually profit from the creation and distribution of Making the Band.

78.     As a joint venture partner, MTV owed a fiduciary duty to both Trans Continental and the Joint Venture.

79.     Trans Continental placed its trust in MTV, and MTV accepted Trans Continental's trust.

80.     As a joint venture partner, MTV was obligated to maximize revenue from the Series and to put the interests of the Joint Venture in front of its own interests.

81.     MTV breached its fiduciary duties to Trans Continental and to the Joint Venture by, among other things and without limitation:

      a.     lying to and threatening Trans Continental;

      b.     engaging in repeated self-dealing;

c.     broadcasting unlimited re-runs of Making the Band episodes
       without permission and without additional payment to the Joint
       Venture;

d.     failing to seek competitive offers and licensing the Series at fair
       market value;

e.     failing to negotiate with its sister and affiliated companies in good
       faith or on customary market terms, including in multiple instances,
       permitting its sister, affiliated and parent companies to broadcast the
       Series free of charge and without any return consideration to the
       Joint Venture;

f.     unilaterally registering the trademark to and copyright in Making
       the Band in Viacom International's name, thereby wrongfully
       stripping the Joint Venture of valuable intellectual property rights;

g.     failing to market, license, distribute and/or shop the Series so as to
       maximize the value of the Series to the Joint Venture;

h      acting in its own best interests at the expense of the Joint Venture;

i.     acting in its own best interests at the expense of Trans Continental,
       its joint venture partner;

j.     sacrificing Trans Continental's interests by, among other things,
       agreeing to Bad Boy Films' demand to cease exploring revenue
       streams from the exploitation of the Making the Band through DVD
       and home video sales;

k.     exploiting the Series on its MTV.com domain, and refusing to
       account to Trans Continental for the advertising and other revenues
       derived therefrom;

l.     failing to properly account to Trans Continental;

m.     generally failing to maximize the Series' revenue;

n.     lying to Trans Continental that there was not market for DVD and
       home video sales for Making the Band (when, in truth, MTV
       voluntarily agreed to waive this right as an inducement to entice
       Diddy and Bay Boy Films);

o.     creating features, spin-offs, sequels, or and other projects based on
       the Making the Band Series and the related band members,
       including, but not limited to, Making His Band, There and Back,

and Taquita & Kaui, without consulting or otherwise negotiating with Trans Continental in good faith, and without any benefit to the Joint Venture; and

p.  requiring the finalists to Making the Band III to contractually agree to be managed by Wright Entertainment Group as a pre-condition to appearing as a contestant on Making the Band III.

82.  Owing to Trans Continental's original concept and initial efforts, MTV has realized hundreds of millions of dollars in advertising and other revenue from the Series. Yet, because of MTV's self-dealing and wrongful conduct, Trans Continental, both individually and in its capacity as a partner in the Joint Venture, has failed to receive the benefit of its bargain and the just rewards for the incredible success of Making the Band.

83.  MTV's breaches of its fiduciaries duty to Trans Continental have proximately caused Trans Continental to suffer substantial economic damages.

84.  In breaching its fiduciaries duties to Trans Continental, MTV has acted with malice and oppression, and in conscious disregard of Trans Continental's and the Joint Venture's rights. MTV has caused and intended to cause great economic harm to Trans Continental with full knowledge of the wrongfulness and unjustified nature of its conduct.

85.  MTV's conduct was deliberate and intentional.

86.  Given the outrageousness of MTV's willful, malicious and wanton conduct, Trans Continental should be awarded punitive and exemplary damages sufficient to punish MTV for engaging in this conduct and to deter similar conduct in the future.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks for all actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest and attorneys' fees and costs, as well as punitive and exemplary damages

sufficient to punish MTV for engaging in this conduct and to deter similar conduct in the future, and such other relief as this Court deems just and proper.

## COUNT III
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against MTV)

87.     Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

88.     Included in the parties' Agreements is an implied covenant of good faith and fair dealing by which MTV agreed not the deprive Trans Continental of the full benefits of the Agreements, and not to take any action with the motive to frustrate Trans Continental's rights under the Agreements.

89.     Because the parties failed to execute follow-up long-form agreements (as is standard in the entertainment industry), a number of the Agreements' provisions lack definition and require commercially reasonable definitions as understood in the industry.

90.     By way of example, the Amended Agreement only entertains the possibility of MTV broadcasting each episode of the particular season of Making the Band once. Nonetheless, MTV, in breach of the implied covenant of good faith and fair dealing, has aired repeated broadcasts of each episode of Making the Band I-IV, without permission and without paying an additional license fee to the Joint Venture. For example, MTV broadcast episode one of Season 4.2 on its station a total of sixty-time (69) times, without paying either Trans Continental or the Joint Venture a license revenue or a proportional share of the advertising revenues earned in connection with these multiple broadcasts.

91.     MTV has similarly breached its implied covenant of good faith and fair dealing in that it has, in bad faith and with a motive to intentionally frustrate, destroy or injure Trans Continental's enjoyment of its rights under the Agreements by:

a.  running repeated broadcasts of each episode of Making the Band II-IV, without payment of an additional license fees or sharing of the resulting advertising revenues;

b.  unilaterally making all business deals relating to the Series, without consulting with Trans Continental, including, for example, involving Diddy and/or his related companies in connection with Making the Band II-IV;

c.  failing to protect Trans Continental's interests in negotiating with Bad Boy Films and Bad Boy Records;

d.  precluding Trans Continental, in conjunction with Bad Boy Films and Bad Boy Records, from managing the artists/groups which arose from Making the Band II-IV;

e.  engaging in repeated self-dealing;

f.  failing to negotiate with its sister and affiliated companies in good faith or on customary market terms, including in multiple instances, permitting its sister, affiliated and parent companies to broadcast the Series free of charge and without any return consideration to the Joint Venture;

g.  unilaterally registering the trademark in Making the Band in Viacom International's name;

h.  failing to market, license, distribute and/or shop the Series so as to maximize the value of the Series to the Joint Venture;

i.  failing to maximize and properly account for the foreign revenue from the Series;

j   acting in its own best interests at the expense of the Joint Venture;

k.  threatening Trans Continental and its principal, Pearlman, when Trans Continental requested the amounts owed to it;

l.  lying to and misleading Trans Continental;

m.  failing to timely obtain payment from Bad Boy Records and/or Atlantic Recording Corp.;

n.  permitting third-parties to become delinquent in their obligations to account and make payments in connection with sale of the Artists' albums and merchandise;

o.   improperly charging administrative overhead for certain items on the participation statements;

p.   failing to fully disclose the amount paid by MTV to Bad Boy Films for the services of Diddy;

q.   failing to negotiate with and otherwise excluding Trans Continental from any involvement in the creation and exploitation of Making His Band, There and Back, and Taquita & Kaui;

r.   failing to permit Trans Continental share in the revenues generated in connection with Making His Band, There and Back, and Taquita & Kaui; and

s.   exploiting the Series on its MTV.com domain, and refusing to account to Trans Continental for the advertising and other revenues derived therefrom.

92.   When previously confronted by Trans Continental about its unfair dealing, MTV threatened Trans Continental's then-principal, Pearlman, advising Pearlman that, if Trans Continental sought legal redress, MTV would ensure that his musical acts would never appear on TRL or any other MTV programming, and that MTV would run an expose Pearlman's purported sharp business practices and alleged inappropriate relationships with the members of his boy bands.[7]

93.   MTV's unfair dealing has frustrated the parties' agreed common purposes and vitiated not only Trans Continental's reasonable expectations, but Trans Continental's benefit of the bargain.

94.   MTV has acted in bad faith with the express goal of destroying Trans Continental's right to enjoy the benefits of the Agreements.

---

[7]   MTV is ostensibly not alone in utilizing threats as part of its business repertoire. Diddy, for example, has been accused on multiple instances of making threats or resorting to physical violence in order gain leverage. For example, in 1999, Diddy was arrested for allegedly assaulting Steve Stoute, a rival music executive, in Mr. Stoute's office with fists, champagne bottles, and a telephone. Diddy was also sued for allegedly menacing Kirk Burrowes with a baseball bat in 1996, while his attorney demanded that Mr. Burrowes sign an instrument forfeiting all ownership interest in Bad Boy Entertainment, Inc. *See Burrowes v. Combs*, 25 A.D. 3d 370, 808 N.Y.S. 2d 50 (1st Dept. 2006). Notably, in this case, Mr. Burrowes also accused Diddy of tortiously interfering with his music management contract with an artist.

WHEREFORE, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

<div align="center">

**COUNT IV**
**DECLARATORY RELIEF**
**(Against MTV and Viacom International)**
**(As to Copyright Ownership in Making the Band)**

</div>

95.     Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

96.     On February 2, 2005, Jeffrey Kranzdorf, Esq., on behalf of Trans Continental, wrote to Ms. Lazalde-McPherson to discuss, among other things, the status of the copyright registrations. (A true and correct copy of Mr. Kranzdorf's February 2, 2005 letter to MTV is attached hereto as **Exhibit 3**).

97.     On September 28, 2005, Ms. Lazalde-McPherson responded that "MTV has and will continue to register each episode with the copyright office, and will provide [Trans Continental] copies of such registrations, as requested." (A true and correct copy of Ms. Lazalde-McPherson's September 28, 2005 letter to **Exhibit 4**).

98.     Despite this promise, and despite MTV's clear obligation to do so, Trans Continental recently learned that, with the exception of a handful of registrations, MTV, in conjunction with Viacom, registered the vast majority of the copyrights in the Series in Viacom International's name only.

99.     MTV designated Warren Solow to testify as its corporate representative on the issue of, among other things, the copyright registrations in Making the Band.

<div align="center">

Page | 24

</div>

100.    Mr. Solow is the Vice President of Information and Knowledge Management at Viacom.  He oversees, among other things, copyright compliance for many Viacom entities, including copyright registrations relating to MTV programs.

101.    Viacom uses Viacom International as the formal "owner" of copyrights associated with Viacom-related entities – despite the fact that in most, if not all, instances, Viacom International has no involvement in the authorship, creation or production of the underlying property.

102.    Mr. Solow testified that MTV erroneously registered Viacom International as the sole owner of a number of copyrights relating to Series.  (*See* **Exhibit 5**).

103.    Mr. Solow further testified that MTV should have registered Trans Continental as a joint owner of the copyrights relating to Making the Band.

104.    Mr. Solow agreed that it would be appropriate for MTV to take remedial action by notifying the United States Copyright Office of the errors and amending the registrations to reflect joint ownership.

105.    In this regard, Trans Continental has demanded that MTV immediately contact the United States Copyright Office and take the steps necessary to amend the copyright registrations to reflect Trans Continental's co-ownership in the Series. (A true and correct copy of Trans Continental's May 15, 2009 demand letter is attached hereto as **Exhibit 6**).

106.    To date, neither MTV nor Viacom International has made any effort to notify the copyright office of the error(s), and have refused to take corrective measures to cure the errors in the copyright registrations.

107.    Worse yet, as recently as March 2010, Mr. Solow filed a declaration in federal court on behalf of Viacom International, in which he claims that Viacom International is the sole owner of the Making the Band IV.  Viacom International is seeking damages against Youtube,

LLC, Youtube, Inc., and Google, Inc. premised in these incorrect copyright registrations. Thus, it is clear that Viacom, Viacom International, and MTV will not take corrective actions – and will use the false registrations for its own profit -- unless the Court requires it to cure its false registrations.

      **WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter an order declaring that Trans Continental is a co-owner of the copyright in and to each and every episode which comprise Making the Band, Making the Band II, Making the Band III and Making the Band IV; mandating that MTV Networks and Viacom International, Inc. amend the copyright registrations; awarding Trans Continental's its attorneys' fees and costs, and providing such other relief as this Court deems just and proper, including all relief which Trans Continental is entitled as a consequence of MTV Network's failing to first obtain Trans Continental's consent prior to licensing Making the Band II-IV.

<div align="center">

**COUNT V**
**DECLARATORY RELIEF**
**(Against MTV)**
**(As to Trans Continental's Rights in and to Making His Band, There & Back**
**and Taquita & Kaui and Future Spin-Offs)**

</div>

      108.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

      109.    Paragraph 14 of the Joint Venture Agreement provides that MTV and Trans Continental are to "*jointly* exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation." (emphasis added).

      110.    MTV has argued that, despite the identical format and creative concept, Making the Band II- IV are not sequels to Making the Band. MTV has intermittingly retreated from this

position.

111.   MTV is, however, firmly entrenched in its position that, despite the fact that Making His Band is a variation of Making the Band IV (and, indeed, was initially entitled Making the Band V) and employs essentially the same format, Making His Band is not a feature, spin-off, sequel or "other project" based on the Series.

112.   Making His Band is not the only feature, spin-off or other projects based on the Series, which has originated from the Making the Band television franchise.  There are/have been others, including the television series, There and Back, a show which chronicled the efforts of former O-Town member, Ashley Parker Angel, to launch his solo career.[8]

113.   Similarly, Taquita & Kaui is an admitted spin-off of Making the Band III.[9] Fashioned as a modern-day *Laverne & Shirley,* the show featured two of the female contestants from Making the Band III, trying to make their dreams come true in the big city.

114.   MTV has also recently announced its intention to create another spin-off, featuring former Day 26 band member, Qwanell "Que" Mosely, and former Danity Kane singer, Dawn Richard.

115.   Declaratory relief is proper in this case pursuant to 28 U.S.C. § 2201, as there is a genuine, bona fide dispute between Trans Continental and MTV as to the scope and meaning of

---

[8]   During his deposition, George Cheeks, MTV's Executive Vice President, Business Affairs, General Counsel of the MTV Networks Music Group and Entertainment Group, and co-general counsel of MTV, testified that a "spinoff" is "where you take a character from the original series and 'spin them off' into a new project."

[9]   *See* George Cheeks' June 10, 2009 deposition transcript:

> Q:    Would [Taquita & Kaui]  constitute a spinoff of Making the Band since they are characters or personalities from one show who are now being spun off to a different show?
>
> A:    Yes.

(A true and correct copy of the pertinent excerpt of Mr. Cheek's deposition transcript is attached hereto as **Exhibit** 7, p. 147).

the terms of the parties' Agreements.

116.    Additionally, there is a genuine, bona fide dispute between Trans Continental and MTV as to whether or not Making His Band constitutes a derivative work within the meaning of 17 U.S.C. §§ 101, 106, as well as whether Making His Band, There and Back, Taquita & Kaui and the yet untitled show featuring, Qwanell "Que" Mosely, and Dawn Richard (the "Untitled Show"), constitute spin-offs, sequels or other projects within the meaning of the Joint Venture Agreement.

117.    The controversy between Trans Continental and MTV rests on a present, ascertainable state of facts.

118.    Trans Continental has an actual and present interest which is directly adverse to the interest of MTV.

119.    As evidenced by its actions (*e.g.,* its failure to negotiate with Trans Continental in good faith), MTV has ostensibly taken the position that Making His Band, There and Back, Taquita & Kaui and the Untitled Show are not features, spin-offs, sequels or "other projects" based on the Series.

