# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al*      Case No. 6:07-bk-00761-ABB
                                                Jointly Administered
    Debtor.                            Chapter 11
_____/

SONEET KAPILA, Chapter 11 Trustee
for TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,            Adv. No.: 6:07-ap-_____-ABB

    Plaintiffs,

v.

MTV NETWORKS COMPANY,

    Defendant.
_____/

## COMPLAINT

Plaintiff, Soneet Kapila, as the Chapter 11 Trustee ("Trustee" and/or "Plaintiff") for the bankruptcy estate of Trans Continental Television Productions, Inc. ("Trans Continental") in Case No. 6:07-bk-1856-ABB, by and through undersigned counsel, hereby sues defendant, MTV Networks Company ("MTV"), and alleges as follows:

### NATURE OF THE ACTION

1. This is an action for breach of contract and accounting, which seeks the recovery of monetary damages for the benefit of Trans Continental's creditors.

### JURISDICTION AND VENUE

2. This Court has original jurisdiction over the matter pursuant to 28 U.S.C.

1

§§ 157 and 1334. This Court further has jurisdiction over this matter as it is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2).

3. Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), because the Plaintiff and MTV are citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of attorneys' fees and costs.

4. Additionally, pursuant to Section 48.193(1)(a), Florida Statutes, this Court has personal jurisdiction over MTV as MTV purposefully operates, conducts, engages in and/or transacts business in the State of Florida.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

**PARTIES**

6. Plaintiff is the court-appointed Chapter 11 Trustee for the bankruptcy estate of Trans Continental.

7. Defendant, MTV, is a division of Viacom International, Inc., a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1515 Broadway, New York, New York 10036.

**FACTUAL BACKGROUND**

8. On May 8, 2007, Trans Continental filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, Case No. 6:07-bk-01856, pending before the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

9. On July 18, 2007, the Court entered its Order Directing the Appointment of Chapter 11 Trustee (Dkt. No. 11).

2

10. On the same date, the United States Trustee filed its Notice of Appointment of Trustee (Dkt. No. 12), appointing Plaintiff as the Chapter 11 Trustee for Trans Continental

11. On July 20, 2007, this Court entered its Order Approving the Trustee's appointment (Dkt. No. 15).

12. On July 31, 2007, this Court entered its Order (Dkt. No. 18) pursuant to which the Trans Continental bankruptcy case was jointly administered with the bankruptcy case of Louis J. Pearlman, with case number 6:07-bk-761-ABB.

A. **The Joint Venture Between MTV and Trans Continental**

13. Trans Continental Television Productions was owned and operated by Louis Pearlman, and formed with the express intent of developing motion picture and television concepts.

14. MTV is a media giant, which changed the way that America's youth "listened" to its music. While today, there are a multitude of MTV channels, including MTV Hits, MTV Jams, MTV 2, MTV Tr3s, MTV's flagship station pioneered music videos and music news. Moreover, with the launch of the television series *The Real World* in 1992, MTV has been tabbed as the creator of reality television.

15. On January 7, 2000, Trans Continental entered into a letter agreement (the "Agreement") with MTV wherein the parties agreed to, among other things: (a) jointly develop and produce an episodic television series to air on American Broadcasting Company, Inc. ("ABC"), ultimately titled "*Making the Band*," and (b) jointly develop an

all-male pop band. A true and correct of the January 7, 2000 letter agreement is attached hereto as **Exhibit "A."**

16. The Agreement specified the parties' respective obligations with respect to both the development of the television series and the boy band, as well as their potential profit participation should the enterprise prosper. In particular, Trans Continental was entitled to receive:

- Fifty percent of all merchandizing (after MTV's taking of a ten percent distribution fee deducted from gross revenue and recoupment of its direct, out-of-pocket expenses). (*See* Exhibit A, ¶ 7).

- Fifty percent of all print publishing (after MTV's taking of a ten percent distribution fee deducted from gross revenue and recoupment of its direct, out-of-pocket expenses). (*Id.* at ¶ 8).

- Joint ownership with MTV of all music publishing rights (though MTV was entitled to administer a fifteen percent fee, plus re-coup its expenses). (*Id.* at ¶ 9).

- Fifty percent share of all revenues received from advertisers or sponsors in connection with the official web-site related to the television series and band (after MTV recoups expenses and takes a commission of 15%). (*Id.* at ¶ 10).

- Fifty percent share of all fees received in connection with the domestic and foreign distribution of the series (after MTV takes a ten percent fee off the top). (*Id.* at ¶ 11).

- Fifty percent share of all proceeds received from the home video market (MTV entitled to a ten percent distribution fee off the top and recoupment of its direct, out-of-pocket expenses). (*Id.* at ¶ 12).

