# COMPOSITE EXHIBIT G

*Puffy Agreement for 1st cycle*

MTV NETWORKS, A DIVISION OF VIACOM INTERNATIONAL INC.
1515 Broadway
New York, NY 10036

July 12, 2002

Bad Boy Films, Inc.
1540 Broadway
New York, NY 10036

Re:   Sean Combs/"Making The Band"

Gentlemen:

Set forth below please find a confirmation of the material terms of the agreement we have concluded on behalf of MTV Networks, a division of Viacom International Inc. or its designee ("MTV") and Bad Boy Films, Inc. ("Company") furnishing the services of Sean Combs ("Producer") in connection with Producer's participation in the production of the MTV series currently known as "Making The Band" and the development of a recording group featuring Artist, as defined below ("Series").

1.   Services:  MTV will engage Company to provide Producer's non-exclusive executive producing services (subject to Paragraph 5 below) for two cycles of the Series.  Specifically, MTV shall film Producer assisting MTV in finding and developing a band.  Producer shall use his best efforts to find a multi-ethnic band in the hip-hop genre (the membership of which shall include at least one female member) ("Artist").  MTV and Producer will pick five (5) cities where auditions will be held and one (1) city where a so-called artist "boot-camp" will be held (which is where MTV shall film Producer as he attends casting sessions, run throughs, tapings and other key creative cycle, MTV shall film Producer as he attends casting sessions, run throughs, tapings and other key creative meetings.  In connection with the second cycle, MTV may film Producer as he develops and records Artist's album(s).  During the Term, Producer shall: (a)  be available to MTV via telephone, (b) make himself available to be filmed while in New York City upon MTV's reasonable request, subject to Producer's professional commitments, (c) make himself available to be filmed upon MTV's reasonable request in the event MTV follows Producer to a location outside of New York City (which includes those cities where auditions and boot-camp will be held as well as other cities), subject to Producer's professional commitments, and (d) permit MTV to film Producer while Producer is engaged in other activities (i.e., while performing as an artist, while recording in the studio, etc.) provided that Producer is not contractually prohibited from permitting such taping.  The parties shall work together in good faith with respect to the production scheduling so as not to frustrate the production and delivery of episodes of the Series.  Producer shall assist MTV in securing all necessary third party releases and premises permits in connection with Producer's participation in the Series.

2.   Series:  Company shall provide Producer's EP services on a pay or play basis for two cycles of the Series ("Term") if two (2) cycles of the Series are produced.  A cycle is defined as a minimum of 6 episodes and a maximum of 22 episodes.  In the event MTV does not produce a second cycle of the Series, the Term shall expire after the end of the first cycle (subject to the terms of Paragraph 4(a) and (b) below).  If MTV produces two cycles of the Series, MTV may elect in its sole discretion to produce additional cycles of the Series without Company or Producer and without obligation to Company (subject to the terms of Paragraph 4(b) below).

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000613

3. <u>Series Episodes</u>: MTV agrees to produce, for initial airing on MTV, a minimum of twelve (12) episodes of the Series (which may be a combination of episodes produced for the first and second cycles of the Series). MTV shall broadcast each of the twelve (12) episodes no less than five (5) times. MTV agrees that re-runs of each episode shall not be exhibited during the 1am-6am time period.

4. <u>Series Fees/Backend</u>:  Provided Company and Producer perform all required services under the agreement:

    (a) Company will receive a fee of $50,000 per episode of the Series for the first production cycle and $52,500 per episode if MTV produces a second cycle of the Series (an aggregate of twelve (12) episodes guaranteed).

    (b) Company shall be entitled to 10% of 100% of modified adjusted gross receipts ("MAGR") received by MTV from all exploitations of the Series off the MTV worldwide programming services (excluding soundtrack album revenue derived from the Record Agreement). MAGR shall be defined as all revenue received by MTV in the US from all exploitations of the Series off the MTV worldwide programming services (excluding soundtrack album revenue derived from Record Agreement), less the following: (i) a 10% distribution fee, (ii) distribution expenses, (iii) all sums paid to Producer and all other costs paid in connection with the development, production, post-production and/or acquisition rights in or to the Series (collectively, "Production Costs"), (iv) overhead in the amount of 7.5% of Production Costs, and (v) interest at prime plus 1% on the amount of unrecouped Production Costs (excluding overhead). MTV shall conduct all transactions with related entities on an arms length basis.

    (c) If the initial exhibition of the Series is on MTV in the US, then in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 75% of the Production Costs ("Imputed License Fee") which shall be included in the MAGR calculation upon the initial exhibition of a Series episode on MTV.

    (d) If the Series is exhibited on an MTV foreign programming service, then, in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 25% of the final Production Costs of the Series upon the date that is six (6) months following initial US exhibition of a Series episode on MTV.

5. <u>Exclusivity</u>:  During the Term and for one year thereafter, Producer shall not participate in a similar show and/or similar genre to the Series on any form of television and, during the Term, Producer's EP television services shall be provided to MTV on a first priority basis.

6. <u>Credit</u>:  'Executive Producer' in first position of all EP credits, and production company logo in first or last position (vis a vis third parties), at Producer's discretion.

7. <u>Creative Consultation</u>:  Producer will have mutual approval on all key creative matters in connection with the Series, except that MTVN breaks any tie over all such matters.  Notwithstanding the foregoing, Producer shall have the right to disapprove MTV's use of footage in the Series which portrays Producer in an offensive, harmful or derogatory manner provided that Producer does not exercise such right to delay or frustrate production, delivery and exhibition of the Series.

8. <u>Talent Scouts</u>:  Producer shall have the right to designate two (2) talent scouts ("Scouts") approved by MTV to assist Producer in evaluating talent during the casting and audition phase of the first cycle of the Series.  It is currently contemplated that the Scouts would be employed by MTV for a minimum of four (4) weeks with a maximum of thirteen (13) weeks out of a twenty (20) week period.  During the term of their employment, MTV would pay each Scout $1,500 per week and the Scouts' services must be exclusive in all television and must be available on a first priority basis during production. The Scouts will not receive a credit on the Series.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000614

9. **Phil Robinson:** Provided that Phil Robinson is under the employ of Producer, Phil shall provide producer services for the first cycle of the Series for $3,500 per episode. Thereafter, MTV shall have an option on Phil's producer services for one additional cycle for $7,500 per episode. In the event MTV moves forward with a second cycle of the Series and engages Producer's services, MTV shall pay Phil a "pick-up" bonus in the amount of $4,000 multiplied by the number of new episodes produced and aired in the first cycle. Phil shall receive a producer credit for all episodes for which he performs such series.

10. **Travel:** If MTV requires Producer to travel, MTV will pay for Producer's first class travel and accommodations.

11. **Artist:** MTV shall enter into an agreement with Artist for Artist's exclusive recording services ("Record Rights"). MTV and Bad Boy Records will then enter into an agreement, wherein MTV will grant the Record Rights to Bad Boy Records pursuant to the material terms set forth in the attached Exhibit A ("Record Agreement") which is incorporated herein by reference.

12. **Record Agreement:** If MTV: (i) does not utilize Producer's services for the second cycle of the Series, or (ii) chooses an Artist that is not approved by Producer, Producer shall have the option to enter into the Record Agreement with MTV (but shall not be obligated to do so). In the event MTV engages Company to provide Producer's services for the second cycle of the Series and provided that Producer has approved Artist, Producer shall be obligated to enter into the Record Agreement with MTV.

13. **Bad Boy Studios:** Prior to the Record Agreement, MTV shall be responsible for the cost of any demos recorded by Artist for the Series (provided that MTV has commissioned such recordings ("Demos")). All Demos shall be recorded at Bad Boy Studios in New York. MTV shall not be obligated to pay more than $1000 per day (inclusive of engineer costs) for Artist to record Demos. Once MTV and Producer enter into the Record Agreement, Producer shall be responsible and pay for the cost of all Artist recordings.

14. **Lou Pearlman:** Producer acknowledges that Lou Pearlman has the right of first opportunity to manage Artist. In the event Lou manages Artist, Lou's on-air involvement in the Series will not be substantial and shall relate solely to the issue of Artist management.

15. **Work-for-Hire:** All material and services provided by Producer hereunder are provided on a work-for-hire-basis.

16. **Name and Likeness:** MTV shall have the right to use Producer's name, voice and approved likeness and approved biography in all media in perpetuity worldwide in connection with the Series.

17. **Public Statements:** Neither Producer nor his representatives will disclose any information concerning the Series to third parties or make statements to the press without MTV's prior written consent. Notwithstanding the foregoing, subsequent to the initial press release announcing Series, Producer may make incidental, non-confidential, non-derogatory mentions in Producer's personal and professional publicity.

18. **Independent Contractor:** Company represents and warrants that it is, and has been for more than thirty (30) days prior to the date of this Agreement, a corporation duly organized and existing under the laws of its state or country of incorporation; that Company is a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit, or agent for Producer; that Producer is under an exclusive written contract of employment with Company for a term extending at least until the completion of all services required of Producer hereunder, which contract gives Company the right to direct Producer as to when and how Producer performs services, and to loan or furnish the services of Producer to MTV, as herein provided. Company further acknowledges that the foregoing representations and warranties will be relied upon by MTV for the purpose of determining whether or not it is necessary to make withholdings of U.S. Federal, State or local taxes from monies being paid to Company hereunder, and Company agrees that if withholdings are not made from said payments, and

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000615

#174487 v. 6

thereafter it is determined that such withholdings were legally required, Company and Producer will indemnify MTV against all loss, costs, damages and expenses relating thereto (including, but not limited to, penalties, interest and reasonable attorney's fees and costs in the defense and disposition of such matters). Notwithstanding the foregoing, MTV may make U.S. Federal, State or local tax withholdings if it is required by law.

Notwithstanding anything to the contrary set forth above, Company and Producer hereby warrant and represent that for the purposes of any applicable workers' compensation statutes (the "Statutes"): the employment relationship exists between MTV and Producer; Producer is MTV's special employee; and Company is Producer's general employer (as the terms "special employee," "special employer" and "general employer" are understood for purposes of workers' compensation statutes). In this regard, Company and Producer warrant and represent that:  (a) any rights and remedies of Producer (or Producer's heirs, executors or administrators) against MTV (or its principals, officers, agents and/or employees, including without limitation, any other special employee of MTV's) by reason of any injury, illness, disability or death will be limited to those rights and remedies provided under the Statutes; (b) MTV (and its principals, officers, agents, and/or employees including, without limitation, any other special employee of MTV's) shall have no obligation or liability to Company (or Company's principals, assignees, licensees, transferees or designees) by reason of harm to Producer; and (c) neither Company nor Producer (or the successors in interest of either) shall assert any claim arising out of harm to Producer against any other entity which furnishes to MTV the services of any other special employee.  MTV and Company hereby make any election whatsoever necessary to render the Statutes applicable to our engagement of Company and/or Producer's services hereunder. MTV, Company and Producer expressly agree that the New York Worker's Compensation Act shall apply to Producer's services hereunder.

#174487 v. 6

4

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000616

Please sign where indicated below to indicate your understanding and agreement with the terms of this letter. I will then rely on these terms to prepare a more formal agreement that will also include other standard and customary provisions for deals of this nature subject to reasonable requests for modification to be negotiated in good faith. Unless and until a more formal agreement is signed, this letter shall constitute a full and binding agreement between the parties.

Very truly yours,

Virginia Lazalde-McPherson

MTV Networks, a Division of Viacom International Inc.

By: _____

Its: _____

ACCEPTED AND AGREED:
Bad Boy Films, Inc.

By: _____

Its: _____

ACCEPTED AND AGREED:
(With respect to Paragraph 9 only)

Phil Robinson

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000617

#174487 v. 6

## PERSONAL INDUCEMENT

The undersigned hereby acknowledges that he has read and is familiar with each and every provision of this agreement and approves this agreement and agrees to perform all the terms and conditions hereof insofar as they are to be performed by him in the same manner as if he had executed the agreement with MTV Networks, a division of Viacom International Inc.  Further the undersigned hereby acknowledges that without his endorsement and approval MTV Networks would not have entered into this agreement.

_____
Sean Combs


Date: _____


#174487 v. 6

6

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000618

# COMPOSITE EXHIBIT G-1

**MTV NETWORKS, A DIVISION OF VIACOM INTERNATIONAL, INC.**
1515 Broadway
New York, NY 10036

January 31, 2003

Bad Boy Films, Inc.
1440 Broadway, 16th Floor
New York, NY 10018

Re:     **Sean Combs/ "Making the Band II"**

Gentlemen:

This letter amends the agreement between Bad Boy Films, Inc. ("Company") furnishing the services of Sean Combs ("Producer") and MTV Networks, a division of Viacom International Inc. ("MTV") dated July 12, 2002 in connection with Producer's participation in the second cycle of the production for the MTV television series "Making the Band II" and the recording and development of Artist ("Agreement"). All defined terms used herein and not otherwise defined shall have the definitions set forth in the Agreement. Pursuant to your request, the Agreement is hereby amended as follows:

1.  <u>Second Cycle Services</u>:  Producer shall provide his non-exclusive executive producing services for the second cycle of the Series ("Second Cycle"). In connection therewith, Producer shall be available in-person in New York City during the ten (10) week production period, commencing three (3) weeks following full execution of this agreement ("Production Period"). Producer shall not take vacation during the Production Period and shall not cause delays in the production schedule or frustrate the production of the Series in any way. As executive producer of the Series, Producer shall assist MTV in filming and documenting the story points set forth in Paragraph 5 below.

2.  <u>Second Cycle Series Fees</u>:  Paragraph 4(a) of the Agreement shall be modified as follows: MTV shall pay Company $65,000 per episode payable following the final cut of each episode. In addition, MTV shall pay Company a one-time only bonus of $100,000 payable the week of May 17, 2003, provided that production for the Second Cycle is complete.

3.  <u>Second Cycle Ratings Bonus</u>:  Company shall be entitled to the following non-cumulative ratings bonus payable forty-five (45) days after exhibition of the final episode of the Second Cycle:

| Cycle 2 Ratings | Bonus |
|---|---|
| 3.3-3.99 | $100,000 |
| 4.0-4.49 | $150,000 |
| 4.5 + | $200,000 |

Ratings are based on Second Cycle averages for persons 12 – 34 years old.

#187642 v. 1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000604

4. <u>Making of the Artist Video</u>:  MTV shall fund the production costs to create a one-half hour "Making of the Music Video" show featuring the first music video by Artist.  In connection therewith, MTV shall be responsible for the cost of sending a small camera crew to the video set and filming the behind the scenes interviews and performances.  Company shall pay all costs associated with the music video.  For the avoidance of doubt, Producer shall not receive an episodic fee for the "Making of the Video" show.

5. <u>Second Cycle Story Points</u>:  The parties agree that it is the essence of this agreement that the following story points be achieved and filmed and shall form the basis of the creative for the Second Cycle of the Series:  Company shall enter into the Record Agreement with MTV for Artist's recording services.  Company shall, among other things, develop Artist and work with various producers and Artist in the recording studio and record songs for Artist's first album.  Company shall record and release (to the public) a single and music video by Artist.  Company shall develop Artist so that Artist can perform live at a designated venue.  Company shall pay all costs associated with Artist's recording career that are customarily borne by major record companies (including, without limitation, recording, marketing, promotion and distribution).   Any and all reimbursements to Company must be pre-approved by MTV in writing.

6. <u>Endorsements</u>:  Neither Producer nor Company shall have approval over any goods, products or services (e.g., furniture, cell phones, computers, etc.) used in connection with the Series.  However, Producer shall not be required to endorse any goods, products or services for which he does not want to be associated (i.e., he can reject using such items personally).  MTV shall use good faith efforts to obtain an SUV, on a barter basis, for Producer's use in connection with the Series during the Production Period.  MTV shall not be required to provide Producer with a driver.

7. <u>House/Lighting/Studio Equipment/Work Station</u>:  MTV has budgeted $20,000 per month to lease a house where Artist will reside during the Production Period ("House").  MTV shall give Producer meaningful consultation over the House (prior to securing the lease), subject to budgetary restrictions.  MTV shall give Producer meaningful consultation over the lead lighting designer to be hired for the Second Cycle, subject to budgetary restrictions.  Producer shall submit to MTV a list of studio equipment needed for the House mini-studio and, subject to budgetary restrictions, MTV shall lease such equipment.  MTV shall provide Producer with a fax, printer, internet access and two computers (if necessary) at the House.

8. <u>Editors</u>:  Producer shall have mutual approval over editor(s), such approval shall not be unreasonably withheld.

9. <u>Post Production</u>:  All episodes shall be edited in New York City.  Producer shall have access to the post-production facilities.

10. <u>Personnel</u>:  MTV shall pay Producer's hairstylist and make-up artists $450.00 each per day when filming Producer.  MTV shall hire and pay for a band liaison.  MTV shall also hire and pay Harve Pierre $500 per week (for 10 weeks) to perform production related and on-air services.  MTV shall hire and pay for one production assistant for Producer (at $500 per week for 10 weeks).  The production assistant shall provide Producer with customary production assistance during production hours.  The fees set forth in this Paragraph 10 shall be "all-inclusive" fees (i.e., MTV shall not be responsible for providing transportation, housing or reimbursements for travel).

#187642 v. 1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000605

11. <u>Music Clearance Budget</u>:  The per episode music clearance budget shall be $15,000.

12. Except as otherwise specified above, all terms of the Agreement are hereby ratified and confirmed and shall remain in full force and effect.

Please acknowledge your acceptance of the foregoing by signing where indicated below and return to me via fax and mail.

Thank you and should you have any questions or comments, please feel free to contact me.

Best regards,


Virginia Lazalde-McPherson

ACCEPTED AND AGREED TO:
Bad Boy Films, Inc.

By: _____

Its: _____

MTV Networks, a division of
Viacom International Inc.

By: _____

Its: _____

#187642 v. 1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

## PERSONAL INDUCEMENT

The undersigned hereby acknowledges that he has read and is familiar with each and every provision of this agreement and approves this agreement and agrees to perform all the terms and conditions hereof insofar as they are to be performed by him in the same manner as if he had executed the agreement with MTV Networks, a division of Viacom International Inc. Further the undersigned hereby acknowledges that without his endorsement and approval MTV Networks would not have entered into this agreement.

