# EXHIBIT J



**BAD BOY RECORDS**
1710 Broadway
4th Floor
New York, New York 10019

Remote Productions Inc.                             Dated as of March 23, 2006
1515 Broadway
New York, New York  10036

Gentlepersons:

The following, when executed by you and by us, shall constitute our agreement with respect to the rights to the recording services of certain individual contestants identified on Schedule 1 annexed hereto (each, an "Artist") appearing on the television program produced by you entitled "Making the Band 3" (the "Program"):

1.—    <u>Recording Options/Recording Agreements.</u>

1.01.   In connection with your production of the Program, you have entered into an agreement (each, a "<u>Recording Agreement</u>") with each of the Artists, pursuant to which each Artist has granted to you the exclusive and irrevocable option to require such Artist to provide her exclusive recording services as a member of the musical group selected as part of the Program and/or for such Artist's recording services for other recording projects.  (The option for each Artist's recording services as a member of the group is referred to in the applicable Recording Agreement as the "<u>Group Option</u>" and the option for each Artist's recording services other than as a member of the group is referred to in the applicable Recording Agreement as the "<u>Service Option</u>".   The options for each Artist are referred herein collectively as the "<u>Recording Option</u>".)

1.02.   You hereby warrant and represent as follows, as of the date of execution hereof:

(a)    The Recording Agreement with each Artist has been fully executed by all necessary parties, is currently in full force and effect and is binding on each Artist in all respects, including with respect to the Recording Option, and you are not currently in breach of any of your obligations under the Recording Agreement.

(b)    You own all right, title and interest in and to each of the Recording Agreements and the Recording Options, free and clear of any obligations to any third party, and you currently have the full and unconditional right to exercise the Recording Option for each Artist, or to refrain therefrom with no liability whatsoever to the Artist or any third party.  With respect to each Artist, you have the right to exercise the Group Option or the Service Option or both options.

?161.4
:006

1

ATLANTIC000674

(c)   You have until at least April 28, 2006 to exercise the Recording Option for each Artist, and you have not yet exercised any of the Recording Options.

(d)   The exercise of the Recording Option for each Artist shall not give rise to any obligation to make any payment to or on behalf of the applicable Artist or any third party or to any other obligation, except for (i) those payment obligations and other obligations set forth in the Recording Agreement itself, and (ii) those payment obligations and other obligations set forth in our agreement with Yeah! Brothers Records, LLC regarding the "YBR Claim" (as defined in paragraph 5.01(c) below).

(e)   You have the right to assign to us each Recording Option and all of your right, title and interest therein.

(f)   Each Recording Agreement is identical in form and content to the form annexed hereto as Exhibit A.

2.   **Assignment of Rights and Obligations.**

2.01.   For good and valuable consideration, receipt of which is hereby acknowledged, you hereby sell, assign and transfer to us all right, title and interest in and to each Recording Agreement and each Recording Option. Promptly following the complete execution hereof, you shall deliver to us true and complete copies of each Recording Agrement.

2.02.   The assignment set forth in paragraph 2.01 includes, without limitation, the assignment to us of: (a) the right to exercise the Recording Option and cause the applicable Artist to furnish her exclusive recording services to us; (b) the Recording Agreement itself and all rights therein; and (c) all music publishing rights under Article 12 of the Recording Agreement or otherwise under the Recording Agreement.

2.03.   In connection with the assignment set forth in paragraph 2.01, you hereby assign to us, and we hereby assume, all of your executory obligations under each Recording Agreement (including, without limitation, the obligations to pay advances and to account and pay royalties). The foregoing assignment and assumption does not include, and you shall remain solely responsible for fulfilling, any and all obligations which were due to be performed by you under any of the Recording Agreements prior to the date hereof.

2.04.   We shall grant you a gratis non-exclusive license to use master recordings (including promotional videos) owned by us pursuant to the Recording Agreements in the Program and to exhibit, distribute and otherwise exploit the Program in any and all media, throughout the world and in perpetuity, and to use excerpts of such master recordings in (x) advertisements for the Program and (y) other marketing and/or promotions for the Program, provided we have approved such other marketing and/or promotions (which approval shall not be unreasonably withheld, but in no event shall we

ATLANTIC000675

have any obligation to approve any proposed marketing or promotional use of master recordings on any audio or audiovisual record). The grant of such license is conditioned upon you obtaining (a) the consents of the Artists concerned to the extent that such consents are not already granted in the Recording Agreements or elsewhere, and (b) licenses from the music publishers of the compositions embodied in such master recordings. With respect to those compositions (or portions thereof) owned by us or our music publishing affiliates, we shall use our reasonable efforts to cause our music publishing affiliates exclusive administrator, EMI Music Publishing, to grant such licenses to you on a gratis basis. We shall use our reasonable efforts to assist you in obtaining any required consents of the Artists concerned. We and our music publishing affiliates shall honor any such grants of licenses to you which were made by the Artists concerned prior to the execution hereof.

2.05.   Solely to the extent of any ownership interest we may have in the professional name of the group consisting of one or more of the Artists (the "Group Name"), we shall grant you a gratis non-exclusive license to use the Group Name in the Program and in and to exhibit, distribute and otherwise exploit the Program in any and all media, throughout the world and in perpetuity, and to use the Group Name in (a) advertisements for the Program and (b) other marketing and/or promotions for the Program. You shall be solely responsible for obtaining the consents of the Artists concerned (to the extent such consents have not already been granted in the Recording Agreements or in other agreements with you or with us) and/or of any other persons or entities with any ownership interest in the Group Name. We shall use our reasonable efforts to assist you in obtaining any required consents of the Artists and/or other persons or entities concerned.

3.   <u>Compensation</u>.

3.01.   (a)   In full consideration for your assignment to us of the Recording Agreements and the Recording Options for the Artists, we shall pay to you an "override" royalty (the "<u>Override Royalty</u>") solely in respect of "Qualifying Masters" (as defined in paragraph 3.01(b)(i) below) as follows: The Override Royalty in respect of long-playing albums embodying Qualifying Masters shall be at a rate equal to ███████████████ (the "<u>Basic Rate</u>") of the royalty base price therefor, subject to all of the other provisions of this paragraph 3. Notwithstanding the foregoing, to the extent that the aggregate of the Basic Rate and the "all in" royalty payable to the applicable Artist (i.e., inclusive of the royalty payable to the producers and other third parties) in respect of net sales of a particular Qualifying Album (commencing with the fourth Qualifying Album of the "Group" (as defined below) and the fourth Qualifying Album of each "Solo Artist" (as defined below)) through normal retail channels at top price in the United States ("<u>USNRC Net Sales</u>") would exceed ████████████ percent, then the Basic Rate with respect to such Qualifying Album shall be reduced by an amount equal to ██████ percent of such excess; provided, however, in no event shall the Basic Rate in respect of a particular Qualifying Album be so reduced to below ██████████████ percent. (By way of example, if the aggregate of the aforesaid royalties in respect of USNRC Net Sales of a particular Qualifying Album would be ████, then the Basic Rate for such

ATLANTIC000676

Qualifying Album will be ▓▓▓.)  Notwithstanding any of the foregoing, the Basic Rate in respect of any Qualifying Album by a "Leaving Member" (as defined below) shall be ▓▓▓) percent, and (same shall not be subject to reduction pursuant to the immediately preceding sentence).

(b)  (i)  As used herein, the term "Qualifying Masters" shall mean:

(A) All master recordings (audio and audiovisual) featuring the performances of two or more of the Artists as to whom we exercise the Group Option performing together as a group (the "Group") which are recorded and delivered to us under the Recording Agreements up to and including the delivery to us of the sixth "Qualifying Album" (as defined below) of the Group;

(B) If, prior to the delivery to us of the sixth Qualifying Album of the Group, one or more members thereof shall cease to perform as part of the Group and if we exercise our "leaving member" rights with respect to any such departing members (each, a "Leaving Member"), then all master recordings (audio and audiovisual) featuring the performances of any such Leaving Member recorded pursuant to the applicable Recording Agreement up to and including the delivery to us of the first Qualifying Album of such Leaving Member; and

(C) With respect to each Artist who is not a member of the group described in the foregoing clause (A) as to whom we exercise the Service Option (each, a "Solo Artist"), all master recordings (audio and audiovisual) featuring the performances of such Solo Artist which are recorded and delivered to us under the Recording Agreements up to and including the delivery to us of the sixth Qualifying Album of such Solo Artist.

(ii)  As used herein, the term "Qualifying Album" shall mean: (A) the first six (6) long-playing audio-only record albums featuring the performances of the Group which are recorded and delivered to us in fulfillment of the Group's recording commitment pursuant to the applicable Recording Agreement(s); (B) the first long-playing audio-only record album featuring the performances of each Leaving Member which is recorded and delivered to us in fulfillment of the Leaving Member's recording commitment as a leaving member pursuant to the applicable Recording Agreement (but only if such Leaving Member ceased to be a member of the Group prior to the delivery to us of the sixth Qualifying Album of the Group); and (C) with respect to each Solo Artist, the first six (6) long-playing audio-only record albums featuring such Solo Artist's performances which are recorded and delivered to us in fulfillment of such Solo Artist's recording commitment pursuant to the applicable Recording Agreement.

3.02.  (a)  The Override Royalty shall be calculated at the Basic Rate in respect of USNRC Net Sales of the applicable Qualifying Album.  The royalty payable to you for sales of records embodying the Qualifying Masters and other exploitations of the Qualifying Masters (including, without limitation, sales outside the United States, sales at reduced price, digital sales and club sales) shall be reduced in the same proportion that

269161.4
042006

4

ATLANTIC000677

the basic royalty rate payable by us to the applicable Artist (or group of Artists, if applicable) for USNRC Net Sales of the applicable Qualifying Album is reduced for such sale, provided that with respect to sales or exploitations for which the Artist receives a royalty which is computed as a percentage of our net receipts, net monies, or the like, the Override Royalty in respect of such sale or exploitations shall be equal to the Artist's royalty therefor multiplied by a fraction, the numerator of which is equal to the Basic Rate as set forth in paragraph 3.01(a) above (and as same may be adjusted as provided therein), and the denominator of which is equal to the applicable Artist's basic "all-in" royalty rate for USNRC Net Sales of the applicable Qualifying Album.

(b)     The Override Royalty shall be computed, determined, calculated and paid in the same manner (e.g., container charges, free goods and other non-royalty bearing units, definitions of royalty base price, reserves, compact disc, new technology, and other format-based adjustments, etc.) as royalties payable by us to the applicable Artist in respect of the applicable Qualifying Album are computed, determined, calculated and paid pursuant to the applicable Recording Agreement.

(c)     With respect to sales of records embodying one or more Qualifying Masters along with other master recordings, the Override Royalty shall be the otherwise applicable royalty multiplied by a fraction, the numerator of which is equal to the number of Qualifying Masters contained on the record and the denominator of which is the total number of master recordings (including the Qualifying Masters) contained on the record.

3.03.    You shall not be entitled to any royalty in respect of the sale of singles. (Solely for purposes of this paragraph 3.03, the digital sale of individual Masters, as permanent downloads and the like, shall not be deemed to be excluded hereunder as "singles".)

3.04.    With respect to each relevant Artist, you shall not be entitled to receive the Override Royalty unless and until we have recouped from the applicable Artist's "net" royalties in respect of Qualifying Albums (i.e., the Artist's royalties net of the royalties payable to all producers, mixers, "guest" artists and other third parties) all of the following: (a) all advances (excluding music publishing advances) required to be paid to the Artist in connection with the Qualifying Albums pursuant to the applicable Recording Agreement, (b) all recording costs incurred in connection with the recording of the Qualifying Albums, and (c) all marketing costs (including video production costs) in connection with the Qualifying Albums which are recoupable from the Artist's royalties (provided, for these purposes, no more than ▓▓▓ of video production costs and ▓▓▓ of independent radio promotion costs will be deemed recoupable).  Following such recoupment, we shall pay you the Override Royalty on all prospective sales and retroactively to the "first record sold".  By way of clarification, for these purposes, we shall have the right to treat all of the Qualifying Albums featuring a particular Artist as a single account, but we shall not "cross-collateralize" the account of one Artist with that of any other Artist.  We shall not "cross-collateralize" the account of a Leaving Member with the account of the Group except to the extent that we are permitted to do so under the applicable Recording Agreement for such Leaving Member.  For purposes of this

ATLANTIC000678

acceptable to us, in an amount reasonably consistent with the amount of such claim, then we shall not withhold payment of monies otherwise payable to you hereunder in respect of such claim, demand or action. We shall cease to withhold sums in respect of a claim if no lawsuit has been commenced as of the date twelve (12) months after such claim is initially made unless we are then actively engaged in settlement negotiations with respect to such claim. The Indemnitor shall be notified of any such claim, action or demand and shall have the right, at its own expense, to participate in the defense thereof with counsel of its own choosing; provided, however, that the Indemnitee's decision in connection with the defense of any such claim, action or demand shall be final.

6.    __Miscellaneous.__

6.01.   This Agreement sets forth the entire understanding between the parties, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, with respect to the subject matter hereof. The parties expressly acknowledge that in entering into this Agreement they have not relied on any representations, written or unwritten, concerning the subject matter of this Agreement other than those contained herein. No modification, amendment or waiver of or under this Agreement or any of its terms will be binding unless confirmed by a document signed by the party to be charged. Should any paragraph or provision of this Agreement be held void, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein. This Agreement may be executed in counterparts and, as so executed, will constitute one Agreement binding on all parties. The parties further agree that facsimile signatures will be acceptable and fully binding on all parties.

6.02.   We may assign our rights and delegate our obligations hereunder with respect to a particular Artist, in whole or in part, to any party in conjunction with an assignment of our rights in respect of the applicable Recording Agreement. Any assignee of all or substantially all of our rights under this Agreement and/or a Recording Agreement shall agree in writing to assume our obligations with respect thereto. You shall have the right to assign your right to receive income hereunder. You shall have the right to assign your rights under paragraph 2.04 in conjunction with a sale or assignment of the Program.

6.03.   This Agreement shall be governed by and construed under the laws and judicial decisions of the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the State Courts of or the Federal Court in the State and County of New York; provided, however, if we are sued or joined in any other court or forum in respect of any matter which may give rise to a claim by us hereunder, you and Producer consent to the jurisdiction of such court or forum over any such claim which may be asserted by us.

269161.4
042006

ATLANTIC000679

If the foregoing accurately reflects your understanding of the terms and conditions of the agreement between you and us with respect to the subject matter of this Agreement, please so indicate by signing where indicated below.

Very truly yours,

**BAD BOY RECORDS**

By: _____

ACCEPTED AND AGREED TO:

**REMOTE PRODUCTIONS INC.**

By: _____

269161.4
042006

10

ATLANTIC000680

## Schedule 1

Wanita Woodgett

Aubrey O'Day

Aundrea Fimbres

Shannon Bex

Dawn Angelique Richard

269161.4
042006

11

ATLANTIC000681

<u>**Exhibit A**</u>

[form of Recording Agreement]

269161.4
042006

12

ATLANTIC000682

# EXCLUSIVE ARTIST RECORDING AGREEMENT

This "Agreement" made as of _____, 200_ by and between Remote Productions Inc. 1515 Broadway, New York, NY 10036 (hereinafter referred to as "Company"), and _____ residing at _____, ("You" or "Your") together with the additional members of the Group (as defined below) who have each executed or will execute an agreement in the form of this Agreement with Company (hereinafter referred to collectively as "the Group").

1A.    (a)    You acknowledge that You have appeared for auditions and interviews and performed artistic and professional services as requested by Company, at times and locations designated by Company.  The auditions and interviews were filmed and/or taped during the time period of _____ through approximately _____ pursuant to a Participant Release signed by You and such footage may be used by Company for evaluating your suitability for a role in an unnamed musical group, and in television productions relating thereto.  Company's consideration of your suitability for a role in the Group, and in the reality-based television program currently entitled "Making the Band 3" (the "Program") shall be deemed Company's full and complete consideration for all services in connection with the auditions and interviews, and all rights granted therein.

(b)    You have completed and submitted the Official Application, Company's Guest/Performer Release, Company's forms for medical history and background checks, and the Applicant Agreement between You and Company dated as of _____,200_ (the "Television Agreement") (collectively, the "Program Agreements"), wherein, You, among other things, have agreed to grant Company and its successors, licensees and assignees, certain rights, and perform certain services, in connection with the Program.

(c)    You hereby grant to Company the exclusive and irrevocable option to require you to render services to Company in connection with the Group exercisable by written notice by Company to you no later than _____, 200_ (the "the Group Option").  The Group Option notice may include the names of the additional members of the Group that comprise the Group.  You hereby also grant to Company the exclusive and irrevocable option to require You to render services to Company in connection with any other recording project (the "Other Project") produced, either individually or with others, by Company (or such other entity as Company designates in its sole discretion) exercisable by written notice by Company to You no later than _____, 200_ (the "Service Option").

(d)    If Company elects not to exercise the Group Option or the Service Option (as set forth in paragraph 1A(c) above), as it relates to You, then the terms and conditions of this Agreement shall expire automatically, only as it relates to You, at the end of the final day of the option period herein provided.  If Company has not exercised Company's option(s), You shall not be deemed to have acquired any right, title or interest in any of the materials created by Company prior to such expiration, all of which You acknowledge shall remain, as between the You Company, the sole property of Company pursuant to the Program Documents.

(d)    If Company elects to exercise the Group Option (as set forth in Paragraph 1A (c) above), then the provisions that follow this Paragraph 1A shall constitute the Agreement

252406v1

05/19/2005

ATLANTIC000683

between Company and You and the other members of the Group designated by Company for whom the Group Option is exercised. For those members whose Group Option is exercised, this Agreement shall govern all of the members individually and collectively as the Group. If Company elects to exercise the Service Option (as set forth in Paragraph 1A(c) above), then the provisions that follow this Paragraph 1A shall constitute the Agreement between You and Company, provided, however, that your rights and obligations under this Agreement shall be those rights and obligations provided for a Leaving Member (as defined in Paragraph 15(b)(iii) below).

1B.    Company hereby engages You to provide to Company Your exclusive services as set forth herein. All sums payable to You shall be equally distributed to each individual member of the Group (e.g., if there are five (5) members comprising the Group, than all sums payable hereunder shall be equally pro-rated one-fifth to each member). For purposes of further clarification, You hereby agree that all sums payable to You (on behalf of the Group) and/or the Group (i.e., advances, fees, royalties, etc.) as set forth in this Agreement [by way of example, those advances provided for in paragraphs 8(a) and 12(h)(i)] shall be pro-rated equally by each member of the Group and shall constitute the full payment due the Group (and not just to an individual member of the Group) and the Group shall provide one (1) designee or representative of the Group to whom all payments shall be made and to whom accounting statements shall be sent.

1.    (a)    You hereby agree to render Your sole and exclusive personal services to Company for the performance and production of demonstration recordings (hereafter "Demos"), phonograph records and otherwise during the Term of this Agreement (as hereafter defined in Paragraph 3), as the same may be extended, modified or renewed.

(b)    During the Term hereof and at all relevant times thereafter, You shall comply with all reasonable restrictions and prohibitions contained in the Distribution Agreement (as hereafter defined in Paragraph 2), including, without limitation, the re-recording restrictions contained therein.

