# EXHIBIT K

CONFIDENTIAL

**BAD BOY RECORDS**
1710 Broadway
4th Floor
New York, New York 10019

Dated as of August 22, 2007

Remote Productions Inc.
1515 Broadway
New York, New York  10036

Gentlepersons:

The following, when executed by you and by us, shall constitute our agreement with respect to the rights to the recording services of certain individual contestants identified on Schedule 1 annexed hereto (each, an "Artist") appearing on the television program produced by you entitled "Making the Band 4" (the "Program"):

1.    Recording Options/Recording Agreements.

1.01.   In connection with your production of the Program, you have entered into an agreement (each, a "Recording Agreement") with each of the Artists, pursuant to which each Artist has granted to you the exclusive and irrevocable option to require such Artist to provide his exclusive recording services as a member of the musical group selected as part of the Program and/or for such Artist's recording services for other recording projects. (The option for each Artist's recording services as a member of the group is referred to in the applicable Recording Agreement as the "Group Option" and the option for each Artist's recording services other than as a member of the group is referred to in the applicable Recording Agreement as the "Service Option". The foregoing Group Option and Service Option for each Artist are referred herein collectively as the "Recording Option".)

1.02.   You hereby warrant and represent as follows, as of the date of execution hereof:

(a)     The Recording Agreement with each Artist has been fully executed by all necessary parties, is currently in full force and effect and is binding on each Artist in all respects, including with respect to the Recording Option, and you are not currently in breach of any of your obligations under the Recording Agreement.

(b)     You own all right, title and interest in and to each of the Recording Agreements and the Recording Options, free and clear of any obligations to any third party, and you currently have the full and unconditional right to exercise the Recording Option for each Artist, or to refrain therefrom with no liability whatsoever to the Artist or any third party. With respect to each Artist, you have the right to exercise the Group Option or the Service Option or both options.

297552.3
082407

1

ATLANTIC000905

(c)     You have until at least February 15, 2008 to exercise the Recording Option for each Artist, and you have not yet exercised any of the Recording Options.

(d)     To the best of your knowledge, the exercise of the Recording Option for each Artist shall not give rise to any obligation to make any payment to or on behalf of the applicable Artist or any third party or to any other obligation, except for: (i) those payment obligations and other obligations set forth in the Recording Agreement itself; and (ii) the potential payment obligations set forth in our agreement with Matthew Knowles ("Knowles"), dated as of August 20, 2007 (the "Knowles Agreement").

(e)     You have the right to assign to us each Recording Agreement and all of your right, title and interest therein.

(f)     A copy of each Recording Agreement is attached hereto as Exhibit A and is made a part hereof.

2.      **Assignment of Rights and Obligations.**

2.01.   For good and valuable consideration, receipt of which is hereby acknowledged, you hereby sell, assign and transfer to us all right, title and interest in and to each Recording Agreement and each Recording Option. Promptly following the complete execution hereof, you shall deliver to us true and complete copies of each Recording Agreement.

2.02.   The assignment set forth in paragraph 2.01 includes, without limitation, the assignment to us of: (a) the right to exercise the Recording Option and cause the applicable Artist to furnish her exclusive recording services to us; and (b) the Recording Agreement itself and all rights contained therein.

2.03.   In connection with the assignment set forth in paragraph 2.01, you hereby assign to us, and we hereby assume, all of your executory obligations under each Recording Agreement (including, without limitation, the obligations to pay advances and to account and pay royalties). The foregoing assignment and assumption does not include, and you shall remain solely responsible for fulfilling, any and all obligations which were due to be performed by you under any of the Recording Agreements prior to the date hereof.

2.04.   We shall grant you a gratis non-exclusive license to use master recordings (including promotional videos) owned by us pursuant to the Recording Agreements in the Program and to exhibit, distribute and otherwise exploit the Program in any and all media, throughout the world and in perpetuity, and to use excerpts of such master recordings in (x) advertisements for the Program and (y) other marketing and/or promotions for the Program, provided we have approved such other marketing and/or promotions (which approval shall not be unreasonably withheld, but in no event shall we have any obligation to approve any proposed marketing or promotional use of master recordings on any audio or audiovisual record). The grant of such license is conditioned upon you obtaining (a) the consents of the Artists concerned to the extent that such consents are not already granted in the Recording Agreements or elsewhere, and (b) licenses from the music publishers of the compositions embodied in such

297552.3
062407

2

ATLANTIC000906

master recordings.  With respect to those compositions (or portions thereof) owned by us or our music publishing affiliates, we shall use our reasonable efforts to cause our music publishing affiliates exclusive administrator, EMI Music Publishing, to grant such licenses to you on a gratis basis.  We shall use our reasonable efforts to assist you in obtaining any required consents of the Artists concerned.  We and our music publishing affiliates shall honor any such grants of licenses to you which were made by the Artists concerned prior to the execution hereof.

2.05.   Solely to the extent of any ownership interest we may have in the professional name of the group consisting of one or more of the Artists (the "Group Name"), we shall grant you a gratis non-exclusive license to use the Group Name in the Program and in and to exhibit, distribute and otherwise exploit the Program in any and all media, throughout the world and in perpetuity, and to use the Group Name in (a) advertisements for the Program and (b) other marketing and/or promotions for the Program.  You shall be solely responsible for obtaining the consents of the Artists concerned (to the extent such consents have not already been granted in the Recording Agreements or in other agreements with you or with us) and/or of any other persons or entities with any ownership interest in the Group Name.  We shall use our reasonable efforts to assist you in obtaining any required consents of the Artists and/or other persons or entities concerned.

2A.   <u>Commitments</u>.

2A.01. In connection with the Group, you have agreed to provide the following commitments:

(a)   In connection with the release of the Group's first Album (and in connection with the first two (2) commercial singles from such Album), create special programming supporting the U.S. launch of such Album (at least similar in size and concept to that provided for the group known as "Danity Kane"), with video premieres in connection with the first two (2) singles, on those video programs related to the Group's genre of music, which currently encompass the following video countdown shows: "TRL", "Sucker Free" and those relevant countdown shows on "MTV Jams" and "MTV Hits".  It being understood that simultaneously we shall provide you with our U.S. marketing plan relating to the launch of the Group's first Album.

