UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.*

Debtor. _____ /

SONEET KAPILA, Chapter 11 Trustee for
TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,

               Plaintiff,

v.

MTV NETWORKS, a division of Viacom,
International, Inc.

               Defendant. _____ /

Case No. 6:10-cv-181-Orl-28-DAB

## THE TRUSTEE'S MOTION FOR SANCTIONS AGAINST MTV NETWORKS FOR SPOLIATION AND DISCOVERY ABUSES

Pursuant to Federal Rule of Civil Procedure 37 and the Court's inherent power, plaintiff Soneet Kapila, in his capacity as the Chapter 11 Trustee for Trans Continental Television Productions, Inc. (the "Trustee"), respectfully moves this Court to enter a default judgment against MTV Networks ("MTV") or, in the alternative, to instruct the jury of certain adverse inferences against MTV, award the Trustee his attorneys' fees and costs, and impose such other relief as the Court deems proper, as sanctions for MTV's spoliation, discovery abuses and related litigation misconduct. The grounds for this motion are set forth below.

## I.  INTRODUCTION

The "delete" button on a computer keyboard is a very powerful tool. In this case, MTV has used it as both a sword and a shield. As a "shield," MTV systematically eliminated redlines and predecessor drafts of the controlling agreements, potentially pertinent electronically stored information and the supporting metadata ("ESI"), as well as other pivotal documents, that would assist the Trustee in prosecuting his claims for a joint venture interest in the television series

Making the Band.  As a "sword," MTV's witnesses have then attempted to capitalize on the absence of these now-destroyed documents by either offering slanted deposition testimony or pointing to the absence of the documents as "proof" of its defenses.

  While there is no "dump" button on a computer keyboard, there may be one in this case. MTV has abused the litigation process by producing ***approximately 85%*** of its total production ***after*** January 5, 2011 – twenty-nine months into the case, sixty-three days prior to the close of fact discovery and after the Trustee completed the vast majority of his depositions.  Specifically, starting in January of 2011, MTV began producing 1,058,051 pages on a rolling basis. The last of this rolling production was promised to be sent today (March 9, 2011) – the deadline for fact discovery.   Notably, a majority of these documents – several of which are critical – were responsive to the Trustee's discovery requests served in 2008 and 2009. An assessment of MTV's actions compels the conclusion that the only just remedy is a default judgment.[1]

## II. STATEMENT OF RELEVANT FACTS

### A. Despite Anticipating Litigation as Early as 2000, MTV Failed to Issue a Litigation Hold Memorandum Until 2008.

  Trans Continental Television Productions, Inc. ("Trans Continental") and MTV began negotiating the formation of joint venture relating to the television franchise Making the Band (the "Joint Venture") in 1999.[2]  As evidenced by its assertion of the work product privilege in this case, MTV was anticipating litigation with Trans Continental ***as early as 2000***. (*See* MTV's Tenth Amended Privilege Log, attached as **Ex**. **1**, p. 14).  Indeed, the Tenth Amended Privilege Log reflects that MTV has asserted its anticipation of litigation with Trans Continental for

---

[1]  While the Trustee expects that MTV will attempt to once again characterize this motion as "overheated rhetoric," the facts vitiate this contention and demand not only an explanation, but an evidentiary hearing.

[2]  In total, there have been twelve seasons of Making the Band, consisting of three seasons each of Making the Band, Making the Band II, Making the Band III and Making the Band IV.

documents spanning each year from 2000 through 2007.  (*See* the chart attached as **Ex**. **2**). Despite its awareness of a reasonable likelihood of litigation as early as 2000, MTV took no action for ***eight years*** to preserve any documents relevant to this case.  In fact, it was not until September 2008 – after the Trustee initiated this action – that MTV belatedly issued its litigation hold. MTV's eight year delay resulted in the destruction of critical evidence – including documents and information relating to arguably the three most significant documents in this case: (1) the Proposal for MTV Productions Trans Continental Joint Venture (the "Joint Venture Proposal"); (2) the January 7, 2000 Joint Venture Agreement (the "Joint Venture Agreement") and (3) the November 15, 2001 Amended Agreement (the "Amended Agreement" and together with the Joint Venture Agreement,  the "Agreements").

## 1.     MTV Failed to Preserve Pivotal Documents Central to this Case.

According to the testimony of MTV's in-house lawyers, Elizabeth Skoler, Esq. and Virginia Lazalde-McPherson, Esq., the respective authors of the Agreements, both Agreements were drafted on MTV's document management system. (*See* Skoler Depo. pp. 24-25, Lazalde-McPherson Depo., p. 70, respectively attached hereto as **Exs**. **3** and **4**; MTV's First Responses to the Trustee's Second Request for Admissions (**Ex. 5**, Request No. 39).[3]  Despite being drafted on MTV's computer system, and despite the fact that ESI and supporting metadata exists for documents created both ***before*** and ***after*** the Agreements, MTV has yet to produce ***any*** metadata for the Joint Venture Agreement and has produced incomplete metadata for the Amended Agreement.  By way of example, missing from the metadata related to the Amended Agreement is the author field. More troubling is the limited metadata which does exist suggests that the

---

[3]  Ms. Skoler testified that she drafted both the Joint Venture Agreement and portions of the Amended Agreement. (*See* Ex. 3 at p. 93)  Ms. Lazalde-McPherson, Esq. testified that she both drafted and ***did not*** draft the Amended Agreement. (*Compare* Ex. 4, pp. 68-70, 103, 144).  Yet, all of MTV's subsequent witnesses identified the Amended Agreement as "Ms. Lazalde-McPherson's deal."

document was initially captured by MTV on ***December 16, 2008*** – a particularly egregious fact given that the metadata was not produced to the Trustee until January of 2011. The fact that metadata is purportedly missing altogether for the Joint Venture Agreement and is incomplete for the Amended Agreement raises a number of questions, particularly given that Viacom's Vice President of Information and Knowledge Management (Warren Solow) testified that an MTV employee would need to obtain advance approval to permanently delete a document created on MTV's document management system and that it is "***rarer***" than "***exceedingly rare***" for an MTV employee to receive such approval. (Solow 12/17/10 Depo. attached as **Ex. 6**, pp. 221-222, 235).

