**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

_____

SONEET KAPILA, Chapter 11 Trustee
for TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,                                    Case No.: 6:10-cv-00181-Orl-28-DAB

                **Plaintiff,**

v.

MTV NETWORKS COMPANY, a division
of Viacom International, Inc., et al.

                **Defendants.**

_____/

**MTVN'S MEMORANDUM IN OPPOSITION TO THE TRUSTEE'S CORRECTED**
**MOTION FOR SANCTIONS AGAINST MTV NETWORKS**
**FOR SPOLIATION AND DISCOVERY ABUSES**

      Defendant MTV Networks ("MTVN"), a division of Viacom International, Inc., hereby

files this memorandum of law in opposition to Plaintiff Soneet R. Kapila, as Chapter 11 Trustee

("Trustee") for Trans Continental Television Productions, Inc.'s ("Trans Continental" or "TC")

motion for sanctions against MTVN for spoliation and discovery abuses.

## INTRODUCTION

      The Trustee has brought a motion for spoliation sanctions where there is absolutely no

evidence of spoliation.  What the record shows is the unremarkable fact that some seven docu-

ments, over an eleven-year period, survived in TC's files, but not in MTVN's.  At least as

many, unsurprisingly, survived in MTVN's files but not TC's.  There is not a single document

in which MTVN alludes to destruction of evidence.  There is not a single witness who testified

as to the destruction of evidence.  And, stunningly, the Trustee's public accusation that an

MTVN attorney "must have" destroyed documents is pure speculation lacking any record sup-

port.  In response to the Trustee's last-minute discovery demands about discovery, MTVN was able to locate a small number of documents that it had not previously produced—which only serves to underscore that documents were not destroyed.  At bottom, the spoliation component of the Trustee's motion is premised on the flawed assumption that documents proving his merit-less position necessarily once existed.  The Trustee's view that "missing" documents must have contained critical information he needs, because he otherwise cannot establish his concocted theory, is the very definition of circular.  As demonstrated in more detail below, the other com-ponents of the motion have no more merit.  MTVN went to extraordinary lengths to respond to more than 421 requests for documents in this case, collecting documents from all over the globe, and often creating documents where none existed.  This is the very opposite of sanction-able conduct.

Just as fundamentally, the motion should be denied because it seeks to hijack the dis-covery process for improper purposes.  The context is deeply telling of the motive: although the Trustee deposed MTVN's document custodian almost *three months* before filing this mo-tion, he did nothing to follow up on the information learned in that deposition.  Rather than elect to timely raise and discuss his issues with MTVN's counsel, the Trustee embarked on a gambit to serve "gotcha" discovery requests about MTVN's discovery that were due just days before discovery's close.  By delaying these requests to a point at which it would be impossi-ble to meaningfully meet-and-confer, the Trustee's clear objective was to file this motion on the final day of discovery, rather than actually resolve the issues.  The Court should see this for what it is: an attempt to achieve by improper "satellite litigation" a judgment that the Trus-tee will never be able to obtain on the merits.  Further underscoring the Trustee's apparent greater interest in the gamesmanship of this motion practice than an inquiry into the underly-ing facts, he unilaterally canceled the deposition of Virginia Lazalde-McPherson, scheduled

just five days before discovery's close, blithely citing "the press of other matters."  Rather than give Ms. Lazalde-McPherson the opportunity to address the accusation that she intentionally destroyed documents (of which there is *no* evidence), counsel apparently spent the time drafting this motion, which is based on the *absence* of her testimony.

This all stands in stark contrast to MTVN's discovery of the Trustee.  Several weeks ago MTVN deposed the Trustee's records custodians.  As the Court is aware, the information they provided was deeply concerning as to deficiencies in the Trustee's document collection and production.  But rather than seek sanctions, just two business days later, MTVN outlined for the Trustee in writing the remedies it sought.  And, because MTVN was of the genuine view that the documents mattered to the discovery process, it sought the adjournment of relevant depositions pending the production of documents, which request this Court granted.

Had the Trustee employed a similar strategy with respect to many of the issues raised in this motion, they would have been eliminated from contention—but plainly, that was not the Trustee's aim.  Nevertheless, the Trustee's gambit fails even on its own terms.  Cutting through the Trustee's invective reveals a discovery record in which the Trustee pursued massive discovery, and MTVN exercised its best efforts to meet those requests.

## RELEVANT PROCEDURAL HISTORY

On December 17, 2010, the Trustee deposed an MTVN records custodian about MTVN's discovery efforts.  Those efforts have been massive, driven by the Trustee's extraordinary requests.  Over the course of the case, he has propounded five separate requests for documents containing 291 individual requests that, with sub-parts, number 421 in all.  (Pl. Ex. 34.)  Of those 291 requests, 74 were served on January 25, 2011—just six weeks before the fact discovery deadline—at least half of which could have been served earlier in the case.  All of the requests generally call for documents over an eleven-year period, from literally dozens

of custodians.[1]  Many of them call for documents that do not exist in the normal course and have caused MTVN to create large numbers of documents for this litigation.

The Trustee did not, however, then follow up after the records custodian deposition as to any perceived deficiencies in MTVN's discovery responses.  Rather, some six weeks later, on February 2 and 3, 2011—just a month before the close of discovery—the Trustee served on MTVN extensive discovery requests about MTVN's discovery.  In more than 170 Requests for Admissions (Composite Ex. A) and two dozen interrogatories (Composite Ex. B), he asked MTVN to admit that it had not produced certain documents, such as prior drafts of specific documents that bore identifying information.  The Trustee now accuses MTVN of spoliation of evidence; however, as demonstrated in detail below, the purportedly "destroyed" documents either (1) were produced, or produced in substantially similar format, before this motion was filed; (2) were located in the process of responding to the Trustee's discovery about discovery; or (3) in the case of *seven* documents, were found in TC's files, but not in MTVN's files.  That is hardly surprising, of course, given that this case involves an eleven-year time period; the Trustee fails to mention that MTVN has identified as many documents that survived in *its* files, but not in TC's.   None of this is unusual, and none of it is the stuff of sanctions.

