# COMPOSITE

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al*                Case No. 6:07-bk-00761-ABB
                                          **Jointly Administered**
    **Debtor.**                          **Chapter 11**
_____/

SONEET KAPILA, Chapter 11 Trustee
for TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,                        **Adv. No.: 6:08-ap-00157-ABB**

          **Plaintiffs,**

    v.

MTV NETWORKS COMPANY,

          **Defendant.**
_____/

## TRANS CONTINENTAL'S FIRST REQUEST FOR ADMISSIONS

    Pursuant to Rule 36, Fed. R. Civ. P., plaintiff, Trans Continental Television Productions,

Inc. ("Trans Continental"), by and through counsel, hereby serves this First Request for

Admission on MTV Networks, a division of Viacom International, Inc. ("MTVN").

## REQUESTS FOR ADMISSIONS

    **Request No. 1**    Admit that MTVN failed to provide an up-to-date accounting of

revenues generated from the foreign and domestic distribution of *Making the Band*.

**Response:**

    **Request No. 2**    Admit that MTVN excluded Trans Continental's participation and input

as required by Paragraph 5 of the 2001 Agreement from *Making the Band*.

**Response:**

{Client Files\43\43-1\00003551.DOC }

1

<u>Request No. 3</u>   Admit that Trans Continental was entitled to participate in all business and creative processes related to *Making the Band*.

**Response:**

<u>Request No. 4</u>   Admit that Trans Continental notified MTVN that it objected to Diddy's involvement with *Making the Band*.

**Response:**

<u>Request No. 5</u>   Admit that the 2000 Agreement applies to Making the Band I, Seasons 1 and 2.

**Response:**

<u>Request No. 6</u>   Admit that the 2001 Agreement applies to Making the Band I, Seasons 3 through Making the Band IV, Season 3.

**Response:**

<u>Request No. 7</u>   Admit that MTVN owed Trans Continental at least $1,424,108.71 in connection with Making the Band.

**Response:**

<u>Request No. 8</u>   Admit that MTVN never paid Trans Continental a percentage of the concert or tour revenue in connection with any concert or tour performed by O-Town.

**Response:**

<u>Request No. 9</u>   Admit that MTVN never paid Trans Continental a percentage of the concert or tour revenue in connection with any concert or tour performed by Da Band.

**Response:**

{Client Files\43\43-1\00003551.DOC }

**Request No. 10**    Admit that MTVN never paid Trans Continental never received a percentage of the concert or tour revenue in connection with any concert or tour performed by Danity Kane.

**Response:**

**Request No. 11**    Admit that MTVN never paid Trans Continental a percentage of the concert or tour revenue in connection with any concert or tour performed by Donnie Klang.

**Response:**

**Request No. 12**    Admit that MTVN never paid Trans Continental never received a percentage of the concert or tour revenue in connection with any concert or tour performed by Day 26.

**Response:**

Dated: January 30, 2006.

Respectfully submitted,

**SILVERMAN COSGROVE & SAMMATARO**
*Special Litigation Counsel for Soneet R.*
*Kapila, as Chapter 11 Trustee for the*
*bankruptcy estate of Trans Continental*
*Television Productions, Inc.*
One Biscayne Tower
2 South Biscayne Boulevard, Suite 2650
Miami, Florida 33131
Telephone: (305) 377-1666
Facsimile: (305) 377-1664
jsammataro@scs-legal.com

By: _____
James G. Sammataro
Florida Bar Number: 0520292
Michelle Montjoy
Florida Bar Number: 0060392

{Client Files\43\43-1\00003551.DOC }

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Trans Continental's First Request for Admissions* was served via Hand Delivery on this ___ day of January, 2009 to:

**Carol C. Lumpkin, Esq.**
K& L Gates
Wachovia Financial Center
Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

_____
Attorney

{Client Files\43\43-1\00003551.DOC }

4

# COMPOSITE

# EXHIBIT A-1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

LOUIS J. PEARLMAN, *et al.*

Debtor.

_____/

SONEET KAPILA, Chapter 11 Trustee for
TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.,

Case No. 6:10-cv-181-Orl-28DAB

Plaintiff,

v.

MTV NETWORKS, a division of Viacom,
International, Inc.

Defendant.

_____/

TRANS CONTINENTAL TELEVISION PRODUCTIONS, INC.'S SECOND
<u>REQUEST FOR ADMISSIONS TO MTV NETWORKS</u>

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, plaintiff, Soneet Kapila,  in

his capacity as the Chapter 11 Trustee ("Trustee") for the bankruptcy estate of Trans Continental

Television Productions, Inc. ("Trans Continental"), by and through undersigned counsel, hereby

propounds his Second Request for Admissions (the "Requests") to defendant, MTV Networks

("MTV").

<u>Definitions</u>

The following definitions shall apply to Trans Continental's Requests:

1.     "And" and "or" shall be construed either conjunctively or disjunctively as

necessary to bring within the scope of these Requests all responses that might otherwise be

construed to be outside of their scope.

2.     The term "communication" shall mean the transmittal of information (in the form of facts, inquiries, ideas or otherwise) between or among any persons, in any medium or form, whether tangible, hard copy or electronic.

3.     The term "referring or relating to" shall mean relating to, referring to, reflecting, describing, evidencing, constituting, concerning, or comprising.

4.     "Document(s)" means all materials within the full scope of Fed.R.Civ.P. 34 including but not limited to: all writings and recordings, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise (including but without limitation to, email and attachments, correspondence, memoranda, notes, diaries, minutes, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, statements, tags, labels, invoices, brochures, periodicals, telegrams, receipts, returns, summaries, pamphlets, books, interoffice and intraoffice communications, offers, notations of any sort of conversations, working papers, applications, permits, file wrappers, indices, telephone calls, meetings or printouts, teletypes, telefax, invoices, worksheets, and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural representations of any kind (including without limitation, photographs, charts, microfiche, microfilm, videotape, recordings, motion pictures, plans, drawings, surveys), and electronic, mechanical, magnetic, optical or electric records or representations of any kind (including without limitation, computer files and programs, tapes, cassettes, discs, recordings), **including metadata**.

