# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 07-00761-6B1
ADV. NO.: 08-00157

IN RE:

LOUIS J. PEARLMAN,

Debtor.

---

FEBRUARY 10, 2009

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ARTHUR B. BRISKMAN
UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S:

LAWRENCE SILVERMAN, ESQUIRE
JAMES SAMMATARO, ESQUIRE
Silverman, Cosgrove & Sammataro
        Appearing on behalf of Soneet Kapila,
        Chapter 11 Trustee

CAROL C. LUMPKIN, ESQUIRE
ANNIE T. ZAFFUTO, ESQUIRE
K&L Gates LLP
        Appearing on behalf of MTV Networks

ALSO PRESENT:
Lavatus V. Powell III
Vice President & Senior Counsel
Intellectual Property & Litigation

REPORTED BY:
Cynthia D. Vachon
Accredited Court Reporters

2

I N D E X

PROCEEDINGS BEFORE JUDGE BRISKMAN:          3

CERTIFICATE OF REPORTER                    43

3

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | P R O C E E D I N G S                                        |
| 2  | THE COURT: Please be seated. Who's the bad guy?              |
| 3  | What's your case?                                            |
| 4  | MR. SILVERMAN: Good afternoon, Your Honor.                   |
| 5  | Larry Silverman with James Sammataro for Soneet              |
| 6  | Kapila as Chapter 11 Trustee for Transcontinental.           |
| 7  | Our case, simply put, is there's a 2001                      |
| 8  | contract, November 15th, 2001, which is attached as          |
| 9  | Exhibit C to our motion.  Under that contract we             |
| 10 | believe that Transcontinental was supposed to                |
| 11 | receive sixty-five percent of the production costs           |
| 12 | incurred in making the TV show Making the Band,              |
| 13 | Making the Band II, Making the Band III, Making the          |
| 14 | Band IV.                                                     |
| 15 | THE COURT: And does the contract say sixty-five              |
| 16 | percent of production costs?                                  |
| 17 | MR. SILVERMAN: Correct.  At Section 9, 9A,                   |
| 18 | 9B -                                                         |
| 19 | THE COURT: Yes or no.                                        |
| 20 | MR. SILVERMAN: Yes.  Now, the contract is not                |
| 21 | a model of clarity –                                         |
| 22 | THE COURT: Wait.  I'm just –                                 |
| 23 | MR. SILVERMAN:  -- definitively --                           |
| 24 | THE COURT: I'm trying to get my head around                  |
| 25 | this.                                                        |

4

1      MR. SILVERMAN: Sure.

2      THE COURT: Do we know what production costs

3    mean, the term?

4      MR. SILVERMAN: Yes.

5      THE COURT: Is it a term of art or is it

6    defined --

7      MR. SILVERMAN: I believe that it's -- of all

8    the things that we're fighting about in this case,

9    I don't believe that that's one of them.

10      THE COURT: And what info do you need in order

11    to establish what production costs are?

12      MR. SILVERMAN: We would need to see -- well,

13    we've asked for in interrogatories, bring it down

14    season by season what are the production costs.

15      The production costs is not the problematic

16    side of the production of discovery.  We believe

17    that that number is roughly seventy-one million

18    dollars and that the claim of the trustee exceeds

19    thirty million dollars.

20      The problem is, if you look at the contract,

21    there are also additional revenue streams going in

22    both directions.  There are additional sources of

23    revenue for foreign exhibition -

24      THE COURT: Are you entitled to some of the

25    revenue stream?

5

1        MR. SILVERMAN: We believe that we are.  The

2    contract is both a schedule and a provision of the

3    contract which sets forth depending on the kind of

4    revenue, what percentage of it, goes to -- went to

5    Transcontinental.  Things like DVD sales, concert

6    sales, things like that.

7        Foreign exhibition is an area in which we are

8    fighting about.  The show was shown in eleven

9    countries all in for the last ten seasons of this

10   show, which we own half of per Paragraph 5, we have

11   received zero.

12       THE COURT: Wait. You get sixty-five percent of

13   production costs, you get half of what?

14       MR. SILVERMAN: Items including -- it's fifty

15   percent of a hundred percent of the total cost but

16   things like worldwide video and cassette sales,

17   worldwide merchandising and other uses --

18       THE COURT: Slower.  Slower.

19       MR. SILVERMAN: Pardon.

20       THE COURT: So the court reporter can hold up.

21       MR. SILVERMAN: Television exhibition outside

22   of the United States.

23       THE COURT: So designated revenue sources.

24       MR. SILVERMAN: Yes.

25       THE COURT: United States revenue sources you

6

1       don't get because you got the production costs?

2           MR. SILVERMAN: Yes.  The --

3           THE COURT: So everything other than national,

4       U.S. revenue sources you get a cut of what the -

5           MR. SILVERMAN: Correct.

6           THE COURT:  -- is what your position is?

7           MR. SILVERMAN: Correct.

8           THE COURT: Anything else?

9           MR. SILVERMAN: That's pretty much it.  The

10      dispute -

11          THE COURT: And does the -

12          MR. SILVERMAN: Sorry.

13          THE COURT:  -- the thirty-one million only go

14      to the production costs or does it go also to the

15      revenue sources?

16          MR. SILVERMAN: Well, so far we know that there

17      were seventy-one million in production costs.

18          THE COURT: But if you're entitled to sixty-five

19      percent, why is it only thirty million?

