# EXHIBIT J

11/21/01 WED 15:39  FAX 407 345 0888 TRANSCONTINENTAL CO                              ☒002/007

November 15, 2001

Lou Pearlman
Transcontinental Television Productions, Inc.
7380 Sand Lake Road
Orlando, FL 32819

    Re:    MTV's "Making the Band"

Dear Lou:

    Reference is made to the letter agreement (the "Agreement") dated January 7, 2000 between MTV Networks, a division of Viacom International Inc. ("MTV") and Transcontinental Television Productions, Inc ("TC") in connection with the MTV television series featuring O-Town (the "Artist") entitled "Making the Band" (the "Series").

    The Agreement shall be amended as follows:

1. The parties agree that the $350,000 license fee for the back order of 9 episodes of the Series provided by ABC shall be divided as follows:

   a. $310,000 per episode shall be provided to Bunim Murray Productions for production costs.

   b. $20,000 per episode shall be paid to MTV as a producer fee.

   c. $20,000 per episode shall be paid to TC toward recoupment of band development expenses.

2. The parties agree that the $380,000 license fee for the 13 episodes of the second season of the Series provided by ABC shall be divided as follows:

   a. $330,000 per episode shall be provided to Bunim Murray Productions for production costs.

   b. $25,000 per episode shall be paid to the Band for band salaries.

   c. $25,000 per episode shall be divided equally between MTV and TC, after recoupment off-the-top (prior to the division of income between TC and/or MTV) of $29,250 in payroll taxes incurred by MTV and $63,000 in band salaries incurred

137176 ver. 01

1

MTVN 000202

by TC. Of said amount, TC shall receive $179,250 promptly following full execution of this agreement.

3. Band development, radio tour and other out-of-pocket expenses incurred by MTV and TC for the prior two seasons of the Series may be recouped off-the-top (prior to the division of profits between TC and MTV) from ancillary monies (i.e., record and merchandise advances and royalties). The parties acknowledge that TC's expenses are $360,000 and MTV's expenses are $43,000. The parties agree that TC shall retain 100% of the record advances paid to date (i.e., $330,000) to recoup its expenses. Notwithstanding anything to the contrary contained herein, the parties have elected not to recoup their remaining expenses from ancillary monies. For the avoidance of doubt, neither TC nor MTV shall be entitled to recoup any additional expenses from ancillary monies for the prior two seasons of the Series unless both parties agree in writing.

4. Paragraph 11 of the Agreement relating to domestic and foreign distribution shall be amended to provide that MTV shall be able to recoup direct out-of-pocket expenses related to the Series incurred in connection with such distribution.

5. The copyright in the Series shall be held jointly by TC and MTV. MTV shall register and protect the copyright and recoup any expenses incurred in connection therewith from ancillary profits (record, merchandising, etc.) off-the-top before proceeds are split. Upon written request by TC, MTV shall provide TC with copies of copyright registration and renewal certificates.

6. MTV and TC shall enter into an agreement with Trans Continental Records Inc. ("TRC") wherein TRC shall provide MTV and TC each with non-exclusive licenses for use of the O-Town trademark in connection with the Series and ancillary uses thereof (for example merchandising, records). No other licenses shall be granted in the O-Town trademark to any third party. For the avoidance of doubt, the parties acknowledge that TC previously entered into third party non-exclusive licenses for the use of the O-Town trademark in connection with the "Live from O-Town" concert television series, the record company O-Town Records and the restaurant O-Town café. TC agrees not to exploit the O-Town trademark in any other way without the consent of MTV and MTV agrees not to exploit the O-Town trademark without the consent of TC. If the series is no longer being produced and new records are not being recorded, TC agrees not to exploit the O-Town trademark without MTV's express approval, which shall not be unreasonably withheld. TC and MTV each agree to execute any documents (for example, a security interest document) necessary to effectuate the exploitation of the Series. All trademark registration fees, annual renewal fees and costs to protect the trademark shall be recouped from ancillary profits (record, merchandising, etc.) off-the-top before proceeds are split.

7. Unless otherwise agreed in writing, all contractual payment obligations to Artist provided in the agreement dated January 12, 2000 between Artist, on the one hand and

137178 ver. 01

2

MTVN 000203

11/21/01 WED 15:38   FAX 407 345 0888 TRANSCONTINENTAL CO                            ☒004/007

TC and MTV, on the other, and the amendment thereto dated August 23, 2001 shall be split 50-50 between MTV and TC.

8. With respect to the first and second season of the Series, the parties agree that as of September 30, 2001, TC's profit share of merchandise revenues is $187,803. TC acknowledges that it has received $100,000 of said amount and that it shall receive $87,803 promptly following full execution of this agreement. The parties also agree that as of September 30, 2001, TC's profit share of international program sales is $458,011.85 and it shall receive said amount promptly following full execution of this agreement.

9. Notwithstanding anything to the contrary in the Agreement, with respect to the third season and all subsequent seasons of the Series, MTV shall pay to TC an all-in amount equal to 50% of 100% of the MTV's Net Proceeds derived from the Series and defined as set forth in Schedule A (a copy of which is attached hereto); provided, however, the distribution fee will be capped at 20% for all Ancillary Uses.

