## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**SONEET KAPILA, Chapter 11 Trustee**
**for TRANS CONTINENTAL**
**TELEVISION PRODUCTIONS, INC.,**

**Case No.: 6:10-cv-00181-Orl-28-DAB**

                            **Plaintiff,**          **DISPOSITIVE MOTION**

v.

**MTV NETWORKS COMPANY, a division**
**of Viacom International, Inc., et al.**

                            **Defendants.**

_____/

## VIACOM DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
## SUPPORTING MEMORANDUM OF LAW

            Defendants MTV Networks Company, a division of Viacom International Inc.

("MTVN"), Viacom International Inc., and Viacom Inc. (collectively, "Viacom Defendants"

or "Defendants"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby move

for an order granting partial summary judgment dismissing Counts III, IV, X, and XI of the

Third Amended Complaint ("TAC") filed by Soneet Kapila, Chapter 11 Trustee (the

"Trustee") for Trans Continental Television Productions, Inc. ("TC"), and in support state:

### I.
### PRELIMINARY STATEMENT

            Discovery in this case has been extensive, but, as the dust settles, it confirms

what the Defendants knew all along:  that many of the legal claims being advanced by the

Trustee in this lawsuit have absolutely no merit.

MTVN devised the concept of a reality television series, *Making the Band*, that documented the creation of a boy band, and invited Louis Pearlman to collaborate on the first cycle of the series. That show resulted in the creation of the band O-Town. When the cycle featuring O-Town ran its natural course, MTVN pursued an entirely new and different project with hip-hop star Sean "P. Diddy" Combs. The crux of this case concerns what entitlements, if any, Pearlman was owed for *Making the Band 2-4*, *i.e.*, the cycles featuring Combs. The Trustee has conjured up common-law and copyright theories under which he claims more than *$70 million* in alleged damages for the cycles featuring Combs—as to which TC and Pearlman made no contributions and, indeed, admittedly had no involvement and shouldered no risk whatsoever. These wide-eyed damage scenarios seek more than *48 times* what TC was in fact paid—and accepted—for *Making the Band 1*, a show in which TC actually made contributions and exposed itself to economic risk. Such a result defies logic and common sense. As the Viacom Defendants demonstrate below, it is also unsupported in fact and in law.

Indeed, had the Trustee ever had a meaningful conversation with Pearlman about his claims, he would have learned what Pearlman ultimately testified at his deposition. Pearlman, the person in charge of TC and the person who caused TC to enter into the agreements with MTVN which are at the heart of this lawsuit, renounced many of the causes of action and types of damages being pursued here, explaining they have no basis in fact as demonstrated by the parties' agreements, intent, and course of dealing over time. Thus, while this suit may present many issues regarding the relationship between the parties and

their respective rights, this motion presents four discrete issues on which there can be no genuine disputes of fact.

*First*, the Trustee's exorbitant damage claims derive in large part from his extra-contractual copyright co-ownership theory and his outlandish contention that Pearlman and TC were entitled to half of the advertising revenues allegedly associated with *Making the Band*, as well as half of the cable carriage fees paid by cable providers to MTVN.  The Trustee's claims should be dismissed on summary judgment because they are incorrect as a matter of law.

TC could derive a copyright interest of the kind the Trustee asserts in one of two ways under the law:  either under copyright law, as a co-author of the works at issue, or through its contracts with MTVN.  TC is not a co-author, under copyright law, of the copyright in *Making the Band* for several reasons.  As the subject of a documentary reality show, its contribution to *Making the Band* is not independently copyrightable as a matter of law.  Even assuming that it contributed to the show's format, that format is simply an idea that, under well-established precedent, is not entitled to copyright protection.  Moreover, as numerous witnesses, including Lou Pearlman, admitted at depositions, TC contributed nothing at all to *Making the Band 2-4*, and there was no intent for co-authorship of those later shows.

*Second*, even if there were a question of fact as to whether TC was a co-author, it would not be entitled to a share in advertising revenue or cable carriage fees, as those fees do not flow from the copyright itself—they are far too attenuated as a matter of law.  TC's damages recovery as a purported co-author instead would be limited by the terms

of two agreements between the parties.  Whatever the parties' disputes as to the meaning of those two contracts, of which there are many, their plain language does not provide for an interpretation entitling TC to share in MTVN's revenues from broadcasting *Making the Band 2-4*.  Although the clarity of the agreements on this point does not require examining extrinsic evidence, such evidence underscores the contrived nature of the Trustee's claims.  It is deeply telling that not once over the parties' nine-year contractual relationship did TC *ever* assert a demand for advertising revenue or cable carriage fees—and in his deposition in this action, Pearlman himself rejected any notion that TC was so entitled.  Further, even assuming TC has only a contractual copyright interest in *Making the Band 2-4*, rather than an interest under copyright law, the same limitations on damages would apply.

*Third*, as an agreement signed by Pearlman himself makes perfectly clear, TC does not have, and never had, an ownership interest in the "Making the Band" trademark, and therefore there is no basis for the Trustee's unfair competition claim.  *Finally*, the Trustee's quasi-contractual theories, including breach of the covenant of good faith and fair dealing and unjust enrichment, are merely duplicative of the Trustee's breach of contract claim, and accordingly fail as a matter of law.

Resolution of these issues by summary judgment will greatly reduce the scope of the trial and the accompanying burdens on the Court, and may help foster a settlement.  For the reasons stated below, MTVN respectfully requests that the Court enter partial summary judgment granting the relief specified below.

## II.
## FACTUAL BACKGROUND

The factual record in this case spans more than a decade; the parties produced over a million pages of documents and took more than two dozen depositions.  The parties dispute many of the underlying facts, and at trial Defendants will establish that the Trustee's version of the events is demonstrably false.  In this motion, however, Defendants ask the Court to make certain determinations as a matter of law that rest on a dozen undisputed, and often admitted, straightforward facts about the course of the parties' dealing:

### A.      Genesis of *Making the Band*

*First,* it is undisputed—and admitted by Pearlman himself, as well as the Trustee's 30(b)(6) representative—that the idea for *Making the Band* ("MTB") originated with Ken Mok, an MTVN producer, who wanted to create a reality television show documenting the creation of a boy band.  (Ex. A at 47; Ex. B at 26:23-27:12; Comp. Ex. C at 62:9-64:8; Comp. Ex. D at 21:16-21; Comp. Ex. E at 51:14-21.)  Mok presented this concept to well-known boy-band impresario Louis Pearlman, who agreed to be involved in selecting and managing the band.  (Ex. A at 47; Ex. B at 29:10-17.)

*Second*, MTVN and TC reached an arrangement to develop and produce this "Series"[1] that was formalized in a letter agreement dated January 7, 2000 (the "2000 Agreement").  (Ex. F.)  The 2000 Agreement contemplated that MTVN and TC would

---

[1]      "Series" was defined as "an untitled Boy Band series for ABC." (Ex. F, Preamble.)

license MTB to ABC Networks, which aired the first two seasons of the show featuring the boy band O-Town (MTB 1.1 and 1.2).[2]   (Ex. G.)

Third, whatever disputes there may be about the meaning of the 2000 Agreement, there is no dispute that under the terms of the 2000 Agreement, ABC served as the initial broadcaster, retained all broadcast-based revenue streams such as advertising, and paid MTVN and TC a license fee.  (Comp. Ex. C-1 at 87:11-88:7; Ex. G; Ex. F.)

