# EXHIBIT O

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

```
---------------------------------
In re:                           )
                                 )
LOUIS J. PEARLMAN, et al.,       )
                                 )
            Debtor.              )  Case No.
_____   6:10-cv-181-Orl-28-DAB
                                 )
SONEET KAPILA, Chapter 11        )  VOLUME I
Trustee for TRANS CONTINENTAL    )
TELEVISION PRODUCTIONS, INC.,    )
                                 )  CONFIDENTIAL
            Plaintiff,           )
                                 )
v.                               )
                                 )
MTV NETWORKS, a division of      )
Viacom, International, Inc.,     )
                                 )
            Defendant.           )
---------------------------------
```

THIS TRANSCRIPT IS CONFIDENTIAL

PURSUANT TO CONFIDENTIALITY AGREEMENT

Deposition of ELAINE P. DOUGLAS at 10100 Santa

Monica Boulevard, Suite 1725, Los Angeles,

California, commencing at 9:53 A.M., Friday,

May 6, 2011, before Irma C. Hogan, CSR No. 4877.

PAGES 1 - 84

Page 45

1  Q. Like 65, 75 percent?  11:02:30AM
2  A. But the provision in the imputed fees is that
3  that -- those imputed fees increase as seasons are
4  picked up. And then there's what we call the day of
5  reckoning in the sense that if it achieves a certain  11:02:47AM
6  number of seasons, then -- and the ratings are at a
7  certain level -- that that entire deficit that may
8  have been incurred prior to that is made up for.
9  Q. Through renegotiation?
10  A. No. No. Through -- this is part of --  11:03:08AM
11  Q. The rescheduling?
12  A. -- Exhibit A, if you will.
13  Q. Through a schedule?
14  A. Right. Right.
15  Q. That contemplates if there's later success,  11:03:17AM
16  you will recoup earlier deficits?
17  A. Exactly. Exactly. That the imputed license
18  fee is going to be back-engineered, if you will, so
19  that you start at a position that reflects the success
20  of the series.  11:03:35AM
21  Q. Got it. Have you ever seen a contract that
22  provides a flat imputed license fee of 300 percent
23  regardless of the success of the series?
24  MR. SAMMATARO: Objection to form.
25  THE WITNESS: Not that I can recall.  11:03:47AM

Page 46

1  BY MR. EHRLICH:  11:03:49AM
2  Q. Have you ever seen a contract that provides a
3  flat imputed license fee of 200 percent of production
4  cost no matter the success of the series?
5  A. No.  11:04:01AM
6  Q. In your experience how common is it for an
7  imputed license fee to exceed 100 percent of
8  production costs?
9  MR. SAMMATARO: Objection to form. What
10  period of time?  11:04:12AM
11  BY MR. EHRLICH:
12  Q. At this period of time in 2001.
13  A. Well, it certainly happens. I have seen it.
14  Q. How frequent is it? Is it a common
15  occurrence?  11:04:27AM
16  A. You mean as in one out of five producers gets
17  it?
18  Q. Yeah.
19  A. No.
20  Q. One out of ten?  11:04:35AM
21  A. Possibly, yeah.
22  Q. And what would distinguish the circumstances
23  of an imputed license fee exceeding 100 percent of
24  production costs? In what types of circumstances have
25  you seen that?  11:04:48AM

Page 47

1  A. It's been -- and are we talking sort of out  11:04:51AM
2  of the box here as opposed to a show that's --
3  Q. Yeah.
4  A. -- achieved some success?
5  Q. Well, I don't know. You said this period in  11:04:59AM
6  time roughly, I think -- and I don't want to
7  mischaracterize your testimony -- you've seen an
8  imputed license fee exceeding a hundred percent maybe
9  one in ten times. Is that accurate?
10  A. Yes.  11:05:11AM
11  Q. So my question is in what circumstances have
12  you seen that fee. New shows? Established shows? Is
13  there anything that distinguishes those circumstances?
14  A. And that's why I was asking --
15  Q. Right.  11:05:26AM
16  A. -- which you were talking about.
17  If we're talking about a new show that does
18  not -- has not established itself, I've seen it only
19  in reality series.
20  Q. Can you think of any in particular?  11:05:37AM
21  A. Not that I can tell. I mean, yes, but --
22  Q. What? What show?
23  THE WITNESS: Again, this is all
24  confidential?
25  MR. SAMMATARO: This is, yeah.  11:05:50AM

Page 48

1  THE WITNESS: Because I am really in a bind  11:05:51AM
2  with this as far as confidentiality agreements and
3  disclosing things.
4  BY MR. EHRLICH:
5  Q. Okay. I mean if you can't tell me, then you  11:06:01AM
6  can't. That's fine, and we'll deal with that
7  otherwise. It's just that you're offering an opinion
8  as to what's common industry practice and I believe
9  I'm entitled to understand the basis for it. And if
10  it's shows that I can't tell you about that I don't  11:06:12AM
11  know the name of, then it's very hard for me to
12  understand the basis of your opinion. So that's --
13  MR. SAMMATARO: I understand your opinion.
14  Just to be clear, it's not that she says she doesn't
15  know the name of it. It's that --  11:06:19AM
16  MR. EHRLICH: That she can't tell me the name
17  of it --
18  MR. SAMMATARO: Correct.
19  THE WITNESS: What I will tell you is that,
20  you know, for the most part they were reality shows  11:06:33AM
21  with a network.
22  BY MR. EHRLICH:
23  Q. Not on cable?
24  A. Right.
25  Q. Well-known reality shows that would be  11:06:49AM