120.    Trans Continental disagrees with MTV's position and believes that: (i) it is a co-owner of the copyright in and to Making His Band by virtue of the fact that Making His Band constitutes a derivate work within the meaning of 17 U.S.C. §§ 101, 106; and/or (ii) entitled to "jointly exploit" and otherwise share in the revenues generated in connection with Making His Band, There and Back, Taquita & Kaui and the Untitled Show in accordance with the terms of the Joint Venture Agreement, as these shows constitute features, spin-offs, sequels or "other projects" based on the Series.

121.    Trans Continental is uncertain as to its legal rights with respect to the Making His Band, There and Back, Taquita & Kaui and the Untitled Show and is entitled to have this

uncertainty resolved.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a an order declaring (a) that Making His Band, There and Back and Taquita & Kaui are features, spin-offs, sequels or "other projects" based on the Series within the meaning of Paragraph 14 of the Joint Venture Agreement; (b) that Trans Continental is the rightful co-owner in and to the copyrights associated with Making His Band; (c) that Trans Continental is entitled to jointly share in the net proceeds received in connection with Making His Band, There and Back and Taquita & Kaui; (d) precluding MTV Networks, Viacom International, Inc. and Viacom, Inc. from unilaterally registering the copyrights in Making His Band, There and Back and Taquita & Kaui in Viacom International, Inc's name; (e) awarding Trans Continental's its attorneys' fees and costs, and (f) that Trans Continental is entitled to recover all other relief that this Court deems just and proper.

## COUNT VI
## <u>DISSOLUTION OF THE JOINT VENTURE</u>
### (Against MTV)

122.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, and 76 through 86 as if fully set forth herein.

123.    As referenced above, MTV and Trans Continental formed a Joint Venture wherein both parties agreed to a common purpose, contributed labor and capital to the Joint Venture, and had a mutual interest, and a common goal of mutually profiting from the creation, distribution and exploitation of Making the Band and all related projects.

124.    The parties' Joint Venture Agreement provided that "[t]he parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein. [sic]   Until such time as such formal agreement is executed, this letter shall remain binding upon the parties."

125.   Despite this fact, "a more formal joint venture agreement" was never entered into. Consequently, there is no provision for the involuntary dissociation of a partner, or for the dissolution of the Joint Venture itself.

126.   Nonetheless, as documented herein, MTV's actions constitute a willful and persistent breach of the parties' Joint Venture and, by virtue of its actions, MTV has wrongfully expelled Trans Continental from the Joint Venture and has caused the wrongful dissolution of the Joint Venture as a matter of law.

127.   Given MTV's actions, it is not reasonably practicable for the parties to carry on the business of the Joint Venture.

128.   Pursuant to governing law, upon a wrongful dissolution of a joint venture, the former joint venture partners are required to wind-up the affairs of the joint venture and to liquidate it assets.

129.   MTV's actions require a judicial dissolution of the Joint Venture.  Additionally, a dissolution of the joint venture is further required in that, according to MTV's calculations the joint venture is un-recouped in an amount in excess of $15,000,000.00.   There is no purpose in perpetuating a valueless joint venture, particularly when the Joint Ventures' assets, the intellectual properties in and to the Series, Making His Band, and its related spins-off and products, can be sold at a tremendous profit (and benefit Trans Continental and Pearlman's creditors).

130.   Given, however, that dissolving the Joint Venture is a complex undertaking, which will require an evaluation of the value of the Series, as well as an evaluation of the rights in and to Making His Band, There and Back and Taquita & Kaui and all of the attendant intellectual property rights to these properties, an appointment of a receiver is warranted to oversee the winding up of the Joint Venture and the liquidation of its assets after dissolution.

131.   Soneet Kapila has agreed to pay the undersigned counsel a reasonable fee and costs.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a decree dissolving the joint venture, appointing a receiver to oversee the winding-up of the Joint Venture's business, imposing a constructive trust for the benefit of Trans Continental upon all funds, assets, revenues and profits MTV Networks receives from the distribution and exploitation of the Series Making His Band, There and Back and Taquita & Kaui, enjoining MTV Networks (and its affiliates) from entering into any license agreements with its sister or affiliated entities without first seeking the most competitive and beneficial license deal from unaffiliated third parties in a free and open market; and awarding Trans Continental attorneys' fees and costs as provided for under governing law, and for such other relief as this Court deems just and proper.

## COUNT VII
## DEMAND FOR EQUITABLE ACCOUNTING
### (Against MTV and Viacom International)

132.   Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

133.   Pursuant to the United States Copyright Act, joint owners of a copyright are deemed to be tenants-in-common, with each having an independent right to use or license the copyright, subject to a duty to account to the co-owner for any profits earned from the copyrighted work.

134.   Trans Continental has an ownership interest in Making the Band II, season 1 (hereinafter, "Making the Band 2.1"), through Making the Band IV, Season 3 (hereinafter, "Making the Band 4.3") as well as Making His Band, There and Back and Taquita & Kaui.

135.   MTV, through its corporate representative, has acknowledged Trans Continental's

ownership interest in the episodes of Making the Band I-IV reflected in the copyright registrations attached as Exhibit 5.

136.   Laura Dorson works for MTV and holds the position of Vice President, Participations Management. Ms. Dorson's responsibilities include overseeing the department at MTV that prepares participation statements to those who share an interest with MTV on various projects. Ms. Dorson was designated as an MTV corporate representative, and testified that Making the Band IV, Seasons 1 through 3, are a Trans Continental property.

137.   Brad Hazzard works for MTV and holds the position of Vice President, business and legal affairs. Mr. Hazzard, also designated as an MTV corporate representative, prepared an e-mail on March 18, 2005 noting that although Making the Band II and Making the Band III featured Diddy, the shows are a Trans Continental Property.

138.   Notwithstanding the recognition of ownership, MTV has taken the position that the Amended Agreement and the Joint Venture Agreement are not applicable subsequent to Making the Band I, Season 3.

139.   By way of example, in his capacity as a MTV corporate representative, Brad Hazzard testified, under oath, that the Agreements only apply to seasons of Making the Band involving O-Town (e.g., Making the Band I). Mr. Hazzard explained that he reached this conclusion after the lawsuit was filed through internal discussions.

140.   George Cheeks, MTV's Executive Vice President and General Counsel and was also designated as MTV's corporate representative, also testified that the Amended Agreement was limited to Making the Band I, Season 3.

141.   Thus, according to the sworn testimony of MTV's Fed. R. Civ. P. 30(b)(6) corporate representatives, there is no contract which governs MTV and Trans Continental's respective rights to Making the Band II-IV, or which otherwise delineates Trans Continental's

entitlement to share in the revenues generated in connection with the television series, Making His Band, There and Back and Taquita & Kaui.

142.    Consequently, MTV and Viacom International are obligated to account to Trans Continental for the rateable share of the profits realized from the use of the Series, including all advertising revenue generated therefrom.

143.    As a joint owner in the copyright to the Series, Trans Continental is entitled to a full accounting of all the profits realized from the use of the Series, including all advertising revenue generated in connection with the broadcast of the Series.

144.    Despite Trans Continental's prior demands, MTV and Viacom International have failed to provide Trans Continental with a full accounting of the profits realized from the use of the Series.

145.    The accounting which MTV has provided to Trans Continental in connection with Making the Band II-IV is insufficient, causing Trans Continental doubt as to, among other things, whether MTV has fully compensated Trans Continental in connection with Trans Continental's interest in its on-going rights to Making the Band.

146.    Also, to date, MTV has failed to provide Trans Continental with an accounting for Making His Band, There and Back and Taquita & Kaui, as well as any other undisclosed (and to be discovered) television programs, series and shows that are features, spin-offs, sequels or "other projects" based on the Making the Band Series

147.    As described in greater detail above, through MTV's wanton actions, Trans Continental have been deprived of its share of the on-going revenues relating to Making the Band; as well as its share of the revenues relating to Making the Band II-IV, Making His Band, There and Back, Taquita & Kaui and potentially other television shows.

148.    All of the information relating to the on-going revenues relating to *Making the*

*Band*; the revenues relating to Making the Band II-IV, and the revenues relating to Making His Band, There and Back and Taquita & Kaui lie exclusively in MTV's possession.

149.   Trans Continental is in need of an accounting in order to determine the exact amount of money which it is owed by MTV.  Plaintiff's remedy at law will not be full and adequate absent an extensive accounting and Plaintiff is, thus, entitled to the equitable remedy of an accounting.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a decree ordering MTV Networks and Viacom International, Inc. to provide Trans Continental with a full accounting of all the profits which MTV Networks will realize from the exploitation of the entirety of the Making the Band Series, including all advertising revenues, as required by law; together with the costs of suit herein incurred, as well as for such other and further relief as this Honorable Court may deem just and proper.

**COUNT VIII**
**DEMAND FOR ACCOUNTING**
**(Against MTV)**
**(Pursuant to the terms of the Amended Agreement)**

150.   Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

151.   This is a demand for an accounting pursuant to the terms of the Amended Agreement.

152.   Schedule A to the Amended Agreement provides:

During the term of this Agreement and for a period of one year following the last exhibition of the Series, [Trans Continental] or its designated certified public accountant may at [MTV's] principle [sic] place of business and at reasonable times during regular business hours upon reasonable advance, written notice … inspect and make copies of any relevant portions of books and records of [MTV]

relating to the Series in order to determine the accuracy of [MTV's] statement of Net Proceeds rendered pursuant thereto.

153.    MTV has refused, and continues to refuse, to provide Trans Continental with an accounting.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a decree ordering an accounting of all revenues relating to the Series in accordance with the terms of the Amended Agreement, as well as for such other and further relief as this Honorable Court may deem just and proper.

<div align="center">

**COUNT IX**
**CONVERSION**
**(Against MTV, Viacom and Viacom International)**

</div>

154.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

155.    Trans Continental is a co-owner of Making the Band (the "property"), which includes and consists of, but is not limited to, its unique, special and novel idea, all underlying copyright and trademark registrations, physical embodiments including masters and any unauthorized and unlicensed copies, all monies garnered from unauthorized and unlicensed possession, use or distribution, and all wrongfully obtained management contracts; and Trans Continental has a right to possess the property.

156.    Despite not having any involvement in the creation or development of Making the Band, Viacom International and Viacom, together with MTV, have each, individually and collectively, exercised unauthorized and wrongful dominion and control over Trans Continental's property rights in Making the Band; specifically:

> a. MTV, Viacom and Viacom International have intentionally excluded Trans Continental as a co-owner of Making the Band in

applying for copyright registrations – an act which has limited Trans Continental's right to itself license Making the Band;

b.  MTV, Viacom and Viacom International have restricted Trans Continental access to the masters and/or physical tapes containing the recordings of the Making the Band episodes and refused to grant Trans Continental access to the same;

c.  MTV, in conjunction with Viacom entities, Remote Productions and New Remote Productions, excluded Trans Continental from exerting its ownership rights and control over the property by unilaterally making business deals with Bad Boy Films and Bad Boy Records, which had the additional effect of depriving Trans Continental of its ownership rights in connection with the management of the artists/groups which arose from Making the Band II-IV, and related revenue generated from album sales, music publishing, and artist-related merchandising;

d.  MTV, Viacom, and Viacom International engaged in repeated self-dealing by failing to market, license, distribute and/or shop the Series so as to maximize the value of the Series to the Joint Venture;

e.  MTV and Viacom unilaterally registered the trademark to Making the Band solely in Viacom International's name;

f.  Viacom, wrongfully and without authorization, ran repeated broadcasts of each episode of Making the Band II-IV, on Viacom owned television stations, including VH1, without payment of an additional license fees to Trans Continental or the Joint Venture, thereby depriving Trans Continental of the ability to use the property via licensing arrangements for said broadcasts;

g.  Viacom and Viacom International, wrongfully and without authorization, negotiated for agreements permitting third parties to broadcast Making the Band without payment to Trans Continental, thereby depriving Trans Continental of the ability to use the property via licensing arrangements for said broadcasts.

h.  Viacom, wrongfully and without authorization, permitted its affiliates, including by way of example, MTV Networks AB, MTV Networks GmbH, and Nickelodeon Australia, to broadcast Making the Band free of charge, wrongly depriving the Joint Venture of license fees and prospective revenue as well as the ability to use the property as consideration in exchange for license fees and prospective revenue in connection with such broadcasts; and

i.   Viacom severely limited or destroyed the value the property to Trans Continental or the Joint Venture by usurping prospective markets in which Trans Continental or the Joint Venture could have itself sought to license the Series.

157.   Defendants' numerous acts of conversion have deprived Trans Continental of its property rights in Making the Band.  Indeed, by way of example, Trans Continental presently has no access to the physical masters which contain episodes of Making the Band.

158.   As a direct and proximate result of Defendants' actions, Trans Continental has incurred actual and substantial monetary damages, and will continue to incur such damages, in an amount to be determined at the final hearing in this matter.

**WHEREFORE,** plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, Viacom International, Inc. and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT X
## UNJUST ENRICHMENT
### (Against MTV, Viacom International and Viacom)

159.   Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, and 133 to 149 as if fully set forth herein.

160.   As referenced above, according to the sworn testimony of MTV's Fed. R. Civ. P. 30(b)(6) corporate representatives, there is no contract which governs MTV and Trans Continental's respective rights to Making the Band II-IV, or which otherwise delineates Trans Continental's entitlement to share in the revenues generated in connection with the television series, Making His Band, There and Back and Taquita & Kaui.

161.    Trans Continental conferred a benefit on MTV, Viacom International and Viacom in the form of its interests in the television series: Making the Band II-IV, Making His Band, There and Back and Taquita & Kaui (collectively, the "Television Shows").

162.    MTV, Viacom International, and Viacom all had knowledge of Trans Continental's interest in the Television Shows and the benefit conferred upon them in the form of the Television Shows.

163.    MTV, Viacom International, and Viacom have exploited the Television Shows, without providing compensation to Trans Continental for its share of the revenues.   MTV specifically profited from Trans Continental's interest by airing the Television Shows domestically on MTV-owned stations.   Viacom similarly profited from Trans Continental's interest in the Television Show by, among other things, permitting the broadcast of Making the Band II-IV and Making His Band on numerous Viacom-owned stations, including VH-1, Nickelodeon Australia, Nickelodeon Latin America, MTV Networks GmbH, MTV Networks AB), without any compensation to Trans Continental or the Joint Venture.  Viacom International has similarly entered into license agreements with third-parties, such as Veoh.com and Centric TV, for the broadcast of some or all of the Television Shows without any compensation to Trans Continental or the Joint Venture.

164.    By virtue of their exploitation of some or all of the Television Shows, MTV, Viacom International and Viacom have been unjustly enriched and have received a benefit without paying for same.

165.    It would be inequitable under the circumstances to allow MTV, Viacom International and Viacom to retain the full benefit of the exploitation of some or all of the Television Shows without paying Trans Continental for its fair share.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of

Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, Viacom International, Inc. and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

<div align="center">

**COUNT XI**
**UNFAIR COMPETITION UNDER § 43(a) OF THE LANHAM ACT**
**(Against MTV, Viacom International and Viacom)**

</div>

166.    Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

167.    Certain MTV corporate representatives have testified that the Amended Agreement is limited solely to Season 3 of Making the Band.