- Twenty percent management fee for managing the band. (*Id.* at ¶ 18); and

- Fifty percent interest in all other ancillary rights. (*Id.* at ¶ 16).

17. Notably, the Agreement stipulated that MTV and Trans Continental "will

4

*jointly* exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the Series or the band, subject to good faith negotiation." (*Id.* at ¶ 14) (emphasis added).

18. The Agreement additionally provided that "all business deals relating to the Series and Band and ancillary rights therefrom must be approved by both parties." (*Id.* at ¶ 15).

19. The Agreement further provided that "[t]he parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein. [sic] Until such time as such formal agreement is executed, this letter shall remain binding upon the parties."

20. A more formal joint venture agreement was never entered into.

**B.   The Launch of *Making the Band* on ABC**

21. *Making the Band* originally aired on ABC in late 1999. The show chronicled, in what has become typical reality-show fashion, the real-life competition between young men vying to become members of the next boy band group. Midway through the initial season, the final eight contestants were narrowed to five, with these five winners ultimately forming a band entitled "O-Town."

22. *Making the Band* captured the initial competition and tracked O-Town's early development, including the recording of O-Town's self-titled debut CD, *O-Town*.

23. Boosted by the popularity of the television series, *O-Town* sold more than two million copies. Its first single, *Liquid Dreams*, was the first song to reach # 1 on the Billboards single sales chart without making the airplay chart.

5

24.     Almost overnight, O-Town had become the next great boy band.

25.     *Making the Band's* ratings were strong enough to warrant a second season, which further tracked the band's development and struggles, including O-Town's tours, performances, the creation of their second CD, *O2*, and their transition to a new record label, J Records.

26.     Season Two of *Making the Band* was ground-breaking in that it marked the first time the main cast of a reality show returned for a second season.

27.     *Making the Band* was scheduled to run for a third season on ABC, when Walt Disney World, Inc. ("Walt Disney") acquired ABC. Walt Disney is a direct competitor of Viacom, MTV's parent company. As a consequence, MTV objected to renewing the licensing agreement with ABC.

C.   **The Parties Amend the Agreement in Light of Walt Disney's Acquisition of ABC.**

28.     Instead, on November 15, 2001, Trans Continental and MTV entered into an amended agreement (the "Amended Agreement"), which altered certain provisions of the original Agreement.

29.     In particular, the Amended Agreement provided that *Making the Band* was to be aired on MTV Networks; specified that Trans Continental's total compensation was to be premised upon a percentage of production costs; and required MTV to account to Trans Continental on a semi-annual basis. Perhaps, most importantly, paragraph 9 of the Amendment specified that:

6

> **Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series** (emphasis added).

A true and correct copy of the Amended Agreement is attached hereto as **Exhibit "B."**

30. The parties also agreed to "negotiate in good faith the exploitation of the formal rights for the [*Making the Band*] in Europe." (*See* Exhibit B at ¶ 13).

31. Notably, "[e]xcept as amended [by the Amended Agreement], all of terms of the Agreement shall remain in full force and effect."

32. Pursuant to Schedule A of the Amended Agreement, MTV was to account to Trans Continental with respect to Trans Continental's share of the Net Proceeds (as defined therein), if any, on a semi-annual basis provided there are payments due to Trans Continental, and each such accounting was to be accompanied by a payment of Trans Continental's share of the Net Proceeds.

33. On December 3, 2001, MTV belatedly provided Trans Continental with a check for $725,064.85 for Trans Continental's share of the proceeds related to seasons one and two of *Making the Band*. According to MTV Records, this amount was comprised as follows: $87,803.00 in merchandising revenues,[1] $458,011.85 in connection with international program sales, and $179,250.00 as part of ABC's licensing fee.[2]

34. A third season of *Making the Band* aired in January of 2002, and followed O-Town as they opened for Britney Spears and recorded their next album. The third

---

[1] Trans Continental had already received a $100,000.00 advance in merchandising revenue.

[2] Trans Continental also separately received $330,000.00 from record advances to off-set the expenses it incurred in connection with band development and related expenses.

7

season was the last season of *Making the Band* which featured O-Town.

35. MTV did not timely account to, or pay, Trans Continental in connection with the third season of *Making the Band*. In fact, MTV did not provide Trans Continental with an accounting for the third season of *Making the Band* until April of 2005.

### D. *Making the Band 2* and its Successors

36. In October of 2002, a new talent search was begun, this time by Sean Combs *p/k/a* P. Diddy *f/k/a* Puff Daddy (hereinafter, "Diddy").

37. As the name suggests, the premise of *Making the Band 2* was identical to *Making the Band*. Diddy sought to find the best rappers and singers from which to assemble a new hip-hop group.

38. After weeks of selection and training, Diddy chose the final contestants for the band on the first season of *Making The Band 2*, which ended on December 21, 2002.