X _____
Sean Combs

Date: _____2/5/03_____

#187642 v. 1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000607

# COMPOSITE EXHIBIT G-2

**MTV NETWORKS, A DIVISION OF VIACOM INTERNATIONAL, INC.**
1515 Broadway
New York, NY 10036

October 2, 2003

Bad Boy Films, Inc.
1440 Broadway, 16th Floor
New York, NY  10018

    Re:    <u>Sean Combs/ "Making the Band II"</u>

Gentlemen:

Reference is hereby made to the agreement dated as of July 12, 2002, amended January 31, 2003 (the "Agreement") between Bad Boy Films, Inc. ("Company") and MTV Networks, a division of Viacom International Inc. ("MTV") for the executive producing and on-camera services of Sean Combs ("Producer") in connection with the MTV television series "Making the Band II" and the recording and development of Artist ("Series"). All defined terms used herein and not otherwise defined shall have the definitions set forth in the Agreement.

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties wish to further amend the Agreement as follows:

1.  <u>Third Cycle Services</u>:  Upon execution of this amendment ("Amendment") MTV shall engage Company to furnish the non-exclusive executive producing and on-camera services of Producer for a third cycle of the Series ("Third Cycle") which shall consist of a minimum of eight (8) ½ hour episodes. In connection therewith, Producer shall be available in-person in New York City during the production period, commencing immediately following full execution of this agreement and continuing for approximately eight (8) weeks ("Production Period"). Producer shall not take vacation during the Production Period and shall not cause delays in the production schedule or materially frustrate the production of the Series in any way. As an executive producer of the Series, Producer shall assist MTV in filming and documenting mutually approved story points for the Third Cycle; it being understood that Producer shall exercise such approval rights in good faith so as not to cause delays or materially frustrate the production of the Series in any way.

2.  <u>Third Cycle Series Fees/Bonus</u>:  The engagement of Producer shall be on a "pay-or-play" basis (subject to default, disability and force majeure). The services fee for Producer for the first eight (8) episodes of the Third Cycle shall be $70,000 per episode, payable following the final cut of each episode. In addition, MTV shall pay Company a one-time only bonus of $125,000 payable following completion of production for the Third Cycle. In the event MTV produces more than eight (8) episodes, the services fee for Producer shall be $85,000 per episode, commencing with the ninth (9th) produced episode, payable following the final cut of each episode.

#203718 v. 4

3.  Third Cycle Ratings Bonus:  Provided that neither Company nor Producer is in material breach or material default of the Agreement or this Amendment, Company shall be entitled to the following non-cumulative ratings bonus payable forty-five (45) days after exhibition of the final episode of the Third Cycle:

| Cycle 3 Ratings | Bonus |
|---|---|
| 3.3-3.99 | $100,000 |
| 4.0-4.49 | $150,000 |
| 4.5 + | $200,000 |

Ratings are based on Third Cycle (i.e., season) averages for persons 12 – 34 years old.

4.  Artist Expenses:  Company shall continue to pay all costs associated with Artist's recording career as set forth in the recording agreement between Company and Artist.  MTV shall not be obligated to treat any such cost as a Series related production cost unless MTV preapproves such cost in writing.

5.  Sponsors:  Neither Producer nor Company shall have approval over any goods, products or services (e.g., furniture, cell phones, computers, etc.) used in connection with the Third Cycle of the Series. However, Producer shall not be required to endorse any goods, products or services for which he does not want to be associated (i.e., he can reject using such items personally).  Company shall obtain MTV's written approval prior to entering into any agreements concerning sponsorships, trade-outs, commercial tie-ins, marketing partnerships, etc. relating to the Series.

6.  Post Production:  All episodes shall be edited in Los Angeles.  Producer shall have access to the post-production facilities.  MTV will provide Producer with rough cuts of each episode within a reasonable time frame so that Producer may review the rough cuts and offer editorial comments with respect to such cuts.

7.  Personnel:  MTV shall pay Producer's hairstylist and make-up artist $450.00 each per day when Producer is on-camera.  The aforesaid fees shall be "all-inclusive" fees (e.g., MTV shall not be responsible for providing transportation, housing or reimbursements for travel for either person). MTV shall not be obligated to hire or pay any other personnel designated by Company or Producer other than Phil Robinson and the two (2) stylists as set forth herein.

8.  Music Clearance Budget:  The per episode music clearance budget shall be $15,000.

9.  Development Deal:  For a development fee of $35,000 ("Development Fee"), Producer shall develop two (2) original television show ideas and submit such ideas to MTV to serve as the potential basis(es) for an MTV television series.  The Development Fee shall be payable, one-half promptly following full execution of this Amendment and the balance following Producer's pitch of the two (2) ideas to MTV.  If MTV approves one (or both) of Producer's ideas, the deal terms for the project(s) will be negotiated in good faith within customary parameters for similar projects.

Except as otherwise specified above, all terms of the Agreement are hereby ratified and confirmed and shall remain in full force and effect.

CONFIDENTIAL

ATTORNEY'S EYES ONLY

MTVN 000610

# COMPOSITE
# EXHIBIT G-3

# OVERALL DEVELOPMENT/PRODUCTION AGREEMENT

This agreement ("Agreement") is made and entered into as of June 15, 2004, by and between Remote Productions Inc. ("Company") and Bad Boy Films Inc. ("Lender"), a New York corporation (Federal ID # _____) for the services of Sean Combs ("Artist").

## DEAL TERMS

1.   **TERM**.  Company hereby engages Lender to lend and furnish the services of Artist for a period of one (1) year, commencing on June 15, 2004 through and including June 14, 2005, (the "Initial Term").  Company shall have the exclusive, irrevocable option ("Option") to extend the Initial Term for an additional one (1) year period (i.e., June 15, 2005 through and including June 14, 2006) ("Extended Term").  The Option shall be exercisable by Company in writing on or before the date which is sixty (60) days prior to the expiration of the Initial Term, subject to extension, suspension and/or termination due to events of default, disability, death and force majeure (the Initial Term and Extended Term sometimes collectively shall be referred to as the "Term"); provided that the Term automatically shall be extended through any periods during which Company, in its sole discretion, permits Artist to render  services on an exclusive basis in connection with any third party television projects.

2.   **SERVICES**.  During the Term, Lender shall lend and furnish Artist's non-exclusive creative, development and executive producing services to Company in all fields of cable television under the terms and conditions of this Agreement, subject to the following pre-existing deals:  (a) "Bad Boys of Comedy" (currently financed by Paramount) ;  and (b) "Bentley Farnsworth/Paramount Project" (currently set up at Paramount) (the projects listed in 2(a) and 2(b) above, together with any spin-offs, sequels, prequels or remakes thereof, collectively shall be referred to herein as the "Excluded Projects"); provided that Artist's services in connection with the foregoing pre-existing contractual commitments shall not materially interfere with Artist's provision of services to Company hereunder. All of Artist's services shall be rendered in connection with creating, developing, supervising, and executive producing, as follows:

a.   INTENTIONALLY DELETED.

b.   First Look/Artist Projects:  During the Term, Lender and Artist shall submit to Company on an "exclusive first look basis" any and all materials, ideas, concepts, presentations, formats or scripts for scripted or reality series (individually an "Artist Property" and collectively, "Artist Properties") which Lender or Artist originates or to which either has an option, or which Lender or Artist owns or controls or acquires during the Term, for development and production as a cable television program and which Lender or Artist is interested in developing.  An "exclusive first look basis" shall mean the exclusive first opportunity prior to submission to a third party to acquire rights to develop an Artist Property for the potential production of a program or series for cable television.  To that end, Lender shall meet with Company's creative executives and submit to Company, in writing as reasonably required by Company, each Artist Property.  After submission of the Artist Property, Company shall have fifteen business (15) days subject to any applicable provisions hereunder to elect in writing to accept or reject each Artist Property for development (by, at a minimum, ordering paper development and/or a presentation tape). The "date of submission" of an oral submission or "pitch" will be deemed to be the date Company receives a written submission detailing the contents of such "pitch," including a clear delineation of format, storyline, characters and talent attachments, if any.  If the applicable Artist Property is rejected, the terms and conditions of Paragraph 9 shall apply.  If the applicable Artist Property is accepted by Company, the terms and conditions hereof shall apply.  If Company elects to produce a series which is

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000655

based on an Artist Property, then, Lender shall, on a guaranteed pay or play basis (subject to Company's rights in the event of default, incapacity or force majeure) furnish Artist's executive producing services in connection with the pilot (if produced) and/or the presentation (if produced) by Company. Company shall notify Lender and Artist in writing of its election to produce the first cycle of any series based on an Artist Property no later than four (4) months from final delivery of the pilot (or presentation tape, if no pilot is ordered).

c. During the Term, Lender shall submit a minimum of four (4) proposed Artist Properties to Company per year. Each such Artist Property submitted to Company prior to commencement of the Term (if any) shall not count for purposes of the aforesaid minimum submission requirement. If, in accordance with Paragraph 9, Lender resubmits an Artist Property to Company with Changed Elements or Changed Terms, such resubmission shall not constitute a distinct Artist Property for purposes of Subparagraph 2.b.

d. Artist shall be "locked" as an executive producer on a guaranteed pay-or-play basis (subject to Company's rights in the event of default, disability or force majeure as set forth elsewhere in this Agreement) on all produced episodes of all cycles of any applicable series based on an Artist Property with a minimum guarantee of six (6) episodes per cycle. (Each cycle of each applicable television series based on an Artist Property is sometimes individually referred to herein as a "Cycle" and sometimes may be referred to as "First Cycle," "Second Cycle," etc.). Each Cycle of each television series produced hereunder based upon an Artist Property shall include no more than twenty-two (22) episodes if said television series is produced on a weekly basis (i.e., one original episode broadcast per week, excluding marathons, "double pumps," and other similar broadcast patterns).

e. Post Term: With respect to any television series the production of which commences during the Term but is not completed prior to expiration of the Term, Artist shall render to completion his services in connection with the applicable production Cycle of such television series, and Artist shall be locked as an executive producer in accordance with Subparagraph 2.d. For such post-Term completed services, Company shall pay Lender the applicable episode fees set forth in Paragraph 4.

f. Other Post Term Services: With respect to any Artist Property developed hereunder but not produced during the Term, Artist shall render to completion Artist's services in connection with such pilot, presentation or television series (as applicable) in accordance with the terms hereof, notwithstanding the expiration of the Term. Artist shall be locked to said television series based on an Artist Property in accordance with Subparagraph 2.d. Notwithstanding anything to the contrary contained herein, the First Cycle of the applicable television series based upon an Artist Property must be ordered, if at all, on or before the date which is five (5) months after expiration of the Term and production of said First Cycle must commence, if at all, within nine (9) months after expiration of the Term (subject to delays caused by force majeure and any other events outside of Company's reasonable control). By way of clarification, the foregoing sentence shall not operate to extend any of the applicable time periods regarding "Abandoned Projects" as set forth and defined in Paragraph 11.

226394v5

3.   NON-EXCLUSIVITY.  Except as expressly provided herein, all of Artist's services hereunder shall be rendered on a non-exclusive basis.  Artist's outside services outside of this Agreement shall not materially interfere with the services to be rendered by Artist hereunder.  In the event that Company reasonably determines that any outside services materially interfere with the rendition of Artist's services hereunder, Company may, at its election, suspend and/or extend or reduce the Term, for the period of such interference, subject to Artist's receipt of written notice and a reasonable opportunity for Artist's to cure (which period of time to cure shall not exceed five (5) business days).  For the avoidance of doubt and notwithstanding anything to the contrary contained herein, solely with respect to the "Making The Band" project ("MTB") , the provisions of Paragraph 5 as set forth in the agreement dated as of July 12, 2002 between MTV Networks and Lender for MTB shall remain in full force and effect.

4.   FEES.

a.   For each series episode (or week of episodes in the event that the series is produced on a strip basis), presentation tape or pilot, as designated below, of any television series developed under this Agreement for which Artist completes all required material creative, development, and executive producing services under this Agreement, the following shall apply:

(i)   Series:  For Artist's services under this Agreement on a television series, Company shall pay Lender the series fee listed below per half-hour episode if such series is produced on a "weekly" (i.e., one episode per week) basis, or per week of episodes the applicable series is produced on a stripped basis, which amount shall be pro-rated up based upon length.

| | Series Fee |
|---|---|
| First Cycle | $50,000 |
| Second Cycle | $60,000 |
| Third Cycle | $80,000 |
| Subsequent Cycles | $100,000 |

If, however, Artist serves as a host or other principal performer in the applicable series, the series fee shall be One Hundred Thousand Dollars ($100,000) per half-hour episode (pro-rated up based upon length) for the First Cycle, with Twenty Thousand Dollar ($20,000) cumulative bumps for each subsequent Cycle.

(ii)   Pilot:  Subject to Paragraph 19 below, for Artist's services under this Agreement on a pilot (including back-door pilots), Company shall pay Lender the total sum of Fifty Thousand Dollars ($50,000), per half-hour pilot which amount shall be pro-rated up based upon length.

(iii)   Presentation Tape:  For Artist's services under this Agreement on a presentation tape, Company shall pay Lender the total sum of Twenty-Five Thousand Dollars ($25,000) if the presentation is not broadcast or Fifty Thousand Dollars ($50,000) if the presentation is broadcast.

226394v5

    b.   The amounts paid under Subparagraph 4.a. shall not be reduced by any amounts paid to a showrunner, and shall compensate Lender and Artist for any incidental appearances on camera by Artist such as wraps, lead-ins, and lead-outs, etc.

    c.   <u>Stripped Series.</u>"  By way of clarification, in order for a series produced hereunder to be considered a "stripped series," Company must order a minimum of sixteen (16) episodes per Cycle and Company must intend in good faith that original episodes of said series will be broadcast more than one (1) time per week.

5.   <u>BONUSES</u>.

    a.   <u>Second Cycle Bonus</u>.  If, but only if, Company orders production of the Second Cycle of a television series based on an Artist Property (excluding "MTB"), and neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in this Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider]), then Company shall pay Lender an aggregate, one-time, lump-sum bonus of Forty Thousand Dollars ($40,000) upon the commencement of production of the Second Cycle thereof.

    b.   <u>Third Cycle Bonus</u>.  If, but only if, Company orders production of the Third Cycle of a television series based on an Artist Property (excluding "MTB") and neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in this Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider]), then Company shall pay Lender an aggregate, one-time, lump-sum bonus of Sixty Thousand Dollars ($60,000) upon the commencement of production of the Third Cycle thereof.

    c.   <u>Fourth Cycle Bonus</u>.  If, but only if, Company orders production of the Fourth Cycle of a television series based on an Artist Property (excluding "MTB") and neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in this Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider]), then Company shall pay Lender an aggregate, one-time, lump-sum bonus of Eighty Thousand Dollars ($80,000) upon the commencement of production of the Fourth Cycle thereof.

    d.   <u>Subsequent Cycle Bonuses</u>.  For every subsequent Cycle commencing with the Fifth Cycle of a television series (excluding "MTB") and developed under this Agreement (i.e., Fifth Cycle, Sixth Cycle, Seventh Cycle, etc.), if, but only if, Company orders production of such applicable Cycle(s) and neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in this Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider]), Company shall pay Lender an aggregate, one-time, lump-sum bonus of One Hundred Thousand Dollars ($100,000) upon the commencement of production of each of the applicable Cycle(s).

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000658

6.  RATINGS BONUS.  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in this Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider]) the following amounts shall be payable to Lender upon the occurrence of the indicated condition(s).

a.  **Qualification:**  If for a particular Cycle of the applicable television series produced hereunder the average Nielsen (or the successor thereof) ratings for the demographic category of persons 12-34 in the U.S. reaches the indicated level, then Lender shall have initially qualified for a "Ratings Bonus" for that Cycle of the applicable television series.  Initial qualification for a bonus shall be based on the combined average ratings for the exhibitions of all episodes for the particular Cycle and shall be determined at the conclusion of each Cycle of the applicable television series.  The non-cumulative target levels for Ratings Bonus qualification are:

| Rating | Bonus Amount |
| --- | --- |
| At least 3.3, but less than 3.99 | $100,000 |
| At least 4.0 but less than 4.49 | $150,000 |
| At least 4.5 | $200,000 |

b.  **Payment:**  If Lender initially qualifies for a Ratings Bonus for a particular Cycle, Company shall pay to Lender the indicated one-time (for each applicable Cycle), lump-sum bonus as set forth above.  Such Ratings Bonus shall be paid within forty-five (45) days after exhibition of the final episode of the particular Cycle for which the Ratings Bonus is payable.

c.  **No Warranty:**  Lender and Artist acknowledge that Company does not represent or warrant that any Ratings Bonus will ever be achieved or be payable, and nothing contained in this Agreement shall be construed as creating a fiduciary relationship between Lender and Artist, on the one hand, and Company, on the other hand, or requiring Company to schedule or distribute the applicable television series produced hereunder in any particular manner or to attempt to maximize ratings or the chance of Lender realizing the Ratings Bonus.  Company and its successors, licensees and/or assigns shall have full and exclusive control over the scheduling, distribution and exploitation of each television series produced hereunder.  Each television series produced hereunder may be scheduled and distributed, or withheld or withdrawn from the exhibitor's schedule and/or distribution, as Company (or its successors, licensees and assigns) may determine and may be scheduled and exhibited in such manner, by such means, in such media (subject to any restrictions set forth herein), on such days and at such times as Company and its successors, licensees and assigns may determine.

7.  CONTINGENT PARTICIPATION.  With respect to each television series initially produced hereunder after commencement of the Term, the following shall apply:

a.  For each television series for which Artist completes all reasonably required material executive producing services hereunder, Lender shall be entitled to receive an amount equal to Twenty-Five Percent (25%) of the "Adjusted Gross Receipts" ("AGR") derived from any such television series; provided, however, that the amount that Lender is entitled to under this Subparagraph 7.a. shall be reduced by all payments to third parties based on AGR (or "Modified Adjusted Gross Receipts") derived from any such television series, but shall not be reduced below a floor of Twelve and One-Half Percent (12.5%) of AGR.