2.    If Company elects to exercise the Group Option, it is the intent of the parties that Company record and distribute records containing master recordings embodying Your and the Group's musical performances hereunder or that Company endeavor to secure a record distribution agreement for the purpose of engaging a third party recording or distribution company to record and distribute master recordings embodying Your and the Group's musical performances. To that end, during the Initial Period (as defined in subparagraph 3(b) below) You, as part of the Group, shall record Demos for Company, in a form acceptable to Company and sufficient in Company's sole judgment to use for the solicitation of an offer from a third party recording and/or distribution company (hereinafter referred to as the "Distributor") to enter into an agreement with Company with respect to the distribution of phonograph records and videos embodying master recordings ("Masters") to be recorded by You hereunder (the "Distribution Agreement"). The cost of recording the Demos shall be paid by Company and shall be chargeable against and deductible from record royalties payable to the Group pursuant to this Agreement. The Demos shall be recorded at times, dates, and recording studios reasonably designated by Company and pursuant to a budget determined or approved by Company in writing. You acknowledge and agree that Company shall have no obligation to pay additional Advances (as defined in Paragraph 8(a) below) to You and/or the Group in connection with the recording of the

252406v1

05/19/2005

ATLANTIC000684

Demos. In the event the Demos are not embodied on Albums (as hereinafter defined) delivered hereunder in fulfillment of Your Recording Commitment (as defined in Paragraph 3(c)(i)) or on any so-called "greatest hits" or "best of" album hereunder (provided that Company shall not embody any of the Demos on a so-called "greatest hits" or "best of" album without your prior consent, which shall not be unreasonably withheld), Company shall not exploit the Demos in any manner without your prior consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, it is hereby expressly understood that the Demos are subject to the terms hereof, including, without limitation, Paragraph 7 hereof, and that You, individually, or the Group, collectively, shall not have the right to exploit on Your own or permit any third party to exploit the Demos in any manner.

3.     (a)     The Term of this agreement will commence as of the date hereof.

(b)     The first contract period of the Term (hereinafter referred to as the "Initial Period") will commence upon the date that Company exercised the Group Option or the Service Option as applicable and will end on the later of (i) nine (9) months after the date of completion of satisfactory Demos, (ii) upon Company entering into the Distribution Agreement as provided herein below; or (iii) Company providing to You written notice that Company intends to distribute the Masters hereunder on its own, provided that You, individually, and the Group, collectively, is continually available and fully cooperates with Company and delivers to Company satisfactory Demos. Notwithstanding the foregoing, the Initial Period hereof shall end no later than thirteen (13) months from the date hereof.

(c)     (i)     You hereby grant to Company six (6) consecutive separate options to extend this Agreement for further additional successive contract periods each upon the same terms and conditions contained herein (the "Option Periods"). During each Option Period You, as part of the Group, shall be required to deliver to Company (Your "Recording Commitment") Master Recordings sufficient to constitute one (1) album of at least forty-five (45) minutes playing time ("Album"). The Initial Period and each exercised Option Period may sometimes be referred to herein as a "Contract Period" and shall be referred to collectively as the "Term." If Company exercises its option to extend the Term of this Agreement, each such Option Period concerned shall begin immediately upon the expiration of the then current Contract Period and shall continue until the date nine (9) months, or such earlier date as Company shall advise You in writing following the initial commercial release in the United States of the Album required to be delivered in that Option Period. Each option shall be exercisable by Company by providing to You written notice of Company's desire to extend the Term of this Agreement for an additional Contract Period at any time prior to the date that the then current Contract Period would otherwise expire.

(ii)     You hereby acknowledge and agree that no so-called "greatest hits" or "best of" albums, specialty albums (i.e., Christmas albums) or live albums of any kind shall count towards the fulfillment of Your or the Group's Recording Commitment hereunder.

(iii)     Company hereby represents that Company shall secure within the Distribution Agreement a commitment from the Distributor that each Album delivered hereunder in fulfillment of Your Recording Commitment shall be commercially released in the United States within one hundred twenty (120) days from the date of Delivery (as defined in the Distribution Agreement) of such Album to the Distributor, subject to any

252406v1

05/19/2005

ATLANTIC000685

notice and cure periods required by the Distributor in connection therewith and contained in the Distribution Agreement.

(d)    Notwithstanding the foregoing or anything to the contrary contained herein, if as of the last date on which Company has the right to extend the Term for an additional Contract Period pursuant to Subparagraph (c) above, Company has failed to exercise its option to extend the Term for the next Contract Period, the then-current Contract Period nonetheless shall continue until You notify Company in writing of that failure, referring specifically to this Subparagraph 3(d).  If Company fails to exercise its option to extend the Term for the next Contact Period on or before the date that is thirty (30) days after Company receives that specific written notice from You, then the Term shall end on the date that is thirty (30) days after Company receives that notice from You, as if that date were the original expiration date of Term, without any liability or additional obligation to You in connection therewith.

4.    Notwithstanding anything to the contrary contained in Paragraph 3 above, if Company enters into the Distribution Agreement, then the Term of this Agreement as provided in Paragraph 3 hereinabove shall be conformed to be co-terminus with the term of the Distribution Agreement and all of the provisions contained in the Distribution Agreement regarding the term thereof shall control, however, in no event shall the Term of this Agreement expire prior to the date on which this Agreement would naturally expire in the event Company had not entered into the Distribution Agreement.  It is hereby acknowledged by the parties that, irrespective of the term of the Distribution Agreement, You shall not be required to deliver to Company during the Term hereof more than six (6) Albums in fulfillment of Your Recording Commitment hereunder.  If the Distribution Agreement does not contain provisions regarding the Term herein then Paragraph 3 above shall be deemed to be controlling.

5.    The selection of material, individual producers and similar creative matters with respect to the recording of Masters hereunder (e.g., not the budgets therefore or other business matters) shall be mutually determined by the Group and Company and the Distributor, provided, that in the event of a disagreement between the Group and Company with respect to such matters, Company's decision shall be final and controlling. Notwithstanding the foregoing, You acknowledge and agree that the Distributor may have the right of approval with respect to the selection of material, individual producers, or similar creative matters, and that, if applicable, the decision of the Distributor in such matters may be final and controlling.  All rights of approval, consultation and similar or related rights granted to Company pursuant to the Distribution Agreement shall be exercised by Company.

6.    Company shall have the right to require You, individually, and the Group, collectively, to perform at such times and places as Company reasonably designates for the production of (i) films or videotapes featuring the Group's performances of compositions embodied in Masters recorded hereunder (hereinafter referred to as "Videos").  As between You and Company, Company shall be the sole and exclusive owner throughout the universe and in perpetuity of such Videos and all rights therein, including all copyrights and renewal of copyrights, and shall have all of the rights with respect thereto which are set forth in Paragraph 7 hereof, including, without limitation, the right (but not the obligation) to use and exploit such Videos in any and all forms.

252406v1

05/19/2005

ATLANTIC000686

7. (a) As between You and Company, and subject to the terms and conditions hereof and of the Distribution Agreement, all Masters recorded by You, individually or collectively as the Group, during the Term hereof shall, from the inception of recording, be Company's property throughout the universe, in perpetuity, free from any claims by You, or any person deriving any rights or interest from You and shall be assignable by Company to a third party in Company's sole discretion. Accordingly, each Master (including the Demos) shall be considered a "work-made-for-hire" for Company; if any Master is determined not to be a "work-made-for-hire" it will be deemed transferred to Company hereunder, including the copyright therein, together with all rights in and to the Master and the proceeds of Your services as are described in the Distribution Agreement. Without limiting the generality of the foregoing, Company and any person, firm, or corporation designated by Company shall have the exclusive, perpetual right throughout the universe to manufacture, sell, distribute and advertise phonograph records, Videos and other reproductions embodying the Masters (including the Demos) under any trademarks, trade names or labels, and to lease, license, convey and otherwise exploit and use the Masters (including the Demos) by any method (whether now known or unknown) and in any medium (whether now known or unknown) and to perform publicly phonograph records, Videos and other reproductions embodying the Masters (including the Demos), all upon such terms as Company may approve, or Company may refrain from doing any or all of the foregoing.

(b) Company and any person authorized by Company, each shall have the right and may grant to others the right to reproduce, print, publish or disseminate in any medium Your name, portraits, pictures, likenesses and biographical material concerning You, as news or information, or for the purposes of trade or for advertising purposes; provided, however, that no direct endorsement by You of any product or services shall be used without Your prior consent. You shall have the right to approve any portraits, pictures, likenesses and biographical material concerning You which Company intends to utilize in accordance with this Subparagraph 7(b). Notwithstanding the foregoing, any such materials shall be deemed approved by You (i) if You do not provide to Company written notice of Your disapproval thereof within five (5) business days of Company's submission to You of such materials, or (ii) if You submit such materials to Company. You shall cooperate, subject to Your prior professional commitments, with Company relating to the exploitation of master recordings and records hereunder.

8. (a) Provided that You, individually, and no other individual comprising the Group, are not in material breach of any of Your obligations hereunder or under any of the Program Agreements, Company shall pay the Group, with respect to each Album recorded by the Group under the Distribution Agreement, the following amounts as an advance against any and all sums payable to the Group hereunder or otherwise ("Advance" or "Advances"):

| ALBUM | ADVANCE |
|---|---|
| First | $75,000.00 |
| Second | $80,000.00 |
| Third | $90,000.00 |
| Fourth | $100,000.00 |
| Fifth | $110,000.00 |
| Sixth | $120,000.00 |

252406v1

05/19/2005

ATLANTIC000687

Notwithstanding the foregoing, in the event that Company does not enter into the Distribution and determines to distribute records hereunder on its own, or in the event that any time during the Term hereof the Distribution Agreement terminates and a substitute Distribution Agreement is not obtained by Company, the following Advances shall be applicable:

| ALBUM | ADVANCE |
|-------|---------|
| First | $20,000.00 |
| Second | $25,000.00 |
| Third | $35,000.00 |
| Fourth | $45,000.00 |
| Fifth | $50,000.00 |
| Sixth | $60,000.00 |

(b)     The applicable Advance payable in connection with the First Album shall be payable (i) fifty (50%) percent promptly following notice to the Group from Company that Company shall on its own distribute the Masters hereunder or promptly following execution by Company and the Distributor of the Distribution Agreement, Your execution of any so-called "inducement letters" in connection therewith and Company's receipt of the initial advance payment due Company from the Distributor, and (ii) the balance promptly following delivery to and acceptance by the Distributor of such First Album and Company's receipt of the final payment due Company from the Distributor with respect to the delivery of such Album.  In the event that Company has not entered into a Distribution Agreement, the balance of the Advance shall be payable upon delivery to and acceptance by Company of such First Album.  The applicable Advance for each subsequent Album shall be payable as follows: fifty (50%) percent promptly following commencement of the recording of the Album concerned; and the balance promptly after delivery to and acceptance by the Distributor of said Album and Company's receipt of the final payment due Company from the Distributor with respect to the delivery of the Album concerned.  In the event that Company has not entered into a Distribution Agreement, the balance of the Advance shall be payable upon delivery to and acceptance by Company of the Album concerned.

(c)     Each Album shall be recorded pursuant to a recording budget prepared by Company.  Per Your request, Company shall furnish the Group with a copy of said recording budget.  All Recording Costs ("Recording Costs") shall constitute Advances to the Group hereunder and shall be recouped from any record royalties payable to the Group hereunder.  In the event the Recording Costs of any particular Album exceed the approved budget for such Album, provided that such excess costs are due primarily to any of Your or the Group's acts or omissions, Company shall have the right to charge and/or deduct such excess from any and all record royalties or mechanical royalties payable to the Group hereunder.

(d)     Any penalties charged to Company including, without limitation, penalties due to failure to effect timely compliance with any of Company's or Distributor's obligations under any applicable agreement with any union or labor organization in connection with the Masters and penalties due to the late delivery to the Distributor of Masters hereunder shall, provided that any of such penalties are due solely to Your or the Group's acts or omissions, be Your and the Group's responsibility, and Company shall have

252406v1

05/19/2005

ATLANTIC000688

paragraph 3.04, the Artist's "net" royalties shall be calculated based on a basic rate for USNRC Net Sales of albums of no less than twelve (12%) percent.

3.05.    The Override Royalty as described in this Article 3 constitutes the full and complete compensation payable to you in connection with the rights granted by you to us. Without limiting the foregoing, we shall have no obligation to pay any advances to you or to pay you any sums in connection with our or our affiliates' exploitation of any other rights relating to the Artists, whether pursuant to the Recording Agreements or otherwise, including music publishing rights.

3.06.    You acknowledge and agree that we shall have no obligation or liability to you if, for any reason, we fail or refuse to exercise any Recording Option or option for any Qualifying Album or if we fail or refuse to record and/or release any Qualifying Album or other Masters.

3.07.    We shall have the right, in our sole discretion, to enter into a new, substitute recording agreement with any Artist(s) on such terms as we may, in our sole discretion, determine.  If we so enter into a substitute recording agreement with a particular Artist (including two or more of the Artists as a group), such substitute agreement shall be deemed to be the applicable Recording Agreement for that Artist(s) with respect to the Qualifying Album(s) subject to such substitute agreement.  If the substitute Recording Agreement provides for the calculation of the Artist's royalties on a royalty base price which is other than a retail-based price (e.g., on the basis of the wholesale price or the published price to dealers without a so-called "uplift") and/or if such substitute Recording Agreement materially changes any other element(s) of the calculation of the royalty base price or the net effective price on which royalties are payable (e.g., a change in the container deduction or in so-called "standard" free goods) from the comparable elements provided for in Exhibit A to the existing Recording Agreements, then the Basic Rate hereunder shall be deemed adjusted so that the net amount of royalties payable to you in respect of sales of top price albums in the applicable country pursuant to the royalty calculation provisions of the substitute Recording Agreement would be the same as the net amount of royalties payable to you in respect of the same sale pursuant to the royalty calculation provisions of the existing Recording Agreement.

4.    <u>Accounting.</u>

4.01.    Within ninety (90) days after June 30 and December 31 of each year during which applicable records are sold, we shall render a statement of accrued royalties earned under this Agreement during the preceding calendar semi-annual period. Concurrently with the rendition of each statement, we shall pay you all royalties shown to be due by such statement.  No statements need be rendered by us for any such calendar semi-annual period for which there are no sales of records hereunder.  We may withhold a reasonable reserve against returns, exchanges, refunds, credits and the like, such reserve to be established by us in our reasonable discretion, based on, among other factors, the applicable Artist's sales experience, which reserves shall not be in excess of twenty-five

269161.4
142006

6

ATLANTIC000689

percent (25%) of royalties otherwise credited to your account hereunder for shipments of records in any particular royalty period (unless we anticipate, in our reasonable, good faith judgment, returns, exchanges, refunds, credits and the like which justify the establishment of a larger reserve) and each such reserve shall be fully liquidated no later than with the rendition of statement rendered two (2) years following the statement with respect to which such reserve was originally maintained; provided, however, with respect to reserves in connection with Qualifying Masters subject to a particular Recording Agreement, you shall have the benefit of any more favorable liquidation provision contained in such Recording Agreement. You shall be deemed to have consented to all accountings rendered by us hereunder and such accountings shall be binding upon you and not subject to any objection by you for any reason unless specific objection, in writing, stating the basis thereof, is given to us within two and one-half (2 1/2) years after the date we are deemed to have rendered the applicable statement, and after such written objection, unless suit is instituted within three (3) years after the date we are deemed to have rendered the applicable statement. We shall be deemed conclusively to have rendered each statement on the date prescribed in this paragraph 4.01 unless you notify us otherwise with respect to any particular statement within sixty (60) days after the date that we are required to render that statement pursuant to the first sentence of this paragraph 4.01.

4.02. (a)   You shall have the right at your sole cost and expense to appoint a certified public accountant (or a qualified member of your finance or accounting staff) who is not then currently engaged in an outstanding audit of us to examine our books and records as same pertain to sales of records subject hereto; provided that, any such examination shall be for a reasonable duration, shall take place at our offices during normal business hours on reasonable prior notice and shall not occur more than once in any calendar year. You may examine our books and records with respect to a particular statement only once.

(b)   Notwithstanding anything to the contrary contained in paragraph 4.02(a) above, if we notify you that the certified public accountant (or other designated individual) designated by you to conduct an audit under paragraph 4.02(a) is engaged in another outstanding audit of us on behalf of another person, you may nevertheless have your audit conducted by such accountant (or other individual), and the running of the time within which such audit may be made shall be suspended until such accountant (or other individual) has completed such other audit, provided: (A) you shall notify us of your election to that effect within fifteen (15) days after the date of our such notice to you; (B) your accountant (or other individual) shall proceed in a reasonably continuous and expeditious manner to complete such other audit and render the final report thereon to you and us; and (C) your audit shall not be commenced by your accountant (or other individual) before the delivery to is of the final report on such other audit, shall be commenced within forty-five (45) days thereafter, and shall be conducted in a reasonably continuous manner. The provisions of this paragraph 4.02(b) shall not apply if we elect to waive the provisions of paragraph 4.02(a) that require that your accountant (or other individual) shall not be engaged in any other audit.

269161.4
042006

7

ATLANTIC000690

5.    <u>Representations and Warranties.</u>

5.01.   You hereby warrant and represent that:

(a)    You are free to and have the full right, power and authority to enter into and fully perform this Agreement and to assign the Recording Options and the other rights as set forth in Article 2 above;

(b)    We shall have no obligation to make any payment to you or to any third party for or in connection with the assignment made hereunder or the exploitation by us of the rights acquired by us hereunder, except as expressly provided for in the applicable Recording Agreements or in this Agreement;

(c)    You are not aware of (i) any claim by an Artist or by any other person relating to any of the Artists, the Recording Options or the Recording Agreements which might affect our rights or our ability to exploit our rights under any of the Recording Agreements, or (ii) any other fact or allegation which, if true, might affect our rights or our ability to exploit our rights under any of the Recording Agreements. We acknowledge that Yeah! Brothers Records, LLC has claimed that it owns the rights to the recording services of Dawn Angelique Richard (the "YBR Claim") and your representations and warranties contained in this paragraph 5.01(c) shall not be deemed to extend to the YBR Claim, nor shall you be obligated to indemnify us pursuant to paragraph 5.02 below in respect of the YBR Claim; and .

(d)    The Artists identified on Schedule 1 annexed hereto comprise all of the individuals on the Program who were selected to be in the Group.

5.02.   We hereby warrant and represent that (a) we are free to and have the full right, power and authority to enter into and fully perform this Agreement, and (b) we shall fully and timely perform all of our obligations under the Recording Agreements.