(b)   In connection with the music videos for the first two (2) singles from each of the Group's Albums, medium rotation for such videos on MTV, subject to the next sentence.  In the event you fail to fulfill your commitment set forth in the preceding sentence in connection with any Group Album (other than the first Group Album, which commitment is deemed a "firm" commitment), then we shall not be required to pay you the Override Royalty for such Album or any other compensation otherwise payable to you in connection with such Album (including without limitation, monies payable to you pursuant to paragraph 3 below).

(c)   In connection with the 2007 MTV Video Award Show in Las Vegas (the "Award Show"), either: (i) one (1) ticket for each member of the Group (each such member being 21 years of age or older) whose seats shall be next to Sean Combs and his one (1) guest; or (ii) three (3) tickets for Sean Combs' guests (all of which will be 21 years of age or older).  To

ATLANTIC000907

the extent that you formally identify on camera celebrities and/or other artists in attendance at the Award Show, then to the extent the members of the Group are in attendance, you shall also identify the members of the Group as the selected members from the Program.

(d)   In connection with the release of the first Album, no less than two (2) appearances on TRL.

3.   **Compensation.**

3.01.   (a)   In full consideration for your assignment to us of the Recording Agreements and the Recording Options for the Artists, we shall pay to you an "override" royalty (the "Override Royalty") solely in respect of "Qualifying Masters" (as defined in paragraph 3.01(b)(i) below) as follows: The Override Royalty in respect of long-playing albums embodying Qualifying Masters shall be at a rate equal to ███████████████████ (the "Basic Rate") of the royalty base price therefor, subject to all of the other provisions of this paragraph 3. Notwithstanding any of the foregoing, the Basic Rate in respect of any Qualifying Album by a "Leaving Member" (as defined below) shall be ███████████████ and (same shall not be subject to reduction pursuant to the immediately preceding sentence).

(b)   (i)  As used herein, the term "Qualifying Masters" shall mean:

(A) All master recordings (audio and audiovisual) featuring the performances of two or more of the Artists as to whom we exercise the Group Option performing together as a group (the "Group") which are recorded and delivered to us under the Recording Agreements up to and including the delivery to us of the sixth "Qualifying Album" (as defined below) of the Group;

(B) If, prior to the delivery to us of the sixth Qualifying Album of the Group, one or more members thereof shall cease to perform as part of the Group and if we exercise our "leaving member" rights with respect to any such departing members (each, a "Leaving Member"), then all master recordings (audio and audiovisual) featuring the performances of any such Leaving Member recorded pursuant to the applicable Recording Agreement up to and including the delivery to us of the first Qualifying Album of such Leaving Member; and

(C) With respect to each Artist who is not a member of the group described in the foregoing clause (A) as to whom we exercise the Service Option (each, a "Solo Artist"), all master recordings (audio and audiovisual) featuring the performances of such Solo Artist which are recorded and delivered to us under the Recording Agreements up to and including the delivery to us of the sixth Qualifying Album of such Solo Artist.

(ii)   As used herein, the term "Qualifying Album" shall mean: (A) the first six (6) long-playing audio-only record albums featuring the performances of the Group which are recorded and delivered to us in fulfillment of the Group's recording commitment pursuant to the applicable Recording Agreement(s); (B) the first long-playing audio-only record album featuring the performances of each Leaving Member which is recorded and delivered to

ATLANTIC000908

us in fulfillment of the Leaving Member's recording commitment as a leaving member pursuant to the applicable Recording Agreement (but only if such Leaving Member ceased to be a member of the Group prior to the delivery to us of the sixth Qualifying Album of the Group); and (C) with respect to each Solo Artist, the first six (6) long-playing audio-only record albums featuring such Solo Artist's performances which are recorded and delivered to us in fulfillment of such Solo Artist's recording commitment pursuant to the applicable Recording Agreement.

    3.02.  (a)    The Override Royalty shall be calculated at the Basic Rate in respect of USNRC Net Sales of the applicable Qualifying Album.  The royalty payable to you for sales of records embodying the Qualifying Masters and other exploitations of the Qualifying Masters (including, without limitation, sales outside the United States, sales at reduced price, digital sales and club sales) shall be reduced in the same proportion that the basic royalty rate payable by us to the applicable Artist (or group of Artists, if applicable) for USNRC Net Sales of the applicable Qualifying Album is reduced for such sale, provided that with respect to sales or exploitations for which the Artist receives a royalty which is computed as a percentage of our net receipts, net monies, or the like, the Override Royalty in respect of such sale or exploitations shall be equal to the Artist's royalty therefor multiplied by a fraction, the numerator of which is equal to the Basic Rate as set forth in paragraph 3.01(a) above (and as same may be adjusted as provided therein), and the denominator of which is equal to the applicable Artist's basic "all-in" royalty rate for USNRC Net Sales of the applicable Qualifying Album.

    (b)    The Override Royalty shall be computed, determined, calculated and paid in the same manner (e.g., container charges, free goods and other non-royalty bearing units, definitions of royalty base price, reserves, compact disc, new technology, and other format-based adjustments, etc.) as royalties payable by us to the applicable Artist in respect of the applicable Qualifying Album are computed, determined, calculated and paid pursuant to the applicable Recording Agreement.

    (c)    With respect to sales of records embodying one or more Qualifying Masters along with other master recordings, the Override Royalty shall be the otherwise applicable royalty multiplied by a fraction, the numerator of which is equal to the number of Qualifying Masters contained on the record and the denominator of which is the total number of master recordings (including the Qualifying Masters) contained on the record.

    3.03.  You shall not be entitled to any royalty in respect of the sale of singles.  (Solely for purposes of this paragraph 3.03, the digital sale of individual Masters, as permanent downloads and the like, shall not be deemed to be excluded hereunder as "singles".)