Compounding matters is that MTV failed to produce any redline versions of the Agreements (the "Redline Agreements"). This failing is startling given that Trans Continental – whose documents and computer systems were seized by the Federal Bureau of Investigation in 2007 and whose principals have been accused of dissipating documents – did retain and produce redlines of the Amended Agreement. In fact, after sifting through warehouse boxes, the Trustee has produced two (2) redline versions of the Amended Agreement, along with corresponding facsimiles from Ms. Lazalde-McPherson dated November 19 and 20, 2001. The first of these facsimiles explains the Amended Agreement's last set of redlines revisions – including the edits made to paragraph 9, the principal provision in dispute, stating "[t]his is what MTV is willing to agree to at this point in order to close this deal." (**Ex. 7**). Despite having been drafted on MTV's computer system, MTV did not produce the redlines, their supporting metadata or the accompanying facsimiles – ostensibly because they were destroyed by MTV.[4] (*See* **Ex. 5,**

---

[4]   The very face of the Amended Agreement raises additional, serious questions – which MTV cannot answer and which suggest that the document may have been manipulated. None of MTV's witnesses can explain, for example, why the signature page of the Amended Agreement reflects that it is version four of that document, when the contract's other remaining pages reflect that they are version one of the document. (*See* **Ex. 6** at p. 226). There are also two paragraphs numbered eleven. Versions 2 and 3 of the Amended Agreement have not seen the light of day in discovery – because they no longer exist. (*See* **Ex. 5**, Request Nos. 43, 46 and 49).

Request Nos. 62-63).  Thus, both the metadata and the redlines of the Amended Agreement –
which are of undeniable import given the parties' conflicting interpretations of the applicability
and substance of the Amended Agreement – were lost, destroyed or otherwise not produced
during the discovery period.

There is no question that MTV was and is capable of retrieving ESI and metadata for
documents created in 2000 and 2001.[5]  In fact, ESI indicates that the third pivotal document, the
Joint Venture Proposal, was drafted on MTV's computer system on September 7, 1999.  Yet,
even the ESI which MTV produced in connection with the Joint Venture Proposal is incomplete
in that it fails to identify the author of the document – a glaring omission given that every one of
MTV's witnesses has denied ever seeing the Joint Venture Proposal, much less drafting it.[6]

MTV also failed to produce any metadata in connection with a fourth potentially pivotal
document: the original July 12, 2002 contract with Bad Boy Films (the "Bad Boy Contract").  As
is the case with the Agreements, the Bad Boy Contract was drafted on MTV's document
management system. (**Ex. 4**, p. 247).  The Bad Boy Contract is significant because it is the first
agreement memorializing Sean Combs *p/k/a* Diddy's involvement with Making the Band.
Paragraph 14 of the contract is titled "Lou Pearlman," and "acknowledges that Lou Pearlman has
the right of first opportunity to manage [the artists that originated from Making the Band]."  The
ESI to the Bad Boy Contract could very well be revealing, particularly given a document just
turned over on February 8, 2011 in which Ms. Lazalde-McPherson instructs not to offer Diddy a
joint venture in Making the Band because "***MTV already has a joint venture with Lou***." (**Ex**. **9**).

In addition to the missing Redline Agreements and the four documents for which the

---

[5]   By way of example, attached hereto as composite **Ex**. **8** are a sampling of documents which pre-date the Joint
Venture Agreement in which MTV produced ESI and complete metadata.

[6]   Making matters worse is that MTV refused to produce the Joint Venture Proposal for over eighteen (18) months
– claiming that the document was "privileged."

metadata is either incomplete or missing altogether, there is yet another document that is conspicuously absent: the more formal joint venture agreement that MTV purportedly began drafting.  The Joint Venture Agreement states that the "parties intend to enter into a more formal joint-venture agreement, the terms of which shall be subject to good faith negotiations (except for as expressly set forth herein)." (**Ex**. **10**).  A draft of this more formal joint venture agreement has never been produced, despite the fact that MTV ostensibly "took the lead on drafting [this contract] and never concluded such."  (**Ex. 11**).

In sum, MTV has presently failed to produce: (a) the Redline Agreements; (b) metadata for the Joint Venture Agreement or the Bad Boy Contract; (c) complete metadata for the Amended Agreement; (c) sufficient ESI to identify the author of the Joint Venture Proposal; (d) the purported draft of the more formal joint venture agreement, and (e) several consequential communications exchanged between the parties (which the Trustee was able to locate and produce) (collectively, the "critical missing information").[7] The absence of these documents and the accompanying ESI is no accident.  MTV either destroyed them or failed to properly preserve them despite its admitted anticipation of this litigation as early as 2000.

### 2.    <u>MTV Ignores Trans Continental's Demand Letters over the *Next Four Years*</u>.

By its own account, MTV anticipated litigation with Trans Continental as early as 2000. This anticipation should have been heightened when Trans Continental, and then later its outside counsel, placed MTV on direct notice of its breaches and of potential litigation through a series of demand letters sent between 2002 and 2006.  On October 2, 2002, Mr. McDonald, Trans Continental's President, wrote to Ms. Lazalde-McPherson, demanding that MTV pay Trans Continental the amounts due under the Agreements. (**Ex**. **12**).  Mr. McDonald's letter detailed

---

[7]  Notably, the Trustee's counsel has sought confirmation that MTV had produced all metadata in its possession as early as May of 2010.  (*See* **composite Ex. 29**, *infra*).

several of MTV's material breaches of the Agreements and demanded:

- Payment of all amounts owed by MTV pursuant to paragraph 11 of the Joint Venture Agreement (*id.* at p. 2);

- An immediate meeting to discuss creative issues based on MTV's unilateral decision to involve Diddy in the next Making the Band cycle – a breach of paragraph 5 of the Joint Venture Agreement, which provides that "[a]ll business/creative matters in the joint venture are to be mutually determined" (*id.* at pp. 1-2);

- To be a party to all agreements relating to the Making the Band franchise from which MTV had excluded Trans Continental in connection with Diddy and the future bands emerging from Making the Band, pursuant to paragraph 15 of the Joint Venture Agreement (*id.* at p. 2);

- To enter into a management agreement with the new bands pursuant to paragraph 18 of the Joint Venture Agreement (*id.*);

- That MTV continue to register Trans Continental as the co-copyright owner in Making the Band (*id.* at pp. 2-3); and

- Payment of all amounts owed by MTV pursuant to paragraph 9 of the Amended Agreement for the imputed license fee (*Id.* at p. 3).