The Trustee also complains about a purported "document dump."  This complaint rings hollow on the full record.  For one, the Trustee never demanded that MTVN's production be completed by a date certain; to the contrary, he served request after request as the case proceeded.  Moreover, throughout the case, the Trustee has sought to depose MTVN's wit-

---

[1] These document requests do *not* include the 184 requests for admissions that the Trustee has served on MTVN (Composite Ex. A), nor do they include the more than 58 interrogatories served, collectively, on MTVN, Viacom Inc., and Viacom International, Inc. (Composite Ex. B).

nesses even though he was fully aware that document production was substantially incomplete. Indeed, the Trustee served his initial request for production of documents in this case on October 31, 2008. (Pl. Ex. 34.) Immediately thereafter, the Trustee asserted it was "imperative that MTV's witnesses be expeditiously made available for deposition" and began scheduling depositions even before document production had begun. (Ex. C.) MTVN informed the Trustee that the sheer volume of documents to review because of the ten-year period of time would require a rolling production. (Ex. D at 37:25-38:5.) Nevertheless, the Trustee continued to aggressively press MTVN to adhere to early deposition dates and threatened to involve the Court if depositions were delayed any longer, regardless of the state of document production. (Ex. E.) MTVN acquiesced to the Trustee's demands for a swift schedule—notwithstanding the early stages of document production—and in January 2009 provided the Trustee with several deponents. Additionally, MTVN offered to reopen certain depositions if necessary in light of the rolling document production—and ultimately did for Jackie French, a production executive, and Virginia Lazalde-McPherson (whose re-opened deposition was summarily canceled by the Trustee). (*See* Ex. D at 38:1-12.) Also in the Bankruptcy Court, the Trustee suggested moving ahead with depositions that were "not document-dependent," suggesting Mr. Kranzdorf and Mr. Eichen. (Ex. F.)[2]

After the discovery stay was lifted, the Trustee immediately requested that the depositions of MTVN witnesses George Eichen, Ken Mok, John Miller, Ken Parks, and Elizabeth Skoler occur between January 25, 2010 and February 19, 2010. (Ex. G at 2.) Meanwhile, in

---

[2] Telling of the Trustee's course of conduct during this entire case, during the February 10, 2009 hearing, the Trustee complained both about delays in scheduling depositions and the unavailability of documents—some of which MTVN informed the Court it would have to specifically compile because such documents did not exist in the regular course of business. (Ex. D at 32:4-19.) Noting the impossibility of the Trustee's requests for both the creation of documents and the elimination of delay, the Court asked: "What good are the depositions without the discovery . . . . What do you want me to do? Tell me what you want me to do. There's no way I can order them to get something they can't get together in time for your deposition schedule." (*Id.*)

his January 21, 2010 Third Request for Production, the Trustee asked for various documents related to John Miller.  (Pl. Ex. 34 (Third Request at 12-13).)  MTVN was not even obligated to comply with those document requests until *after* the desired deposition date for Mr. Miller. As MTVN, unlike the Trustee, had never represented that it had completed its document discovery, and as the Trustee had continued to propound discovery requests, the Trustee had to have known that he did not have possession of all responsive documents.

## MEMORANDUM

## I.   MTVN IMPLEMENTED A TIMELY LITIGATION HOLD

The Trustee's motion is predicated on an absurd premise: that MTVN should have implemented a document hold from the moment the parties first entered into a contractual relationship.  This is unsupported by the law and the evidence, which shows the largely cordial give-and-take of parties that dealt with one another at arm's length, over an eight-year period, without a *single* express or implied threat of litigation.  In fact, MTVN was not obligated to implement any litigation hold until this action was commenced.

The majority of Florida courts have held that there is no general common law duty to preserve evidence before litigation has commenced, which disposes of this argument altogether.[3]  And, jurisdictions that do recognize a common law duty to preserve evidence generally look to the specific facts of the particular case to determine the point at which a party was on

---

[3] *See, e.g.*, *In re Elec. Mach. Enters., Inc.*, 416 B.R. 801, 873 (Bankr. M.D. Fla. 2009);  *Silhan* v. *Allstate Ins. Co.*, 236 F. Supp. 2d 1303, 1312-13 (N.D. Fla. 2002) (holding that pre-litigation duty to preserve does not arise without formal notice of intent to sue); *Gayer* v. *Fine Line Const. & Elec., Inc.*, 970 So.2d 424, 426 (Fla. Dist. Ct. App. 2007) (noting that "[b]ecause a duty to preserve evidence does not exist at common law, the duty must originate either in a contract, a statute, or a discovery request");  *Royal & Sunalliance* v. *Lauderdale Marine Ctr.*, 877 So.2d 843, 846 (Fla. Dist. Ct. App. 2004) (holding that the plaintiff's "argument that there was a common law duty to preserve the evidence in anticipation of litigation to be without merit").  On a motion of this kind, the application of federal law by Florida federal courts is guided by Florida state law because the law in the Eleventh Circuit does not set forth specific spoliation guidelines.  *See, e.g.*, *In re Elec. Mach. Enters.*, 416 B.R. at 872-73.

notice of "pending" or "reasonably anticipated" litigation.  *See, e.g., Zubulake* v. *UBS Warburg LLC*, 220 F.R.D. 212, 216-17 (S.D.N.Y. 2003).  Even in those jurisdictions, "the mere existence of a dispute" does not trigger a duty to preserve evidence.  *Treppel* v. *Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006).

Even assuming MTVN had a common law duty to preserve evidence prior to litiga-tion—which under Florida law it would not have—MTVN had no basis for doing so prior to 2008.  As the case law cited by the Trustee makes clear, a defendant's common law duty to pre-serve evidence only "arises when the party has notice that the evidence is relevant to litiga-tion—most commonly when suit has already been filed."  *Kronisch* v. *United States*, 150 F.3d 112, 126 (2d Cir. 1998).[4]  The circumstances here belie any assertion that MTVN should have been on notice of the possibility of litigation.  The artifice of the Trustee's motion is under-scored by the fact that although TC's notoriously litigious principal, Lou Pearlman, filed at least 14 lawsuits between 2003 and 2006 (Composite Ex. H), TC not once even *threatened* to sue MTVN.  To the contrary, as late as September 2005, Pearlman was still pitching new shows to MTVN, the party that the Trustee now claims Pearlman was contemplating suing.  (*See* Ex. I.)

In early 2000—the date the Trustee claims MTVN should have anticipated litigation— the first season of *Making the Band* had not yet even aired; there is no evidence that anyone was thinking about litigation.  The parties' course of conduct thereafter does not remotely resemble that of parties that appear headed to a litigated dispute:

- *The Amended Agreement*: In 2001, when the show's future was in jeopardy after ABC evinced an intent to drop it, the parties worked together to negotiate the 2001 Amended Agreement, and kept the show alive by moving it to MTVN.  (Ex. J.)

---

[4] The Trustee's reliance on *Kronisch* highlights the disconnect between the remedy he seeks and the unremark-able facts of this case.  There, a court permitted an adverse inference based on the CIA's intentional destruction of records detailing the "surreptitious administration of LSD to unwitting nonvolunteer subjects" ten years ear-lier.  *See Kronisch*, 150 F.3d at 117.  This case could not be more dissimilar from *Kronisch*.

- Over the course of 2002, when TC sought updated accountings from MTVN, it did not threaten litigation. Instead, TC continued to communicate through cordial e-mails. (*See, e.g.*, Composite Ex. K.)