5.     The term "person" shall mean any natural individual, in any capacity whatsoever, or any entity or organization, including divisions, departments, and other units therein, and shall include, without limitation, any public or private corporation, partnership, joint venture,

voluntary or unincorporated association, organization, proprietorship, trust, estate, governmental agency, commission, bureau, or department.

6.      The term "representative" shall mean any agent, employee, servant, officer, director, accountant, attorney, or other person acting or purporting to act on behalf of the person in question.

7.      The terms "you," "your," and "MTV" shall mean MTV Networks, a division of Viacom International, Inc., and the signatory of the November 15, 2001 agreement.

8.      The term, "MTV," shall mean defendant, MTV Networks, a division of Viacom International, Inc., and its present and former agents, officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities (including, without limitation, Remote Productions, Inc. and New Remote Productions, Inc.), accountants, attorneys, predecessors, and any other person acting or purporting to act on MTV's behalf.

9.      The term, "Trans Continental," shall mean "Trans Continental Television Productions, Inc." and all others persons acting or purporting to act on its behalf, including Trans Continental's legal counsel and representatives.

10.     The term, "Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, on or about January 7, 2000 in connection with the development and production of an untitled Boy Band series for ABC.

11.     The term, "Amended Agreement," refers to the letter agreement entered into by and between, MTV, on the one hand, and Trans Continental, on the other hand, on or about November 15, 2001, in connection with the MTV series featuring O-Town, entitled "Making the Band."

12.    The term, "Making the Band," refers to not only the reality television series which initially aired on ABC and then later on MTV.  Unless specifically noted to the contrary, "Making the Band" shall refer to Making the Band 2, Making the Band 3 and Making the Band 4 and all of the seasons therein (*i.e.*, Making the Band 1.1 through Making the Band 4.3).

13.    The terms, "Sean Combs," "P. Diddy," "Puff Daddy" and "Diddy" refer to the artist/entertainer that appears in Making the Band 2, Making the Band 3, Making the Band 4 and Making His Band, his present and former agents and representatives, as well as his corporate entities, Bad Boy Films, Bad Boy Entertainment and Bad Boy Records, and their respective officers, directors, employees, servants, representatives, parents, affiliates, subsidiaries, sister entities, related entities, accountants, attorneys, predecessors, and any other person acting or purporting to act on Diddy's or Bad Boy's behalf.

14.    The term, "Making the Band 2.1" refers to the first season of the television program broadcast on MTV beginning on or about October of 2002, in which Diddy sought to find the best rappers and singers from which to assemble a new hip-hop group.

15.    The term, "Making the Band 2.2" refers to the second season of the television program broadcast on MTV beginning on or about October of 2002, in which Diddy sought to find the best rappers and singers from which to assemble a new hip-hop group.

16.    The term, "Making the Band 2.3" refers to the third season of the television program broadcast on MTV beginning on or about October of 2002, in which Diddy sought to find the best rappers and singers from which to assemble a new hip-hop group.

17.    The term, "Making the Band 3.1" refers to the first season of the television program broadcast on MTV in 2005, which featured Diddy and his search for the next all female group.

18.     The term, "Making the Band 3.2" refers to the second season of the television program broadcast on MTV in 2005, which featured Diddy and his search for the next all female group.

19.     The term, "Making the Band 3.3" refers to the third season of the television program broadcast on MTV in 2005, which featured Diddy and his search for the next all female group.

20.     The term, "Making the Band 4.1" refers to the first season of the television program broadcast on MTV, which features Diddy, the subsequently named band, *Day26,* and Donnie Klang, and a return of Danity Kane, the winners of Making the Band 3.

21.     The term, "Making the Band 4.2" refers to the second season of the television program broadcast on MTV, which features Diddy, the subsequently named band, *Day26,* and Donnie Klang, and a return of Danity Kane, the winners of Making the Band 3.

22.     The term, "Making the Band 4.3" refers to the third season of the television program broadcast on MTV, which features Diddy, the subsequently named band, *Day26,* and Donnie Klang, and a return of Danity Kane, the winners of Making the Band 3.

23.     The term, "Da Band," refers to the musical group, which arose out of Making the Band 2, and which released the album, *Too Hot for TV.*

24.     The term, "Danity Kane," refers to the musical group, which arose out of Making the Band 3 and which is signed to Bad Boy Records.

25.     The term "Chopper," refers to the artist, Rodney Hill, who is alternatively known as "Young City."

26.     The term, "Donnie Klang," refers to the artist who appeared on Making the Band 4, and recently released his album, Just Like a Rolling Stone.

27.    The term, "Day 26," refers to the musical group formed during Making the Band 4, and which is signed to Bad Boy Records.

28.    The term "Action" shall refer to the instant lawsuit styled *Soneet Kapila, Chapter 11 Trustee for Trans Continental Television Productions, Inc. v. MTV Networks, et al.*, Case No. 6:10-cv-181-Orl-28DAB.

29.    The term "ESI" shall mean electronically stored information as that term is defined in the Federal Rules of Civil Procedure.

30.    The term "including" shall mean including but not limited to.

31.    The term "any" or "each" shall be construed to include and encompass "all."

32.    The term "date" shall mean the exact day, month, and year, if ascertainable, or, if not, the best approximation thereof.

33.    The use of the word "the" shall not be construed as limiting the scope of any request.

34.    The use of the singular shall be deemed to include the plural, and the use of one gender shall include the other as are appropriate in the context.

## ADMISSION REQUESTS

1.    Admit that Ken Mok is not a records custodian in this Action.

2.    Admit that MTV did not search Ken Mok's ESI in collecting documents responsive to Trans Continental's document requests in this Action.