20          MR. SILVERMAN: Because there are some offsets

21      for things like their distribution costs and things

22      like that.  We don't have a complete break down on

23      that and so I'm not going to say that it's

24      sixty-five percent minus zero.  It's sixty-five

25      percent minus some number.

7

1          The dispute between the parties -

2          THE COURT: No, no, no, no.

3          MR. SILVERMAN: Oh, I'm sorry.

4          THE COURT: Are there any other claims you're

5     making, any other revenue source that you claim an

6     interest in?

7          MR. SILVERMAN: No.  However --

8          THE COURT: So there's two revenue sources.

9     There's the percent of production costs with offsets

10    and then there's a non-U.S. revenue --

11         MR. SILVERMAN: No, they're forth in Schedule A,

12    the primary ones --

13         THE COURT: I'm just asking.

14         MR. SAMMATARO: Your Honor, if I may --

15         MR. SILVERMAN: I apologize.

16         THE COURT: You're the eightieth case I've had

17    today.

18         MR. SILVERMAN: I apologize, Your Honor.

19         MR. SAMMATARO: Your Honor, if I may real quick

20    and I do apologize.  This is relatively confusing.

21         The issue is that Paragraph 9 of the amended

22    agreement is split two ways.  The first part of the

23    paragraph --

24         THE COURT: All I'm asking --

25         MR. SAMMATARO: I'm going to answer directly,

8

1       Your Honor, I promise you.  The answer is if you're

2       traveling under 9 there's other revenue streams and

3       those revenue streams include the proceeds made by

4       the artists that were featured in the shows.  So

5       there are issues of concert promotion, DVD sales

6       meaning the music DVDs and then there's the issue

7       of DVDs of the sale of the television show,

8       licensing agreements with the television show to

9       foreign markets and any other after market products.

10      Now it's either under 9 or 9A, so it gets a little

11      complicated.  I just wanted to clarify that.

12          THE COURT: But all is related to non-U.S.

13      revenue streams.

14          MR. SILVERMAN: Correct.

15          THE COURT: Are there some domestic revenue

16      streams you're entitled to?

17          MR. SILVERMAN: Yes, but they're not related

18      to -- in the greater scheme of things, they're much

19      smaller than --

20          THE COURT: The two principals are international

21      revenue streams of fifty percent and sixty-five

22      percent of production costs --

23          MR. SILVERMAN: Correct.

24          THE COURT:  -- with adjustments.

25          MR. SILVERMAN: Correct.

9

1          THE COURT: Is that your case?

2          MR. SILVERMAN: That is our case.

3          THE COURT: The bulk of your case?

4          MR. SILVERMAN: That is the great bulk of our

5     case.

6          THE COURT: And what do you need to establish

7     that?

8          MR. SILVERMAN: What we need to establish that,

9     number one, is a break down as we set forth in the

10    interrogatories, what were the production costs.  I

11    shouldn't have to ball park.  I should be able to

12    look at Viacom and say, what do you think your

13    productions costs were year by year?  They have

14    refused to do that.  Instead they've produced

15    heavily redacted documents.  This is, to give one

16    example --

17         THE COURT: No, no, no, no.

18         MR. SILVERMAN: All right.

19         THE COURT: Not arguing the motion.

20         MR. SILVERMAN: Okay.

21         THE COURT: I'm trying to figure out the

22    motion.

23         MR. SILVERMAN: Understood.

24         THE COURT: Other than production costs, what

25    do you need?

1    MR. SILVERMAN: Other than production costs,

2  we need the revenue stream that came in so that we

3  can figure out which of those we're supposed to

4  share and which of those we're not supposed to

5  share.

6    THE COURT: And what would you need to establish

7  the revenue stream?

8    MR. SILVERMAN: I would need -- I would prefer

9  them to answer the narratives in the interrogatories

10  that ask, what came in during each season on these

11  various streams.  I'm not as concerned about the

12  backup.  We would like the backup but the interrogs,

13  if I walked out with -- what I wanted to start with

14  is we specifically asked these questions, what were

15  your productions costs, what were your revenues,

16  what was the profitability of the show.  I would

17  prefer narrative answers to the interrogatories.

18    THE COURT: I'm sorry, I didn't hear the

19  word profit before.  Where does profit come into

20  it?

21    MR. SILVERMAN: Where profit comes in is that

22  the defendants do not agree with our interpretation

23  of the contract.  They have deposited an

24  interpretation of the contract which can only by

25  algebra lead to negative numbers.

11

1       Their interpretation is that you take the

2   sixty-five percent and you minus out the actual

3   production costs.  And so as a matter of algebra,

4   if I take sixty-five percent of something and then

5   minus out a hundred percent, that can only lead to

6   a negative number.

7       THE COURT: I understand.

8       MR. SILVERMAN: That said, if the Court found

9   that that were a reasonable interpretation of the

10  split for our fifty percent, then on a reaffirmation

11  basis I would want to know what's the show actually

12  worth.  That's where we get into the question of

13  what did you make on that show.  You renewed it for

14  ten seasons and you're telling me that it's not

15  profitable, that it's never spun off a penny and

16  that the intent of the parties is that we were

17  going to give up the profits, you know, a revenue

18  stream in exchange for a number that can only be

19  negative.  That's why we're asking for the other

20  aspects as pertains to what the profitability was

21  and what the U.S. --

22      THE COURT: You use -- excuse me.  You use

23  production costs and revenue streams in the same

24  sentence. Are they either/or or are they two

25  different reliefs you're requesting?