   (a) If the initial exploitation of the Series is over MTV Networks in the US, then, in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 65% of the final production costs of the Series ("Imputed License Fee") which shall be included in the following installments:

       (i) 50% thereof shall be deemed credited as revenue upon completion of production of a Series episode, and

       (ii) 50% thereof shall be deemed credited as revenue upon the date which is six (6) months following the initial exhibition of a Series episode over MTV.

   (b) If the initial exploitation of the Series is over an MTV Networks foreign programming service, then, in lieu of any other revenues therefrom, MTV shall credit to revenues an amount equal to 10% of the final production costs of the Series upon the date of the initial exhibition of the Series on that foreign programming service

10. TC has agreed that Lou Pearlman will not take an Executive Producer credit or fee in connection with the third season or any subsequent season of the Series and instead the parties shall mutually agree on a credit to Lou Pearlman similar to a "Consultant" credit. The parties agree that TC shall receive a production credit for the third season of the Series.

11. For the avoidance of doubt, and as set forth in the attached Schedule A, Artist album and merchandise revenue (other than television series related merchandise revenue) shall be excluded from Ancillary Uses and shall be split 50-50 pursuant to the terms set forth in the Agreement.

137178 ver. 01                                   3

MTVN 000204

11/21/01 WED 15:40  FAX 407 345 0888 TRANSCONTINENTAL CO                        ☒005/007

11. For the avoidance of doubt, and as set forth in the attached Schedule A, Artist album and merchandise revenue (other than television series related merchandise revenue) shall be excluded from Ancillary Uses and shall be split 50-50 pursuant to the terms set forth in the Agreement.

12. The parties agree that TC shall not be responsible for any so-called "short fall" payments in respect of the production costs for the first thirteen (13) episodes of the third season of the Series. ~~This paragraph 12 is amended as set forth on page 12(a) attached hereto and incorporated herein by reference.~~

13. The parties shall negotiate in good faith the exploitation of the format rights for the Series in Europe.

Please indicate your acceptance of these terms by signing on the line below. Except as amended herein, all other terms of the Agreement shall remain in full force and effect.

Very truly yours,

MTV NETWORKS
BY: _____
ITS:  SVP

ACCEPTED AND AGREED

TRANS CONTINENTAL TELEVISION
PRODUCTIONS, INC.

BY: _____
ITS: _____

137176.ver04

4

MTVN 000205

11/21/01 WED 15:40  FAX 407 346 0888 TRANSCONTINENTAL CO                    ☑007/007

### SCHEDULE A TO THE AGREEMENT ("AGREEMENT") DATED NOVEMBER 15, 2001 BETWEEN MTV NETWORKS AND TRANSCONTINETAL TELEVISION PRODUCTIONS, INC. ("PARTICIPANT")

#### NET PROCEEDS DEFINITION

For the purposes of the Agreement, "Net Proceeds" shall mean all non-refundable revenues actually received in the United States from all sources worldwide by MTV Networks ("MTVN") in connection with Ancillary Uses (as defined below) of the Series (excluding exhibition on MTVN worldwide programming services), less the following items in the following order: (a) first, the applicable distribution fees (as set forth below) with respect to revenues derived from Ancillary Uses; then (b) distribution expenses paid on account of any Ancillary Uses; then (c) any third-party participations; and then (d) MTVN's recoupment of all sums paid to Participant (if any) and all other costs incurred in connection with the development and production of the Series, and overhead on the foregoing (in the amount of 10%) (collectively, "Production Costs").

For the purposes of the Agreement, "Ancillary Uses" shall mean all distribution and/or exploitation of episodes of the Series, including without limitation the trademarks and all other elements, in any manner or media other than on MTVN worldwide programming services. Notwithstanding the foregoing, artist album and merchandising other than television series related merchandise shall not be included in Ancillary Uses.

The distribution fees (inclusive of subdistributor fees) to be withheld and retained by MTVN are as follows:

| | Ancillary Uses | Percentage of Gross Receipts |
|---|---|---|
| (A) | U.S. Network Television Exhibition (ABC, CBS, NBC, and/or Fox to the extent programming is sold to Fox as a network rather than on a station-by-station basis): | 20% |
| (B) | Television Exhibition in the United States (other than Network): | 20% |
| (C) | Television Exhibition outside of the United States: | 20% |
| (D) | Worldwide Videocassette and Videodisc Exhibition: | 20% |
| (E) | Worldwide Merchandising and all Other Uses: | 20% |

MTVN shall account to Participant with respect to Participant's share of Net Proceeds, if any, on a semi-annual basis provided there are payments due Participant, and such accounting shall be accompanied by payment of Participant's share of Net Proceeds payable for such semi-annual period. During the term of this Agreement and for a period of one year following the last exhibition of the Series, Participant or its designated certified public accountant may at MTVN's principle place of business and at reasonable times during regular business hours upon reasonable advance, written notice, but no more than once per year, inspect and make copies of any relevant portions of books and records of MTVN relating to the Series in order to determine the accuracy of MTVN's statements of Net Proceeds rendered pursuant thereto.