**B.**    *Making the Band's Move to MTVN and the Amended Agreement*

Fourth, there is no dispute—and it is admitted by the Trustee as TC's 30(b)(6) representative—that as a result of MTB's low ratings, ABC planned to cancel MTB after the second season of the first cycle.  (Comp. Ex. H at 142:2-10; Ex. I; see Comp. Ex. C-1 at 92:16-93:1, 93:11-94:21; Comp. Ex. E-1 at 59:18-60:19.)  To keep the show alive, MTVN decided to move MTB to its own network.  (Comp. Ex. H-1 at 146:3-147:6; Ex. J.)

Fifth, it is undisputed that MTVN and TC amended the 2000 Agreement in a letter agreement dated November 15, 2001 (the "2001 Agreement"; collectively with the 2000 Agreement, the "Agreements"), and commenced production of a third season of the "Series."[3]   (Ex. K; Comp. Ex. C-2 at 98:21-99:3.)  Again, although the parties dispute the meaning of many provisions in this contract, there can be no doubt that the parties agreed to replace the majority of the revenue provisions in the 2000 Agreement with a "Net Proceeds" formula, which set out the revenue in which TC was entitled to share.  (*See* Ex. K.) Significantly, that formula excluded advertising revenues.

---

[2]    There were four cycles of MTB, consisting three seasons each.  Specific seasons are identified as MTB 1.1 through MTB 4.3.  MTB 1.1 therefore refers to season one of *Making the Band 1*, and so on.

**C.      MTVN Developed and Produced *Making the Band 2*, *3*, and *4* with Sean Combs**

  *Sixth*, it is undisputed that after the third season of MTB 1, O-Town did not want to participate in a fourth season, and it became clear to MTVN that the program needed to be reformulated.  (Ex. L; Comp. Ex. C-3 at 128:7-15; Comp. Ex. M at 617:14-16; Comp. Ex. N at 144:4-5; Comp. Ex. H-2 at 204:21-25.)  Given changes in musical tastes, MTVN decided to produce a hip-hop show.  It realized that the show needed a star representing that genre, and thus approached hip-hop mogul Sean "P. Diddy" Combs ("Combs") to participate in a new show, *Making the Band 2*.  (Comp. Ex. N-1 at 151:8-152:2; Comp. Ex. M-1 at 456:15-17.)

  *Seventh*, there is no dispute—and it is admitted—that as early as July 2002, TC was aware of MTVN's decision to hire Combs to feature on MTB 2, and to create a hip-hop-focused show.  (Comp. Ex. C-3 at 130:5-16; Comp. Ex. C-4 at 250:17-19; Comp. Ex. E-2 at 77:17-78:5; Comp. Ex. E-3 at 301:3-302:7; Comp. Ex. D-1 at 158:19-159:20.)

  *Eighth*, it is a matter of public record that MTVN broadcast MTB 2-4 from 2002-2010.  More specifically:  MTVN produced three seasons of MTB 2, featuring Combs and Da Band (a mixed-gender rap group) (MTB 2.1, 2.2, and 2.3).  This was followed by three seasons of MTB 3, featuring Combs and the all-girl band Danity Kane (MTB 3.1, 3.2, and 3.3), and three seasons of MTB 4, featuring Combs, solo singer Donnie Klang, R&B group Day 26, and Danity Kane (MTB 4.1, 4.2, and 4.3).  Following this final installment of MTB, MTVN broadcast a series entitled *Making His Band*, which chronicled Combs's selection of a back-up band for his tour.  MTVN also broadcast two short-lived shows that

---

[3] "Series" was defined as "the MTV television series featuring O-Town (the 'Artist')."  (Ex. K, Preamble.)

featured individuals who had particpated in MTB: *There and Back* documented a former O-Town band member's attempt to launch a solo career several years later; while *Taquita & Kaui* catalogued the exploits of two unsuccessful applicants from MTB 3 (together with *Making His Band*, collectively, the "alleged spinoffs").

*Ninth*, there is no dispute that whatever TC's involvement with MTB 1, TC did not make any financial contributions to MTB 2-4 or the alleged spinoffs. (Comp. Ex. C-5 at 136:14-20, 140:4-7, 141:20-143:6, 149:14-151:2; Comp. Ex. E-4 at 85:7-86:9.)

**D.     TC's Communications with MTVN following *Making the Band 2***

*Tenth*, in October 2002 and February 2005, TC sent MTVN letters claiming it had been excluded from the MTB creative process and requesting payment of net participation proceeds. Neither letter mentioned any purported entitlement to advertising revenue or cable carriage fees. (Ex. O; Ex. P; *see also* Comp. Ex. D-2 at 118:24-119:5.) After receipt of each letter, MTVN sent TC updated participation statements, along with payments of TC's participation interests. (Ex. Q; Ex. R.) These statements did not include any information concerning MTVN's advertising revenue or cable carriage fees, nor was there any payment to TC on account of such items. (Comp. Ex. S through S-11.)

*Eleventh*, in August and October 2006, Pearlman's lawyers sent MTVN requests for accounting statements pursuant to the 2000 and 2001 Agreements. (Ex. T; Ex. U.) Again, these letters did not request advertising revenue or cable carriage fees. (Ex. T; Ex. U.)

*Twelfth*, and finally, as has been widely reported, Pearlman's Trans Continental empire collapsed in early 2007 after a government investigation revealed that

Pearlman had been running a Ponzi Scheme through his many companies. Pearlman fled the United States in January 2007 and was arrested in Indonesia in June 2007. (Comp. Ex. C-6 at 41:18-42:6; Ex. V at 44; Ex. W.)

**III.**
**ARGUMENT**

**A.   TRANS CONTINENTAL IS NOT ENTITLED TO A ONE-HALF SHARE IN THE COPYRIGHTS OF *MAKING THE BAND 2-4***

Count IV of the TAC is premised on TC's alleged joint ownership interest in the copyrights to MTB 2-4. In order to establish a copyright interest, TC must demonstrate that these shows are "joint works," which are defined as works "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. A "joint work" can exist in one of two ways: either by co-authorship of the copyrighted work, or by contractual co-ownership. Melville B. Nimmer & David Nimmer, 1 Nimmer on Copyright § 6.01 at 6-3 (2010). The Trustee does not specify whether he believes TC is a co-author or a contractual co-owner of the copyrights, but his damages claims fail as a matter of law under either theory.

**1.   TC is not a Co-Author of the Copyrights in Any Cycle of *Making the Band***

The Trustee cannot establish either prong of the test for copyright co-authorship. For a copyrightable work to be considered jointly authored, each purported co-author must *both* (1) make an independently copyrightable contribution of authorship, *and* (2) have the intent—at the time the work is created—that the work be jointly authored. *M.G.B. Homes, Inc.* v. *Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990);

9

*Nicholson* v. *Shaffe*, 2005 WL 6336948, at *6-7 (N.D. Ga. May 18, 2005); *see Design Options, Inc.* v. *BellePointe, Inc.*, 940 F. Supp. 86, 90 (S.D.N.Y. 1996).

> ### (a)   TC and Pearlman admittedly did not make any independently copyrightable contributions to any cycle of Making the Band

Joint authorship, logically, can only arise between "authors"—*i.e.*, those "to whom anything owes its origin." *Burrow-Giles Lithographing Co.* v. *Sarony*, 111 U.S. 53, 58 (1884). The touchstone of authorship is originality, meaning the work is "the product of one's own independent efforts, *i.e.* [that the work] has not been copied." Nimmer § 1.06[A], at 1-103. To be copyrightable, an "original" work must exhibit a degree of creativity—"a modicum of intellectual labor" that is "greater than *de minimis*," *id.*; *see also Feist* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991), and must be "fixed in any tangible medium of expression," 17 U.S.C. § 102(a). The law is clear that ideas are not copyrightable. *Id.* § 102(b) (copyright does not subsist in "any idea . . . concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied . . . .").