168.    Brad Hazzard, George Cheeks and Jackie French have each testified that Making the Band 2.1 through Making the Band 4.3, constitute new and unrelated television series in which Trans Continental possesses no ownership interest.[10]

169.    According to the testimony of Messrs. Hazzard, Cheeks, and Ms. French, Making the Band II-IV are each new, television series which do not constitute "sequels," "spin-offs" or "other projects" within the meaning of the Joint Venture Agreement and are otherwise unrelated to Making the Band.

170.    MTV, Viacom International and Viacom have violated Section 43(a) of the Lanham Act by naming Making the Band II-IV with a title (Making the Band) that has caused and is likely to cause confusion as to origin, source, sponsorship and/or affiliation.

---

[10]    Undermining the testimony of MTV's representatives is Viacom's updating of the Making the Band trademark file to include specimens of the digital mark as it appears on-line, and which contains an image of Making the Band IV.

171.    The use of the title, Making the Band, in connection with Making the Band II-IV has caused and is likely to continue to cause public deception and lead the viewing public to believe that there is a relationship, or some form of connection, between Making the Band and Making the Band II-IV.

172.    The first two seasons of the original television series, Making the Band, were originally broadcast on prime time on Friday nights on ABC. Millions of viewers watched the show. The third season of Making the Band was broadcast on MTV. As a consequence of this wide-spread broadcast, Making the Band acquired secondary meaning. Through pub'icity and use, Making the Band attained notoriety such that the show's title became associated in the minds of the public with a particular show that possessed a unique format (*e.g.,* elimination, reality-style format) and a specific creative focus (the creation of a band).

173.    MTV, Viacom International and Viacom's use of the title, Making the Band, in connection with Making the Band II-IV creates a likelihood of public confusion – *i.e.*, misleading the viewing public into believing that Making the Band II, Making the Band III and Making the Band IV originated with, or were sponsored by, the same creators (Trans Continental and MTV) of Making the Band.

174.    MTV, Viacom International and Viacom's use of the title, Making the Band, in connection with Making the Band II-IV was done with the deliberate goal of capturing the audience base from Making the Band and capitalizing on the good will, which was created by and belongs to the Joint Venture, and which existed in connection with the original television series, Making the Band.

175.    MTV and Viacom named Making the Band II-IV with the wrongful intent of inducing the public to believe that there was a relationship between Making the Band and Making the Band II-IV. MTV and Viacom naming of Making the Band II-IV constitutes a false

designation of origin.

176.    Evidence of MTV, Viacom International, and Viacom' intention – their position that Making the Band II-IV are each new, television series unrelated to Making the Band notwithstanding – to create a connection in the viewing public mind's between Making the Band and Making the Band II is found in the press releases issued by MTV in announcing Diddy's participation in Making the Band II.  Specifically, John Miller, MTV's then senior vice-president of original programming and series development, stated:

> Once we committed to a new season of Making the Band, the first person who came to mind was P. Diddy.  He's a star maker who has created and produced numerous number one musical acts.  *He is the perfect person to take Making the Band to the next level*.

(*See* **Exhibit 8**) (emphasis added).

177.    Similarly, evidence of the fact that the public was confused as to Making the Band II's association with Making the Band can be found in Entertainment Weekly's original description of Making the Band II:

> Welcome to Making the Band II, the Diddified sequel.  On October 19, MTV will revive the reality show (responsible for the boy band O-Town), as a vehicle for Mr. Diddy, who'll handpick a hip-hop dream team and hand them a contract with his Bad Boy label, all while the cameras roll.

(*See* **Exhibit 9**) (emphasis added).[11]

178.    Moreover, since this time, MTV and Viacom have both on MTV's website and in press releases consistently referred to Making the Band as a continuing series.  These actions have resulted in public deception and led the viewing public to believe that there is a relationship, or some form of connection, between Making the Band and Making the Band II-IV.

---

[11]  Worth noting is the United States Patent and Trademark Office ("PTO") refused to furnish a trademark in the name, *The Making of a Country Band*, in connection with a television program that featured musicians being chosen for a country band, based on its belief that the requested mark was likely to create confusion, and create "a similar commercial impression" given that both television series chronicled music auditions and the creation of a band

179.   As referenced herein, Trans Continental and MTV entered into a Joint Venture Agreement to jointly develop and co-produce, Making the Band.

180.   The good will which exists in the title, Making the Band, belongs to the Joint Venture and is not a divisible asset, as a matter of law.   Similarly, the use which spawned the right to trademark the term, Making the Band, was the Joint Venture's use.[12]

181.   The Joint Venture possesses an indivisible interest in the trademark, Making the Band, and the related goodwill.   Viacom did not possess the right to unilaterally trademark, Making the Band, and does not possess the right to use the mark, separate and apart from the Joint Venture.[13]

182.   Viacom International is a company that holds the registrations for Viacom's copyright and trademark registrations.

183.   Viacom made the decision to register the Making the Band trademark in Viacom International's name.

184.   Viacom instructed the United States Patent and Trademark Office to register the Making the Band trademark in Viacom International's name.

185.   Consequently, the wrongful registration of Making the Band in Viacom International's name does not immunize Defendants' use of the terms, Making the Band II, Making the Band III and Making the Band IV, or the resulting confusion it has caused as to origin, source or affiliation.

---

[12]   The specimen which Viacom submitted to the PTO as evidence of first use contained the image of the O-Town band members.   Moreover, Viacom claimed that the date of first use in commerce was January 13, 2001 – a date which coincided with season 3 of Making the Band.

[13]   Notably, pursuant to paragraph 6 of the Amended Agreement, Trans Continental and MTV agreed: "[Trans Continental] agrees not to exploit the O-Town trademark in any other way without the consent of MTV, and MTV agrees not to exploit the O-Town trademark without the consent of [Trans Continental]."   There is no express mention as to how the trademark in and to Making the Band was to be handled.

186.   MTV possessed a legal duty not to use the Joint Venture's asset in the goodwill in and to the mark, Making the Band, for its individual benefit.   MTV's breach of its legal duty has resulted in harm to Trans Continental, and gives rise to a cause of action for the unfair misappropriation of good will and consumer confusion under the Lanham Act.

WHEREFORE, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, Viacom International, Inc. and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.  Plaintiff further requests that MTV and Viacom be precluded from unilaterally using the mark, Making the Band, and that the trademark be sold as part of the dissolution of the Joint Venture.

## COUNT XII
## AIDING AND ABETTING OR INDUCING BREACH OF FIDUCIARY DUTY
### (Against Viacom)

187.   Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

188.   Pursuant to the Joint Venture Agreement, Trans Continental and MTV formed a Joint Venture for the purposes of creating, producing and exploiting the Making the Band series, all sequels, spin-offs and other related projects, and any resulting Musical Acts.

189.   Viacom had knowledge of MTV's Joint Venture Agreement and Joint Venture relationship with Trans Continental.

190.   With full knowledge of the Joint Venture Agreement and MTV's Joint Venture relationship with Trans Continental, Viacom induced and/or aided and abetted MTV's breach of its fiduciary duties to Trans Continental, its Joint Venture Partner by: (a) intentionally excluding

Trans Continental as co-owner of the Series in registering the copyrights for Making the Band; (b) unilaterally registered the trademark to Making the Band solely in Viacom International's name; (c) directing MTV to license the Series to Viacom entities, including but not limited to VH1, MTV Networks AB, MTV Networks GmbH, Nickelodeon Australia, Nickelodeon Australia, either free of charge, on less than customary market terms and without adequate consideration to the Joint Venture or Trans Continental; and (d) directing and/or assisting MTV to self-deal at the expense of the Joint Venture.

191.    Viacom, both directly and through its affiliates, has been intimately involved in the Making the Band franchise and has profited from the Series.

192.    Viacom induced MTV to breach its fiduciary duties, and substantially participated in such breaches. By way of example, Viacom's employees orchestrated many of the breaches of fiduciary duty, including but not limited to, the registration of copyrights and trademark solely in the name of Viacom International.

193.    By way of further example, Viacom's affiliates, subsidiaries and related entities aired multiple broadcasts of the Series while paying no or almost no licensing fees to Trans Continental or the Joint Venture, despite knowledge of the value of licensing fees for similar shows, and for the Series in particular.

194.    Trans Continental has suffered damages as a result of Viacom's inducement or aiding and abetment of MTV's breaches of fiduciary duties, including but not limited to: the loss of licensing fees for repeated broadcasts of Making the Band on MTV and Viacom's affiliated channels; the loss of licensing opportunities in foreign markets usurped by Viacom's broadcast of Making the Band (for free and/or on less than fair market terms); and losses attributable to the registration of the trademark and copyrights in Viacom International's sole name.

**WHEREFORE,** plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of

Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against MTV Networks, and Viacom, Inc. for actual and compensatory damages in an amount to be determined at the final hearing in this matter, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

### COUNT XIII
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
#### (Against Bad Boy Films and Bad Boys Records)

195.   Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 63, as if fully set forth herein.

196.   As referenced above, Trans Continental and MTV enjoyed a contractual and business relationship, which was memorialized in part by the Joint Venture Agreement.   The Joint Venture was formed to create, produce and exploit the Making the Band series, its sequels, spin-offs and other related projects, including any resulting musical acts which were spawned from the Making the Band franchise.

197.   Trans Continental, as co-owner of the Series and pursuant to the Joint Venture Agreement and Amended Agreement, was entitled to various rights in connection with the Series, including, for example and without limitation, the rights to: (a) share in the creative vision and production of the show; (b) share in the proceeds from the television program and its ancillary revenue streams; (c) manage the artists and/or bands that originated from the show; and (d) enter into record company negotiations.

198.   After three successful seasons of the Series, and without consulting Trans Continental, MTV sought to install Diddy as the new face of the Series.  MTV's initial plan was ostensibly to have Diddy play the lead role as the "band maker," and to have Mr. Pearlman serve in a secondary capacity, as the band manager.

199.   With this goal in mind, MTV approached Bad Boy Films to gauge Diddy's interest

in getting involved with Making the Band. Specifically, Ms. Lazalde-McPherson, Esq. broached the topic with Bad Boy Films and began entering into negotiations with, among others, Bad Boy Films' agents (Peter Safran and Amy Weiss of Brillstein Grey Management)[14] and with Phil Robinson, Diddy's music manager.

200.    As part of these negotiations, Bad Boy Films and Bad Boy Records were made aware of the business relationship and contract between Trans Continental and MTV, as well as Trans Continental and Pearlman's contractual, joint venture and co-ownership rights and interests in and to Making the Band and its sequels, spin-offs and other related projects, and the resulting Musical Acts. Indeed, Bad Boy Films and its agents were provided with written contractual overviews of Trans Continental and Pearlman's contractual rights by Ms. Lazalde-McPherson, Esq., MTV's in-house counsel.[15]

201.    These contractual summaries delineated Trans Continental and Pearlman's rights to the minutiae, advising Bad Boy Films and Bad Boy Records of, among things, Trans Continental and Pearlman's rights to record royalties, creative consulting and production credit; financial participation; and the first opportunity to negotiate to manage any of the artists or bands that originated from Making the Band II or its sequels. (*See, e.g.,* **Exhibit 10**).

202.    Despite such knowledge, Bad Boy Films, both directly and through its agents (Peter Safran and Amy Weiss) and representatives (Phil Robinson) demanded that Trans Continental and Pearlman be cast aside. By way of example, Bad Boy Films, through its agents, repeatedly made the following demands:

> • *"... that puffy would not do the show if Pearlman [sic] had first opportunity to manage the band"* (*see* **Exhibit 11**) (emphasis added);

---

[14]  Brillstein Grey Management now operates as Brillstein Entertainment Partners (hereinafter, "Brillstein").

[15]  In that MTV has designated this contractual overview as "Confidential-Attorney's Eyes Only," this document (bates stamped MTVN 024184 through MTVN 024185) is not attached as an exhibit to this complaint.

- *"I expressed to MTV the need to put in language that make it clear that [Pearlman] is not involved with this production in any way other than getting a credit and piece of the backend from MTV (e.g. Sean will not have to deal with him)"* (see **Exhibit 12**) (emphasis added); and

- *"Sean will not permit Lou to be on-air without his approval"* (see **Exhibit 13**) (emphasis added).

203.    Acceding to Bad Boy Films' demand, MTV -- in its *own* words – made the decision to "*f\*ck lou*" and "*keep lou off tv*."

204.    Bad Boy Films' knowledge of Trans Continental and Pearlman's existing rights in the Series and related musical acts is also explicit on the face of the very first contract which Bad Boy Films entered into with MTV.  Paragraph 14 of this contract is entitled, *"Lou Pearlman"* and provides: *"[Bad Boy] acknowledges that Lou Pearlman has the right of first opportunity to manage Artist."*[16]

205.    Thus, in addition to having contractual knowledge of Trans Continental's rights by virtue of the broadcast of the first three seasons of Making the Band, Bad Boy Films and Bad Boy Records had actual (and constructive) knowledge of Trans Continental's contractual, joint venture and co-owner rights in and to Making the Band and its related projects, including the rights to receive revenues in connection with the to-be-formed musical acts.

206.    Despite having been expressly advised and indisputably aware of Trans Continental's contractual rights, Bad Boy Films, through a series of continuing, successive, synergistic, cumulative acts, knowingly, intentionally, and unjustifiably interfered with Trans Continental's contractual rights and advantageous business relationships.

207.    By way of example, Bad Boy Films entered into a series of separate agreements

---

[16] This Agreement has been previously filed with this Court under seal and is incorporated herein by reference. [*See* D.E. 86, Exhibit G].

with MTV or its affiliates, each of which undermined, transgressed and interfered with Trans Continental's rights. The first of Bad Boy Films' agreements was signed on July 12, 2002. Thereafter, Bad Boy Films entered into eight (8) separate, successive agreements with MTV, respectively dated: January 31, 2003; October 2, 2003; June 15, 2004; February 3, 2006; March 14, 2006; January 17, 2007; October 16, 2007; and February 28, 2008. (*See* D.E. 86, Exhibit G).

208.    Each of the resulting agreements between MTV and Bad Boy Films impacted and interfered with Trans Continental's contractual rights and prospective business relations.  In simple terms, the more that Bad Boy Films sought to and successfully increased its interests, the more Trans Continental's rights and interests suffered as a result.  Bad Boy Film's gains came at Trans Continental's expense.

209.    Bad Boy Films' damage-causing behavior did not cease, if at all, until 2009, when Season 4.3 of the Making the Band completed its broadcast.

210.    Notably, in certain instances, Bad Boy Films ensured the lessening of Trans Continental's interests even if Bad Boy Films did not serve to gain any economic benefit.  By way of example, in one instance, Bad Boy Films insisted that MTV's exploitation of Making the Band be limited on a forward-going basis strictly to television (*e.g.,* no DVDs, videos or related ancillary uses).  Bad Boy's insistence upon this term interfered with Trans Continental's rights to share in DVD and home video sales.  Similarly, Bad Boy Films, in conjunction with Bad Boy Records, sought to exclude Trans Continental and Pearlman from their contractual rights to manage the musical acts, even though Bad Boy Films and Bad Boy Records had no intention of themselves managing the musical acts.