39. *Making the Band 2* was followed by two additional seasons in which the program tracked the successes and trials of the contestants, including the well-chronicled and parodied episode in which the contestants were forced to walk from Midtown Manhattan to Brooklyn to purchase Diddy cheesecake.

40. The finalists of *Making the Band 2* named themselves, *Da Band*. *Da Band*'s debut album, *Too Hot for TV*, was released on Diddy's label, Bad Boy in September of 2003.

41. Da Band effectively ended its career at the end of the third season of the show, when Diddy dissolved the group during the season finale.

8

42. Season Three was the last season of *Making the Band 2*.

43. After the failure of *Da Band*, Diddy returned with *Making the Band 3*, a search for the next all female group, in 2005. *Making the Band 3* lasted three seasons.

44. Season One of *Making the Band 3* chronicled Diddy's multi-city search to find girls who had everything: the look, dancing ability, and a great voice. The season ended on a down note, as Diddy decided that all but three of the contestants were unworthy.

45. Season Two of *Making the Band 3* opens with Diddy conducting a search for new contestants and followed the finalists as they vied to become final members of the band. As part of the competition, the finalists performed in front of a crowd of 20,000 plus at a Backstreet Boys concert. They performed as two separate groups, SHE and Chain 6. The finale took place on December 8, 2005, when the eleven finalists were pared down to five.

46. Season Three of *Making the Band 3* tracked the band members, now known as *Danity Kane*, as they moved into a house and honed their act.

47. Just as *Making the Band* launched *O-Town*, *Making the Band 3* propelled *Danity Kane* to stardom. Despite mixed reviews, Danity Kane's self-titled debut album sold over 90,000 copies on the first day of its release, and over 234,000 copies within the first week of release. The album eventually debuted at number one on the Billboard 200, and received a platinum certification from the RIAA in November 2006.

48. Fresh off the success of *Making the Band 3*, MTV aired *Making the Band 4* on June 18, 2007.

49. *Making the Band 4* returned to its original roots and was in search of an all-male group. Season One of *Making the Band 4* kicked off with the panel of judges traveling the country to find fifty-eight (58) men with the most potential. Diddy selected twenty (20) of the men, and eliminated the other thirty-eight (38).

50. After a series of grueling tests, the twenty (20) finalists were further whittled down to ten (10), and then ultimately to five. The finalists became the band later named *Day26*.[3] Another one of the finalists, Donnie Klang, was offered a solo artist contract on Diddy's Bad Boy label.

51. Season Two of *Making the Band 4* aired on January 28, 2008 and featured a new twist: it pitted "guys versus girls," as the male finalists from season one were joined in the penthouse by *Danity Kane*, the winners of *Making the Band 3*. With all of the artists living together in the same house, Season Two focused on the band members' personal relationships and their efforts in trying to record albums in a truncated period of time.

52. Season Three of *Making the Band 4* is scheduled to air in August of 2008, and is slated to center upon *Day 26* and Donnie Klang, who are on tour with headliners, *Danity Kane*.

## COUNT I
## BREACH OF CONTRACT

53. Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 52 as if fully set forth herein.

---

[3] The band name was not chosen until near the end of Season Two of *Making the Band 4*.

54.     Paragraph 5 of the original Agreement entered into by and between MTV and Trans Continental provided that "all business/creative matters in connection with the joint venture are to be mutually determined ..."

55.     Paragraph 14 of the Agreement similarly provided that MTV and Trans Continental were to "*jointly* exploit any features, spin-offs, sequels, made-for-TV-movies, direct to video, non-theatrical, radio or other projects based on the [*Making the Band*] or the band, subject to good faith negotiation," while Paragraph 15 stated that "[a]ll business deals relating to [*Making the Band*] and [O-Town] and ancillary rights therein must be approved by *both* parties" (emphasis added).

56.     The parties' Amended Agreement further provided that "with respect to the third season and all subsequent seasons of the Series, MTV shall pay [Trans Continental] an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series."

57.     Despite the aforementioned contractual provisions, MTV excluded Trans Continental from the creative process and failed to pay Trans Continental its proportional share of the net proceeds derived by MTV in connection with *Making the Band 2*, *Making the Band 3*, and *Making the Band 4*.

58.     MTV's decision to exclude Trans Continental from the creative process and to cease paying Trans Continental is particularly egregious given that MTV began submitting payments to Trans Continental in connection with Season One of *Making the Band 2*.

59.     MTV further breached the original Agreement by failing to sufficiently

11

account to and pay Trans Continental the money Trans Continental was owed in connection with the residual rights relating to seasons one through three of *Making the Band*.

60. MTV was not entitled to unilaterally involve Diddy and/or his related companies in connection with *Making the Band 2*, *Making the Band 3*, and *Making the Band 4*, and the creation of, to date, eight seasons of *Making the Band* without Trans Continental's involvement constitute separate, independent and continuing breaches of the parties' Agreement.