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000659

b. <u>Definitions</u>. "AGR" shall be defined, computed, determined and paid in accordance with Exhibit "B" attached hereto and incorporated herein by this reference. Exhibit "B" shall be subject only to such change(s), if any, as are agreed to in writing by the parties hereto following good faith negotiations within customary basic cable television industry parameters, it being understood and agreed that, unless and until, and only to the extent that any such change(s) are agreed to, the provisions of Exhibit "B" will govern, and provided further that such negotiations shall be completed within 90 days after execution of this Agreement by Lender and Artist. For the avoidance of doubt, no gross revenues from exploitation of merchandising, home video/ DVD, soundtracks or format exploitation shall be included in the calculation of AGR but instead shall be treated separately as set forth in Paragraph 7.c.

c. <u>Shares of Ancillary Proceeds</u>. A separate participation in each of the following categories of exploitation (*i.e.*, uncrossed with each other) derived from each television series produced hereunder: (1) Twenty-Five Percent (25%) of the "Home Video/DVD Defined Revenues" ("HVDR"), reducible by all payments to third parties to a floor of Twelve and One-Half Percent (12.5%) of HVDR; (2) Twenty-Five Percent (25%) of the "Merchandising Defined Revenues" ("MDR"), reducible by all payments to third parties to a floor of Twelve and One-Half Percent (12.5%) of MDR; (3) Twenty-Five Percent (25%) of the "Soundtrack Defined Revenues" ("SDR"), reducible by all payments to third parties to a floor of Twelve and One-Half Percent (12.5%) of SDR; and (4) Twenty-Five Percent (25%) of the "Format Defined Revenues" ("FDR"), reducible by all payments to third parties to a floor of Twelve and One-Half Percent (12.5%) of FDR; if any derived from each television series produced hereunder. HVDR, MDR, SDR and FDR shall be defined as all gross receipts actually received by (or credited and made unconditionally available to) Company in connection with the exploitation of the particular indicated medium or method of exploitation (without any cross-collateralization), less the following on a continuous basis in the following order:

i. a twenty-five percent (25%) distribution fee to Company; provided, however, that if Company engages any subdistributor(s) to handle the particular exploitation medium or method and the subdistributor(s) is/are entitled to distribution fees, the overall distribution fee (i.e., the aggregate sum of the percentage distribution fees taken by all subdistributors, all distributors and Company) shall never be more than the overall 25% cap; and

ii. all of Company's actual, out-of-pocket distribution costs and expenses related to the particular medium or method of exploitation.

Notwithstanding anything to the contrary contained hereinabove, solely with respect to the calculation of HVDR, if, but only if, the home video/DVD distributor accounts to Company on a royalty basis, Company shall be entitled to a ten percent (10%) override fee (in lieu of the distribution fee set forth in subparagraph 7.c.i. above).

d. <u>Vesting</u>: Lender's participation hereunder shall be deemed fully vested for each television series produced hereunder upon completion of production of the First Cycle thereof.

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000660

e. **Acknowledgement; No Warranty**. Lender and Artist acknowledge that Company makes no warranty or representation that the applicable television series will generate any AGR, HVDR, MDR, SDR or FDR or any particular amount thereof. Nothing herein shall be construed as vesting in Lender or Artist or any other person or entity any right, title or interest whatsoever in the applicable television series, or in the profits, proceeds or receipts thereof (except as otherwise expressly set forth in this Paragraph 7), or any lien or charge thereon or assignment thereof. The applicable television series may be distributed, or withheld or withdrawn from distribution, as Company (or its successors, licensees, assigns and/or distributors) may determine, and may be exhibited in such manner, by such means and in such media as they may determine, all without any obligation to consult with or obtain Lender's or Artist's approval.

8. **CREDIT**. For each pilot (if broadcast) and episode of each television series with respect to which neither Lender nor Artist is in material breach or default (which has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider]), the following shall apply:

a. **Individual Producer Credit**: The following shall apply:

   i. **Screen Credit**: With respect to each pilot (if broadcast) and/or series episode for which Artist renders and completes his material executive producing services, Artist shall be accorded screen credit as an executive producer, in first position or last position (at Artist's discretion), subject to applicable guild/union and network requirements, if any, either in the opening titles, but if the main titles are the end titles then in the end titles. For the pilot (if broadcast) and each series produced hereunder, Artist's executive producer credit shall be bigger and bolder than the credits accorded to other individuals on said pilot and series episode (as applicable).

b. **Production Credit**: With respect to any pilot and television series developed under this Agreement, while Artist serves as an executive producer and provided that neither Lender nor Artist is in material breach or default hereof, Artist's production company shall receive one (1) production company credit designated by Artist in a form to be reasonably approved by Company, which approval shall not be unreasonably withheld (which may be a logo credit, but not animated or musical unless at Lender's sole expense [including, but not limited to, creation costs, legal clearance costs, etc.] outside of the applicable pilot/series budget), and such credit shall immediately precede the MTV credit, subject to the placement of company credit(s) accorded to any co-financiers (if applicable).

**General**: Except as explicitly provided above, all aspects of Lender and Artist's credits shall be at Company's sole discretion. Nothing in this Agreement shall derogate from Company's ability to accord any third party "executive producer," "co-executive producer," "producer," "associate producer," "co-producer," or any other similar producer-type credit, or any consultant-type credit, or any production company or entity credit (subject to Paragraph 17 below), at Company's sole discretion. No casual or inadvertent failure to accord Lender and/or Artist credits as provided herein shall be deemed to be a breach of this Agreement. Lender and Artist agree that in the event of any failure or omission to accord any credit as provided herein, the damages, if any, caused Lender or Artist are not irreparable or sufficient to entitle Lender or Artist to injunctive or other equitable relief. Following written notice to Company from Lender specifying in reasonable detail any failure by Company to comply with any credit provision hereof, Company agrees to use reasonable efforts

to cure prospectively any actual such failure to comply with such provision. Company will to notify third party exhibitors, licensees and assigns (with whom Company contracts with directly) of all credit provisions hereof, it being understood and agreed that no casual, inadvertent or unintentional failure by Company to do so or any failure of said third party to comply with said credit instructions will constitute a breach by Company of this Agreement.

9. **REJECTED PROJECTS.** An Artist Property shall be deemed rejected by Company (a) if Company notifies Lender in writing that Company rejects the applicable Artist Property, or (b) if by the end of the fifteen (15) business day period following Lender's submission of an Artist Property to Company in accordance with the terms of this Agreement (such period to be extended as reasonably required for Company to examine, clarify, negotiate or prepare documents in connection with either the chain-of-title for the underlying rights or any unusual problems relating to such Artist Property) it has not been accepted for development by Company by, at a minimum, ordering paper development and/or a presentation tape ("Rejected Project"). Notwithstanding the foregoing, in the event that Lender or Artist introduces (at Artist's sole election) any new elements or alters any material existing elements ("Changed Elements") (including without limitation, a change of the talent, director, producer, a material change in the format or a story line not previously discussed with Company) to the applicable Rejected Project after it has been rejected by Company but prior to Lender or Artist entering into an agreement with a third party for development, production or otherwise in respect of such Rejected Project, Lender shall first resubmit such Rejected Project to Company and Company shall have five (5) business days to accept the same for development.

10. **DISCRETIONARY FUND.** Upon Company's receipt of this Agreement (in the form submitted to Lender by Company as the execution version) signed by Lender and Artist, Artist shall be authorized, through Lender, to draw upon a discretionary fund ("Discretionary Fund") of up to the following annual amounts (with no carry over from year-to-year): (i) for the Initial Term, up to One Hundred Sixty Five Thousand Dollars ($165,000) and (ii) for the Extended Term, if any, up to Two Hundred Twenty Five Thousand Dollars ($225,000). Disbursements from the Discretionary Fund may be used only to further the purposes of this Agreement through the optioning or acquisition of properties from third parties and/or payment for development services provided by third parties in connection with the projects developed hereunder. Each expenditure from the Discretionary Fund must be approved in advance by Company, provided that such approval shall not be unreasonably withheld and shall be issued by Company directly to the applicable third party. For the avoidance of doubt, expenditures from the Discretionary Fund, if any, shall not be recoupable against any fees payable to Lender hereunder, but shall be deemed production costs and allocated pro-rata against produced projects for the purpose of calculating Lender's contingent compensation hereunder.

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000662

11. ABANDONED PROJECTS (OTHER THAN REJECTED PROJECTS). Company may abandon development and/or production of any Artist Property at any time upon written notice to Lender without further obligation to Lender or Artist, except Company's obligation to pay any amount to Lender then due and payable hereunder, subject to Company's rights, at law and in equity. Without limiting the generality of the foregoing, an Artist Property that has been accepted for development within the time period set forth in Paragraph 9 above shall be deemed abandoned if, for any consecutive four (4) month period, there is no active development (e.g., there are no offers outstanding with respect to producers, directors, writers, performers or any key production personnel, no budgeting or location surveying taking place, etc.), Lender may give Company written notice and if Company fails to greenlight a presentation or a pilot based upon such Artist Property within twenty (20) business days following receipt of such written notice, said Artist Property shall be deemed abandoned. In the event that Company abandons (or is deemed to have abandoned) development of an Artist Property prior to commencement of production of the first cycle of episodes thereof ("Abandoned Project"), and on the condition that neither Lender nor Artist is in material breach or material default of this Agreement, Company will quitclaim all of its rights, title and interest owned at such time in in and to any such Abandoned Project to Lender, subject to the provisions of this Agreement, and warrant only that Company has not theretofore transferred, hypothecated or otherwise disposed of any of its rights, title or interest in or to the applicable Abandoned Project; (provided, however, that, Company shall have the absolute and unlimited right to broadcast any pilot or presentation for an Artist Property which is not ordered to series) until such time as (i) Lender or Artist shall have entered into a Third Party Exploitation Agreement (as defined hereinafter) and (ii) Company shall have received full payment of the Buy-Out Price (as defined hereinafter). At such time as Lender or Artist enters into an agreement to exploit any Abandoned Project ("Third Party Exploitation Agreement"), Lender and Artist agree to pay to Company the aggregate sum of all of Company's out-of-pocket costs incurred in connection with such Abandoned Project, including without limitation the applicable fees paid to Lender in connection therewith, plus interest thereon from the date(s) of Company's payment(s) until the date of such payment by Lender and Artist, calculated at the rate of One Percent (1%) above the prime commercial rate from time to time in effect, as announced by The Chase Manhattan Bank at its principal office in New York City (the "Buy-Out Price").

12. INTENTIONALLY DELETED.

13. OFFICE/EXPENSES. For each year of the Term, Company shall reimburse Lender an amount equal to One Hundred Thousand Dollars ($100,000) (pro-rated for partial years) in monthly installments for the services of a development executive of Artist's choice, subject to Company's approval (which approval will not be unreasonably withheld). During the Term, Company shall also provide Lender Five Thousand Dollars ($5,000) a month for office rental expenses, a non-accountable sum of Two Thousand Dollars ($2,000) a month for other office expenses, and Six Hundred Fifty Dollars ($650) a week, payable monthly, for an assistant.

14. TRAVEL. In connection with each trip Company requires Artist to make, Lender shall receive one (1) round trip air fare, first class (if available), a first class hotel room (room and tax only), and exclusive first class ground transportation.

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000663

15. <u>PRESS RELEASES</u>. Provided that Artist is available as and when reasonably requested by Company, Artist shall have a right of meaningful consultation on press releases regarding this Agreement and any Artist Property. For avoidance of doubt, nothing hereunder shall obligate Company to issue any press release.

16. <u>KEY CREATIVE ELEMENTS</u>. Provided that Artist is available as and when reasonably requested by Company, Artist shall have the right of mutual approval over key creative elements with respect to each program produced hereunder. In the event of a disagreement, Company shall make the final determination in each instance.

17. <u>SHOWRUNNER</u>. Artist shall have a right of meaningful consultation over the selection of each showrunner (and whether such showrunner should be accorded a production company credit) on each television series produced hereunder. In the event of a disagreement, Company shall make the final determination.

18. <u>NON-UNION</u>. Without limiting the generality and applicability of Section 21 of the Standard Terms and Conditions, Lender and Artist acknowledge that Company is not a signatory to any collective bargaining agreement that might have jurisdiction over Lender or Artist's services, and Lender and Artist acknowledge and agree that this Agreement and the services contemplated to be rendered by Lender and Artist hereunder are not subject to any collective bargaining agreement. Accordingly, without limiting the generality of the foregoing, Lender and Artist agree that in no event will Lender be entitled to any payment for any use or reuse of any productions produced hereunder or any part thereof and/or any rights therein unless otherwise expressly specified herein.

19. <u>EXISTING PROJECTS</u>. The following existing projects shall be subject to the terms of this Agreement (except that none of these existing projects shall be counted as an Artist Property for the purpose of Lender's obligation under Subparagraph 2.c) and if (i) further Cycles of MTB and/or the Farnsworth Series is /are ordered, Lender shall be engaged to furnish Producer's services in connection therewith in accordance with the terms hereof:

a. "Making the Band III," subject to the following: Notwithstanding the fees set forth in this Agreement, Artist's fees on "Making the Band III" shall be One Hundred Thousand Dollars ($100,000) per episode produced, such episodic fee to increase by Seven-Percent (7%) for each subsequent Cycle of "Making the Band." In addition, all other applicable terms from the last "Making the Band II" agreement dated as of January 31, 2003 shall also apply, and Company agrees to pay an all-inclusive fee of up to Twenty Five Thousand Dollars ($25,000) to hire a mutually-approved consultant in connection with "Making the Band III."

b. "Borrow My Crew" (previously known as "Change Your Crew")/Bentley Farnsworth Project ("Farnsworth Series"), subject to the following: the pilot fee shall be Twenty Five Thousand Dollars ($25,000), plus (i) an additional Ten Thousand Dollars ($10,000) if the Farnsworth Series is ordered but the pilot is not broadcast or the pilot is broadcast but the Farnsworth Series is not ordered <u>or</u> (ii) an additional Fifteen Thousand Dollars ($15,000) if the pilot is broadcast and the Farnsworth Series is ordered.

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000664

20. ENGAGEMENT OF PHIL ROBINSON. Subject to Artist's approval in each instance, Phil Robinson ("Robinson") shall be engaged as a producer on each television series produced hereunder based on an Artist Property. Robinson's producing fee shall be Ten Thousand Dollars ($10,000) per episode. Robinson shall execute a short-form "Work-for-Hire Agreement" for each project produced hereunder for which Robinson is engaged. With respect to "The Farnsworth Series," the foregoing applies only if the Farnsworth Series is ordered.

21. ENGAGEMENT OF BRILLSTEIN-GREY ENTERTAINMENT. Company agrees to consider, in good faith and on a case-by-case basis (where appropriate based upon the BGE-represented elements included therein), the engagement of Brillstein-Grey Entertainment ("BGE") as non-exclusive executive producers on any television series based on an Artist Property. The terms of such engagement shall be negotiated in good faith provided that, should the parties be unable to reach agreement following negotiations not to exceed twenty (20) days, Company may proceed with the applicable series with no further obligation of any kind to BGE and Lender shall be fully responsible for commissions payable to BGE in connection therewith.

22. LENDER AND ARTIST REPRESENTATIONS AND WARRANTIES; INDEMNITY. Lender is, and has been for more than thirty (30) days prior to the date hereof, a corporation duly organized and existing under the laws of Lender's state or country of incorporation; Lender is a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit, or agent for Artist; if Lender is not a California corporation, then Lender is qualified to do business in the State of California; provided, however, if Lender is incorporated outside the United States of America, then it is not engaged in any trade or business in the United States and does not have a "permanent established" in the United States as this term is defined in the Tax Treaty between the United States and the country of incorporation and it does not have any agent in the United States who has, or habitually exercises, general authority to negotiate and conclude contracts on behalf of Lender. Lender further acknowledges that the foregoing representations and warranties will be relied upon by Company for the purpose of determining whether or not it is necessary to make withholdings for Federal and State taxes from monies being paid to Lender hereunder, and Lender agrees that if withholdings are not made from said payments, and if thereafter it is determined that such withholdings were legally required, Lender and Artist will indemnify Company against all loss, costs, damages and expenses (including reasonable outside attorney's fees) relating thereto. Notwithstanding the foregoing, Company may make Federal, State and local tax withholdings if it deems it advisable to do so.

Lender has entered into an agreement with Artist pursuant to which Lender has the full right and authority to provide Artist's services and to make the representations and warranties as provided herein and to grant the rights herein granted to Company. This representation, warranty and agreement by Lender is a material inducement to Company to enter into this Agreement.

23. INSURANCE. Except to the extent arising from any claim or action which, if proven true, shall constitute a breach by Lender or Artist, Lender and Artist shall be covered under Company's errors and omissions insurance and, if produced, general liability insurance for each television series produced hereunder, subject to the exclusions and limitations set forth in such policies.

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY        MTVN 000665

24. DERIVATIVE PRODUCTIONS. Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in this Agreement, the following shall apply: if within seven (7) years following the initial exhibition of the first episode of each television series produced hereunder, Company (or its successor, licensee or assignee) elects, in its sole discretion, to produce a television sequel, prequel, remake or spin-off (i.e., a television series pilot or first episode if no pilot; a spin-off television series; or a television mini-series or made-for-television motion picture), theatrical motion picture or direct-to-video motion picture based upon the applicable series (each of the foregoing referred to herein as a "Derivative") and such Derivative is a "Qualifying Production" (as defined below), and provided further that Artist is still active as an executive producer in the motion picture and/or television industry to the same or a greater extent than Artist is now active as of the date of this Agreement and Artist is not then an executive for a so-called "major," "mini-major," or "major independent" motion picture and/or television production and/or distribution company, then Lender shall have the first opportunity to furnish Artist's services as an executive producer on such Qualifying Production, on terms to be negotiated in good faith; provided, that, if the Qualifying Production is a reality television pilot and/or series for basic cable, then in no event shall the applicable financial terms be less favorable to Lender than those set forth in this Agreement. Notwithstanding the foregoing, in the event no agreement is reached within twenty (20) business days of the commencement of such negotiations, or if Artist elects not to be an executive producer on such Qualifying Production or is unavailable as and when Company reasonably requires, Company shall have no further obligation to Lender or Artist in connection with such Qualifying Production except as otherwise specified in Paragraph 24A below.