5.03.   You and we (each, the "Indemnitor") agree to indemnify and hold the other party and its successors, assigns, agents, distributors, licensees, officers, directors and employees (collectively, the "Indemnitee") harmless against any claim, liability, cost and expense (including reasonable attorneys' fees and legal costs) in connection with any third party claim which is in consistent with any agreement, covenant, representation, or warranty made by Indemnitor herein which has resulted in a final judgment or has been settled with Indemnitor's written consent, which consent shall not be unreasonably withheld (it being agreed that Indemnitor shall be deemed to have consented to any settlement not in excess of $5,000). Indemnitor will reimburse Indemnitee upon demand for any payment made by Indemnitee at any time after the date hereof in respect of any claim, liability, damage or expense to which the foregoing indemnity relates. Upon the making or filing of any such claim, action or demand against us as the Indemnitee, we shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue; provided, however, that if you deliver to us an indemnity or surety bond, in a form and with a company

269161.4
042006

8

ATLANTIC000691

Distributor, Company shall nevertheless continue to be entitled to receive the share (the "Production Share") of any and all sums (including, without limitation, advances and royalties) which Company would otherwise have received if Distributor had not exercised such option. In such event, You agree to authorize and direct the Distributor to pay directly to Company such Production Share. If the Distributor pays to You any portion of the Production Share, You shall pay such sums to Company promptly following Your receipt of such sums.

15.    (a)    You agree to be bound by all of the provisions of the Distribution Agreement which pertain to Your rights and obligations and the rights and obligations of the individual members comprising the Group, if the Group is a professional group. Without limiting the generality of the preceding sentence, You, as part of the Group, hereby acknowledge and agree that if the Group is a group: (i) any leaving member shall not, without Distributor's and Company's consent, use the Group's professional group name in any commercial or artistic endeavor; (ii) said professional name shall remain the property of those members of the Group who continue to perform their obligations hereunder and whose engagements are not terminated; and (iii) any person engaged to replace a leaving member shall execute and become bound by the terms and conditions of this Agreement and the Distribution Agreement.

(b)    (i)    A breach of any term of this Agreement or a disaffirmance or attempted disaffirmance of this Agreement on the ground of minority by or with respect to any individual comprising of the Group (whether presently or hereafter signatories to or otherwise bound by the terms of this Agreement) shall, at Company's election, be a breach by or with respect to You, the Group and all individuals comprising of the Group;

(ii)    Individuals in addition to those presently members of the Group may become members of the Group only with Company's prior written approval. Additional members shall be bound by the terms of this Agreement relating to You, and You individually, and the Group, collectively, shall cause any additional member to execute and deliver to Company such documents as Company may deem necessary or desirable to evidence that individual's agreement to be so bound;

(iii)    For the purpose of this Agreement, a "Leaving Member" shall mean ] an individual member of the Group who ceases to record as a member of the Group, to perform live as a member of the Group, and to engage in other professional activities of the Group; or b) You, if Company has exercised the Service Option for your services. If any individual member of the Group shall become a Leaving Member, the Group shall promptly give to Company written notice thereof by certified or registered mail, return receipt requested. Company shall designate a replacement member for that Leaving Member. The replacement member shall be bound by the terms of this Agreement relating to You and You, individually, and the Group collectively, shall cause a replacement member to execute and to deliver to Company such documents as Company may deem necessary or desirable to evidence that replacement member's agreement to be so bound;

(iv)    With respect to any member of the Group who becomes a Leaving Member, Company shall have the irrevocable Service Option (as defined above in Paragraph 1A(c)) for the exclusive recording services of such Leaving Member. Company may exercise Company's Service Option by written notice to the Leaving Member no later

252406v1

05/19/2005

ATLANTIC000692

than one hundred twenty (120) days after the date upon which Company shall have received the written notice required to be sent by the Group and referred to in Subparagraph 15(b)(iii) above. If Company shall so exercise Company's Service Option with respect to any Leaving Member, or if Company has exercised Company's Service Option with respect to You, or such Leaving Member shall be deemed to have executed an exclusive recording contract with Company ("Leaving Member Contract") pursuant to which You or such Leaving Member, shall furnish to Company its exclusive recording services on the same terms contained in this Agreement, except as otherwise hereinafter provided: and

(A)     Company shall have the same number of options, each to extend the Term of the Leaving Member Contract for an Option Period, as equal the number of separate renewal options remaining under this Agreement pursuant to Paragraph 3(c) above as of the date that individual became a Leaving Member, but in no event shall Company have fewer than two (2) options for additional Option Periods. Each Option Period under the Leaving Member Contract shall run consecutively and shall commence upon the expiration of the immediately preceding Option Period thereunder.

(B)     The advances of Paragraph 8 above shall not apply and the royalties set forth in Paragraph 9 above, if any, shall apply to the Master Recordings recorded by a Leaving Member under a Leaving Member Contract or to any services by a Leaving Member under a Leaving Member Contract, however, the amounts which shall apply shall be two-thirds (2/3) of the applicable royalties set forth therein. Company shall be responsible for paying recording costs for Master Recordings recorded by any such Leaving Member, but no other Advances shall be payable by Company hereunder.

(v)     At Company's request, any Leaving Member shall execute and deliver to Company any and all documents as Company may deem necessary or desirable to evidence the foregoing, including, without limitation, an exclusive recording contract with Company relating to that Leaving Member's recording services;

(c)     Notwithstanding any of the foregoing, if any member of the Group shall be a Leaving Member or if the Group shall completely disband, then, without limiting Company's other rights and remedies, Company may terminate the Term of this Agreement by written notice to You and shall thereby be relieved of any obligations or liabilities hereunder, except Company's obligations with respect to Masters recorded prior to that termination. In the event Company elects to so terminate the Term of this Agreement, Subparagraph 15(b) above shall be applicable to each member of the Group as if each member were a Leaving Member;

(d)     Notices to a Leaving Member may be sent by Company to Your address above, or at such other address of which that Leaving Member shall have advised Company in writing.

16.     No failure by Company to perform any of its obligations hereunder shall be deemed a breach hereof, unless You or the Group give Company written notice of such failure and Company fails to cure such nonperformance within thirty (30) days after Company's receipt of such notice. You acknowledge that, notwithstanding anything to the contrary contained herein and as a material term hereof, You, individually, or the Group, collectively, will not seek to enjoin or otherwise interfere with the distribution of phonograph records or

252406v1

05/19/2005

ATLANTIC000693

audiovisual programs embodying Masters recorded hereunder for any reason whatsoever including, without limitation, breach of this Agreement. Your and the Group's only remedy, if any, shall be to bring an action at law for damages.

17.    (a)    If You fail, refuse or neglect to comply with any of Your material obligations hereunder (including, without limitation, failure to timely deliver to Company or the Distributor Albums recorded by You hereunder) or under any of the Program Agreements, then, in addition to any other rights or remedies which Company may have, Company shall have the right, exercisable at any time by notice to You: (i) to terminate this Agreement without further obligation to You, the Group or any other individual comprising the Group, as to unrecorded Master Recordings, (ii) to suspend Company's obligations hereunder (including, without limitation, the obligations to pay any royalties or other sums hereunder unless Distributor continues to pay to Company the Group's share of such royalties or other sums, in which event Company shall pay over to You and/or the Group, as applicable, such royalties or other sums) until such failure is cured, or (iii) to extend the then current Option Period of the Term for the period of such default plus such additional time as is necessary so that Company shall have no less than one hundred fifty (150) days after completion of Your, and the Group's obligation within which to exercise its option, if any, for the next following Option Period.

(b)    If Your voice or ability to perform as instrumentalists should be materially or permanently impaired, then in addition to any other rights or remedies which Company may have, Company shall have the right, upon written notice to you, to terminate this Agreement. In the event Company terminates this Agreement as set forth in the immediately preceding sentence, Company's obligation to pay royalties with respect to prior released Masters or any other sums owed to You prior to the date of such termination, shall remain.

18.    Company may assign its rights or obligations pursuant to this Agreement, provided that any such assignee shall assume all of Company's obligations hereunder, and, further, provided that Company shall remain secondarily liable with respect to such obligations. Company may also assign its rights hereunder to any of its licensees to the extent necessary or advisable in Company's sole discretion to implement the license granted. This Agreement is personal to You and You may not assign Your rights or obligations hereunder, and any such purported assignment shall be null and void.

19.    This Agreement and Exhibit "A" attached hereto, together with the Program Agreements (including, but not limited to the Official Application, Guest Performer Release, the Background Check, the Confidentiality and Non-Disclosure Agreement, the Authorization for Release of Medical Information, the Medical Report, the Emergency Medical Release, the Rules and the Television Agreement) constitute the entire agreement and understanding between the parties concerning the subject matter hereof, and supersede and replace all prior negotiations, proposed agreements and agreements, written and oral, relating thereto, and cannot be changed or terminated except by a written instrument signed by the parties hereto. This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this Agreement. Any claim, dispute or disagreement with respect to this Agreement shall be

252406v1

05/19/2005

ATLANTIC000694

submitted to the courts of the State of New York or the federal courts within the State of New York, which courts shall have exclusive jurisdiction thereof.

20.    All notices required hereunder or which either party desires to serve upon the other shall be in writing and sent to the addresses set forth on Page 1 of this Agreement or to such other address as either party may hereafter designate in writing, and shall be deemed given when delivered personally, with a receipt signed by a principal or officer of the deliveree; when deposited, postage prepaid, in the United States mail (certified or registered mail, return receipt requested, in all cases other than royalty statements); or when deposited, toll prepaid in any telegraph office in the United States.  A copy of any notice to Company shall be simultaneously sent to Bad Boy Records c/o Kenny Meiselas of Grubman, Indursky & Schindler located at 152 West 57th Street, New York, New York 10019.

21.    (a)    Company and its licensees shall have the exclusive right, throughout the world, and shall have the exclusive right to authorize any third parties, to create, maintain and host any and all websites relating to You and the Group and to register and exclusively use Your and the Group's name and any variations thereof which embody Your or the Group's name as Uniform Resource Locators (or "URL's"), addresses or domain names for each website created by Company in respect to You or the Group (each a "Group Site").  All such websites and all rights thereto and derived therefrom shall be Company's property throughout the Territory and in perpetuity.  As used herein, the term "Ancillary Exploitation" shall mean: (i) the leasing of commercial advertising space to third parties or entities other than Company or any of its licensees, assigns or designees on Your or on the Group Site; (ii) the placement on Your or on the Group Site of links to so-called "c-commerce" websites owned or controlled by third parties or entities other than Company or any of its licensees, assigns or designees; and (iii) the inclusion on phonograph records of web browsers, software applications, utilities or website links of third parties or entities other than Company or any of its licensees, assigns or designees.  In connection with any Ancillary Exploitation, Company shall pay to the Group fifty percent (50%) of its Net Receipts (as hereinafter defined) that are readily and directly attributable to such Ancillary Exploitation.  As used in this Subparagraph 21(a), "Net Receipts" shall mean the gross monies received by Company in connection with the applicable Ancillary Exploitation less all direct expenses (including, without limitation, advertising sales commissions or fees, taxes, fees incurred in connection with the creation of Your or the Group Site or the production of the Ancillary Exploitation, agency fees or costs incurred in connection with the collection and receipt of such gross monies in the United States) incurred with respect to such Ancillary Exploitation.

(b)    Notwithstanding the foregoing, Company hereby agrees to relinquish to You all rights of exclusivity in connection with the Group Site as set forth in Subparagraph 21(a) above and to quitclaim to You, any and all of Company's right in and to the registration of Your name as a URL upon the later of: (i) the expiration or termination of the Option Periods pursuant to Subparagraph 3(c)(i) above or (ii) the expiration of the options or failure to exercise the options set forth in Paragraphs 2(g) and 2(j) of the Television Agreement.

22.    Notwithstanding anything to the contrary contained herein, Company shall maintain separate accounts, which accounts shall not be cross-collateralized, for payment to the Group of income resulting from: (i) the exploitation by any means and in any medium of

252406v1

05/19/2005

ATLANTIC000695

the Masters; (ii) the exploitation of Compositions pursuant to Paragraph 12 above; (iii) the exploitation of merchandising rights in connection with Your name and likeness as set forth in Exhibit "A" hereto and (iv) income payable to You in connection with Your services provided in the Television Agreement. By way of example, and without limitation, Company shall not recoup recording costs incurred or monies advanced to You in connection with the production of the Masters hereunder from sums payable to You pursuant to the grant to Company of publishing rights contained in Paragraph 12 above.

23.     ARTIST MAINTAINS THE RIGHT TO SECURE COMPETENT LEGAL ADVICE AND REPRESENTATION IN CONNECTION WITH THE NEGOTIATION AND SIGNING OF THIS AGREEMENT OR TO KNOWINGLY AND VOLUNTARILY WAIVE SUCH RIGHT. ARTIST ACKNOWLEDGES THAT ARTIST UNDERSTANDS SUCH RIGHT AND HAS ACTED ACCORDINGLY IN CONNECTION WITH THE NEGOTIATION AND SIGNING OF THIS AGREEMENT.

Very truly yours,

REMOTE PRODUCTIONS INC.

By: _____
                An Authorized Signatory

ACCEPTED AND AGREED TO:

By: _____

SS#: _____

DOB: _____

252406v1

05/19/2005

ATLANTIC000696

EXHIBIT A

The following provisions of this Exhibit "A' attached to the agreement between Remote Productions Inc. ("Company") and _____ residing at _____ together with the additional members of the Group (as defined below) chosen by Company ("You," "Your" or "Artist"), dated _____, 2005 (the "Agreement"), shall be incorporated therein in accordance with the terms and conditions (the "Main Text") of the Agreement. Any capitalized terms not otherwise defined in this Exhibit "A," including Paragraph 4 entitled "Definitions," shall have that meaning as set forth in the Main Text of the Agreement.

1.     Royalty Calculations.

(a)     Company will accrue royalties to Artist as set forth in Paragraph 9(a) of the Main Text of the Agreement on Net Sales of Records, which royalty shall be computed by multiplying the Royalty Base Price, less the deductions hereafter provided, by the applicable percentage set forth in said Paragraph 9(a):

(i)     On Records sold in Canada, the royalty rate shall be Seventy-five percent (75%) of the otherwise applicable rate;

(ii)     On Records sold in the United Kingdom, the royalty rate shall two-thirds percent (66 2/3%) of the otherwise applicable rate; and

(iii)     On Records sold outside the United States, Canada and the United Kingdom, the royalty rate shall be fifty (50%) percent of the otherwise applicable rate.

(b)     Notwithstanding the foregoing:

(i)     On Records sold through a direct mail or mail order distribution method (including, without limitation through so-called "record clubs") or through any combination of the foregoing, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate, but in no event shall Your royalty in respect of those sales exceed an amount equal to fifty percent (50%) of the Net Receipts from the sale of those Records (whether or not sold by an affiliate of Company's);

(ii)     On Records sold for use as premiums, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate and the Royalty Base Price of those Records shall be deemed to be an amount equal to the monies actually received by Company from the sale of those Records, unless manufactured and sold by an affiliate or licensee of Company's, in which event the Royalty Base Price shall be deemed to be the price used by that affiliate or licensee in accounting to Company;

(iii)     On Mid-Price Records the royalty rate shall be two-thirds (2/3) of the otherwise applicable royalty rate, and on Budget Records the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate;

251031v1

Exhibit A-1

Revised 05/05/05

ATLANTIC000697

(iv)   On Records sold to the United States Government, its subdivisions, departments or agencies (including Records sold for resale through military facilities) or to educational institutions or libraries, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate;

(v)   On Singles and Long-Play Singles, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate for Albums, and on EPs the royalty rate shall be two-thirds (2/3) of the otherwise applicable royalty rate for Albums;

(vi)   On Records in the form of Digital Records the royalty rate shall be:

(A)   Seventy-five (75%) percent of the otherwise applicable royalty rate for all Digital Records other than Compact Discs; and

(B)   Eighty percent (80%) percent of the otherwise applicable royalty rate on Compact Discs;

(vii)   On Masters licensed by Company to others for their manufacture and sale of Records or for any other uses Your royalty shall be an amount equal to fifty percent (50%) of Company's Net Receipts from the sale of those Records or from those other uses of the Masters;

(viii)   On Audio-Visual Recordings embodying Your performances, Your royalty shall be as follows:

(A)   On Audio-Visual Recordings Your royalty shall be computed in accordance with the provisions Paragraph 9(a) of the Main Text and of this Exhibit "A" applicable to Albums, except on sales of Audio-Visual Recordings in the United States the royalty rate pursuant to Paragraph 9(a) of the Main Text shall be deemed to be six percent (6%).  For sales of Audio-Visual Recordings outside of the United States the relevant reduction provisions of this Exhibit "A" shall apply to said royalty of six percent (6%).  Notwithstanding anything to the contrary contained herein, the royalty payable to You pursuant to this Subparagraph (viii)(A) on the exploitation of Audio-Visual Recordings shall be inclusive of any royalties or other monies required to be paid or incurred by Company (or otherwise deducted from monies payable to Company) to any person, firm or corporation for the synchronization, reproduction and/or public performance of any master recording embodied in the Audio-Visual Recording in question and, without limiting any of Company's other rights or remedies hereunder or otherwise, Company shall have the right to deduct from the royalty payable to You pursuant to this Subparagraph (viii)(A) an amount equal to those sums required to be paid to any person, firm or corporation in connection therewith;

251031v1

Exhibit A-2

Revised 05/05/05

ATLANTIC000698

(B)   On Audio-Visual Recordings sold by any of Company non-affiliated licensees, Your royalty shall be an amount equal to fifty percent (50%) of Company's Net Receipts from the sale of those Audio-Visual Recordings.

(c)   Notwithstanding the foregoing:

(i)   No royalties shall be payable on Records furnished as free or bonus Records to members, applicants or other participants in any record club or other direct mail distribution method; on Records distributed for promotional purposes to radio stations, television stations or networks, record reviewers or other customary recipients of promotional Records; on so-called "promotional sampler" Records; on Records sold as scrap or as "cut-outs"; or on Records (whether or not intended for sale by the recipient) furnished on a no-charge or free basis (such as, but not limited to, Records commonly described in the record industry as "free goods" or "freebies"); or sold at less than fifty percent (50%) of their regular wholesale price to distributors, sub-distributors, dealers or others, whether or not the recipients thereof are affiliated with Company.  Company shall not distribute Records embodying solely Masters in the United States at no-charge for sale by the recipient thereof other than in accordance with Company's then-current general policy applicable at the time of Company's distribution of those Records which, in the United States on the date of this Contract, is that Company shall not distribute Records embodying solely Masters in the United States for sale by the recipient thereof in amount greater than fifteen percent (15%) of the aggregate number of Records distributed to such recipient for re-sale thereof;

(ii)   Royalties shall not be payable on Records sold at less than fifty percent (50%) of their regular wholesale price;

(iii)   For purposes of computing royalties, there shall be a so-called "packaging reduction" deducted from the Royalty Base Price (or other applicable price, if any, upon which royalties are calculated) of Records hereunder in an amount equal to twenty percent (20%) thereof for all Records in the form of cassette tapes and twenty-five percent (25%) thereof for Records in all other forms, including, without limitation, Compact Discs, whether now known or hereafter devised;

(iv)   The royalty payable to You hereunder on Records embodying Masters together with other master recordings shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be the number of Masters contained on that Record and the denominator of which shall be the total number of master recordings embodied on that Record; and

(v)   The royalty payable to You hereunder on a Master embodying Your performances jointly with any other artist or musician to whom Company is obligated to pay a royalty in respect of that Master shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the sum of one (1) and the total number of other artists or musicians whose performances are embodied on that Master.