    3.04.  With respect to each relevant Artist, you shall not be entitled to receive the Override Royalty unless and until we have recouped from the applicable Artist's "net" royalties in respect of Qualifying Albums (i.e., the Artist's royalties net of the royalties payable to all producers, mixers, "guest" artists and other third parties) all of the following: (a) all advances (excluding music publishing advances) required to be paid to the Artist in connection with the Qualifying Albums pursuant to the applicable Recording Agreement, (b) all recording costs incurred in connection with the recording of the Qualifying Albums, and (c) all marketing costs (including video production costs) in connection with the Qualifying Albums which are

ATLANTIC000909

recoupable from the Artist's royalties (provided, for these purposes, no more than ▮▮▮ of video production costs and ▮▮▮ of independent radio promotion costs will be deemed recoupable). Following such recoupment, we shall pay you the Override Royalty on all prospective sales and retroactively to the "first record sold". By way of clarification, for these purposes, we shall have the right to treat all of the Qualifying Albums featuring a particular Artist as a single account, but we shall not "cross-collateralize" the account of one Artist with that of any other Artist. We shall not "cross-collateralize" the account of a Leaving Member with the account of the Group except to the extent that we are permitted to do so under the applicable Recording Agreement for such Leaving Member. For purposes of this paragraph 3.04, the Artist's "net" royalties shall be calculated based on a basic rate for USNRC Net Sales of albums of no less than twelve (12%) percent.

3.05.   The Override Royalty as described in this Article 3 constitutes the full and complete compensation payable to you in connection with the rights granted by you to us. Without limiting the foregoing, we shall have no obligation to pay any advances to you or to pay you any sums in connection with our or our affiliates' exploitation of any other rights relating to the Artists, whether pursuant to the Recording Agreements or otherwise, including music publishing rights.

3.06.   You acknowledge and agree that we shall have no obligation or liability to you if, for any reason, we fail or refuse to exercise any Recording Option or option for any Qualifying Album or if we fail or refuse to record and/or release any Qualifying Album or other Masters.

3.07.   We shall have the right, in our sole discretion, to enter into a new, substitute recording agreement with any Artist(s) on such terms as we may, in our sole discretion, determine. If we so enter into a substitute recording agreement with a particular Artist (including two or more of the Artists as a group), such substitute agreement shall be deemed to be the applicable Recording Agreement for that Artist(s) with respect to the Qualifying Album(s) subject to such substitute agreement. If the substitute Recording Agreement provides for the calculation of the Artist's royalties on a royalty base price which is other than a retail-based price (e.g., on the basis of the wholesale price or the published price to dealers without a so-called "uplift") and/or if such substitute Recording Agreement materially changes any other element(s) of the calculation of the royalty base price or the net effective price on which royalties are payable (e.g., a change in the container deduction or in so-called "standard" free goods) from the comparable elements provided for in Exhibit A to the existing Recording Agreements, then the Basic Rate hereunder shall be deemed adjusted so that the net amount of royalties payable to you in respect of sales of top price albums in the applicable Recording country pursuant to the royalty calculation provisions of the substitute Recording Agreement would be the same as the net amount of royalties payable to you in respect of the same sale pursuant to the royalty calculation provisions of the existing Recording Agreement.

3.08.   Notwithstanding anything to the contrary contained herein, with respect to the Merchandise Rights and/or the Touring Rights (as those terms are defined in paragraph 7 of each of the Recording Agreements), in the event we exploit our Touring Rights and/or Merchandise Rights, then in connection therewith, we shall provide you with a copy of our marketing and promotion plan (with associated cost breakdown), and you shall, within ten (10) business days,

297552.3
082407

6

ATLANTIC000910

provide us with a detailed marketing and promotion plan indicating how you plan on assisting our efforts in connection with our exploitation of such Touring Rights and/or Merchandise Rights (the "Plan"). Upon our receipt of your Plan, we will negotiate with you in good faith for a period of thirty (30) days to work out an arrangement for your contribution to our efforts and your participation in income derived from such Merchandising Rights and/or Touring Rights. In the event the parties fail to successfully negotiate an agreement in good faith within the time prescribed, then you shall not be required to assist us in our exploitation of such Touring Rights and/or Merchandise Rights, and you shall not be entitled to participate in income derived from such Merchandising Rights and/or Touring Rights.

4.   **Accounting.**

4.01.   Within ninety (90) days after June 30 and December 31 of each year during which applicable records are sold, we shall render a statement of accrued royalties earned under this Agreement during the preceding calendar semi-annual period. Concurrently with the rendition of each statement, we shall pay you all royalties shown to be due by such statement. No statements need be rendered by us for any such calendar semi-annual period for which there are no sales of records hereunder. We may withhold a reasonable reserve against returns, exchanges, refunds, credits and the like, such reserve to be established by us in our reasonable discretion, based on, among other factors, the applicable Artist's sales experience, which reserves shall not be in excess of twenty-five percent (25%) of royalties otherwise credited to your account hereunder for shipments of records in any particular royalty period (unless we anticipate, in our reasonable, good faith judgment, returns, exchanges, refunds, credits and the like which justify the establishment of a larger reserve) and each such reserve shall be fully liquidated no later than with the rendition of statement rendered two (2) years following the statement with respect to which such reserve was originally maintained; provided, however, with respect to reserves in connection with Qualifying Masters subject to a particular Recording Agreement, you shall have the benefit of any more favorable liquidation provision contained in such Recording Agreement. You shall be deemed to have consented to all accountings rendered by us hereunder and such accountings shall be binding upon you and not subject to any objection by you for any reason unless specific objection, in writing, stating the basis thereof, is given to us within two and one-half (2 1/2) years after the date we are deemed to have rendered the applicable statement, and after such written objection, unless suit is instituted within three (3) years after the date we are deemed to have rendered the applicable statement. We shall be deemed conclusively to have rendered each statement on the date prescribed in this paragraph 4.01 unless you notify us otherwise with respect to any particular statement within sixty (60) days after the date that we are required to render that statement pursuant to the first sentence of this paragraph 4.01.

4.02.   (a)   You shall have the right at your sole cost and expense to appoint a certified public accountant (or a qualified member of your finance or accounting staff) who is not then currently engaged in an outstanding audit of us to examine our books and records as same pertain to sales of records subject hereto; provided that, any such examination shall be for a reasonable duration, shall take place at our offices during normal business hours on reasonable prior notice and shall not occur more than once in any calendar year. You may examine our books and records with respect to a particular statement only once.