Mr. McDonald's demand letter emphasized that Trans Continental "expect[ed] to be treated in 'every' respect as a full partner" in the Joint Venture.  Trans Continental's demand letter spurred dialogue,[8] several meetings, and ultimately MTV's issuance of a check in the amount of $512,132.00 in March of 2003.

MTV's partial payment did not, however, quell Trans Continental's continuing concern that MTV was breaching its duties under the Agreements by underpaying the Joint Venture and ignoring Trans Continental's co-ownership and copyright interests in Making the Band II-IV.[9]

---

[8]   In response, on October 18, 2002, Ms. Lazalde-McPherson responded to Mr. McDonald, writing that she was "very surprised by [his] assertion that Lou was never told anything about the show," and invited Mr. McDonald and Mr. Pearlman to come to New York to discuss these issues in person.  (This letter is attached hereto as **Ex. 13**).  This document was *not* produced by MTV.  Later, on March 24, 2003, Ms. Lazalde-McPherson advised Trans Continental of the commencement of Making the Band 2.2 and again encouraged Mr. Pearlman and Mr. McDonald to travel to New York to meet the band to discuss potential management opportunities.  (**Ex. 14**).  Again, MTV did *not* produce this document, as it was not properly preserved.  (*See* **Ex. 6** at 164-167).

[9]   In his capacity as MTV's Rule 30(b)(6) corporate representative on Trans Continental's copyright interests in Making the Band II-IV, Mr. Solow testified that Trans Continental was in fact a co-copyright owner in Making the

Indeed, in a multitude of conversations and meetings occurring throughout 2003 and 2004, Trans Continental continued to assert its rights to additional payments under the Agreements.  Unable to resolve the matter, Trans Continental had its outside legal counsel (Jeffrey Kranzdorf, Esq.) send a subsequent demand letter to Ms. Lazalde-McPherson on February 2, 2005, in which Trans Continental reiterated its previous demands. Mr. Kranzdorf's 2005 demand letter stressed that Trans Continental was "*at a complete loss to understand why it is that MTV has seen fit to totally disregard its obligations to [Trans Continental] as if the Agreement (and the Amendment) does not exist*." (**Ex**. **15**) (emphasis added).

Rather than issuing a litigation hold based on the potential of litigation (which, at this point, MTV had already been anticipating for *five* years), Ms. Lazalde-McPherson instead waited seven months before replying that Trans Continental had no rights or interests in Making the Band II-IV.  Despite drawing a line in the sand, neither Ms. Lazalde-McPherson nor any other member of MTV's legal affairs department issued a litigation hold.   Thereafter, Trans Continental engaged the law firm of Troutman Sanders to pursue its rights.  Michael Friedman, Esq. sent two subsequent demand letters to Ms. Lazalde-McPherson, Esq., dated August 29, 2006 and October 27, 2006.  Mr. Friedman demanded an accounting from MTV in connection with Making the Band III, as well as immediate answers relating to MTV's questionable accountings for Making the Band I-II. [10] (*See* **Exs**. **17** & **18**).[11]  Again, MTV failed to issue a

---

Band II-IV and that MTV had erroneously failed to register Trans Continental as such.  (A copy of Mr. Solow's May 14, 2009 Deposition is attached as **Ex**. **16**, pp. 59-62).

[10]    Notably, MTV had previously taken the position that Trans Continental ceased its demand for any additional payment from MTV as of the date of Ms. Lazalde-McPherson's September 28, 2005 letter.  Yet after Trans Continental voluntarily agreed to expand the date limitation on *its* ESI production at MTV's request from May 30, 2006 (which was six (6) months after the-then last known communication between the parties) following the February 11, 2011 deposition of Trans Continental's records custodian, it unearthed Troutman Sanders' demand letters.  MTV inexplicably failed to produce these demand letters to the Trustee.

[11]    The only copy of the August 29, 2006 demand letter that Trans Continental has located is unsigned. Yet, this

litigation hold.

> **3.**    **The Trustee's 2007 Demand Letter and Subsequent Subpoena Did Not Trigger a Litigation Hold in 2007.**

After Trans Continental filed for bankruptcy, the Trustee picked up where Troutman Sanders left off.  On June 28, 2007, the Trustee sent Ms. Lazalde-McPherson another demand letter, writing that "Trans Continental is owed money in connection with Making the Band 2, Making the Band 3 and the just-launched Making the Band 4, as well as, possibly season three of Making the Band." (This letter is attached as **Ex**. **19**). Despite being informed of Trans Continental's potential litigation – now for the ***fifth time*** – neither Ms. Lazalde-McPherson, Esq. nor MTV's legal department issued a litigation hold.

After receiving no response to his letter, the Trustee engaged Akerman Senterfitt to issue a Subpoena *Duces Tecum* on MTV on August 13, 2007 (the "2007 Subpoena"). (**Ex**. **20**).  The 2007 Subpoena did not trigger MTV's issuance of a litigation hold memorandum.   MTV's failure to issue a litigation hold upon receipt of the 2007 Subpoena is particularly perplexing given Mr. Solow's sworn testimony that the receipt of a subpoena had prompted MTV's issuance of a litigation hold memorandum in the past. (*See* **Ex. 6**, p. 248).

On its Tenth Amended Privilege Log, MTV makes repeated claims of work product protection relating to emails discussing the 2007 Subpoena.  (**Ex. 1** at pp. 17-18).  Similarly, MTV's First Supplemental Redaction Log liberally documents MTV's anticipation of litigation in October 2007, describing "***threatened litigation re: Kapila v. MTV***." (MTV's First Supplemental Redaction Log is attached hereto as **Ex**. **21** at pp. 21-22).   Also included on MTV's log is a reference to a redacted document entitled "***Lou Pearlman Mess***," which attached yet another demand letter dated December 5, 2007 from the Trustee's outside counsel.  (**Ex. 22**).

---

letter is referenced as being executed and sent to Ms. Lazalde-McPherson in Mr. Friedman's demand letter dated October 27, 2006.

Between 2002 and 2007, MTV received no less than six demand letters and a subpoena from Trans Continental or its legal representatives demanding that Trans Continental be paid in connection with its co-copyright and Joint Venture interests in Making the Band.  On this score, MTV went 0 for 7, failing on seven separate occasions to issue a litigation hold.   By the time that MTV issued its hold in September of 2008, pivotal documents and information – including but not limited to the critical missing information described above – either went missing or was destroyed.   MTV's failure to abide by its own internal policy and clear legal precedent reeks of willfulness and bad faith.