- *The So-Called 2002 Demand Letter*:  After Greg McDonald of TC raised additional concerns in an October 2002 letter, MTVN invited TC to a meeting to resolve the issues.  (Pl. Ex. 13.)  Notably, Mr. McDonald's letter did not conclude with a threat of litigation, but instead requested a meeting because TC had "always enjoyed a warm, mutually respectful and productive relationship with MTV," and sought a resolution that was "both amicable and designed to resolve all outstanding items."  (Pl. Ex. 12 at MTV-MTB 2252.)  Following Mr. McDonald's letter, the Trustee's motion itself concedes that there was dialogue, several meetings, and MTVN's payment to TC in March 2003 of $512,132 in profit participation. (Mot. at 7.)

- *The So-Called 2005 Demand Letter:*  In February 2005, TC sent MTVN a letter the Trustee now characterizes as a demand letter.  The letter from TC's counsel, Jeffrey Kranzdorf, was in fact a near-verbatim rendition of the letter sent by McDonald in October 2002—including the cordial closing and request for a meeting.  (Pl. Ex. 15 at MTVN 62.)

- *Following the 2005 Kranzdorf letter*, MTVN and TC had calls, additional meetings, and exchanged accounting information to facilitate payments.  (*See, e.g.*, Ex. L; Composite Ex. M.)  These discussions culminated in MTVN providing participation statements, and a check for $123,265, in September 2005.  (Ex. N.)

Over the two years thereafter, until Pearlman's enterprises crumbled under the weight of his crimes, TC periodically requested participation statements, and MTVN provided them. (Composite Ex. O; Ex. P.)  The Trustee's ongoing efforts to remedy his *own* discovery failings have recently unearthed a draft letter from August 2006 and a signed letter from October 2006 from Michael Friedman, who at that point apparently acted as counsel for TC.  (Pl. Exs. 17-18.) The letters can only be described as bland, business-like requests for accountings, devoid of threats or even remotely aggressive language.  And, on November 14, 2006, MTVN sent TC updated participation statements and payment.  (Ex. P.)  Weeks thereafter, Pearlman's massive scam was revealed, thereby ending the relationship between TC and MTVN.[5]

---

[5] Even assuming the 2002 and 2005 "demand" letters should have provided notice to MTVN—which they plainly did not—the reasonableness of any litigation threat would have clearly subsided after the years of amicable discussions, followed by inactivity, that followed each.  *See* Sedona Conference, *Commentary on Legal Holds: The Trigger & The Process*, 11 Sedona Conference J. 267, 273 (2010) (a party may "reasonably conclude

There is no basis in law for the Trustee's claim that TC's alleged "demand" letters—vague requests for accounting that were amicably resolved—put MTVN on notice of any impending litigation.  In order to provide such notice, a letter must be explicit in its demands, unequivocally stating a position and demanding the preservation of relevant materials.  *See, e.g.*, *Cache La Poudre Feeds, LLC* v. *Land O'Lakes, Inc.*, 244 F.R.D. 614, 623 (D. Colo. 2007) (holding no duty to preserve arose where demand letter "hinted at the possibility of a non-litigious resolution" and neither explicitly threatened litigation nor demanded preservation of materials).  The Trustee fails to cite any case law supporting its allegations that TC's "demand" letters—which fail to explicitly state legal claims or an "intent to investigate and pursue such claims"—provide sufficient notice of impending litigation.  *Siani* v. *State Univ. of N.Y.*, 2010 WL 3170664, at *6 (E.D.N.Y. Aug. 10, 2010).[6]

Nor did the Trustee's conduct after Pearlman's Ponzi scheme and business empire crumbled put MTVN on notice that litigation was a reasonable possibility.  Indeed, in the Trustee's first communication with MTVN, he noted that his "ultimate goal" was to "*avoid* litigation." (Pl. Ex. 19 at 2 (emphasis added).)  He also stated that he sought to "work amicably with [MTVN] and open up a dialogue."  *Id.*  The Trustee's August 13, 2007 subpoena merely formalized the Trustee's request for certain information regarding *Making the Band*.  (Pl. Ex. 20.)  Indeed, the Trustee's December 5, 2007 letter to MTVN reiterated that he was looking forward to "amicably resolving this matter." (Pl. Ex. 22 at MTV-MTB 2224.)  In truth, the first point at

---

that there was no credible threat of litigation" where actual litigation threat made, but "person making the threat had made previous threats without initiating litigation.").

[6] Unlike the inflammatory rhetoric found in communications in the cases the Trustee cites, the communications between TC and MTVN never once threaten litigation, and always refer to a desire to amicably resolve issues. Compare to, *e.g.*, *Goodman* v. *Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 511 (D. Md. 2009) (finding demand letter provided notice as it "openly threaten[ed] litigation," referenced attorney consultations, and identified possible damages); *Optowave Co.* v. *Nikitin*, 2006 WL 3231422, at *10 (M.D. Fla. Nov. 7, 2006) (lawyer's letter provided notice by stating it anticipated "legal action").

which it was clear that litigation was imminent was in 2008 when the Trustee filed this action. At that point, MTVN appropriately began identifying relevant custodians and implementing litigation holds. (Ex. Q ¶ 4.)

The Trustee's contention that MTVN had a duty to issue a litigation hold based on the assertion of work product protections in its privilege log is emblematic of this motion's strategic character. The Trustee has been aware of the timing of MTVN's litigation holds since December 16, 2010. Plainly more interested in manufacturing a spoliation issue than ascertaining the truth, however, he did not raise this issue until a letter dated March 2, 2011—just one week before the filing of this motion, in the final week of fact discovery. (Ex. R.) Based on the concerns set forth in the Trustee's March 2 letter, MTVN voluntarily revisited those few documents from prior to 2008 that were designated as work product. On the same date that this motion was filed, MTVN produced a revised privilege log that indicated that these documents were withheld either because (i) they included privileged information about *this* matter, but information that constituted work product about *other* matters, or (ii) were properly designated as privileged but not work product.[7] Had the Trustee pursued these matters properly, permitted MTVN a meaningful opportunity to investigate his charges, and met-and-conferred, his concerns could have been alleviated.

Finally, perhaps most telling of the contrived nature of the Trustee's arguments is that TC never issued a litigation hold notice itself. The Trustee's privilege log does not include a single such notice. (Ex. S.) To the extent the Trustee asserts that TC contemplated litigation in 2002—and therefore itself would have been subject to a preservation obligation—its own failure to institute a litigation hold and preserve evidence is completely inexcusable. *See, e.g., Pen-*

---

[7] The only exception is some pages of handwritten notes from the files of Virginia Lazalde-McPherson that MTVN provided to predecessor counsel. Due to photocopying, the handwriting is illegible. MTVN is continuing its efforts to locate legible copies of those pages to determine their appropriate designations.