3.    Admit that MTV did not search Ken Mok's tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

4.    Admit that George Eichen is not a records custodian in this Action.

5.    Admit that MTV did not search George Eichen's ESI in collecting documents responsive to Trans Continental's document requests in this Action.

6.    Admit that MTV did not search George Eichen's tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

7.      Admit that Sheri Howell is not a records custodian in this Action.

8.      Admit that MTV did not search Sheri Howell's ESI in collecting documents responsive to Trans Continental's document requests in this Action.

9.      Admit that MTV did not search Sheri Howell's tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

10.    Admit that Drew Tappon is not a records custodian in this Action.

11.    Admit that MTV did not search Drew Tappon's ESI in collecting documents responsive to Trans Continental's document requests in this Action.

12.    Admit that MTV did not search Drew Tappon's tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

13.    Admit that Lois Curren is not a records custodian in this Action.

14.    Admit that MTV did not search Lois Curren's ESI in collecting documents responsive to Trans Continental's document requests in this Action.

15.    Admit that MTV did not search Lois Curren's tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

16.    Admit that Carol Eng is not a records custodian in this Action.

17.    Admit that MTV did not search Carol Eng's ESI in collecting documents responsive to Trans Continental's document requests in this Action.

18.    Admit that MTV did not search Carol Eng's tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

19.    Admit that Paul DeBenedittis is not a records custodian in this Action.

20.    Admit that MTV did not search Paul DeBenedittis' ESI in collecting documents responsive to Trans Continental's document requests in this Action.

21.    Admit that MTV did not search Paul DeBenedittis' tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

22.    Admit that Tom Calderone is not a records custodian in this Action.

23.    Admit that MTV did not search Tom Calderone's ESI in collecting documents responsive to Trans Continental's document requests in this Action.

24.     Admit that MTV did not search Tom Calderone's tangible hard copy documents in collecting documents responsive to Trans Continental's document requests in this Action.

25.     Admit that the Agreement, or Trans Continental's Exhibit 5 which is attached hereto as **Exhibit A**, was originally drafted on MTV's document management system before it was executed.

26.     Admit that the Agreement is version 2 of the Agreement, as evidenced by the footer 120812.ver02 on TCP00015153-56, attached hereto as **Exhibit B**.

27.     Admit that MTV searched for version 1 of the unexecuted version of the Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

28.     Admit that MTV failed to produce version 1 of the unexecuted version of the Agreement to Trans Continental in this Action.

29.     Admit that version 1 of the unexecuted version of the Agreement is no longer within MTV's possession, custody, or control.

30.     Admit that MTV searched for draft(s) of the unexecuted version of the Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

31.     Admit that MTV failed to produce any draft(s) of the unexecuted version of the Agreement to Trans Continental in this Action.

32.     Admit that draft(s) of the unexecuted version of the Agreement are no longer within MTV's possession, custody, or control.

33.     Admit that MTV searched for redline(s) of the unexecuted version of the Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

34.     Admit that MTV failed to produce any redline(s) of the unexecuted version of the Agreement to Trans Continental in this Action.

35.     Admit that redline(s) of the unexecuted version of the Agreement are no longer within MTV's possession, custody, or control.

36.     Admit that MTV does not have ESI for any unexecuted version(s) of the Agreement in its possession, custody, or control.

37.     Admit that MTV does not have ESI for any draft(s) of the unexecuted version of the Agreement in its possession, custody, or control.

38.     Admit that MTV does no have ESI for any redline version(s) of the unexecuted version of the Agreement in its possession, custody, or control.

39.     Admit that the Amended Agreement, which is Trans Continental's Exhibit 4 and is attached hereto as **Exhibit C**, was drafted on MTV's document management system before it was executed.

40.     Admit that page 4 of Exhibit C is version 4 of the Amended Agreement, as evidenced by the footer "137176.ver04."

41.     Admit that pages 1-5 of Exhibit C are version 1 of the Amended Agreement, as evidenced by the footer "137176.ver01."

42.     Admit that MTV searched for version 2 of the unexecuted version of the Amended Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

43.     Admit that MTV failed to produce version 2 of the unexecuted version of the Amended Agreement to Trans Continental in this Action.

44.     Admit that version 2 of the unexecuted version of the Amended Agreement is no longer within MTV's possession, custody, or control.

45.     Admit that MTV searched for version 3 of the unexecuted version of the Amended Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

46.     Admit that MTV failed to produce version 3 of the unexecuted version of the Amended Agreement to Trans Continental in this Action.

47.     Admit that version 3 of the unexecuted version of the Amended Agreement is no longer within MTV's possession, custody, or control.

48.     Admit that MTV searched for the full version 4 (aside from, and in addition to, page 5 of Exhibit C) of the unexecuted version of the Amended Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

49.     Admit that MTV failed to produce the pages 1-3 and 5 of version 4 of the unexecuted version of the Amended Agreement to Trans Continental in this Action.

50.     Admit that pages 1-3 and 5 of version 4 of the unexecuted version of the Amended Agreement are no longer within MTV's possession, custody, or control.

51.     Admit that MTV searched for draft(s) of the unexecuted version of the Amended Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

52.     Admit that MTV failed to produce any draft(s) of the unexecuted version of the Amended Agreement to Trans Continental in this Action.

53.     Admit that draft(s) of the unexecuted version of the Amended Agreement are no longer within MTV's possession, custody, or control.

54.     Admit that MTV searched for redline(s) of the unexecuted version of the Amended Agreement in collecting documents responsive to Trans Continental's document requests in this Action.

55.     Admit that MTV failed to produce any redline(s) of the unexecuted version of the Amended Agreement to Trans Continental in this Action.

56.     Admit that redline(s) of the unexecuted version of the Amended Agreement are no longer within MTV's possession, custody, or control.

57.     Admit that MTV does not have ESI for any unexecuted version(s) of the Amended Agreement in its possession, custody, or control.

58.     Admit that MTV does not have ESI for any draft(s) of the unexecuted version of the Agreement in its possession, custody, or control.