12

1          MR. SILVERMAN: It -- they're either/or.  That

2     if we get the sixty-five percent of production costs

3     and we walk out with that, it doesn't matter what

4     the revenue streams are.

5          If the Court adopts their interpretation of the

6     contract, this can only be negative, then whether

7     it's mutual mistake or allowed mistake --

8          THE COURT: I'm not asking for their position.

9          MR. SILVERMAN: Okay.

10          THE COURT: I'm asking for your position.

11          MR. SILVERMAN: My position is that if we are

12     awarded the production costs, we don't need -- we

13     don't look at the U.S. revenue streams for

14     advertising --

15          THE COURT: I'm not talking about U.S. I'm

16     talking about non-U.S.

17          MR. SILVERMAN: Non-U.S. we would still get the

18     MTV Finland, MTV --

19          THE COURT: The revenue streams for non --

20          MR. SILVERMAN: For those entities, yes.

21          THE COURT: Okay.  You're starting to confuse

22     Me.  Okay.  Thank you.  You may sit down.

23          MR. SILVERMAN: Thank you.

24          THE COURT: What are they entitled to?  I

25     understand all your allegations and I understand

13

1     the complexity of your industry, but there is a

2     lawsuit and they are entitled to try and figure out

3     what the damages are and not on your terms.   What

4     are they entitled to?

5          MS. LUMPKIN: Your Honor, Carol Lumpkin along

6     with Annie Zaffuto on behalf of MTVN and with us

7     today is V. Powell, the vice president and senior

8     counsel for intellectual property and litigation,

9     and he's here today, Your Honor, so that if Your

10    Honor has any questions regarding what MTV has done

11    to date with regard to this production and

12    discovery.

13         THE COURT: I'm really not -- I'm not interested

14    in refighting what you've done.

15         MS. LUMPKIN: I --

16         THE COURT: I'm not looking for a bad guy yet.

17         MS. LUMPKIN: I appreciate that, Your Honor.

18         THE COURT: I want to know what they're entitled

19    to so they can establish what the number is.

20         MS. LUMPKIN: Okay.   One of the things we did

21    with regard to the narrative that they're describing

22    that we have not supplemented and we did supplement

23    a narrative to say that, and I'll read it because

24    I want the Court to follow what the net proceeds,

25    the way we read the net proceeds.   Keeping in mind

14

1     that this contract was negotiated in 2001 by counsel

2     for both parties, okay.

3          MTV has stated that the calculation of the net

4     proceeds -- the types of revenues, there are

5     different types of revenue streams and expenses

6     within this net proceeds formula and the imputed

7     license fee is sixty-five percent, okay, yes, we

8     do believe that you have to reduce and deduct

9     expenses as stated in the actual proceeds formula

10    in the contract. The contract speaks for itself,

11    Your Honor.

12         What we have done is we have now given them

13    the narrative which is what they've asked for which

14    says, the types of revenue included but are not

15    limited to, home video, international syndication --

16    excluding any advertisement revenue because that's

17    clear from this language -- internet, merchandise

18    excluding any album related merchandise, music

19    Publishing, print publishing.  Then after you have

20    that into the actual net proceeds formula, artists

21    album and merchandise revenue other than television

22    series related revenue and expenses are split 50/50

23    after MTVN takes ten percent distribution fee off

24    the top and recoups direct out-of-pocket expenses.

25         Where have we given them that?  We have given

15

1    them that, with regard to the participation

2    statements that they have received during the

3    initial production in December and supplemented

4    continuously as we get it. They have been given the

5    opportunity to review it.

6        Now one of the things that Mr. Silverman

7    mentioned was that they want a narrative season

8    to season profitability.  Well, frankly, Your Honor,

9    first, the contract doesn't call for season by

10   season.  The company doesn't maintain it season

11   by season.  They do these semi-annual participation

12   statements.

13       If there is no revenue coming from that net

14   proceeds formula for that particular time period,

15   that semi-annual time period, then at that point

16   they don't issue a statement.  That was agreed to

17   by the parties back in 2001.

18       THE COURT: When you say revenue or net income?

19       MS. LUMPKIN: The net proceeds statements that

20   would show them what revenue they would have gotten

21   based on the sixty-five percent imputed license

22   agreement.

23       THE COURT: So you're calculating for them

24   without giving them the backup information to make

25   that term; is that what you're saying?

16

1          MS. LUMPKIN: Well, Your Honor, it's not that

2     we're calculating.  Participation statements are

3     compiled with various different, the different

4     revenue streams from different departments.

5          THE COURT: Of your company?

6          MS. LUMPKIN: Yes.  It's decentralized system.

7     For instance, the international syndication --

8          THE COURT: But you have the information that's

9     the basis of that net.

10          MS. LUMPKIN: We've never denied having

11     information other than saying to them, we've given

12     them the participation statements for which they

13     are entitled, we've given them all of those, what

14     he mentioned, the redacted documents that show what

15     the fees have been for, the costs, the production

16     costs could have been for the episodes during the

17     various series.  Okay.

18          What they're now asking for is, after they

19     deposed one of our witnesses who works in the

20     participation department, they decided that because

21     Viacom has a decentralized system of maintaining

22     all these different divisions and we'll throw

23     everything into a shared file for purposes of

24     generating a report, they now want all the backup.

25     We're already up to a hundred and fifteen thousand

1   pages that we have had to distill.  So, I guess,

2   they keep talking about how this is a very

3   simplistic case but they couldn't even really

4   explain the contract much less it belies the idea

5   that it's as a simplistic case as they're stating

6   when they've hit us with a hundred thirty-nine

7   request for production and every day we get one more

8   request.