In the Eleventh Circuit, *joint* authorship only exists if each author's "contribution [is] independently copyrightable." *MacNeil* v. *Yates*, 2010 WL 2330275, at *4 (M.D. Fla. June 10, 2010) (citing *M.G.B. Homes*, 903 F.3d at 1492-93); *Fun Spot of Fla., Inc.* v. *Magical Midway of Cent. Fla., Ltd.*, 242 F. Supp. 2d 1183, 1196 (M.D. Fla. 2002).[4] "[A] person must add more than a word or a line to qualify as a joint author." Nimmer

---

[4]   As Trustee's counsel himself has acknowledged, most courts require independently copyrightable input "[i]n order to stymie claims from overreaching contributors." James Sammataro, FILM AND MULTIMEDIA AND THE LAW § 9:18, at 667 (2010). But, here, TC is nothing more than an "overreaching contributor[]." Mr. Sammataro has further commented that "[c]ollaboration alone is insufficient to establish joint authorship. . . ." *Id.* § 9:20 at 669-70.

§ 6.07[A][1], at 6-20.   Indeed, "each party must have contributed substantially and significantly to the final product in order for co-authorship to exist." *Designer's View, Inc.* v. *Publix Super Markets, Inc.*, 764 F. Supp. 1473, 1477 (S.D. Fla. 1991).   Pearlman and TC are not authors because they contributed no independently copyrightable original authorship to any cycle of MTB.

(i)      <em>Making the Band 1</em>

The Trustee has tried to establish that TC and MTVN were co-authors of MTB 1 by alleging that Pearlman created the show.   (*See, e.g.*, Ex. X at ¶¶ 29, 31, 32.)   Not only is this insufficient to support a copyright claim, since ideas are not copyrightable, but it is also factually incorrect.   The discovery record is undisputed on this point; Pearlman himself acknowledged that Ken Mok came up with the idea for the show, and McDonald and the Trustee (as 30(b)(6) witness) corroborated this testimony.   (Ex. A at 47; Comp. Ex. C at 62:9-64:18; Comp. Ex. D at 22:6; Comp. Ex. E at 51:14-21.)

In fact, none of TC's contributions rises to the level of authorship, much less the independently copyrightable expression necessary for joint authorship.   Greg McDonald testified that TC's contribution to MTB 1 included "[c]ash, expertise and the basic format of the program."   (Comp. Ex. D at 19:10-11; *see also* Comp. Ex. E-5 at 319:20-320:9 (Pearlman contributed expertise in making boy bands and management skills); Ex. Y at 23:18-25:6 (Pearlman's contributions included format and "business plan").)   However, the contribution of mere financing is insufficient to qualify for copyright co-authorship.   *Baker* v. *Robert I. Lappin Charitable Found.*, 415 F. Supp. 2d 473, 487 (S.D.N.Y. 2006).   The contribution of physical labor is also insufficient for authorship.   *Kyjen Co.* v. *Vo-Toys, Inc.*, 223 F. Supp. 2d

1065, 1068-69 (C.D. Cal. 2002).   The abstract notion of "expertise," just like ideas or concepts, is likewise not independently copyrightable.  *See* 17 U.S.C. § 102(b); *R.W. Beck, Inc.* v. *E3 Consulting, LLC*, 577 F.3d 1133, 1144 (10th Cir. 2009) ("When a work describes how to perform a task (a function), there is no copyright protection for the knowledge (the useful art) thereby conveyed.").

This leaves the claim of joint authorship based on the "format" of the show, which is insufficient to grant TC rights.  It is well established that elements of television formats—much like ideas—are generally not copyrightable.  Nimmer § 2.09[G], at 2-172, 173 (format not copyrightable); *Olson* v. *Nat'l Broad. Co.*, 855 F.2d 1446, 1453 (9th Cir. 1988) (same).  *Baris/Fraser Enters.* v. *Goodson-Todman Enters. Ltd.*, 5 U.S.P.Q.2d 1887 (S.D.N.Y. 1988) is instructive.  There, the court analyzed the similarities between the formats of two television game shows.  The court held that the devices needed for the game show to work—celebrity guests, questioning of contestants and ensuing comic banter, hesitation as a suspense device—were logical and necessary stock elements not subject to copyright protection.  *Id.* at 1891.  The stock elements on reality television shows like MTB—such as the concept of contestants competing to be selected for the band, or being documented putting together an album or tour—are similarly not copyrightable.

A plaintiff cannot "own an enforceable copyright in the 'basic concept' of a . . . reality show, even though the 'value of an unscripted program may lie almost entirely' in that idea," nor can a plaintiff claim ownership in stock format devices.[5]  *Castorina* v. *Spike*

---

[5]   Even the selection and coordination of stock elements may be "largely inherently functional to the idea of a [particular genre of] reality show, not 'original' creative expressions of any particular idea."  *Castorina* v.

*Cable Networks, Inc.*, 2011 WL 1118429, at *4 (E.D.N.Y. Mar. 24, 2011); *Survivor Prods. LLC* v. *Fox Broad. Co.*, 2001 WL 35829270, at *5 (C.D. Cal. 2001) (plaintiff "cannot [] seek copyright protection in the idea of reality programming"). Case law shows that there is not much more to a basic reality show than ideas and stock format elements. "[T]he idea of a reality television show where people compete for a prize is a basic staple of modern television programming." *Rodriguez* v. *Heidi Klum Co., LLC*, 2008 WL 4449416, at *4 n.11 (S.D.N.Y. Sept. 30, 2008); *see Castorina*, 2011 WL 1118429, at *4 (holding that plaintiff's synopsis of a reality show about professional athletes competing against amateurs "consists largely of stock concepts and 'scènes à faire'");[6] *Milano* v. *NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1295-96 (C.D. Cal. 2008) (plaintiff's synopsis of a weight loss reality competition show was "largely conceptual and describe[d] what is essentially an idea, which is not protected under copyright"); *Rodriguez*, 2008 WL 4449416, at *5 ("The similarities between the [synopsis] and Project Runway which Plaintiffs highlight in their submissions are predominantly *scenes a faire*.").

When asked what elements of the MTB show format TC contributed, McDonald responded as follows: "It was the format—the format was the Trans Continental *business model*. It was a training camp of young musicians and it was a constant talent audition *process*." (Comp. Ex. D at 22:10-16) (emphasis added). As in *Baris/Fraser*, TC's

---

*Spike Cable Networks, Inc.*, 2011 WL 1118429, at *5 (E.D.N.Y. Mar. 24, 2011). By its witnesses' own testimony, TC provided only unprotectable elements of format rather than any selection or organization thereof. (Ex. C-7 at 338:17-340:5; Ex. D at 19:10-11; *see also* Ex. E-5 at 319:20-320:9; Ex. Y at 23:18-25:6.)