211.    These acts were, in part, malicious in nature or derivative of independently wrongful acts.

212.    Separately, Bad Boy Films and Bad Boy Records tortiously interfered with Trans

Continental's rights with the later-to-be-formed musical acts, including, without limitation, Da Band, Danity Kane, Chopper (*a/k/a* "Young City" and "Chopper Young City," hereinafter, "Young City"), Danity Kane, Day 26 and Donnie Klang (hereinafter, the "Musical Acts"). This interference occurred over a period of at least several years, starting in 2003 and continuing until at least 2008.

213.   As noted above and pursuant to the Joint Venture Agreement, Trans Continental also enjoyed separate, prospective advantageous business relationships with each of the Musical Acts that were originated from the Series.

214.   Bad Boy Films, in conjunction with Bad Boy Records, separately interfered with each of the prospective advantageous business relationships between Trans Continental and Pearlman, on one hand, and the Musical Acts, on the other.

215.   By way of example, and without limitation, Bad Boy Films and/or Bad Boy Records, either in conjunction with MTV or by and amongst themselves, ensured that Trans Continental and Pearlman did not have access to the artists that originated from Making the Band II-IV (*e.g.,* Da Band, Young City, Danity Kane, Day 26 and Donnie Klang).

216.   Despite having no intention of themselves managing the Musical Acts, Bad Boy Films and Bad Boy Records ensured, for example, that Pearlman was never even so much as permitted to meet with Danity Kane, Young City, Day 26 and Donnie Klang.

217.   With Da Band, Pearlman was only permitted to meet with Da Band after Bad Boy Records and its preferred manager were first able to cement a relationship with the band. Da Band's manager was Phil Robinson, who just so happened to be Diddy's manager.

218.   Bad Boy Films and Bad Boy Records' interference with Trans Continental's relationships with the Musical Acts occurred at separate points in time – years apart. By way of

example, Da Band was not formed until 2003; Danity Kane was created in late 2005; and Day 26 and Donnie Klang originated from Making the Band IV and were formed in 2007.

219.    As part of its agreements with MTV, Bad Boy Films and MTV agreed that any artists that originated from Making the Band II (and beyond) would be signed to Bad Boy Records.   In accordance with these contractual provisions, MTV (via its affiliate Remote Productions, Inc.) assigned the Recording Agreements and Recording Options for the Musical Acts at separate points in time:  March 23, 2006 (as to Danity Kane); August 22, 2007 (as to Day 26); and some point after February of 2007 (as to Donnie Klang).  (*See* D.E. 86, Exhibits J-L).

220.    Thus, even if Pearlman had been afforded the right to manage the Musical Artists, Trans Continental's ability to manage and monetize the artists would have been severe'y limited given that the artist was contractually obligated to sign with Bad Boy Records (and, thus, not able to shop for a more lucrative deal).

221.    The damages suffered by Trans Continental in connection with Bad Boy Films and Bad Boy Records' interference with Trans Continental's relationships with the Musical Acts are continuing, as their albums – which were released at various points in point, including September 30, 2003 and November 24, 2003 (Da Band); August 22, 2006, March 18, 2008 and July 1, 2008 (Danity Kane); March 25, 2008 and April 14, 2009 (Day 26); and August 26, 2008 (Donnie Klang) – remain available for purchase in the marketplace.[17]

222.    Bad Boy Films and Bad Boy Records' interference with Trans Continental's contractual rights and advantageous business relationships was intentional, malicious, carried out through dishonest, fraudulent, unfair, wrongful and/or improper means, and was specifically

---

[17]  As a general rule, there is a substantial lag time between when a musical act is created, their musical works released and, most importantly, when (or if) their musical works become profitable.  Consequently, and by way of example, while Da Band's album, *Too Hot for TV*, was initially released in September of 2003, this is not the date in which Trans Continental's damages necessarily occurred.  The same is equally true for the other Musical Act's subsequently-released albums.

designed to injure, if not outright eliminate, Trans Continental's rights.

223.     As a direct, natural and proximate result of Bad Boy Films and Bad Boy Records' knowing, intentional and unjustifiable interference with Trans Continental's contractual rights and advantageous business relationships, Trans Continental has suffered damages which would not have occurred but for Bad Boy Films and Bad Boy Records' interference.

**WHEREFORE**, plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court enter a judgment in his favor and against Bad Boy Films, Inc. and Bad Boy Records, LLC for actual and compensatory damages in an amount to be determined at the final hearing in this matter, including but not limited to the monetary amounts which Trans Continental lost from: (i) being denied the opportunity to manage the Musical Acts, as well as the lost of management fees, album revenues and related revenue streams from other musical acts that may have been interested in being managed by Trans Continental and Pearlman; (ii) lost album and merchandise revenue relating to the Musical Acts; (iii) being excluding from active participation in Making the Band II-IV, and the resulting diminishment in the Trans Continental brand; (iv) Bad Boy's refusal to permit the exploitation of Making the Band in DVDs and home videos; (v) being denied the opportunity to further exploit the creation of spin-offs, sequels and related projects; (vi) attorneys' fees, costs and expenses incurred in protecting Trans Continental and Pearlman's interests, including those incurred with respect to the claims brought against MTV and Bad Boy; (vii) punitive and exemplary damages based on Bad Boy Films and Bad Boy Records' willful, malicious and wanton conduct in an amount sufficient to punish Bad Boy Films and Bad Boy Records for engaging in this conduct and to deter similar conduct in the future, together with all pre-judgment and post-judgment interest, and such other relief as this Court deems just and proper.

## Demand for Jury Trial

Plaintiff hereby reiterates its earlier demand for a trial by jury of all issues so triable.

Dated:   June 11, 2010

Respectfully submitted,

**KASOWITZ, BENSON, TORRES
& FRIEDMAN, LLP**
*Special Litigation Counsel for Soneet R. Kapila,
as Chapter 11 Trustee for the bankruptcy estate of
Trans Continental Television Productions, Inc.*
Four Seasons Tower
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131
Telephone:  (305) 377-1666
Facsimile:  (305) 377-1664
jsammataro@kasowitz.com

By: */s/ James G. Sammataro*
     James G. Sammataro
     Florida Bar Number: 0520292

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 11, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

**Andrew J. Ehrlich, Esq.**
aehrlich@paulweiss.com
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

**Jonathan D. Davis, Esq.**
Jonathan D. Davis, P.C.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
99 Park Avenue, Suite 1600
New York, New York 10016
Telephone: (212) 687-5464
Facsimile: (212) 557-0565

**Brian A. McDowell, Esq.**
brian.mcdowell@hklaw.com
Holland & Knight, LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
200 South Orange Avenue
Suite 2600
Orlando, Florida 32801
Telephone: (407) 425-8500
Facsimile: (407) 244-5288

**Daniel E. Traver, Esq.**
Gray Robinson, P.A.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
301 E. Pine Street, Suite 1400
Orlando, Florida
Telephone: (407) 843-8880
Facsimile: (407) 244-5690

/s/ James G. Sammataro
Attorney

# EXHIBIT 1

January 7, 2000

Mark Steverson
Rudolph & Beer
432 Park Avenue South
7th Floor
New York, NY 10016

Re:   Untitled Boy Band Series

Dear Mark:

I am writing to confirm the terms of the deal between MTV Networks, a division of Viacom International Inc. ("MTV") and Trans Continental Television Productions, Inc. ("TC") in connection with the development and production of an untitled Boy Band series for ABC (the "Series"), and the creation of a joint venture to develop an all male pop band (the "Band").

1.  TC will provide to MTV written sign off from BMG that TC or an affiliated entity is free to enter into a soundtrack and exclusive recording rights deal with Hollywood Records with respect to the Band.  TC will solely bear any override royalty necessary to be paid to BMG and will defend, indemnify and hold harmless MTV against any claim or action brought by BMG on account of any rights of BMG against TC in connection with producing boy band records.  If TC cannot obtain sign off from BMG, TC will solely bear ABC's merchandise participation of 10% pursuant to paragraph 7 of the Agreement dated as of September 21, 1999 between MTV, TC and ABC.

2.  The parties agree that the $350,000 license fee per 13 episodes provided by ABC shall be divided as follows:

    a.  $310,000 per episode shall be provided to Bunim Murray Productions for production costs (included therein is a one-time $30,000 cost for the talent search).  The production budget shall be approved by TC and MTV.

    b.  $20,000 per episode shall be provided to TC for band development.

    c.  $10,000 per episode shall be considered production pad, which shall be split between MTV and TC if unused.

    d.  $8,750 per episode is paid to MTV as a production fee.

MTVN 000205



e. Of the remaining $1,250 per episode ($16,250 all together), $10,000 goes to TC for band development. The other $6,250 shall be used to cover part of the cost of producing flyers for the talent search.

3. TC has agreed to contribute its own funds to match the $20,000 per episode for band development that comes out of the license fee, subject to its ability to recoup this contribution off the top (subject to audit).

4. MTV has reserved its right to contribute to the funding, if any, needed for touring of the Band. The parties will negotiate in good faith concerning such contribution and the splitting of tour revenues.

5. Business Matters / Creative Decisions: All business / creative matters in connection with the joint venture are to be mutually determined, except that on the Series, MTV breaks any tie over creative matters, and on the creative musical aspect of the venture, TC breaks the tie.

6. Credit: TC has agreed that Lou Pearlman has opted not to take an Executive Producer credit or fee or a TC company credit on the first 13 episodes. After the first 13 episodes, Executive Producer credit and TC company credit is within TC's discretion. On the first 13 episodes, subject to mutual approvals, TC employees may be acknowledged in the credits. Ken Mok shall receive an Executive Producer credit on the Series.

On packaging for home video, records and on merchandising and publishing both MTV and TC shall receive credits to be mutually determined.

7. Merchandise: Unless otherwise mutually agreed to, MTV shall control merchandise in-house. In connection therewith, MTV shall take a 10% distribution fee off the top and recoup direct, out-of-pocket expenses. After that, proceeds shall be split 50-50 by the parties. MTV shall also have the option to control tour merchandise for the same split referenced above. If MTV decides not to handle merchandise in-house, the parties may jointly approach a party such as Sony Signatures to handle the merchandise and neither party shall take a fee.

8. Print Publishing: MTV shall control distribution of all publishing related to the Series and Band. MTV shall take a 10% distribution fee, plus direct, out-of-pocket expenses. Proceeds shall then be split 50-50 by the parties.

9. Music Publishing: MTV (Famous Music or other MTV-designated entity) and TC shall have joint ownership of all music publishing. MTV shall administer music publishing for a 15% fee, plus expenses.

MTVN 000209

10. Internet Rights:  Subject to paragraph 5 above, MTV shall create and control the official web site related to the Series and Band.  In connection with advertising/sponsorship revenues brought in by MTV on the official website, MTV shall recoup its expenses and take a commission of 15% and then share revenues with TC on a 50-50 basis.  In addition, TC shall receive a 15% commission if it brings a sponsor/advertiser to the site.  Non-advertising revenues shall be split 50-50 with TC after a 10% fee off the top and recoupment of expenses on both the official website and MTV's site.  TC can promote the Band on its corporate site, but only with MTV's approval, which will not be unreasonably withheld.  MTV can promote the Band on the MTV website.

11. Domestic and Foreign Distribution of Series:  MTV controls the rights, takes a 10% fee off the top and splits proceeds 50-50 with TC.

12. Home Video:  MTV shall control distribution, taking a 10% fee off the top and recoup direct, out-of-pocket expenses.  Proceeds shall be split 50-50.

13. The parties shall negotiate in good faith a reasonable license fee for runs of the series on MTV, if any.  If MTV is required to pay a license fee to ABC, there shall be no additional attributable license.

14. The parties will jointly exploit any features, spin-offs, sequels, made-for-TV movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation.

15. MTV and TC will enter into record company negotiations jointly.  All business deals relating to the Series and Band and ancillary rights therein must be approved by both parties.

16. Other than as explicitly set out herein, the parties have agreed to split any pre-approved Band and Series expenses and revenues 50-50, including but not limited to revenues received from any record company.

17. MTV distribution fees are not inclusive of any subdistributor fees.  MTV deals with sister/affiliated companies shall be on customary market terms.

18. TC will enter into a management deal directly with the Band outside of the joint venture and take a 20% fee.

19. TC or another TC affiliated entity (i.e. Trans Continental Records Inc.) will enter into an agreement with the Band(with terms approved by MTV) and assign over the agreement to the joint venture.

MTVN 000210

Please indicate your acceptance of these terms by signing on the line below.   The parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein.  Until such time as such formal agreement is executed, this letter shall remain binding upon the parties.

Trans Continental Television
Productions, Inc.

By:
Its:

MTV Networks, a division of
Viacom International Inc.

By:
Its:

MTVN 000211

# EXHIBIT 2

November 15, 2001

Lou Pearlman
Transcontinental Television Productions, Inc.
7380 Sand Lake Road
Orlando, FL 32319

Re:    MTV's "Making the Band"

Dear Lou:

Reference is made to the letter agreement (the "Agreement") dated January 7, 2000 between MTV Networks, a division of Viacom International Inc. ("MTV") and Transcontinental Television Productions, Inc ("TC") in connection with the MTV television series featuring O-Town (the "Artist") entitled "Making the Band" (the "Series").

The Agreement shall be amended as follows:

1.  The parties agree that the $350,000 license fee for the back order of 9 episodes of the Series provided by ABC shall be divided as follows:

    a.  $310,000 per episode shall be provided to Bunim Murray Productions for production costs,

    b.  $20,000 per episode shall be paid to MTV as a producer fee,

    c.  $20,000 per episode shall be paid to TC toward recoupment of band development expenses.

2.  The parties agree that the $380,000 license fee for the 13 episodes of the second season of the Series provided by ABC shall be divided as follows:

    a.  $330,000 per episode shall be provided to Bunim Murray Productions for production costs.

    b.  $25,000 per episode shall be paid to the Band for band salaries.

    c.  $25,000 per episode shall be divided equally between MTV and TC, after recoupment off-the-top (prior to the division of income between TC and/or MTV) of $28,250 in payroll taxes incurred by MTV and $63,000 in band salaries incurred

137171 ver. 01

EXHIBIT NO.
JANEEN PAVESI
CERTIFIED REALTIME REPORTER

by TC. Of said amount, TC shall receive $179,250 promptly following full
execution of this agreement.

3.  Band development, radio tour and other out-of-pocket expenses incurred by MTV and
TC for the prior two seasons of the Series may be recouped off-the-top (prior to the
division of profits between TC and MTV) from ancillary monies (i.e., record and
merchandise advances and royalties). The parties acknowledge that TC's expenses are
$360,000 and MTV's expenses are $43,000. The parties agree that TC shall retain
100% of the record advances paid to date (i.e., $330,000) to recoup its expenses.
Notwithstanding anything to the contrary contained herein, the parties have elected
not to recoup their remaining expenses from ancillary monies. For the avoidance of
doubt, neither TC nor MTV shall be entitled to recoup any additional expenses from
ancillary monies for the prior two seasons of the Series unless both parties agree in
writing.