61. Except to the extent that it was purposefully excluded by MTV, Trans Continental satisfied all of its obligations under both the Agreement and the Amended Agreement (hereinafter, the "Agreements").

62. MTV breached the parties' Agreements by, among other things: excluding Trans Continental from the creative process; failing to consult with Trans Continental; unilaterally replacing Trans Continental with Diddy; and by failing to account for and pay Trans Continental its contractual share of the proceeds generated from *Making the Band*, *Making the Band 2*, *Making the Band 3*, and *Making the Band 4*.

63. As a direct and proximate result of MTV's breaches of the parties' Agreements, Trans Continental has incurred actual and substantial monetary damages, and will continue to incur such damages with the soon to be broadcast of Season Three of *Making the Band 4*, in an amount to be determined at the final hearing in this matter.

**WHEREFORE**, Plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., respectfully prays that this Court

enter a judgment in his favor and against MTV Networks, Inc. for damages in an amount to be determined at the final hearing in this matter, together with interest and attorneys' fees and costs, and such other relief as this Court deems just and proper.

## COUNT II
## ACCOUNTING

64. Plaintiff hereby re-alleges each of the allegations contained in paragraphs 1 through 52 as if fully set forth herein.

65. This is an action for an equitable accounting.

66. The Agreement provided Trans Continental with a multitude of potential revenue streams, including revenue from band-related merchandising, print and music publishing, the official web-site, domestic and foreign distribution fees, home video fees and a band management fee. Some of this revenue, including for example, revenue from music publishing, foreign distribution fees and home video fees, manifests long-after the *Making the Band* original broadcast and remains on-going.

67. Similarly, pursuant to the terms of the Amended Agreement, MTV was to account to Trans Continental with respect to Trans Continental's fifty percent share of the Net Proceeds (as defined in Schedule A to the Amended Agreement), if any, on a semi-annual basis provided there are payments due to Trans Continental, and each such accounting was to be accompanied by a payment of Trans Continental's fifty percent share of the Net Proceeds.

68. The accounting which MTV has provided to Trans Continental in connection with *Making the Band* is insufficient, causing Trans Continental doubt as to, among other things, whether MTV has fully compensated Trans Continental in

connection with Trans Continental's back-end participation in the on-going rights to *Making the Band*.

69. Despite Trans Continental's previous demands, MTV has never provided Trans Continental with any documents, much less a full accounting, relating *Making the Band 2*, the three completed seasons of *Making the Band 3* or the two completed seasons of *Making the Band 4*. In fact, to date, MTV has never provided Trans Continental with a single participation statement in connection with Seasons Two and Three of *Making the Band 2* or any participation statements in connection with any of the seasons of *Making the Band 3* or *Making the Band 4*.[4]

70. Through MTV's wanton actions, Trans Continental have been deprived of its share of the on-going revenues relating to *Making the Band*; its full share of the revenues relating to Season Three of *Making the Band*; and its share of the Net Proceeds relating to all three seasons of *Making the Band 2*, the three completed seasons of *Making the Band 3*, and the two recently completed seasons of *Making the Band 4*.

71. All of the information relating to the on-going revenues relating to *Making the Band*; the revenues relating to Season Three of *Making the Band*; the profitability of the three seasons relating to *Making the Band 2*, the three completed seasons of *Making the Band 3* or the two completed seasons of *Making the Band 4* lies exclusively in MTV's possession.

72. Plaintiff is in need of an accounting in order to determine the exact

---

[4] As referenced above, MTV began the process of accounting to Trans Continental for Season One of *Making the Band 2*, before ostensibly deciding not to pay Trans Continental for any season featuring Diddy.

14

amount of money which it is owed by MTV. Plaintiff's remedy at law will not be full and adequate absent an extensive accounting and Plaintiff is, thus, entitled to the equitable remedy of an accounting.

**WHEREFORE**, Plaintiff, Soneet Kapila, Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc., prays for judgment against defendant, MTV Networks, as follows: for an accounting of all revenues relating to Seasons One through Three of *Making the Band,* Seasons One through Three of *Making the Band 2,* Seasons One through Three of *Making the Band 3* and Seasons One and Two of *Making the Band 4*; together with the costs of suit herein incurred, as well as for such other and further relief as this Honorable Court may deem just and proper.

           Respectfully submitted,

           **SILVERMAN COSGROVE & SAMMATARO**
*Special Litigation Counsel for Soneet R. Kapila, as Chapter 11 Trustee for the bankruptcy estate of Trans Continental Television Productions, Inc.*
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2650
Miami, Florida 33131
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
jsammataro@scs-legal.com

By: s/*James G. Sammataro*
  James G. Sammataro
  Florida Bar Number: 0520292