The above right shall apply with respect to each Qualifying Production or subsequent Qualifying Production based upon the applicable television series produced hereunder or based upon any prior Qualifying Production, provided that all of the conditions precedent and Lender and Artist's obligations in and to this Agreement (including, without limitation, this Paragraph 24) and the agreements for each subsequent Qualifying Production (if applicable) have been satisfied and fulfilled.

For purposes of this Agreement, a "Qualifying Production" shall be defined as any Derivative that is based on a television series produced hereunder and: (i) utilizes the name of the applicable series or significant material elements derived from such television series produced hereunder; (ii) utilizes the substantially similar format of the applicable series; and (iii) consists primarily of copyright protectable elements of the applicable series (i.e., said elements are not available for use by the general public in the same context as such elements are used in the Series pursuant to applicable United States copyright law). For clarity, the parties acknowledge and agree that Artist shall not have any rights pursuant to this Paragraph 24, and Company shall not have any obligations to Artist, with respect to any Derivative that does not constitute a Qualifying Production as defined above.

24.A. PASSIVES: If Lender/Artist is not engaged pursuant to Paragraph 24 in connection with a particular Qualifying Production and if neither Lender nor Artist is in material breach or default of this Agreement (which material breach or default has not been cured pursuant to Section 6 of Schedule "A" [as modified by the "Rider" thereto]), then Lender shall be entitled to the applicable payment set forth below:

226394v5

CONFIDENTIAL
ATTORNEY'S EYES ONLY

08/24/2004

MTVN 000666

a. _Theatrical Motion Picture_. One Hundred Thousand Dollars ($100,000). If earned, the foregoing payment shall be made within thirty (30) days of the delivery of the motion picture.

b. _Direct-to-Video Motion Picture_. Fifty Thousand Dollars ($50,000). If earned, the foregoing payment shall be made within thirty (30) days of the delivery of the motion picture.

c. _Television Spinoff Series Royalties_. Two Thousand Dollars ($2,000) for each episode (or week of episodes if said spin-off television series is produced on a "stripped" basis) of a spinoff television series based upon the Series, payable within thirty (30) days of delivery of the applicable episode.

d. _MOW_. Thirty Thousand Dollars ($30,000) for two hours (pro rated, if longer than 2 hours). If earned, the foregoing payment shall be made within thirty (30) days of the delivery of the MOW.

e. _Mini-Series_. Thirty Thousand Dollars ($30,000) for the first two hours; Fifteen Thousand Dollars ($15,000) for each additional hour thereafter pro-rata, up to an aggregate of Ninety Thousand Dollars ($90,000) for the entire mini-series. If earned, the foregoing payment shall be made within thirty (30) days of the delivery of the mini-series.

f. (i) If the MOW or Mini-Series referenced in Paragraph 24A.d. or 24A.e. is/are released theatrically in the domestic territory prior to the initial television exhibition thereof, Company agrees to pay Lender the total sum equal to One Hundred Percent (100%) of the payment due Lender under Paragraph 24A.d. or 24A.e. (as applicable), payable within thirty (30) business days after such theatrical release, if any; or

(ii) If the MOW or Mini-Series referenced in Paragraph 24A.d. or 24A.e. is/are released theatrically in the domestic territory subsequent to the initial television exhibition thereof, Company agrees to pay Lender the total sum equal to Fifty Percent (50%) of the payment due Lender under Paragraph 24A.d. or 24A.e. (as applicable) payable within thirty (30) business days after such theatrical release, if any; and if the MOW or Mini-Series referenced in Paragraph 24A.d. or 24A.e. is/are released theatrically in all of the international territories prior or subsequent to the initial television exhibition thereof, Company agrees to pay the total sum equal to Fifty Percent (50%) of the payment due Lender under Paragraph 24A.d. or 24A.e. (as applicable).

(iii) For purposes hereof, the domestic territory shall mean the United States and its territories, possessions and commonwealths and the international territories shall mean the rest of the world outside the domestic territory.

(iv) Notwithstanding anything contained herein, Lender shall not be entitled to a total sum in excess of an amount equal to One Hundred Percent (100%) of the payment due Lender under Paragraph 24A.d. or 24A.e. (as applicable) for any theatrical release of the MOW or Mini-Series referenced in 24A.d-e.

(v) Test engagements, previews and festivals shall not constitute a theatrical release of the MOW or Mini-Series.

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000667

25. STANDARD TERMS AND CONDITIONS. The balance of the terms and conditions of the Agreement consists of the Standard Terms and Conditions ("Standard Terms") attached hereto as Exhibit "A," the Rider to Exhibit "A," and Exhibit "B," which are incorporated herein by this reference. In the event of any conflict between any of the terms of the Standard Terms or any exhibit or attachment, on the one hand, and any provision(s) of this Agreement, on the other hand, said provision(s) of this Agreement will govern. In the event of any conflict between any provision of this Agreement and any statute, law or regulation, the latter will prevail; provided, however, that in such event, the provision(s) of this Agreement so affected will be curtailed and limited only to the minimum extent necessary to permit compliance with the requirement(s) of such statute, law, regulation or agreement, and all other provision(s) will continue in full force and effect. No waiver by Company of any term or condition of this Agreement will constitute a waiver by Company of any other term, condition or default. This Agreement supersedes any and all prior agreements, negotiations and communications with respect hereto (including, but not limited to, the term sheet issued by Company outlining the material terms of the arrangement more specifically set forth hereunder), and may not be modified except by an instrument in writing signed by the parties hereto.

If the foregoing correctly sets forth your understanding of the agreement between the parties, please so indicate by signing in the spaces provided below.

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS INC.

By: _____

Its: _____
GEORGE A. CHEEKS
SENIOR VICE PRESIDENT, BUSINESS AFFAIRS
AND GENERAL COUNSEL

BAD BOY FILMS INC.

By: _____

Its: _____CFO_____

By countersigning this Agreement, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

SEAN COMBS _____

Social Security # _____

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000668

## EXHIBIT "A": STANDARD TERMS AND CONDITIONS (OFF-LO)

This Exhibit "A" is attached to and made part of the deal terms ("Deal Terms") agreed to as of June 15, 2004 between Remote Productions Inc. ("Company"), and Bad Boy Films, Inc. ("Lender") which shall supply the services of Sean Combs ("Artist"). If the Deal Terms apply to more than one television program (e.g., a pilot, presentation and/or series, and/or separate episodes of a series, etc.), then as used below, the term "Project" shall be deemed to include all such programs collectively, as well as each such program individually, as context allows or requires. As used herein, the term "Agreement" shall jointly refer to the Deal Terms and these Standard Terms and Conditions, provided, however, that in the event of any disagreement between the Deal Terms and these Standard Terms and Conditions, the Deal Terms shall control, but only to the extent necessary to resolve the conflict.

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000669

## 1. SERVICES:

a.   Lender hereby accepts the engagement under this Agreement and agrees to provide Artist's services as set forth herein. Lender and Artist agree that Artist shall render services conscientiously, shall devote Artist's time, attention, efforts, talents and abilities in accordance with the requirements of Company and shall comply with all of Company's instructions, directions and requests and all of the instructions, directions and requests of any other person(s) designated by Company. Lender and Artist agree that Company's decisions shall be final and controlling with respect to all matters relating to the rendition of Artist's services, including, without limitation, any and all business, production and creative matters, except as otherwise set forth in the Deal Terms. Artist's services shall be rendered for and as directed by Company at such places and on such locations as Company may from time to time designate. Time is of the essence in the performance of this Agreement by Artist. Lender shall furnish Artist's services hereunder as an independent contractor. Lender warrants that it is a duly organized and existing corporation presently in good standing which now has and will continue to have, while Artist renders services under this Agreement, a valid and legally enforceable employment agreement with Artist providing for such rights and remedies as may enable Lender fully to comply with all of its obligations hereunder; and that it is free to enter into this Agreement, to furnish to Company the services of Artist upon the terms and conditions set forth herein, to make the representations and warranties contained herein, and to grant the rights granted herein. Lender will discharge all obligations of an employer with respect to Artist's services hereunder pursuant to any present or future statute, law, ordinance, regulation or order, including, but not limited to, payment of compensation and payroll taxes, making of all deductions and withholdings required by law, timely filing of all reports and returns required by any governmental or other applicable authority, and carrying of workers' compensation insurance and any other insurance which may be required by law. Lender shall indemnify and hold harmless Company, its shareholders, directors, officers, employees, agents, representatives, successors, licensees and assigns, and each of them, from and against any loss, cost, claim or expense incurred by reason of its failure to comply with this Section 1.a. or otherwise in connection with the failure to fulfill any obligations of an employer, and defend, at Company's request, any and all claims pertaining thereto.

b.   For purposes of any and all Workers' Compensation statutes, laws, or regulations ("Workers' Compensation"), Lender acknowledges that an employment relationship exists between Company and Artist, Company being Artist's special employer under the Agreement.

Accordingly, Lender and Artist acknowledge that in the event of Artist's injury, illness, disability, or death falling within the purview of Workers' Compensation, Lender and Artist's rights and remedies (and those of Artist's heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

c.   INTENTIONALLY DELETED..

d.   No additional payments shall be required in respect of services rendered at night, on weekends, on holidays or otherwise, or after the expiration of any particular number of hours in any day. Company shall have the right, without limitation, to intermingle production of episodes, to average work days and work weeks over the number of programs of the Project for which Lender is guaranteed payment (if any) and to combine programs and work periods.

## 2. RIGHTS:

a.   Lender and Artist both agree that all results and proceeds of every kind of the services heretofore and hereafter to be rendered by Artist in connection with the Project, including, without limitation, all ideas, gags, suggestions, themes, plots, stories, characters, characterizations, dialogue, titles, drawings, artwork, digital works, songs, music, photography, video, film and other material, whether or not fixed or reduced to drawing or writing, at any time heretofore or hereafter created or contributed by Artist which in any way relate to the Project or to any of the material on which the Project will be based, whether or not actually used by Company in or in connection with the Project (collectively, the "Material"), are and shall be deemed to be works-made-for-hire specially ordered or commissioned by Company. Accordingly, Company is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (collectively, the "Rights"). The Rights shall include, without limitation, all copyrights, neighboring rights, trademarks, patents and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions, including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or

CONFIDENTIAL
ATTORNEY'S EYES ONLY

hereafter developed or devised. If under any applicable law the fact that the Material is a work-made-for-hire is not effective to place authorship and ownership of the Project, the Materials and/or the Rights, and all rights therein, in Company, then to the fullest extent allowable and for the full term of protection otherwise accorded to Lender and/or Artist under such applicable law, Lender and Artist hereby assign and transfer to Company the Rights and, in connection therewith, any and all right, title and interest of Lender and Artist in the Project and any other works now or thereafter created containing the Material.

b.  Company shall have the sole and exclusive right to use, develop, market, sell, manufacture, exhibit, distribute, netcast, broadcast, license and/or otherwise exploit the Material, the Rights and the Project, in whole or in part, throughout the universe in perpetuity in any and all media, platforms and formats now known or hereafter devised, alone, or together or as part of other works of any kind or nature including, without limitation, by all forms of graphic, audio, visual, textual, digital, multimedia and other distribution which are now known or may hereafter exist or be devised, including, but not limited to, all print, broadcast, cablecast, all forms and means of video and/or audio streaming, still or download, whether delivered to portable devices, personal computers, set top boxes, televisions or other forms of hardware via broadcast, syndication, basic cable, pay television, satellite television, pay-over-the-air, closed circuit, hotel/motel, TVRO, SMATV, MDS, MMDS, DBS, video-on-demand, pay-per-view, datacasting, Internet protocol, wireless protocol, terrestrial radio, satellite radio, "high definition," superstation telecast, video cassette, compact disc, laser disc, DVD, CD, "Interactive Product" (as defined below) and moving picture rights; all allied, ancillary, subsidiary, commercial tie-in rights; and all rights in any and all other electronic means, methods or devices; and Company may otherwise exploit the Material, the Rights and the Project in such media, form and for such uses throughout the universe as Company deems desirable or appropriate.  Company will have the sole and exclusive right to authorize others to exercise any and/or all of the rights granted to Company under this Agreement, whether by license, sublicense, assignment or otherwise.  Subject to any contrary terms of the Deal Terms, all revenues derived by Company from the use, exhibition, publication, distribution, transmission, licensing, display or other exploitation of the Material, the Rights and/or the Project shall be the sole and exclusive property of Company and neither Lender nor Artist shall have any interest in or to any such revenues. For the purposes of this Agreement, "Interactive Products" shall mean multimedia and/or interactive products, motion pictures and/or programs delivered optically, electronically or otherwise through any form, medium or technology currently existing or hereafter developed including, without

limitation, all optical forms of delivery such as video game forms and platform formats (including further, without limitation, arcade games), computer floppy discs, CD-ROM, CD, DVD and virtual reality, and all other electronic devices and forms of delivery.

c.  Lender and Artist hereby grant Company the right to change, add to, take from, translate, reformat or reprocess the Material in any manner Company may in its sole discretion determine. To the fullest extent allowable under any applicable law, Lender and Artist hereby irrevocably waive or assign to Company the benefits of any provision of law known as "droit moral," "moral rights" or any similar rights or principles of law in any country of the world which Lender and/or Artist may now or later have in the Material, and agrees not to institute or permit any action or lawsuit on the ground that the Project or any other production based upon the Material constitutes an infringement of Lender or Artist's droit moral or is in any way a defamation or mutilation of the Material or any part thereof, or contains unauthorized variations, alterations, modifications, changes or translations.  Lender and Artist expressly acknowledge that many parties will contribute to the Project and other works that will embody all or part of the Material or the Rights.  Accordingly, if under any applicable law the above waiver or assignment by Lender or Artist of "moral rights" or "droit moral" is not effective, then Lender and Artist agree to exercise such rights in a manner that recognizes the contribution of, and will not have a material adverse effect upon, such other parties.

d.  Company, Lender and Artist acknowledge and agree that the sums paid to Lender pursuant to the Agreement are in consideration of, and constitute equitable remuneration for, the rental right included in the Rights.  If, under the applicable law of any territory or jurisdiction, any additional or different form of compensation is required to satisfy the requirement of equitable remuneration, then it is agreed that the grant to Company of the rental right nevertheless shall be fully effective, and Company shall pay Lender such compensation or, if necessary, the parties shall in good faith negotiate the amount and nature thereof in accordance with applicable law. Since Company already has paid or agreed to pay Lender equitable remuneration for the rental right, and Lender and Artist hereby assign to Company all compensation for the rental right payable or which may become payable to Lender or Artist on account or in the nature of a tax or levy, through a collecting society or otherwise. Lender and Artist shall cooperate fully with Company in the collection and payment to Company of such compensation.  Further, since under this Agreement Company has already paid or agreed to pay Lender full compensation for all services rendered and rights granted by Lender and Artist hereunder, Lender and Artist hereby assign to Company all other compensation payable or which may become payable to Lender and/or

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000671          08/24/2004

Artist on account or in the nature of a tax or levy, through a collecting society or otherwise, under the applicable law of any territory or jurisdiction, including, by way of illustration only, so-called blank tape or similar levies. Lender and Artist shall cooperate fully with Company in connection with the collection and payment to Company of all such compensation. Lender and Artist agree on their own behalf and on behalf of Lender's successors and assigns and Artist's heirs, executors, administrators and assigns, not to institute, support, maintain or authorize directly or indirectly any litigation or proceedings instituted or maintained on the ground that Company's (or its licensee's, assignee's or designee's) exercise of the rights granted Company in the Project in any way constitutes an infringement or violation of any such rental or lending right as aforesaid.

e.   In addition, and without limiting any of the foregoing, Lender and Artist are aware and hereby acknowledge that new rights to the results and proceeds of Artist's services hereunder may come into being and be recognized in the future, under law and/or in equity (collectively, the "New Exploitation Rights"), and that new (and/or changed) technology, uses, media, formats, modes of transmission, and methods of distribution, dissemination, exhibition or performance (collectively, the "New Exploitation Methods") are being and inevitably will continue to be developed in the future, which would offer new opportunities for exploiting such results and proceeds. Lender and Artist intend to and do hereby assign, grant and convey to Company, any and all such New Exploitation Rights and New Exploitation Methods with respect to such results and proceeds.

3.   NAME AND LIKENESS:   Company shall have the perpetual, irrevocable and nonexclusive right to use, and authorize others to use, Lender's name and Artist's name, approved likeness (in accordance with Company's customary procedures) and biographical information pertaining to Artist for advertising, publicity, marketing, promotional and commercial tie-in purposes in connection with the Project, the Materials and/or the Rights, or any other use of the Project, as well as in or in connection with promotional materials for MTVN.

4.   PROMOTION:

a.   Lender shall cause Artist to make promotional appearances on behalf of the Project, Company and/or any entity related to Company or the Project, if requested by Company.

b.   Company may take promotional, "behind-the-scenes" type footage and stills relating to the Project and Company shall have the unrestricted right to use such footage and stills for promotional purposes related to the Project to the same extent set forth in Section 3 of these Standard Terms.