251031v1

Exhibit A-3

Revised 05/05/05

ATLANTIC000699

2.    Royalty Payments and Accountings.

(a)    Company shall use its reasonable good faith efforts to cause the Distributor to account to You directly and to pay to You directly, royalties due to You hereunder. In such case as the Distributor agrees to account to You and pay You directly, You shall be accounted to and paid in the manner set forth in the Distribution Agreement. In the event the Distributor refuses to account to You directly, Company shall account and pay any royalties due You hereunder within sixty (60) days after Company's receipt of a royalty statement and payment from the Distributor less all Advances and other permissible charges under the Agreement. Company shall have the right to retain, as a reserve against returns or other charges or credits, such portion of payable royalties (but specifically excluding mechanical royalties payable to You hereunder) as shall be reasonable in its best business judgment. You shall reimburse Company on demand for any overpayments, and Company may also deduct the amount thereof from any monies payable to You under the Agreement. Royalties paid by Company on Records subsequently returned shall be deemed overpayments.

(b)    No royalties shall be payable to You on sales of Records or other exploitations of Masters by any of Company's affiliates or licensees until payment on those sales has been received by Company in the United States. Sales or other exploitations by an affiliate or licensee shall be deemed to have occurred in the semiannual accounting period during which that affiliate or licensee shall have rendered to Company and Company shall have received in the United States accounting statements and payments for those sales or other exploitations of Masters.

(c)    Royalties on exploitations of Masters outside of the United States shall be computed in the national currency in which Company's licensees or affiliates or other distributors pay Company, shall be credited to Your royalty account hereunder at the same rate of exchange at which Company's licensees or affiliates or other distributors pay Company and shall be proportionately subject to any foreign withholding or comparable taxes which may be imposed upon Company's receipts. You shall not be entitled to any portion of a tax credit which may be available to Company or to any of Company's licensees or affiliates in connection with any foreign taxes withheld from Company's receipts. If Company shall not receive payment in United States dollars in the United States for any exploitations of Masters outside of the United States, royalties on those exploitations shall not be credited to Your royalty account hereunder, provided, however, that upon Your request and if Company is able to do so, Company shall accept payment for those exploitations in foreign currency and shall deposit in a foreign bank or other depository, at Your expense, in that foreign currency, that portion thereof, if any, as shall equal the royalties which would have been payable to You under the Agreement and this Exhibit "A" on those exploitations had payment for those exploitations been made to Company in United States dollars in the United States. Deposit as aforesaid shall fulfill Company's royalty obligations hereunder as to those sales.

(d)    You shall be deemed to have consented to all royalty statements and other accountings rendered or required to be rendered by Company hereunder and each royalty statement and other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever, unless

ATLANTIC000700

You give Company written notice stating in detail the specific basis for that objection within one (1) year after the date such statement is required to be rendered. You may not maintain any action, suit, or proceeding of any nature against Company in respect of any royalty statement or other accounting rendered or required to be rendered by Company under the Agreement and this Exhibit "A" unless You commence that action, suit, or proceeding against Company in a court of competent jurisdiction within two (2) years after the date such statement was required to be rendered. If You shall commence an action, suit, or proceeding against Company concerning royalty statements or other accountings rendered or required to be rendered by Company to You under the Agreement and this Exhibit "A", the scope of that action, suit or proceeding shall be limited to a determination of the amount of royalties, if any, payable to You for the accounting periods in question, and Your sole remedy shall be the recovery of those royalties.

(e)   Company shall maintain accurate books and records concerning the sale of Records hereunder. You shall have the right to designate an independent certified public accountant on Your behalf (who shall not be compensated on a contingent fee basis), at Your own expense, to examine those books and records (but not any of Company's books or records relating to the manufacture of Records hereunder) solely for the purpose of verifying the accuracy of royalty statements and other accountings rendered by Company hereunder, only during Company's normal business hours, at Company's normal place of business and only upon at least sixty (60) days written notice. Company's books and records relating to a particular royalty statement or other accounting may be examined only within one (1) year after the date such statement or accounting is required to be rendered. Company shall have no obligation to permit You to examine Company's books or records relating to any particular royalty statement or other accounting more than once. Neither You nor Your independent certified public accountant or other representatives shall communicate at any time to any others or use on behalf of any other person, firm or corporation any facts or information obtained as a result of any such examination of Company's books and records. The rights hereinabove granted to You shall constitute Your sole and exclusive rights to examine Company's books and records.

(f)   Company shall have the right to deduct from any monies payable to You under the Agreement or this Exhibit "A" any amounts paid by Company to You or on Your behalf or to or on behalf of any person, firm or corporation representing You or any amount incurred by Company on Your behalf or on behalf of any person, firm or corporation representing You, if those monies are not otherwise required to be paid or incurred by Company under the Agreement or this Exhibit "A". Without limiting the foregoing, fifty percent (50%) of all amounts paid or incurred by Company for the services of independent third parties to promote sales of Records embodying Masters shall be recoupable from royalties earned by You hereunder and one hundred percent (100%) of all amounts paid to or incurred by Company for the services of independent publicists and marketing companies.

(g)   Company shall have the right to deduct from any monies payable to You under the Agreement or this Exhibit "A" any amounts which are required to be deducted from any of those monies under any statute, regulation, treaty or other law, or under any union or guild agreement, and You shall promptly execute and deliver to Company any forms or other documents as may be required in connection therewith. If Company fails for

251031v1                        Exhibit A-5                    Revised 05/05/05

ATLANTIC000701

any reason to deduct and instead pay any of those monies required to be deducted from monies payable to You hereunder, and if, as a result, Company is required by any statute, regulation, treaty or other law or union or guild agreement to pay to any third party any amounts which were paid to You but which were required to be deducted, then, without limiting any of Company's other rights or remedies in that event. You shall pay to Company, upon demand, the amount of those monies which were paid to You but which were required to be deducted, or, at Company's election, Company may deduct from any monies payable to You under the Agreement or this Exhibit "A" the amount of those monies paid to You but which were required to be deducted.

3.   Musical Composition Licenses.

   (a)   You hereby grant to Company the irrevocable non-exclusive right to reproduce each Controlled Composition on Records and to distribute those Records in the United States and Canada in accordance with the following terms and conditions:

      (i)   Mechanical royalties shall be payable for Controlled Compositions on Net Sales of Records in the United States and Canada at the following rates:

         (A)   On Records sold in the United States and Canada, the rate for each Controlled Composition embodied thereon shall be an amount equal to seventy-five (75%) percent of the minimum "Statutory Rate" (as hereinafter defined), without regard to playing time, for the reproduction of Musical Compositions as of the "Calculation Date" (as hereinafter defined) (the "Controlled Composition Statutory Rate");

         (B)   The term "Statutory Rate" shall mean the minimum compulsory license rate applicable to a single Musical Composition, without regard to playing time, in effect rant to the United States Copyright Act (or the recognized equivalent thereof in Canada) as of the Calculation Date.

         (C)   The term "Calculation Date" shall mean the date of satisfactory delivery to Company of the Masters embodying the applicable Musical Compositions, or, if earlier, the date on which such Masters embodying the applicable Musical Compositions were required to have been delivered to Company;

      (ii)   Notwithstanding the foregoing, the mechanical royalty rate on a Controlled Composition which is an arrangement of a public domain work shall be that percentage of the Controlled Composition Statutory Rate, in the United States or Canada, as applicable, that is equal to the percentage of the arrangement of the Controlled Composition which is original in the arrangement and therefore subject to copyright in accordance with the rules and regulations of ASCAP and/or BMI and for which ASCAP and/or BMI provides written documentation of that percentage of the originality in and to that arrangement of a Controlled Composition.

251031v1                         Exhibit A-6                    Revised 05/05/05

ATLANTIC000702

(iii)   The mechanical royalty rate for a Controlled Composition recorded in an EP, Long-Play Single, or Records sold through record clubs shall be three-fourths (3/4) of the Controlled Composition Statutory Rate and the mechanical royalty rate for a Controlled Composition recorded in a Mid-Priced Record or Budget Record shall be two-thirds (2/3) of the Controlled Composition Statutory Rate.  In the event any particular Record (including, without limitation, so-called "cassette singles") embodies more than one (1) of the same or different recordings of the same Controlled Composition, then mechanical royalties shall be payable only for one (1) reproduction of that Controlled Composition in that Record.  Notwithstanding anything to the contrary contained herein, mechanical royalties shall not be payable for the reproduction of any Controlled Composition on a Record unless the timing of the Controlled Composition in question as recorded in the Master embodied on that Record exceeds one (1) minute and thirty (30) seconds in length.

(b)   Notwithstanding anything to the contrary contained herein, for Net Sales of Records in the United States and Canada, the maximum aggregate mechanical royalty rate for all Selections, including Controlled Compositions, contained on a Record, regardless of the number of Selections contained thereon, shall be the product of: (A) the Controlled Composition Statutory Rate and (B) ten (10) for an Album, five (5) for an EP, and two (2) for a Single and a Long-Play Single.

(c)   If for any reason Company is required to pay mechanical royalties for the reproduction of all Selections (including Controlled Compositions) that are mechanically reproduced in a particular Record in excess of those applicable amounts set forth above in Subparagraph 3(b) of this Exhibit "A," the mechanical royalties payable by Company for the Controlled Compositions reproduced on Records hereunder shall be reduced by the amount of such excess, if that excess is greater than the amount of mechanical royalties payable for Controlled Compositions on the Record in question, then upon Company's demand, You shall pay to Company an amount equal to the amount by which those excess mechanical royalties exceed the mechanical royalties payable for the Controlled Compositions, or, **in addition to all of Company's other rights and remedies, Company may deduct the amount of that excess from any and all royalties or other monies payable to You under the Agreement and or the Exhibit "A."**

(d)   Notwithstanding anything to the contrary contained herein, royalties for the mechanical reproduction of any Selection in any Record distributed in the United States or Canada shall be payable only on Net Sales of that Record in question for which a Record royalty is payable pursuant to Paragraph 9(a) of the Agreement and Paragraph 1 of this Exhibit "A."

(e)   Company shall account for and pay royalties for the mechanical reproduction of Controlled Compositions in accordance with the provisions of Paragraph 2 of this Exhibit "A."

(f)   Upon Company's request, You shall cause the issuance to Company and its designees of licenses to mechanically reproduce all Selections on Records distributed outside the United States and Canada on terms no less favorable to Company and its designees than those generally applicable to Record manufacturers in each country in question.  The obligation to account for and pay royalties for the mechanical reproduction of

251031v1                         Exhibit A-7                        Revised 05/05/05

ATLANTIC000703

Selections on sales of Records outside of the United States shall be that of Company's affiliates and/or licensees.

(g)    If the copyright in any Controlled Composition, or Selection which is not a Controlled Composition mechanically reproduced on Records hereunder, is owned or controlled by a person, firm or corporation other than You, You shall cause that person, firm or corporation to grant to Company and its designees the same rights as You are required to grant to Company and its designees pursuant to this Paragraph 3 of this Exhibit "A."

(h)    You hereby grant to Company and its designees at no fee, royalty or other cost to Company or its designees, the irrevocable, non-exclusive, worldwide right in perpetuity to reproduce and publicly perform each Controlled Composition in Audio-Visual Recordings, to distribute those Audio-Visual Recordings and to otherwise exploit in any manner and through any media, those Audio-Visual Recordings. You shall, upon Company's request, cause the issuance to Company and its designees, at no fee, royalty or other cost to Company or its designees, the irrevocable, non-exclusive, worldwide right in perpetuity to reproduce and publicly perform each Selection which is not a Controlled Composition in Audio-Visual Recordings, to distribute those Audio-Visual Recordings and to otherwise exploit in any manner or media those Audio-Visual Recordings. If Company or its designees shall pay any such fee, royalty or other cost, then You shall, upon Company's demand, pay to Company the amount thereof; or Company may, in addition to all of its other rights and remedies, deduct that amount from any monies payable to You under the Agreement and/or this Exhibit "A."

(i)    Any assignment, license or other agreement made with respect to Controlled Compositions shall be subject to the terms of the Agreement and this Exhibit "A."

(j)    You hereby grant to Company and its designees the irrevocable right throughout the universe in perpetuity to: (i) print and reproduce on the packaging of Records the title and lyrics to each Controlled Composition embodied in a Master; and (ii) digitally encode in a Master or transmit together with the transmission of the Master the title and/or lyrics to each Controlled Composition embodied in a Master, all without payment to You or any other person, firm or corporation of any monies or other consideration in connection therewith. In addition, You shall cause to be granted to Company and its designees the irrevocable right throughout the universe in perpetuity to: (i) print and reproduce on the packaging of Records embodying Masters the title and lyrics to each Selection which is not a Controlled Composition and is embodied in a Master; and (ii) digitally encode in a Master or transmit together with the transmission of the Master the title and/or lyrics to the each Selection which is not a Controlled Composition and is embodied in the Master, all without payment to You or any other person, firm or corporation of any monies or other consideration in connection therewith. If Company is required to pay any monies to any person, firm or corporation for the printing, reproduction, encoding, or transmission of the title or lyrics of any Selection (including a Controlled Composition) recorded in a Master as aforesaid, then You shall, upon Company's demand, pay to Company an amount equal to those monies paid by Company in connection therewith, or in the alternative, Company may, in addition to all of its other rights or remedies, deduct that amount from any monies payable to You hereunder.

251031v1                           Exhibit A-8                           Revised 05/05/05

ATLANTIC000704

4.      Definitions.

(a)      The term "Album" shall mean a twelve (12) inch thirty-three and a third (33-1/3) rpm long-playing vinyl-disc Record of no fewer than forty-five (45) minutes in playing time or its cassette tape or other equivalent or substantial equivalent in any form or configuration.

(b)      The term "Audio-Visual Recording" shall mean a Master Recording embodying visual images.

(c)      The term "Budget Record" shall mean a Record which bears a Royalty Base Price in the applicable country which is sixty-six and two-thirds (66-2/3%) percent or less of the Royalty Base Price in that country of top-line Records distributed in that country by Company or its designees or licensees.

(d)      The term "Compact Disc" shall mean a Record in any configuration (e.g., Album, Single, EP) in disc form primarily reproducing sound (but not together with visual images), the signals of which are read and transmitted from that disc by means of laser.

(e)      The term "Controlled Composition" shall mean a Musical Composition or other Selection, written or composed by You, in whole or in part, alone or in collaboration with others, or which is owned or controlled, in whole or in part, directly or indirectly, by You, or any person, firm or corporation in which You have a direct or an indirect interest.

(f)      The term "Digital Records" shall mean Records in any configuration (e.g., Album, Single, EP), the signals of which are encoded and decoded by digital technology, whether now known or hereafter devised, as opposed to analog technology, and shall include, without limitation, Compact Discs, digital audio tapes, mini discs and digital compact cassettes.

(g)      The term "Long-Play Single" shall mean a twelve (12) inch thirty-three and a third (33-1/3) rpm or forty-five (45) rpm vinyl-disc Record or other equivalent or substantial equivalent in any form or configuration, embodying one (I) or more recordings of no more than three (3) different Musical Compositions.

(h)      The term "Master" shall mean a master recording embodying Your performances recorded during the Term of the Agreement.

(i)      The term "Mid-Price Record" shall mean a Record bearing a Royalty Base Price in the country in question in excess of sixty-six and two-thirds (66-2/3%) percent and less than eighty percent (80%) of the Royalty Base Price in that country of top-line Records distributed in that country by Company or its designees or licensees.

(j)      The terms "Musical Composition" and "Composition" shall mean a single musical composition.

(k)      The term "Net Receipts" shall mean the gross monies received by Company from a person, firm or corporation from the applicable exploitation by that person, firm or corporation of rights in Masters, less all costs paid or incurred by Company in connection

251031v1                          Exhibit A-9                          Revised 05/05/05

ATLANTIC000705

with the exploitation of those rights and the collection of those monies, less all taxes and adjustments and less all royalties or other sums payable by Company to any person, firm or corporation in connection with the exploitation of those rights, including, without limitation, royalties for the mechanical reproduction of the Selections (including Controlled Compositions) embodied in those Masters but excluding royalties or other sums payable to individual producers of those Masters, which shall be borne solely by You. Notwithstanding the foregoing, with respect to Company's calculation of Net Receipts in connection with the exploitation of Audio-Visual Recordings, in addition to those deductions set forth above in this Paragraph 4(k), Company shall also deduct from the gross monies received by Company in connection with each applicable exploitation of such Audio-Visual Recording twenty percent (20%) of those monies as a distribution fee.

(l)   The term "Net Sales" shall mean ninety percent (90%) of gross sales for which final payment has been received by Company in the United States, after deducting from gross sales, returns, credits and reserves against anticipated returns and credits.

(m)   The term "Record" shall mean every form of reproduction (whether now known or unknown), embodying sound alone, or sound with a visual image, distributed primarily for home use, school use, jukebox use and use in means of transportation.

(n)   The term "Royalty Base Price" shall mean the following amounts for the following Records:

(i)   With respect to Records (other than Audio-Visual Records) sold in the United States or Canada, the "SRLP". As used herein, "SRLP" shall mean, unless otherwise set forth herein, those suggested retail list prices established by Company or its affiliates, designees or licensees from time to time for Records in a particular configuration, which shall be determined from time to time in a manner that shall be applied consistently to a majority of Company's (or its licensees', designees' or affiliates') then-current recording artists. With respect to Records that are distributed by telephone, satellite, cable or other direct transmissions over wire or through the air, the term "SRLP" shall mean either those suggested retail list prices therefore, if any, established by Company or its affiliates, designees or licensees in accordance with the terms of the preceding sentence or those retail list prices charged to the ultimate consumer therefore, excluding any shipping and handling charges in connection therewith;

(ii)   With respect to Records (other than Audio-Visual Recordings) sold outside of the United States and Canada:

(A)   If an SRLP is established or utilized by Company's licensee (whether or not affiliated with Company) in a particular country in accounting to Company, then that particular SRLP established or utilized by Company's licensees shall apply to Records hereunder; and

(B)   If an SRLP is not established or utilized by Company's licensee (whether or not affiliated with Company) in a particular country in accounting to Company on sales of

251031v1                        Exhibit A-10                    Revised 05/05/05

ATLANTIC000706

Records, then, at Company's election: (1) the price upon which mechanical royalties are generally computed and paid by major record companies (including, without limitation, Company's then-current principal distributor) in the country in question pursuant to the then-current agreement between major record companies and the mechanical reproduction rights society in that country; or (2) an amount computed by multiplying the lesser of: (aa) that percentage utilized by Company's affiliate or licensee in computing a retail related price or constructed price on which royalties are paid to Company and (bb) one hundred twenty-six percent (126%), by the lowest of the so-called "published price to dealers;" (bb) the lowest wholesale price paid to Company or its affiliate's or licensee's principal distributor in the country in question by the largest category of customers during the relevant semi-annual accounting period and (cc) the wholesale price which Company's licensee (whether or not affiliated with Company) in a particular country uses in accounting to Company for royalties;

(iii)    With respect to Audio-Visual Recordings sold in any territory of the universe, an amount equal to the monies actually received by Company in the United States (or credited to Company in final reduction of an advance previously received by Company in the United States from the sale of those Audio-Visual Recordings, after deduction of a distribution fee of twenty percent (20%) of those monies; and

(iv)    There shall be deducted from the Royalty Base Price an amount equal to any excise, sales, value-added or comparable or similar taxes which are included therein.

(o)    The term "Single" shall mean a seven (7) inch vinyl-disc Record or its cassette tape or other equivalent or substantial equivalent in any form or configuration.