ATLANTIC000911

(b)     Notwithstanding anything to the contrary contained in paragraph 4.02(a) above, if we notify you that the certified public accountant (or other designated individual) designated by you to conduct an audit under paragraph 4.02(a) is engaged in another outstanding audit of us on behalf of another person, you may nevertheless have your audit conducted by such accountant (or other individual), and the running of the time within which such audit may be made shall be suspended until such accountant (or other individual) has completed such other audit, provided:  (A) you shall notify us of your election to that effect within fifteen (15) days after the date of our such notice to you; (B) your accountant (or other individual) shall proceed in a reasonably continuous and expeditious manner to complete such other audit and render the final report thereon to you and us; and (C) your audit shall not be commenced by your accountant (or other individual) before the delivery to is of the final report on such other audit, shall be commenced within forty-five (45) days thereafter, and shall be conducted in a reasonably continuous manner.  The provisions of this paragraph 4.02(b) shall not apply if we elect to waive the provisions of paragraph 4.02(a) that require that your accountant (or other individual) shall not be engaged in any other audit.

5.      <u>Representations and Warranties</u>.

  5.01.   You hereby warrant and represent that:

    (a)     You are free to and have the full right, power and authority to enter into and fully perform this Agreement and to assign the Recording Options and the other rights as set forth in Article 2 above;

    (b)     We shall have no obligation to make any payment to you or to any third party for or in connection with the assignment made hereunder or the exploitation by us of the rights acquired by us hereunder, except as expressly provided for in the applicable Recording Agreements or in this Agreement;

    (c)     You are not aware of  (i) any claim by an Artist or by any other person relating to any of the Artists, the Recording Options or the Recording Agreements which might affect our rights or our ability to exploit our rights under any of the Recording Agreements, or (ii) any other fact or allegation which, if true, might affect our rights or our ability to exploit our rights under any of the Recording Agreements.  We acknowledge that we have entered into the Knowles Agreement, and pursuant thereto, may have a payment obligation to Knowles.  With respect to the Knowles Agreement, your warranties and representations contained in this paragraph 5.01(c) shall not be deemed to extend to the Knowles Agreement or any claims made in connection therewith, nor shall you be obligated to indemnify us pursuant to paragraph 5.02 below with respect to the Knowles Agreement or claims made in connection therewith; and

    (d)     The Artists identified on Schedule 1 annexed hereto comprise all of the individuals on the Program who were selected to be in the Group.

  5.02.   We hereby warrant and represent that (a) we are free to and have the full right, power and authority to enter into and fully perform this Agreement, and (b) we shall fully and timely perform all of our obligations under the Recording Agreements.

ATLANTIC000912

5.03.   You and we (each, the "Indemnitor") agree to indemnify and hold the other party and its successors, assigns, agents, distributors, licensees, officers, directors and employees (collectively, the "Indemnitee") harmless against any claim, liability, cost and expense (including reasonable attorneys' fees and legal costs) in connection with any third party claim which is in consistent with any agreement, covenant, representation, or warranty made by Indemnitor herein which has resulted in a final judgment or has been settled with Indemnitor's written consent, which consent shall not be unreasonably withheld (it being agreed that Indemnitor shall be deemed to have consented to any settlement not in excess of $5,000). Indemnitor will reimburse Indemnitee upon demand for any payment made by Indemnitee at any time after the date hereof in respect of any claim, liability, damage or expense to which the foregoing indemnity relates. Upon the making or filing of any such claim, action or demand against us as the Indemnitee, we shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue; provided, however, that if you deliver to us an indemnity or surety bond, in a form and with a company acceptable to us, in an amount reasonably consistent with the amount of such claim, then we shall not withhold payment of monies otherwise payable to you hereunder in respect of such claim, demand or action. We shall cease to withhold sums in respect of a claim if no lawsuit has been commenced as of the date twelve (12) months after such claim is initially made unless we are then actively engaged in settlement negotiations with respect to such claim. The Indemnitor shall be notified of any such claim, action or demand and shall have the right, at its own expense, to participate in the defense thereof with counsel of its own choosing; provided, however, that the Indemnitee's decision in connection with the defense of any such claim, action or demand shall be final.

6.   **Miscellaneous.**

6.01.   This Agreement sets forth the entire understanding between the parties, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, with respect to the subject matter hereof. The parties expressly acknowledge that in entering into this Agreement they have not relied on any representations, written or unwritten, concerning the subject matter of this Agreement other than those contained herein. No modification, amendment or waiver of or under this Agreement or any of its terms will be binding unless confirmed by a document signed by the party to be charged. Should any paragraph or provision of this Agreement be held void, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein. This Agreement may be executed in counterparts and, as so executed, will constitute one Agreement binding on all parties. The parties further agree that facsimile signatures will be acceptable and fully binding on all parties.

6.02.   We may assign our rights and delegate our obligations hereunder with respect to a particular Artist, in whole or in part, to any party in conjunction with an assignment of our rights in respect of the applicable Recording Agreement. Any assignee of all or substantially all of our rights under this Agreement and/or a Recording Agreement shall agree in writing to assume our obligations with respect thereto. You shall have the right to assign your right to receive income

ATLANTIC000913

hereunder. You shall have the right to assign your rights under paragraph 2.04 in conjunction with a sale or assignment of the Program.

6.03.   This Agreement shall be governed by and construed under the laws and judicial decisions of the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the State Courts of or the Federal Court in the State and County of New York; provided, however, if we are sued or joined in any other court or forum in respect of any matter which may give rise to a claim by us hereunder, you and Producer consent to the jurisdiction of such court or forum over any such claim which may be asserted by us.

If the foregoing accurately reflects your understanding of the terms and conditions of the agreement between you and us with respect to the subject matter of this Agreement, please so indicate by signing where indicated below.