    **4.**      **Virginia Lazalde-McPherson, Esq. is at the Fulcrum of the Spoliated <u>Documents</u>**.

It is not coincidental that there is one individual who lies at the center of MTV's spoliation of documents:  Ms. Lazalde-McPherson.  Despite her sworn testimony to the contrary, Ms. Lazalde-McPherson was MTV's chief actor.  She: (1) drafted the Amended Agreement; (2) falsely represented to Trans Continental that MTV was registering Trans Continental's copyright interests; (3) negotiated the Bad Boy contract; (4) was the recipient of six of Trans Continental's demand letters, and (5) was either the author or recipient of nearly all of the missing significant documents.   Ms. Lazalde-McPherson is a seasoned lawyer, who joined MTV as its Senior Counsel of Business and Legal Affairs in September of 2000. Accordingly, Ms. Lazalde-McPherson should have ensured the issuance of a timely litigation hold.

Ms. Lazalde-McPherson's role in this case is evidenced, in part, by her approximate eighty (80) appearances on MTV's Tenth Amended Privilege Log between late 2000 and 2002, when MTV was negotiating and drafting the Amended Agreement and then later excluding Trans Continental from MTV's negotiations with Diddy.  Ms. Lazalde-McPherson's failure to preserve documents is exacerbated by her alleged lack of recollection of the pivotal events, and

dubious testimony. Ms. Lazalde-McPherson testified, for example, that she had no involvement in the negotiation of the Amended Agreement, and no recollection of ever seeing any redlined versions of the Amended Agreements. (**Ex**. **4**, pp 74-75, 80, 163, 195-196).  This statement is negated by a multitude of documents, including the aforementioned November 19 and 20, 2001 facsimiles in which *she* sent redline versions of the Amended Agreement conveying MTV's final position. Ms. Lazalde-McPherson was also the recipient of two memoranda dated October 10, 2001 and November 6, 2001 – not produced by MTV – which detail and confirm her participation in the conference calls in which the parties negotiated the finer points of the Amended Agreement. (Composite **Ex**. **23**).

MTV also failed to preserve and produce the two demand letters sent by Troutman Sanders to Ms. Lazalde-McPherson in 2006.  This failing is particularly egregious.  When specifically asked if she received any demands or further correspondence from Trans Continental after her September 28, 2005 reply to Jeffrey Kranzdorf's February 2, 2005 demand letter, Ms. Lazalde-McPherson testified that as best as she could recall Trans Continental ceased pursuing the matter.  (*See* **Ex**. **4**, pp. 202-205).  In addition to revealing the untruthfulness of Ms. Lazalde-McPherson's testimony, the documents that MTV failed to produce beg two questions.  First, what else did MTV not preserve or produce?  Second, why is it that nearly all of the critical documents sent to or by Ms. Lazalde-McPherson are missing?  The answer to this latter question appears obvious. Rather than issue a litigation hold, Ms. Lazalde-McPherson was busy secreting her involvement in the underlying events by ridding her files of critical documents.

In an eleventh-hour attempt to clean up Ms. Lazalde-McPherson's mess, on March 7, 2011, MTV admitted in its responses to the Trustee's Second Request for Admissions that "it is possible that Ms. Lazalde-McPherson deleted at least some files, possibly relating to Making the

Band, just as all employees create and delete files during the normal course of business[.]"  (**Ex. 5**, Request No. 82).   In light of Mr. Solow's testimony that an MTV employee could not permanently delete a document without approval and that such requests are "exceedingly rare" and the approval is "rarer," the suggestion that Ms. Lazalde-McPherson deleted pivotal documents relating to an on-going dispute in "the normal course of business" smacks of insincerity.   Further, to date, MTV has offered no explanation as to **when** Ms. Lazalde-McPherson deleted her files.

**B.**     **MTV's Discovery Abuses Have Permeated this Entire Proceeding**.

MTV's spoliation of pivotal documents is only one component of MTV's discovery abuses. MTV has also attempted to hide critical documents under disingenuous claims of privilege and, worse yet, produced 1,058,051 pages out of its 1,254,767 production – or approximately *eighty-five percent* – after January 5, 2011, twenty-nine months after the commencement of this litigation, and *after* the Trustee's completion of seventeen depositions.

**1.**     **An *In Camera* Review is Warranted**.

The Trustee was forced to send MTV no less than twenty-eight correspondences, ranging in time from February 29, 2009 through March 3, 2011, as well as draft a Motion for *In Camera* Inspection of MTV's Claimed Privileged Documents (furnished in September of 2010), in order to have MTV reconsider its privilege claims. The Trustee's exhaustive efforts led to the de-designation of approximately 2,200 previously-withheld pages. Included among these begrudgingly surrendered pages are a number of key documents, the most salient being:

- An e-mail from John Miller, MTV's then-Vice President of Television Development and Programming, to Jackie French, the creative executive in charge of Making the Band, communicating the thoughts of Brian Graden, the president of MTV Programming:  "*f\*%k lou.  bg's thoughts were: keep lou off tv*" (emphasis added) (the "*f\*%k Lou* e-mail," **Ex**. **24**);

- The aforementioned Joint Venture Proposal (**Ex**. **25**);

- MTV's November 18, 1999 unexecuted joint venture offer to Mr. Pearlman (**Ex**. **26**); and

- A December 14, 2000 proposal from RZO, Inc. for the provision of services relating to the "joint venture" between MTV and Trans Continental (**Ex**. **27**).

While MTV's desire to suppress these damaging documents is understandable, it is also untenable because these documents are not privileged.  The *f\*%k Lou* e-mail was exchanged between two non-lawyers and communicates the sentiments, however crude, of another non-lawyer.  MTV's counsel's attempt to shroud this non-privileged communication under the cloak of privilege, coupled with the eighteen month delay in producing this document, indelibly impacted this litigation.  Similarly, the Joint Venture Proposal was first claimed to be privileged on February 6, 2009, despite MTV's inability to identify either the document's drafter or recipient, and was only produced after "reconsideration" on May 4, 2010.  Worse yet, in its recent admission responses, MTV's coyly states that there is no evidence that MTV "created" this document. (*See* **Ex**. **5**, Request No. 75).  If true, MTV could not have laid a claim of privilege to this damaging document in good faith.  Again, the Trustee would have undoubtedly benefitted from having received this vital piece of evidence during the intervening fifteen months in which he conducted eight depositions.