*sion Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Secs., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) ("A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation."). More likely, there is no litigation hold in TC's files because the spectre of litigation, prior to 2008, has been conjured by the Trustee for purposes of this motion, and has no basis in fact.

## II.   THE TRUSTEE'S SPOLIATION CLAIMS ARE WITHOUT MERIT

The Trustee's accusation that MTVN has intentionally destroyed documents and metadata is entirely groundless. In every instance, MTVN has acted in good faith with regard to its discovery obligations. Spoliation is defined as the "intentional destruction, mutilation, alteration, or concealment of evidence." *Optowave Co.*, 2006 WL 3231422, at *7 (citation omitted). Before imposing spoliation sanctions, a court must decide: "(1) that the missing evidence existed at one time; (2) that the alleged spoliator had a duty to preserve the evidence; and (3) that the evidence was crucial to the movant being able to prove its prima facie case or defense." *Floeter* v. *City of Orlando*, 2007 WL 48663, at *5 (M.D. Fla. Feb. 9, 2007). As demonstrated above, MTVN was under no obligation to retain documents prior to the litigation. Moreover, MTVN timely instituted litigation holds, the sufficiency of which the Trustee's motion does not challenge. In fact, the Trustee's motion identifies a total of *seven* documents—over an eleven year period—that were produced from TC's files, but not from MTVN's.[8] Although the Trustee's eleventh-hour discovery requests about discovery led to MTVN's identification of a small number of additional responsive documents, MTVN has now produced those to the Trustee.[9]

---

[8] The same criticism could be leveled at the Trustee, who has failed to produce at least as many documents that, by the Trustee's logic, should have been in his possession. (Composite Ex. T.)

[9] In his haste to seek punishment of MTVN, the Trustee did not so much as pause to meet and confer with MTVN about the spoliation alleged in his motion. Had he done so, MTVN would have explained that, as discussed *infra*, in preparing its responses and objections to his Second Request for Admissions, MTVN discovered a small number of documents that it had not previously produced. These documents include the drafts and redlines that the Trustee contends MTVN intentionally deleted.

Sanctions for spoliation are appropriate only when the moving party has displayed through "probative evidence" that "the absence of that evidence is predicated on bad faith." *Bashir* v. *Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). "'Mere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" *Id.* (quoting *Vick* v. *Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)). Default judgment is "the most severe sanction" and is appropriate *only* if "there is a showing of bad faith and lesser sanctions will not suffice." *Optowave Co.*, 2006 WL 3231422, at *8.

### A.    MTVN Has Not Intentionally Destroyed Documents Or Metadata

Many of the documents that the Trustee claims MTVN destroyed were in fact produced *before* the Trustee filed his motion.  Specifically:

- MTVN *produced* the October 10, 2001 memorandum sent to Virginia Lazalde-McPherson; indeed, the memorandum the Trustee attaches as evidence of documents that MTVN did not produce bears an MTVN production bates number.  (Mot. at 11; Pl. Ex. 23.)

- MTVN *produced* a draft of the 2000 Agreement ("Agreement"), which the Trustee attached as part of Exhibit I to his Second Request for Admissions to MTVN (Exs. U, V), as well as a redline of the 2001 Amended Agreement ("Amended Agreement"), which the Trustee recently attached as Exhibit J to that same Second Request for Admissions (Ex. W).  (Mot. at 4, 17.)

- MTVN *produced* a draft of the Amended Agreement (Ex. X) despite the Trustee's claim to the contrary.  (Mot. at 4, 17.)

- As for the "more formal joint venture agreement," there is no evidence that such a document ever existed.  (Mot. at 6.)  The Trustee assumes MTVN began drafting such a document based on a line in a memo drafted by *Trans Continental* employees.  (Pl. Ex. 11.)

With respect to the remaining documents that were purportedly destroyed, had the Trustee raised his concerns properly—rather than through the stratagem of discovery about discovery, followed immediately by motion practice—MTVN would have addressed them without the need for a motion.  As it is, in preparing its responses to the Trustee's Second Request for Ad-

missions—which were initially due five days before the close of discovery—MTVN was able to identify nearly all of the balance of the documents that were purportedly destroyed.  The Second Request for Admissions asked MTVN to admit that certain specific documents (such as versions of documents, identified by the document footer) were not in its possession, custody, or control; MTVN therefore searched its document management system to try to identify the specific documents the Trustee had cited.  It discovered a small number of documents that had not previously been collected as part of its general searches.  As explained more fully in the attached declaration of Warren Solow, this oversight was due in part to a technical issue caused by the configuration of MTVN's document management system.  (Ex. Q ¶ 22.)  MTVN also uncovered two related issues regarding a miscoding by a Viacom contract attorney and an instruction from MTVN's prior counsel.  (*Id.* ¶¶ 23-24.)   Human error in document review, particularly in a case involving tens of thousands of documents spread across dozens of custodians, does not support the draconian relief of a default judgment sought by the Trustee, especially since, upon discovering the omitted documents, MTVN undertook a comprehensive review of its forensic data collection to ensure that nothing else was missed. (*Id.* ¶ 25.)  MTVN has devoted in excess of 1,000 hours of staff time to ensure that all responsive documents have been produced.  (*Id.* ¶ 26.)   And, MTVN's production of nearly all the documents sought by the Trustee belies any inference of spoliation.

This leaves seven specific documents that MTVN has not produced, but were found in TC's files, that the Trustee charges that MTVN has intentionally deleted.  MTVN has produced one of these documents in draft form *twice* (Composite Ex. Y); the only difference is that the Trustee's version is printed on MTV letterhead (Pl. Ex. 14).  As for the remaining six unproduced documents, three are hard copy documents and thus could not have been deleted as the Trustee claims—a memo from TC from 2001 (Pl. Ex. 23) and two letters from TC's counsel

requesting an accounting in 2006 (Pl. Exs. 17 and 18).   Another two are redlines of the Amended Agreement and their fax cover sheets, which are also hard copy documents (Pl. Ex. 7).[10]   The last document is an October 2002 letter drafted by Ms. Lazalde-McPherson.  (Pl. Ex. 13.)  It does not have a document identification number in the footer and it is therefore impossible to determine whether this document was *ever* saved on MTVN's document management system.  In short, the Trustee's position is that this Court should grant a default judgment or an adverse inference because of six unproduced documents.  This is, in a word, preposterous.