59.     Admit that ESI does not have ESI for any redline version(s) of the unexecuted version of the Agreement in its possession, custody, or control.

60.     Admit that MTV searched for Trans Continental's Exhibit 118, attached hereto as **Exhibit D**, in collecting documents responsive to Trans Continental's document requests in this Action.

61.     Admit that MTV failed to produce Trans Continental's Exhibit 118 to Trans Continental.

62.     Admit that Trans Continental's Exhibit 118 is no longer within MTV's possession, custody, or control.

63.     Admit that MTV does not have ESI for Trans Continental's Exhibit 118 in its possession, custody, or control.

64.     Admit that MTV searched for pages TCP00010124-10128 of Trans Continental's Exhibit 199, attached hereto as **Exhibit E** in collecting documents responsive to Trans Continental's document requests in this Action.

65.     Admit that pages TCP00010124-10128 of Trans Continental's Exhibit 199 were created on MTV's document management system.

66.     Admit that MTV failed to produce Trans Continental's Exhibit 199 in response to Trans Continental's document requests in this Action.

67. Admit that Trans Continental's Exhibit 199 is no longer within MTV's possession, custody, or control.

68. Admit that MTV does not have ESI for TCP00010124-28 in its possession, custody, or control.

69. Admit that MTV searched for Trans Continental's Exhibit 198, attached hereto as **Exhibit F** in collecting documents responsive to Trans Continental's document requests in this Action.

70. Admit that the unexecuted version of Trans Continental's Exhibit 198 was created on MTV's document management system.

71. Admit that MTV failed to produce Trans Continental's Exhibit 198 in response to Trans Continental's document requests in this Action.

72. Admit that Trans Continental's Exhibit 198 is no longer within MTV's possession, custody, or control.

73. Admit that MTV does not have ESI for Trans Continental's Exhibit 198 in its possession, custody, or control.

74. Admit that MTV created MTV-MTB00027245, which is page 1 of Trans Continental's Exhibit 200 which is attached hereto as **Exhibit G**, on its document management system.

75. Admit that MTV created MTV-MTB00158996, which is page 3 of Trans Continental's Exhibit 200 on its document management system.

76. Admit that MTV added the term "joint venture" on page 3 of Trans Continental's Exhibit 200 as evidenced by the metadata on page 4 of this same exhibit.

77. Admit that no additional ESI other than that evidenced in Trans Continental's Exhibit 200 exists for MTV-MTB00027245 and MTV-MTB00158996.

78. Admit that MTV searched for hard copy documents from Jackie French, including but not limited to those she testified were in her office or in a closet located on the 25th floor of 1515 Broadway, New York, New York, in collecting documents responsive to Trans Continental's document requests.

79. Admit that MTV produced hard copy documents collected from Jackie French to Trans Continental in this Action.

80. Admit that MTV searched for hard copy documents from Virginia Lazalde-McPherson in collecting documents responsive to Trans Continental's document requests.

81. Admit that MTV produced hard copy documents collected from Virginia Lazalde-McPherson to Trans Continental in this Action.

82.     Admit that Virginia Lazalde-McPherson deleted documents, including but not limited to communications and emails, relating to Making the Band and Trans Continental prior to receiving the litigation hold memorandum in 2008.

83.     Admit that MTV searched for Trans Continental's Exhibit 21 attached hereto as **Exhibit H** in collecting documents responsive to Trans Continental's document requests in this Action.

84.     Admit that the unsigned version of Trans Continental's Exhibit 21 was created on MTV's document management system.

85.     Admit that MTV failed to produce Trans Continental's Exhibit 21 in response to Trans Continental's document requests in this Action.

86.     Admit that Trans Continental's Exhibit 21 is no longer within MTV's possession, custody, or control.

87.     Admit that MTV does not have ESI for Trans Continental's Exhibit 21 in its possession, custody, or control.

88.     Admit that Trans Continental's Exhibit 149 attached hereto as **Exhibit I** was created on MTV's document management system.

89.     Admit that MTV does not have ESI for Trans Continental's Exhibit 149 in its possession, custody, or control.

90.     Admit that the original version of Trans Continental's Exhibit 150 attached hereto as **Exhibit J** was created on MTV's document management system.

91.     Admit that MTV does not have any ESI for Trans Continental's Exhibit 149 in its possession, custody, or control.

92.     Admit that MTV searched for Trans Continental's Exhibit 153, attached hereto as **Exhibit K** in collecting documents responsive to Trans Continental's document requests in this Action.

93.     Admit that MTV failed to produce Trans Continental's Exhibit 153 to Trans Continental in this Action.

94.     Admit that Trans Continental's Exhibit 153 is no longer within MTV's possession, custody, or control.

95.     Admit that MTV does not have ESI for Trans Continental's Exhibit 153 in its possession, custody, or control.

96.     Admit that MTV searched for TCP00004361, which is attached hereto as **Exhibit L,** in collecting documents responsive to Trans Continental's document requests in this Action.

97.     Admit that MTV failed to produce TCP00004361 to Trans Continental in this Action.

98.     Admit that TCP00004361 is no longer within MTV's possession, custody, or control.

99.     Admit that MTV does not have ESI for TCP00004361 in its possession, custody, or control.

100.    Admit that MTV searched for TCP00004380, which is attached hereto as **Exhibit M,** in collecting documents responsive to Trans Continental's document requests in this Action.

101.    Admit that MTV failed to produce TCP00004380 to Trans Continental in this Action.

102.    Admit that TCP00004380 is no longer within MTV's possession, custody, or control.

103.    Admit that MTV does not have ESI for TCP00004380 in its possession, custody, or control.

104.    Admit that MTV searched for TCP00004526-27, which is attached hereto as **Exhibit N,** in collecting documents responsive to Trans Continental's document requests in this Action.

105.    Admit that MTV failed to produce TCP00004526-27 to Trans Continental in this Action.

106.    Admit that TCP00004526-27 is no longer within MTV's possession, custody, or control.

107.    Admit that MTV does not have ESI for TCP00004526-27 in its possession, custody, or control.

108.    Admit that MTV searched for TCP00004566, which is attached hereto as **Exhibit O,** in collecting documents responsive to Trans Continental's document requests in this Action.