9        We've given them a narrative that explains

10   what MTV believes goes into the net proceeds

11   formula.  We've told them the participation

12   statements show the various categories that have

13   gone into that.  They have received all of that.

14        Now if what they're asking for is one number,

15   as I stand here today, I don't have it and it would

16   take much more time than the time frame we've been

17   given in light of the fact that this is a ten-year

18   production, Your Honor.  The series has been on

19   since 1999.  I've got not only production people

20   but lawyers that have come and gone in ten years.

21   We're trying to find custodial files. We're trying

22   to determine -- the person who drafted the agreement

23   is not there.

24        THE COURT: I'm not worried about the time at

25   this point.  I'm worried about what the parameters

18

1    of the discovery should be.

2        MS. LUMPKIN: Thank you, Your Honor.  I truly

3    appreciate the fact that the Court is focusing on

4    that.

5        THE COURT: You're telling me that the basic

6    information as to what makes your calculation can't

7    be determined?

8        MS. LUMPKIN: No, that's not what I'm saying,

9    Your Honor.

10       THE COURT: Okay.

11       MS. LUMPKIN: I apologize if that's the way --

12       THE COURT: No, no, no.  You don't have to.

13       MS. LUMPKIN: The participation statements that

14    they have received and that TC would be entitled to

15    receive and has received since 2001 would capture,

16    it has a statement that shows -- I don't have a copy

17    in front of me but it has a statement of a copy

18    of a check if there are monies due and then what

19    will happen is attached to that is every type of

20    revenue stream a report from that particular

21    division, whether it's international syndication

22    or home video or music publication.  Every

23    department will submit their information for that

24    semi-annual period.  That gets compiled into this

25    participation statement to which TC would have been

1    entitled pursuant to the terms of the agreement,

2    and they have received that to date what we have.

3        THE COURT: But is that your calculations, is

4    that your bottom line?

5        MS. LUMPKIN: That's the bottom line from the

6    company as to participation.

7        THE COURT: Or does it give them the actual

8    categories that you have to get to that bottom line?

9        Do you understand my question?

10        MS. LUMPKIN: No, I'm sorry, Your Honor, I'm not

11    following.

12        THE COURT: If there is income of a million

13    dollars and there are deducts of five hundred

14    thousand, are you giving them the categories and

15    the amount of the deducts?

16        MS. LUMPKIN: Yes, Your Honor.  With regard to

17    the expenses, yes.

18        MR. SAMMATARO: There are participation

19    statements attached to our motion if it will help,

20    Your Honor, to see what they are and explanation --

21        THE COURT: Unfortunately my computer's down.

22        MR. SAMMATARO: I can give you a hard copy if

23    you like.

24        MS. LUMPKIN: Your Honor, if I can approach,

25    I have a copy.

20

1          THE COURT: Okay.  All right.  You have one

2     example.

3          MR. SAMMATARO: Can I see what you have?

4          MS. LUMPKIN: Is it attached -- do you want to

5     look at it?

6          MR. SAMMATARO: Sure.

7          (Thereupon, a brief interruption in the

8     proceedings, after which the following was had.)

9          THE COURT: Do you think you owe them anything?

10         MS. LUMPKIN: Your Honor, I cannot say because,

11    and as an officer of the court I'm saying this,

12    because I have not had and the client has not had

13    enough time to pull ten years worth of all of the

14    documentation in order to get the actual numbers.

15         As a matter of act, if I was comfortable

16    saying to Your Honor one way or the other, I would

17    say to Your Honor that I request, which I am going

18    to request anyway, a court ordered mediation at

19    some point after we've had the opportunity to digest

20    all of this documentation.

21         But I would like to point out that apart from

22    the participation statements, Your Honor, with

23    regard to production costs specifically, not only

24    were they given these redacted charts because that's

25    part of the production they requested but more

21

1    importantly they were given the actual budgets and

2    they have had seven hours worth of testimony with a

3    witness that acted as corporate representative and

4    as part of this she provided numbers across the

5    board.

6         So they've been given all the production costs

7    to date that we have.  She provided what they

8    requested, and I think in their request for

9    production drafts and finals of what we gave them as

10   much as we have.  They have been given everything

11   we have as to the revenue stream and the passage

12   of time of the scope in ten years, even though it's

13   a breach of contract action but they're requesting

14   ten years worth of information.

15        Frankly, we have continued to supplement, we

16   have supplemented at least five to six times in the

17   last three months. I realize Your Honor doesn't want

18   to hear argument right now but I just want for

19   purposes of the record say it's a three month

20   discovery period. In three months we had to go

21   through and distill three thousand (sic) documents

22   and in a privilege log it has the three

23   thousand pages and it's about a six hundred page

24   document, the privilege log, because we've had about

25   seven lawyers that have come and gone during that

22

1         time period work in that series.  It's not stall-

2         walling --

3            THE COURT: Would it make any sense to pick

4         out a year and discover for one year so we can get

5         the formula down as to what would be necessary?

6            MS. LUMPKIN: Yes, Your Honor, that would be

7         extremely helpful --

8            THE COURT: And is there an average year or a

9         logical year to try to scope instead of doing ten

10        years all at one time?

11           MR. SAMMATARO: If we do the most recent season

12        of Making the Band, 4.3, which would be the last

13        season.

14           THE COURT: Would that make sense to everybody?

15           MS. LUMPKIN: Do we have all the numbers?

16           (Thereupon, a brief interruption in the

17      proceedings, after which the following was had.)