[6] "Scènes à faire" are stock items that are "made inevitable by the action which leads up to [them]." William F. Patry, 2 Patry on Copyright § 4:24 (2011). They are not copyrightable.

training camp and talent audition process were simply stock elements necessary to successfully create a competition-elimination reality show based on the formation of a new band through auditions and training.  In fact, McDonald even testified that "Ken Mok came down and basically saw what Lou Pearlman did . . . . [H]e was basically doing a documentary of Lou Pearlman and his business operation."  (Comp. Ex. D at 21:16-21; *see also* Comp. Ex. E-6 at 109:12-15; Comp. Ex. E-5 at 321:14-18 (MTB was a "documentary" of Pearlman putting together a band); Ex. Y at 25:1-6 (MTB was a "docuseries" of Pearlman creating a band).)  Since the show was merely a documentary, TC certainly cannot claim a monopoly over the documentary format, itself, and cannot claim authorship of a work that was simply documenting real life as it occurred.[7]

In sum, as a matter of law, TC simply is not a co-author of MTB 1 because the evidence is undisputed that it did not contribute any copyrightable expression to the show, and the Trustee will be unable to proffer any evidence to the contrary.

(ii)      *Making the Band 2-4*

As to MTB 2-4, it is undisputed that TC offered no creative input whatsoever, much less any independently copyrightable contributions.  Pearlman admitted as much in his deposition.  (Comp. Ex. C-5 at 140:4-7 *see also id.* at 136:14-20; Comp. Ex. E-4 at 85:7-86:9

---

[7]    To the extent that the Trustee claims a copyright over TC's "business model," it is well-established copyright policy that a "business model" is not subject to copyright protection.  *CCC Info. Servs., Inc.* v. *MaClean Hunter Mkt. Rpts., Inc.*, 44 F.3d 61, 71 n.22 (2d Cir. 1994) (noting that section 102(b) of the Copyright Act "denies protection to 'any idea, procedure, *process*, system, *method of operation*, concept, principle, or discovery'"; noting that 37 C.F.R. § 202.1(b) "denies protection to '[i]deas, plans, *methods*, systems, or devices'"; noting that "Copyright Office Circular 31 maintains that 'Copyright protection is not available for "ideas or procedures for doing, making, or building things; . . . *business operations or procedures* . . . ."'") (emphases added).  TC's alleged contributions simply cannot form the basis of copyright authorship of MTB 1.

(Pearlman made no contribution to MTB 2-4).)  Pearlman further testified that he and TC were not involved in casting, training, or judging artists, and did not contribute any writing, ideas, formats, themes, or plot lines for MTB 2-4.  (Comp. Ex. C-5 at 141:20-143:6.)[8]  In fact, by January 2007, Pearlman had left the country and was fleeing justice after his long-running Ponzi scheme collapsed.  (Comp. Ex. C-6 at 41:18-44:6.)  MTB 4 first aired in June of 2007; Pearlman plainly could not have had any input during the show's production while he was hiding abroad.  (Comp. Ex. C-5 at 144:13-21.)

Nor did MTB 2-4 follow the same "format" as defined by McDonald.  MTB 1 documented how Pearlman put together a boy band based on his pre-existing methods.  MTB 2-4 documented how Combs put together various hip-hop and R&B groups based on *his* own pre-existing methods.  (Comp. Ex. Z-1 at 141:23-142:1, 142:18-25, 143:1-4.)  Significantly, Combs did not even watch MTB 1 before implementing his techniques in MTB 2-4.  (Comp. Ex. Z at 45:24-46:5; Comp. Ex. Z-1 at 143:5-24.)

### (b)     *There was no intent to be co-authors of* **Making the Band 2-4**

In order to be co-authors, the parties must also *intend* to share authorship.  *Latimer* v. *Roaring Toyz, Inc.*, 550 F. Supp. 2d 1345, 1356 (M.D. Fla. 2008), *rev'd in part on other grounds*, 601 F.3d 1224 (11th Cir. 2010).  Both parties must have this intent at the time the work is created.  *Nicholson*, 2005 WL 6336948, at *7; *Design Options*, 940 F. Supp. at 90.

The evidence is undisputed that neither party intended to jointly author MTB 2-4.  As demonstrated above, by Pearlman's own admission, TC had no involvement in MTB

---

[8]     TC also did not contribute any money toward MTB 2-4.  (Ex. C-5 at 136:21-137:1; Ex. E-4 at 84:7-16.)

2-4. (Comp. Ex. C-5 at 140:4-7; *see also* Comp. Ex. E-4 at 85:7-86:9.) Moreover, Pearlman was not even in the country starting in early 2007. (Comp. Ex. C-6 at 41:18-42:6.) TC could not have had an intent to be a joint author given that it did not make a single contribution and its principal was not even available to work on the program.

MTVN most certainly had no intent to co-author the shows. Indeed, a crux of the Trustee's own complaint is that MTVN lacked such intent; thus, the Trustee alleges that MTVN "exclud[ed] [TC] from the creative process." (Ex. X at ¶ 63(b).) McDonald's letter to MTVN in 2002 and Kranzdorf's substantially identical letter in 2005 both stated that TC's participation in the later cycles of MTB "ha[d] been excluded", (Ex. O; Ex. P), and Kranzdorf testified that TC "had been completely excluded from . . . the creative process . . . ." (Comp. Ex. AA at 133:7-14; Comp. Ex. AA-1 at 178:15-19.)[9]

Because it is indisputable that TC is not a co-author of MTB under federal copyright law, the Trustee's claim to half of all moneys flowing from the MTB copyright— including advertising revenue and cable carriage fees—fails as a matter of law.

**2. Even if TC Was a Co-Author, it Would Not be Entitled to a One-Half Share in MTVN's Advertising Revenue or Cable Carriage Fees**

*(a) Copyright law limits the Trustee's damages, if any*

Even if TC was a co-author, the Trustee does not recover advertising revenue or cable carriage fees under copyright law because a co-author is only entitled to an

---

[9]    To the extent TC believes MTB is a single continual show, even if MTVN had intent to co-author MTB 1 (which Defendants do not concede), this does not mean that MTVN *ipso facto* had intent to co-author MTB 2-4. As discussed above, the author's intent must be present at the time of the creation of the particular work. *Nicholson*, 2005 WL 6336948, at *7. MTB 2-4 were created at different points in time from MTB 1.

accounting of moneys that are "earned on the work." *MacNeil*, 2010 WL 2330275, at *3. For example, in *Strauss* v. *Hearst Corp.*, 1988 WL 18932 (S.D.N.Y. Feb. 19, 1988), plaintiff was held to be not entitled to defendant magazine's advertising revenues for the unauthorized use of a joint work—plaintiff's photograph—in a promotional brochure for the magazine. *Id.* at *6. The photograph "constituted only one element of the [promotional] insert which was itself probably only a small portion of the total efforts used to induce business to advertise" in defendant's magazine. *Id.*; *cf. Walker* v. *Forbes, Inc.*, 28 F.3d 409, 412-13 (4th Cir. 1994) (upholding jury's determination that advertising revenue and magazine subscription fees were not attributable to the use of an infringing photograph in magazine, because advertisements were based on the magazine's reputation and readership, and subscriptions were based on "reputation and repeated experience" with the magazine); *Mackie* v. *Rieser*, 296 F.3d 909, 916 (9th Cir. 2002) (denying subscription fees as damages after finding that connection between infringing use of plaintiff's artwork in promotional brochure for symphony was too attenuated because the court could "surmise virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question"). The same is true here.