4.  Paragraph 11 of the Agreement relating to domestic and foreign distribution shall be
amended to provide that MTV shall be able to recoup direct out-of-pocket expenses
related to the Series incurred in connection with such distribution.

5.  The copyright in the Series shall be held jointly by TC and MTV. MTV shall register
and protect the copyright and recoup any expenses incurred in connection therewith
from ancillary profits (record, merchandising, etc.) off-the-top before proceeds are
split. Upon written request by TC, MTV shall provide TC with copies of copyright
registration and renewal certificates.

6.  MTV and TC shall enter into an agreement with Trans Continental Records Inc.
("TRC") whereby TRC shall provide MTV and TC each with non-exclusive licenses
for use of the O-Town trademark in connection with the Series and ancillary uses
thereof (for example merchandising, records). No other license shall be granted in the
O-Town trademark to any third party. For the avoidance of doubt, the parties
acknowledge that TC previously entered into third party non-exclusive licenses for the
use of the O-Town trademark in connection with the "Live from O-Town" concert
television series, the record company O-Town Records and the restaurant O-Town
café. TC agrees not to exploit the O-Town trademark in any other way without the
consent of MTV and MTV agrees not to exploit the O-Town trademark without the
consent of TC. If the series is no longer being produced and new records are not
being recorded, TC agrees not to exploit the O-Town trademark without MTV's
express approval, which shall not be unreasonably withheld. TC and MTV each agree
to execute any documents (for example, a security interest document) necessary to
effectuate the exploitation of the Series. All trademark registration fees, annual
renewal fees and costs to protect the trademark shall be recouped from ancillary
profits (record, merchandising, etc.) off-the-top before proceeds are split.

7.  Unless otherwise agreed in writing, all contractual payment obligations to Artist
provided in the agreement dated January 12, 2000 between Artist, on the one hand and

2

TC and MTV, on the other, and the amendment thereto dated August 23, 2001 shall be split 50-50 between MTV and TC.

8. With respect to the first and second season of the Series, the parties agree that as of September 30, 2001, TC's profit share of merchandise revenue is $187,803. TC acknowledges that it has received $100,000 of said amount and that it shall receive $87,803 promptly following full execution of this agreement. The parties also agree that as of September 30, 2001, TC's profit share of international program sales is $456,611.85 and it shall receive said amount promptly following full execution of this agreement.

9. Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A (a copy of which is attached hereto); provided, however, the distribution fee will be capped at 30% for all Ancillary Uses.

   (a) If the initial exploitation of the Series is over MTV Networks in the US, then, in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 65% of the final production costs of the Series ("Imputed License Fee") which shall be included in the following installments:

      (i) 50% thereof shall be deemed credited as revenue upon completion of production of a Series episode, and

      (ii) 50% thereof shall be deemed credited as revenue upon the date which is six (6) months following the initial exhibition of a Series episode over MTV.

   (b) If the initial exploitation of the Series is over an MTV Networks foreign programming service, then, in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 10% of the final production costs of the Series upon the date of the initial exhibition of the Series on that foreign programming service.

10. TC has agreed that Lou Pearlman will not take an Executive Producer credit or fee in connection with the third season or any subsequent season of the Series and, instead the parties shall mutually agree on a credit to Lou Pearlman similar to a "Consultant" credit. The parties agree that TC shall receive a production credit for the third season of the Series.

11. For the avoidance of doubt, and as set forth in the attached Schedule A, Artist album and merchandise revenue (other than television codes related merchandise revenue) shall be excluded from Ancillary Uses and shall be split 50-50 pursuant to the terms set forth in the Agreement.

137174 ver. 01                    2

11. For the avoidance of doubt, and as set forth in the attached Schedule A, Artist album and merchandise revenue (other than television series related merchandise revenue) shall be excluded from Ancillary Uses and shall be split 50-50 pursuant to the terms set forth in the Agreement.

12. The parties agree that TC shall not be responsible for any so-called "short fall" payments in respect of the production costs for the first thirteen (13) episodes of the third season of the Series. ~~This paragraph 12 is amended as set forth on page 12(y) attached hereto and incorporated herein by reference.~~

13. The parties shall negotiate in good faith the exploitation of the format rights for the Series in Europe.

Please indicate your acceptance of these terms by signing on the line below. Except as amended herein, all other terms of the Agreement shall remain in full force and effect.

Very truly yours,

MTV NETWORKS

BY: _____

ITS: _____ SVP _____


ACCEPTED AND AGREED

TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.

BY: _____

ITS: _____


137176.vw04

4

**SCHEDULE A TO THE AGREEMENT ("AGREEMENT") DATED NOVEMBER 15, 2001 BETWEEN MTV NETWORKS AND TRANSCONTINENTAL TELEVISION PRODUCTIONS, INC. ("PARTICIPANT")**

## NET PROCEEDS DEFINITION

For the purposes of the Agreement, "Net Proceeds" shall mean all non-refundable amounts actually received in the United States from all sources worldwide by MTV Networks ("MTVN") in connection with Ancillary Uses (as defined below) of the Series (including exhibition on MTVN worldwide programming services), less the following items in the following order: (a) first, the applicable distribution fees (as set forth below) with respect to amounts derived from Ancillary Uses; then (b) distribution expenses paid on account of any Ancillary Uses; then (c) any third-party participations; and then (d) MTVN's recoupment of all sums paid to Participant (if any) and all other costs incurred in connection with the development and production of the Series, and overhead on the foregoing (in the amount of 10%) (collectively, "Production Costs").

For the purposes of the Agreement, "Ancillary Uses" shall mean all distribution and/or exploitation of episodes of the Series, including without limitation the soundtracks and all other elements, in any manner or media other than on MTVN worldwide programming services. Notwithstanding the foregoing, serial albums and merchandising other than television color-related merchandise shall not be included in Ancillary Uses.

The distribution fees (inclusive of sub-distributor fees) to be withheld and retained by MTVN are as follows:

| | Ancillary Uses | Percentage of Gross Receipts |
|---|---|---|
| (A) | U.S. Network Television Exhibition (ABC, CBS, NBC, and/or Fox to the extent programming is sold to Fox or a network other than on a station-by-station basis); | 20% |
| (B) | Television Exhibition in the United States (other than Network); | 20% |
| (C) | Television Exhibition outside of the United States; | 20% |
| (D) | Worldwide Videocassette and Videodisc Exhibition; | 20% |
| (E) | Worldwide Merchandising and all Other Uses; | 20% |

MTVN shall account to Participant with respect to Participant's share of Net Proceeds, if any, on a semi-annual basis provided there are payments due Participant, and such accounting shall be accompanied by payment of Participant's share of Net Proceeds payable for such semi-annual period. During the term of this Agreement and for a period of one year following the last exhibition of the Series, Participant or its designated certified public accountant may at MTVN's principal place of business and at reasonable times during regular business hours upon reasonable advance, written notice, but no more than once per year, inspect and make copies of any relevant portions of books and records of MTVN relating to the Net Series in order to determine the accuracy of MTVN's statements of Net Proceeds rendered pursuant thereto.

# EXHIBIT 3

Law Offices of
# JEFFREY P. KRANZDORF
Admitted in California and New York

18410 St. Moritz Drive
Tarzana, California 91356
♦ Telephone: (818) 343-1875 ♦
♦ Facsimile: (818) 343-1876 ♦
E-mail: jkranzdorf@earthlink.net

VIA E-MAIL

Four (4) Page[s] (including this one)

February 2, 2005

VIRGINIA LAZALDE-McPHERSON, ESQ.
Senior Counsel
MTV NETWORKS- a division of Viacom International
e-mail: Virginia.Lazalde@mtvstaff.com

Re:   TRANS CONTINENTAL TELEVISION PRODUCTIONS, INC. –v– MTV
PRODUCTIONS, a division of Viacom International, Inc.

Dear Virginia:

As you know, I represent Trans Continental Television Productions, Inc. ("TCTV") I am writing you in regard to the above-referenced television series. There are a number of extremely important issues of mutual interest to MTV and TCTV, which need to be addressed as soon hereafter as possible. As per Lou Pearlman's prior request to you, these matters should be discussed with Greg McDonald acting on TCTV's behalf. Some of the unresolved issues have been outstanding for several seasons of the series and TCTV believes that it would be in both its and MTV's best interests to resolve them now.

There are number of items of significant interest that merit our immediate attention. I refer to the agreement ("Agreement") entered into between TCTV and MTV on January 7, 2000 as amended November 15, 2001 (the "Amendment").

Please note:

Paragraph 5 of the Agreement provides that "All business/creative matters in connection with the joint venture are to be mutually determined, except that on the Series, MTV breaks any tie over creative matters, and on the creative musical aspects of the venture, TC(TV) breaks the tie".

1

MTVN 000059

(1) To date TCTV has been told nothing at all about the last several season's Series episodes and the involvement of Sean Combs. To date TCTV's participation and input as required by the foregoing Paragraph 5 has been excluded. It is TCTV's position that no creative musical matters relating to these or any other, further or future episodes may proceed with TCTV's input and TCTV's full and active participation in the creative process. TCTV's require an immediate meeting be scheduled with all creative participants so that we can all get acquainted and commence to plan for additional episodes.

Paragraph 11 of the Agreement provides for a  50/50 split of Domestic and Foreign Distribution of Series, subject to MTV taking 10% "off the top".  This was amended to include MTV's ability to further recoup its "direct out-of-pocket expenses related to the Series in connection with such distribution" (see paragraph 4 of the Amendment).

(2) TCTV still does not have an up-to-date accounting of such revenues and TCTV believes that both an accounting and monies that would be indicated thereby are presently due us. In this regard the last thing TCTV has sent was the payment of $512,000.00 paid in April 2003, representing a payment of TCTV's share of international program licensing fees then due to date.  To the extent that there are substantial international net revenues to be divided, that should occur immediately.  The involvement of Mr. Combs and his company in Making The Band did not change the terms of the MTV-TCTV's deal and we are at a complete loss to understand why it is that MTV has seen fit to totally disregard its obligations to TCFT as if the Agreement (and the Amendment) does not exist.

(3) Paragraph 15 of the Agreement provides in pertinent part that "All business deals relating the Series and Band and ancillary rights therefrom must be approved by both parties."

(4) To date we STILL have no idea or understanding of what business deals or agreements have been struck between MTV and Sean Combs or with "Band" members pertaining to the 4th season and/or beyond.  We need to gain an immediate understanding of what those may consist of.  TCTV should be a party to all such agreements and all further and future deals must be entered into in the names of, approved by and signed off on, by both MTV and TCTV.

Paragraph 18 of the agreement provides that: "TC(TV) will enter into a management deal directly with the Band outside of the joint venture and take a 20% fee."

Since this Agreement pertains not only to the initial program but also to any "…spin-offs, sequels,…etc. in accordance with paragraph 14 thereof, it is our position that Trans Con is entitled to enter into such a management agreement with the artists who are the subject of the current Series episodes production.  To date, though we have requested it, no one from MTV has even so much as introduced Lou and TCTV to any artist since O-Town. This needs to be rectified immediately.

2

The November 15, 2001 Amendment provides in paragraph 5 that the Series is to be copyrighted in the joint names of TCTV and MTV and that MTV was(is) to be responsible for effecting all such registrations.

To date we have no copies of any such registrations. Please make arrangement to have copies of all registrations filed with the Office of the U.S. Register of Copyrights (or elsewhere) furnished to us and as please ensure that as a matter of course copies of all further and future registrations are sent to TCTV promptly following their receipt from the Copyright Office (and/or other foreign registries). TCTV's co-ownership of these programs, their copyrights and all other rights therein constitute valuable assets of TCTV and into which TCTV has made substantial investment of its money, time and other resources. TCTV expect to be treated in "every" respect as a full partner. Making certain that the copyright registrations are in apposite with the Agreement and the Amendment is not only in the interests of both parties; it's the right thing to do!

Paragraph 9 of the Amendment references our agreement to a continuing "all in" 50/50 split of net proceeds derived from the third season and subsequent seasons, in accordance with and subject to the MTV Net Proceeds definition set forth as Schedule "A" to the Amendment. We need an immediate assessment of where we stand under this provision based on the imputed license fee based on the initial exploitation of the Series (3rd season going forward) on MTV Networks in the US. As indicated in paragraph 9(a) the Imputed License Fee (i.e. 65% of the final production cost of the Series") is to be credited as follows:

"(i) 50% thereof shall be credited as a revenue upon completion of production of a Series episode, and.........."

As early as the 4th season of "Making The Band" TCTV requested copies of the production budgets in order to determine what the Imputed License Fee would be. My clients are ENTITLED to participate in all business and creative processes Virginia. TCTV is ENTITLED to review these budgets. TCTV is entitled to offer its meaningful input. TCTC has a substantial investment at stake here. Based on the Agreement and Amendment TCTV is a co-owner of this Series (including its sequels). There is no reason why TCTV should not have been provided with the production budgets as and when requested. TCTV expects that all budgets both actual and proposed with a view forward to the production of additional episodes, will be furnished to it promptly.

Paragraph 10 of the Amendment provides that Lou Pearlman will receive a "Consultant credit" and that TC(TV) shall receive a continuing production credit for the Series. We would like to know what credits are continuing to be used and affixed to Series episodes and why TCTV has not been given the opportunity to review and approve of these items. The TCTV electronic logo should appear in the credits. If that has not occurred in the past, that mistake should certainly not continue into the future.

3

MTVN 000061

It is absolutely imperative that all of the aforementioned matters are addressed without delay. TCTV has traditionally enjoyed a warm, mutually respectful and productive relationship with MTV and they certainly hope to continue to do so. My clients believe that it would be instructive for all concerned to meet together at a mutually convenient time and location as soon as possible in order to resolve these issues in a matter that is both amicable and designed to resolve all outstanding items in an immediate and comprehensive manner. I would encourage you to contact me or, if you like, contact Greg McDonald directly at the TCTV office (gmcm@i-con.com/ phone: 407-345-0004 ext. 5229) to get things back on track.

TCTV continues to be thrilled with the unprecedented success that Making The Band continues to enjoy on MTV.

Please give me a call on receipt of this letter to arrange for the same.

Warmest regards,

*Jeff* /s/

JEFFREY F. KRANZDORF

Cc:   Louis J. Pearlman- via e-mail
      Greg McDonald-via e-mail

MTVN 000062

# EXHIBIT 4



Vie Lizzido-mapherson / vice president / business and legal affairs
/ music television
1616 broadway /
new york / ny / 10034-3797
voice / 212.846.5018
fax / 212.846.1795
email / virginia.lozzido@mtvstaff.com

September 28, 2005

**Via Fax: (818) 343-1876**

Jeffrey Kranzdorf, Esq.
18410 St. Moritz Drive
Tarzana, CA 91356

RE:   **Trans Continental Television Productions, Inc. ("TCTV") w/ MTV Networks**

Dear Jeff:

    As discussed when you, Greg and I met, please have Greg or Lou contact Jackie French at (212) 258-7264 to set up a meeting to discuss the various television projects Lou is working on and those that he wants to pitch to MTV.