5.   REPRESENTATIONS AND WARRANTIES:

a.   Lender and Artist each individually, as well as both jointly and severally, represent and warrant that: Lender is free to enter into this Agreement and is not (and will not be) subject to any conflicting obligations or disability that would prevent or interfere with the execution and performance of this Agreement by Lender and/or Artist; neither Lender nor Artist has undertaken and shall not undertake any obligation to any person, firm or corporation that would conflict with, interfere with or derogate from the rights granted to Company or the obligations incurred by Lender and/or Artist under this Agreement; neither Lender nor Artist has made nor will make any grant or assignment that would conflict with or impair the complete enjoyment of the rights and privileges granted to Company under this Agreement; all writings, material, results and proceeds and contributions of Lender and Artist (including, without limitation, the Material) are and shall be wholly original with Lender and/or Artist and are not and shall not be copied in whole or in part from any other work or based in whole or in part on the life of any real person; none of the Material shall defame or disparage any person or entity or infringe upon or violate the rights of privacy, publicity, copyright or any other statutory or common law rights of any kind or nature whatsoever of any person, firm or entity; and the Material, Lender's performance and Artist's services are not and shall not be the subject of any lien, encumbrance, claim, litigation or arbitration, whether pending, suspected or threatened.

b.   Lender and Artist each individually, as well as both jointly and severally, agree to defend, indemnify and hold harmless Company and its licensees, successors and assigns, and its and their respective officers, directors, shareholders, employees, representatives and agents, and any person(s) or entity(ies), in whole or in part, owning, financing, producing, distributing and/or otherwise exploiting the Project, the Materials and/or the Rights, and all principals of each of the foregoing, and each of them (collectively, "Affiliates"), from and against any and all claims, liabilities, losses, judgments, damages, costs and expenses (including, without limitation attorneys' and accountants' fees and costs and court costs, whether or not in connection with litigation) (collectively, "Damages") arising out of, resulting from, based upon or incurred because of or in connection with (i) a breach or otherwise arising out of any claim which, if true, would constitute such a breach of any of Lender and/or Artist's representations, warranties or obligations contained in this Agreement; (ii) the malfeasance and/or negligence and/or other tortious acts or omissions committed by Lender, Artist and/or any agent, employee, guest or invitee of Lender and/or Artist; and/or (iii) any acts by Lender and/or Artist outside of the scope of their engagement

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000672          08/24/2004

hereunder or contrary to Company's instructions in connection with the occurrence giving rise to such Damages. Company may compromise or settle any such Claim made by a third party upon such terms as Company may determine.

6. DEFAULT, DISABILITY AND FORCE MAJEURE:

a. An event of "disability" shall be deemed to exist under this Agreement if Artist becomes incapacitated or prevented from fully performing any of Artist's obligations under this Agreement by reason of Artist's illness or mental, physical or other disability or disfigurement. Company may require Artist to submit to medical examination(s) to be conducted by such physician(s) as may be designated by Company to determine the extent of Artist's disability.

b. An event of "default" shall be deemed to exist under this Agreement if at any time: (i) Lender or Artist breaches any representation, warranty, obligation, covenant or provision in this Agreement, (ii) Lender or Artist fails, refuses or neglects or at any time Company is notified by or on behalf of Lender or Artist (including by a representative) that Lender and/or Artist intend(s) to fail, refuse or neglect, to report or render services to the full limit of Lender and Artist's ability as, when and where required hereunder, or to comply fully with any of Lender and/or Artist's obligations under this Agreement as required by Company, or (iii) Lender or Artist fails to confirm by notice within one (1) business day after Company requests in writing that Lender or Artist give such confirmation, that Lender and Artist will perform fully under this Agreement. A "default" shall include any event of disability occasioned as a result of Artist's use of alcohol or of any drug or controlled substance.

c. An event of "force majeure" shall be deemed to exist under this Agreement if Company's general business operations and/or Company's production or distribution operations and/or the operations of any licensee of the Project and/or any normal transmission or distribution operations for the Project are impaired, hampered, interrupted, prevented, suspended, postponed or discontinued, including, without limitation, by reason of any war, riot, fire, earthquake, casualty, accident, labor controversy, governmental order or regulation, judicial order (whether imposed on an industry-wide basis or affecting only Company, the Project and/or the licensee(s) of the Project), act of God, all other events customarily included as events of force majeure in the U.S. television industry and/or any other similar or dissimilar occurrence beyond Company's control.

d. If any event of disability, default or force majeure occurs at any time during the term of this Agreement, then notwithstanding anything to the contrary contained in this Agreement, Company

shall have the right to suspend the term of Lender's engagement of Artist under this Agreement. No compensation shall accrue or be payable to Lender under this Agreement during any such period of suspension. Company's payment of compensation to Lender during any period of suspension shall not be deemed a waiver by Company of any of its rights under this Agreement, and Company may apply such payment(s) against any compensation accruing or coming due to Lender pursuant to this Agreement. Any suspension under this Agreement shall continue until Company's notice to Lender ending the suspension or until the cause of such suspension shall have ceased to exist, whichever first occurs, and, with respect to a suspension for disability or default, until Lender has caused Artist to report to Company ready, willing and able to perform all of Artist's obligations hereunder. Notwithstanding the foregoing, any period of suspension may, at Company's election, be extended to include such period of time as may be required by Company to make preparation for the utilization or resumption of Artist's services. Lender shall cause Artist to resume rendering services upon such date following the lifting of any suspension as Company may designate. If the period of any suspension under this Agreement shall include a starting date previously designated by Company, then Company may, at Company's election, cancel and/or postpone such starting date.

e. If Lender and/or Artist is/are in default under this Agreement, Company shall have the right at Company's election to terminate this Agreement either during the continuance of such default or within a reasonable time thereafter (whether or not Company has first suspended Lender or Artist). In the event of Artist's disability, Company shall have the right, at Company's election, to terminate this Agreement at any time after the continuance of such disability for ten (10) consecutive business days or for an aggregate of twenty (20) business days during any production period, or immediately in the event of death. In the event that any period of force majeure continues for more than four (4) weeks, Company shall have the right, at Company's election, to terminate this Agreement. In the event of any termination of this Agreement, Company shall be relieved of any and all further obligations to Lender or Artist under this Agreement, except that termination for any reason other than for default by Lender or Artist shall not relieve Company of its obligation to pay all accrued compensation to Lender with respect to periods for which Artist completed all services prior to such termination. Company's rights under this Agreement (including, without limitation, its termination and suspension rights) are in addition to any other rights or remedies available to Company, whether at law, in equity or otherwise.

7. EQUITABLE REMEDIES: The rights and services which are the subject matter of this

CONFIDENTIAL
ATTORNEY'S EYES ONLY

Agreement are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and which would cause Company great irreparable injury and damage. Accordingly, Company shall be entitled to injunctive relief, specific performance and other equitable relief to preserve its rights and interest in and to such rights and services as are set forth herein. This provision shall not, however, be construed as a waiver of any rights Company may have for damages or otherwise arising from any breach of this Agreement. Lender and Artist agree that Lender and Artist's sole remedy in the event of any default or breach of the Agreement by Company (including, but not limited to, the failure to pay any sums which may be due Lender, and/or to comply with any credit provisions hereunder) shall be an action at law against Company to recover monetary damages actually suffered, if any (but no special, consequential or punitive damages). Specifically, Lender and Artist agree that neither Lender nor Artist shall have any right to enjoin the distribution or exhibition of the Project, any other motion picture or other work based upon the Project, the Materials and/or the Rights, or to terminate or rescind any of the rights, releases or privileges granted hereunder to Company, or to obtain any other form of equitable or injunctive relief, any right to which Lender and Artist irrevocably waive. At all times, Company shall have all rights and remedies which it has at law or in equity pursuant hereto or otherwise, all of which rights and remedies shall be construed as cumulative.

8.   PAYMENTS:

a.   All payments to be made by Company hereunder are subject to the full and faithful performance and observance by Lender and Artist of Lender and Artist's services and other obligations hereunder. It is expressly understood and agreed that should Company for any reason whatever fail to make any such payment as herein provided, then Company shall not be deemed in default hereunder unless and until following such failure the payee shall have given Company written notice demanding such payment and Company shall have failed to make such payment within thirty (30) days after Company's receipt of said notice. In any event, Company's liability for any such default and Lender and Artist's rights and remedies therefor shall be limited as set forth in Section 7, and in no event shall any of the rights acquired or to be acquired by Company hereunder be affected or impaired.

b.   If the compensation provided by this Agreement shall exceed the amount permitted by any present or future law or governmental order or regulation, such stated compensation shall be reduced while such limitation is in effect to the amount which is so permitted; and the payment of such reduced compensation shall be deemed to constitute full performance by Company of its obligations hereunder with respect to compensation for such period.

c.   Company may deduct and withhold from compensation due Lender to the extent permitted by law, any dues, fees, or assessments payable by Lender or Artist to any labor organization having jurisdiction over this Agreement, provided the amounts owed to Company by Lender or Artist in connection with this Agreement or otherwise and/or all amounts so deducted and withheld are remitted to such labor organization as may be entitled thereto. Company may deduct and withhold from Lender's compensation all amounts to be deducted or withheld pursuant to any present or future statute, ordinance, law, order, regulation, judgment or decree requiring the withholding of compensation.

9.   NO OBLIGATION TO PROCEED:  Failure of Company actually to use the services of Artist, in whole or in part, shall not be deemed a breach of this Agreement by Company, and in any such event, neither Lender nor Artist shall be entitled to any damages by reason thereof; provided, however, that if Lender and Artist shall fully and faithfully perform and observe all of the terms and conditions of this Agreement, such failure shall not relieve Company of its obligation to pay Lender the guaranteed compensation provided for in the Deal Terms (if any), subject, however, to any other provisions of this Agreement relieving Company of its obligations hereunder (e.g., default, disability or force majeure). Without limiting the foregoing, it is understood that Company shall have the unqualified right at all times to engage other artists, employees and consultants to work on the Project. Further, Lender and Artist acknowledge and agree that Company shall not be obligated to develop, produce, exhibit, distribute, advertise or otherwise exploit the Project, the Materials and/or the Rights, or otherwise exploit any of the rights granted to Company hereunder.

10.   PUBLICITY:         All   publicity,   paid advertisements, press notices, interviews and other information with respect to the Project shall be under Company's sole control and all information pertaining to the Project, the Material, Lender and Artist's duties and obligations pursuant to this Agreement, the terms of this Agreement and all business and activities of Company, its related and affiliated entities and all of its employees and agents, shall be kept strictly confidential by Lender and Artist and neither Lender nor Artist shall issue nor consent to, nor authorize any person or entity to release any such information, without Company's express prior written approval in each instance. Under no circumstances shall Lender or Artist, or any person or entity on Lender or Artist's behalf use or employ any of the names, marks or

226394v5

CONFIDENTIAL
ATTORNEY'S EYES ONLY

logos of MTV or any other MTV Networks or Viacom entity for any purpose without the prior, express, written permission of MTV Networks.

11. SCREEN AND ADVERTISING CREDIT: Artist shall be accorded credit only if provided for in the Deal Terms or in an applicable and binding collective bargaining agreement and only if Artist has performed all services called for by this Agreement. The obligation to accord Artist credit in paid advertisements, if any, shall apply only to the so-called "billing block" portion of paid advertisements issued by Company or under its direct control relating primarily to the Project and shall in no event apply to any of the following "Excluded Ads": so-called "teaser" or "special" advertising, publicity and/or exploitation relating to the Project or to the material upon which the Project is based, any members of the cast, the authors, directors, producers or similar matters; so-called "trailers" or other advertising (including promotional films) on the screen or by radio or television; institutional, group or list advertising; other advertising not relating primarily to the Project; narrative form; credits on the screen at the end of the Project; newspaper or other periodical advertisements of 1200 lines or less; by-products, record album jackets and similar packaging, merchandising products or commercial tie-ups; or advertising of such nature that Artist has not granted consent to the use of Artist's name in connection therewith. Any references in the Deal Terms to "size," however stated, whether as a percentage or otherwise, shall mean height. Except as specified specifically to the contrary in the Deal Terms, all matters relating to credit (such as size, style of type, placement, color, etc.) shall be at Company's sole discretion, and notwithstanding anything to the contrary in said Deal Terms or elsewhere in this Agreement: (i) there shall be no obligation whatsoever to accord Artist credit of any kind in any so-called "Award Ads" (including consideration, nominations or congratulations for an award) relating to any other person or entity involved in the Project; and (ii) no so-called "presentation" or production credit shall be deemed granted to Lender or Artist.

12. INTENTIONALLY DELETED..

13. INSURANCE: Company may secure life, health, accident, cast or other insurance covering Artist and/or others, and Artist shall not have any right, title or interest in and to such insurance. Lender shall cause Artist to submit to usual and customary medical examinations and will sign such applications and other documents and cooperate with Company's requirements and policies, all as may be required by Company for Company's insurance purposes (including self-insurance). In the event any examination establishes a doubt as to Artist's physical ability to complete Artist's services under this Agreement, or if Artist fails to appear for such examination at the time and place

designated, Company may terminate this Agreement; and, moreover, in the event cast insurance covering Artist cannot be obtained for normal premiums and without substantial exclusions, Company may terminate this Agreement.

14. PLUGS: Lender and Artist acknowledge that it is a crime under Section 507 of the Federal Communications Act for any person in connection with the production or preparation of any program intended for broadcasting to accept or pay any money or provide any service or other valuable consideration for the inclusion of any matter as a part of any such program without disclosing the same to the employer of the person to whom such payment is made or to the person for whom such program is being produced. Lender and Artist further acknowledge that it is Company's policy not to permit any employee to accept or pay any such consideration, and Lender and Artist represent that neither Lender nor Artist has and will not accept and have not and will not pay any money or provide services or other valuable consideration for the inclusion of any "plug," reference or product identification or of any other matter in the Project or any other production based on the Project.

15. ASSIGNMENT: Company may transfer and assign this Agreement or all or any of its rights or privileges hereunder, and/or delegate all or any of its obligations hereunder, and/or lend any of Artist's services under this Agreement to any person or entity, in which event Company shall be released and discharged from all of its obligations hereunder and Lender and Artist shall look solely to such assignee or delegee, as the case may be, for performance thereof. Neither Lender nor Artist may assign this Agreement or any rights hereunder, in whole or in part, except with Company's prior written approval, and any such purported assignment shall be null and void.

16. ADDITIONAL DOCUMENTS: Upon request by Company, Lender and Artist shall duly execute, acknowledge and deliver to Company, or cause to be executed, acknowledged and delivered to Company, in form approved by Company, any and all further assignments, instruments or documents consistent herewith that Company may deem necessary, expedient or proper to carry out and effectuate the purposes and intent of this Agreement. Lender and Artist hereby irrevocably appoint Company as Lender and Artist's attorney-in-fact to execute any such documents in the event Lender or Artist fails to within five (5) business days from receipt of Company's request to do so, unless a shorter time is required by Company, which appointment shall be a power coupled with an interest, with full rights of substitution and delegation. Company shall have the right to record the same in the United States Copyright Office or elsewhere as Company may determine.

226394v5

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000675

08/24/2004

17. <u>WORK PERMITS; VISAS</u>: Lender and Artist represent and warrant that Artist has obtained and will maintain at all times during which this Agreement is in effect, any and all passports, visas, work permits, immigration clearances and all other clearances and permits necessary to enable Artist to perform Artist's duties hereunder in the jurisdictions in which services are contemplated (collectively, "Clearances"). Such Clearances shall be valid and effective during the period of production of the Project in all such jurisdictions, and Lender and Artist's obtaining and maintaining such Clearances shall be a condition subsequent to Company's obligations hereunder.

18. <u>CONTROLLING LAW</u>:

a. THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND FULLY TO BE PERFORMED THEREIN; THE PARTIES CONSENT AND AGREE TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION OVER NEW YORK COUNTY, NEW YORK, WITH RESPECT TO ANY ACTION THAT ANY PARTY DESIRES TO COMMENCE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY BREACH OR ALLEGED BREACH OF ANY PROVISION OF THIS AGREEMENT; AND ALL PARTIES WAIVE ANY OBJECTION AS TO IMPROPER VENUE OR THAT ANY STATE OR FEDERAL COURT OF NEW YORK IS AN INCONVENIENT FORUM.

b. Nothing in this Agreement shall be construed to require the commission of any act contrary to law, and in the event of any conflict between any provision of this Agreement and any present or future statute, law, ordinance or regulation, the latter shall prevail and the provision of this Agreement affected thereby shall be modified only to the extent necessary to bring it within legal requirements, such provision shall be deemed stricken and severed from this Agreement and the remaining terms of this Agreement shall continue in full force and effect.

19. <u>NOTICES</u>: All notices and payments hereunder shall be given in writing either by personal delivery or by telegram, cable or mail (postage prepaid) to the party at the applicable address(es) set forth in the Deal Terms, or to such other address(es) as either party may designate from time to time in writing. The date of personal delivery, facsimile (receipt confirmed) or cable (receipt confirmed), or the date which is three (3) business days following the date of mailing, as applicable, shall be deemed the date of service or delivery.

20. <u>MISCELLANEOUS</u>: No waiver by Company of any failure to perform under this Agreement shall be deemed a waiver of any preceding or succeeding breach of the same or any other obligation. No officer, employee or representative of Company has any authority to make any representation or promise in connection herewith or the subject matter hereof which is not contained herein, and neither Lender nor Artist has executed this Agreement in reliance upon any such representation or promise. Any and all rights granted to Company shall inure not only to Company's benefit but also to the benefit of all persons and entities that may hereafter acquire from Company any right to produce, distribute, transmit, exhibit and/or otherwise exploit any of Company's motion pictures or other products, and such may be released under any company or trade name, brand, producing mark, trademark or characteristic desired by Company and/or its assignees or licensees. The rights granted to Company hereunder are in addition to any rights Company may have as a member of the public. Neither expiration nor termination of this Agreement for any reason shall affect Company's ownership of the rights granted or agreed to be granted by Artist hereunder or alter any of the rights or privileges of Company or any of Lender or Artist's representations, warranties, indemnities or undertakings. The headings of paragraphs, subparagraphs, sections and other subdivisions of this Agreement are for convenient reference only, and they shall not be used in any way to govern, limit, modify or construe this Agreement or any part or provision thereof or otherwise be given legal effect. The obligations and liability of Lender and Artist under the Agreement shall be joint and several, and a breach by one shall be considered a breach by the other.