(p)    The term "Selection" shall mean a Musical Composition, poem, dramatic work, comedy routine, or other verbal expression.

251031v1

Exhibit A-11

Revised 05/05/05

ATLANTIC000707



9.    (a)    In full consideration of all services rendered by You, individually and as part of the Group, and all of the rights granted by You to Company herein, and subject to Your and the Group's performance of all of the material terms hereof, with respect to Net Sales of Records in the United States embodying Master Recordings through normal retail channels ("USNRC Net Sales"), Company shall credit the Group's royalty account with the following percentages of the Royalty Base Price (as defined in the Distribution Agreement or Exhibit "A", as applicable and subject to the terms of Paragraph 11 hereof) which is set forth in the Distribution Agreement or that which is set forth in Exhibit "A" attached hereto, if applicable:

| ALBUM | ROYALTY |
|---|---|
| First | 12% |
| Second | 13% |
| Third & Fourth | 14% |
| Fifth & Sixth | 15% |

Notwithstanding the foregoing, the royalty rate set forth in the schedule immediately above with respect to each particular Album (the "Basic Rate") shall be escalated as follows: (A) in the event USNRC Net Sales of the Album concerned exceeds two million (2,000,000) units, the Basic Rate for all such sales of said Album in excess of two million (2,000,000) units but not greater than three million (3,000,000) units shall be increased by one-half (1/2%) percent; and (B) in the event USNRC Net Sales of the Album concerned exceeds three million (3,000,000) units, the Basic Rate for all such sales of said Album in excess of three million (3,000,000) units shall be increased by an additional one-half (1/2%) percent. The royalty set forth in the schedule immediately above in connection with the Album concerned (the Basic Rate) All royalties payable to Company by the Distributor pursuant to the Distribution Agreement in excess of the royalties payable to You hereunder shall be retained by Company. Accordingly, "Your Proportionate Share" of such royalties payable by the Distributor (or as used elsewhere herein) shall mean a fraction, the numerator of which shall be equal to the royalty payable to the Group hereunder with respect to USNRC Net Sales of the Album concerned, and the denominator of which shall be equal to the total "all-in" basic royalty payable under the Distribution Agreement for the Album concerned. In the event the Royalty Base Price contained in the Distribution Agreement is not derived from the suggested retail list price of the Album concerned, the penny-rate royalty payable to You and/or the Group hereunder shall be no less than the applicable Basic Rate provided above of the suggested retail list price as reduced by the applicable container charge and other standard reductions for the configuration concerned in order to derive the applicable Royalty Base Price upon which to calculate royalties hereunder.

(i)    The royalty payable to the Group, collectively, for singles, long-playing singles, foreign sales, budget records, mid-priced records, compact discs, club sales and other sales or uses of the Masters produced hereunder shall be reduced and pro-rated in the same proportion that Company's Basic Rate (as defined in the Distribution Agreement) is reduced and pro-rated pursuant to the Distribution Agreement. All royalties payable to the Group hereunder shall be computed, determined, calculated and paid in the same manner (e.g., container charges, free goods, definition of suggested retail list price or equivalent royalty base, percentages of sales, reserves, etc.) as royalties payable to Company by Distributor are computed, determined, calculated and paid pursuant to the Distribution

252406v1

05/19/2005

ATLANTIC000727

Agreement. With respect to exploitation of the Masters for which the royalty payable to Company under the Distribution Agreement is calculated as a percentage of net receipts or the like, the Group's royalty shall be equal to the Group's Proportionate Share of those monies payable to Company by the Distributor under the Distribution Agreement.

(b)     The royalty payable to the Group hereunder includes all royalties payable to the Group and any other person(s) engaged by the Group or Company for or in connection with the creation and recording of, or the acquisition of rights in, the Masters including, without limitation, all royalties payable to any individual producer(s) of the Masters (including any of Company's "in-house" staff producers). Each individual producer of Masters hereunder shall be paid a royalty to be determined by Company with Your consent, not to be unreasonably withheld or delayed, provided that Your consent shall hereby be deemed given for the payment of a royalty to any such individual producer not to exceed four percent (4%) of the applicable Royalty Base Price (as defined in the Distribution Agreement or Exhibit "A" attached hereto, if applicable) for Net Sales of Albums solely embodying Masters produced hereunder. Notwithstanding the foregoing sentence, in the event that the individual producer is a so-called "A-level" producer (i.e., Sean "Puffy" Combs) and requires a royalty of more than four percent (4%), then Your and the Group consent shall automatically be deemed given for the higher producer royalty, provided that the producer has received such a royalty from other artists.

(c)     Company may elect from time to time to compute and pay the Group's royalties hereunder on a wholesale base rather than a retail base as provided herein, as long as such computation does not materially affect the net amount of royalties otherwise payable to the Group or Company at that time hereunder.

(d)     Company shall use its reasonable good faith efforts to cause the Distributor to account to the Group directly and to pay to the Group directly royalties due to the Group hereunder. In such case as the Distributor agrees to account to the Group and pay the Group directly, the Group shall be accounted to and paid in that manner set forth in the Distribution Agreement, the applicable provisions of which shall be provided to the Group upon the Group's request. In the event the Distributor refuses to account to the Group directly, Company shall account and pay any royalties due to the Group hereunder within sixty (60) days after Company's receipt of a royalty statement and payment from the Distributor. Company may deduct from any royalty due to the Group under this Agreement pursuant to Paragraphs 9, 10, or 12 hereof or Paragraph 10 of Exhibit "A" any amount You, or any member of the Group, may owe Company hereunder or otherwise. Company shall have the absolute right in accounting to the Group to rely upon the statements received by Company from the Distributor and Company shall not be responsible in any manner for any error, omission or other inaccuracy of any such statement. Notwithstanding the foregoing, any payment made by the Distributor in connection with such an error or inaccuracy shall be shared pro-rata between Company and the Group in accordance with the provisions contained herein. The Group, collectively, shall have the right to audit Company's books and records relating to the sale of records hereunder, but the Group's right to audit Company, to object to statements and institute a law suit in respect thereof shall be subject to the same terms, conditions and restrictions as are contained in the accounting provisions of the Distribution Agreement, and the deadline dates by which the Group shall be required to object to statements and to institute law suits in respect thereof shall be the dates six (6) months prior to the deadline dates by which Company is required to object to statements

252406v1

05/19/2005

ATLANTIC000728



rendered by the Distributor and to institute law suits in respect thereof pursuant to the Distribution Agreement. Unless otherwise agreed in writing, You, individually, or the Group shall not be permitted to audit the books and records of the Distributor for any reason, however, as good business practice requires, the Group shall have the right, by providing to Company written notice of the Group's request, to cause Company to audit the books and records of the Distributor on its and the Group's behalf in accordance with the terms of this Paragraph 9(d).

(e)   In the event of any commercial exploitation of Videos produced hereunder by the Distributor, the royalty payable to the Group hereunder in connection therewith shall be equivalent to the Group Proportionate Share of the "all-in" royalty which is payable to Company under the Distribution Agreement with respect to the particular exploitation concerned.

10.   (a)   You shall issue mechanical licenses to the Distributor and its designees for Controlled Compositions as defined in the Distribution Agreement, at the dates and on the terms (including, without limitation, those provisions relating to aggregate mechanical royalty limits and licenses for the use of Controlled Compositions in audiovisual programs) set forth in the Distribution Agreement. Company shall use its reasonable good faith efforts to cause the Distributor to (i) pay to the Group mechanical royalties at a rate equivalent to seventy-five (75%) percent of the minimum statutory rate in effect in the United States (or the equivalent thereof in Canada) on the date of initial release in the United States of the Master concerned (the "United States Statutory Rate"); and (ii) pay to the Group aggregate mechanical royalties for the Album concerned not in excess of eleven (11) times seventy-five (75%) percent United States Statutory Rate (or the equivalent thereof in Canada). Accordingly, Company shall use its reasonable good faith efforts to ensure that the so-called "aggregate mechanical royalty cap" for Albums under the Distribution Agreement shall not be less than eleven (11) times seventy-five (75%) percent of the United States Statutory Rate (or the equivalent thereof in Canada).

(b)   If Company or the Distributor is required to pay any mechanical royalties in excess of the aggregate maximum mechanical royalties set forth in the Distribution Agreement, the Group shall be responsible for such excess mechanical royalties. Any such excess mechanical royalties for which the Group are responsible may be applied by the Distributor, Company's publishing designee, or Company in reduction of mechanical royalties otherwise payable to the Group or, at Company's or the Distributor's election, Company may deduct the amount of such excess from any and all sums otherwise payable to You and/or the Group hereunder. Notwithstanding the foregoing or anything to the contrary contained herein, if Company or the Distributor is required to reduce record royalties payable to You and/or the Group hereunder as a result of the applicable party's obligation to pay excess mechanical royalties, the Group shall only be responsible for, and the Group's record royalty shall only be reduced by, the Group's Proportionate Share of such excess mechanical royalties.

11.   Notwithstanding the foregoing provisions of Paragraphs 9 and 10 above or anything to the contrary contained herein, in the event Company on its own distributes the Masters hereunder or in the event the Distribution Agreement does not contain royalty calculation' provisions, mechanical royalty provisions or accounting provisions which embody terms, conditions, limitations and deadline dates with respect to all of the aforementioned, those

252406v1

ATLANTIC000729

royalty calculation, mechanical royalty and accounting provisions embodied within Exhibit "A" attached hereto and incorporated herein by this reference shall govern with respect to the same, provided that upon the Group's written request, the Group and Company shall negotiate in good faith the terms and conditions contained in said Exhibit "A." Further and in connection with the foregoing, in the event Company on its own distributes the Masters hereunder, or subsequent to the full execution of the Distribution Agreement (in the event the Distribution Agreement does not contain royalty and accounting provisions), upon Your request, You and Company shall negotiate in good faith those terms and conditions contained within Exhibit "A" but unless and until such time, if any, as You and Company do so, this Agreement complete with the terms and conditions of Exhibits "A" shall constitute a valid and binding contract and shall control.

12.    (a)    You hereby irrevocably and absolutely assign, convey and set over to Company or Company's publishing designee ("Publisher") an undivided fifty (50%) percent interest in Your share of the worldwide copyright (and all renewals and extensions thereof) and all other rights in and to each musical composition written, owned or controlled, in whole or in part by You during the Term hereof and embodied in a Master delivered to Company hereunder (each such musical composition is hereinafter referred to as a "Composition"). You shall retain the remaining fifty (50%) percent thereof. For the purpose of this Paragraph 12(a) only, "You" shall refer only to that individual or Group members who actually write(s) such musical Compositions.

(b)    (i)    Publisher shall be the exclusive administrator of all rights in and to each such Composition, and it shall be entitled to exercise any and all rights with respect to the control, exploitation and administration of each Composition, including without limitation, the sole right to grant licenses, collect all income and to use the name, likeness and biographical material of each composer, lyricist and songwriter hereunder in connection with each applicable Composition for the full term of copyright (including all renewals and extensions thereof) in and to each Composition. Notwithstanding the foregoing, Company shall not, without your prior consent, license to any third party the right to synchronize any Composition in a motion picture with a rating below "N-C 17" or in any radio or television commercial of a political or religious in nature; and

(ii)    Without limiting the generality of the foregoing, BMI or ASCAP (hereinafter collectively referred to as the "Society") shall be authorized and directed to pay the Publisher's share of performance fees collected by the Society with respect to public performances of Compositions in the United States and Canada directly to Publisher.

(c)    You represent and warrant that the Compositions are original and do not infringe upon or violate the rights of any other person and that You have the full and unencumbered power and authority to grant to Publisher all of the rights herein granted to Publisher. You will indemnify Publisher against any loss, damage or expense (including reasonable attorney's fees) in respect of any claims, demands, liens or encumbrances arising out of Your breach hereof Publisher shall have the benefit of all warranties and representations given by the writers of the Compositions.

252406v1

05/19/2005

ATLANTIC000730

(d)    From all royalties earned and received by Publisher in the United States from the exploitation of the Compositions throughout the world (the "Gross Receipts"), Publisher shall:

(i)    Deduct and retain an administration fee equal to a percentage of Gross Receipts, which percentage is equivalent to that percentage of gross income charged to Publisher as an administration fee by its bona-fide third party music publishing administrator (currently Famous Music Publishing) of Publisher's musical composition catalogue;

(ii)    Deduct and retain all direct out-of-pocket costs incurred by Publisher in connection with the registration of and administration of copyrights in and to the Compositions;

(iii)    Deduct and pay royalties payable to the writers of the Compositions (which You warrant and represent shall not exceed fifty (50%) percent of the Gross Receipts) after deduction of the amounts set forth in Subparagraphs (i) and (ii) above, and which shall not include any share of Publisher's share of public performance income; and

(iv)    Pay to You an amount equal to fifty (50%) percent of the balance remaining after deducting the aggregate sums set forth in Subparagraphs (i), (ii) and (iii) above, and the remaining (50%) percent thereof shall be retained by Publisher for its sole use and benefit.

(e)    Accountings for such royalties shall be rendered semi-annually subject to all the terms and provisions (including those relating to the examination of Company's books and records) of Exhibit A" hereof.

(f)    Any assignment made of the ownership or copyright in, or right to license the use of, any Compositions referred to in this Paragraph 12 shall be made subject to the provisions hereof.

(g)    You shall promptly provide Publisher with a copy of Your songwriter agreement, if any and if applicable, with the writer of each Composition or such other agreement evidencing Your rights in and to such Composition, and You shall provide Publisher with copies of such agreements with respect to Compositions not yet created promptly after their creation.

(h)    You shall execute and deliver to Publisher any documents (including, without limitation, assignments of copyright and Publisher's standard co-publishing and songwriter agreements (subject to negotiation of the non-substantive provisions thereof) which Publisher may reasonably require to vest in Publisher and/or its designees the copyright and other rights herein granted to Publisher in respect of each Composition. If You shall fail to promptly execute document, You hereby irrevocable grant to Publisher a power of attorney to execute such document in Your name.

(i)    In consideration for the foregoing grant of rights to Publisher and assignment of copyrights in and to the Compositions hereunder, Publisher shall pay to You the following Advances in each Contract Period of the Term hereof. Notwithstanding the

252406v1

05/19/2005

ATLANTIC000731

foregoing, the below Advances shall only be divided amongst and payable to those members of the Group who are writers and/or co-writers of the Compositions and shall be divided on a pro-rata basis by the number of Compositions included on the applicable Group album.

| CONTRACT PERIOD | PUBLISHING ADVANCE |
|---|---|
| First | $10,000.00 |
| Second | $15,000.00 |
| Third | $20,000.00 |
| Fourth | $25,000.00 |
| Fifth | $30,000.00 |
| Sixth | $35,000.00 |

The foregoing Advances shall be fully recoupable from any monies payable to You pursuant to this Paragraph 12 or any successor co-publishing agreement between You and Publisher. The immediately aforementioned Advances shall be payable to You (i) one-half (1/2) upon Your commencement of recording of the Album required to be delivered to Company hereunder during the Contract Period concerned, and (ii) the balance upon Your delivery to Company of such Album, provided that such Album contains at least three (3) full Compositions. In the event that the Album concerned does not contain three (3) full Compositions, the balance of the advance payable to You with respect thereto shall be reduced proportionately.

(j)     During the Term of this Agreement You shall not assign any ownership rights in and to any compositions written, composed or controlled, in whole or in part, by You and not embodied on Masters delivered to Company hereunder ("Outside Compositions") or enter into any publishing or administration agreement with a third party in connection with such Outside Compositions unless and until You have first offered to Publisher by notice in writing the option to enter into such an agreement with You, and You and Publisher have failed to negotiate the material terms of such an agreement within thirty (30) days from the date of Publisher's receipt of such written notice. In the event You and Publisher have not entered into a publishing or administration agreement with respect to the Outside Compositions as immediately aforementioned, You shall not enter into any such agreement with a third party unless and until: (A) You have notified Publisher of all material terms and conditions of, and parties to, the proposed agreement pursuant to which any such rights in and to the Outside Compositions ("Publishing Rights") are to be granted; and (B) You offer to enter into an agreement with Publisher containing the same terms and conditions described in such notice. If Publisher does not accept such offer within thirty (30) days following its receipt thereof, You may then enter into such proposed agreement with the parties identified in said notice, provided that such agreement is consummated within sixty (60) days after the expiration of such thirty (30) days upon the same terms and conditions as set forth in the aforesaid notice. If such agreement is not so consummated, no party other than Publisher will be authorized to enter an agreement for Your Publishing Rights unless You again offer to enter into an agreement with Publisher pursuant to this Paragraph 12. Publisher shall not be required, as a condition to accepting any offer made pursuant to this Subparagraph 12(j), to agree to any terms or conditions contained in the proposed agreement which cannot be fulfilled by Publisher as readily as by the party to the proposed agreement.

252406v1

05/19/2005

ATLANTIC000732

13.   (a)   You warrant and represent that: (i) You have the right to enter into and fully perform this Agreement; and (ii) You are not a party to any agreement which would in any way interfere with or restrict Company's ability to make or enter into the Distribution Agreement or any of the Company's rights hereunder. You further affirm each applicable representation and warranty made in the Distribution Agreement and agree that You shall be bound thereby as though each such representation and warranty were incorporated herein. You further agree to execute any so-called "Inducement Letter" as may be required by any Distributor.

(b)   You acknowledge and agree that Your services are unique and extraordinary and that Company shall be entitled to injunctive relief to enforce the provisions of this Agreement and our rights hereunder.

(c)   You further acknowledge and agree that Your breach of any representation, covenant, warranty, or obligation under any or all of the Program Agreements, including, without limitation, the Television Agreement, shall be deemed a breach of this Agreement. You acknowledge and agree that Company's remedies hereunder and under any and all of the Program Agreements shall be cumulative.

(d)   You will at all times indemnify and hold harmless Company; the Distributor and Company's and Distributor's respective licensees, successors and assigns from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by You of any warranty or representation made by You in this Agreement, provided that no such claim or action shall be settled without Your consent, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Company shall be entitled to settle, without Your consent, any claim to which the indemnity herein applies, provided that any such claim is less than seven thousand five hundred ($7500.00) dollars. You will reimburse Company and/or the Distributor and/or their respective successors, assigns and licensees on demand for payment made at any time after the date hereof in respect of any liability or claim in respect of which Company, the Distributor or Company's and Distributor's respective successors, assigns and licensees are entitled to be indemnified. Pending the resolution of any such claim, Company shall have the right to withhold moneys which would otherwise be payable to You under this Agreement in an amount reasonably related to Your potential liability to Company under this Subparagraph 13(d). If no litigation on the claim concerned has been commenced within one (1) year after Company or the Distributor is first notified of it, Company will release any such monies then being held by Company by reason of that claim, upon Your request, unless Company anticipates upon reasonable grounds that such litigation may be commenced and provided that Distributor has released such monies to Company in the event it has withheld monies in accordance with the provisions of the Distribution Agreement. Company will undertake to notify You of any such claim, but Company's failure to notify You will not constitute a breach of this Agreement or impair Company's rights under this Subparagraph 13(d) or otherwise. Company will notify You of any action commenced on such a claim. You may participate in the defense of any such claim through counsel of Your selection at Your own expense, but Company will have the right at all times, in Company's sole discretion to retain or resume control of the conduct of the defense.