Very truly yours,

**BAD BOY RECORDS**

By: _____

ACCEPTED AND AGREED TO:

**REMOTE PRODUCTIONS INC.**

By: _____

297552.3
082407

10

ATLANTIC000914

Schedule 1

297552.3
082407

11

ATLANTIC000915

<u>**Exhibit A**</u>

Artist Agreements

297552.3
082407

12

ATLANTIC000916

 Day 26 

**CONFIDENTIAL**

**BAD BOY RECORDS**
1710 Broadway
4th Floor
New York, New York 10019

Dated as of August 22, 2007

Remote Productions Inc.
1515 Broadway
New York, New York  10036

Gentlepersons:

The following, when executed by you and by us, shall constitute our agreement with respect to the rights to the recording services of certain individual contestants identified on Schedule 1 annexed hereto (each, an "<u>Artist</u>") appearing on the television program produced by you entitled "Making the Band 4" (the "<u>Program</u>"):

1. <u>Recording Options/Recording Agreements.</u>

    1.01.   In connection with your production of the Program, you have entered into an agreement (each, a "<u>Recording Agreement</u>") with each of the Artists, pursuant to which each Artist has granted to you the exclusive and irrevocable option to require such Artist to provide his exclusive recording services as a member of the musical group selected as part of the Program and/or for such Artist's recording services for other recording projects. (The option for each Artist's recording services as a member of the group is referred to in the applicable Recording Agreement as the "<u>Group Option</u>" and the option for each Artist's recording services other than as a member of the group is referred to in the applicable Recording Agreement as the "<u>Service Option</u>". The foregoing Group Option and Service Option for each Artist are referred herein collectively as the "<u>Recording Option</u>".)

    1.02.   You hereby warrant and represent as follows, as of the date of execution hereof:

        (a)    The Recording Agreement with each Artist has been fully executed by all necessary parties, is currently in full force and effect and is binding on each Artist in all respects, including with respect to the Recording Option, and you are not currently in breach of any of your obligations under the Recording Agreement.

        (b)    You own all right, title and interest in and to each of the Recording Agreements and the Recording Options, free and clear of any obligations to any third party, and you currently have the full and unconditional right to exercise the Recording Option for each Artist, or to refrain therefrom with no liability whatsoever to the Artist or any third party. With respect to each Artist, you have the right to exercise the Group Option or the Service Option or both options.

297552.3
082407

1

ATLANTIC000917

(c)   You have until at least February 15, 2008 to exercise the Recording Option for each Artist, and you have not yet exercised any of the Recording Options.

(d)   To the best of your knowledge, the exercise of the Recording Option for each Artist shall not give rise to any obligation to make any payment to or on behalf of the applicable Artist or any third party or to any other obligation, except for: (i) those payment obligations and other obligations set forth in the Recording Agreement itself; and (ii) the potential payment obligations set forth in our agreement with Matthew Knowles ("Knowles"), dated as of August 20, 2007 (the "Knowles Agreement").

(e)   You have the right to assign to us each Recording Agreement and all of your right, title and interest therein.

(f)   A copy of each Recording Agreement is attached hereto as Exhibit A and is made a part hereof.

2.   <u>Assignment of Rights and Obligations.</u>

2.01.   For good and valuable consideration, receipt of which is hereby acknowledged, you hereby sell, assign and transfer to us all right, title and interest in and to each Recording Agreement and each Recording Option. Promptly following the complete execution hereof, you shall deliver to us true and complete copies of each Recording Agreement.

2.02.   The assignment set forth in paragraph 2.01 includes, without limitation, the assignment to us of: (a) the right to exercise the Recording Option and cause the applicable Artist to furnish her exclusive recording services to us; and (b) the Recording Agreement itself and all rights contained therein.

2.03.   In connection with the assignment set forth in paragraph 2.01, you hereby assign to us, and we hereby assume, all of your executory obligations under each Recording Agreement (including, without limitation, the obligations to pay advances and to account and pay royalties). The foregoing assignment and assumption does not include, and you shall remain solely responsible for fulfilling, any and all obligations which were due to be performed by you under any of the Recording Agreements prior to the date hereof.

2.04.   We shall grant you a gratis non-exclusive license to use master recordings (including promotional videos) owned by us pursuant to the Recording Agreements in the Program and to exhibit, distribute and otherwise exploit the Program in any and all media, throughout the world and in perpetuity, and to use excerpts of such master recordings in (x) advertisements for the Program and (y) other marketing and/or promotions for the Program, provided we have approved such other marketing and/or promotions (which approval shall not be unreasonably withheld, but in no event shall we have any obligation to approve any proposed marketing or promotional use of master recordings on any audio or audiovisual record). The grant of such license is conditioned upon you obtaining (a) the consents of the Artists concerned to the extent that such consents are not already granted in the Recording Agreements or elsewhere, and (b) licenses from the music publishers of the compositions embodied in such

297552.3
082407

2

ATLANTIC000918

master recordings. With respect to those compositions (or portions thereof) owned by us or our music publishing affiliates, we shall use our reasonable efforts to cause our music publishing affiliates exclusive administrator, EMI Music Publishing, to grant such licenses to you on a gratis basis. We shall use our reasonable efforts to assist you in obtaining any required consents of the Artists concerned. We and our music publishing affiliates shall honor any such grants of licenses to you which were made by the Artists concerned prior to the execution hereof.

2.05. Solely to the extent of any ownership interest we may have in the professional name of the group consisting of one or more of the Artists (the "Group Name"), we shall grant you a gratis non-exclusive license to use the Group Name in the Program and in and to exhibit, distribute and otherwise exploit the Program in any and all media, throughout the world and in perpetuity, and to use the Group Name in (a) advertisements for the Program and (b) other marketing and/or promotions for the Program. You shall be solely responsible for obtaining the consents of the Artists concerned (to the extent such consents have not already been granted in the Recording Agreements or in other agreements with you or with us) and/or of any other persons or entities with any ownership interest in the Group Name. We shall use our reasonable efforts to assist you in obtaining any required consents of the Artists and/or other persons or entities concerned.

2A.    **Commitments.**

2A.01. In connection with the Group, you have agreed to provide the following commitments:

(a)    In connection with the release of the Group's first Album (and in connection with the first two (2) commercial singles from such Album), create special programming supporting the U.S. launch of such Album (at least similar in size and concept to that provided for the group known as "Danity Kane"), with video premieres in connection with the first two (2) singles, on those video programs related to the Group's genre of music, which currently encompass the following video countdown shows: "TRL", "Sucker Free" and those relevant countdown shows on "MTV Jams" and "MTV Hits". It being understood that simultaneously we shall provide you with our U.S. marketing plan relating to the launch of the Group's first Album.