The attorney-client privilege is not a license to shield damaging documents.  Nor should it be an opportunity to force an adversary to expend extensive resources to obtain documents that were never privileged in the first instance. Here, MTV's shenanigans foisted the onus upon the Trustee to sift through MTV's then eighty-four page privilege log in order to catch MTV "red-handed." Challenging an adversary's privilege log invariably involves a degree of uncertainty, and it is likely that the Trustee has not yet secured every non-privileged document listed on

MTV's Tenth Amended Privilege, First Supplemental Redaction Log, Fourth Amended Redaction Log and Supplemental and Amended Redaction Log.  Indeed, the incomprehensibly of MTV's numerous logs, and how they purportedly interplay with one another, only furthers the chance that non-privileged documents remain buried.[12]  That said, the Trustee continues to poke holes in MTV's claims of privilege. Indeed, as recently as February 22, 2011, MTV de-designated another fifty-nine pages.  MTV has represented that more once-claimed privileged documents are forthcoming. But for the Trustee's challenges of MTV's "privileged" documents, the Trustee would have been wrongly deprived of thousands of pages of essential documents – including, for example, the *f\*%k Lou* e-mail and Joint Venture Proposal.

At present, thirty-one documents remain in dispute.  (These documents are listed on **Ex. 28**).  MTV's conduct strips it of the benefit of the doubt, rendering it incapable of serving as the final arbiter over its debatable claims of privilege.  The Trustee requests this Court's intervention and accordingly seeks an *in camera* inspection of the remaining thirty-one documents to determine whether they are, in fact, protected by the attorney-client privilege.[13]

### 2.  <u>MTV's Production of over One Million Pages at the Close of Discovery</u>.

The most recent example of MTV's discovery abuse is its continuous production of a total of 1,058,051 (and counting) pages since January 5, 2011.  Included among this production

---

[12]   Further adding to the confusion is that, throughout this action, MTV has produced documents bearing three (3) different sets of Bates stamps: MTVN, MTV-MTB and MTVN-RE.  Upon its introduction into this case, the Trustee's counsel requested that Paul Weiss re-do the entirety of MTV's original flawed production.  Paul Weiss declined to do so, citing expense.  Instead, Paul Weiss has provided "explanatory" charts which purport to link the corresponding documents. Attached as **Composite Ex. 29** are three sample charts.  These charts speak volumes as to the clarity of MTV's production.  Moreover, in its March 8, 2011 correspondence, MTV's counsel indicated that amended logs will be produced "with instruction[s] as to how these logs relate to the logs previously produced." (*See* **Ex. 30**).  While it should go without saying, privilege and redaction logs should not have to be accompanied by instructions.

[13]   This Court has recognized the necessity of an *in camera* review when a party contends it cannot evaluate which withheld documents are actually privileged.   *See In re Seroquel Products Liab. Litig.,* 2008 WL 1995058, * 1, 9 (M.D. Fla. May 7, 2008) (Baker, J.).  Indeed, it is the "Court's duty and not the duty of the one asserting the privilege to determine whether a communication is, in fact, privileged." *Int'l Tel. & Tel. Corp. v. United Tel. Co. of Fla.,* 60 F.R.D. 177, 185 (M.D. Fla. 1973) (Krentzman, J.).

are several key documents – which are dated as early 1999 and which were responsive to the Trustee's requests for production propounded upon MTV over two years ago – in 2008 and early 2009.  The Trustee's receipt of these documents at the tail-end of the discovery period has resulted in tangible harm.  While too voluminous to detail with specificity,[14] many of these belatedly produced documents reveal new information, provide new insights and raise questions as to credibility of prior sworn testimony.  Included among these documents are:

- Ms. Lazalde-McPherson's admission that "***MTV already has a joint venture with Lou which still applies for mtb [Making the Band] II***" (**Ex. 9**);

- Ms. Skoler's (unsigned) June 28, 2000 letter to Ms. Lewitt (Trans Continental's then legal counsel), advising that MTV has "… jointly registered the copyright in Trans Con and MTV's name.  In areas of the world, where trademarks can be jointly owned, we will register [the Making the Band trademark] in both names." (**Ex. 31**); and

- Ms. Skoler's (unsigned) July 14, 2000 letter to Ms. Lewitt, which details that "[u]nless otherwise agreed, proceeds from the exploitation of the 'Making the Band' and 'O-Town' trademarks shall be split 50-50 amongst [Trans Continental] and MTV," and "the parties intend to set up a separate joint venture entity for exploitation of the Series …". (**Ex. 32**).[15]

These documents bear directly on Count VI (Dissolution of the Joint Venture), Count IX (Conversion) and Count XI (Violation of the Lanham Act) of the Third Amended Complaint and were not produced as of the date of Ms. Skoler and Ms. Lewitt's depositions, despite being responsive to the Trustee's October 31, 2008 First Request for Production.

Prior to January 5, 2011, MTV produced 196,715 pages of documents.  In the last two months, MTV has inexplicably produced over ***four-fifths*** of its total production.[16]   While the

---

[14]   At the Court's request, the Trustee would endeavor to explain the import of the other belatedly produced critical documents.

[15]   MTV ostensibly failed to preserve hard copies of the executed version of Ms. Skoler's letters to Ms. Lewitt.

[16]   MTV's counsel has stated that many of these documents were produced in an abundance of caution as it was unclear as to whether MTV's prior counsel (K&L Gates) had already produced the documents.   In addition to failing to explain how the post-January 5, 2011 production could possibly be four times the size of MTV's original production, implicit in MTV's representation is a concession that MTV has thrust the burden of sifting through

full extent of the harm caused by MTV's belated production is still being assessed as the Trustee's counsel continues its review of these one million pages, one need look no further than the words of MTV's counsel's as to the fairness of MTV's belated production.  During the February 17, 2011 Status Conference before the Court, MTV argued that it would be "fundamentally unfair" for the defendants to take the depositions of Messrs. Pearlman and McDonald without the benefit of all of the Trustee's ESI.[17]  While the Trustee has voluntarily agreed to search for additional, responsive ESI so that MTV will have it in advance of these depositions, MTV is incapable of curing the "fundamental unfairness" that its litigation abuses have caused.

Such discovery misconduct should not go unnoticed by the Court.  MTV has not – and cannot – explain why it waited until the close of discovery to produce a million plus pages to the Trustee or why it failed to disclose the existence of these documents as responsive to the Trustee's First, Second, Third, Fourth, or Fifth Request for Production.[18]  MTV's silence is deafening.