   To the extent these documents did not survive at MTVN, they may have been properly discarded in the normal course of business.  While the Trustee is correct that documents saved on MTVN's document management system ("DMS") are rarely deleted entirely, he ignores the fact that documents need not be saved on the DMS in the first instance, or may be overwritten.[11] (Ex. Q ¶ 13.)  Additionally, e-mails or data saved on personal or departmental share drives can be deleted in the normal course of business.  (*Id.* ¶¶ 13-15, 17.)  It is intuitively the case that, during the ten-year period that *Making the Band* aired, some documents on those drives would have been deleted.  It is also reasonable to assume that an employee would not retain every document dating back more than ten years.  However, this does not give rise to sanctions because, as discussed *supra*, MTVN did not have a duty to retain such documents.  *See Wilson* v. *Wal-Mart Stores, Inc.*, 2008 WL 4642596, at *2 (M.D. Fla. Oct. 17, 2008) ("A party is not guilty of spoliation when it destroys documents as part of its regular business practices and is

---

[10] The Trustee conveniently ignores the fact that MTVN produced a *different* redline of the Amended Agreement that is absent from the Trustee's production.  (Ex. W.)

[11] When drafting a letter or fax to a particular person, it is not uncommon to open a letter or fax from the DMS that was previously sent to that individual. (Ex. Z ¶ 7.)  The new body of the correspondence is inserted and the document is saved over the prior text.  (*Id.*)  This common practice effectively deletes the previous correspondence from the DMS.  (*Id.*)

unaware of their potential relevance to litigation.") (internal quotation marks omitted); *Managed Care Solutions* v. *Essex Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1326 (S.D. Fla. 2010).[12]

Finally, there is also absolutely no basis for the Trustee's allegations that MTVN destroyed or manipulated any metadata.  There are two simple explanations for the missing metadata fields that the Trustee identifies, which MTVN would have explained to the Trustee had the Trustee raised this issue before filing this motion.  First, the Agreement and Amended Agreement that the Trustee cited do not have author fields because they are hard copy documents.  This metadata field is simply not available for any hard copy document unless it is manually inputted.[13]  Second, there was a technical error in processing MTVN's document production that resulted in an inadvertent failure to provide "author" metadata for all non-e-mail, natively electronic documents.  (Ex. Q ¶ 18.)   Unfortunately, MTVN only became aware of this issue after researching the allegations that the Trustee made in his motion.[14]  Had the Trustee raised it sooner, MTVN could have addressed it sooner.  However, no metadata has been lost, and MTVN will provide the Trustee with all of the agreed-upon metadata fields for previously produced non-e-mail, natively electronic documents.

---

[12] The Trustee's request for any sanctions whatsoever—much less default judgment—is absurd in light of TC's *own* clear bad faith intentional destruction of documents.  While MTVN may have misplaced a handful of documents in the regular course of business, TC was a proven criminal enterprise engaged in the actual shredding of documents.  Indeed, the Receiver appointed before TC's bankruptcy publicly stated that TC employees shredded documents before the company's collapse.  (Ex. AA .)  TC's unclean hands should itself bar the Trustee from seeking any sanctions in this matter.

[13] It is for this same reason that the July 12, 2002 contract between MTVN and Bad Boy Films has limited metadata; this was a hard copy document produced electronically.  (Mot. at 5.)

[14] The Trustee never alerted MTVN to its belief that there were missing metadata fields before filing this motion, and his statement that he sought confirmation that MTVN produced all metadata in its possession is flatly inaccurate.  (Mot. at 6 n.8.)  What the Trustee sought was metadata for documents that had been produced by MTVN's prior counsel without metadata—which MTVN's present counsel provided.  The Trustee never raised with MTVN that he perceived some fields in MTVN's production to be systematically missing metadata.  That is precisely the type of issue about which counsel's respective information technology staff should confer.

**B.**     **Sanctions Are Unwarranted Because Any Missing Documents Are Not Critical to the Trustee's Case And the Trustee Has Not Suffered Prejudice**

Sanctions are inappropriate because if there are any missing documents—and it is not even clear that there are—the Trustee has not shown that they are critical to his case such that he has been prejudiced by their absence.  It is insufficient for the Trustee to show that the missing documents are *relevant*; the Trustee must demonstrate that they were *crucial*.  *Managed Care Solutions*, 736 F. Supp. 2d at 1327 ("The law in this Circuit requires that the movant show that the spoliated evidence was crucial to its claim or defense.  It is not enough that the spoliated evidence would have been relevant to a claim or defense.") (citations omitted).  The Trustee must also show that he has been prejudiced by the absence of the documents, which he cannot do.  *Eli Lilly & Co.* v. *Air Exp. Int'l USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010).   Indeed, a default judgment or adverse inference is an unreasonable sanction in light of the absence of prejudice.  *Optowave*, 2006 WL 3231422, at *12 (default judgment is limited to the most "flagrant cases in which it is demonstrated that the failure to produce materially affect[s] the substantial rights of the adverse party and is prejudicial to the presentation of his case") (internal quotation marks omitted).  Sanctions must be tailored to the harm and "the most severe sanction" of default judgment is only appropriate if "lesser sanctions will not suffice."  *Id.* at *8.[15]

The Trustee has not been prejudiced because the majority of the documents at issue were either produced by MTVN before the Trustee took most of his depositions or were included, in some form, in TC's files.[16]  As for the documents MTVN recently produced (which

---

[15] *See also Pension Comm.*, 685 F. Supp. 2d at 469-70 ("It is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy. . . . [A] terminating sanction is justified in only the most egregious cases, such as where a party has engaged in perjury, tampering with evidence, or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives.").

[16] MTVN produced MTVN 23818 (Oct. 10, 2001 Making the Band Memorandum) (Pl. Ex. 11) on February 9, 2009 and MTVN-RE 1153-54 (draft Agreement) (Ex. U) and MTVN-RE 1051-52 (redline of Amended Agreement) (Ex. W) on October 8, 2010.  Other documents are found in the Trustee's possession as TCP 7652-58 (Pl. Ex. 7); TCP 10123-28 (Pl. Ex. 7); TCP 10111 (Pl. Ex. 14); TCP 17719 (Pl. Ex. 17); TCP 17658 (Pl. Ex. 18); TCP 783-88  (Pl. Ex. 23).

the Trustee likely would have received sooner, had he raised the issues sooner), those were in large part drafts, redlines, letters, and memoranda exchanged between the parties—which presumably were once in TC's possession.  (Mot. at 4, 7 n.9, 11.)  The irony of the Trustee's claim that MTVN deserves to be sanctioned for failing to preserve documents that TC also did not retain is undeniable.  Moreover, any prejudice to the Trustee from MTVN's delayed production of some few documents could be cured by re-opening depositions of certain witnesses; there is no need to resort to a default or an adverse inference, which are remedies of last resort.[17]  The Trustee's extreme demand for a default judgment or an adverse inference against MTVN, rather than an extension of discovery and an opportunity to re-take depositions, which would entirely remedy any claimed harm, demonstrates that the Trustee is not actually interested in rectifying any perceived discovery deficiencies.  Rather, the Trustee is only seeking an easy way to win a case he cannot prove.  This Court should not countenance such an abuse of the discovery process.  *Cf. Swofford*, 2009 WL 1025223, at *1 ("Creation of satellite litigations or opportunities for seeking sanctions is not a goal of the [discovery] process.")