109.    Admit that MTV failed to produce TCP00004566 to Trans Continental in this Action.

110.    Admit that TCP00004566 is no longer within MTV's possession, custody, or control.

111.    Admit that MTV does not have ESI for TCP00004566 in its possession, custody, or control.

112.    Admit that MTV searched for TCP00004570, which is attached hereto as **Exhibit P,** in collecting documents responsive to Trans Continental's document requests in this Action.

113.    Admit that MTV failed to produce TCP00004570 to Trans Continental in this Action.

114.    Admit that TCP00004570 is no longer within MTV's possession, custody, or control.

115.    Admit that MTV does not have ESI for TCP00004570 in its possession, custody, or control.

116.    Admit that MTV searched for TCP00004573-74, which is attached hereto as **Exhibit Q,** in collecting documents responsive to Trans Continental's document requests in this Action.

117.    Admit that MTV failed to produce TCP00004573-74 to Trans Continental in this Action.

118.    Admit that TCP00004573-74 is no longer within MTV's possession, custody, or control.

119.    Admit that MTV does not have ESI for TCP00004573-74 in its possession, custody, or control.

120.    Admit that MTV searched for TCP00004598-99, which is attached hereto as **Exhibit R,** in collecting documents responsive to Trans Continental's document requests in this Action.

121.    Admit that MTV failed to produce TCP00004598-99 to Trans Continental in this Action.

122.    Admit that TCP00004598-99 is no longer within MTV's possession, custody, or control.

123.    Admit that MTV does not have ESI for TCP00004598-99 in its possession, custody, or control.

124.    Admit that MTV searched for TCP00004694, which is attached hereto as **Exhibit S,** in collecting documents responsive to Trans Continental's document requests in this Action.

125.    Admit that MTV failed to produce TCP00004694 to Trans Continental in this Action.

126.    Admit that TCP00004694 is no longer within MTV's possession, custody, or control.

127.    Admit that MTV does not have ESI for TCP00004694 in its possession, custody, or control.

128.    Admit that MTV searched for TCP00004744-46, which is attached hereto as **Exhibit T,** in collecting documents responsive to Trans Continental's document requests in this Action.

129.    Admit that MTV failed to produce TCP00004744-46 to Trans Continental in this Action.

130.    Admit that TCP00004744-46 is no longer within MTV's possession, custody, or control.

131.    Admit that MTV does not have ESI for TCP00004744-46 in its possession, custody, or control.

132.    Admit that MTV searched for TCP00004756-58, which is attached hereto as **Exhibit U,** in collecting documents responsive to Trans Continental's document requests in this Action.

133.    Admit that MTV failed to produce TCP00004756-58 to Trans Continental in this Action.

134.    Admit that TCP00004756-58 is no longer within MTV's possession, custody, or control.

135.    Admit that MTV does not have ESI for TCP00004756-58 in its possession, custody, or control.

136.    Admit that MTV searched for TCP00004773, which is attached hereto as **Exhibit V,** in collecting documents responsive to Trans Continental's document requests in this Action.

137.    Admit that MTV failed to produce TCP00004773 to Trans Continental in this Action.

138.    Admit that TCP00004773 is no longer within MTV's possession, custody, or control.

139.    Admit that MTV does not have ESI for TCP00004773 in its possession, custody, or control.

140.    Admit that MTV searched for TCP00004780, which is attached hereto as **Exhibit X,** in collecting documents responsive to Trans Continental's document requests in this Action.

141.    Admit that MTV failed to produce TCP00004780 to Trans Continental in this Action.

142.    Admit that TCP00004780 is no longer within MTV's possession, custody, or control.

143.    Admit that MTV does not have ESI for TCP00004780 in its possession, custody, or control.

144.    Admit that MTV searched for TCP00004790, which is attached hereto as **Exhibit Y,** in collecting documents responsive to Trans Continental's document requests in this Action.

145.    Admit that MTV failed to produce TCP00004790 to Trans Continental in this Action.

146.    Admit that TCP00004790 is no longer within MTV's possession, custody, or control.

147.    Admit that MTV does not have ESI for TCP00004790 in its possession, custody, or control.

148.    Admit that MTV searched for TCP00004804-05, which is attached hereto as **Exhibit Z,** in collecting documents responsive to Trans Continental's document requests in this Action.

149.    Admit that MTV failed to produce TCP00004804-05 to Trans Continental in this Action.

150.    Admit that TCP00004804-05 is no longer within MTV's possession, custody, or control.

151.    Admit that MTV does not have ESI for TCP00004804-05 in its possession, custody, or control.

152.    Admit that MTV searched for TCP00004871, which is attached hereto as **Exhibit AA,** in collecting documents responsive to Trans Continental's document requests in this Action.

153.    Admit that MTV failed to produce TCP00004871 to Trans Continental in this Action.

154.    Admit that TCP00004871 is no longer within MTV's possession, custody, or control.

155.    Admit that MTV does not have ESI for TCP00004871 in its possession, custody, or control.

156.    Admit that MTV searched for TCP00005149, which is attached hereto as **Exhibit BB,** in collecting documents responsive to Trans Continental's document requests in this Action.

157.    Admit that MTV failed to produce TCP00005149 to Trans Continental in this Action.

158.    Admit that TCP00005149 is no longer within MTV's possession, custody, or control.

159.    Admit that MTV does not have ESI for TCP00005149 in its possession, custody, or control.

160.    Admit that MTV searched for TCP00005343, which is attached hereto as **Exhibit CC**, in collecting documents responsive to Trans Continental's document requests in this Action.