18           THE COURT: Would it make sense to try to find

19        an expert in the area of entertainment law to merely

20        mediate the discovery process?

21           MR. SAMMATARO: Your Honor, if I may for one

22        second.

23           THE COURT: Okay.

24           MS. SAMMATARO: We do have participation

25        statements.  Those participation statements have

23

1   been sent.  Well, the initial matter of the series,

2   Making the Band I, and there's three seasons --

3           THE COURT: People really watch this?

4           MR. SAMMATARO: Yes, Your Honor.  It's actually

5   a very profitable show and according to MTV (sic)

6   it's the most highly rated show.  But if the Court

7   will indulge me for just thirty seconds because

8   this is really important.

9           THE COURT: Okay.

10          MR. SAMMATARO: The first three seasons of

11  Making the Band, 1.1 and 1.2 and 1.3, involve

12  Transcontinental and Lou Pearlman.

13          Starting with Making the Band II, so 2.1 going

14  forward, they replaced Transcontinental with Puff

15  Daddy or Diddy who's a very famous artist.  The

16  participation statements that we have, we never

17  received the participation statements for Making

18  the Band III or IV, so that's six seasons, 3.1 to

19  3.3 and 4.1 to 4.3, until June 12th of 2008.  The

20  participation statements that they have rendered

21  are solely in connection with seasons 1 through 3

22  involving O'Town.  Their statement has been

23  consistently, and they testified to this,

24  Transcontinental's interest is limited to the

25  seasons involving O'Town.  The seasons involving

24

 1      Diddy, you don't get and we don't need to

 2      participate -- we don't need to give you an

 3      accounting.  We don't have an accounting.  They've

 4      produced supplemental documents.

 5          THE COURT: Are you claiming an interest in

 6      those years?

 7          MR. SAMMATARO: Not only am I claiming an

 8      interest, I have documents where they do not --

 9          THE COURT: Okay.

10          MR. SAMMATARO:  -- dispute we have an interest,

11      and I have a document here with us today and the

12      problem with that document is I received that after

13      we flew to New York, after we took three depositions

14      where they said, that's our position, you have no

15      interest in that.  The very first document I got

16      out of the box, which I have right over here, says

17      you need to account to Transcontinental because

18      they have an interest in all cycles of Making the

19      Band including those involving Diddy.  That

20      directly, directly contradicts the question that

21      Mr. Silverman asked the witness seven times, the

22      very person who is in charge of doing the

23      participation statements saying, that's not what

24      I was told to do, that wasn't my obligation, that

25      wasn't my job.  What do we have?  Unsupplement (ph)

1    production which by the way we received on February

2    6th, after the depositions, this is your job, you

3    need to account for that.

4        So we have not received a single participation

5    statement as it relates to the seasons not involving

6    Transcon.  So they say, look at all the

7    participation statements.  Not a single one relates

8    to Diddy.  And all the revenue numbers, those all

9    relate to the Diddy seasons.  We know what the

10   O'Town seasons are. At least we know what the first

11   two seasons are.  We don't know anything about the

12   Diddy seasons and that's ten seasons involved. We

13   don't have participation statements for those and we

14   don't have any of the revenue numbers for those.

15       Yes, they have produced somewhere in the

16   vicinity of twenty thousand documents.  Two of the

17   boxes were produced to me yesterday.  I haven't

18   looked at them.  I was here traveling.  So we don't

19   know what they've produced.  But what I do know is I

20   know what they didn't produce prior to this hearing

21   being set.

22       To be fair, this case, the bankruptcy started

23   in May.  We sent them a subpoena in June or July

24   of 2007.  Those document requests and subpoena are

25   the same requested in our request for production

1    and we sent our request for production in October.

2    October.  And now, because there's a hearing, they

3    start producing thousands and thousands and

4    thousands of pages of documents.  I didn't get them

5    when I asked to confer.  I didn't get them when I

6    asked them to meet with me.  I got them when there

7    was a motion and this Court set it for hearing and

8    now they're taking it serious.

9         They didn't take it serious before.  They

10   didn't take it serious before there was a lawsuit.

11   They're taking it serious because there's now a

12   motion to compel. We've taken three depositions,

13   flown to New York and got pretty much contradictory

14   evidence, evidence that had we had the documents

15   that they've now produced, we could have grilled

16   the witnesses on and we could have gotten different

17   testimony.  We have been really significantly

18   prejudiced by their substantive (sic) production.

19        As I sit here today, I don't know what we

20   have but I can tell you what we don't have and we

21   don't have any of the statements related to Diddy

22   and we don't know the advertising revenue as it

23   relates to the ten seasons of the show.

24        THE COURT: That's thirty seconds?

25        MR. SAMMATARO: Your Honor, forty-five?

27

1      THE COURT: No, it's about three minutes, and

2      I don't know, is that how you normally bill?

3      MR. SAMMATARO: No, Your Honor, and I apologize

4      for running long.

5      THE COURT: So the two years that Inter (sic)

6      continental had it, you got your information to

7      try the case?

8      MR. SAMMATARO: The two seasons we actually

9      got paid for, the first two seasons we actually got

10     paid for, and it's --

11     THE COURT:   So that's not part of your

12     lawsuit?

13     MR. SAMMATARO: Well, the residuals that would

14     result are part of the lawsuit.  The first two

15     seasons of the show didn't air on MTV, it aired

16     on ABC.  The last season involving my client aired

17     on MTV and then the next nine seasons also aired

18     on MTV.