Like in *Strauss*, since MTVN's advertising revenue and cable carriage fees are not "earned on the work" (*i.e.*, MTB), they are not streams of revenue that are shared between co-authors. MTB was but one input in the entire package of MTVN programming that was used to attract advertisers. The discovery record is undisputed that MTVN sells and places its advertisements based on viewer numbers and demographics of the network, or by specified time periods—and not based on a particular show. (Ex. UU at 82:19-23, 84:5-

85:19; Comp. Ex. BB at 105:11-16; Comp. Ex. BB-1 at 141:2-142:3; Comp. Ex. H-3 at 264:10-23; *see* Comp. Ex. M-2 at 349:15-351:19.)  "With one or two exceptions a year, no one buys [advertising for] a specific show.  And those shows are events: Video Music Awards, Movie Awards." (Comp. Ex. H-3 at 264:14-17.)  Otherwise, advertising is sold on a "run of schedule" basis—that is, advertisers buy the opportunity to have their ads shown to a certain number of viewers of a certain demographic makeup across the MTVN *schedule*, with no requirement that their spots will air on any particular show.

The disconnect between ad sales for the network's overall schedule and advertising on any particular show is underscored by the fact that MTVN does not even maintain records in the regular course of business that break down advertising revenue by show.  (Comp. Ex. BB-2 at 37:21-38:15.)  To address the Trustee's overreaching discovery demands, MTVN created, for the first time and solely for the purpose of this litigation, documents that attempted to track approximate advertising revenue associated with MTB.  (Comp. Ex. BB-3 at 189:7-190:10; Ex. CC; Ex. DD.)  Of course, if MTVN considered advertising revenue as being earned on a given program, or if any of its myriad production partners and net participants believed it to be so, then these records would have been kept in the normal course of business.  Thus, advertising revenue cannot be said to be "earned" on MTB itself, but rather is a product of the network's offerings as a whole, based on its overall track record of reaching certain demographic groups—and is in no way directly traceable to MTB.

This attenuation is even greater for cable carriage fees—that is, the fees that cable services such as Time Warner, Comcast, and the like pay for the right to transmit

MTVN's content.  For one, there is no evidence in the record of such carriage fees.  Although the Trustee propounded over 200 discovery requests on MTVN, he never sought data concerning carriage fees.  Instead, he rests his claim for $29 million of damages on a feeble estimation by one of his purported experts, which, in the *Daubert* motion filed concurrently with this motion, the Defendants demonstrate to be utterly unreliable.[10]

Even if, contrary to fact, there was reliable evidence of cable carriage fees in the record, such fees are not appropriate copyright damages because they are not, as a matter of law, "earned on the work."  *MacNeil*, 2010 WL 2330275, at *3.  Plainly, MTB was one of hundreds, if not thousands, of offerings aired on MTV over the relevant decade.  As in *Mackie*, over that period one could "surmise virtually endless permutations" of reasons why a cable service would choose to pay MTVN to offer its content—none of which are tied to MTB.

### (b)  The Agreements do not grant TC advertising revenue or cable carriage fees

Even if this Court holds that there is a question of fact as to TC's authorship of MTB, it should still award summary judgment dismissing the Trustee's damages theories that seek advertising revenue and cable carriage fees.  As a co-author, TC's interests in the copyright would be limited by the terms of any applicable agreement.  Joint authors only share equally in the proceeds of the work "[*i*]*n the absence of agreement to the contrary*."

---

[10]  The Trustee's expert, Richard Marks, claims, incorrectly, that the Trustee had requested data relating to carriage fees and that it was the subject of a pending motion to compel.  (Ex. EE at 22 n.8.)  Rather, the Trustee asked for *tax returns* and suggested in his motion that such information would reflect carriage fees.  (Ex. FF at 3.)  In its opposition, MTVN demonstrated, through sworn evidence from MTVN's tax department, that the tax returns would not reflect such information.  (Ex. GG at 4-5.)

Nimmer § 6.08, at 6-34 (emphasis added).  The Agreements do not entitle TC to advertising revenue or cable carriage fees, as the Trustee's witnesses have repeatedly admitted and the undisputed discovery record makes plain.

The 2000 Agreement does not address these revenues, which the parties never contemplated sharing.  (Ex. F.)  Instead, ABC retained all advertising revenue because it was broadcasting the show.  Paragraph 11, which relates to domestic and foreign licensing, does not contemplate advertising.  Under the 2001 Agreement, the Net Proceeds provision specifically precludes the sharing of broadcast revenues such as advertising sales.  (Ex. K ("Net Proceeds" includes revenues received from all sources worldwide by MTVN in connection with "Ancillary Uses" of the Series "*excluding exhibition on MTVN worldwide programming services*") (emphasis added).)

The testimony in this case supports these conclusions.  Pearlman himself testified that neither the 2000 Agreement nor the 2001 Agreement provided TC with an entitlement to MTVN's advertising revenue.  (Comp. Ex. C-1 at 87:11-24; Comp. Ex. C-8 at 107:18-108:1.)  McDonald also testified that, because ABC was paying a license fee for MTB, TC was not entitled to advertising revenue; nothing in the 2000 Agreement referred to splitting advertising revenue and TC was not entitled to advertising revenue with respect to MTB 1.3 under the 2001 Agreement.  (Comp. Ex. D-3 at 78:18-79:2; Comp. Ex. D-4 at 95:23-96:10; Comp. Ex. D-5 84:10-13.)  The Trustee, in his capacity as TC's 30(b)(6) representative, testified that TC was not entitled to advertising revenue for MTB 1.1 and 1.2, and was unable to point to a specific contractual provision entitling TC to advertising revenue for MTB 2-4.  (Comp. Ex. E-7 at 114:11-21; Comp. Ex. E-8 at 122:12-124:16.)  The

Trustee even conceded, in his Objection and Response to the Mediator's Recommendation filed with this Court on April 1, 2010, that the Agreements do not call for sharing advertising revenue.  (Ex. HH at 2) ("Trans Continental further agrees with the Mediator's finding that neither the parties' January 7, 2000 Joint Venture Agreement nor the November 15, 2001 Amended Agreement . . . require the sharing of advertising revenue.").)

The parties' course of conduct is likewise uncontroverted on this point.  *None* of the many participation statements that MTVN sent to TC mentioned advertising or cable carriage fees, and TC never once requested a share of these monies in its demands for accountings.  (*See, e.g.*, Comp. Ex. II-1; Comp. Ex. II-2; *see also* Comp. Ex. S through S-11; Comp. Ex. E-9 at 347:6-19.)  Moreover, in *none* of the several letters that were exchanged between the parties contemporaneously did TC ever explicitly ask for an entitlement of advertising revenue or cable carriage fees.  (Ex. O; Ex. JJ; *see also* Comp. Ex. D-2 at 118:24-119:5.)  Even TC's lawyers' requests for accountings in 2006 did not mention advertising or carriage fees.  (*See, e.g.*, Ex. T; Ex. U.)  Thus, even as a joint author, the Trustee is not entitled to the excessive damages he claims.

Additionally, even if advertising revenue or carriage fees were to be shared under the 2000 Agreement—which they clearly were not—the Trustee cannot recover them to the extent that they are barred by the six-year statute of limitations.  *See, e.g.*, *Ely-Cruikshank Co.* v. *Bank of Montreal*, 81 N.Y.2d 399, 403 (N.Y. 1993).  Under New York law, a claim for breach of contract accrues at the time of the breach.  *Id.* at 402.  Absent a showing of fraud, the statute of limitations begins to run even if the plaintiff does not know of the breach.  *Id.* at 403.