    As you know, we are currently in production for the fifth cycle of the Making the Band III series featuring Sean "Puffy" Combs. With respect to the issues raised in your letter dated February 2, 2005, please note the following (I have attached your letter with corresponding numbers next to each point raised for ease in understanding my responses):

1)    As you know, the "Series" as defined in the January 7, 2000 agreement between MTVN and Trans Continental Television Productions, Inc., as amended, is the Making the Band television program which features O-Town ("Making the Band I"), thus almost all of your comments do not apply with respect to Making the Band III.

2)    I have forwarded to Lou an accounting statement for Making the Band I and II covering the accounting periods April 1, 2003 through December 31, 2004, along with the corresponding payment. We are currently preparing the accounting statement for Making the Band III and will send it to Lou shortly.

3)    As set forth in point 1 above, the Series is defined as the Making the Band I television program.

4)    As discussed when we met in person, there is currently no band formed.

5)   MTV has and will continue to register each episode with the copyright office, and will provide TCTV copies of such registrations, as requested.

6)   As set forth in point 2 above, I have forwarded to Lou the applicable accounting statements.

7)   As you know, Lou Pearlman and TCTV have been given the credits you set forth in your letter on every new episode of Making the Band beginning with the third season of Making the Band I which have been produced by MTV.

Finally, as discussed in our meeting, MTV expects its share of the last advance paid by J Records in connection with O-Town's second artist album. Accordingly, we hereby request a more detailed statement from TCTV regarding recoupable expenses claimed by TCTV against MTV's share of the advance. As you know, MTV was not a party to the loan agreement TCTV and O-Town and therefore, TCTV should not be entitled to recoup any of those monies from MTV's share of the advance.

This letter is not intended to be an entire statement of the facts involved in this matter, and I must reserve my colleagues' right to comment.

Please call me with any questions you have.

Best regards.

Sincerely,

Virginia Lazalde-McPherson

cc:   Jackie French, Brad Hazzard, Lou Pearlman

# EXHIBIT 5

1 (Pages 1 to 4)

**Page 1**

```
 1
 2   IN THE UNITED STATES BANKRUPTCY COURT
     MIDDLE DISTRICT OF FLORIDA
 3   ORLANDO DIVISION
     ----------------------------x
 4   In re:
                        Case No.
 5   LOUIS J. PEARLMAN, et al, 6:07-bk-00761-ABB
                   Jointly Administered
 6       Debtors.    Chapter 11
     ----------------------------x
 7   SONEET KAPILA, Chapter 11
     Trustee for TRANS CONTINENTAL
 8   TELEVISION PRODUCTIONS, INC.,
         Plaintiff,
 9       -against-
10                     Adv. No.
11   MTV NETWORKS COMPANY,    6:08-ap-00157-ABB
12       Defendant.
     ----------------------------x
13
14        May 14, 2009
15        10:16 a.m.
16
17        Deposition of WARREN SOLOW, held at
18   the offices of Kasowitz, Benson, Torres &
19   Friedman, 1633 Broadway, New York, New York,
20   pursuant to Notice, before Lynne D. Metz, a
21   Shorthand Reporter and Notary Public of the State
22   of New York.
23
24
25
```

**Page 3**

```
 1
 2   APPEARANCES: (Cont'd)
 3
 4
 5   BY:  CAROL C. LUMPKIN, ESQ.,
 6            and
 7        MARC H. AUERBACH, ESQ.,
 8            of Counsel
 9
10
11
12   ALSO PRESENT:
13        AMANDA LEITH - MTV Networks
14        PHILIP GLAUBERSON - Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1
 2   APPEARANCES:
 3
 4        KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
 5        Attorneys for Plaintiff Soneet Kapila as
 6        Chapter 11 Trustee for the Bankruptcy
 7        Estate of Trans Continental Television
 8        Productions, Inc.
 9        One Biscayne Tower
10        2 South Biscayne Boulevard, Suite 2650
11        Miami, Florida 33131
12        305-377-1666
13        scosgrove@kasowitz.com
14   BY:  SCOTT B. COSGROVE, ESQ.,
15            of Counsel
16
17   K&L GATES LLP
18   Attorneys for Defendant MTV Networks Company
19        Wachovia Financial Center
20        Suite 3900
21        200 South Biscayne Boulevard
22        Miami, Florida 33131-2399
23        305-539-3300
24        carol.lumpkin@klgates.com
25        marc.auerbach@klgates.com
```

**Page 4**

```
 1
 2
 3
 4        IT IS HEREBY STIPULATED AND AGREED, by and
 5   between the attorneys for the respective parties
 6   herein, that filing and sealing be and the same
 7   are hereby waived.
 8        IT IS FURTHER STIPULATED AND AGREED
 9   that all objections, except as to the form of the
10   question. shall be reserved to the time
11   of the trial.
12        IT IS FURTHER STIPULATED AND AGREED that the
13   within deposition may be signed and sworn to
14   before any officer authorized to administer an
15   oath, with the same force and effect as if signed
16   and sworn to before the officer before whom the
17   within deposition was taken.
18
19
20
21
22
23
24
25
```



15 (Pages 57 to 60)



57

W. Solow

1    it.
2         MR. COSGROVE: I am not lead. It is
3    what it is.
4         Q.   You can take a look at it and I will
5    try to direct you through in the most efficient
6    way possible.
7         MS. LUMPKIN: This is marked as
8    composite 91?
9         MR. COSGROVE: Yes.
10        Q.   Why don't we start with what is marked
11   MTVN 29539.
12        A.   Okay.
13        Q.   Okay.
14        Under the name of author, do you see
15   that section?
16        A.   2A7
17        Q.   Yes.  2A and 2B.
18        A.   Yes.
19        Q.   It identifies two authors there.  MTV
20   Networks division of Viacom International, Inc.
21   and Trans Continental Television Productions, Inc.
22        A.   Yes.
23        Q.   Do you know why two authors were
24   identified in this copyright registration?

58

W. Solow

1         A.   Because the person responsible for
2    making this registration was told to.
3         Q.   By whom?
4         A.   Specifically I don't know, but pattern
5    and practice would suggest the production group or
6    the attorney responsible for the production.
7         Q.   Okay.  And if you look at the next
8    document, the next registration I should say 29541
9    also MTV Networks and Trans Continental Television
10   Productions.
11        A.   I see that.
12        Q.   And that appears to continue through
13   to the registrations all the way up to MTVN 29553
14   through 554.  Joint registrations there under 2A.
15        A.   So I am sorry, I am to go to 553?
16        Q.   Yes.  If you go to 29553 you will also
17   see that MTV and Trans Continental are reflected
18   as the authors.
19        A.   Right.
20        Q.   The next document is Making the Band
21   episode 110 and that starts with MTVN 29555.
22        Why did MTV or -- excuse me, why was
23   Viacom International, Inc. the sole author of this
24   copyright registration?

59

W. Solow

1         A.   I don't know the specific reason why
2    that happened.
3         Q.   Do you know the general reason why it
4    happened?  You qualified it and you said I don't
5    know the specific reason and I am wondering what's
6    the explanation for MTV, why the registrations
7    went from MTV to Viacom and why joint ownership
8    was not reflected after the last document that we
9    discussed?
10        A.   I have not seen any data anywhere that
11   would explain why it happened.  There is no
12   documentary explanation.
13        Q.   On behalf of MTV can you tell me why
14   there is not a joint registration on MTVN 29555 or
15   any document or any registration thereafter?
16        A.   My assumption would be that, that the
17   person who filled out this form was given
18   information and they filled it out accordingly.
19        Q.   But you don't know who gave, whomever
20   filled this form out, the information?
21        A.   That's correct.
22        Q.   And you don't know why MTV stopped
23   jointly registering these copyrights?
24        A.   No.  But I do note that there is -- it

60

W. Solow

1    is at that very moment that somebody else is
2    signing the registration certificate which
3    suggests that perhaps there was some disconnect.
4         Q.   Okay.
5         Does MTV believe that the
6    registrations that are in front of you that have
7    not been jointly registered should be jointly
8    registered?
9         A.   It is my belief that or MTV's belief
10   they should be registered as in the correct
11   manner.
12        Q.   What's the correct manner from MTV's
13   perspective?
14        A.   According to whatever contractual
15   obligations they had.
16        Q.   I know and what is that?  Here is what
17   I am driving at and this is not a secret.  We --
18   we, my client and I, believe that there should be
19   a joint registration here as reflected in the
20   first series of documents and they were jointly
21   registered as they were supposed to be and then it
22   stopped.  And I want to know why it stopped.  And
23   I want to know if it was error, if it was
24   intentional and if there is a reason and that's

16  (Pages 61 to 64)

61

W. Solow

1
2  what I am driving at.
3      A.   I believe that Viacom -- it is MTV's
4  believe that it was an error.
5      Q.   So MTV believes that it mistakenly --
6  scratch that.
7          MTV believes that it erroneously
8  registered the copyrights in the name of Viacom
9  International, Inc. and it should have jointly
10  registered these copyright registrations; is that
11  correct?
12      A.   I believe that that's correct.
13      Q.   What, if anything, is MTV planning on
14  doing to correct these errors?
15      A.   I am not aware of any plan at the
16  moment.
17      Q.   Well, that leaves me to my next
18  question.
19          If in your experience if there is an
20  error in copyright registration, what is your
21  common practice or what is MTV's common practice?
22      A.   I have not come across another
23  instance where there had been an error on a
24  copyright registration.
25      Q.   Okay.

62

W. Solow

1
2          Would you agree with me --
3      A.   This is an anomaly.
4      Q.   Would you agree with me that it would
5  be the appropriate action to correct in the United
6  States Copyright Office when you improperly made a
7  claim of a single ownership when it should be
8  joint ownership?
9      A.   I suppose so.
10      Q.   Okay.
11      MR. COSGROVE:  Give me five minutes.
12  We will go off the record for just five
13  minutes.
14      THE VIDEOGRAPHER:  This will end
15  videotape number 1 of the deposition of
16  Warren Solow.  We are going off the record
17  at approximately 11:45 a.m. May 14, 2009.
18      (Discussion off the record.)
19      (Recess taken.)
20      THE VIDEOGRAPHER:  We are now on the
21  record beginning approximately 12:22 p.m.
22  May 14, 2009.  This will begin videotape
23  number 2 of the deposition of Warren Solow.
24  BY MR. COSGROVE:
25      Q.   I had a few more questions on the

63

W. Solow

1
2  copyright registrations and what have been marked
3  as Plaintiff's Exhibit 91.
4          You mentioned that someone from
5  production and/or a lawyer would communicate to
6  the person who filled out the copyright
7  registrations?
8      A.   Yes.
9      Q.   And you would instruct them on how the
10  copyright registration should be completed as far
11  as ownership of the copyright goes?
12      A.   Yes.
13      Q.   And you don't know who provided
14  instructions to the copyright department in the
15  filling out of Exhibit 91?
16      A.   Not specifically.
17      Q.   Other than it would be the same people
18  that we talked about in general categories
19  production and/or lawyer?
20      A.   Or a production lawyer, yes.
21      Q.   Or a production lawyer?
22      A.   Well, when you said lawyer several
23  times there I meant the lawyer responsible for the
24  production which in turn we call a production
25  lawyer.

64

W. Solow

1
2      Q.   Do you know who the lawyer responsible
3  for the production is with respect to the Making
4  the Band registrations?
5      A.   Not as I sit here.  It might be
6  Lazalde, but I believe that's it Lazalde.  I maybe
7  wrong there.  I think I should say I don't know
8  for sure.
9      Q.   Did you speak to Lazalde about any
10  instructions she might have given regarding
11  copyright registrations on Making the Band?
12      A.   I did not personally, no.
13      Q.   Did you do anything to investigate why
14  the copyright registrations were initially jointly
15  registered and subsequently not jointly
16  registered?
17      A.   We looked to see if there is any
18  documents that survived from that time period to
19  see if there was an instruction, but I think it's
20  most likely that it just happened because joint
21  registrations are a real anomaly in our company.
22      Q.   But you don't know why?
23      A.   I don't know -- can you repeat your
24  question?
25      Q.   Sure.  You don't know why the program

# EXHIBIT 6

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

A NEW YORK LIMITED LIABILITY PARTNERSHIP

ONE BISCAYNE TOWER, SUITE 2650

2 SOUTH BISCAYNE BOULEVARD

MIAMI, FLORIDA 33131

305-377-1666

FACSIMILE: 305-377-1664

ATLANTA
HOUSTON
NEWARK
NEW YORK
SAN FRANCISCO

May 15, 2009

**Via Scanned E-Mail & U.S. Mail**
Carol Lumpkin, Esq.
K&L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

Re:   In re: Louis J. Pearlman, et al.
      *Trans Continental Television Productions v. MTV Networks*

Dear Carol:

I am writing as a follow-up to our conversation at the conclusion of Mr. Solow's testimony.

With respect to electronically stored information ("ESI"), Mr. Solow testified that MTV Networks ("MTVN") provided ESI in native form to K&L Gates. We now know that K&L Gates intentionally chose not to produce ESI in the form in which it was maintained (*i.e.*, electronically) – and, equally important, in the form in which it was received from MTVN. Instead, K&L Gates converted the ESI to paper form for production. As a result, document review of ESI was considerably more time consuming and cumbersome and the ability to review associated metadata was lost.[1]

---

[1] Rule 34 requires that ESI be produced in a "form or forms in which it is ordinarily maintained or in a reasonably usable form." As Mr. Solow's testimony confirmed, K&L Gates did not produce the ESI in the form in which it is ordinarily maintained, nor did it produce the documents in a reasonably usable form. "[T]he option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in litigation. If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a way that removes or significantly degrades this feature." Fed. R. Civ. P. 34, Advisory Comm. Notes 2006 Amend. Indeed, federal courts have recognized that producing printouts of electronic data is often not feasible and may be considered as abusive tactic. There is support for that conclusion here. While K&L Gates had the luxury of reviewing the ESI in native form, its conversion of ESI to paper form required that we undergo a manual review.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

In response to our repeated demands for ESI, MTVN first took the position that ESI was not requested. *See* Zaffuto letter dated April 24, 2009. This assertion was incorrect. *See* Sammataro letter dated April 30, 2009. Subsequently, Ms. Finesilver, on behalf of MTVN, argued that "MTVN is not required to produce documents in electronic form." *See* Finesilver letter dated May 1, 2009. Ms. Finesilver's statement on ESI was so shocking that we wrote back, asking MTVN to reconsider its position. *See* Cosgrove letter dated May 1, 2009. To date, MTVN has not retracted its argument.

However, after Mr. Solow's testimony, you went "on the record" to explain MTVN's failure to produce ESI. First, you stated that MTVN was not required to produce ESI in electronic form because MTVN raised objections in response to Trans Continental's First Request for Production. Second, you argued that the "stay" relieved MTVN from any obligation to produce ESI. I will briefly respond to these points.

MTVN objected to Trans Continental's definitions to the extent that they placed burdens or obligations upon MTVN beyond applicable rules and case law. That objection does not moot MTVN's obligation to produce ESI. *See, e.g.,* Fed. R. Civ. P. 34. MTVN did not object to producing ESI in native form, nor was there any explanation as to why MTVN would have difficulty producing ESI in native form (a difficult argument to make considering that MTVN produced ESI in its native form to K&L Gates).