21. <u>UNION/GUILD JURISDICTION; RESIDUALS</u>: The services of Artist in connection with the Project shall not be rendered pursuant to the terms of or under the jurisdiction of any guild or union collective bargaining agreement, and Lender and Artist acknowledge that Company is not signatory to any such agreement. Notwithstanding the foregoing, if this Agreement ever becomes subject to any applicable guild or union agreement ("Guild Agreement"), Company shall have the right to receive the maximum benefits (or, if Company elects, at any time to increase the compensation and receive the maximum benefits) of such Guild Agreement for Artist's compensation level. In such case, Company shall pay on Artist's behalf any applicable pension, welfare and other fringe payments that Company may be required to pay by virtue of any such Guild Agreement for the portion of compensation Company has agreed herein to be allocated for Artist's services covered by such Guild Agreement, and the balance of compensation shall be deemed to be for Artist's other services to be furnished hereunder, if any; provided that in no event shall such amount exceed the amount that

CONFIDENTIAL
ATTORNEY'S EYES ONLY

Company would be required to pay if Artist were a direct employee of Company.   To the extent allowed by the Guild Agreement, any compensation paid hereunder in excess of the minimum required by any such Guild Agreement shall be considered as prepayment and in reduction of any further amounts otherwise required to be paid pursuant to said Guild Agreement, including, without limitation, by way of overtime, penalties, work on 6th and 7th days and holidays, as well as for residuals, reuse payments, supplemental market payments and other additional or premium compensation, and the same shall be fully creditable against the balance of the compensation payable to Lender hereunder. Subject to the foregoing provisions of this Section 21, all payments made hereunder shall be for a complete buyout of all rights throughout the universe in perpetuity in all media now known or hereafter devised, and no other payments shall be owed.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000677

08/24/2004

## RIDER TO STANDARD TERMS AND CONDITIONS (OFF-LO)

This Rider is attached to and made part of the deal terms ("Deal Terms") agreed to as of June 15, 2004 between Renote Productions Inc. ("Company"), and Bad Boy Films, Inc. ("Lender") which shall supply the services of Sean Combs ("Artist"). The terms below modify the terms of "Exhibit "A": Standard Terms and Conditions (OFF-LO)" ("STCs") as indicated. Paragraph numbers correspond to those set forth in the STCs.

1.  **SERVICES:**

a.  In the second sentence, the word "reasonable" is inserted before the word "requirements" and before each of the two instances of the word "instructions."

In the fourth sentence, the word "reasonable" is also inserted prior to the words "places" and "locations," and the word "reasonably" is inserted prior to the word "designate."

In the seventh sentence, the word "material" is inserted before the word "obligations".

3.  **NAME AND LIKENESS:**   The word "approved" is inserted before "biographical" and the following is added to the end of the existing paragraph prior to the period:

"; provided, however, that neither Lender nor Artist shall be depicted as endorsing any product, commodity or service (other than Company, Company's related entities, the licensees of the Project and/or the Project itself) without Lender's prior written consent in each instance; provided, however, that the use of Lender or Artist's name in the billing block or other form of credit listing on a particular item of merchandise, commercial tie-in premium or the packaging for any of the foregoing shall not be deemed an endorsement.  Lender shall have the right to provide the facts to be utilized in Artist's biography, provided that Lender provides such facts within five (5) business days of Company's request therefor (reducible to three [3] business days if exigencies so-require).   If Lender complies with the foregoing provision and provides sufficient facts for Company's use in the promotion and publicity of the Project, then Company shall use only said facts.  If the biographical information is not supplied by Lender or such information as is supplied by Lender is insufficient, Company shall provide written notice thereof to Lender and if within three (3) business days after Lender's receipt thereof, Lender does not supply the additional requested information, Company may use such additional biographical information not supplied by Lender as may be required.  If Company plans to use any still photographs of Artist in connection with a Project, Lender shall have the right to supply the photos ("Artist's ") if Lender does so within five (5) business days of Company's request therefor (reducible to three [3] business days if exigencies so-require).

4.  **INTENTIONALLY DELETED.**

5.  **REPRESENTATIONS AND WARRANTIES:**

a.  The word "materially" is inserted prior to the word "prevent" as well as both instances of the word "conflict."

The following is inserted after the phrase "wholly original with Lender and/or Artist":

"(except to the extent based upon assigned material from Company, or, in minor part, material in the public domain throughout the universe)".

In place of the semi-colon following the phrase "any real person" but before the word "none," the following is inserted:

", except as approved in advance in writing by Company; to the best of Artist's knowledge (in the exercise of reasonable prudence), ".

b.  In the first sentence, the word "defend," is deleted and the phrase "reasonable, outside" is inserted in front of "attorneys' and accountants' fees."

In the last sentence, the word "determine" is replaced with the following:

"deem reasonable for payment unless Lender furnishes Company with a surety bond or letter of credit in such form and in an amount and by a surety or financial institution reasonably satisfactory in all respects to Company's Legal Department for the payment to Company covering such Damages.  Company shall defend, indemnify and hold Lender and Artist harmless against any and all Damages arising out of any claim or legal action in respect of material furnished, added to or interpolated by Company in the Material or Project, or arising out of the development, production, distribution and/or other exploitation of the Project; provided, however, that the foregoing defense and indemnification shall not apply to any Damages arising out of or resulting from (i) any breach of Lender and/or Artist's representations, warranties or agreements; or (ii) malfeasance and/or gross negligence and/or other intentional tortious acts or omissions committed by Lender and/or Artist or any agent, employee, guest or invitee of Lender and/or Artist.  Any indemnified party shall have the right to engage its own counsel at its own expense".

6.  **DEFAULT, DISABILITY AND FORCE MAJEURE:**

a.  In the first sentence, the word "material" is inserted in front of "obligations."

Between "may" and "require" in the second sentence the phrase ", at Company's expense," is inserted.

The following sentence is added to the end of the paragraph:

"Artist may have his or her own physician present at any such examination(s) at Lender and Artist's sole expense, provided that the presence of such own physician does not unduly delay or interfere with such examination(s)."

b.  In the first sentence, the word "material" is inserted prior to the words "obligation", "covenant", "provision", "services"

226394v5

08/24/2004

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000678

and "obligations" and the word "reasonably" is inserted prior to each of the two instances of the word "required".

The following sentence is added to the end of the paragraph:

"Company may not suspend or terminate this Agreement for the reasons specified in clause (i) or (ii) above without first giving Lender written notice of the alleged default and two (2) business days within which to cure such default (if curable)."

c.   The word "materially" is inserted prior to "impaired".

d.   In the first sentence, the phrase "upon written notice" is inserted after "have the right" and the following is added to the end of the sentence but prior to the period:

", but only after providing Lender or Artist two (2) business days to cure if the suspension is due to default (if curable)".

In the fifth sentence, "reasonably" is inserted before "required" and the following is added to the end of the sentence but prior to the period: ", but not to exceed one (1) extra week".

In the eighth sentence, the phrase "for disability or default" is added after "period of suspension".

The following sentences are added to the end of the paragraph:

"Notwithstanding anything to the contrary above, if the suspension of Artist hereunder is lifted, Artist shall not again be suspended due to the same on-going event which originally caused suspension of Artist, e.g., if Company suspends Artist because a fire destroys a particular location on which the Project was being taped or filmed (as applicable) and then lifts such suspension, Company may not again suspend Artist because of the same fire destroying the same location but if a second fire destroys the same or a second location, Company may suspend Lender and Artist because of such second fire. Notwithstanding anything to the contrary contained herein, Artist's services on the Project shall not be suspended for a force majeure event unless all other personnel engaged on the Project with the same job title or a lesser title (other than the line producer) also have been suspended. Furthermore, if any person with the same or a lesser job title as Artist's (other than the line producer) who was also suspended for force majeure is reinstated to the Project, so too shall be Artist; provided, however, that if such reinstatement occurs more than ninety (90) days after the commencement of Artist's suspension for force majeure, Artist's continuing services as provided by Lender shall be subject to Lender's then-existing professional contractual obligations for Artist.

e.   In the first sentence, the phrase ", and upon written notice," is inserted after the word "election" and the following is added to the end of the sentence after the parenthetical but prior to the period:

", but only after providing Lender two (2) business days within which to cure such default (if curable)".

In the second sentence, the numbers "three (3)" and "five (5)" are replaced, respectively, by "five (5)" and "ten (10)".

In the third sentence, the number "two (2)" is replaced by "four (4)" and the following new sentences are added after the third sentence:

"In the event that any period of suspension for force majeure continues for more than six (6) weeks without Company terminating this Agreement, Lender may provide written notice to Company of Artist's intention to terminate this Agreement. Company shall have five (5) business days from the receipt of such notice to either end the suspension and reinstate the Agreement and Artist's services hereunder, or allow Lender to terminate the Agreement, in which case both parties shall be released from any further obligation pursuant to this Agreement, except for matters customarily surviving such termination, such as warranties, representations, indemnities and previously-accrued payments."

The end of the penultimate sentence is deleted after the phrase "completed all" and replaced by the following:

"required services prior to such termination nor of any of Company's indemnity, insurance or screen credit obligations."

The following sentence shall be added at the end of this Paragraph 6.e.:

"Notwithstanding anything to the contrary contained herein, Artist's services on the Project shall not be terminated for a force majeure event unless all other personnel engaged on the Project with the same job title also have been terminated."

7.   EQUITABLE REMEDIES:   In the second sentence, the word "seek" is inserted before "injunctive."

8.   PAYMENTS:

a.   In the first sentence, the word "material" is inserted before the words "services" and "obligations".

The phrase "thirty (30) days" in the second sentence is replaced with "fifteen (15) business days".

b.   the following shall be added to the end of Paragraph:

"; provided, however, that, upon the revocation of any such applicable future law or governmental order or regulation, Company promptly shall remit to Lender the difference between the stated compensation hereunder and the reduced compensation paid to Lender in accordance herewith."

c.   In the first sentence, the following phrase is inserted after "over this Agreement", but before the comma: "after Lender has first been given the reasonable opportunity to make such payment directly".

9.   NO OBLIGATION TO PROCEED:   The word "material" is inserted before "terms and conditions" in the first sentence.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

(Revised 12/03)

MTVN 000679

10. PUBLICITY:  The following sentence is added to the end of the paragraph:

"Notwithstanding the preceding, Lender and Artist may, after the initial press release issued by Company for the Project, make incidental, non-derogatory, truthful reference to the Project and Artist's services in connection therewith in Artist's personal publicity and may reveal the terms of this Agreement to agents, managers, attorneys and other representatives of Lender and/or Artist who require such information."

11. SCREEN AND ADVERTISING CREDIT:  In the first sentence, the word "material" is inserted before the word "services".

The following new sentence is inserted between the second and third sentences:

"Notwithstanding the foregoing, if any other producer of the Project is accorded credit in an Excluded Ad (other than a so-called "Award Ad" mentioning only that person), Artist will be included in such Excluded Ad as well."

12.   INTENTIONALLY DELETED.

13. INSURANCE:   In the second sentence, the word "reasonably" is inserted before "required".

In the third sentence, the word "substantial" is inserted prior to "doubt".

The following sentences are added between the current second and third sentences:

"Artist may have his or her own physician present at any such examination at Lender and Artist's sole expense and subject to such physician not materially interfering with, preventing or delaying the examination. Company shall not have the right to terminate this Agreement if Lender promptly pays any premiums in excess of customary rates. Performer shall be entitled to receive copies of the results of any medical examination required hereunder upon written request therefor."

The following sentence is added to the end of the paragraph:

"Notwithstanding the preceding, Company shall not have the right to terminate this Agreement on the grounds of non-insurability during that particular production year of the Project once it has commenced principal photography of the Project for that production year. Company will cover Lender and Artist under any errors and omissions and comprehensive general liability insurance policies that Company may obtain for the Project, in connection with all of the acts and omissions of Lender and Artist within the course and scope of their engagement hereunder."

15. ASSIGNMENT:    The following is added between "entity," and "in which" in the first sentence:

"provided that Company shall remain secondarily liable for Company's obligations hereunder unless such assignment or delegation is to a so-called "major" or "mini-major" motion picture distributor or television

network, any similarly financially responsible party, or any party which substantially controls, is substantially controlled by or is under common control with Company or which through merger, consolidation or acquisition succeeds to substantially all of the assets of Company, and such assignee/delegee assumes in writing all of Company's obligations hereunder."

The following is added to the end of the paragraph, before the final period:

"; provided, however, that on a one-time-only basis Lender may instruct Company to make any payments of compensation hereunder to a third party assignee, provided that (i) such instruction is in writing; and (ii) all services relating to such payments have been completed by Lender and Artist and Lender is entitled to receive such payments pursuant to the terms and conditions of this Agreement, and subject to Lender's prior delivery to Company of a written Notice and Agreement of Irrevocable Authority and Assignment, in form and substance reasonably acceptable to Company, signed by Lender and the assignee."

16. ADDITIONAL DOCUMENTS:  In the first sentence, the word "reasonably" is inserted before the words "approved" and "necessary".

In the second sentence, the number "five (5)" is changed to "ten (10)", "reasonably" is inserted before "required" and the phrase "in writing" is inserted between "required by Company" and the comma thereafter.

The following sentence is added to the end of the paragraph:

"In the event that Company executes any such document on Lender and/or Artist's behalf, it shall provide Lender with an executed copy of such document, provided that an inadvertent failure to do so shall not be deemed a breach of this Agreement."

17. WORK PERMITS; VISAS:  The following sentence is added to the end of the paragraph:

"Notwithstanding the preceding, Company will render all reasonable assistance within the scope of Company's actual experience and knowledge to aid Artist in coordinating with local authorities responsible for issuing or filing any of the Clearances which shall be at Company's expense."

20. MISCELLANEOUS:  The first incidence of the word "Company" is replaced by "any party".

21. UNION/GUILD JURISDICTION; RESIDUALS:    The following sentence is added to the end of the paragraph:

"In the event of any conflict between any mandatory term of the applicable Guild Agreement and this Agreement, the mandatory provision of the Guild greement shall control and the Agreement shall be deemed modified to the extent necessary to bring it into compliance with such mandatory provision."

CONFIDENTIAL
ATTORNEY'S EYES ONLY

(Revised 12/03)

MTVN 000680

# EXHIBIT "B":  ADJUSTED GROSS RECEIPTS

For the purposes of and subject to the terms of the Agreement between Company and participant ("Participant") to which this Exhibit "B" is attached, "Adjusted Gross Receipts" shall mean all non-returnable, nonrefundable revenues ("Gross Receipts") actually received by Company and/or MTV Networks (collectively for purposes of this Exhibit "B", "MTVN") made unconditionally available to (and which are convertible to U.S. currency) from all sources worldwide in connection with Ancillary Uses (as defined below) of the applicable television series produced hereunder (each, "Project"), if any, excluding: (i) exhibition on MTVN branded and/or affiliated worldwide programming or online services; (ii) any promotional fees paid in connection with the marketing and/or promotion of the applicable Project; (iii) any sums paid or payable to MTVN to finance development, production or distribution costs or expenses (which are not otherwise deducted under (b) below), or advances therefor, or as reimbursement of such costs or expenses; (iv) any portion of any advance payments, guarantee payments or minimum royalty payments <u>unless</u> all of the following three (3) conditions have been satisfied:  (1) such advance payment, guarantee payment or minimum royalty payment is/are non-returnable; (2)  such advance payment, guarantee payment or minimum royalty payment is/are not paid or payable to finance development, production or distribution of the applicable "Ancillary Use" (i.e., a "net-in-pocket advance"); and (3) the agreement for the applicable "Ancillary Use" covers only the Project or specifically allocates to one or more productions (including the Project) an identifiable portion of such payment; and (v) any sums paid or payable to MTVN for or in connection with, or as the result of, MTVN furnishing, supplying, rendering, procuring, arranging for, or making available, any materials, equipment, facilities or services in connection with the applicable Project and/or any Ancillary Uses thereof), less the following items on a continuing basis in the following order: (a) the applicable distribution fees (as set forth below) with respect to revenues derived from Ancillary Uses; and (b) direct, out-of-pocket distribution costs and expenses incurred in connection with the exploitation of any Ancillary Uses (including, but not limited to, any development, production, manufacturing and/or publishing costs associated with such Ancillary Use).

For purposes of the Agreement, "Ancillary Uses" shall mean all distribution and/or exploitation of the Project, if any, in any manner or media now known or hereafter devised, throughout the universe, in perpetuity, other than on any MTVN-branded and/or affiliated worldwide programming or on-line services.

Notwithstanding anything to the contrary contained herein or in the Agreement, if:  (i) Participant is not engaged to render services in connection with any other production (i.e., excluding the Project) that is based on the Project (each, a "Derivative Production") and/or Participant is otherwise entitled to receive contingent compensation in connection with such Derivative Production; and (ii) such Derivative Production constitutes an "Ancillary Use" as defined herein, then, solely with respect to such Derivative Production, Participant shall not be entitled to receive any share of Adjusted Gross Receipts hereunder.  If the applicable Derivative Production is a theatrical motion picture or a direct-to-video motion picture and

226394v5

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000681

Participant is not engaged to render services thereon and/or Participant is not otherwise entitled to receive contingent compensation in connection therewith, only the applicable Gross Receipts from said Derivative Production that are received by Company on a prospective basis after the applicable Derivative Production reaches "Initial Cash Breakeven," as such term is defined below, shall be included for purposes of calculating Participant's share of "Adjusted Gross Receipts" hereunder. Initial Cash Breakeven shall mean when "Net Proceeds" are first available under the customary definition of "Net Proceeds" furnished by the distributor of the theatrical motion picture or furnished by MTVN if the Derivative Production is a "direct-to-video" motion picture, as applicable; provided, however that the definition of "Net Proceeds" for the applicable Derivative Production shall be no less favorable than said definition (if any) accorded to any writer, director or individual producer for his/her/their writing, directing or individual producing services, respectively, on the applicable Derivative Production.

The distribution fees to be withheld and retained by Company and/or MTVN (inclusive of subdistributors' and sales agents' distribution fees) are as follows:

Ancillary Uses:
Receipts:                                                                    Percentage of Gross

(A)     U.S. Network Television Exhibition
        (ABC, NBC, CBS, FBC, WB and UPN,
        as a network rather than a station-by-station basis):        10%

(B)   Television Exhibition in the United States (other than Network):   35%

(C)   Television Exhibition outside of the United States:            40%

(D)   All Other Uses:                                               45%

Company shall account to Participant with respect to Participant's share of Adjusted Gross Receipts, if any, within sixty (60) days after the end of each semi-annual period in which there are payments due Participant (provided that, notwithstanding the foregoing, Participant shall have the right no more than one (1) time per year to request an accounting statement even if no payment is due to Participant), and such statement of accounting shall be accompanied by payment of Participant's share of any monies payable for such a semi-annual period, if any. Participant may, at Participant's own expense, audit Company's books and records relating to the Project in order to verify statements rendered hereunder. Any such audit only shall be conducted by a reputable firm of certified public accountants during reasonable business hours at Company's offices so as not to unreasonably interfere with Company's normal business activities and a true copy of any report(s) furnished to Participant concurrently shall be furnished to Company. Such right to audit is limited to the Project, and under no circumstances shall Participant or Participant's representative have the right to examine records relating to Company's business generally, or with respect to any other projects, for purposes of comparison or otherwise. In no event shall an audit occur more than once per calendar year or continue longer than thirty (30) days. The records supporting the statements may not be audited more than once. Company's methods of

CONFIDENTIAL
ATTORNEY'S EYES ONLY

treating any amount referred to in this Exhibit for Company's tax or financial purposes will have no bearing on the computation of Adjusted Gross Receipts. Each statement hereunder shall be deemed conclusive and binding unless Participant shall object thereto to Company in writing within twenty-four (24) months after the statement is issued and shall state in detail in such writing the basis for the objection. Participant shall be barred from bringing any legal proceeding later than the expiration of the period of the applicable statute of limitations established by law or twenty-four (24) months after making such objection, whichever occurs first.