14.   You hereby agree that if, in accordance with the provisions of the Distribution Agreement, the Distributor shall elect to cause You to render Your services directly to the

252406v1

05/19/2005

ATLANTIC000733

submitted to the courts of the State of New York or the federal courts within the State of New York, which courts shall have exclusive jurisdiction thereof.

20.    All notices required hereunder or which either party desires to serve upon the other shall be in writing and sent to the addresses set forth on Page 1 of this Agreement or to such other address as either party may hereafter designate in writing, and shall be deemed given when delivered personally, with a receipt signed by a principal or officer of the deliveree; when deposited, postage prepaid, in the United States mail (certified or registered mail, return receipt requested, in all cases other than royalty statements); or when deposited, toll prepaid in any telegraph office in the United States. A copy of any notice to Company shall be simultaneously sent to Bad Boy Records c/o Kenny Meiselas of Grubman, Indursky & Schindler located at 152 West 57th Street, New York, New York 10019.

21.    (a)    Company and its licensees shall have the exclusive right, throughout the world, and shall have the exclusive right to authorize any third parties, to create, maintain and host any and all websites relating to You and the Group and to register and exclusively use of Your and the Group's name and any variations thereof which embody Your or the Group's name as Uniform Resource Locators (or "URL's"), addresses or domain names for each website created by Company in respect to You or the Group (each a "Group Site"). All such websites and all rights thereto and derived therefrom shall be Company's property throughout the Territory and in perpetuity. As used herein, the term "Ancillary Exploitation" shall mean: (i) the leasing of commercial advertising space to third parties or entities other than Company or any of its licensees, assigns or designees on Your or on the Group Site; (ii) the placement on Your or on the Group Site of links to so-called "e-commerce" websites owned or controlled by third parties or entities other than Company or any of its licensees, assigns or designees; and (iii) the inclusion on phonograph records of web browsers, software applications, utilities or website links of third parties or entities other than Company or any of its licensees, assigns or designees. In connection with any Ancillary Exploitation, Company shall pay to the Group fifty percent (50%) of its Net Receipts (as hereinafter defined) that are readily and directly attributable to such Ancillary Exploitation. As used in this Subparagraph 21(a), "Net Receipts" shall mean the gross monies received by Company in connection with the applicable Ancillary Exploitation less all direct expenses (including, without limitation, advertising sales commissions or fees, taxes, fees incurred in connection with the creation of Your or the Group Site or the production of the Ancillary Exploitation, agency fees or costs incurred in connection with the collection and receipt of such gross monies in the United States) incurred with respect to such Ancillary Exploitation.

(b)    Notwithstanding the foregoing, Company hereby agrees to relinquish to You all rights of exclusivity in connection with the Group Site as set forth in Subparagraph 21(a) above and to quitclaim to You, any and all of Company's right in and to the registration of Your name as a URL upon the later of : (i) the expiration or termination of the Option Periods pursuant to Subparagraph 3(c)(i) above or (ii) the expiration of the options or failure to exercise the options set forth in Paragraphs 2(g) and 2(j) of the Television Agreement.

22.    Notwithstanding anything to the contrary contained herein, Company shall maintain separate accounts, which accounts shall not be cross-collateralized, for payment to the Group of income resulting from:  (i) the exploitation by any means and in any medium of

252406v1

05/19/2005

ATLANTIC000708

the Masters; (ii) the exploitation of Compositions pursuant to Paragraph 12 above; (iii) the exploitation of merchandising rights in connection with Your name and likeness as set forth in Exhibit "A" hereto and (iv) income payable to You in connection with Your services provided in the Television Agreement. By way of example, and without limitation, Company shall not recoup recording costs incurred or monies advanced to You in connection with the production of the Masters hereunder from sums payable to You pursuant to the grant to Company of publishing rights contained in Paragraph 12 above.

23.     ARTIST MAINTAINS THE RIGHT TO SECURE COMPETENT LEGAL ADVICE AND REPRESENTATION IN CONNECTION WITH THE NEGOTIATION AND SIGNING OF THIS AGREEMENT OR TO KNOWINGLY AND VOLUNTARILY WAIVE SUCH RIGHT.  ARTIST ACKNOWLEDGES THAT ARTIST UNDERSTANDS SUCH RIGHT AND HAS ACTED ACCORDINGLY IN CONNECTION WITH THE NEGOTIATION AND SIGNING OF THIS AGREEMENT.

Very truly yours,

REMOTE PRODUCTIONS INC.

By: _____
        An Authorized Signatory

ACCEPTED AND AGREED TO:

By: _____

SS#: _____

DOB: _____

252406v1

05/19/2005

ATLANTIC000709

## EXHIBIT A

The following provisions of this Exhibit "A" attached to the agreement between Remote Productions Inc. ("Company") and _____ residing at _____ together with the additional members of the Group (as defined below) chosen by Company ("You," "Your" or "Artist"), dated _____, 2005 (the "Agreement"), shall be incorporated therein in accordance with the terms and conditions (the "Main Text") of the Agreement. Any capitalized terms not otherwise defined in this Exhibit "A," including Paragraph 4 entitled "Definitions," shall have that meaning as set forth in the Main Text of the Agreement.

1.      Royalty Calculations.

(a)     Company will accrue royalties to Artist as set forth in Paragraph 9(a) of the Main Text of the Agreement on Net Sales of Records, which royalty shall be computed by multiplying the Royalty Base Price, less the deductions hereafter provided, by the applicable percentage set forth in said Paragraph 9(a):

(i)     On Records sold in Canada, the royalty rate shall be Seventy-five percent (75%) of the otherwise applicable rate;

(ii)    On Records sold in the United Kingdom, the royalty rate shall two-thirds percent (66 2/3%) of the otherwise applicable rate; and

(iii)   On Records sold outside the United States, Canada and the United Kingdom, the royalty rate shall be fifty (50%) percent of the otherwise applicable rate.

(b)     Notwithstanding the foregoing:

(i)     On Records sold through a direct mail or mail order distribution method (including, without limitation through so-called "record clubs") or through any combination of the foregoing, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate, but in no event shall Your royalty in respect of those sales exceed an amount equal to fifty percent (50%) of the Net Receipts from the sale of those Records (whether or not sold by an affiliate of Company's);

(ii)    On Records sold for use as premiums, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate and the Royalty Base Price of those Records shall be deemed to be an amount equal to the monies actually received by Company from the sale of those Records, unless manufactured and sold by an affiliate or licensee of Company's, in which event the Royalty Base Price shall be deemed to be the price used by that affiliate or licensee in accounting to Company;

(iii)   On Mid-Price Records the royalty rate shall be two-thirds (2/3) of the otherwise applicable royalty rate, and on Budget Records the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate;

251031v1                          Exhibit A-1                          Revised 05/05/05

ATLANTIC000710

    (iv)   On Records sold to the United States Government, its subdivisions, departments or agencies (including Records sold for resale through military facilities) or to educational institutions or libraries, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate;

    (v)   On Singles and Long-Play Singles, the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate for Albums, and on EPs the royalty rate shall be two-thirds (2/3) of the otherwise applicable royalty rate for Albums;

    (vi)   On Records in the form of Digital Records the royalty rate shall be:

        (A)   Seventy-five (75%) percent of the otherwise applicable royalty rate for all Digital Records other than Compact Discs; and

        (B)   Eighty percent (80%) percent of the otherwise applicable royalty rate on Compact Discs;

    (vii)   On Masters licensed by Company to others for their manufacture and sale of Records or for any other uses Your royalty shall be an amount equal to fifty percent (50%) of Company's Net Receipts from the sale of those Records or from those other uses of the Masters;

    (viii)   On Audio-Visual Recordings embodying Your performances, Your royalty shall be as follows:

        (A)   On Audio-Visual Recordings Your royalty shall be computed in accordance with the provisions Paragraph 9(a) of the Main Text and of this Exhibit "A" applicable to Albums, except on sales of Audio-Visual Recordings in the United States the royalty rate pursuant to Paragraph 9(a) of the Main Text shall be deemed to be six percent (6%). For sales of Audio-Visual Recordings outside of the United States the relevant reduction provisions of this Exhibit "A" shall apply to said royalty of six percent (6%). Notwithstanding anything to the contrary contained herein, the royalty payable to You pursuant to this Subparagraph (viii)(A) on the exploitation of Audio-Visual Recordings shall be inclusive of any royalties or other monies required to be paid or incurred by Company (or otherwise deducted from monies payable to Company) to any person, firm or corporation for the synchronization, reproduction and/or public performance of any master recording embodied in the Audio-Visual Recording in question and, without limiting any of Company's other rights or remedies hereunder or otherwise, Company shall have the right to deduct from the royalty payable to You pursuant to this Subparagraph (viii)(A) an amount equal to those sums required to be paid to any person, firm or corporation in connection therewith;

251031v1                Exhibit A-2               Revised 05/05/05

ATLANTIC000711

(B)    On Audio-Visual Recordings sold by any of Company non-affiliated licensees, Your royalty shall be an amount equal to fifty percent (50%) of Company's Net Receipts from the sale of those Audio-Visual Recordings.

(c)    Notwithstanding the foregoing:

(i)    No royalties shall be payable on Records furnished as free or bonus Records to members, applicants or other participants in any record club or other direct mail distribution method; on Records distributed for promotional purposes to radio stations, television stations or networks, record reviewers or other customary recipients of promotional Records; on so-called "promotional sampler" Records; on Records sold as scrap or as "cut-outs"; or on Records (whether or not intended for sale by the recipient) furnished on a no-charge or free basis (such as, but not limited to, Records commonly described in the record industry as "free goods" or "freebies"); or sold at less than fifty percent (50%) of their regular wholesale price to distributors, sub-distributors, dealers or others, whether or not the recipients thereof are affiliated with Company. Company shall not distribute Records embodying solely Masters in the United States at no-charge for sale by the recipient thereof other than in accordance with Company's then-current general policy applicable at the time of Company's distribution of those Records which, in the United States on the date of this Contract, is that Company shall not distribute Records embodying solely Masters in the United States for sale by the recipient thereof in amount greater than fifteen percent (15%) of the aggregate number of Records distributed to such recipient for re-sale thereof;

(ii)    Royalties shall not be payable on Records sold at less than fifty percent (50%) of their regular wholesale price;

(iii)    For purposes of computing royalties, there shall be a so-called "packaging reduction" deducted from the Royalty Base Price (or other applicable price, if any, upon which royalties are calculated) of Records hereunder in an amount equal to twenty percent (20%) thereof for all Records in the form of cassette tapes and twenty-five percent (25%) thereof for Records in all other forms, including, without limitation, Compact Discs, whether now known or hereafter devised;

(iv)    The royalty payable to You hereunder on Records embodying Masters together with other master recordings shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be the number of Masters contained on that Record and the denominator of which shall be the total number of master recordings embodied on that Record; and

(v)    The royalty payable to You hereunder on a Master embodying Your performances jointly with any other artist or musician to whom Company is obligated to pay a royalty in respect of that Master shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the sum of one (1) and the total number of other artists or musicians whose performances are embodied on that Master.

251031v1                       Exhibit A-3                 Revised 05/05/05

ATLANTIC000712

2.      Royalty Payments and Accountings.

(a)      Company shall use its reasonable good faith efforts to cause the Distributor to account to You directly and to pay to You directly, royalties due to You hereunder.  In such case as the Distributor agrees to account to You and pay You directly, You shall be accounted to and paid in the manner set forth in the Distribution Agreement.  In the event the Distributor refuses to account to You directly, Company shall account and pay any royalties due You hereunder within sixty (60) days after Company's receipt of a royalty statement and payment from the Distributor less all Advances and other permissible charges under the Agreement.  Company shall have the right to retain, as a reserve against returns or other charges or credits, such portion of payable royalties (but specifically excluding mechanical royalties payable to You hereunder) as shall be reasonable in its best business judgment.  You shall reimburse Company on demand for any overpayments, and Company may also deduct the amount thereof from any monies payable to You under the Agreement.  Royalties paid by Company on Records subsequently returned shall be deemed overpayments.

(b)      No royalties shall be payable to You on sales of Records or other exploitations of Masters by any of Company's affiliates or licensees until payment on those sales has been received by Company in the United States.  Sales or other exploitations by an affiliate or licensee shall be deemed to have occurred in the semiannual accounting period during which that affiliate or licensee shall have rendered to Company and Company shall have received in the United States accounting statements and payments for those sales or other exploitations of Masters.

(c)      Royalties on exploitations of Masters outside of the United States shall be computed in the national currency in which Company's licensees or affiliates or other distributors pay Company, shall be credited to Your royalty account hereunder at the same rate of exchange at which Company's licensees or affiliates or other distributors pay Company and shall be proportionately subject to any foreign withholding or comparable taxes which may be imposed upon Company's receipts.  You shall not be entitled to any portion of a tax credit which may be available to Company or to any of Company's licensees or affiliates in connection with any foreign taxes withheld from Company's receipts.  If Company shall not receive payment in United States dollars in the United States for any exploitations of Masters outside of the United States, royalties on those exploitations shall not be credited to Your royalty account hereunder, provided, however, that upon Your request and if Company is able to do so, Company shall accept payment for those exploitations in foreign currency and shall deposit in a foreign bank or other depository, at Your expense, in that foreign currency, that portion thereof, if any, as shall equal the royalties which would have been payable to You under the Agreement and this Exhibit "A" on those exploitations had payment for those exploitations been made to Company in United States dollars in the United States.  Deposit as aforesaid shall fulfill Company's royalty obligations hereunder as to those sales.

(d)      You shall be deemed to have consented to all royalty statements and other accountings rendered or required to be rendered by Company hereunder and each royalty statement and other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever, unless

251031v1                              Exhibit A-4                         Revised 05/05/05

ATLANTIC000713

Demos. In the event the Demos are not embodied on Albums (as hereinafter defined) delivered hereunder in fulfillment of Your Recording Commitment (as defined in Paragraph 3(c)(i)) or on any so-called "greatest hits" or "best of" album hereunder (provided that Company shall not embody any of the Demos on a so-called "greatest hits" or "best of" album without your prior consent, which shall not be unreasonably withheld), Company shall not exploit the Demos in any manner without your prior consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, it is hereby expressly understood that the Demos are subject to the terms hereof, including, without limitation, Paragraph 7 hereof, and that You, individually, or the Group, collectively, shall not have the right to exploit on Your own or permit any third party to exploit the Demos in any manner.

3.    (a)    The Term of this agreement will commence as of the date hereof.

(b)    The first contract period of the Term (hereinafter referred to as the "Initial Period") will commence upon the date that Company exercised the Group Option or the Service Option as applicable and will end on the later of (i) nine (9) months after the date of completion of satisfactory Demos, (ii) upon Company entering into the Distribution Agreement as provided herein below; or (iii) Company providing to You written notice that Company intends to distribute the Masters hereunder on its own, provided that You, individually, and the Group, collectively, is continually available and fully cooperates with Company and delivers to Company satisfactory Demos. Notwithstanding the foregoing, the Initial Period hereof shall end no later than thirteen (13) months from the date hereof.

(c)    (i)    You hereby grant to Company six (6) consecutive separate options to extend this Agreement for further additional successive contract periods each upon the same terms and conditions contained herein (the "Option Periods"). During each Option Period You, as part of the Group, shall be required to deliver to Company (Your "Recording Commitment") Master Recordings sufficient to constitute one (1) album of at least forty-five (45) minutes playing time ("Album"). The Initial Period and each exercised Option Period may sometimes be referred to herein as a "Contract Period" and shall be referred to collectively as the "Term." If Company exercises its option to extend the Term of this Agreement, each such Option Period concerned shall begin immediately upon the expiration of the then current Contract Period and shall continue until the date nine (9) months, or such earlier date as Company shall advise You in writing following the initial commercial release in the United States of the Album required to be delivered in that Option Period. Each option shall be exercisable by Company by providing to You written notice of Company's desire to extend the Term of this Agreement for an additional Contract Period at any time prior to the date that the then current Contract Period would otherwise expire.

(ii)    You hereby acknowledge and agree that no so-called "greatest hits" or "best of" albums, specialty albums (i.e., Christmas albums) or live albums of any kind shall count towards the fulfillment of Your or the Group's Recording Commitment hereunder.

(iii)    Company hereby represents that Company shall secure within the Distribution Agreement a commitment from the Distributor that each Album delivered hereunder in fulfillment of Your Recording Commitment shall be commercially released in the United States within one hundred twenty (120) days from the date of Delivery (as defined in the Distribution Agreement) of such Album to the Distributor, subject to any

05/19/2005

ATLANTIC000714

notice and cure periods required by the Distributor in connection therewith and contained in the Distribution Agreement.

(d)     Notwithstanding the foregoing or anything to the contrary contained herein, if as of the last date on which Company has the right to extend the Term for an additional Contract Period pursuant to Subparagraph (c) above, Company has failed to exercise its option to extend the Term for the next Contract Period, the then-current Contract Period nonetheless shall continue until You notify Company in writing of that failure, referring specifically to this Subparagraph 3(d). If Company fails to exercise its option to extend the Term for the next Contact Period on or before the date that is thirty (30) days after Company receives that specific written notice from You, then the Term shall end on the date that is thirty (30) days after Company receives that notice from You, as if that date were the original expiration date of Term, without any liability or additional obligation to You in connection therewith.

4.     Notwithstanding anything to the contrary contained in Paragraph 3 above, if Company enters into the Distribution Agreement, then the Term of this Agreement as provided in Paragraph 3 hereinabove shall be conformed to be co-terminus with the term of the Distribution Agreement and all of the provisions contained in the Distribution Agreement regarding the term thereof shall control, however, in no event shall the Term of this Agreement expire prior to the date on which this Agreement would naturally expire in the event Company had not entered into the Distribution Agreement. It is hereby acknowledged by the parties that, irrespective of the term of the Distribution Agreement, You shall not be required to deliver to Company during the Term hereof more than six (6) Albums in fulfillment of Your Recording Commitment hereunder. If the Distribution Agreement does not contain provisions regarding the Term herein then Paragraph 3 above shall be deemed to be controlling.

5.     The selection of material, individual producers and similar creative matters with respect to the recording of Masters hereunder (e.g., not the budgets therefore or other business matters) shall be mutually determined by the Group and Company and the Distributor, provided, that in the event of a disagreement between the Group and Company with respect to such matters, Company's decision shall be final and controlling. Notwithstanding the foregoing, You acknowledge and agree that the Distributor may have the right of approval with respect to the selection of material, individual producers, or similar creative matters, and that, if applicable, the decision of the Distributor in such matters may be final and controlling. All rights of approval, consultation and similar or related rights granted to Company pursuant to the Distribution Agreement shall be exercised by Company.

6.     Company shall have the right to require You, individually, and the Group, collectively, to perform at such times and places as Company reasonably designates for the production of (i) films or videotapes featuring the Group's performances of compositions embodied in Masters recorded hereunder (hereinafter referred to as "Videos"). As between You and Company, Company shall be the sole and exclusive owner throughout the universe and in perpetuity of such Videos and all rights therein, including all copyrights and renewal of copyrights, and shall have all of the rights with respect thereto which are set forth in Paragraph 7 hereof, including, without limitation, the right (but not the obligation) to use and exploit such Videos in any and all forms.