(b)    In connection with the music videos for the first two (2) singles from each of the Group's Albums, medium rotation for such videos on MTV, subject to the next sentence. In the event you fail to fulfill your commitment set forth in the preceding sentence in connection with any Group Album (other than the first Group Album, which commitment is deemed a "firm" commitment), then we shall not be required to pay you the Override Royalty for such Album or any other compensation otherwise payable to you in connection with such Album (including without limitation, monies payable to you pursuant to paragraph 3 below).

(c)    In connection with the 2007 MTV Video Award Show in Las Vegas (the "Award Show"), either: (i) one (1) ticket for each member of the Group (each such member being 21 years of age or older) whose seats shall be next to Sean Combs and his one (1) guest; or (ii) three (3) tickets for Sean Combs' guests (all of which will be 21 years of age or older). To

ATLANTIC000919

the extent that you formally identify on camera celebrities and/or other artists in attendance at the Award Show, then to the extent the members of the Group are in attendance, you shall also identify the members of the Group as the selected members from the Program.

(d)     In connection with the release of the first Album, no less than two (2) appearances on TRL.

3.     Compensation.

3.01.   (a)     In full consideration for your assignment to us of the Recording Agreements and the Recording Options for the Artists, we shall pay to you an "override" royalty (the "Override Royalty") solely in respect of "Qualifying Masters" (as defined in paragraph 3.01(b)(i) below) as follows:  The Override Royalty in respect of long-playing albums embodying Qualifying Masters shall be at a rate equal to three and one-half percent (3.5%) (the "Basic Rate") of the royalty base price therefor, subject to all of the other provisions of this paragraph 3.  Notwithstanding any of the foregoing, the Basic Rate in respect of any Qualifying Album by a "Leaving Member" (as defined below) shall be three (3%) percent, and (same shall not be subject to reduction pursuant to the immediately preceding sentence).

(b)     (i)     As used herein, the term "Qualifying Masters" shall mean:

(A) All master recordings (audio and audiovisual) featuring the performances of two or more of the Artists as to whom we exercise the Group Option performing together as a group (the "Group") which are recorded and delivered to us under the Recording Agreements up to and including the delivery to us of the sixth "Qualifying Album" (as defined below) of the Group;

(B) If, prior to the delivery to us of the sixth Qualifying Album of the Group, one or more members thereof shall cease to perform as part of the Group and if we exercise our "leaving member" rights with respect to any such departing members (each, a "Leaving Member"), then all master recordings (audio and audiovisual) featuring the performances of any such Leaving Member recorded pursuant to the applicable Recording Agreement up to and including the delivery to us of the first Qualifying Album of such Leaving Member; and

(C) With respect to each Artist who is not a member of the group described in the foregoing clause (A) as to whom we exercise the Service Option (each, a "Solo Artist"), all master recordings (audio and audiovisual) featuring the performances of such Solo Artist which are recorded and delivered to us under the Recording Agreements up to and including the delivery to us of the sixth Qualifying Album of such Solo Artist.

(ii)     As used herein, the term "Qualifying Album" shall mean: (A) the first six (6) long-playing audio-only record albums featuring the performances of the Group which are recorded and delivered to us in fulfillment of the Group's recording commitment pursuant to the applicable Recording Agreement(s); (B) the first long-playing audio-only record album featuring the performances of each Leaving Member which is recorded and delivered to

ATLANTIC000920

us in fulfillment of the Leaving Member's recording commitment as a leaving member pursuant to the applicable Recording Agreement (but only if such Leaving Member ceased to be a member of the Group prior to the delivery to us of the sixth Qualifying Album of the Group); and (C) with respect to each Solo Artist, the first six (6) long-playing audio-only record albums featuring such Solo Artist's performances which are recorded and delivered to us in fulfillment of such Solo Artist's recording commitment pursuant to the applicable Recording Agreement.

3.02.    (a)    The Override Royalty shall be calculated at the Basic Rate in respect of USNRC Net Sales of the applicable Qualifying Album.  The royalty payable to you for sales of records embodying the Qualifying Masters and other exploitations of the Qualifying Masters (including, without limitation, sales outside the United States, sales at reduced price, digital sales and club sales) shall be reduced in the same proportion that the basic royalty rate payable by us to the applicable Artist (or group of Artists, if applicable) for USNRC Net Sales of the applicable Qualifying Album is reduced for such sale, provided that with respect to sales or exploitations for which the Artist receives a royalty which is computed as a percentage of our net receipts, net monies, or the like, the Override Royalty in respect of such sale or exploitations shall be equal to the Artist's royalty therefor multiplied by a fraction, the numerator of which is equal to the Basic Rate as set forth in paragraph 3.01(a) above (and as same may be adjusted as provided therein), and the denominator of which is equal to the applicable Artist's basic "all-in" royalty rate for USNRC Net Sales of the applicable Qualifying Album.

(b)    The Override Royalty shall be computed, determined, calculated and paid in the same manner (e.g., container charges, free goods and other non-royalty bearing units, definitions of royalty base price, reserves, compact disc, new technology, and other format-based adjustments, etc.) as royalties payable by us to the applicable Artist in respect of the applicable Qualifying Album are computed, determined, calculated and paid pursuant to the applicable Recording Agreement.

(c)    With respect to sales of records embodying one or more Qualifying Masters along with other master recordings, the Override Royalty shall be the otherwise applicable royalty multiplied by a fraction, the numerator of which is equal to the number of Qualifying Masters contained on the record and the denominator of which is the total number of master recordings (including the Qualifying Masters) contained on the record.

3.03.    You shall not be entitled to any royalty in respect of the sale of singles.  (Solely for purposes of this paragraph 3.03, the digital sale of individual Masters, as permanent downloads and the like, shall not be deemed to be excluded hereunder as "singles".)