### III.    ARGUMENT

### A.    The Elements of Spoliation to Impose Sanctions.

"Spoliation is the intentional destruction, mutilation, alteration, or concealment of evidence." *Optowave Co., Ltd. v. Nikitin*, 2006 U.S. Dist. LEXIS 81345, *21 (M.D. Fla. Nov. 7,

---

duplicative documents on the Trustee.

[17]   On February 11, 2011 – sixteen months after its initial receipt of the Trustee's ESI production – MTV took the deposition of Trans Continental's records custodian.  This deposition revealed some issues with respect to the scope of some of the Trustee's ESI searches.  After receiving MTV's February 15, 2011 demand letter, the Trustee responded on the following day that it would voluntarily conduct supplemental searches.  (**Ex**. **33**).  These searches are under way, and the Trustee has made its first supplemental production – which notably contains minimal additional responsive documents, except for the Troutman Sanders demand letters that MTV failed to produce and which *aid* the Trustee's claims.

[18]   Copies of the Trustee's prior Requests for Production are attached hereto as **composite Ex**. **34**.

2006) (quotations omitted).  Federal law governs the imposition of spoliation sanctions, but the court's opinion may be "informed" by state law, provided that it is consistent with federal law. *Id.* at *24; *see Swofford v. Eslinger,* 671 F. Supp. 2d 1274, 1279 n.5 (M.D. Fla. 2009).  Prior to entering sanctions for spoliation, the court must determine: (1) whether the evidence existed at one time, (2) whether the spoliator had a duty to preserve the evidence, and (3) whether the evidence was critical to an opposing party being able to prove its *prima facie* case. *Id.* at *24-25.

       1.      **The Critical Missing Information Existed**.

It is undisputed that MTV created the Agreements (including the Redline Agreements), and the Bad Boy Contract.[19]   All of these documents were created on MTV's document management system. It is also undisputed that MTV has produced ESI and complete metadata for documents created on its document management system both ***before and after*** these documents were created.  ESI and its supporting metadata come into existence when a document is created or edited on a computer. Given MTV's creation and editing of these documents on its document management system, it is beyond dispute that the missing ESI once existed.  It is equally undisputed that the Redline Agreements, as well as differing versions of the Agreements, also existed.

       2.      **The Duty to Preserve Arises When Litigation Becomes Reasonably Foreseeable**.

The duty to preserve evidence arises when a party knows or reasonably should know that such evidence might be relevant to reasonably foreseeable litigation, and as such, may arise "many years before litigation commences[.]"  *Micron Technology, Inc. v. Rambus, Inc.*, 255 F.R.D. 135, 148 (D. Del. 2009); *see, e.g., Optowave*, 2006 U.S. Dist. LEXIS 81345 at *30; *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("Spoliation refers to the

---

[19]  It is highly likely that MTV also created the Joint Venture Proposal.

destruction or material destruction of evidence […] in pending or reasonably foreseeable litigation); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (same).

In *Kronisch v. United States*, 150 F.3d 112, 126-27 (2d Cir. 1998), the Second Circuit held that the defendants' duty to preserve evidence arose ten years before plaintiff's lawsuit was filed.  *See Kronisch*, 150 F.3d at 127.  Thus, litigation may be "reasonably foreseeable" even though a lawsuit is not filed until years later.

> ### a.   MTV Foresaw Litigation No Later than November 2000 – When It Has First Asserted Work Product Privilege.

Courts routinely hold that a party must preserve documents from the date it ***first*** asserts work product protection because both the duty to preserve and the work product doctrine are premised on the same predicate: a reasonable anticipation of potential litigation.  *See, e.g., Sanofi-Aventis Deutschland GMBH v. Glenmark Pharmaceuticals, Inc.*, 2010 LEXIS U.S. Dist. 65323, *14 (D.N.J. July 1, 2010); *Siani v. State Univ. of N.Y.*, 2010 U.S. Dist. LEXIS 82562, *16-18 (E.D.N.Y. August 10, 2010); [20] *Hagopian v. Publix Supermarkets, Inc.,* 788 So.2d 1088, 1090 (Fla. 4th DCA 2001) (assertion of work product "evidenced [party's] anticipation of litigation and therefore the necessity of preserving [evidence].").

*Sanofi-Aventis* is instructive.  There, the court held that the defendants' "duty to impose a litigation hold and to institute legal monitoring for purposes of compliance arose" on the earliest date of work product privilege claimed on the defendants' privilege log.  *Id.*  In so holding, the court relied on the definition of work product immunity – "which requires a showing that the materials in question were prepared in the course of preparation for possible litigation" – concluding that a duty to preserve is triggered upon the date a party first claims work product

---

[20]   Although the *Siani* court declined to impose an adverse inference because the movant failed to show the relevance of the missing documents, this is not the case here:  the missing ESI for the various contracts and redlines are crucial to the Trustee's claims, as set forth herein.  *See Siani*, 2010 U.S. Dist. LEXIS at *29.

protection.  *Id.*  Because the spoliating party failed to do so, the *Sanofi-Aventis* court imposed an adverse inference for the documents that were not preserved as of the first date the spoliating party claimed work product protection on its privilege log.   Similarly, in *Siani*, the court explained:  "If it was reasonably foreseeable for work product purposes, Siani argues, it was reasonably foreseeable for duty to preserve purposes.  The court agrees."  *Siani*, 2010 U.S. Dist. LEXIS at *16-17.

MTV's Tenth Amended Privilege Log reveals that MTV was anticipating this litigation as early as 2000.  MTV's concomitant obligation to preserve evidence, thus, also arose in 2000.  It further bears noting that MTV repeatedly asserts work production protection for the entire time period between 2000 and September 2, 2008, establishing that it was constantly anticipating this action and was preparing its litigation strategy accordingly. (*See* **Ex. 1**).  This is the beginning and end of the analysis:  MTV's assertion of the work product protection continuously from 2000 onward is irrefutable evidence that MTV foresaw litigation as of 2000.

**b.    Trans Continental and its Legal Representatives Sent MTV Six Demand Letters and a Subpoena from 2002-2007.**

Even if MTV's duty to preserve had not arisen in 2000, the six demand letters and the 2007 Subpoena each independently renewed MTV's duty to preserve.  The receipt of a demand letter in and of itself can impose a duty to preserve documents.  *See, e.g., Siani*, 2010 U.S. Dist. LEXIS 82562 at *16-18; *Goodman v. Praxair Servs.*, 632 F. Supp. 2d 494, 511 (D. Md. 2009) (demand letter triggered duty to preserve "because pre-filing communications between the litigants can provide constructive notice that litigation is likely.  Demand letters stating a claim may be sufficient to trigger an obligation to preserve."); *see Optowave,* 2006 U.S. Dist. LEXIS 81345 at *30.