## C.     The Trustee has not provided "probative evidence" of bad faith

In addition to his failure to prove the substantive prongs of spoliation, the Trustee has not provided any evidence—much less the legally required "probative evidence"—establishing that any failure to preserve evidence was a result of MTVN's bad faith.  All the Trustee offers in support of his charges is invective—not facts.  The Trustee cites absolutely no case law for

---

[17] Indeed, those remedies have been rejected even where claims of prejudice might *actually* be present, unlike here.  *See, e.g.*, *Rabello* v. *Bell Helicopter Textron, Inc.*, 200 F.R.D. 484, 487-89 (S.D. Fla. 2001) (declining to impose default judgment in favor of a lesser remedy where defendant produced "thousands of pages of documents" one month before trial); *Preferred Care Partners Holding Corp.* v. *Humana, Inc.*, 2009 WL 982460, at *7-8 (S.D. Fla. Apr. 9, 2009) (refusing to impose default judgment where defendant discovered hundreds of thousands of pages of relevant documents one month before trial and finding that the appropriate remedy was to permit plaintiff to conduct limited additional discovery pertaining to the new information the documents revealed and awarding monetary sanctions).

his novel proposition that the possible loss of a handful of documents during the regular course of business over a more than ten-year period constitutes "probative evidence" of the bad faith intentional destruction of documents.[18]   Glaringly absent from the Trustee's motion is the clear case law in this jurisdiction holding that the negligent destruction of documents—even as a result of a failure to institute a timely litigation hold—"is not tantamount to bad faith" and therefore not sanctionable conduct.[19]

Finally, it is necessary to address Virginia Lazalde-McPherson, in-house counsel at MTVN, who the Trustee vilifies and accuses of intentional destruction of evidence.  These are serious charges, made against an attorney, in a public court filing.  Surely one would think that such allegations would not be made without some support.  Stunningly, however, the Trustee offers *not one fact* in support of these charges, other than that some small number of Ms. Lazalde-McPherson's documents appear not to have survived over a more than ten-year period (while countless others did).  These are irresponsible and improper accusations that should be rejected out of hand, and Ms. Lazalde-McPherson rebuts them directly in a declaration submitted in connection with this opposition brief.  (Ex. Z.)

---

[18] The cases that the Trustee relies upon are so factually dissimilar as to be inapplicable.  *Swofford* v. *Eslinger*, 671 F. Supp. 2d 1274, 1281-82 (M.D. Fla. 2009) (finding bad faith where guns used during shooting were sent to manufacturer for disassembly after receiving multiple preservation notices); *Optowave*, 2006 WL 3231422, at *9 (imposing adverse inference where temporal gaps in e-mail existed and the PST file indicated intentional deletion of messages); *Telectron, Inc.* v. *Overhead Door Corp.*, 116 F.R.D. 107, 133-34 (S.D. Fla. 1987) (finding bad faith where senior executives "explicitly and urgently called for the destruction of records in a category directly related to the opposing party's claims, on the very date that he became aware of those claims"); *Flury* v. *Daimler-Chrysler Corp.*, 427 F.3d 939, 944-45 (11th Cir. 2005) (finding bad faith for active and knowing physical destruction of an allegedly defective vehicle).

[19] *See, e.g.*, *Mann* v. *Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009) ("[M]ere negligence in losing or destroying records is not sufficient to draw an adverse inference."); *Managed Care Solutions*, 736 F. Supp. 2d at 1329 (refusing to impose sanctions where there was no evidence that defendant purposely failed to institute litigation hold); *Floeter* v. *City of Orlando*, 2007 WL 486633, at *7 (M.D. Fla. Feb. 9, 2007) ("[I]n this [C]ircuit the negligent destruction of evidence is insufficient to support an adverse inference instruction.").  The delayed production of documents also does not support a default judgment absent bad faith.  *Stimpson Computing Scale Co.* v. *Knuck*, 508 So.2d 482, 484-85 (Fla. Dist. Ct. App. 1987) (holding that the late production of a critical document fell "far short of the level of egregiousness required to sustain the dismissal of an action and the entry of a default judgment").

### III.   MTVN'S DOCUMENT PRODUCTION HAS COMPLIED WITH THE COURT'S ORDERS, THE DISCOVERY RULES, AND THE TRUSTEE'S INSTRUCTIONS AND THUS DOES NOT CONSTITUTE A "DOCUMENT DUMP"

The Trustee seeks the ultimate sanction against MTVN for having supposedly "dumped" documents on the Trustee through its document productions on and after January 5, 2011.  MTVN did not violate any discovery order, as it produced the documents prior to the March 9, 2011 deadline set by the Court's Case Management Order ("CMO").  MTVN neither intentionally delayed in producing those documents, nor acted in bad faith.  Rather, the additional productions in early 2011 stemmed from the Trustee's numerous and rolling document requests (more than 400, in all), and a re-review of documents collected by predecessor counsel that MTVN undertook at great expense, out of an abundance of caution that it comply with its discovery obligations—a review that the Trustee himself had previously requested. (Ex. BB.)  On this record, there is no basis for the imposition of *any* sanctions.

### A.   MTVN Complied With The Court's Orders

As noted earlier, entry of default judgment is a "last resort" and unwarranted where a party has not displayed willfulness, bad faith, or fault.  *See, e.g.*, *United States* v. *Certain Real Property Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1317 (11th Cir. 1997) ("The decision to dismiss a claim or enter default judgment ought to be a last resort—ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders.") (citations and internal quotation marks omitted).  In the Eleventh Circuit, default judgment is inappropriate absent the "flagrant disregard and willful disobedience of *discovery orders*."  *Id.* at 1317 (citations omitted).  The CMO here did not provide for document discovery to conclude at any time before fact discovery, which was scheduled to close on March 9, 2011.  The documents produced between January 5 and March 9, 2011 fell within the discovery period and did not violate the CMO, and thus cannot be the basis for sanctions.

19

It bears emphasis that the Trustee did not seek an interim deadline for the completion of document discovery; nor did MTVN ever represent, prior to the completion of fact discovery, that it had completed its productions.[20]  The Trustee has not been shy about making demands in this case.  The Trustee's counsel has attempted on no fewer than eight occasions to seek discovery sanctions against, or attorneys' fees from, MTVN.  [D.E. 27, 31, 32, 76, 123, 157; Bankr. D.E. 19, 23.]  He could have asked that MTVN complete its productions by a date certain, or before certain depositions.  He could have pursued motion practice if he did not gain satisfaction through a negotiated process.  He did none of this, which precludes an entry of any sanctions—much less a default judgment.