161.    Admit that MTV failed to produce TCP00005343 to Trans Continental in this Action.

162.    Admit that TCP00005343 is no longer within MTV's possession, custody, or control.

163.    Admit that MTV does not have ESI for TCP00005343 in its possession, custody, or control.

164.    Admit that the final production costs for season 2.1 of Making the Band was $4,389,190.00.

165.    Admit that the final production costs for season 2.2 of Making the Band was $4,738,873.00.

166.    Admit that the final production costs for season 2.3 of Making the Band was $4,541,515.00.

167.    Admit that the final production costs for season 3.1 of Making the Band was $6,277,828.00.

168.    Admit that the final production costs for season 3.2 of Making the Band was $5,617,382.00.

169.    Admit that the final production costs for season 3.3 of Making the Band was $7,850,748.00.

170.    Admit that the final production costs for season 4.1 of Making the Band was $11,022,155.00.

171.    Admit that the final production costs for season 4.2 of Making the Band was $10,268,236.00.

172.    Admit that the final production costs for season 4.3 of Making the Band was $9,612,150.

Dated:  February 2, 2011.

Respectfully submitted,

**KASOWITZ, BENSON, TORRES &
FRIEDMAN, LLP**
*Special Litigation Counsel for Soneet R. Kapila, as
Chapter 11 Trustee for the bankruptcy estate of
Trans Continental Television Productions, Inc.*
Four Seasons Tower
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131
Telephone:  (305) 377-1666
Facsimile:  (305) 377-1664
jsammataro@kasowitz.com
ccaprio@kasowitz.com

By: _James G. Sammataro_
JAMES G. SAMMATARO
Florida Bar No. 0520292
COURTNEY CAPRIO
Florida Bar No. 0933961

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 2, 2011, a true and correct copy of the foregoing was hand-delivered upon Andrew J. Ehrlich, Esq. and delivered by U.S. Mail on the remaining counsel listed below.

Via Hand-Delivery
**Andrew J. Ehrlich, Esq.**
aehrlich@paulweiss.com
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Via U.S. Mail
**Brian A. McDowell, Esq.**
brian.mcdowell@hklaw.com
Holland & Knight, LLP
*Counsel for MTV Networks, Viacom, Inc and Viacom International, Inc.*
200 South Orange Avenue
Suite 2600
Orlando, Florida 32801
Telephone: (407) 425-8500
Facsimile: (407) 244-5288

Via U.S. Mail
**Jonathan Davis, Esq.**
Jonathan D. Davis, P.C.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
99 Park Avenue, Suite 1600
New York, New York 10016
Telephone: (212) 687-5464
Facsimile: (212) 557-0565

Via U.S. Mail
**Daniel E. Traver, Esq.**
Gray Robinson, P.A.
*Counsel for Bad Boy Films, Inc. and Bad Boy Records, LLC*
301 East Pine Street, Suite 1400
P.O. Box 3068
Orlando, Florida 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690

Attorney

EXHIBIT I

# AGREEMENT

This Agreement is made as of November 18, 1999, between MTV Networks ("MTV"), a division of Viacom International Inc., and Louis J. Pearlman ("LP") in connection with a television series currently known as "Boy Band Project" ("Series") to be produced by MTV/LP for initial broadcast on the ABC Television Network ("ABC").

WHEREAS, Louis J. Pearlman Enterprises, Inc. ("LPE") and MTV will enter into an agreement ("License Agreement") with ABC (a copy of which is attached hereto as Exhibit A), pursuant to which MTV/LP will grant to ABC certain rights as set forth in the License Agreement; and

WHEREAS, MTV and LP desire to produce the Series for ABC.

THEREFORE, MTV and LP hereby agree as follows:

1.      As an inducement for MTV to enter into the License Agreement and into a joint venture with LP and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, LP hereby represents and warrants to MTV the following:

    (a)     LPE and LP have the right to enter into and fully perform under the License Agreement and this Agreement, respectively;

    (b)     None of the rights granted under the License Agreement have been granted, assigned, mortgaged, pledged, hypothecated or otherwise encumbered in any manner which would or might derogate from or interfere with any rights granted to ABC thereunder;

    (c)     LPE has not breached any of its representations, warranties, obligations or agreements contained in the License Agreement prior to the date hereof;

    (d)     LPE shall fully perform its obligations under the License Agreement;

    (e)     There are no adverse claims nor any pending or threatened litigation in or against any of the rights granted to ABC under the License Agreement;

    (f)     There are no other contracts or agreements which or might adversely affect the rights granted by LPE under the License Agreement; and

    (g)     ABC's exploitation (through Hollywood Records) of the soundtrack rights as set forth in the License Agreement will not violate or infringe upon the right of or violate any common law, copyright, trademark or contract rights, or any other rights, of any third party.

122170 ver. 01

CONFIDENTIAL
PRIVILEGED
MTVN 010679



Confidential

MTVN-RE 00001153

2.      LP will defend, indemnify and hold MTV, its divisions, parents, subsidiaries and related and affiliated entities and any present or former officers, directors, shareholders, employees, licensees and agents of the foregoing, and their respective heirs, executors, administrators, successors and assigns, harmless from and against any and all claims, losses, demands, liability, damages (including but not limited to punitive damages), cost or expense (including reasonable attorneys' fees), arising out of or resulting from any breach or alleged breach by LP of any of the representations or warranties set forth by LP hereunder, and any claims or litigation related to or in connection with the License Agreement or Series, or the exploitation of rights therein, brought by BMG Ariola Muenchen GmbH or any of its related or affiliated companies.

3.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  MTV shall have the right to assign all or a portion of this Agreement or any of the rights granted hereunder to any person, firm or corporation.

4.      The parties agree to execute and/or deliver to the other party such further instruments as may be reasonably required to carry out or effectuate the purposes and intent of this Agreement.

5.      This Agreement includes the entire understanding of the parties as to its subject matter and may not be modified except in a written instrument signed by the parties hereto.

6.      This Agreement shall be governed by the laws of the State of New York.

7.      The obligations of LP hereunder shall be secured by [insert collateral, such as bond, L/C, insurance, bank guarantee, etc.]