19     So the first two seasons Transcontinental

20     was paid a little bit around 1.5 million dollars.

21     We have those documents.  I don't have any reason

22     to challenge the sufficiency of those documents.

23     I don't believe MTV cooked the books.  I believe

24     those documents are what they are.  It's beginning

25     with season three of Making the Band I through all

28

 1    the Diddy seasons that we don't have the documents

 2    for.

 3         THE COURT: And is your percent that you're

 4    claiming reduced once Diddy is the production

 5    company?

 6         MR. SAMMATARO: Diddy wasn't actually the

 7    production company, MTV was --

 8         THE COURT: Or whatever.

 9         MR. SAMMATARO: Your Honor, Diddy's -- it's

10    based on a percentage of production.  The way MTV

11    treated Diddy's involvement was he was the top line,

12    so he's part of the production costs.  The answer

13    to your question is no.  It's part of the production

14    costs.

15         THE COURT: I'm sorry.  My questions was, is

16    the amount you're seeking in years under Diddy an

17    amount less than what would be owed same amount?

18         MR. SAMMATARO: Significantly more, Your Honor.

19         THE COURT: Because the income was more?

20         MR. SAMMATARO: Because there's an amended

21    agreement.  The contract entirely changed.

22         THE COURT: Okay.  Is there a logical year for

23    you to use as a baseline year to limit discovery

24    to one year?

25         MR. SAMMATARO: I would go with the most recent

29

1   year.

2         THE COURT: Which is what?

3         MR. SAMMATARO: Which would be cycle three of

4   Making the Band IV.  They don't run them like one

5   season per year, so sometimes there's two seasons

6   they show per year.  So it would be the most recent

7   series that was exhibited on MTV.

8         THE COURT: So that would be '08 and '09, or

9   '07 and '08?

10        MR. SAMMATARO: That would be, it just

11   concluded.  It started -- well, actually, you know,

12   testimony indicated that they're going to pick up

13   a couple of additional episodes.  So I guess it's

14   not completed.

15        MS. LUMPKIN: I just informed you of that.

16        THE COURT: Okay.  Okay.  Listen, no cat fights

17   now, okay?

18        MR. SAMMATARO: Your Honor, we'll take the

19   most recent --

20        THE COURT: This is the first hearing I've had

21   on this and I'm trying to lay down a starting point.

22   At some point I'll tax somebody a million dollars.

23   That's fine.  We're not going to do it today.  Okay?

24        MR. SAMMATARO: Okay.  Your Honor, we'll take

25   the most recently completed season.  If it's not

30

1    the -- if it's not 4.3, it could be 4.2 which I

2    believed it aired over 2007 and 2008.

3        THE COURT: Is that a defined entity?

4        MS. LUMPKIN: Your Honor, the 4.2 season we

5    would absolutely be able to put together.

6        THE COURT: Okay.  And how long will it take

7    you to put it together?

8        MR. POWELL: A couple --

9        MS. LUMPKIN: I'm sorry.  Let me answer that

10   in due part.  It depends on the discovery schedule

11   that we're being held to, Your Honor.

12       THE COURT: Don't worry about the discovery

13   schedule.

14       MS. LUMPKIN: Well, but, I'm the lawyer on it,

15   I've got the review --

16       THE COURT: Ma'am, I'm the one who fines you

17   the million dollars, okay.

18       MS. LUMPKIN: I know, Your Honor.  Don't do

19   that to me because I can't afford it.  But if you,

20   if Your Honor is going to consider the tight

21   schedule we have for the next two weeks, we can

22   probably produce this and put it together in two

23   weeks?

24       MR. POWELL: We should be able to.  The only

25   question is how much of the scope that plaintiff

1  has suggested goes to getting information from

2  international affiliates, etc. etc.  So...

3      THE COURT: What do you have that you don't

4  have to get from other affiliates?

5      MR. POWELL: What we have in-house we can

6  show -- we can show revenue from international

7  syndication, we can show merchandise, we can show

8  production costs, we can show --

9      MS. LUMPKIN: Home video.

10      MR. POWELL:  -- home video, download to own.

11  So we can show the universe that we believe is

12  relevant absolutely to the net proceeds calculation.

13  And if we -- if we can agree to those, to that, then

14  we can produce within a couple of weeks.

15      THE COURT: Okay.  Why don't we give them a shot

16  of being good guys and give them to March the 5th

17  to produce all the discovery for that entity and

18  see where we are.

19      MR. SAMMATARO: So we -- I just want to make

20  sure that we're clear.  So it would be all the

21  documents relating to season 4.2 but that would

22  include the ad revenue and the revenue from the

23  eleven countries that MTV airs the program in

24  foreign which is Finland, Portugal, Germany.  We

25  know --

1          THE COURT: I asked for what they had in-house.

2     I didn't ask for outside sources.  I'm trying to

3     start the process.

4          MR. SAMMATARO: Okay.  I would ask literal

5     clarity from the Court in the sense that we have

6     six or seven depositions lined up between now and

7     March 2nd and --

8          THE COURT: What good are the depositions

9     without the discovery?

10          MR. SAMMATARO: Well, that's my concern, Your

11     Honor, and the problem is it took a lot of effort

12     to get these depositions lined up and it seems as

13     though this case is just going to fly by the

14     wayside and that's my concern.  I understand, Your

15     Honor, we'll --

16          THE COURT: What do you want me to do?  Tell me

17     what you want me to do.  There's no way I can order

18     them to get something they can't get together in

19     time for your deposition schedule.