For the same reason, the Trustee would not be entitled to recover for any breach of contract claim based upon MTVN's airings of MTB 1.1 and 1.2, which originally aired on ABC and were subsequently aired on MTV. Specifically, any claim that the 2000 Agreement obliged MTVN to pay a license fee for airing MTB 1.1 and 1.2 on its network would clearly be barred by the statute of limitations, since MTVN aired episodes of MTB 1.1 and 1.2 between January 13, 2001 and November 24, 2001—almost seven years before the Trustee filed this lawsuit. (Ex. VV.) Assuming that these airings constituted a breach of the parties' agreements, which MTVN disputes, the Trustee's failure to bring the claim within the six years following the last airing of those episodes bars him from now seeking damages for those airings.

**3.     Even if TC Were a Contractual Co-Owner of the Copyright in *Making the Band 2-4* the Trustee is Not Entitled to the Exorbitant Damages He Seeks**

Since TC is not a co-author, the only other way TC can obtain a copyright interest in MTB is by contractual co-ownership. Two or more parties may own a copyright jointly by virtue of a contractual arrangement. 17 U.S.C. § 201(d)(2); *see also Erickson* v. *Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994). The entitlements of contractual co-ownership of a copyright are governed by the terms of the applicable agreement, which is interpreted under state law. *See, e.g., Merchant* v. *Levy*, 92 F.3d 51, 55 (2d Cir. 1996).

There is a factual dispute as to which Agreement, if any, applies past MTB 1.3 and, as such, the resolution of this issue is inappropriate for summary judgment. For purposes of this motion, viewing all facts in favor of the Trustee, MTVN assumes that TC has a contractual copyright interest in MTB 2-4 as a result of the Agreements. However,

even if TC retains a contractual copyright interest in MTB 2-4, its damages, if any, are limited to those revenue streams spelled out in the Agreements.[11]  For the reasons set forth immediately above, the undisputed discovery record—including the plain language of the Agreements, the Trustee's admissions, and the parties' undisputed course of conduct— demonstrates that TC is not entitled to advertising revenue and cable carriage fees.  *See, e.g.*, *Merchant*, 92 F.3d at 55.

**B.    THE TRUSTEE'S CLAIM OF UNFAIR COMPETITION FAILS BECAUSE TRANS CONTINENTAL HAD NO INTEREST IN THE "MAKING THE BAND" TRADEMARK**

To succeed on a claim under Section 43(a) of the Lanham Act, the Trustee must show that TC had a valid ownership interest in the trademark and that there is a likelihood of confusion on the part of viewers.  *Planetary Motion, Inc.* v. *Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001); *Automobili Lamborghini SpA* v. *Lamboshop, Inc.*, 2008 WL 2743647, at *4 (M.D. Fla. June 5, 2008).  The undisputed evidence establishes that TC never had an ownership interest in the "Making the Band" mark, so this Court need not address likelihood of confusion.

**1.    TC Does not Own the "Making the Band" Mark**

Neither the 2000 nor the 2001 Agreements mention ownership of the "Making the Band" mark, much less vest TC with any ownership rights therein.  In fact, the Trustee's own complaint concedes that the trademark is not addressed in either Agreement: "There is

---

[11]    (Ex. F (2000 Agreement ¶¶ 7, 8, 9, 10, 11, 12: merchandise, print publishing, music publishing, internet rights, domestic and foreign distribution, and home video); Ex. K (2001 Agreement ¶ 9 & Sched. A, ¶ 11: net proceeds in ancillary revenues (network television exhibition, videocassette and videodisc distribution, worldwide merchandising); artist album and merchandising revenues.))

no express mention as to how the trademark in and to Making the Band was to be handled." (Ex. X at ¶ 181 & n.13.)

Further, Pearlman approved a Merchandise License Agreement in April 2000 that contained a trademark notice provision explicitly recognizing that "Making the Band" is an MTVN trademark.  (Ex. KK at MTVN 010222.)[12]  The agreement states, in a section entitled "Trademark Notices," that the licensee would place the following notice on all relevant merchandise: "'Making the Band' and all related titles and logos are trademarks of MTV Networks, a Division of Viacom International Inc."  (*Id.*)  Below this provision, Pearlman signed the agreement in his capacity as president of Trans Continental Records, Inc. and Trans Continental Television Productions, Inc.  (*Id.*; *see* Comp. Ex. C-9 at 203:18-205:1.)

Moreover, there are numerous drafts of another O-Town merchandise licensing agreement between MTVN, TC, and Signatures Network, Inc. that similarly indicate that MTVN is the sole owner of the "Making the Band" mark.  For example, the "Trademark Notice" sections of two drafts say "MAKING THE BAND and all related titles and logos are trademarks of MTV Networks, a division of Viacom International Inc."  (Ex. LL at TCP 19376; Ex. MM at TCP 20205.)  E-mails among MTVN, Signatures, and TC

---

[12]   Notably, this contract was produced to the Trustee by MTVN on June 15, 2009—six months before the Trustee amended his complaint to assert a Lanham Act claim on December 31, 2009.  Thus, the Trustee was on notice for a half a year that there was no factual basis for his unfair competition claim.

show TC was aware of these terms. (Ex. NN at TCP 19858.)[13]   There is *no* evidence of TC ever suggesting otherwise.

### 2.    The Trustee's Claim of Unfair Competition is Barred by Laches

Even if TC had rights in the "Making the Band" mark, the record is clear that TC unreasonably delayed in bringing the unfair competition claim.  Laches bars a Lanham Act claim if a plaintiff (1) delayed in asserting a right or claim; (2) the delay was not excusable; and (3) it resulted in undue prejudice.   *Kason Indus., Inc.* v. *Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997).   Federal courts borrow the limitations period from the most closely analogous state law cause of action which, in Florida, is the four-year statute of limitations for trademark dilution.   *See Mulholland* v. *Mulholland*, 2009 WL 1117411, at *2 (M.D. Fla. Apr. 24, 2009); Fla. Stat. §§ 495.151, 95.11(3).   If a claim "is filed after the analogous limitations period," the claim is presumptively barred absent a showing by the plaintiff of a valid excuse for the delay.   *S. Grouts & Mortars, Inc.* v. *3M Co.*, 2008 WL 4346798, at *3 (S.D. Fla. Sept. 17, 2008) (internal quotation marks omitted).

### (a)    TC unreasonably delayed in filing its Lanham Act claim

TC should have raised its unfair competition claim years ago.   A Lanham Act claim accrues when a "plaintiff knows or should know she has a provable claim."   *Kason*

---

[13]    The Court need not address the "likelihood of confusion" prong because the Trustee's lack of ownership in the mark is dispositive.  *See Grimes Contracting, Inc.* v. *Grimes Util., Inc.*, 2009 WL 88571, at *7 (M.D. Fla. Jan. 13, 2009) ("Because Plaintiffs have failed to demonstrate 'ownership' sufficient to support its Motion for Preliminary Injunction, the Court need not consider the 'likelihood of confusion.'").  Indeed, "[o]wnership of a mark must first be considered before an inquiry is made into likelihood of confusion," *id.* at *2 (quoting *Ambrit, Inc.* v. *Kraft*, 812 F.2d 1531 (11th Cir.1986)), and TC cannot surpass this hurdle as a

*Indus.*, 120 F.3d at 1206.  TC should have known of its claim as of the 2000 Merchandise License Agreement or as of Viacom International Inc.'s publicly filed registration of the "Making the Band" mark in its sole name on December 11, 2001. (Ex. KK; Ex. OO.)  At the very latest, TC was aware of its claim when it found out about Combs's involvement in MTB in July 2002 (Comp. Ex. AA-2 at 203-206; Comp. Ex. C-4 at 250:17-19; Comp. Ex. E-2 at 77:23-78:5; Comp. Ex. E-3 at 301:3-302:7), or when MTB 2 first aired in October 2002. Under any of these scenarios, the Trustee's January 25, 2010 filing was unreasonably late, and the Trustee has no excuse for a more than seven-year delay.