Second, as I noted at the conclusion of Mr. Solow's testimony, a stay is necessarily forward-looking. It halts discovery obligations from the point it is entered forward. Trans Continental's First Request for Production of Documents required MTVN to produce ESI <u>before</u> the stay was entered, and the entry of the stay does not erase MTVN's intentional (and improper) withholding.[2]

Regardless, in the spirit of cooperation, I propose the following. The parties enter into an "Agreed Order on Electronically Stored Information." The order will require MTVN to produce ESI in native form (or some other reasonably usable form). To the extent you are seeking "limitations," we will agree that whatever ESI you produced in paper form should be produced electronically, with all metadata intact. If the court later orders MTVN to produce additional categories of documents, any ESI that falls within those categories should be produced in electronic form as well.

I recall that you expressed concern regarding bates stamping and redacting ESI. Those concerns should serve as no obstacle. ESI can easily be bates stamped and redacted.[3]  K&L

---

[2] To the extent that you argue that MTVN is under no obligation to <u>correct</u> its known and intentional discovery violation pending the stay, that is your prerogative. We do not think the Court intended this effect, and disagree with your characterization.

[3] We <u>do not</u> agree that MTVN can redact a responsive documents based on "relevance." We believe it is highly improper to redact a document based on a lawyer's interpretation of what is "relevant." Given the level of protection in this case, redacting for relevance is even more improper.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Gates probably has the capability to handle this "in house," but any outside vendor can handle the job.

Finally, I recall that Mr. Solow conceded that MTVN improperly registered MTVN (or Viacom) as the sole owner of a number of episodes in the *Making the Band* series. Mr. Solow further stated that MTVN has no current plans to notify the copyright office of the errors, nor does it have any plans to amend the copyright registrations. Although this should go without saying, we ask that MTVN immediately take steps to notify the copyright office that it filled out inaccurate copyright applications, and start the process of amending the registrations to accurately reflect ownership. During this process, we ask that you keep us informed of the steps that are being taken.

I look forward to hearing from you.

Very truly yours,

Scott B. Cosgrove, Esq.

cc:  Karen P. Finesilver, Esq.
Annie T. Zaffuto, Esq.
James O. Sammataro, Esq.
Lawrence D. Silverman, Esq.

# EXHIBIT 7

1  (Pages 1 to 4)

**Page 1**

```
1
2   IN THE UNITED STATES BANKRUPTCY COURT
3   MIDDLE DISTRICT OF FLORIDA
4   ORLANDO DIVISION
5   Case No. 6:07-bk-007651-ABB
6   Jointly Administered
7   Chapter 11
8   Adv. No.:  6:08-ap-00157-ABB
9   ----------------------------------x
10  In re:
    LOUIS J. PEARLMAN, et al
11      Debtor.
    ----------------------------------x
12  SONEET KAPILA, Chapter 11 Trustee for
    TRANS CONTINENTAL TELEVISION PRODUCTIONS,
13  INC.,
        Plaintiffs,
14      v.
    MTV NETWORKS COMPANY,
15      Defendant.
    ----------------------------------x
16          June 10, 2009
17          9:45 a.m.
18
19          CONFIDENTIAL TRANSCRIPT
20      Videotaped deposition of GEORGE
    CHEEKS, pursuant to Notice, held at the
21  offices of Kasowitz, Benson, Torres &
    Friedman LLP, 1633 Broadway, New York, New
22  York, before Jineen Pavesi, a Registered
    Merit Reporter, Certified Realtime
23  Reporter and Notary Public of the State of
    New York.
24
25
```

**Page 2**

```
1
2   A P P E A R A N C E S :
3   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
4   One Biscayne Tower
5   2 South Biscayne Boulevard, Suite 2650
6   Miami, Florida 33131
7           Attorneys for Soneet R.
8           Kapila, as Chapter 11
9           Trustee for the bankruptcy
10          estate of Trans Continental
11          Television Productions, Inc.
12  BY:     JAMES G. SAMMATARO, ESQ.
13          jsammataro@kasowitz.com
14
15  K&L GATES LLP
16  Wachovia Financial Center
17  200 South Biscayne Boulevard, Suite 3900
18  Miami, Florida 33131-2399
19          Attorneys for MTV Networks
20          Company
21  BY:     CAROL C. LUMPKIN, ESQ.
22          MARK AUERBACH, ESQ.
23
    ALSO PRESENT:
24  BATE POWELL, Videographer
    KEVIN GALLAGHER, Videographer
25
```

**Page 3**

```
1
2           THE VIDEO TECHNICIAN:  We're
3   now going on the record at approximately
4   9:45 a.m.
5           This is Tape No. 1 in the
6   videotaped deposition of witness George
7   Cheeks, taken in the U.S. Bankruptcy
8   Court, Middle District of Florida, Orlando
9   Division, Case No. 6:07-bk-007651-ABB,
10  Soneet Kapila Chapter 11 versus MTV.
11          The deposition is being held
12  today, June 10, 2009, at the office of
13  Kasowitz Benson, 1633 Broadway, New York
14  City.
15          I am Kevin Gallagher,
16  videographer, and the court reporter is
17  Jineen Pavesi, both from the independent
18  firm of Veritext Court Reporting Service.
19          Counsel will now identify
20  themselves.
21          MR. SAMMATARO:  James Sammataro
22  of Kasowitz Benson Torres & Friedman on
23  behalf of Soneet Kapila as the Chapter 11
24  Trustee for Trans Continental Television
25  Productions, Inc.
```

**Page 4**

```
1
2           MS. LUMPKIN:  Carol Lumpkin on
3   behalf of MTVN along with Bate Powell,
4   in-house counsel.
5   G E O R G E   C H E E K S,
6   having first been duly sworn by a Notary
7   Public of the State of New York, was
8   examined and testified as follows:
9   EXAMINATION BY
10  MR. SAMMATARO:
11      Q.    Good morning, Mr. Cheeks.
12      A.    Morning.
13      Q.    Before we get into the basics,
14  I want to just make sure we're both on the
15  same page as to the topics we'll be
16  covering today during your deposition.
17          I am going to hand you what we
18  previously marked as 73 and my
19  understanding, if you turn to, starting on
20  page 6, there is a list of topics on
21  Schedule A.
22      A.    Yes.
23      Q.    My understanding is that you're
24  being designated by MTV as its corporate
25  representative on topic 4?
```


37 (Pages 145 to 148)

---

**145**

CHEEKS - CONFIDENTIAL

1  Films.
2  
3     A.    Yes.
4     Q.    Do you know if this fee was
5  included in the production cost of Making
6  the Band?
7     A.    No idea.
8           Customarily it is not, but I
9  don't know that for sure here.
10    Q.    Can you just tell me why
11  customarily it would not be.
12    A.    Because if you are actually
13  requiring someone to develop television
14  shows, it is not a production cost, it is
15  a development cost.
16          So it would be part of MTV's
17  development budget and then if a
18  presentation or pilot or series was
19  produced out of it, those costs would get
20  folded into the production budget.
21    Q.    Do you know did Diddy in fact
22  develop two original television show
23  ideas?
24    A.    He pitched a lot of ideas, so I
25  don't know whether any of the ideas he

---

**146**

CHEEKS - CONFIDENTIAL

1  pitched were part of this.
2          For example, he pitched Run's
3  House, but I don't know if it was part of
4  this.
5     Q.    Turning to the next exhibit,
6  the overall production agreement, 27.
7          Same general question that I
8  just want to ask you now; again you said
9  that Diddy pitched a number of ideas, do
10  you know if any ideas were pitched within
11  the purview or pursuant to, I guess would
12  be the better term, pursuant to this
13  contract?
14    A.    I definitely heard about
15  pitches he had made during the term of
16  this overall deal, yes.
17    Q.    Same question as before; the
18  amounts of money that were paid to him to
19  pitch those ideas or to develop those
20  ideas, would that have been money that
21  would have accounted towards the Making
22  the Band expense?
23    A.    No, totally separate.
24    Q.    You indicated Diddy pitched

---

**147**

CHEEKS - CONFIDENTIAL

1  ideas; do you know if any were used, aside
2  from Run's House?
3     A.    Farnsworth Bentley project,
4  Borrow My Crew was a pitch of his, I
5  believe Taquita and Kaui was a pitch of
6  his.
7          I am not sure about others.
8     Q.    Which of those actually made it
9  to shows?
10    A.    Taquita and Kaui was a show, I
11  think it was a one-cycle show.
12          Farnsworth was definitely a
13  pilot, I can't remember if that show went
14  to series.
15    Q.    The Taquita, that show, you
16  said it was a one-cycle show; what is the
17  nature of that show?
18    A.    It was two of the girls from I
19  think one of his Diddy Making the Band
20  cycles, it was like a Laverne & Shirley
21  type reality series with them when they
22  moved to Vegas.
23    Q.    Two of the girls who presumably
24  were in Making the Band 3?

---

**148**

CHEEKS - CONFIDENTIAL

1     A.    I think so, I am not certain.
2     Q.    Would that show constitute a
3  spinoff of Making the Band since they are
4  characters or personalities from one show
5  who are now being spun off to a different
6  show?
7     A.    Yes.
8     Q.    And that was a one-cycle show?
9     A.    Correct.
10    Q.    Was that intended to be a
11  one-cycle show?
12    A.    They are never intended; it is
13  usually based on performance, the hope is
14  they won't be one-cycle shows.
15          The way to make your money is,
16  you know, the more you have from an
17  ancillary standpoint.
18    Q.    So that show was presumably
19  canceled for lack of performance?
20    A.    Correct.
21    Q.    Previously you and I were
22  talking about the negotiations that you
23  had with Diddy after 4.3 and generally we
24  were talking about in connection with

---

# EXHIBIT 8

Sign in | Register

Shop | Mobile | Podcasts | RSS Feeds | Widgets | Boards | Search

News   Photos   Video   Fashion   Red Carpet   Movies   Awful Truth   Watch w/Kristin   The Soup   Chelsea Lately   E! Shows

## MTV Does Diddy

Wed., Jul. 17, 2002 2:10 PM PDT by MARCUS BRUCO

P. Diddy is keeping it real for MTV.

The cable network has signed the rap impresario otherwise known as Sean Combs to lord over an upcoming reality series.

Combs had long been petitioning for a reality show in the vein of MTV's hit *The Osbournes*. Finally, on Wednesday, MTV announced it had found an appropriate vehicle: Combs will oversee the next installment of *Making the Band*.

*Making the Band II* will follow a group of wannabes from raw auditions to full-fledged hip-hop/R&B group under Combs' tutelage. As an MTV press release says, "the audience will be present for all of P. Diddy's thoughts, criticisms and final decisions."

Or, in the words of the ever-modest Puffy: "This show will be a wild ride, no risks or gimmicks, just P. Diddy reality. I have been grooving since I was 19 and this show will give insight into what it takes to be at the top. I'm excited to be working with MTV and doing what I love to do—create and nurture new talent."

Combs, who runs Bad Boy Entertainment, has produced such artists as Jennifer Lopez, Notorious B.I.G., Mary J. Blige, Faith Evans and 112, in addition to his own top-selling recordings. Combs will select the final band lineup and then help his charges learn to perform together, get a record contract, release a single, shoot a video and play concerts.

The original *Making the Band* was spearheaded by *Real World* creators Mary-Ellis Bunim and Jon Murray and aired as a midseason series on ABC in 2000. The initial show followed boy-band mastermind Lou Pearlman—the man behind the Backstreet Boys and 'N Sync—as he put together O-Town.

The series hopped to MTV for its second season, tracking O-Town's burgeoning pop career, including the band's signing with Clive Davis' J Records, issuing a short-lived single ("Liquid Dreams") and releasing an eponymous debut album.

This time around, P. Diddy will assume the Pearlman role.

"Once we committed to a new season of *Making the Band*, the first person who came to mind was P. Diddy. He's a star maker who has created and produced numerous number one musical acts. He is the perfect person to take *Making the Band* to the next level," says John Miller, MTV senior veep of original programming and series development. "We're looking forward to...watching P. Diddy nurture and cultivate his new group."

MTV has ordered 16 half-hour episodes of *Making the Band II*. Production begins next week, with a series of nationwide auditions, and the show will premiere October 12 at 9 p.m. ET/PT.

Combs is the latest celeb to land a reality show in the wake of *The Osbournes*' groundbreaking success. For the past month, MTV has been airing *Diary Presents: Brandy—Special Delivery*, following the erstwhile Moesha's journey to motherhood. It will begin airing its *The Anna Nicole Smith Show*, a series tracking the former *Playboy* and *Guess?* model, on August 4 at 10 p.m.

Meanwhile, VH1 confirmed this week that it's in talks with bizarre couple Liza Minnelli and David Gest for a possible show. And Tommy Lee has also been shopping his own show, but so far no network is biting.

As for the Puffy-fied *Making the Band*, tryouts begin next Monday in Detroit, then hit Miami (July 28), Atlanta (July 29), Los Angeles (August 2), Baltimore (August 3), Washington, D.C. (August 5) and Philadelphia (August 10), before winding up August 11 in New York.

PRINT    EMAIL    SHARE ON FACEBOOK    SHARE    LINK    COMMENTS

Previous                                          Next
Eminem: "Superman" Out "Bully" In?              Ron & Sidney Rockwell



**THE BIG PICTURE**   More Photos
**A Good Morning, Indeed**
Our favorite Mad Man Jon signs autographs for some lucky fans outside of *GMA*'s studios



**MOST COMMENTED**

1. Blah-Backt Jen Aniston a Poor Little Lonely Girl? (1121)

2. R.Patz Photographed Leaving Kristen's House?

http://www.eonline.com/uberblog/b43599_mtv_does_diddy.html

8/13/2009

# EXHIBIT 9

Westlaw.

10/25/02 ENTWEEK 20

10/25/02 Ent. Wkly. 20
2002 WLNR 11971675

ENTERTAINMENT WEEKLY
Copyright 2002 Time Inc. All rights reserved. Reproduction in whole or in part
without permission is prohibited.

October 25, 2002

Section: Behind the ScenesNo. 679

Diddy Knows Best
The ruler of rap serves as judge, jury, and executive producer on the new edition
of Making the Band.

Evan Serpick

Dozens of restless teenagers sit in a midtown New York studio, rapping or singing
under their breath. Several are pacing, a few are shaking, and at least one is cry-
ing. Next door, P. Diddy --the seven-named hydra of hip-hop--sits at a long table
with stacks of head shots. A girl with a guitar steps up to a platform and intro-
duces herself. "I wrote this song myself," she begins.

"Do you know 'Amazing Grace'?" Diddy booms into the mic after she's sung roughly
2.5 syllables. She does, and this time, she gets to the fourth syllable, "Gra-,"
before Puff cuts her off. "Thank you. Next, please."

Welcome to Making the Band II, the Diddified sequel. On Oct. 19, MTV will revive
the reality show (responsible for the boy band O-Town) as a vehicle for Mr. Diddy,
who'll handpick a hip-hop dream team and hand them a contract with his Bad Boy la-
bel, all while the cameras roll.