Participant acknowledges that Company is part of a diversified, multifaceted, international company, the affiliates of which include, or may in the future include, among others, exhibitors, television "platforms", networks, stations and programming services, video device distributors, cable or satellite operators, record companies, publishers (literary and electronic) and wholesale and retail outlets (individually or collectively, "Affiliated Company" or "Affiliated Companies"). Participant further acknowledges that Company has informed Participant that Company intends to make use of Affiliated Companies in connection with its distribution and exploitation of the Project as, when and where Company deems it appropriate to do so. Participant expressly waives any right to object to such distribution and exploitation of the Project (or aspects thereof) or assert any claim that Company should have offered the applicable distribution/exploitation rights to unaffiliated third parties (in lieu of, or in addition to, offering the same to Affiliated Companies). In consideration thereof, Company agrees that Company's transactions with Affiliated Companies will be on monetary terms comparable to the terms on which the Affiliated Company enters into similar transactions with unrelated third party distributors for comparable programs. Participant agrees that Participant's sole remedy against Company for any alleged failure by Company to comply with the terms of this subparagraph shall be money damages, and Participant hereby waives any right to seek or obtain preliminary or permanent equitable relief in connection with any such alleged failure.

### END OF EXHIBIT "B"

CONFIDENTIAL
ATTORNEY'S EYES ONLY

11/21/05  19:05    L  _LSTEIN-GREY ENTERTAINMENT → 212 846 1049
EXECUTIVE OFFICE      Fax:212·381·2010
11/16/05  17:21   B    S.EIN-GREY ENTERTAINMENT           Nov    2005  17:33         NO.730  P003/006
08/09/2005  14:05     212-846-1049                        MTV LEGAL                               P.02
                                                                                          PAGE   03/06

                                                                                          ⟨ 2 0 ⟩

# REMOTE PRODUCTIONS INC.
## 1515 BROADWAY
## NEW YORK, NEW YORK 10036

As of June 22, 2005

<u>VIA TELECOPIER</u>
<u>(310) 275-3116</u>

Mr. Peter Saffran
Amy Weiss, Esq.
Brillstein Grey Entertainment
9150 Wilshire Boulevard
Beverly Hills, California 90212

Re:   "Making the Band"

Dear Amy & Peter:

Reference hereby is made to that Overall Development/Production Agreement (as amended, the "Overall Agreement") dated as of June 15, 2004 between Remote Productions Inc. ("Company") and Bad Boy Films, Inc. ("Lender") for the services of Sean Combs ("Artist"). Capitalized terms not defined herein shall have the same meanings as set forth in the Overall Agreement.

For good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the parties wish to amend the Overall Agreement as follows:

1.  <u>Ratings Bonus Advance</u>:  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the second Cycle of "Making the Band III":

Within ten (10) business days following Company's receipt of this amendment ("Amendment") signed by Lender and Artist, Company shall advance Lender the sum of $100,000, which amount shall be fully applicable against any "Ratings Bonus" earned and payable to Lender with respect to the second Cycle of "Making The Band III" in accordance with Paragraph 6 of the Overall Agreement.

257423v1                                          I                                07/25/2005

NOV-16-2005  09:07              310 275 6100              96%                      P.03
                                         CONFIDENTIAL
                                    ATTORNEY'S EYES ONLY              MTVN 000639

2.    **Paragraph 19.a. of the Overall Agreement:** The words "first cycle of" shall be added in the following places:

    A.    after the word "on" and before series title "Making the Band III" in the 2nd line of Paragraph 19.a.; and

    B.    after the word "with" and before the series title "Making the Band III" in the penultimate line of Paragraph 19.a.

3.    **Completion of Services Bonus:** Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the second Cycle of "Making the Band III":

If, but only if, Artist renders and completes his on-camera services in connection with the second Cycle of "Making the Band III" as reasonably required by Company but in no event less than the services outlined in Schedule "X" attached to this Amendment and incorporated herein by this reference, Lender shall be entitled to a bonus ("Completion of Services Bonus") in the amount of $68,000 per episode for up to the first 10 episodes produced and delivered in connection with the second Cycle of "Making the Band III" and in the amount of $75,000 per episode  for any episode(s) contained in said Cycle in excess of 10 episodes.  The Completion of Services Bonus shall be payable, if earned, within ten (10) business days following final delivery of the episodes contained in the second Cycle of "Making the Band III."

Except as otherwise set forth hereinabove, the Overall Agreement (as well as the other applicable terms from the last "Making the Band II" agreement dated as of January 31, 2003) hereby are ratified and confirmed in all respects.

Please have this Amendment signed by your clients where indicated and return the partially executed originals to me

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS INC.

By: _____

Its: _____

       George A. Cheeks
  Executive Vice President, Business Affairs
       and General Counsel

257423v1                                        2                                07/25/2005

CONFIDENTIAL
ATTORNEY'S EYES ONLY                    MTVN 000640

11/21/05  19:05   BRILLSTEIN-GREY ENTERTAINMENT → 212 846 1849        NO.730  P005/006
EXECUTIVE OFFICE        Fax:212-381-2010        Nov 23 2005  17:33      P.04
11/16/05  17:22   BRILLSTEIN-GREY ENTERTAINMENT                                P.04
08/05/2005  14:05   212-846-1849          MTV LEGAL                    PAGE  05/06

BAD BOY FILMS INC.

By:   (X) _____

Its: _____

By countersigning this Agreement, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

(X) _____

SEAN COMBS

Social Security # _____

257423v1

3

07/25/2005

NOV-16-2005  08:07        310 275 6180        96%        P.05

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000641

11/21/05 19:06   BRILLSTEIN-GREY ENTERTAINMENT → 212 846 1849
EXECUTIVE OFFICE       Fax:212-381-2010   Nov 22 2005   17:33   NO.730   P006/006
11/16/05  17:22    BRILLSTEIN-GREY ENTERTAINMENT → 716 396
08/09/2008  14:08    212-846-1849           MTV LEGAL           PAGE  06/06

## EXHIBIT "B"

**Making the Band**
Cycle 3, Season 2

Production Period: May 19 – August 8

P. DIDDY APPEARANCES THROUGH JULY 19:

| June 22 | Event:<br>Location: | Final Casting<br>The Apollo Theater |
|---|---|---|
| June 23 | Event:<br>Location | Welcome speech<br>MTB House |
| June 30 | Event:<br>Location: | First cut<br>Daddy's House |
| July 6 | Event:<br>Location: | Arrival via helicopter to Manhattan<br>Heliport |
| | Event:<br>Location: | Wakes up the girls<br>MTB House |
| | Event:<br>Location: | Six mile run<br>Central Park |
| | Event:<br>Location: | Second cut<br>Alvin Ailey Dance Studio |
| July 12 | Event:<br>Location: | Third cut<br>Roxy |

P. DIDDY APPEARANCES TO BE SCHEDULED:

| July 22 | P. Diddy flies to Miami |
|---|---|
| July 22 – 29 | No fewer than three appearances in Miami |
| July 29 – August 8 | No fewer than four appearances in New York |
| After production wraps: | A minimum of four interviews on dates yet to be determined. |

257423v1

4

07/25/2005

NOV-16-2005  09:07        310 275 6100        96%        P. 06

CONFIDENTIAL
ATTORNEY'S EYES ONLY           MTVN 000642

# COMPOSITE
# EXHIBIT G-4

**REMOTE PRODUCTIONS INC.**
**1515 BROADWAY**
**NEW YORK, NEW YORK 10036**

As of February 3, 2006

<u>VIA TELECOPIER</u>
<u>(310) 278-0885</u>
Mr. Peter Saffran
The Saffran Company
9420 Wilshire Blvd., Suite 250
Beverly Hills, CA 90212

Re:     <u>"Making the Band"</u>

Dear Peter:

Reference hereby is made to that Overall Development/Production Agreement (as amended, the "Overall Agreement") dated as of June 15, 2004 between Remote Productions Inc. ("Company") and Bad Boy Films, Inc. ("Lender") for the services of Sean Combs ("Artist"), as amended by that certain first amendment ("First Amendment") dated as of June 22, 2005 between Company and Lender.  Capitalized terms not defined herein shall have the same meanings as set forth in the Overall Agreement.

For good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the parties wish to amend the Overall Agreement as follows:

1.  <u>Ratings Bonus Advance</u>:  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the third Cycle of "Making the Band III":

Within ten (10) business days following Company's receipt of this second amendment to the Overall Agreement ("Second Amendment") signed by Lender and Artist, Company shall advance Lender the sum of $100,000, which amount shall be fully applicable against any "Ratings Bonus" earned and payable to Lender with respect to the broadcast of the episodes contained in the third Cycle of "Making The Band III" in accordance with Paragraph 6 of the Overall Agreement.

2.      Lender and Artist hereby acknowledge that, subject to the recoupment provisions of the soundtrack agreement to be entered into between Bad Boy Records and Company as between Lender/Artist and Company, Lender shall be solely responsible for all recording artist development costs and recording costs in

273279v2

I

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000651

connection with any proposed album or otherwise in connection with the recording career of the "girl group" featured in "Making the Band III".

3.   Completion of Services Bonus:  Lender and Artist hereby acknowledge that the episodic fee payable to Lender for Artist's on-camera and executive producing services in connection with the third Cycle of "Making the Band III" is $114.490 ("Base Episodic Fee").  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the third Cycle of "Making the Band III":

If, but only if, Artist renders and completes his on-camera services in connection with the third Cycle of "Making the Band III" as reasonably required by Company but in no event less than the services outlined in Schedule "X" attached to this Second Amendment and incorporated herein by this reference, Lender shall be entitled to a bonus ("Completion of Services Bonus"), in addition to the Base Episodic Fee, in the amount of $78,010 per episode for up to the first eight (8) episodes produced and delivered in connection with the third Cycle of "Making the Band III" and in the amount of $90,510 per episode for any episode(s) contained in said Cycle in excess of eight (8) episodes.  The Completion of Services Bonus shall be payable, if earned, within ten (10) business days following final delivery of the episodes contained in the third Cycle of "Making the Band III."  For the avoidance of doubt, Company intends to produce eight (8) half-hour episodes of the third cycle of "Making the Band III".

Except as otherwise set forth hereinabove, the Overall Agreement , the First Amendment (as well as the other applicable terms from the last "Making the Band II" agreement dated as of January 31, 2003) hereby are ratified and confirmed in all respects.

Please have this Second Amendment signed by your clients where indicated and return the partially executed originals to me.

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS INC.

By: _____

Its: _____
         George A. Cheeks
Executive Vice President, Business Affairs
         and General Counsel

BAD BOY FILMS INC.

By: _____

Its: _____
         CFO

273279v2

2

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000652

By countersigning this Second Amendment, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

SEAN COMBS

Social Security # 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

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000653

EXHIBIT "X"

**Making the Band**
Cycle 3, Season 3

273279v2

4

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000654

# COMPOSITE
# EXHIBIT G-5

**REMOTE PRODUCTIONS INC.**
**1515 BROADWAY**
**NEW YORK, NEW YORK 10036**

As of March 14, 2006

<u>VIA TELECOPIER</u>
<u>(310) 278-0885</u>
Mr. Peter Saffran
The Saffran Company
9420 Wilshire Blvd., Suite 250
Beverly Hills, CA 90212

Re:      <u>"Making the Band"</u>

Dear Peter:

Reference hereby is made to that Overall Development/Production Agreement (as amended, the "Overall Agreement") dated as of June 15, 2004 between Remote Productions Inc. ("Company") and Bad Boy Films, Inc. ("Lender") for the services of Sean Combs ("Artist"), as amended by that certain first amendment ("First Amendment") dated as of June 22, 2005 between Company and Lender, as further amended by that certain second amendment ("Second Amendment") dated as of February 3, 2006 between Company and Lender. Capitalized terms not defined herein shall have the same meanings as set forth in the Overall Agreement.

For good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the parties wish to further amend the Overall Agreement as follows:

1.   <u>Ratings Bonus Advance</u>:  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the first Cycle of "Making the Band IV":

Within ten (10) business days following Company's receipt of this third amendment to the Overall Agreement ("Third Amendment") and the Second Amendment signed by Lender and Artist, Company shall advance Lender the sum of $100,000, which amount shall be fully applicable against any "Ratings Bonus" earned and payable to Lender with respect to the broadcast of the episodes contained in the first Cycle of "Making The Band IV" in accordance with Paragraph 6 of the Overall Agreement.

2.   Lender and Artist hereby acknowledge that, subject to the recoupment provisions of the soundtrack agreement to be entered into between Bad Boy Records and Company as between Lender/Artist and Company, Lender shall be solely responsible for all recording artist development costs and recording costs in connection with any proposed album or otherwise in connection with the recording career of the "rock band" featured in "Making the Band IV".

273392v3

i

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000631

3. <u>Completion of Services Bonus</u>: Lender and Artist hereby acknowledge that the episodic fee payable to Lender for Artist's on-camera and executive producing services in connection with the first Cycle of "Making the Band IV" is $122,504 ("Base Episodic Fee"). Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the first Cycle of "Making the Band IV":

If, but only if, Artist renders and completes his on-camera services in connection with the first Cycle of "Making the Band IV" as reasonably required by Company but in no event less than the services outlined in Schedule "X" attached to this Third Amendment and incorporated herein by this reference, Lender shall be entitled to a bonus ("Completion of Services Bonus"), in addition to the Base Episodic Fee, in the amount of $92,496 per episode for up to the first ten (10) episodes produced and delivered in connection with the first Cycle of "Making the Band IV" and in the amount of $102,496 per episode for any episode(s) contained in said Cycle in excess of ten (10) episodes. The Completion of Services Bonus shall be payable as follows: (i) $462, 480 (i.e., 50% of the Completion of Services Bonus for the first ten (10) episodes of the first Cycle of "Making the Band IV") shall be payable within ten (10) business days following Company's receipt of this Third Amendment and the Second Amendment signed by Lender and Artist; and (ii) the remaining balance of the Completion of Services Bonus, if earned, shall be payable within ten (10) business days following final delivery of the episodes contained in the first Cycle of "Making the Band IV." For the avoidance of doubt, Company intends to produce ten (10) half-hour episodes of the first cycle of "Making the Band IV".

Except as otherwise set forth hereinabove, the Overall Agreement , the First Amendment and the Second Amendment (as well as the other applicable terms from the last "Making the Band II" agreement dated as of January 31, 2003) hereby are ratified and confirmed in all respects.

Please have this Third Amendment signed by your clients where indicated and return the partially executed originals to me.

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS, INC.

By: _____

Its: George A. Cheeks
Executive Vice President, Business Affairs
and General Counsel

BAD BOY FILMS INC.

By: _____

Its: CFO

273392v3

2

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000632

By countersigning this Third Amendment, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

SEAN COMBS

Social Security # 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

273392v3

3

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000633

EXHIBIT "X"

**Making the Band**
Cycle 1, Season 4

273392v3

4

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000634

# COMPOSITE
# EXHIBIT G-6

**REMOTE PRODUCTIONS INC.**
**1515 BROADWAY**
**NEW YORK, NEW YORK 10036**

As of January 17, 2007

<u>VIA TELECOPIER</u>
<u>(310) 278-0885</u>
Mr. Peter Saffran
The Saffran Company
9420 Wilshire Blvd., Suite 250
Beverly Hills, CA 90212

Re:     <u>"Making the Band"</u>/("Fourth Amendment")

Dear Peter:

Reference hereby is made to that Overall Development/Production Agreement (as amended, the "Overall Agreement") dated as of June 15, 2004 between Remote Productions Inc. ("Company") and Bad Boy Films, Inc. ("Lender") for the services of Sean Combs ("Artist"), as amended by that certain first amendment ("First Amendment") dated as of June 22, 2005 between Company and Lender, as further amended by that certain second amendment ("Second Amendment") dated as of February 3, 2006 between Company and Lender and as further amended by that certain third amendment ("Third Amendment") dated as of March 14, 2006 between Company and Lender. Capitalized terms not defined herein shall have the same meanings as set forth in the Overall Agreement.