252406v1

05/19/2005

ATLANTIC000715



7.    (a)    As between You and Company, and subject to the terms and conditions hereof and of the Distribution Agreement, all Masters recorded by You, individually or collectively as the Group, during the Term hereof shall, from the inception of recording, be Company's property throughout the universe, in perpetuity, free from any claims by You, or any person deriving any rights or interest from You and shall be assignable by Company to a third party in Company's sole discretion. Accordingly, each Master (including the Demos) shall be considered a "work-made-for-hire" for Company; if any Master is determined not to be a "work-made-for-hire" it will be deemed transferred to Company hereunder, including the copyright therein, together with all rights in and to the Master and the proceeds of Your services as are described in the Distribution Agreement. Without limiting the generality of the foregoing, Company and any person, firm, or corporation designated by Company shall have the exclusive, perpetual right throughout the universe to manufacture, sell, distribute and advertise phonograph records, Videos and other reproductions embodying the Masters (including the Demos) under any trademarks, trade names or labels, and to lease, license, convey and otherwise exploit and use the Masters (including the Demos) by any method (whether now known or unknown) and in any medium (whether now known or unknown) and to perform publicly phonograph records, Videos and other reproductions embodying the Masters (including the Demos), all upon such terms as Company may approve, or Company may refrain from doing any or all of the foregoing.

(b)    Company and any person authorized by Company, each shall have the right and may grant to others the right to reproduce, print, publish or disseminate in any medium Your name, portraits, pictures, likenesses and biographical material concerning You, as news or information, or for the purposes of trade or for advertising purposes; provided, however, that no direct endorsement by You of any product or services shall be used without Your prior consent. You shall have the right to approve any portraits, pictures, likenesses and biographical material concerning You which Company intends to utilize in accordance with this Subparagraph 7(b). Notwithstanding the foregoing, any such materials shall be deemed approved by You (i) if You do not provide to Company written notice of Your disapproval thereof within five (5) business days of Company's submission to You of such materials, or (ii) if You submit such materials to Company. You shall cooperate, subject to Your prior professional commitments, with Company relating to the exploitation of master recordings and records hereunder.

8.    (a)    Provided that You, individually, and no other individual comprising the Group, are not in material breach of any of Your obligations hereunder or under any of the Program Agreements, Company shall pay the Group, with respect to each Album recorded by the Group under the Distribution Agreement, the following amounts as an advance against any and all sums payable to the Group hereunder or otherwise ("Advance" or "Advances"):

| ALBUM | ADVANCE |
|---|---|
| First | $75,000.00 |
| Second | $80,000.00 |
| Third | $90,000.00 |
| Fourth | $100,000.00 |
| Fifth | $110,000.00 |
| Sixth | $120,000.00 |

252406v1

05/19/2005

ATLANTIC000716

Notwithstanding the foregoing, in the event that Company does not enter into the Distribution and determines to distribute records hereunder on its own, or in the event that any time during the Term hereof the Distribution Agreement terminates and a substitute Distribution Agreement is not obtained by Company, the following Advances shall be applicable:

| ALBUM | ADVANCE |
|---|---|
| First | $20,000.00 |
| Second | $25,000.00 |
| Third | $35,000.00 |
| Fourth | $45,000.00 |
| Fifth | $50,000.00 |
| Sixth | $60,000.00 |

(b)     The applicable Advance payable in connection with the First Album shall be payable (i) fifty (50%) percent promptly following notice to the Group from Company that Company shall on its own distribute the Masters hereunder or promptly following execution by Company and the Distributor of the Distribution Agreement, Your execution of any so-called "inducement letters" in connection therewith and Company's receipt of the initial advance payment due Company from the Distributor, and (ii) the balance promptly following delivery to and acceptance by the Distributor of such First Album and Company's receipt of the final payment due Company from the Distributor with respect to the delivery of such Album.  In the event that Company has not entered into a Distribution Agreement, the balance of the Advance shall be payable upon delivery to and acceptance by Company of such First Album.  The applicable Advance for each subsequent Album shall be payable as follows: fifty (50%) percent promptly following commencement of the recording of the Album concerned; and the balance promptly after delivery to and acceptance by the Distributor of said Album and Company's receipt of the final payment due Company from the Distributor with respect to the delivery of the Album concerned.  In the event that Company has not entered into a Distribution Agreement, the balance of the Advance shall be payable upon delivery to and acceptance by Company of the Album concerned.

(c)     Each Album shall be recorded pursuant to a recording budget prepared by Company.  Per Your request, Company shall furnish the Group with a copy of said recording budget.  All Recording Costs ("Recording Costs") shall constitute Advances to the Group hereunder and shall be recouped from any record royalties payable to the Group hereunder.  In the event the Recording Costs of any particular Album exceed the approved budget for such Album, provided that such excess costs are due primarily to any of Your or the Group's acts or omissions, Company shall have the right to charge and/or deduct such excess from any and all record royalties or mechanical royalties payable to the Group hereunder.

(d)     Any penalties charged to Company including, without limitation, penalties due to failure to effect timely compliance with any of Company's or Distributor's obligations under any applicable agreement with any union or labor organization in connection with the Masters and penalties due to the late delivery to the Distributor of Masters hereunder shall, provided that any of such penalties are due solely to Your or the Group's acts or omissions, be Your and the Group's responsibility, and Company shall have

252406v1

05/19/2005

ATLANTIC000717

the right to either deduct the amount of such penalties from any and all sums otherwise payable to the Group hereunder or, at Company's sole discretion, to treat the amount of such penalties as Advances to the Group which shall be fully recoupable from any and all sums otherwise payable to the Group hereunder.

     (e)    Without limiting the generality of this Paragraph 8, any and all monies paid by Company to You or the Group or, subject to Your prior approval or request, provided that obtaining such prior approval from You is possible and will not hinder Company's performance hereunder and/or exploitation of the Masters, on Your behalf (other than royalties), and any and all monies paid by Distributor to the Group, You or on Your behalf (including, without limitation, tour support payments, video production costs and monies expended in connection with third party promotion or marketing of records embodying Masters hereunder) shall, to the extent such monies are deemed Advances and are recoupable pursuant to the Distribution Agreement, be deemed Advances to You and the Group, as applicable, and shall be recoupable out of any and all royalties payable to You and/or the Group, as applicable hereunder (except as specifically set forth in this Agreement). Company hereby warrants and represents that only fifty (50%) percent of video production costs shall be recoupable from audio-only record royalties payable to You and/or the Group hereunder, provided that, in the event the Distribution Agreement contains any maximum sums beyond which video production costs shall be one hundred (100%) percent recoupable from audio-only royalties payable under the Distribution Agreement, the audio-only royalties payable to You and or the Group hereunder shall be subject to recoupment of video production costs in that manner as is set forth in the Distribution Agreement. All video production costs shall be fully recoupable against any video royalties payable to You and/or the Group pursuant to this Agreement. Notwithstanding the foregoing, in the event any Videos featuring Your or the Group's performances of Masters recorded hereunder contain footage excerpted from the Program, the costs of producing such footage excerpted from the Program shall not be deemed a video production cost recoupable from record or video royalties payable to Your or the Group hereunder. Company further warrants and represents that only fifty (50%) percent of all expenses paid or incurred by Company and/or the Distributor in connection with the independent promotion of the Masters (i.e., promotion by persons or entities other than regular employees of Company or the Distributor) shall be recoupable from royalties payable to You and/or the Group and Company pursuant to the Distribution Agreement. Company shall use its reasonable good faith efforts to cause the Distributor to embody within the Distribution Agreement a maximum sum of monies which the Distributor may expend for independent marketing and promotion services. The Group's Proportionate Share (as defined in Subparagraph 9(a) below) of all legal fees incurred in securing the Distribution Agreement shall also be recoupable from royalties payable to You and/or the Group hereunder.

     (f)    Notwithstanding anything contained herein, Company's obligation to record any Masters (excluding the Demos) or to pay any Advance hereunder shall be expressly conditioned upon Company's entering into a Distribution Agreement with a Distributor as provided hereunder. However, in the event Company provides to You written notice (which notice must be provided to you no later than the date of expiration of the Initial Period) that it intends to distribute hereunder on its own and not through a Distributor pursuant to a Distribution Agreement, the applicable Advance shall be paid to the Group for the Albums concerned in accordance with Paragraphs 8(a) and (b) above.

252406v1

05/19/2005

ATLANTIC000718



9.     (a)     In full consideration of all services rendered by You, individually and as part of the Group, and all of the rights granted by You to Company herein, and subject to Your and the Group's performance of all of the material terms hereof, with respect to Net Sales of Records in the United States embodying Master Recordings through normal retail channels ("USNRC Net Sales"), Company shall credit the Group's royalty account with the following percentages of the Royalty Base Price (as defined in the Distribution Agreement or Exhibit "A", as applicable and subject to the terms of Paragraph 11 hereof) which is set forth in the Distribution Agreement or that which is set forth in Exhibit "A" attached hereto, if applicable:

| ALBUM | ROYALTY |
|---|---|
| First | 12% |
| Second | 13% |
| Third & Fourth | 14% |
| Fifth & Sixth | 15% |

Notwithstanding the foregoing, the royalty rate set forth in the schedule immediately above with respect to each particular Album (the "Basic Rate") shall be escalated as follows: (A) in the event USNRC Net Sales of the Album concerned exceeds two million (2,000,000) units, the Basic Rate for all such sales of said Album in excess of two million (2,000,000) units but not greater than three million (3,000,000) units shall be increased by one-half (1/2%) percent; and (B) in the event USNRC Net Sales of the Album concerned exceeds three million (3,000,000) units, the Basic Rate for all such sales of said Album in excess of three million (3,000,000) units shall be increased by an additional one-half (1/2%) percent. The royalty set forth in the schedule immediately above in connection with the Album concerned (the Basic Rate) All royalties payable to Company by the Distributor pursuant to the Distribution Agreement in excess of the royalties payable to You hereunder shall be retained by Company. Accordingly, "Your Proportionate Share" of such royalties payable by the Distributor (or as used elsewhere herein) shall mean a fraction, the numerator of which shall be equal to the royalty payable to the Group hereunder with respect to USNRC Net Sales of the Album concerned, and the denominator of which shall be equal to the total "all-in" basic royalty payable under the Distribution Agreement for the Album concerned. In the event the Royalty Base Price contained in the Distribution Agreement is not derived from the suggested retail list price of the Album concerned, the penny-rate royalty payable to You and/or the Group hereunder shall be no less than the applicable Basic Rate provided above of the suggested retail list price as reduced by the applicable container charge and other standard reductions for the configuration concerned in order to derive the applicable Royalty Base Price upon which to calculate royalties hereunder.

(i)     The royalty payable to the Group, collectively, for singles, long-playing singles, foreign sales, budget records, mid-priced records, compact discs, club sales and other sales or uses of the Masters produced hereunder shall be reduced and pro-rated in the same proportion that Company's Basic Rate (as defined in the Distribution Agreement) is reduced and pro-rated pursuant to the Distribution Agreement. All royalties payable to the Group hereunder shall be computed, determined, calculated and paid in the same manner (e.g., container charges, free goods, definition of suggested retail list price or equivalent royalty base, percentages of sales, reserves, etc.) as royalties payable to Company by Distributor are computed, determined, calculated and paid pursuant to the Distribution

05/19/2005

ATLANTIC000719

Agreement. With respect to exploitation of the Masters for which the royalty payable to Company under the Distribution Agreement is calculated as a percentage of net receipts or the like, the Group's royalty shall be equal to the Group's Proportionate Share of those monies payable to Company by the Distributor under the Distribution Agreement.

(b)     The royalty payable to the Group hereunder includes all royalties payable to the Group and any other person(s) engaged by the Group or Company for or in connection with the creation and recording of, or the acquisition of rights in, the Masters including, without limitation, all royalties payable to any individual producer(s) of the Masters (including any of Company's "in-house" staff producers). Each individual producer of Masters hereunder shall be paid a royalty to be determined by Company with Your consent, not to be unreasonably withheld or delayed, provided that Your consent shall hereby be deemed given for the payment of a royalty to any such individual producer not to exceed four percent (4%) of the applicable Royalty Base Price (as defined in the Distribution Agreement or Exhibit "A" attached hereto, if applicable) for Net Sales of Albums solely embodying Masters produced hereunder. Notwithstanding the foregoing sentence, in the event that the individual producer is a so-called "A-level" producer (i.e., Sean "Puffy" Combs) and requires a royalty of more than four percent (4%), then Your and the Group consent shall automatically be deemed given for the higher producer royalty, provided that the producer has received such a royalty from other artists.

(c)     Company may elect from time to time to compute and pay the Group's royalties hereunder on a wholesale base rather than a retail base as provided herein, as long as such computation does not materially affect the net amount of royalties otherwise payable to the Group or Company at that time hereunder.

(d)     Company shall use its reasonable good faith efforts to cause the Distributor to account to the Group directly and to pay to the Group directly royalties due to the Group hereunder. In such case as the Distributor agrees to account to the Group and pay the Group directly, the Group shall be accounted to and paid in that manner set forth in the Distribution Agreement, the applicable provisions of which shall be provided to the Group upon the Group's request. In the event the Distributor refuses to account to the Group directly, Company shall account and pay any royalties due to the Group hereunder within sixty (60) days after Company's receipt of a royalty statement and payment from the Distributor. Company may deduct from any royalty due to the Group under this Agreement pursuant to Paragraphs 9, 10, or 12 hereof or Paragraph 10 of Exhibit "A" any amount You, or any member of the Group, may owe Company hereunder or otherwise. Company shall have the absolute right in accounting to the Group to rely upon the statements received by Company from the Distributor and Company shall not be responsible in any manner for any error, omission or other inaccuracy of any such statement. Notwithstanding the foregoing, any payment made by the Distributor in connection with such an error or inaccuracy shall be shared pro-rata between Company and the Group in accordance with the provisions contained herein. The Group, collectively, shall have the right to audit Company's books and records relating to the sale of records hereunder, but the Group's right to audit Company, to object to statements and institute a law suit in respect thereof shall be subject to the same terms, conditions and restrictions as are contained in the accounting provisions of the Distribution Agreement, and the deadline dates by which the Group shall be required to object to statements and to institute law suits in respect thereof shall be the dates six (6) months prior to the deadline dates by which Company is required to object to statements

252406v1

05/19/2005

ATLANTIC000720

rendered by the Distributor and to institute law suits in respect thereof pursuant to the Distribution Agreement. Unless otherwise agreed in writing, You, individually, or the Group shall not be permitted to audit the books and records of the Distributor for any reason, however, as good business practice requires, the Group shall have the right, by providing to Company written notice of the Group's request, to cause Company to audit the books and records of the Distributor on its and the Group's behalf in accordance with the terms of this Paragraph 9(d).

(e)     In the event of any commercial exploitation of Videos produced hereunder by the Distributor, the royalty payable to the Group hereunder in connection therewith shall be equivalent to the Group Proportionate Share of the "all-in" royalty which is payable to Company under the Distribution Agreement with respect to the particular exploitation concerned.

10.     (a)     You shall issue mechanical licenses to the Distributor and its designees for Controlled Compositions as defined in the Distribution Agreement, at the dates and on the terms (including, without limitation, those provisions relating to aggregate mechanical royalty limits and licenses for the use of Controlled Compositions in audiovisual programs) set forth in the Distribution Agreement. Company shall use its reasonable good faith efforts to cause the Distributor to (i) pay to the Group mechanical royalties at a rate equivalent to seventy-five (75%) percent of the minimum statutory rate in effect in the United States (or the equivalent thereof in Canada) on the date of initial release in the United States of the Master concerned (the "United States Statutory Rate"); and (ii) pay to the Group aggregate mechanical royalties for the Album concerned not in excess of eleven (11) times seventy-five (75%) percent United States Statutory Rate (or the equivalent thereof in Canada). Accordingly, Company shall use its reasonable good faith efforts to ensure that the so-called "aggregate mechanical royalty cap" for Albums under the Distribution Agreement shall not be less than eleven (11) times seventy-five (75%) percent of the United States Statutory Rate (or the equivalent thereof in Canada).

(b)     If Company or the Distributor is required to pay any mechanical royalties in excess of the aggregate maximum mechanical royalties set forth in the Distribution Agreement, the Group shall be responsible for such excess mechanical royalties. Any such excess mechanical royalties for which the Group are responsible may be applied by the Distributor, Company's publishing designee, or Company in reduction of mechanical royalties otherwise payable to the Group or, at Company's or the Distributor's election, Company may deduct the amount of such excess from any and all sums otherwise payable to You and/or the Group hereunder. Notwithstanding the foregoing or anything to the contrary contained herein, if Company or the Distributor is required to reduce record royalties payable to You and/or the Group hereunder as a result of the applicable party's obligation to pay excess mechanical royalties, the Group shall only be responsible for, and the Group's record royalty shall only be reduced by, the Group's Proportionate Share of such excess mechanical royalties.

11.     Notwithstanding the foregoing provisions of Paragraphs 9 and 10 above or anything to the contrary contained herein, in the event Company on its own distributes the Masters hereunder or in the event the Distribution Agreement does not contain royalty calculation' provisions, mechanical royalty provisions or accounting provisions which embody terms, conditions, limitations and deadline dates with respect to all of the aforementioned, those

252406v1

05/19/2005

ATLANTIC000721

royalty calculation, mechanical royalty and accounting provisions embodied within Exhibit "A" attached hereto and incorporated herein by this reference shall govern with respect to the same, provided that upon the Group's written request, the Group and Company shall negotiate in good faith the terms and conditions contained in said Exhibit "A." Further and in connection with the foregoing, in the event Company on its own distributes the Masters hereunder, or subsequent to the full execution of the Distribution Agreement (in the event the Distribution Agreement does not contain royalty and accounting provisions), upon Your request, You and Company shall negotiate in good faith those terms and conditions contained within Exhibit "A" but unless and until such time, if any, as You and Company do so, this Agreement complete with the terms and conditions of Exhibits "A" shall constitute a valid and binding contract and shall control.

12.     (a)     You hereby irrevocably and absolutely assign, convey and set over to Company or Company's publishing designee ("Publisher") an undivided fifty (50%) percent interest in Your share of the worldwide copyright (and all renewals and extensions thereof) and all other rights in and to each musical composition written, owned or controlled, in whole or in part by You during the Term hereof and embodied in a Master delivered to Company hereunder (each such musical composition is hereinafter referred to as a "Composition"). You shall retain the remaining fifty (50%) percent thereof. For the purpose of this Paragraph 12(a) only, "You" shall refer only to that individual or Group members who actually write(s) such musical Compositions.

     (b)     (i)     Publisher shall be the exclusive administrator of all rights in and to each such Composition, and it shall be entitled to exercise any and all rights with respect to the control, exploitation and administration of each Composition, including without limitation, the sole right to grant licenses, collect all income and to use the name, likeness and biographical material of each composer, lyricist and songwriter hereunder in connection with each applicable Composition for the frill term of copyright (including all renewals and extensions thereof) in and to each Composition. Notwithstanding the foregoing, Company shall not, without your prior consent, license to any third party the right to synchronize any Composition in a motion picture with a rating below "N-C 17" or in any radio or television commercial of a political or religious in nature; and

          (ii)     Without limiting the generality of the foregoing, BMI or ASCAP (hereinafter collectively referred to as the "Society") shall be authorized and directed to pay the Publisher's share of performance fees collected by the Society with respect to public performances of Compositions in the United States and Canada directly to Publisher.