3.04.    With respect to each relevant Artist, you shall not be entitled to receive the Override Royalty unless and until we have recouped from the applicable Artist's "net" royalties in respect of Qualifying Albums (i.e., the Artist's royalties net of the royalties payable to all producers, mixers, "guest" artists and other third parties) all of the following: (a) all advances (excluding music publishing advances) required to be paid to the Artist in connection with the Qualifying Albums pursuant to the applicable Recording Agreement, (b) all recording costs incurred in connection with the recording of the Qualifying Albums, and (c) all marketing costs (including video production costs) in connection with the Qualifying Albums which are

ATLANTIC000921

recoupable from the Artist's royalties (provided, for these purposes, no more than 50% of video production costs and 50% of independent radio promotion costs will be deemed recoupable). Following such recoupment, we shall pay you the Override Royalty on all prospective sales and retroactively to the "first record sold". By way of clarification, for these purposes, we shall have the right to treat all of the Qualifying Albums featuring a particular Artist as a single account, but we shall not "cross-collateralize" the account of one Artist with that of any other Artist. We shall not "cross-collateralize" the account of a Leaving Member with the account of the Group except to the extent that we are permitted to do so under the applicable Recording Agreement for such Leaving Member. For purposes of this paragraph 3.04, the Artist's "net" royalties shall be calculated based on a basic rate for USNRC Net Sales of albums of no less than twelve (12%) percent.

3.05.   The Override Royalty as described in this Article 3 constitutes the full and complete compensation payable to you in connection with the rights granted by you to us. Without limiting the foregoing, we shall have no obligation to pay any advances to you or to pay you any sums in connection with our or our affiliates' exploitation of any other rights relating to the Artists, whether pursuant to the Recording Agreements or otherwise, including music publishing rights.

3.06.   You acknowledge and agree that we shall have no obligation or liability to you if, for any reason, we fail or refuse to exercise any Recording Option or option for any Qualifying Album or if we fail or refuse to record and/or release any Qualifying Album or other Masters.

3.07.   We shall have the right, in our sole discretion, to enter into a new, substitute recording agreement with any Artist(s) on such terms as we may, in our sole discretion, determine. If we so enter into a substitute recording agreement with a particular Artist (including two or more of the Artists as a group), such substitute agreement shall be deemed to be the applicable Recording Agreement for that Artist(s) with respect to the Qualifying Album(s) subject to such substitute agreement. If the substitute Recording Agreement provides for the calculation of the Artist's royalties on a royalty base price which is other than a retail-based price (e.g., on the basis of the wholesale price or the published price to dealers without a so-called "uplift") and/or if such substitute Recording Agreement materially changes any other element(s) of the calculation of the royalty base price or the net effective price on which royalties are payable (e.g., a change in the container deduction or in so-called "standard" free goods) from the comparable elements provided for in Exhibit A to the existing Recording Agreements, then the Basic Rate hereunder shall be deemed adjusted so that the net amount of royalties payable to you in respect of sales of top price albums in the applicable country pursuant to the royalty calculation provisions of the substitute Recording Agreement would be the same as the net amount of royalties payable to you in respect of the same sale pursuant to the royalty calculation provisions of the existing Recording Agreement.

3.08.   Notwithstanding anything to the contrary contained herein, with respect to the Merchandise Rights and/or the Touring Rights (as those terms are defined in paragraph 7 of each of the Recording Agreements), in the event we exploit our Touring Rights and/or Merchandise Rights, then in connection therewith, we shall provide you with a copy of our marketing and promotion plan (with associated cost breakdown), and you shall, within ten (10) business days,

2975523
082407

6

ATLANTIC000922

provide us with a detailed marketing and promotion plan indicating how you plan on assisting our efforts in connection with our exploitation of such Touring Rights and/or Merchandise Rights (the "Plan"). Upon our receipt of your Plan, we will negotiate with you in good faith for a period of thirty (30) days to work out an arrangement for your contribution to our efforts and your participation in income derived from such Merchandising Rights and/or Touring Rights. In the event the parties fail to successfully negotiate an agreement in good faith within the time prescribed, then you shall not be required to assist us in our exploitation of such Touring Rights and/or Merchandise Rights, and you shall not be entitled to participate in income derived from such Merchandising Rights and/or Touring Rights.

4.    Accounting.

4.01.    Within ninety (90) days after June 30 and December 31 of each year during which applicable records are sold, we shall render a statement of accrued royalties earned under this Agreement during the preceding calendar semi-annual period. Concurrently with the rendition of each statement, we shall pay you all royalties shown to be due by such statement. No statements need be rendered by us for any such calendar semi-annual period for which there are no sales of records hereunder. We may withhold a reasonable reserve against returns, exchanges, refunds, credits and the like, such reserve to be established by us in our reasonable discretion, based on, among other factors, the applicable Artist's sales experience, which reserves shall not be in excess of twenty-five percent (25%) of royalties otherwise credited to your account hereunder for shipments of records in any particular royalty period (unless we anticipate, in our reasonable, good faith judgment, returns, exchanges, refunds, credits and the like which justify the establishment of a larger reserve) and each such reserve shall be fully liquidated no later than with the rendition of statement rendered two (2) years following the statement with respect to which such reserve was originally maintained; provided, however, with respect to reserves in connection with Qualifying Masters subject to a particular Recording Agreement, you shall have the benefit of any more favorable liquidation provision contained in such Recording Agreement. You shall be deemed to have consented to all accountings rendered by us hereunder and such accountings shall be binding upon you and not subject to any objection by you for any reason unless specific objection, in writing, stating the basis thereof, is given to us within two and one-half (2 1/2) years after the date we are deemed to have rendered the applicable statement, and after such written objection, unless suit is instituted within three (3) years after the date we are deemed to have rendered the applicable statement. We shall be deemed conclusively to have rendered each statement on the date prescribed in this paragraph 4.01 unless you notify us otherwise with respect to any particular statement within sixty (60) days after the date that we are required to render that statement pursuant to the first sentence of this paragraph 4.01.

4.02.    (a)    You shall have the right at your sole cost and expense to appoint a certified public accountant (or a qualified member of your finance or accounting staff) who is not then currently engaged in an outstanding audit of us to examine our books and records as same pertain to sales of records subject hereto; provided that, any such examination shall be for a reasonable duration, shall take place at our offices during normal business hours on reasonable prior notice and shall not occur more than once in any calendar year. You may examine our books and records with respect to a particular statement only once.