3.      <u>**The Critical Missing Information is Crucial to the Trustee's Case**</u>.

The critical missing information is directly relevant to the application and interpretation of the Agreements, which lie at the crux of this matter.  Under New York law,[21] when the language used in a contract is ambiguous or unclear, a court may consider extrinsic evidence to elucidate – but not vary – the meaning of the terms.  *67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248-249 (N.Y. 1975) (where contract terms are ambiguous, parol evidence is admissible to show conversations, negotiations and agreements made prior to or contemporaneous with the execution of an agreement). The critical missing information would reveal the edits to, and different versions of, the Agreements, the Joint Venture Proposal, and the Bad Boy Contract, as well as the parties' contractual intent.

There are several issues which lie at the heart of this dispute.  One issue is the applicability of the Amended Agreement – specifically, whether it is limited to Season 1.3 of the Making the Band, or applies to Seasons 2.1 through 4.3 of Making the Band.  As reflected in the attached chart, MTV witnesses have – under oath – sworn to conflicting positions arguing ***both*** that: (a) the Amended Agreement applies to Seasons 1.3 through 4.3, and (b) the Amended Agreement is limited to Season 1.3. (**Ex. 35**).  Assuming that the Amended Agreement applies beyond Season 1.3 of Making the Band, an additional issue of import is the interpretation of paragraph 9(b) of the Amended Agreement.  Specifically, is Trans Continental entitled to a ten percent imputed license fee (*e.g.*, 10% of the production budget) for the totality of MTV's broadcasts of Making the Band on ***all*** of MTV's foreign affiliates irrespective of how many of its foreign programming services broadcast the show, as MTV suggests? Or alternatively, is Trans Continental, as Trans Continental suggests, entitled to a ten percent imputed license fee for ***each*** individual MTV foreign programming service that broadcasts Making the Band?  The parties'

---

[21] Florida's *lex loci contractus* rule mandates the application of New York law to the Agreements.

disparate interpretation of Paragraph 9(b) results in an approximate $70 million dollar chasm.

The missing ESI and supporting metadata, the missing redline drafts of the Amended Agreement and the missing correspondence relating to the Amended Agreement are likely to reveal the parties' comments and revisions, and are of indisputable importance to the interpretation of the Amended Agreement.[22]  *See Optowave*, 2006 U.S. Dist. LEXIS 81345 at *36 (holding that spoliated documents were crucial to construct meaning of contract with undefined terms).[23]

**B.    The Appropriate Sanction for MTV's Spoliation and Discovery Abuses Is a Default Judgment.**

The court has broad discretion to impose sanctions for spoliation and discovery abuses, which is derived from its inherent powers – including the power to enter a default judgment for a defendant's destruction of documents and other discovery abuses.  *See Optowave,* 2006 U.S. Dist. LEXIS at *22; *see Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005).  In the Eleventh Circuit, the ultimate sanction of a default can be exercised upon a showing of bad faith. *See Optowave,* 2006 U.S. Dist. LEXIS at *25. A showing of malice is not required.  *See Swofford*, 671 F. Supp. 2d at 1280.   A lesser sanction, an adverse inference, can also be drawn from a party's bad faith failure to preserve evidence.   An adverse inference enables the trier of fact to infer that the missing evidence is unfavorable to the spoliating party.  *Id.* at *26; *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133 (S.D. Fla. 1987) (bad faith destruction of documents results in adverse inference).

---

[22]  Similarly, any redline drafts, as well as the ESI and metadata for the Bad Boy Contract would also reveal whether the inclusion of Diddy's acknowledgement of Mr. Pearlman's right of first opportunity to manage the band emerging from Making the Band was commented upon or revised – a fact critical to the Trustee's tortious interference claim against Bad Boy Records, LLC and Bad Boy Films, Inc.

[23]  MTV has a heavy burden to establish that the critical missing information is of little relevance.  *See Anderson v. Cryovac, Inc.*, 862 F. 2d 910, 925 (1st Cir. 1998) (holding that presumption of prejudice in case of knowing destruction of evidence "may be refuted by clear and convincing evidence demonstrating the withheld material was in fact inconsequential.").

1.      **MTV Destroyed the Critical Missing Information in Bad Faith**.

MTV acted in bad faith, was at fault and is responsible for the spoliation.  Bad faith can be established by allowing evidence to be destroyed despite being on notice of litigation, which is "a blatant disregard for the liberal rules of discovery which undermines the integrity of the judicial process and warrants sanctions." *Optowave*, 2006 U.S. Dist. LEXIS 81345 at *32-33.

Here, there are numerous indicia that MTV's destruction of the critical missing information was in bad faith and was directed at preventing Trans Continental, and later the Trustee, from obtaining evidence. First, MTV's bad faith is demonstrated by the fact that it has continuously asserted work product protection since 2000 – when it was admittedly anticipating litigation – yet waited eight years to preserve its documents.  Thus, the only conclusion to be drawn is that MTV's destruction of documents was intended to disadvantage Trans Continental and/or the Trustee.  Otherwise, MTV – a division of Viacom, Inc. and highly sophisticated in electronic discovery – would have preserved documents upon anticipating litigation in 2000. Second, MTV's bad faith and fault for the spoliation is demonstrated by its unexplainable destruction of the critical missing information, which was drafted on its computer system, where it is "rarer" than "exceedingly rare" for approval to be granted to permanently delete such. Finally, MTV's bad faith effort to deliberately destroy or fail to preserve discoverable information is further evidenced by Ms. Lazalde-McPherson's dubious testimony and role. Rather than issuing a litigation hold after receiving no less than six demand letters from Trans Continental, she busied herself with secreting her involvement in this dispute.  Indeed, nearly all of the critical missing information passed through Ms. Lazalde-McPherson's hands – only to disappear.   Taken together with its litigation misconduct of purposefully over-designating thousands of privileged pages and dumping over a million pages of production at the eleventh

hour, MTV's bad faith is palpable.