**B.    MTVN's Document Production Was Conducted In Good Faith, And Any Harm to The Trustee Was Of His Own Making**

Prior to January 5, 2011, the date on which the Trustee accuses MTVN of beginning a "document dump," MTVN had produced roughly 12,742 documents, or approximately 36%[21] of its total production of approximately 35,093 documents.  At the end of 2010, in concluding its document production, MTVN's current counsel engaged in certain quality control meas-

---

[20] Although MTVN never represented that *its* production was complete, *Trustee's* counsel has repeatedly stated—erroneously—that *the Trustee's* document production was complete.  The Trustee's May 21, 2010 Responses and Objections to MTVN's Second Request for Documents said that the Trustee had produced the "entire universe" of responsive hard-copy documents and "all non-privileged ESI that was, in any way, related to this action." (Ex. CC at 5, 6.)  On September 8, 2010, the Trustee similarly stated that there were no additional responsive documents to certain MTVN requests. (Ex. DD at 1.)   But on December 3, 2010, the Trustee produced a DVD containing additional ESI, assuring MTVN that *now* he had produced "all non-privileged, responsive ESI." (Ex. EE at 2.)  Then, twice on December 9, 2010, the Trustee's counsel e-mailed MTVN's counsel documents that the Trustee's counsel had "located yesterday" or had "just unearthed." (Composite Ex. FF.)  Six days later,  the Trustee produced yet another set of documents. (Ex. GG.)  Over the seven months following its initial representation that its production was complete, the Trustee produced 351 more documents totaling 1,081 pages.  Then, on February 11, 2011, the Trustee's records custodians were deposed and it was revealed that there were critical gaps in the Trustee's collection efforts which, as the Court is aware, the Trustee has now taken steps to entirely remedy.

[21] The 15% figure that the Trustee relies upon is misleading, as it is based on page numbers alone.  Moreover, the Trustee ignores that over 10,000 documents—nearly 30% of MTVN's total production—were spreadsheets, many of them quite large when imaged.  Indeed, the spreadsheets comprise over 1,061,000 pages of MTVN's total production.  When one sets aside those spreadsheets, it is clear that the volume of material MTVN produced was reasonable and not overwhelming.

ures to confirm that all responsive documents that MTVN had provided to predecessor counsel had been produced.  Unable to confirm that all of those documents had been produced, MTVN determined that the only course of action was to re-review those documents.  MTVN so advised the Trustee, and did so promptly.  MTVN finished that process in early February 2011, by which point the remaining documents were substantially produced.  (Ex. HH.) MTVN then turned to finalizing privilege determinations and redactions for privilege where appropriate; a limited number of documents resulting from that process were produced in subsequent tranches on February 23, March 8, and March 9, 2011.  (Composite Ex. II.)[22]

Many of the ills about which the Trustee complains are of his own creation.  For example, the volume of MTVN's production is due in large part to the Instructions in the Trustee's Requests for Production.  The Trustee's First, Second, and Third Requests for Production (Instruction No. 38) and Fifth Request (Instruction No. 9) specifically ask for "all . . . enclosures [] and attachments to the document in addition to the document itself, without abbreviation or expurgation"; the Fourth Request (Instruction No. 9) asks for all documents that are, in any way, "attached to any requested document."  (Pl. Ex. 34.)  Although the Trustee complains about the burden of sifting through non-responsive documents, MTVN's production included voluminous non-responsive documents *because the Trustee asked for them.*[23]

---

[22] MTVN's good faith is underscored by its voluntary measures to ensure that the Trustee received potentially relevant documents prior to depositions.  For example, before the Trustee's re-deposition of Jackie French—which had initially been scheduled for January 19, 2011—MTVN worked diligently to produce, in advance of that deposition, the documents pertaining to that witness.  (Ex. JJ.)  MTVN plainly would not have pursued such efforts had it intended to abuse the discovery process.

[23] MTVN's conduct is also consistent with the Federal Rules of Civil Procedure.  Federal Rule 34(b)(2)(E)(i) states that documents should be produced as they are kept in the ordinary course of business; likewise, the Trustee's First, Second, Third, and Fifth Requests for Production (Instruction Nos. 36, 36, 37, and 6, respectively) mandated that documents "be produced as they are kept in the ordinary course of business."  (Pl. Ex. 34.) MTVN therefore preserved and collected its documents such that e-mails and attachments were kept together. (Ex. Q ¶ 11.)  Thus, if either the e-mail or an attachment was related to the subject matter of this action, the entire "family" of documents was provided to MTVN's counsel for review even if the other family members were not otherwise relevant.  (*See id.*)  If MTVN's counsel deemed some portion of the "family" to be responsive, the entire "family" was produced.

21

Moreover, as demonstrated above, throughout this case the Trustee has pushed for deposi-tions, even when it has been evident that MTVN's document production was incomplete.

**C.    The Trustee Was Not Prejudiced By The Timing of Production,
       And In Any Event Is Not Without Remedy Other Than a Default**

The balance of the Trustee's other complaints of prejudice are overblown because he had access to the vast majority of the "critical documents" well before the close of discovery. MTVN produced many of the documents the Trustee cites *five* months before the discovery deadline, and the majority of the others were already in the Trustee's possession.  Addition-ally, that the Trustee did not move to extend the discovery deadline or request leave to re-depose any witnesses undermines his claim of prejudice.  This situation is exactly like that of the plaintiffs in the *Swofford* case who complained about the belated discovery of critical documents and sought a default to remedy their claimed prejudice.  *Swofford,* 2009 WL 1025223, at *2.  This Court held that, "[t]o the extent these documents were as critical as Plaintiffs now conclusively claim . . . Plaintiffs' decision not to bring the matter to the imme-diate attention of the Court is inexplicable and supports a conclusion that, if there was a viola-tion of Rule 26, it was not significant."  *Id.*  This Court further commented that the delayed discovery might have warranted a discovery extension, but not more serious sanction.  Here too, the Trustee's protestation about the belated production of discovery rings hollow since he did not seek any of the remedies available to him during the discovery period to address his claimed harm.  Indeed, he did not even *approach* MTVN about any such remedy.

And, it is clear that the Trustee already had much of the allegedly "critical informa-tion" before he took many of the depositions.  He cites three examples of documents whose "belated" production caused him "tangible harm."  The first was not belatedly produced at all. A near duplicate of Plaintiff's Exhibit 32 was produced as MTVN-RE 1051 on October 6,

2010. (Ex. W.) The second was authored by Ms. Lazalde-McPherson, whose re-deposition the Trustee inexplicably canceled; the third was authored by Ms. Skoler, whose re-deposition the Trustee never sought.