MTV NETWORKS

_____          By: _____
Louis J. Pearlman, individually and on          Its: _____
behalf of Louis J. Pearlman Enterprises,
Inc., Trans Continental Records Inc.,
Trans Continental Television
Productions, Inc., and any related or
affiliate entity or other entity in which
the assets of any of them shall have been
assigned.

122170 ver. 01

PRIVILEGED
MTVN 010680

Confidential

MTVN-RE 00001154

RZO, INC.
100 WEST 57TH STREET
NEW YORK, NY 10019

December 14, 2000

MTV Networks, a division of
Viacom International Inc.
1515 Broadway
New York, NY 10036

Trans Continental Television
Productions Inc.
7380 Sand Lake Road
Suite 350
Orlando, FL 32819

Dear Sirs:

In connection with our consideration of a possible employment engagement by you (the "Transaction") involving certain businesses that relate to the joint venture between MTV Networks, a division of Viacom International Inc., and Trans Continental Television Productions Inc. (collectively, the "Companies") we have requested certain financial and other non-public information or contracts concerning Companies (e.g., with respect to the musical performing group known as "O-Town" and the related on-air programming entitled "Making the Band") which information, together with notes, analyses, compilations, studies or other documents prepared by us or our Representatives (as hereinafter defined) based upon, containing or otherwise reflecting such information, is hereinafter referred to as (the "Evaluation Material"). In consideration of your furnishing us with Evaluation Material, we and you agree that:

1.     The Evaluation Material shall be used by us solely for the purpose of evaluating a possible Transaction and not for any other purpose, and, except to the extent permitted by Paragraph 4 hereof, shall be kept strictly confidential by us, provided, however, that Evaluation Material may be disclosed to such of our directors, officers, employees, subsidiaries and representatives, including, but not limited to, our auditors, legal advisors and financial advisors (collectively, the "Representatives") as need to know such information for the purpose of assisting us in evaluating and negotiating the terms of such possible Transaction. We will advise our Representatives that such information is confidential and that by receiving such information such Representatives are agreeing to be bound by this Letter Agreement and not to use such information for any purpose other than described herein. Without your prior written consent, we will not, and will direct our Representatives not to, disclose the Evaluation Material in whole or in part, except to the extent permitted by Paragraph 4 hereof. We agree to be responsible for any breach of this Letter Agreement by our Representatives.

2.     Except to the extent permitted by Paragraph 4 hereof, we will not, and will direct our Representatives not to, disclose to any person (other than our Representatives who need to know) the fact that the Evaluation Material has been made available, that discussions or negotiations are taking place or

PRIVILEGED
MTVN 010748

have recently taken place concerning a possible Transaction or any of the terms, conditions or other facts with respect to any possible Transaction, including the status thereof or the existence of this Letter Agreement.

3.    The term "Evaluation Material" shall be deemed not to include information which (i) is or becomes generally available to the public other than (a) as a result of a disclosure by us or our Representatives or any other person who directly or indirectly receives such information from us or our Representatives or (b) in violation of a confidentiality obligation to you known to us or (ii) is or becomes available to us on a non-confidential basis from a source which is entitled to disclose it to us.

4.    In the event that we or our Representatives are required [by law or] by interrogatories, requests for information or documents, subpoena, Civil Investigative Demand or similar process to disclose any information supplied to us in the course of our dealings including, without limitation, the Evaluation Material or any other information the disclosure of which is restricted by the terms of this Letter Agreement, we will provide you with prompt prior written notice of such request or requirement so that you may seek an appropriate protective order.  If in the absence of a protective order, we or any of our Representatives are nonetheless, in the written opinion of our counsel (which shall be forwarded to you upon your request), compelled to disclose Evaluation Information or any other information concerning the Transaction [to any tribunal] or else [stand liable for contempt or] suffer other material censure or penalty, we or any such Representative may disclose only that portion of the Evaluation Material or other information which we are advised in writing by counsel (which shall be forwarded to you upon your request) is so legally compelled and we will exercise our best efforts to obtain assurance that confidential treatment will be accorded such Evaluation Material.

5.    All Evaluation Material disclosed by you to us shall be and shall remain your property. In the event that we do not proceed with the Transaction which is the subject of this Letter within a reasonable time, and, in any event, within five days after being so requested by you, we shall redeliver all documents furnished by you.  Except to the extent we are advised in writing by counsel that such action is prohibited by law, we will also destroy all written material, memoranda, notes and other writings or recordings whatsoever prepared by us or our Representatives based upon, containing or otherwise reflecting any Evaluation Material.  Any Evaluation Material that is not returned or destroyed, including, without limitation, any oral Evaluation Material, shall remain subject to the confidentiality obligations set forth in this Agreement.

6.    We understand that, although you have endeavored to include in the Evaluation Material information known to you which you believe to be relevant for the purpose of our considering a possible Transaction, you do not make any representation or warranty as to the accuracy or completeness of the Evaluation Material or any component thereof.  We understand that the estimates or projections with respect to future performance included in the Evaluation Material should not be relied upon as an accurate representation or assurance of future results.  Neither you nor any of your Representatives shall have any liability to us or any of our Representatives resulting from our use of the Evaluation Material.

7.    We acknowledge and agree that (a) you and your advisors and representatives are free to conduct the process relating to a possible Transaction as you, in your sole discretion, determine (including, without limitation, by negotiating with any prospective buyer and entering into a preliminary or definitive agreement without prior notice to us or any other person), (b) you reserve the right, in your sole discretion, to change the procedures relating to your consideration of a Transaction at any time without prior notice to us or to any other person, to reject any and all proposals made by us or any of our

PRIVILEGED
MTVN 010749

Confidential

MTVN-RE 00001157

Representatives with regard to a Transaction, and to terminate discussions and negotiations with us at any time and for any reason, and (c) unless and until a written definitive agreement concerning a Transaction has been duly executed, neither you nor any of your advisors or representatives will have any obligation to us with respect to any Transaction, whether by virtue of this Agreement or any other written or oral expression with respect to a Transaction or otherwise. We understand that knowledge of the Transaction is limited to certain of your employees, officers and advisors and we agree not to contact any of your employees, officers and advisors regarding the Transaction other than such employees, officers and advisors as you inform us are permitted to receive such a contact.