20          MR. SAMMATARO: I completely understand, Your

21     Honor.  I understand.

22          THE COURT: Yes, ma'am.

23          MR. SILVERMAN: Your Honor, we had a list of

24     what we specifically wanted if that helps but...

25          MS. LUMPKIN: Your Honor -- no, go ahead.

33

1          MR. SILVERMAN: No, it's --

2          MS. LUMPKIN: I'll wait.

3          MR. SILVERMAN: Because obviously Your Honor,

4     you know, has put some thought into this.

5          I take it that regarding what we just talked

6     about, 4.2, we're going to stay or abate some of the

7     other things we talked about --

8          THE COURT: Absolutely.  We're starting over.

9          MR. SILVERMAN: Okay.  In that case --

10          THE COURT: But at some day I'm going to make

11     a determination that there's violations of

12     discovery and I will fix costs at the appropriate

13     time.

14          MR. SILVERMAN: We appreciate that.  Okay.  Then

15     in terms of going forward, I guess there's two

16     clarifications that we would like. Number one,

17     there have been a significant amount of documents

18     that have been produced to us heavily redacted on

19     the basis of relevance.  When they have a sixty

20     page document that pertains to multiple shows,

21     they've redacted fifty-five of the pages and they

22     give me just Making the Band or whatever it is.

23          Now under the rules you're not allowed to

24     redact for relevance.  We have a confidentiality

25     order that is -- includes an attorney's eyes only

34

1    provision.  It's the order, it is the

2    confidentiality stipulation that they provided

3    to us and we would just like some clarity that

4    when a document includes relevant information you

5    produce the document, you don't redact the heck

6    out of it on relevancy grounds.  Obviously on

7    privilege side you can redact the privilege and

8    then put it on the privilege log.  But we've killed

9    a lot of trees with a lot of blank pages that just

10   have a redaction stamp on it; and even on the 4.2,

11   you know, we're now concentrating on 4.2, I don't

12   know how they keep their documents and a lot of them

13   are going to fall within this guidance request which

14   is, it's going to be -- they're going to be included :

15   within other shows, we have a confidentiality order,

16   just give it to us rather than redacting.  The

17   headers, I can't even figure out what the numbers

18   are.  So we would like clarity on that.  That's

19   number one.

20        Number two, and this is a question for the

21   Court's preference is, which is on the privilege log

22   which has been evolving, there have been a

23   significant number of documents in which they

24   have asserted work product privilege for contract

25   drafting and things like that.  Given the bulk of

1    that assertion, it appeared -- and this is one of my

2    last requests -- that it may make sense to refer

3    that specific material to a special master for in

4    camera inspection because there's so much of it and

5    rather than spend two days, you know, arguing about

6    it and given the fact that the log is, you know, at

7    least a month or two late and given the kinds of

8    assertion, they ought to pay for the special master,

9    but I think that there needs to be a facility that

10   we can deal with the privilege issues.  So those

11   are the two issues that I have now that we've kind

12   of modified and traveling under the 4.2 schedule.

13          MS. LUMPKIN: Thank you.

14          Your Honor, I would prefer not to go back and

15   forth on something like this in light of Your

16   Honor's demeanor with regard to what we would like

17   to accomplish today, so I'm going to refrain from

18   responding to every one of these bad guy allegations

19   but I would like to clarify the record on a few

20   things.

21          We have provided them with Diddy participation

22   schedules which was a standard --

23          THE COURT: I'm glad we're not going back and

24   forth.

25          MS. LUMPKIN: But I need to for the record

36

1     state --

2            THE COURT: I understand, this is how you define

3     it.

4            MS. LUMPKIN: But I --

5            THE COURT: That's the whole problem of the

6     case is going to be definitions.

7            MS. LUMPKIN: I suppose to doing the bad guy

8     response, Your Honor, which is the privilege log

9     was late by a month or two months even though they

10    were actually informed of it but it wasn't two

11    months; nonetheless, for the record, starting with

12    bate stamp number 000015, that pertains to Diddy

13    numbers for Making the Band, not just O'Town.

14           The other issue that I would like to address,

15    I do agree with Mr. Silverman we need to put it

16    to rest, is the fact that the redacted information

17    we did not redact based on relevance even though

18    that is a portion of it.  My understanding of

19    custody and control with regard to the rules -- MTVN

20    has this report in its possession in response to

21    this production -- the reason it's had to redact, it

22    has been a painstakingly, you know, exercise, has

23    been because Making the Band is only one line item

24    in two or three or four pages of this.

25           It's not a relevance issue, Your Honor.  The

1    rest of the shows and the rest of the information

2    listed on these fifty page, seventy page documents

3    are it's unresponsive information, one; it's

4    proprietary and confidential information to Viacom,

5    it has numbers and all kinds of programming and

6    production costs for shows on other channels.  It

7    includes all of the Viacom channels and that's the

8    way the reports are kept.  And so we went through,

9    in order to comply with the federal rule, we

10   produced the document in a complete fashion and

11   we did not modify anything, but we did redact and

12   informed them that it wasn't because of relevance.

13   As a matter of fact, we attempted to resolve this

14   issue before today. We showed them one page out

15   of the document to show that confidentiality

16   agreement that we have in this case does not cover

17   non-parties or non-parties' confidential information

18   and unresponsive to a hundred and thirty-nine

19   requests for production.

20       Now I defy them to find one of their requests

21   that would show why information from VHI or

22   information from Comedy Central would have anything

23   to do with a breach of contract action against MTV.