### (b)  MTVN has suffered both evidentiary and economic prejudice

TC's unreasonable and unexcused delay resulted in prejudice to MTVN. Evidentiary prejudice arises "due to the loss of records . . . or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts."  *S. Grouts*, 2008 WL 4346798, at *6.  Many employees from TC and MTVN who were involved in MTB have faded memories of contracts signed in 2000 and 2001.  (*See, e.g.*, Comp. Ex. PP at 47:6-49:3; Comp. Ex. PP-1 at 59:8-24.)  What is more, Pearlman's corporate empire crumbled in 2007, and the Receiver initially appointed for TC has stated that TC employees destroyed large quantities of documents.  (*See* Ex. QQ.)

MTVN also suffered economic prejudice due to its significant "investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period . . . ."  *S. Grouts*, 2008 WL 4346798, at *5.  In

---

matter of law.  Should the Court choose to address this issue, TC cannot establish a likelihood of confusion because it has not produced any evidence related thereto in discovery.

ten years of MTVN's continuous use of the mark, TC never claimed that it owned the mark, and MTVN had no reason to believe it might be subject to an unfair competition claim. *See Pro Football, Inc.* v. *Harjo*, 565 F.3d 880, 884 (D.C. Cir. 2009). TC should not have been allowed to sit idly by while MTVN incurred increasing costs associated with the "Making the Band" trademark before bringing its claim.

Based on the unreasonable and inexcusable delay and consequent prejudice to MTVN, the Trustee's unfair competition claim should be barred by laches.

**C.    THE TRUSTEE'S CLAIM BASED ON THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS BECAUSE IT IS DUPLICATIVE OF THE TRUSTEE'S BREACH OF CONTRACT CLAIM**

The allegations in the Trustee's claim for breach of the covenant of good faith and fair dealing are duplicative of the allegations in the Trustee's breach of contract claim and therefore should be dismissed. A claim for a breach of the covenant of good faith and fair dealing fails "as redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim for breach of covenant of an express provision of the underlying contract." *In re Houbigant Inc.*, 914 F. Supp. 964, 989 (S.D.N.Y. 1995); *Geler* v. *Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991) (claim for breach of covenant of good faith and fair dealing was duplicative of breach of a contract claim where the allegations "presuppose[d] that the [defendant] breached the express terms of the contract"). The Court should thus grant summary judgment on this claim. *See, e.g., Parker E. 67th Assocs., L.P.* v. *Minister, Elders & Deacons*, 754 N.Y.S.2d 255, 256 (App. Div. 2003) (affirming dismissal of duplicative claims).

**D.    THE TRUSTEE'S UNJUST ENRICHMENT CLAIM IS PRECLUDED BY THE PRESENCE OF VALID WRITTEN AGREEMENTS, IS PREEMPTED BY COPYRIGHT LAW, AND FAILS ON THE MERITS**

The Trustee's unjust enrichment claim fails for a number of reasons.  Such a claim is precluded by the Agreements and is preempted by copyright law.  Moreover, TC cannot prove out the elements of an unjust enrichment claim.

**1.    The Trustee's Unjust Enrichment Claim is Precluded by the Presence of Valid Written Agreements**

The 2000 and 2001 Agreements, which govern the relationship between TC and MTVN, clearly preclude any recovery by the Trustee under a theory of unjust enrichment.  It is improper to seek damages for unjust enrichment where there is a "valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."  *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (N.Y. 1987) (unjust enrichment is only proper "*where there has been no agreement or expression of assent, by word or act, on the part of either party involved*"); *accord Beth Isr. Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("*Clark-Fitzpatrick* precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter . . . ."); *Goldman* v. *Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. 2005).

The Trustee claims that the Viacom Defendants have unjustly received a benefit from the airing of MTB 2-4 and the alleged spinoffs.  (Ex. X at ¶¶ 161-164.)  However, the Trustee's breach of contract claims under the 2000 and 2001 Agreements—whose validity neither party disputes—are predicated on the *exact* same facts: the production and airing "of nine (9) subsequent seasons of Making the Band . . . Making His Band, There

and Back and Taquita & Kaui."  (Ex. X at ¶ 72; *see id.* at ¶¶ 161-64.)  The Trustee cannot

assert his alleged contractual rights through a breach of contract claim and simultaneously

pursue relief from the same acts under a quasi-contractual unjust enrichment theory based on

the *absence* of a contract.[14]  *See Bettan* v. *Geico Gen. Ins. Co.*, 296 A.D.2d 469, 470 (N.Y.

App. Div. 2002) (dismissing unjust enrichment claim as duplicative of breach of contract

action "seek[ing] damages for events arising from the same subject matter that is governed

by an enforceable contract").[15]

### 2.     The Trustee's Unjust Enrichment Claim is Preempted by the Federal Copyright Act Because it is Based on Rights Protected by the Act

The Trustee's unjust enrichment claim also fails because it is precluded by the

federal Copyright Act.  The Copyright Act "preempts a state cause of action if the subject

matter of the state law right falls within the subject matter of federal copyright law and the

state law rights are equivalent to the rights federal copyright law protects."  *Netzer* v.

*Continuity Graphics Assocs., Inc.* 963 F. Supp. 1308, 1321 (S.D.N.Y 1997) (dismissing

unjust enrichment claims based on copyright co-authorship and co-ownership theories);

*accord Crow* v. *Wainwright*, 720 F.2d 1224, 1225-26 (11th Cir. 1983); *see* 17 U.S.C. § 301.

---

[14]   Though there may be a dispute as to the terms and applicability of the Agreements, there is no dispute as to their existence or validity, and therefore the Trustee may not proceed on both a breach of contract and unjust enrichment theory. *Compare Jim Longo, Inc.* v. *Rutigliano*, 294 A.D.2d 541, 542 (N.Y. App. Div. 2002) (dismissing unjust enrichment claim because "plaintiff has chosen not to repudiate the agreement but rather to sue under its terms"), *with Nakamura* v. *Fujii*, 253 A.D.2d 387, 390 (N.Y. App. Div. 1998) (allowing breach of contract and unjust enrichment claim only because "bona fide dispute exists as to the existence of the contract").

[15]   The only factor that differentiates the Trustee's unjust enrichment claim is his assertion that some MTVN witnesses testified that TC is not entitled to proceeds because neither contract governs TC's rights to the shows produced after MTB 1.3.  (*See* Ex. X at ¶ 160.)  However, the Trustee cannot have it both ways, claiming a contract applies while trying to make an end-run around the bar on duplicative unjust enrichment claims by cherry-picking testimony without actually repudiating the contract.