"I thought it would give people a chance to understand what I do every day," Diddy
says of his show. "I've never been interested in doing any cheesy reality show or
Osbournes or anything that would overexpose me more than I'm already overexposed.
This thing is real."

After national open-call auditions, producers flew 50 standouts--a motley crew of
singers, rappers, and instrumentalists--to New York. Diddy and his Bad Boy minions
narrowed the group to 16 finalists, and in September they moved into "boot camp,"
a.k.a. a luxury townhouse on Manhattan's Upper West Side, where they write and per-
form daily for Diddy. That's when the real drama set in.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

10/25/02 ENTWEEK 20

"Already, we [discovered] two young ladies are pregnant, somebody's sister got killed, and somebody had to pull out yesterday because they had to go to jail for eight months," Diddy reports frankly. "These things aren't in the script, they're just things that happen to a kid growing up in the inner city. This is what I deal with every day. Drama all over the place."

The frazzled producers agree. "This is a very different group of kids from the group we saw for O-Town," says Jonathan Murray, who, with Mary-Ellis Bunim, created The Real World and ABC's original 2000 Making the Band. Murray won't reveal how the myriad crises were handled. "A lot of that is part of the soap-opera element of the show that makes it entertaining," he says. "How we deal with it--people will just have to watch."

Drama reigns behind the camera, too: At press time, with the series premiere days away, Diddy still hadn't picked the five or so winners. The shooting schedule remains chaotic, as it bends to accommodate Diddy's social calendar (for one EW interview, he phoned from a party at Chuck E. Cheese with his 4-year-old son). "There's definitely been a tension between the needs of Bad Boy, in terms of creating the group, and the production team trying to make episodes and deliver them to the network," says Murray. But Diddy, the man who "invented the remix," has characteristic confidence that he'll reinvent these kids in his own pop-idol image.

"Some people want to be police officers, some want to be lawyers, some want to be doctors--and some people want to be stars," he says. "I wanted to be a star. I hope they want to be stars too."

B/W PHOTO: PHOTOGRAPH BY DANNY CLINCH A PUFF MAN TO PLEASE Puff Daddy (seated center) peruses hip-hop hopefuls at a recent Making the Band II shoot

---- INDEX REFERENCES ----

COMPANY: BRITISH AMERICAN TOBACCO PLC

INDUSTRY: (Entertainment (1EN08); Gen Y Entertainment (1GE14); Gen Y TV (1GE33))

REGION: (USA (1US73); Americas (1AM92); North America (1NO39); New York (1NE72))

Language: EN

OTHER INDEXING: (ABC; B/W; DIDDIFIED; MANHATTAN; OSBOURNES) (Chuck E. Cheese; DANNY CLINCH; Diddy; Gra; Jonathan Murray; Mary-Ellis Bunim; Murray; P. Diddy)

KEYWORDS: (Television)

Word Count: 651
10/25/02 ENTWEEK 20
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

10/25/02 ENTWEEK 20

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 10

# BRILLSTEIN- GREY MANAGEMENT

## MEMORANDUM

**TO:**        Peter Safran

**CC:**        Jon Liebman
               Sandy Wernick

**FROM:**      Amy Weiss

**DATE:**      5/10/02

**RE:**        Sean Combs- "Making the Band"

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

As you recall, we had specific questions for MTV and we have received the following answers (which are in the shaded area corresponding to the questions):

- Guarantee:
    - Guaranteed minimum number of episodes and a guarantee that they would air, not merely be produced.
    - Guaranteed number of airings of each episode during a specific time frame. MTV will guarantee twelve episodes that will air four times each. (There will be two cycles of a minimum of six episodes and MTV has asked for a maximum of 26 episodes each cycle.) They cannot guarantee, however, that they will air during a specific time slot or time frame. We have told MTV that there will be no options for future services. The deal will be limited to two cycles with the first cycle being the selection of the band, and the second cycle being the recording process. We have also asked them to confirm that once the first cycle is completed and the band has been formed, if they are unwilling to commit to produce and air the second cycle, then Sean would have the option whether or not he wanted to commit to the record contract. (The reason for this is that presumably, Sean is only committing to the record contract in exchange for all the promotion that we are expecting MTV to do during the second cycle.) We have also asked for an assurance that the repeat airings will not be buried during the hours in the middle of the night.

- Exclusivity:
  - Contractually, Sean could not be anything other than non-exclusive, not in person, not full time. I told Virginia that any minimum commitment could not be contractual.

    With respect to Sean's exclusivity, MTV will outline the times during the term when his services are required in-person, as opposed to not-in-person. They would like to obtain a copy of his schedule so they may accommodate Sean and MTV to the best of their ability. However, they will require contractually that he will render in-person services at certain times, which times we need to address and put in the contract.

  - They are concerned about Sean's doing a competitive show and would want some language prohibiting him from doing that. I suggested we might be able to find language to address this concern.

    Per Virginia, they are satisfied with limiting Sean's exclusivity by saying that Sean cannot render services on a similar shows on cable or other networks during the term of the agreement.

- Talent Scouts: Per Virginia, MTV is also willing to hire 1-2 lower level talent scouts to be Sean's eyes and ears at 1-2 different city auditions, in his absence. They would get a small fee (approximately $1,000 per episode) and their travel and accommodations would be covered. Talent Scouts- MTV will pay two talent scouts $1,500 per week each, for a minimum of four weeks and a maximum of thirteen weeks (out of a twenty week period). MTV and Sean will determine how involved the scouts are in the process.

- Creative- Type of group:
  - Sean does not want to be limited to hip-hop or R & B only. He was thinking about a teen "No Doubt" genre. The creative executives will discuss this with you.

    MTV and Sean shall have mutual approval. However, MTV is looking for a multi-ethnic band with a hip-hop element, and a female individual as part of the band. They want this to be contractual.

  - You had indicated after your conversation with Phil Robinson the following: "MTV guaranteed Puffy in a meeting that he would have complete control over the music and the audition process/selection."

    Per Virginia, it is a collaborative process, with mutual selection. Off camera, MTV and Sean will have mutual approval. (On camera, it will appear that the decision is entirely Sean's.)

- Lou Perlman:
  - Does he get an Executive Producer credit on the show?
  - Does he get a Production Company Credit on the show?
  - Does he get a fee which is charged to the production?
  - According to Virginia, he has an overall deal, (he created the concept of "Making the Band") and therefore has certain contractual rights. She will get back to me with answers to these questions.

Lou gets two credits: a Creative Consultant Credit and a Production Company Credit. He does not receive an episodic fee, but gets backend. MTV was not willing to say how much backend Lou is receiving. Sean has no obligation to deal with Lou.

- Perlman's First Opportunity to Manage:
  - Whose option is it? Does the band have to sign with Perlman or do they have the option of saying no?

    Lou has the first opportunity at securing management, but the band members have the right to decline. (MTV cannot force the band to sign with anyone, MTV can only make introductions to managers.)

  - You had indicated the following after your conversation with Phil Robinson: "MTV guaranteed Puffy in a meeting that he would be able to select the band's manager and agent."

    Per Virginia, this is not correct. Sean cannot select the band's manager and agent because there is a conflict of interest, since he owns the recording company. This could lead to potential lawsuits. MTV owns the band and assigns the rights. MTV does not have live performance rights.

- Phil Robinson: I told Virginia that we would want a fee and a credit for Phil Robinson. She said she would get back to me.

- Recordings: You had indicated the following after your conversation with Phil Robinson: "All recording will be done at Daddy's House (Puffy's studio) and that MTV will pay the normal fee for studio time."

  Per Virginia, no. There will be no demo to record, since the band will definitely be signing with Bad Boy. Once the band members are selected, the band will be assigned to Bad Boy (who will assume the costs of any recordings).

- We have told Virginia that Sean would not do this for less than $50,000 per episode. Virginia indicated they did not want to spend more than $15,000 per episode, and we told her that $50,000 was really the bottom line.

Virginia will get back to us with more particulars.

# EXHIBIT 11

weiss assist

From:           Safran, Peter
Sent:           Wednesday, May 08, 2002 2:54 PM
To:             Weiss, Amy; Wernick, Sandy
Subject:        puffy

Follow Up Flag:  Follow up
Flag Status:     Red

phil robinson, who works with puffy on the music side, had a conversation with virginia yesterday and told her that puffy would not do the show if perlman had first opportunity to manage the band. she thought that mtv could work that issue out. also she said off the record that there is probably $50,000/episode.

1

# EXHIBIT 12

# BRILLSTEIN- GREY MANAGEMENT

## MEMORANDUM

**TO:**      Peter Safran

**CC:**      Jon Liebman
Sandy Wernick

**FROM:**   Amy Weiss

**DATE:**   6/3/02

**RE:**      Sean Combs- "Making the Band"

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

I had a conversation with Virginia MacPherson from MTV this morning. I have attached the memo dated 5/31/02 to track those issues discussed below:

- **Series:** Virginia has gotten back to me to say that if MTV does not produce and air the second cycle, Sean would have the option to sign the band and pay the recording advance. He would not be obligated.

- **Phil's Fee:** MTV has offered $3,500 per episode for Phil. They have proposed that if MTV goes forward with the second cycle, MTV pay Phil a pick up bonus of $4,000 per episode that was produced in the first cycle. ($4,000 being the difference per episode between what we asked for and the amount they have offered.) Phil would be locked to the second cycle, if produced and aired, but would only get a 5% bump from $3,500. **We need to check with Phil and Sean.**

- **Approvals:** As you recall in my earlier memo dated 5/31 (see attached), I had requested mutual approvals at every phase of the talent selection process. MTV is insisting that they get final approval, although they will meaningfully consult with Sean.

   My concern about giving MTV final approval is that Sean could potentially be on the hook for the recording advance for a band that he does not necessarily want. My recommendation is that we hold on our request for mutual approvals. Please advise.

- **Backend:** I have reserved our rights to discuss backend once we have resolved some of these other big issues.

- **Lou Perlman issue:** I expressed to MTV the need to put in language that makes it clear that Lou is not involved with this production in any way other than his getting a credit and piece of the backend from MTV. (e.g., Sean will not have to deal with him.) **Virginia will advise.**

- **MTV - New creative issue:**  At the end of the first cycle, MTV would have the option whether to go forward with the band that was selected in the first cycle, and if they choose not to use the band from the first cycle, they would use the second cycle to form a new band. If this happens, Sean will not have any obligation to sign the first band.  He may sign the first band if he chooses, and during the second cycle, MTV would do an occasional check in on the progress of the first band, while proceeding with forming the second band.  My concern on this point is that this potentially takes away the value of why Sean is doing this in the first place.  The intent was for the second cycle to be a promotional tool for the band that was formed. Under this scenario, Sean would lose out on that promotional process.

Let's discuss.

# EXHIBIT 13

## Sean Combs- "Making the Band"

| | **Agreed to:** | **Comments** |
|---|---|---|
| **Sean's Fee** | $50,000 per episode, with a 5% bump in the second cycle. | |
| **Sean's Lock** | Locked for 2 cycles if the second cycle is actually produced. | |
| **Guarantee** | 12 episodes that will air 4-5 times each. (No specific time slots.)  There will be 2 cycles, each cycle with a minimum of 6 episodes and a maximum of 22 episodes. The guaranteed 12 episodes may all be from the first cycle, and MTV may not go forward to the second cycle.  If MTV does not go forward to produce and air the second cycle, Sean would have the option to sign the band and pay the recording advance, but would not be obligated. | |
| **Re-airings** | The re-airings will not be buried in the middle of the night. | |
| **Exclusivity** | Sean cannot render services on similar show on cable or other networks during the term of the agreement. | |
| **Commitment** | Sean will be non-exclusive, not-in-person and not-full-time.  MTV would like to outline times they would need Sean in-person, subject to his schedule (which MTV will go over with Phil Robinson). MTV will agree to accept a certain amount of good faith efforts regarding his time commitment. | |
| **Talent Scouts** | MTV will pay two talent scouts $1,500 per week each for a minimum of 4 weeks and a maximum of 13 weeks (out of a 20 week period).  MTV and Sean will determine how involved in the process the scouts will be.   No credit for talent scouts. | |
| **Creative/ Type of Group** | MTV and Sean have mutual approval, however, MTV is looking for a multi-ethnic band, with a hip-hop element, and a female individual as part of the band. | Sean is not willing to commit to a multi-ethnic hip-hop band with a female.  He wants the latitude to find whatever type of band he wants.  Phil will speak to Virginia about this issue. |
| **Approvals** | • Recordings:  Sean will have final approval over the recording aspects of the album.<br>• TV:  MTV will have final approval over all the TV aspects of the show. | Sean wants approval over any time he is portrayed on TV. Virginia will get back to us on this issue. |

|  |  |  |
|---|---|---|
|  | • Talent Selection: Sean and MTV will have mutual approval, with MTV being the tie-breaker.  However, if Sean doesn't agree and approve the band, it is Sean's option whether to advance the money and sign the band. |  |
| **Recording/ Studios** | Prior to the band signing with Bad Boy, MTV would be financially responsible for any of the band's recording costs.  However, MTV cannot commit to use Sean's studio at market prices, for financial reasons.  After the band signs with Sean, all recording costs would be borne by Bad Boy Records. | Sean will not use any recording studio other than Daddy's House.  He will not be aligned publicly with another studio.  He will charge fair market value for recording time (equal or less than Sony and Hip Hop wold charge).  Virginia is going to find out what was paid on the recording for O-Town and suggest a price MTV would be willing to pay. |
| **Backend** | MTV has said no to backend for Sean.  They have given out all the backend points they are able to give at this time, and feel that Sean will be getting record royalties, because of his role as record producer.  Lou Perlman does get backend, but he does not receive any record royalties. | Sean wants either a significant portion of the backend, or he wants MTV to limit the exploitation of the show strictly to TV (e.g.- no DVDs, videos or ancillary uses).  Virginia will get back to us on this issue. |
| **Credits** | • **Sean**:  EP Card (first position, single card, main or end titles) and Production Company Card (first or last position, Sean's discretion, vis-à-vis third parties- MTV has the last card.)<br>• **Phil**:  Producer Credit<br>• **Lou Perlman**:  Creative Consultant Credit and Production Company Card (no position) |  |
| **Travel** | If MTV requires Sean to travel, they will pay for first class travel accommodations for Sean only. |  |
| **Phil's Fee** | $3,500 per episode during the first cycle.  If they proceed to the second cycle, MTV would pay Phil a pick up bonus of $4,000 times every episode produced in the first cycle.  MTV has an option on Phil's services for the second cycle.  If they exercise their option, they will pay him $7,500 per episode in the second cycle.  MTV will require that Phil continue to work for Sean in order to be a producer on this show. |  |

Chart of Deal2- 6602.doc

| Lou Perlman | He gets:<br>• Creative Consultant Credit<br>• Production Company Credit<br>• Backend<br>• First opportunity to negotiate to manage the band | We will work out language in the long form that only permits Lou to be actively involved if he ultimately signs the band to a management contract.<br><br>Sean will not permit Lou to be on-air without his approval. Virginia will get back to us on this issue. |
|---|---|---|
| **Recording Aspects of the Contract** | MTV will negotiate directly with Kenny Meiselas. | |
| | | |
| | | |