For good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the parties wish to further amend the Overall Agreement as follows:

1.     The parties hereby acknowledge that "Making the Band IV" shall feature a "boy band" instead of a "rock band."

2.     The parties hereby acknowledge that Company is contemplating producing one (1) or more one (1) hour episodes of "Making the Band IV" and, even though the episodic fees set forth in the Third Amendment are not increased or decreased based upon length, Company has agreed on <u>a strictly non-precedential, non-citable basis</u> to increase the episodic rate for "Making the Band IV" (as set forth in the Third Amendment) by twenty-five percent (25%) with respect to each episode of "Making the Band IV" that is in one (1) hour in broadcast length. Accordingly, if, but only if, Company elects in its sole discretion to produce one (1) hour episodes of "Making the Band IV", Paragraph 3 of the Third Amendment shall be deleted in its entirety and replaced with the following:

3.     <u>Completion of Services Bonus</u>:  Lender and Artist hereby acknowledge that the episodic fee payable to Lender for Artist's on-camera and executive producing services in connection with one (1) hour episodes of the first Cycle of "Making the Band IV" is $153,130 ("Base Episodic Fee").  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or

43002.1                                      1

CONFIDENTIAL
ATTORNEY'S EYES ONLY                              MTVN 000635

obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the first Cycle of "Making the Band IV":

If, but only if, Artist renders and completes his on-camera services in connection with the first Cycle of "Making the Band IV" as reasonably required by Company but in no event less than the services outlined in Schedule "X" attached to the Third Amendment and incorporated herein by this reference, Lender shall be entitled to the following

(a) a bonus ("Completion of Services Bonus"), in addition to the Base Episodic Fee, in the amount of $115,620 per episode for up to the first eight (8) 1-hour episodes produced and delivered in connection with the first Cycle of "Making the Band IV" and in the amount of $128,120 per episode for any 1-hour episode(s) contained in said Cycle in excess of eight (8) episodes.  The Completion of Services Bonus shall be payable as follows: (i) $462, 480 (i.e., 50% of the Completion of Services Bonus for the first eight (8) 1-hour episodes of the first Cycle of "Making the Band IV") shall be payable within ten (10) business days following Company's receipt of this Fourth Amendment signed by Lender and Artist (unless such amount already has been paid to Lender); and (ii) the remaining balance of the Completion of Services Bonus, if earned, shall be payable within ten (10) business days following final delivery of the episodes contained in the first Cycle of "Making the Band IV."  For the avoidance of doubt, if Company elects in its sole discretion to produce 1-hour episodes of "Making the Band IV", Company shall intend to produce eight (8) 1-hour episodes of the first cycle of "Making the Band IV"; and

(b) an additional bonus ("1-Hour Episode Bonus") equal to $20,000 per produced episode of "Making the Band IV" that is 1-hour in broadcast length. The 1-Hour Episode Bonus shall be payable upon final delivery of the finale episode contained in the first Cycle finale of "Making the Band IV".

Except as otherwise set forth hereinabove, the Overall Agreement , the First Amendment, the Second Amendment and the Third Amendment (as well as the other applicable terms from the last "Making the Band II" agreement dated as of January 31, 2003) hereby are ratified and confirmed in all respects.

Please have this Fourth Amendment signed by your clients where indicated and return the partially executed originals to me.

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS INC.

By: _____

George A. Cheeks
Its: Executive Vice President, Business Affairs
and General Counsel

CONFIDENTIAL
ATTORNEY'S EYES ONLY                    MTVN 000636

BAD BOY FILMS INC.

By: _____

Its: _____

By countersigning this Third Amendment, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

_____
SEAN COMBS

Social Security # _____

43002.1

3

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000637

BAD BOY FILMS INC.

By: _____

Its: _____

By countersigning this Third Amendment, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

_____
SEAN COMBS

Social Security # _____

43002.1

3

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000638

# COMPOSITE EXHIBIT G-7

REMOTE PRODUCTIONS INC.
1515 BROADWAY
NEW YORK, NEW YORK 10036

As of October 16, 2007

<u>VIA TELECOPIER</u>
<u>(310) 278-0885</u>
Mr. Peter Safran
The Safran Company
9420 Wilshire Blvd., Suite 250
Beverly Hills, CA 90212

Re:   <u>"Making the Band"/("Fifth Amendment")</u>

Dear Peter:

Reference hereby is made to that Overall Development/Production Agreement (as amended, the "Overall Agreement") dated as of June 15, 2004 between Remote Productions Inc. ("Company") and Bad Boy Films, Inc. ("Lender") for the services of Sean Combs ("Artist"), as amended by that certain first amendment ("First Amendment") dated as of June 22, 2005 between Company and Lender, as further amended by that certain second amendment ("Second Amendment") dated as of February 3, 2006 between Company and Lender, as further amended by that certain third amendment ("Third Amendment") dated as of March 14, 2006 between Company and Lender, and as further amended by that certain fourth amendment ("Fourth Amendment") dated as of January 17, 2007 between Company and Lender. Capitalized terms not defined herein shall have the same meanings as set forth in the Overall Agreement.

With the exception of any terms and conditions that are set forth in this Fifth Amendment, the terms from the Overall Agreement that would otherwise apply to Artist's services in connection with the Series if the Overall Agreement were still in term are hereby revived solely with respect to Artist's services in connection with the Series.

For good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the parties wish to further amend the Overall Agreement as follows if and as applicable:

1.   <u>Second Cycle</u>: Subject to full execution of this Fifth Amendment, Company shall engage Lender to provide Artist's executive producing and on-camera performer services in connection with the second production cycle ("Second Cycle") of "Making the Band 4" (the "Series"). Artist's services in connection with the Series shall include, without limitation, any and all services customarily performed by executive producers and on-camera performers in the television

43002.1

1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000643

industry for first-class reality programs and any and all other services that are reasonably required by Company.

2.  **Episodic Base Rate:** *If, but only if, Artist actually renders and completes all of the services set forth in Paragraph 1.a above, then on a strictly non-precedential, non-citable basis* Company has agreed to: (a) increase the Base Episodic Rate set forth in Paragraph 3 of the Third Amendment to One Hundred Twenty Eight Thousand Two Hundred Fifty Dollars ($128,250) for each Second Cycle episode for which Artist actually renders and completes services that is one-half (½) hour in broadcast length, if any; and (b) Company has agreed to increase the Base Episodic Rate set forth in Paragraph 3 of the Fourth Amendment to One Hundred Seventy Six Thousand Seven Hundred Dollars ($176,700) for each Second Cycle episode for which Artist actually renders and completes services that is one (1) hour in broadcast length, if any.   The Episodic Base Rate shall be payable following final delivery of each episode.

3.  Paragraph 3 of the Third Amendment and Paragraph 3 of the Fourth Amendment shall both be deleted entirely and they shall be replaced with the following:

    **Completion of Services Bonus:**  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the Second Cycle:

    *If, but only if, Artist actually renders and completes all of the services set forth in Paragraph 1.a above, on a strictly non-precedential, non-citable basis,* Lender shall be entitled to the following if/as applicable: (a) Ninety Six Thousand Seven Hundred Fifty Dollars ($96,750) for each Second Cycle episode for which Artist actually renders and completes services that is one-half (½) hour in broadcast length, if any; or (b) One Hundred Thirty Three Thousand Three Hundred Dollars ($133,300) for each Second Cycle episode for which Artist actually renders and completes services that is one (1) hour in broadcast length, if any.

    The Completion of Services Bonus shall be payable as follows: (i) 50% of the aggregate Completion of Services Bonus for the first eight (8) episodes of the Second Cycle (i.e., the applicable aggregate Completion of Services Bonus amount for eight [8] ½-hour episodes) shall be payable following the full execution of this Fifth Amendment; and (ii) the remaining balance of the applicable aggregate Completion of Services Bonus, if earned, shall be payable within ten (10) business days following final delivery of the episodes contained in the Second Cycle.  For the avoidance of doubt, if Company elects in its sole discretion to produce 1-hour episodes of the Series, Company would then owe the difference between the ½-hour episodes bonus and the 1-hour episodes bonus.

43002.1

2

CONFIDENTIAL
ATTORNEY'S EYES ONLY

4.    <u>Minimum Guarantee</u>:  Notwithstanding anything to the contrary in the Overall Agreement, Lender shall be guaranteed its Episodic Base Rate on a pay-or-play basis (subject to Company's rights in the event of default, incapacity or force majeure as set forth in Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement) for a minimum of eight (8) ½-hour episodes in connection with the Second Cycle.

5.    <u>Danity Kane</u>:  Company currently intends to engage the members of the musical act known as "Danity Kane" (each a "member" thereof) in connection with the Second Cycle; provided, however, that if any member(s) is/are not willing to accept Two Thousand Dollars ($2,000) or less per ½-hour episode and Company is resultantly inclined not to engage such member(s) but Artist insists on such member(s) engagement, then Artist shall pay each such applicable member's fee in excess of Two Thousand Dollars ($2,000) per ½-hour episode.   For the avoidance of doubt, Company would be willing to pay each member on a pro-rata basis for any Second Cycle episode(s) in excess of ½-hour in broadcast length (e.g., $4,000 or less per 1-hour episode).

6.    <u>Donnie Klang</u>:  Company currently intends to engage the musical artist Donnie Klang p/k/a "Donnie J." ("Donnie") in connection with the Second Cycle; provided, however, that if Donnie is not willing to accept Five Hundred Dollars ($500) or less per episode and Company is resultantly inclined not to engage him but Artist insists on his engagement, then Artist shall pay Donnie's fee in excess of Five Hundred Dollars ($500) per ½-hour episode.  For the avoidance of doubt, Company would be willing to pay Donnie on a pro-rata basis for any Second Cycle episode(s) in excess of ½-hour in broadcast length (e.g., $1,000 or less per 1-hour episode).

7.    <u>Scheduling Changes</u>:  If, after Company approves the production schedule for the Second Cycle, Artist insists on changing his shooting schedule in connection therewith, then Lender shall pay for all actual, out-of-pocket overages actually incurred by Company as a result; provided, however, that Company will use reasonable, good faith efforts to (a) accommodate any such Artist-required scheduling changes; and (b) minimize the overages Company might incur as a result (if reasonably possible) and provided further that the maximum overages payable by Lender in connection with Artist-caused delays would be capped at four (4) times the applicable Episodic Base Rate set forth in Paragraph 2 above.

8.    <u>Ratings Bonus</u>:  Paragraph 6.a of the Overall Agreement is hereby amended so that the non-cumulative target levels for Ratings Bonus qualification are:

| Rating | Bonus Amount |
| --- | --- |
| At least <u>2.75</u>, but less than 3.99 | $100,000 |
| At least 4.0, but less than 4.49 | $150,000 |
| At least 4.5 | $200,000 |

43002.1

3

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000645

For the avoidance of doubt, Company will not pay Lender an advance against any Ratings Bonus that may become payable in connection with the Second Cycle pursuant to the Overall Agreement (i.e., there shall be no amount of a Ratings Bonus that is guaranteed to Artist in connection with the Second Cycle).

Please have this Fifth Amendment signed by your clients where indicated and return the partially executed originals to me.

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS INC.

By: _____

Its: _____
George A. Cheeks
Executive Vice President, Business Affairs
and General Counsel

BAD BOY FILMS INC.

By: _____

Its: _____CFO_____

By countersigning this Fifth Amendment, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

_____
SEAN COMBS

Social Security # _____

43002.1

4

CONFIDENTIAL
ATTORNEY'S EYES ONLY

# COMPOSITE
# EXHIBIT G-8

NEW REMOTE PRODUCTIONS INC.
1515 BROADWAY
NEW YORK, NEW YORK 10036

As of February 28, 2008

<u>VIA TELECOPIER</u>
<u>(310) 278-0885</u>
Mr. Peter Safran
The Safran Company
9420 Wilshire Blvd., Suite 250
Beverly Hills, CA 90212

Re:    <u>"Making the Band"/("Sixth Amendment")</u>

Dear Peter:

Reference hereby is made to that Overall Development/Production Agreement (as amended, the "Overall Agreement") dated as of June 15, 2004 between Remote Productions Inc. ("Remote") and Bad Boy Films, Inc. ("Lender") for the services of Sean Combs ("Artist"), as amended by that certain first amendment ("First Amendment") dated as of June 22, 2005 between Remote and Lender, as further amended by that certain second amendment ("Second Amendment") dated as of February 3, 2006 between Remote and Lender, as further amended by that certain third amendment ("Third Amendment") dated as of March 14, 2006 between Remote and Lender, as further amended by that certain fourth amendment ("Fourth Amendment") dated as of January 17, 2007 between Remote and Lender, and as further amended by that certain fourth amendment ("Fifth Amendment") dated as of October 16, 2007 between Remote and Lender. Capitalized terms not defined herein shall have the same meanings as set forth in the Overall Agreement.

With the exception of any terms and conditions that are set forth in this Sixth Amendment, the terms from the Overall Agreement that would otherwise apply to Artist's services in connection with the Series if the Overall Agreement were still in term are hereby revived solely with respect to Artist's services in connection with the Series.

RPI agrees that as of the date of this Amendment, it hereby relinquishes any and all rights, interests, obligations and responsibilities under the Agreement, and hereby assigns such rights, interests, obligations and responsibilities to New Remote Productions Inc. ("Company").

For good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the parties wish to further amend the Overall Agreement as follows if and as applicable:

43002.1

1

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000647

1.  <u>Third Cycle</u>: Subject to full execution of this Sixth Amendment, Company shall engage Lender to provide Artist's executive producing and on-camera performer services in connection with the third production cycle ("Third Cycle") of "Making the Band 4" (the "Series"). Artist's services in connection with the Series shall include, without limitation, any and all services customarily performed by executive producers and on-camera performers in the television industry for first-class reality programs and any and all other services that are reasonably required by Company.

2.  <u>Episodic Base Rate</u>:  If, but only if, Artist actually renders and completes all of the services set forth in Paragraph 1.a above, then <u>on a strictly non-precedential, non-citable basis</u> Company has agreed to: (a) increase the Base Episodic Rate set forth in Paragraph 3 of the Third Amendment to One Hundred Fifty Five Thousand Forty Dollars ($155,040) for each Third Cycle episode for which Artist actually renders and completes services that is one-half (½) hour in broadcast length, if any; and (b) Company has agreed to increase the Base Episodic Rate set forth in Paragraph 3 of the Fourth Amendment to Two Hundred Thirteen Thousand Seven Hundred Fifty Dollars ($213,750) for each Third Cycle episode for which Artist actually renders and completes services that is one (1) hour in broadcast length, if any. The Episodic Base Rate shall be payable following final delivery of each episode.

3.  Paragraph 3 of the Fifth Amendment shall be deleted entirely and shall be replaced with the following:

    <u>Completion of Services Bonus</u>:  Provided that neither Lender nor Artist is in material breach or default of any material representation, warranty or obligation set forth in the Overall Agreement (which material breach or default has not been cured pursuant to Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement), the following shall apply with respect to the Third Cycle:

    If, but only if, Artist actually renders and completes all of the services set forth in Paragraph 1.a above, <u>on a strictly non-precedential, non-citable basis</u>, Lender shall be entitled to the following if/as applicable: (a) One Hundred Sixteen Thousand Nine Hundred Sixty Dollars ($116,960) for each Third Cycle episode for which Artist actually renders and completes services that is one-half (½) hour in broadcast length, if any; or (b) One Hundred Sixty One Thousand Two Hundred Fifty Dollars ($161,250) for each Third Cycle episode for which Artist actually renders and completes services that is one (1) hour in broadcast length, if any.

    The Completion of Services Bonus shall be payable as follows: (i) 50% of the applicable aggregate Completion of Services Bonus for the first eight (8) episodes of the Third Cycle shall be payable following the full execution of this Sixth Amendment; and (ii) the remaining balance of the applicable aggregate Completion of Services Bonus, if earned, shall be payable within ten (10)

43002.1

2

CONFIDENTIAL
ATTORNEY'S EYES ONLY

business days following final delivery of the episodes contained in the Third Cycle. For the avoidance of doubt, if Company orders 1-hour episodes but later determines that it will produce ½- hour episodes instead, then the applicable Completion of Services Bonus would be based on ½-hour episodes.

4.   Minimum Guarantee:  Notwithstanding anything to the contrary in the Overall Agreement, Lender shall be guaranteed its Episodic Base Rate on a pay-or-play basis (subject to Company's rights in the event of default, incapacity or force majeure as set forth in Paragraph 6 of the Standard Terms and Conditions [as modified by the Rider] attached to the Overall Agreement) for a minimum of eight (8) ½-hour episodes in connection with the Third Cycle.

5.   Danity Kane: Company currently intends to engage the members of the musical act known as "Danity Kane" (each a "member" thereof) in connection with the Third Cycle; provided, however, that if any member(s) is/are not willing to accept Two Thousand Dollars ($2,000) or less per ½-hour episode and Company is resultantly inclined not to engage such member(s) but Artist insists on such member(s) engagement, then Artist shall pay each such applicable member's fee in excess of Two Thousand Dollars ($2,000) per ½-hour episode.  For the avoidance of doubt, Company would be willing to pay each member on a pro-rata basis for any Third Cycle episode(s) in excess of ½-hour in broadcast length (e.g., $4,000 or less per 1-hour episode).

6.   Donnie Klang:  Company currently intends to engage the musical artist Donnie Klang p/k/a "Donnie J." ("Donnie") in connection with the Third Cycle; provided, however, that if Donnie is not willing to accept Five Hundred Dollars ($500) or less per episode and Company is resultantly inclined not to engage him but Artist insists on his engagement, then Artist shall pay Donnie's fee in excess of Five Hundred Dollars ($500) per ½-hour episode.  For the avoidance of doubt, Company would be willing to pay Donnie on a pro-rata basis for any Third Cycle episode(s) in excess of ½-hour in broadcast length (e.g., $1,000 or less per 1-hour episode).

7.   Scheduling Changes:  If, after Company approves the production schedule for the Third Cycle, Artist insists on changing his shooting schedule in connection therewith, then Lender shall pay for all actual, out-of-pocket overages actually incurred by Company as a result; provided, however, that Company will use reasonable, good faith efforts to (a) accommodate any such Artist-required scheduling changes; and (b) minimize the overages Company might incur as a result (if reasonably possible) and provided further that the maximum overages payable by Lender in connection with Artist-caused delays would be capped at four (4) times the applicable Episodic Base Rate set forth in Paragraph 2 above.

8.   For the avoidance of doubt, Company will not pay Lender an advance against any Ratings Bonus that may become payable in connection with the Third Cycle pursuant to the Overall Agreement (i.e., there shall be no amount of a Ratings Bonus that is guaranteed to Artist in connection with the Third Cycle).

CONFIDENTIAL
ATTORNEY'S EYES ONLY

MTVN 000649

Please have this Sixth Amendment signed by your clients where indicated and return the partially executed originals to me.

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS INC.

By: _____

Its: _____


NEW REMOTE PRODUCTIONS INC.

By: _____
          George A. Cheeks
Its: Executive Vice President, Business Affairs
          and General Counsel


BAD BOY FILMS INC.

By: _____

Its: _____CFO_____


By countersigning this Sixth Amendment, the undersigned confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and the undersigned will look solely to Lender for any and all compensation hereunder.

_____
SEAN COMBS

Social Security # _____

43002.1

4

CONFIDENTIAL
ATTORNEY'S EYES ONLY          MTVN 000650