     (c)     You represent and warrant that the Compositions are original and do not infringe upon or violate the rights of any other person and that You have the full and unencumbered power and authority to grant to Publisher all of the rights herein granted to Publisher. You will indemnify Publisher against any loss, damage or expense (including reasonable attorney's fees) in respect of any claims, demands, liens or encumbrances arising out of Your breach hereof Publisher shall have the benefit of all warranties and representations given by the writers of the Compositions.

252406v1

05/19/2005

ATLANTIC000722

(d)    From all royalties earned and received by Publisher in the United States from the exploitation of the Compositions throughout the world (the "Gross Receipts"), Publisher shall:

(i)    Deduct and retain an administration fee equal to a percentage of Gross Receipts, which percentage is equivalent to that percentage of gross income charged to Publisher as an administration fee by its bona-fide third party music publishing administrator (currently Famous Music Publishing) of Publisher's musical composition catalogue;

(ii)    Deduct and retain all direct out-of-pocket costs incurred by Publisher in connection with the registration of and administration of copyrights in and to the Compositions;

(iii)    Deduct and pay royalties payable to the writers of the Compositions (which You warrant and represent shall not exceed fifty (50%) percent of the Gross Receipts) after deduction of the amounts set forth in Subparagraphs (i) and (ii) above, and which shall not include any share of Publisher's share of public performance income; and

(iv)    Pay to You an amount equal to fifty (50%) percent of the balance remaining after deducting the aggregate sums set forth in Subparagraphs (i), (ii) and (iii) above, and the remaining (50%) percent thereof shall be retained by Publisher for its sole use and benefit.

(e)    Accountings for such royalties shall be rendered semi-annually subject to all the terms and provisions (including those relating to the examination of Company's books and records) of Exhibit A" hereof.

(f)    Any assignment made of the ownership or copyright in, or right to license the use of, any Compositions referred to in this Paragraph 12 shall be made subject to the provisions hereof.

(g)    You shall promptly provide Publisher with a copy of Your songwriter agreement, if any and if applicable, with the writer of each Composition or such other agreement evidencing Your rights in and to such Composition, and You shall provide Publisher with copies of such agreements with respect to Compositions not yet created promptly after their creation.

(h)    You shall execute and deliver to Publisher any documents (including, without limitation, assignments of copyright and Publisher's standard co-publishing and songwriter agreements (subject to negotiation of the non-substantive provisions thereof) which Publisher may reasonably require to vest in Publisher and/or its designees the copyright and other rights herein granted to Publisher in respect of each Composition. If You shall fail to promptly execute document, You hereby irrevocable grant to Publisher a power of attorney to execute such document in Your name.

(i)    In consideration for the foregoing grant of rights to Publisher and assignment of copyrights in and to the Compositions hereunder, Publisher shall pay to You the following Advances in each Contract Period of the Term hereof. Notwithstanding the

252406v1

05/19/2005

ATLANTIC000723

foregoing, the below Advances shall only be divided amongst and payable to those members of the Group who are writers and/or co-writers of the Compositions and shall be divided on a pro-rata basis by the number of Compositions included on the applicable Group album.

| CONTRACT PERIOD | PUBLISHING ADVANCE |
|---|---|
| First | $10,000.00 |
| Second | $15,000.00 |
| Third | $20,000.00 |
| Fourth | $25,000.00 |
| Fifth | $30,000.00 |
| Sixth | $35,000.00 |

The foregoing Advances shall be fully recoupable from any monies payable to You pursuant to this Paragraph 12 or any successor co-publishing agreement between You and Publisher. The immediately aforementioned Advances shall be payable to You (i) one-half (1/2) upon Your commencement of recording of the Album required to be delivered to Company hereunder during the Contract Period concerned, and (ii) the balance upon Your delivery to Company of such Album, provided that such Album contains at least three (3) full Compositions. In the event that the Album concerned does not contain three (3) full Compositions, the balance of the advance payable to You with respect thereto shall be reduced proportionately.

(j)     During the Term of this Agreement You shall not assign any ownership rights in and to any compositions written, composed or controlled, in whole or in part, by You and not embodied on Masters delivered to Company hereunder ("Outside Compositions") or enter into any publishing or administration agreement with a third party in connection with such Outside Compositions unless and until You have first offered to Publisher by notice in writing the option to enter into such an agreement with You, and You and Publisher have failed to negotiate the material terms of such an agreement within thirty (30) days from the date of Publisher's receipt of such written notice. In the event You and Publisher have not entered into a publishing or administration agreement with respect to the Outside Compositions as immediately aforementioned, You shall not enter into any such agreement with a third party unless and until: (A) You have notified Publisher of all material terms and conditions of, and parties to, the proposed agreement pursuant to which any such rights in and to the Outside Compositions ("Publishing Rights") are to be granted; and (B) You offer to enter into an agreement with Publisher containing the same terms and conditions described in such notice. If Publisher does not accept such offer within thirty (30) days following its receipt thereof, You may then enter into such proposed agreement with the parties identified in said notice, provided that such agreement is consummated within sixty (60) days after the expiration of such thirty (30) days upon the same terms and conditions as set forth in the aforesaid notice. If such agreement is not so consummated, no party other than Publisher will be authorized to enter an agreement for Your Publishing Rights unless You again offer to enter into an agreement with Publisher pursuant to this Paragraph 12. Publisher shall not be required, as a condition to accepting any offer made pursuant to this Subparagraph 12(j), to agree to any terms or conditions contained in the proposed agreement which cannot be fulfilled by Publisher as readily as by the party to the proposed agreement.

252406v1

05/19/2005

ATLANTIC000724

13.    (a)    You warrant and represent that: (i) You have the right to enter into and fully perform this Agreement; and (ii) You are not a party to any agreement which would in any way interfere with or restrict Company's ability to make or enter into the Distribution Agreement or any of the Company's rights hereunder. You further affirm each applicable representation and warranty made in the Distribution Agreement and agree that You shall be bound thereby as though each such representation and warranty were incorporated herein. You further agree to execute any so-called "Inducement Letter" as may be required by any Distributor.

(b)    You acknowledge and agree that Your services are unique and extraordinary and that Company shall be entitled to injunctive relief to enforce the provisions of this Agreement and our rights hereunder.

(c)    You further acknowledge and agree that Your breach of any representation, covenant, warranty, or obligation under any or all of the Program Agreements, including, without limitation, the Television Agreement, shall be deemed a breach of this Agreement. You acknowledge and agree that Company's remedies hereunder and under any and all of the Program Agreements shall be cumulative.

(d)    You will at all times indemnify and hold harmless Company, the Distributor and Company's and Distributor's respective licensees, successors and assigns from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by You of any warranty or representation made by You in this Agreement, provided that no such claim or action shall be settled without Your consent, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Company shall be entitled to settle, without Your consent, any claim to which the indemnity herein applies, provided that any such claim is less than seven thousand five hundred ($7500.00) dollars. You will reimburse Company and/or the Distributor and/or their respective successors, assigns and licensees on demand for payment made at any time after the date hereof in respect of any liability or claim in respect of which Company, the Distributor or Company's and Distributor's respective successors, assigns and licensees are entitled to be indemnified. Pending the resolution of any such claim, Company shall have the right to withhold moneys which would otherwise be payable to You under this Agreement in an amount reasonably related to Your potential liability to Company under this Subparagraph 13(d). If no litigation on the claim concerned has been commenced within one (1) year after Company or the Distributor is first notified of it, Company will release any such monies then being held by Company by reason of that claim, upon Your request, unless Company anticipates upon reasonable grounds that such litigation may be commenced and provided that Distributor has released such monies to Company in the event it has withheld monies in accordance with the provisions of the Distribution Agreement. Company will undertake to notify You of any such claim, but Company's failure to notify You will not constitute a breach of this Agreement or impair Company's rights under this Subparagraph 13(d) or otherwise. Company will notify You of any action commenced on such a claim. You may participate in the defense of any such claim through counsel of Your selection at Your own expense, but Company will have the right at all times, in Company's sole discretion to retain or resume control of the conduct of the defense.

14.    You hereby agree that if, in accordance with the provisions of the Distribution Agreement, the Distributor shall elect to cause You to render Your services directly to the

252406v1

05/19/2005

ATLANTIC000725

the right to either deduct the amount of such penalties from any and all sums otherwise payable to the Group hereunder or, at Company's sole discretion, to treat the amount of such penalties as Advances to the Group which shall be fully recoupable from any and all sums otherwise payable to the Group hereunder.

(e)     Without limiting the generality of this Paragraph 8, any and all monies paid by Company to You or the Group or, subject to Your prior approval or request, provided that obtaining such prior approval from You is possible and will not hinder Company's performance hereunder and/or exploitation of the Masters, on Your behalf (other than royalties), and any and all monies paid by Distributor to the Group, You or on Your behalf (including, without limitation, tour support payments, video production costs and monies expended in connection with third party promotion or marketing of records embodying Masters hereunder) shall, to the extent such monies are deemed Advances and are recoupable pursuant to the Distribution Agreement, be deemed Advances to You and the Group, as applicable, and shall be recoupable out of any and all royalties payable to You and/or the Group, as applicable hereunder (except as specifically set forth in this Agreement). Company hereby warrants and represents that only fifty (50%) percent of video production costs shall be recoupable from audio-only record royalties payable to You and/or the Group hereunder, provided that, in the event the Distribution Agreement contains any maximum sums beyond which video production costs shall be one hundred (100%) percent recoupable from audio-only royalties payable under the Distribution Agreement, the audio-only royalties payable to You and or the Group hereunder shall be subject to recoupment of video production costs in that manner as is set forth in the Distribution Agreement. All video production costs shall be fully recoupable against any video royalties payable to You and/or the Group pursuant to this Agreement. Notwithstanding the foregoing, in the event any Videos featuring Your or the Group's performances of Masters recorded hereunder contain footage excerpted from the Program, the costs of producing such footage excerpted from the Program shall not be deemed a video production cost recoupable from record or video royalties payable to Your or the Group hereunder. Company further warrants and represents that only fifty (50%) percent of all expenses paid or incurred by Company and/or the Distributor in connection with the independent promotion of the Masters (i.e., promotion by persons or entities other than regular employees of Company or the Distributor) shall be recoupable from royalties payable to You and/or the Group and Company pursuant to the Distribution Agreement. Company shall use its reasonable good faith efforts to cause the Distributor to embody within the Distribution Agreement a maximum sum of monies which the Distributor may expend for independent marketing and promotion services. The Group's Proportionate Share (as defined in Subparagraph 9(a) below) of all legal fees incurred in securing the Distribution Agreement shall also be recoupable from royalties payable to You and/or the Group hereunder.

(f)     Notwithstanding anything contained herein, Company's obligation to record any Masters (excluding the Demos) or to pay any Advance hereunder shall be expressly conditioned upon Company's entering into a Distribution Agreement with a Distributor as provided hereunder. However, in the event Company provides to You written notice (which notice must be provided to you no later than the date of expiration of the Initial Period) that it intends to distribute hereunder on its own and not through a Distributor pursuant to a Distribution Agreement, the applicable Advance shall be paid to the Group for the Albums concerned in accordance with Paragraphs 8(a) and (b) above.

252406v1

05/19/2005

ATLANTIC000726



Distributor, Company shall nevertheless continue to be entitled to receive the share (the "Production Share") of any and all sums (including, without limitation, advances and royalties) which Company would otherwise have received if Distributor had not exercised such option. In such event, You agree to authorize and direct the Distributor to pay directly to Company such Production Share. If the Distributor pays to You any portion of the Production Share, You shall pay such sums to Company promptly following Your receipt of such sums.

15. (a) You agree to be bound by all of the provisions of the Distribution Agreement which pertain to Your rights and obligations and the rights and obligations of the individual members comprising the Group, if the Group is a professional group. Without limiting the generality of the preceding sentence, You, as part of the Group, hereby acknowledge and agree that if the Group is a group: (i) any leaving member shall not, without Distributor's and Company's consent, use the Group's professional group name in any commercial or artistic endeavor; (ii) said professional name shall remain the property of those members of the Group who continue to perform their obligations hereunder and whose engagements are not terminated; and (iii) any person engaged to replace a leaving member shall execute and become bound by the terms and conditions of this Agreement and the Distribution Agreement.

(b) (i) A breach of any term of this Agreement or a disaffirmance or attempted disaffirmance of this Agreement on the ground of minority by or with respect to any individual comprising of the Group (whether presently or hereafter signatories to or otherwise bound by the terms of this Agreement) shall, at Company's election, be a breach by or with respect to You, the Group and all individuals comprising of the Group;

(ii) Individuals in addition to those presently members of the Group may become members of the Group only with Company's prior written approval. Additional members shall be bound by the terms of this Agreement relating to You, and You individually, and the Group, collectively, shall cause any additional member to execute and deliver to Company such documents as Company may deem necessary or desirable to evidence that individual's agreement to be so bound;

(iii) For the purpose of this Agreement, a "Leaving Member" shall mean an individual member of the Group who ceases to record as a member of the Group, to perform live as a member of the Group, and to engage in other professional activities of the Group; or b) You, if Company has exercised the Service Option for your services. If any individual member of the Group shall become a Leaving Member, the Group shall promptly give to Company written notice thereof by certified or registered mail, return receipt requested. Company shall designate a replacement member for that Leaving Member. The replacement member shall be bound by the terms of this Agreement relating to You and You, individually, and the Group collectively, shall cause a replacement member to execute and to deliver to Company such documents as Company may deem necessary or desirable to evidence that replacement member's agreement to be so bound;

(iv) With respect to any member of the Group who becomes a Leaving Member, Company shall have the irrevocable Service Option (as defined above in Paragraph1A(c)) for the exclusive recording services of such Leaving Member. Company may exercise Company's Service Option by written notice to the Leaving Member no later

252406v1

05/19/2005

ATLANTIC000734

than one hundred twenty (120) days after the date upon which Company shall have received the written notice required to be sent by the Group and referred to in Subparagraph 15(b)(iii) above. If Company shall so exercise Company's Service Option with respect to any Leaving Member, or if Company has exercised Company's Service Option with respect to You, or such Leaving Member shall be deemed to have executed an exclusive recording contract with Company ("Leaving Member Contract") pursuant to which You or such Leaving Member, shall furnish to Company its exclusive recording services on the same terms contained in this Agreement, except as otherwise hereinafter provided: and

(A)   Company shall have the same number of options, each to extend the Term of the Leaving Member Contract for an Option Period, as equal the number of separate renewal options remaining under this Agreement pursuant to Paragraph 3(c) above as of the date that individual became a Leaving Member, but in no event shall Company have fewer than two (2) options for additional Option Periods. Each Option Period under the Leaving Member Contract shall run consecutively and shall commence upon the expiration of the immediately preceding Option Period thereunder.

(B)   The advances of Paragraph 8 above shall not apply and the royalties set forth in Paragraph 9 above, if any, shall apply to the Master Recordings recorded by a Leaving Member under a Leaving Member Contract or to any services by a Leaving Member under a Leaving Member Contract, however, the amounts which shall apply shall be two-thirds (2/3) of the applicable royalties set forth therein. Company shall be responsible for paying recording costs for Master Recordings recorded by any such Leaving Member, but no other Advances shall be payable by Company hereunder.

(v)   At Company's request, any Leaving Member shall execute and deliver to Company any and all documents as Company may deem necessary or desirable to evidence the foregoing, including, without limitation, an exclusive recording contract with Company relating to that Leaving Member's recording services;

(c)   Notwithstanding any of the foregoing, if any member of the Group shall be a Leaving Member or if the Group shall completely disband, then, without limiting Company's other rights and remedies, Company may terminate the Term of this Agreement by written notice to You and shall thereby be relieved of any obligations or liabilities hereunder, except Company's obligations with respect to Masters recorded prior to that termination. In the event Company elects to so terminate the Term of this Agreement, Subparagraph 15(b) above shall be applicable to each member of the Group as if each member were a Leaving Member;

(d)   Notices to a Leaving Member may be sent by Company to Your address above, or at such other address of which that Leaving Member shall have advised Company in writing.

16.   No failure by Company to perform any of its obligations hereunder shall be deemed a breach hereof, unless You or the Group give Company written notice of such failure and Company fails to cure such nonperformance within thirty (30) days after Company's receipt of such notice. You acknowledge that, notwithstanding anything to the contrary contained herein and as a material term hereof, You, individually, or the Group, collectively, will not seek to enjoin or otherwise interfere with the distribution of phonograph records or

252406v1

05/19/2005

ATLANTIC000735

audiovisual programs embodying Masters recorded hereunder for any reason whatsoever including, without limitation, breach of this Agreement. Your and the Group's only remedy, if any, shall be to bring an action at law for damages.

17. (a) If You fail, refuse or neglect to comply with any of Your material obligations hereunder (including, without limitation, failure to timely deliver to Company or the Distributor Albums recorded by You hereunder) or under any of the Program Agreements, then, in addition to any other rights or remedies which Company may have, Company shall have the right, exercisable at any time by notice to You: (i) to terminate this Agreement without further obligation to You, the Group or any other individual comprising the Group, as to unrecorded Master Recordings, (ii) to suspend Company's obligations hereunder (including, without limitation, the obligations to pay any royalties or other sums hereunder unless Distributor continues to pay to Company the Group's share of such royalties or other sums, in which event Company shall pay over to You and/or the Group, as applicable, such royalties or other sums) until such failure is cured, or (iii) to extend the then current Option Period of the Term for the period of such default plus such additional time as is necessary so that Company shall have no less than one hundred fifty (150) days after completion of Your, and the Group's obligation within which to exercise its option, if any, for the next following Option Period.

(b) If Your voice or ability to perform as instrumentalists should be materially or permanently impaired, then in addition to any other rights or remedies which Company may have, Company shall have the right, upon written notice to you, to terminate this Agreement. In the event Company terminates this Agreement as set forth in the immediately preceding sentence, Company's obligation to pay royalties with respect to prior released Masters or any other sums owed to You prior to the date of such termination, shall remain.

18. Company may assign its rights or obligations pursuant to this Agreement, provided that any such assignee shall assume all of Company's obligations hereunder, and, further, provided that Company shall remain secondarily liable with respect to such obligations. Company may also assign its rights hereunder to any of its licensees to the extent necessary or advisable in Company's sole discretion to implement the license granted. This Agreement is personal to You and You may not assign Your rights or obligations hereunder, and any such purported assignment shall be null and void.

19. This Agreement and Exhibit "A" attached hereto, together with the Program Agreements (including, but not limited to the Official Application, Guest Performer Release, the Background Check, the Confidentiality and Non-Disclosure Agreement, the Authorization for Release of Medical Information, the Medical Report, the Emergency Medical Release, the Rules and the Television Agreement) constitute the entire agreement and understanding between the parties concerning the subject matter hereof, and supersede and replace all prior negotiations, proposed agreements and agreements, written and oral, relating thereto, and cannot be changed or terminated except by a written instrument signed by the parties hereto. This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this Agreement. Any claim, dispute or disagreement with respect to this Agreement shall be

252406v1

05/19/2005

ATLANTIC000736