ATLANTIC000923

(b)     Notwithstanding anything to the contrary contained in paragraph 4.02(a) above, if we notify you that the certified public accountant (or other designated individual) designated by you to conduct an audit under paragraph 4.02(a) is engaged in another outstanding audit of us on behalf of another person, you may nevertheless have your audit conducted by such accountant (or other individual), and the running of the time within which such audit may be made shall be suspended until such accountant (or other individual) has completed such other audit, provided:  (A) you shall notify us of your election to that effect within fifteen (15) days after the date of our such notice to you; (B) your accountant (or other individual) shall proceed in a reasonably continuous and expeditious manner to complete such other audit and render the final report thereon to you and us; and (C) your audit shall not be commenced by your accountant (or other individual) before the delivery to is of the final report on such other audit, shall be commenced within forty-five (45) days thereafter, and shall be conducted in a reasonably continuous manner.  The provisions of this paragraph 4.02(b) shall not apply if we elect to waive the provisions of paragraph 4.02(a) that require that your accountant (or other individual) shall not be engaged in any other audit.

5.     **Representations and Warranties**

5.01.   You hereby warrant and represent that:

(a)     You are free to and have the full right, power and authority to enter into, and fully perform this Agreement and to assign the Recording Options and the other rights as set forth in Article 2 above;

(b)     We shall have no obligation to make any payment to you or to any third party for or in connection with the assignment made hereunder or the exploitation by us of the rights acquired by us hereunder, except as expressly provided for in the applicable Recording Agreements or in this Agreement;

(c)     You are not aware of (i) any claim by an Artist or by any other person relating to any of the Artists, the Recording Options or the Recording Agreements which might affect our rights or our ability to exploit our rights under any of the Recording Agreements, or (ii) any other fact or allegation which, if true, might affect our rights or our ability to exploit our rights under any of the Recording Agreements.  We acknowledge that we have entered into the Knowles Agreement, and pursuant thereto, may have a payment obligation to Knowles.  With respect to the Knowles Agreement, your warranties and representations contained in this paragraph 5.01(c) shall not be deemed to extend to the Knowles Agreement or any claims made in connection therewith, nor shall you be obligated to indemnify us pursuant to paragraph 5.02 below with respect to the Knowles Agreement or claims made in connection therewith; and

(d)     The Artists identified on Schedule 1 annexed hereto comprise all of the individuals on the Program who were selected to be in the Group.

5.02.   We hereby warrant and represent that (a) we are free to and have the full right, power and authority to enter into and fully perform this Agreement, and (b) we shall fully and timely perform all of our obligations under the Recording Agreements.

ATLANTIC000924

5.03.   You and we (each, the "Indemnitor") agree to indemnify and hold the other party and its successors, assigns, agents, distributors, licensees, officers, directors and employees (collectively, the "Indemnitee") harmless against any claim, liability, cost and expense (including reasonable attorneys' fees and legal costs) in connection with any third party claim which is in consistent with any agreement, covenant, representation, or warranty made by Indemnitor herein which has resulted in a final judgment or has been settled with Indemnitor's written consent, which consent shall not be unreasonably withheld (it being agreed that Indemnitor shall be deemed to have consented to any settlement not in excess of $5,000).  Indemnitor will reimburse Indemnitee upon demand for any payment made by Indemnitee at any time after the date hereof in respect of any claim, liability, damage or expense to which the foregoing indemnity relates. Upon the making or filing of any such claim, action or demand against us as the Indemnitee, we shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue; provided, however, that if you deliver to us an indemnity or surety bond, in a form and with a company acceptable to us, in an amount reasonably consistent with the amount of such claim, then we shall not withhold payment of monies otherwise payable to you hereunder in respect of such claim, demand or action.  We shall cease to withhold sums in respect of a claim if no lawsuit has been commenced as of the date twelve (12) months after such claim is initially made unless we are then actively engaged in settlement negotiations with respect to such claim.  The Indemnitor shall be notified of any such claim, action or demand and shall have the right, at its own expense, to participate in the defense thereof with counsel of its own choosing; provided, however, that the Indemnitee's decision in connection with the defense of any such claim, action or demand shall be final.

6.   **Miscellaneous.**

6.01.   This Agreement sets forth the entire understanding between the parties, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, with respect to the subject matter hereof.  The parties expressly acknowledge that in entering into this Agreement they have not relied on any representations, written or unwritten, concerning the subject matter of this Agreement other than those contained herein. No modification, amendment or waiver of or under this Agreement or any of its terms will be binding unless confirmed by a document signed by the party to be charged.  Should any paragraph or provision of this Agreement be held void, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein.  This Agreement may be executed in counterparts and, as so executed, will constitute one Agreement binding on all parties.  The parties further agree that facsimile signatures will be acceptable and fully binding on all parties.

6.02.   We may assign our rights and delegate our obligations hereunder with respect to a particular Artist, in whole or in part, to any party in conjunction with an assignment of our rights in respect of the applicable Recording Agreement.  Any assignee of all or substantially all of our rights under this Agreement and/or a Recording Agreement shall agree in writing to assume our obligations with respect thereto.  You shall have the right to assign your right to receive income

ATLANTIC000925

hereunder. You shall have the right to assign your rights under paragraph 2.04 in conjunction with a sale or assignment of the Program.

6.03.   This Agreement shall be governed by and construed under the laws and judicial decisions of the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the State Courts of or the Federal Court in the State and County of New York; provided, however, if we are sued or joined in any other court or forum in respect of any matter which may give rise to a claim by us hereunder, you and Producer consent to the jurisdiction of such court or forum over any such claim which may be asserted by us.

If the foregoing accurately reflects your understanding of the terms and conditions of the agreement between you and us with respect to the subject matter of this Agreement, please so indicate by signing where indicated below.

Very truly yours,

BAD BOY RECORDS

By: _Derek Ferguson_

ACCEPTED AND AGREED TO:

REMOTE PRODUCTIONS INC.

By: _____

207552.3
082407

ATLANTIC000926

<u>Schedule 1</u>

ATLANTIC000927

**Exhibit A**

Artist Agreements

297552.3
082407

12

ATLANTIC000928