## 2.        The Trustee Has Been Severely Prejudiced by MTV's Conduct.

The Trustee has made a compelling showing that he has suffered prejudice, both from MTV's spoliation and from its litigation misconduct.[24]  *Quantum Communications Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249 (S.D. Fla. 2007) is instructive on the issue of prejudice and the imposition of the ultimate sanction.  In *Quantum*, the court granted a default judgment because the defendants engaged in a pattern of litigation misconduct, which included lying under oath and failing to produce key documents.  *Id.* at 1270.  The defendants argued their failure to produce documents was not prejudicial because the documents were ultimately obtained from third parties.  *Id.* at 1273.  The court found prejudice because the documents were not produced until after a key deposition, the plaintiff had to expend significant time and money proving facts that would have been available from the documents and the defendants made claims in briefs that were contradicted by the documents.  *Id.* at 1273-74.  The court observed:

> Those who lie, evade and fail to tell the whole truth obviously enjoy an advantage over honest litigants.  The victimized opponent winds up, as in this case, consuming substantial resources to respond to and "undo" the victimizer's lies and distortions.  (*Id.* at 1276).

As in *Quantum,* the Trustee was denied the opportunity to obtain truthful and reliable testimony from MTV's witnesses because he lacked key documents due to destruction and a last-minute document dump.  This was a fundamental denial of due process.  *See Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 U.S. Dist. LEXIS 2866, *36-39 (S.D.N.Y. Feb. 24, 2005) (finding prejudice because the belatedly produced documents could have been used to shape depositions, provided to expert witnesses for more information as well as to reinforce or expand

---

[24]  The prejudice is particularly severe given that, as a stranger to the underlying transactions, the Trustee was at an informational disadvantage to begin with and was not in control of Trans Continental's records prior to his appointment.

its motion for summary judgment).

MTV's flagrant disregard for the integrity of these proceedings cannot go unchecked, and as in *Quantum*, a default judgment is warranted. Where a party's misconduct relates to pivotal issues in a case, this "militates heavily in favor of the severe sanction of default." *Quantum,* 473 F. Supp. 2d at 1278; *Vargas v. Peltz*, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995) (dismissing complaint where the plaintiff's misconduct impeded the defendant's "ability to conduct discovery vital to its defense and to the pursuit of its counterclaim.").

MTV's misconduct relates to pivotal issues in this case – its status as Trans Continental's joint venture partner in Making the Band I-IV and its spoliation/withholding of documents that would further establish this fact.  There is no lesser sanction that can place the Trustee in the position it would have been without MTV's misconduct.  The Trustee has already spent years identifying MTV's transgressions and trying to undo them.  By the time documents were finally produced at the eleventh hour, it was too late to obtain reliable testimony because fact discovery has closed.  There is no other way to replace the missing testimony or restore the truth.  As a result, the ultimate sanction of a default judgment is the only sanction that will deter MTV from future litigation misconduct and cure the prejudice to the Trustee.

If, however, the Court declines to enter a default judgment, then it should at a minimum order an adverse inference instruction to be given for MTV's brazen disregard of the judicial process, especially in light of the fact that such inference would comport with the key documents that MTV has belatedly surrendered.  *See Optowave*, 2006 U.S. Dist. LEXIS 81345 at *38-39 (holding adverse inference on contract construction was warranted).

## IV.   CONCLUSION

Because MTV has unclean hands due to its spoliation and litigation misconduct, the

Court should enter a default judgment. Alternatively, due to MTV's spoliation of crucial evidence, the Court should instruct the jury of an adverse inference directing that the critical missing information would have supported the Trustee's case on the following two issues: (1) that the Joint Venture Agreement, together with the missing documents, establishes a joint venture between MTV and Trans Continental for Making the Band II-IV, and (2) that the imputed license fee described in paragraph 9 of the Amended Agreement is cumulative (*e.g.,* ten percent for **each** programming service). The Trustee also requests that the Court order an *in camera* inspection of the remaining documents that have questionable privilege designations. Finally, the Trustee requests his attorney's fees and costs for bringing this motion, for his two-year long challenge to MTV's false privilege designations that resulted in MTV turning over 2,200 privileged documents to the Trustee pursuant to Fed. R. Civ. P. 26(g), and order an evidentiary hearing on the issues raised in this Motion, and grant such other and further relief the Court deems just and necessary.[25]

---

[25] Alternatively, MTV should be compelled to produce all of the documents which it has withheld on work product grounds prior to its issuance of a litigation hold.

Dated: March 9, 2011                Respectfully submitted,

                                    **KASOWITZ, BENSON, TORRES &**
                                    **FRIEDMAN LLP**
                                    *Attorneys for plaintiff, Soneet Kapila in his capacity*
                                    *as the federally appointed Chapter 11 Trustee*
                                    *charged with administrating the bankruptcy estate*
                                    *of Trans Continental Television Productions, Inc.*
                                    Four Seasons Tower
                                    1441 Brickell Avenue, Suite 1420
                                    Miami, Florida  33131
                                    Telephone:  (305) 377-1666
                                    Facsimile:   (305) 377-1664
                                    jsammataro@kasowitz.com

                                    By:  */s/* James G. Sammataro_____
                                          James G. Sammataro
                                          Florida Bar Number: 0520292
                                          Courtney Caprio
                                          Florida Bar No. 0933961

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 9, 2011, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that a notice of the foregoing

document is being served this day on all counsel of record identified on the attached Service List

in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF

to:

**Andrew J. Ehrlich, Esq.**
aehrlich@paulweiss.com
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
*Counsel for MTV Networks, Viacom, Inc and*
*Viacom International, Inc.*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile: (212) 757-3990

**Brian A. McDowell, Esq.**
brian.mcdowell@hklaw.com
Holland & Knight, LLP
*Counsel for MTV Networks, Viacom, Inc and*
*Viacom International, Inc.*
200 South Orange Avenue
Suite 2600
Orlando, Florida 32801
Telephone:  (407) 425-8500
Facsimile: (407) 244-5288

**Jonathan Davis, Esq.**
Jonathan D. Davis, P.C.
*Counsel for Bad Boy Films, Inc. and Bad*
*Boy Records, LLC*
99 Park Avenue, Suite 1600
New York, New York 10016
Telephone: (212) 687-5464
Facsimile: (212) 557-0565

**Daniel E. Traver, Esq.**
Gray Robinson, P.A.
*Counsel for Bad Boy Films, Inc. and Bad*
*Boy Records, LLC*
301 East Pine Street, Suite 1400
P.O. Box 3068
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690

By:  /s/ James G. Sammataro
         Attorney