Finally, the Trustee's melodramatic assertion that there is now no way "to replace the missing testimony or restore the truth" smacks of insincerity. (Mot. 24.) The most obvious way to do so, of course, would be to re-open certain depositions to examine witnesses about the purportedly "critical" documents. Again telling of this motion's strategic character, the Trustee had demanded, and MTVN had agreed, to produce Ms. Lazalde-McPherson for a deposition in Miami on March 4, 2011, prior to the conclusion of discovery. One week before the deposition of this "central actor" was to take place, the Trustee nonchalantly cancelled it because of "the press of other matters and our unavailability." (Ex. KK.) Plainly, the Trustee was more interested in expending his efforts to initiate this satellite litigation about the litiga-tion than "restoring the truth" by deposing Ms. Lazalde-McPherson using the documents pro-duced in January and February.

## IV. AN IN CAMERA REVIEW IS NOT WARRANTED

In support of its motion, the Trustee takes issue with 31 documents identified on MTVN's privilege and redaction logs (listed in Pl. Ex. 28). Given MTVN's expressed willing-ness to confer promptly on these issues, the Trustee failed to comply with his obligations under Middle District of Florida Local Rule 3.01(g). As such, the motion with respect to in camera review should be denied.[24] With respect to the substance of the purported discovery abuses

---

[24] Although the Trustee had previously inquired as to some, he first challenged the majority of the documents in a letter sent Friday March 4, 2011. (Ex. LL.) MTVN immediately reviewed the challenged documents and, on Tuesday, March 8, informed the Trustee that it would produce or re-redact several of the documents in an attempt to eliminate the dispute. During that conversation, the parties agreed to discuss the issue again on Friday, March 11. The very next day, on March 9, MTVN produced eleven of the documents listed in the Trustee's Exhibit 28 in whole or with more limited redactions. Fixedly determined to seek sanctions, however, the Trustee filed this mo-tion two days before the scheduled meet-and-confer. *Broughton* v. *City of Jacksonville*, 2007 WL 2964174 at *1-

about which the Trustee complains, however:  the Trustee seeks to characterize the normal ebb and flow of negotiation as a conspiracy by MTVN to "suppress" or "shield" damaging documents.  Ironically, the Trustee does so by pointing to allegedly damaging documents which MTVN *has* in fact produced.  (*See* Mot. at 12-13.)

Paul, Weiss took over as counsel for MTVN in late June 2009, and thereafter undertook a re-review of the documents on predecessor counsel's privilege logs.  Shortly after the discovery stay imposed by the Bankruptcy Court was lifted in January 2010, MTVN de-designated certain documents and produced an amended privilege log (the "Amended Log").[25]   The Trustee subsequently challenged certain assertions of privilege and, upon further consideration and in an effort to resolve the differences without court intervention, MTVN produced certain additional documents.  All told, since providing the Amended Log, MTVN has adjusted the designations or redactions of roughly 236 of the approximately 3,729 documents identified on its privilege or redaction logs (not 2,200 documents, as the Trustee's motion falsely contends (Mot. at 25)).  MTVN produced its final logs on March 9, 2011.[26]

Despite the Trustee's claim that its discovery was prejudiced by the de-designation of documents, the fact remains that the Trustee received the majority of the withheld documents

---

[2] (M.D. Fla. Oct. 10, 2007) (denying plaintiff's motion to compel discovery requests for failing to comply with Rule 3.01(g) because plaintiff knew defendant intended to provide supplemental responses shortly).

[25] The Trustee also complains about being confused by MTVN's privilege and redaction logs.  In reality, the logs are quite straightforward.  There are only two sets of logs:  (1) amended versions of the privilege and redaction logs previously provided by K&L Gates, which current counsel has amended and supplemented based on its re-review of privilege determinations made by predecessor counsel; and (2) privilege and redaction logs of documents designated by MTVN's current counsel, which MTVN has supplemented, over time, as it has made additional productions.

[26] The Trustee's concerns regarding MTVN's use of three bates prefixes is simply makeweight argumentation.  Predecessor counsel, K&L Gates, had used the "MTVN" bates prefix. Paul, Weiss began using the "MTV-MTB" bates prefix in order to avoid confusion between Paul Weiss's and predecessor counsel's productions, and to avoid duplication of bates numbers. In fact, the Trustee's counsel actually *asked* MTVN to use a new bates number so that newly produced documents would not contain previously used bates numbers. (Composite Ex. MM.) To further allay the Trustee's concerns, MTVN produced documents originally withheld as privileged by K&L Gates under a third prefix, "MTVN-RE." (Ex. NN.) Notably, the Trustee never complained about this format.

in a production on October 8, 2010—before nearly all the depositions for which they were arguably relevant.  Of the four that the Trustee identifies as "most salient," Plaintiff's Exhibit 25 was produced on May 4, 2010, more than a month before the June 30, 2010 deposition of Ken Parks, at which it was in fact used.  And Exhibit 24—the "f*%k Lou e-mail"—was first produced over a year ago, on March 8, 2010.  Far from causing the Trustee prejudice, the document was produced before (and used during) the depositions of John Miller, the e-mail's author, and Brian Graden, whose thoughts it purportedly communicated (as well as practically every other deposition, whether or not that witness had any connection to the document).[27]

## CONCLUSION

For the foregoing reasons, MTVN respectfully submits that the Trustee's motion should be denied in its entirety, and that based on the record contained on this motion—which does not even suggest intentional spoliation—an evidentiary hearing is unnecessary.

Dated:  This 24th day of March, 2011.

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York  10019-6064
Tel:  (212) 373-3000
Fax: (212) 757-3990

/s Andrew J. Ehrlich
Andrew J. Ehrlich, Esq.
aehrlich@paulweiss.com
(admitted *pro hac vice*)
Leslie Gordon Fagen
lfagen@paulweiss.com
(*pro hac vice* pending)

**HOLLAND & KNIGHT LLP**
200 South Orange Ave.
Suite 2600
Orlando, FL 32801
Telephone: (407) 425-8500
Facsimile: (407) 244-5288

Brian A. McDowell
Florida Bar No. 765521
brian.mcdowell@hklaw.com
Edward M. Fitzgerald
Florida Bar No. 0010391
edward.fitzgerald@hklaw.com

---

[27] (*See, e.g.*, Composite Ex. OO (Miller Tr. at 72, 76, 80; Graden Tr. at 133; Mok Tr. at 140; Skoler Tr. at 229-231; Parks Tr. at 174-176; French Tr. at 451-461).)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 24th, 2011, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following counsel of record: James G. Sammataro, Esq., Kasowitz Benson Torres & Friedman, LLP, Four Seasons Tower, 1441 Brickell Avenue, Suite 1420, Miami, FL 33131; Daniel E. Traver, Esq., GrayRobinson, P.A., 301 E. Pine Street, Suite 1400, Orlando, FL 32801; Jonathan D. Davis, Esq., Jonathan D. Davis P.C., 99 Park Avenue, Suite 1600, New York, New York 10016.

/s Andrew J. Ehrlich
Andrew J. Ehrlich, Esq.