8.    It is further understood and agreed that money damages would not be a sufficient remedy for any breach of this Letter Agreement by us or our Representatives and that you shall be entitled to specific performance, including, without limitation, injunctive relief, as a remedy for any such breach. Such remedy shall not be deemed to be the exclusive remedy for breach of this Letter Agreement but shall be in addition to all other remedies available at law or equity. We agree to reimburse you for costs and expenses (including, without limitation, attorneys' fees) incurred by you in connection with the enforcement of this Agreement.

9.    This Letter Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective successors and assigns.

10.    We acknowledge that we and our Representatives are aware that the United States securities laws and other laws prohibit any person who has material, non-public information concerning the Company or its affiliates from purchasing or selling any securities of the Company or any of its affiliates, or from communicating such information to any other person or entity under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities. We agree to indemnify you for any costs, expenses, liabilities, fines, civil penalties or amounts paid in settlement in connection with any claim to the extent such claim is related to trading by us or any of our Representatives or any person receiving information from us or our Representatives.

For purposes of this paragraph, the term "person" shall be interpreted broadly and shall include any individual, corporation, partnership, association, trust, governmental entity, any other organization or entity or any group including any of the foregoing, and the terms "group" and "affiliate" shall have the meanings provided under the Securities Exchange Act of 1934, as amended.

11.    If any provision of this Agreement is not enforceable in whole or in part, the remaining provisions of this Agreement shall not be affected thereby. No failure or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

12.    The parties hereby agree that any action arising out of this Agreement shall be brought in the state or federal courts located in the City of New York, irrevocably submit to the exclusive jurisdiction of any such court and waive any objection that such party may now or hereafter have to the venue of any such

PRIVILEGED
MTVN 010750

Confidential

MTVN-RE 00001158

action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same.

If you are in agreement with the foregoing, please sign and return one copy of this Letter Agreement which will constitute our agreement with respect to the subject matter of this letter.

Very truly yours,
RZO, INC.

By: _____
Name:
Title:

Agreed to and Accepted this
__ day of _____, 2000:

MTV NETWORKS, a division of
Viacom International Inc.

By: _____
Name:
Title:

TRANS CONTINENTAL TELEVISION
PRODUCTIONS INC.

By: _____
Name:
Title:

PRIVILEGED
MTVN 010751

Confidential

MTVN-RE 00001159

# EXHIBIT J

July 14, 2000

Vivian Lewitt
Rudolph & Beer
432 Park Avenue South
Suite 203
New York, NY 10016

    Re:   "Making the Band"

Dear Vivian:

    Reference is made to the letter agreement (the "Agreement") dated January 7, 2000 between MTV Networks, a division of Viacom International Inc. ("MTV") and Trans Continental Television Productions, Inc ("TC") in connection with the boy band television series for ABC entitled "Making the Band" (the "Series"), and other ancillary rights.

    The Agreement shall be amendment as follows:

1. The parties agree that the $350,000 license fee for the back order of 9 episodes provided by ABC shall be divided as follows:

    a.  $310,000 per episode shall be provided to Bunim Murray Productions for production costs.

    b.  $20,000 per episode shall be paid to MTV as a producer fee.

    c.  $20,000 per episode shall be paid to TC toward recoupment of band development expenses.

2. Other band development or radio tour expenses incurred by TC and/or MTV shall be recouped off-the-top (prior to the division of profits between TC and MTV) from ancillary monies (i.e. record advance or merchandising, advance royalties, etc.).

3. Paragraph 11 relating to domestic and foreign distribution shall be amended to provide that MTV shall be able to recoup direct out-of-pocket expenses incurred in connection with such distribution.

Deleted: 137176 ver. 01

137176 ver. 01

PRIVILEGED
MTVN 010090



EXHIBIT
PK 150
14/1/10   C

Confidential

MTVN-RE 00001051

4.  The copyright in the series shall be held jointly by TC and MTV.  MTV shall register and project the copyright and recoup any expenses incurred in connection therewith from ancillary profits (record, merchandising, etc.) off the top before proceeds are split.

5.  MTV and TC shall enter into an agreement with Trans Continental Records Inc. ("TRC") wherein TRC shall provide MTV and TC each with non-exclusive licenses for use of the O-Town trademark in connection with the Series and ancillary uses thereof (for example merchandising, records).  No other licenses shall be granted in the O-Town trademark to any third party.  TC agrees not to exploit the O-Town trademark in any way without the consent of MTV and MTV agrees not to exploit the O-Town trademark without the consent of TC.  If the series is no longer being produced and new records are not being recorded, TC agrees not to exploit the O-Town trademark without MTV's express approval.  TC and MTV each agree to execute any documents (for example, a security interest document) necessary to effectuate the exploitation of the Series.

6.  Unless otherwise agreed, proceeds from the exploitation of the "Making the Band" and O-Town trademarks shall be split 50-50 amongst TC and MTV.

7.  The parties intend to set up a separate joint venture entity for exploitation of the Series, the cost of which shall be equally borne by both parties.

Please indicate your acceptance of these terms by signing on the line below.  Except as amended herein, all other terms of the Amendment shall remain in full force and effect.

Very truly yours,

MTV NETWORKS

ACCEPTED AND AGREED:

TRANS CONTINENTAL TV PRODUCTIONS

BY: _____
ITS: _____

BY: _____
ITS: _____

CC:   Ken Mok; Steve Sicherman, Michael Rapaport

| Deleted: 4 |
| Deleted: 5 |
| Deleted: 137176 ver. 01 |

137176 ver. 01

CONFIDENTIAL
PRIVILEGED
MTVN 010091

MTVN-RE 00001052