24   That's the redaction issue.

25       Your Honor, with regard to the issue of the

38

1    witnesses, we have already informed counsel and

2    they know this, once again in an attempt to resolve

3    this before today, that because the production

4    has by its very nature because of the volume, that

5    it has been a rolling production and we were willing

6    to reopen depositions in a limited fashion to

7    whatever they needed.  They're aware of this.  MTV

8    went as far as saying, look, we understand this is

9    a rolling production based on the ten year period

10    of time, we'll bring the witnesses down for you to

11    finish what you need to ask about whatever documents

12    you've gotten.  There has been no prejudice.

13         One thing, I don't want to show the frustration

14    that my opposing counsel has shown but I must tell

15    you that, even the case they cite to, the Supreme

16    Court case they cite to in their documents, Hickman,

17    the Court specifically said discovery should be

18    brought.  We agree with that.  There is no fishing

19    expedition excuse anymore.  We agree with that.

20    We're not hiding behind anything, Your Honor.  The

21    reality though is even the Supreme Court in that

22    Hickman opinion specifically said it's a two-way

23    street.

24         In this particular case, we're up to

25    outside vendor costs for blow backs on these pages

1    of up to $40,000, that doesn't include copying.

2    I couldn't agree more about the trees being killed.

3    No participation from the other side because of

4    course it's a bankruptcy estate so they're not

5    really participating in costs, and we have only

6    received from the other side to date in response

7    to all of our discovery less than eight hundred

8    pages of documents that include the original

9    complaint -- the original contracts that we already

10   had. So this is not a two-way street and that's

11   what's caused kind of the disparity.  There's a

12   huge lack of balance; and 4.2 we will work on.

13       We really appreciate the fact that the Court is

14   trying to work with us to come up with something

15   that would be agreeable to the other side. And in

16   that vein, I would like to suggest the Court

17   consider, and I have a blank order, to talk about

18   possibly scheduling this, setting up a scheduling

19   order that will give us an orderly fashion to this

20   case.

21       At the beginning of the case, opposing counsel

22   had suggested September of '09 for this trial as

23   trustee's counsel. Your Honor entered an order

24   setting us earlier.  We're willing to compromise

25   and go in the middle.  It doesn't have to be

40

1    September.  I don't think it can be March.  We're

2    also really encouraging the Court to have a court

3    ordered mediation by a date certain in late April,

4    beginning of May, to give everyone an opportunity

5    to look at the 4.2, determine if that's what we're

6    looking for from the other side and then try to put

7    this whole thing together.

8        As I stand right here, I can tell Your Honor

9    that I've got clients working on trying to produce

10   in regard to their additional thirty-one requests

11   that they served us with ten days ago, we're

12   probably looking at several hundred thousands

13   of pages again.  So I am requesting that we consider

14   a scheduling order that will work and fit this type

15   of case because of the scope.  Thank you, Your

16   Honor.

17       THE COURT: Is that it, the lack of back and

18   forth?

19       MS. LUMPKIN: Thank you, Your Honor.

20       THE COURT: All right.  I'm going to set this

21   matter over to March the 24th at 1:00 just to see

22   where we are.  I don't care what happened up to

23   this point at this time.  I am concerned that both

24   parties act in good faith and we're starting from

25   now.

41

1          By the 5th of March I would like either an

2     agreed upon list or a separate list of potential

3     mediators with entertainment law background that

4     can both deal with discovery and/or final mediation.

5     And I'm going to rely on the person I pick to

6     actually come here and tell me what they think if

7     this thing does not resolve.  So I'm just going to

8     let you know what kind of animal, it's going to be

9     a special master, it's going to be a mediator but

10    I'm looking for someone who can -- you're using

11    terms that would take me a year to figure out --

12    what the contracts mean and I think you're entitled

13    to someone more informed making those initial cuts.

14          MS. LUMPKIN: Thank you, Your Honor.

15          THE COURT: So play nice.  Thank you.

16          MR. SILVERMAN: And, Your Honor, there are

17    certain deadlines like extra witness things, those

18    are admitted?

19          THE COURT: Nothing is sacrament around here.

20    None of you know me.  I'm a practical judge.  I'm

21    going to do what's right for both parties.  I'm

22    going to try to be fair.  I set a hearing date

23    automatically out of the shoe whether it's a one

24    hour 523 or it's a multi-million dollar case because

25    I assume the parties will come and tell me it's

42

1       not practical and that's where we are.

2               MR. SILVERMAN: Thank you, Your Honor.

3               MS. LUMPKIN: Thank you, Your Honor.

4               MR. SILVERMAN: We actually do get along very

5       well.  I think what we do have in common is we're

6       both very anal about deadlines and things like that.

7               THE COURT: I don't think we should use that

8       term.

9               MS. LUMPKIN: Thank you.

10              MR. POWELL: Thank you, Your Honor.

11              (Thereupon, the proceeding was concluded.)

12

C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF ORANGE

I, CYNTHIA D. VACHON, being a Stenograph Shorthand

Reporter and Notary Public, State of Florida at Large, do

hereby certify that I transcribed the stenograph notes

and reduced to typewriting under my supervision; and that

the foregoing pages numbered 3 through 42, inclusive, are

a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee

or counsel of any of the parties, nor financially

interested in the foregoing action.

WITNESS my hand and seal this 13th day of February,

2009, in the City of Orlando, County of Orange, State of

Florida.

CYNTHIA D. VACHON
Notary Public