A state law claim predicated on "unauthorized publication is preempted by federal Copyright law unless it involves rights that are 'different in kind' from those protected by the Copyright statute." *Netzer*, 963 F. Supp. at 1322 (internal citation omitted). "Courts have generally concluded that the theory of unjust enrichment protects rights that are essentially 'equivalent' to rights protected by the Copyright Act; thus, unjust enrichment claims relating to the use of copyrighted material are generally preempted." *Id.*

MTB 1-4 and the alleged spinoffs clearly fall within the subject matter of the Copyright Act, *see* 17 U.S.C. §§ 102(a), and the explicit basis of the Trustee's unjust enrichment claim is TC's alleged co-ownership interest "[p]ursuant to the United States Copyright Act" and its supposed entitlement to the rights accorded thereunder. (Ex. X at ¶¶ 133-35, 143, 159); *see* 17 U.S.C. § 106 (enumerating copyright owner's exclusive rights, which include reproduction, distribution, and public performance). Because here the "gravamen of the unjust enrichment claim is unauthorized exploitation . . . without providing an accounting," which is protected by the Copyright Act, the Trustee's claim is preempted. *Netzer*, 963 F.Supp. at 1322; (*see* Ex. X at ¶165 (claiming "[i]t would be inequitable . . . to allow [Defendants] to retain the full benefit of the exploitation").)

### 3. The Trustee's Unjust Enrichment Claim Fails on Its Merits Because TC Suffered No Expense and Conferred No Benefit on MTVN

Even assuming the Trustee could bring a claim for unjust enrichment, any such claim fails on the merits. To sustain an unjust enrichment claim, "a plaintiff must establish '1) that the defendant benefited; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution.'" *Ambase Corp.* v. *City Investing Co. Liquidating Trust*, 2002 WL 1888860, at *2 n.2 (S.D.N.Y. Aug. 16, 2002) (internal citations omitted).

TC did not confer a benefit on MTVN (at TC's expense) for MTB 2-4 or the alleged spinoffs because TC contributed nothing at all to these shows, either creatively or financially.

First, as discussed above, it is undisputed that Pearlman and TC contributed nothing creative to MTB 2-4 or the alleged spinoffs. (Comp. Ex. C-5 at 136:14-20, 140:4-7, 141:20-143:6, 144:13-21, 149:14-151:2; Comp. Ex. E-4 at 85:7-86:9.) All the Trustee can allege is that TC contributed some nebulous "interest in the television series" (Ex. X at ¶ 161, 162)—an interest which the Trustee cannot even define.[16] Pearlman and TC did not even contribute any money toward MTB 2-4. (Comp. Ex. C-5 at 136:21-137:1; Comp. Ex. E-4 at 84:7-16.) TC cannot have conferred a benefit upon MTVN if it conferred nothing at all.

Even if TC conferred a benefit upon MTVN, TC did not incur any expense in doing so. As noted above, TC bore none of the expenses for MTB 2-4 and the alleged spinoffs, and therefore TC cannot show that MTVN was enriched at TC's "expense." (Comp. Ex. C-5 at 136:21-137:1; Comp. Ex. E-4 at 84:7-16.) In fact, TC even received payments from MTVN for certain episodes of MTB 2, making this claim of unjust enrichment all the more groundless.[17] (*See* Comp. Ex. C-5 at 136:21-143:6, 150:14-151:2; Ex. K at ¶¶ 12-13; Ex. RR; Ex. SS; Ex. TT.)

---

[16]   To the extent the Trustee is arguing that TC's contributions to MTB 1 benefited MTVN for MTB 2-4, this claim is flawed because Ken Mok created the idea for MTB (Ex. B at 26:23-31:6; Comp. Ex. C-10 at 58:2-59:6; Ex. A at 47; Comp. Ex. D at 21:22-22:2), and TC and Pearlman's contribution of formats and methods was limited to the stock elements that appear on any competition-style reality television show. See discussion, *supra*, pp. 10-15.

[17]   While it need not be resolved for purposes of this motion, MTVN's participation department mistakenly believed that the 2001 Agreement applied from MTB 3.1 onwards. In calculating the amounts owing to TC, MTVN's participations department therefore applied the terms of the 2000 Agreement to MTB 1.3, 2.1, 2.2, and 2.3. This mistake resulted in MTVN paying TC approximately $229,942 more for MTB 1.3,

Under these circumstances, where the Trustee seeks to be paid for television shows from which TC has reaped a benefit without making any contribution or incurring any expense, it is clear that the Trustee falls far short of the standard for unjust enrichment, including showing that "'equity and good conscience' require restitution." *Ambase*, 2002 WL 1888860, at *2.    Accordingly, the Trustee's unjust enrichment claim should be dismissed.[18]

## IV.
## CONCLUSION

For the foregoing reasons, the Viacom Defendants respectfully request that this Court grant their motion for partial summary judgment, and grant the following relief: dismiss Count III (breach of covenant of good faith and fair dealing) in its entirety; enter an order on Count IV declaring that TC is not a co-author of the copyrights in any cycle of MTB (and deny the Trustee's request to compel Defendants to amend the copyright registrations) and stating that, even if TC is an author or contractual co-owner, it is not entitled to any advertising revenue or cable carriage fees, or licensing fees for the airing of MTB 1.1 and 1.2 on MTV's network; dismiss Count X (unjust enrichment) in its entirety; dismiss Count XI (unfair competition) in its entirety (and thus deny TC's request to preclude Defendants from

---

2.1, 2.2, and 2.3 than it would have had it applied the 2001 Agreement—a fact which was not discovered prior to the commencement of this litigation.  MTVN has not sought to recover this overpayment from TC.

[18]    The Trustee's claim against Viacom Inc. is even more inappropriate, as any alleged benefit would have been for MTVN, not its corporate parent.  *See, e.g.*, *Gary Powell, Inc.* v. *Mendel/Borg Grp., Inc.*, 655 N.Y.S.2d 558, 559 (App. Div. 1997) (affirming dismissal of breach of contract claim against the principals of the corporate defendant where the services were not performed for the benefit of the principals); *Metro. Elec. Mfg. Co.* v. *Herbert Constr. Co.*, 583 N.Y.S.2d 497, 498 (App. Div. 1992) ("That [defendants] consented to the improvements provided by the plaintiff and accepted the benefits does not render them liable to the plaintiff.").

using the "Making the Band" trademark and to compel Defendants to sell the mark as part of the purported dissolution of the joint venture); and grant any other relief this Court deems just and reasonable.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 3.01(j), the Viacom Defendants respectfully request a total of one hour of oral argument on their Motion for Summary Judgment.

Dated:  This 1st day of June, 2011.

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

1285 Avenue of the Americas
New York, New York  10019-6064
Tel:  (212) 373-3000
Fax: (212) 757-3990

/s/ Leslie Gordon Fagen
Leslie Gordon Fagen
lfagen@paulweiss.com
(admitted *pro hac vice*)
Andrew G. Gordon, Esq.
agordon@paulweiss.com
(admitted *pro hac vice*)
Andrew J. Ehrlich, Esq.
aehrlich@paulweiss.com
(admitted *pro hac vice*)

**HOLLAND & KNIGHT LLP**

200 South Orange Ave.
Suite 2600
Orlando, FL 32801
Telephone: (407) 425-8500
Facsimile: (407) 244-5288

Brian A. McDowell
Florida Bar No. 765521
brian.mcdowell@hklaw.com
Edward M. Fitzgerald
Florida Bar No. 0010391
edward.fitzgerald@hklaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 1st, 2011, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following counsel of record: James G. Sammataro, Esq., Kasowitz Benson Torres & Friedman, LLP, Four Seasons Tower, 1441 Brickell Avenue, Suite 1420, Miami, FL 33131; Daniel E. Traver, Esq., GrayRobinson, P.A., 301 E. Pine Street, Suite 1400, Orlando, FL 32801; Jonathan D. Davis, Esq., Jonathan D. Davis P.C., 99 Park Avenue, Suite 1600, New York, New York 10016.


/s/ Andrew J. Ehrlich
Andrew J. Ehrlich, Esq.