# EXHIBIT Q

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

--------------------------

In re:                     )

LOUIS J. PEARLMAN, et al. )

          Debtor.          )

SONEET KAPILA, Chapter 11 ) Case No.

Trustee for TRANS          ) 6:10-cv-181-Orl-28-DAB

CONTINENTAL TELEVISION     )

PRODUCTIONS, INC.,         )

          Plaintiffs,      )

            VS.            )

MTV NETWORKS, a Division   )

of Viacom, International, )

Inc.,                      )

          Defendants.      )

--------------------------

Videotaped Deposition of RICHARD MARKS, the witness,

taken on behalf of the defendants, on Wednesday, May

4, 2011, 9:40 A.M. at 10100 Santa Monica Boulevard,

Los Angeles, California 90067, before GINA M. CLOUD,

CSR No. 6315, pursuant to NOTICE.


PAGES 1 - 195

Page 125

1    someone in a deal like this typically doesn't        14:54:48
2    recover, right?                          14:54:52
3        A.  That's true.                     14:54:52
4        Q.  And that's true generally in a net profit    14:54:54
5    participation with a cable reality TV show?         14:54:59
6        MR. SAMMATARO:  Objection to form.         14:55:02
7        THE WITNESS:  Again, every -- I don't like    14:55:05
8    the generalization that profit, these are          14:55:10
9    contractual constructs.  This contract is very       14:55:14
10   idiosyncratic and different.  I've seen that in the   14:55:18
11   millionaire case, I've seen it before and -- but if   14:55:21
12   you're talking about the general no leverage        14:55:25
13   situation where the parties are being compensated     14:55:32
14   out of the budget and then they get for precedent    14:55:34
15   purpose a backend definition, which is ultimately a  14:55:41
16   nullity, yes, that's generally true.           14:55:44
17       MR. EHRLICH:  You want to take a break?      14:55:47
18       MR. SAMMATARO:  Yes, just a couple minutes.  14:55:48
19       THE VIDEOGRAPHER:  This is the end of disk   14:55:50
20   number two.  Off the record, the time is 2:52 p.m.   14:55:52
21       (Recess taken)                    15:00:35
22       THE VIDEOGRAPHER:  This is the beginning of  15:00:51
23   disk number 3.  Off the record, the time is 2:57      15:01:25
24   p.m.                                15:01:30
25       THE REPORTER:  You mean on the record.      15:01:30

Page 126

1        THE VIDEOGRAPHER:  On the record, the time   15:01:32
2    is 2:57 p.m.                           15:01:33
3    BY MR. EHRLICH:
4        Q.  Mr. Marks, we're discussing the          15:01:35
5    interpretation of paragraph 9(a) and (b) of what has  15:01:39
6    been marked as Exhibit 4 to your deposition.  Is it   15:01:47
7    your testimony that the plain language of this       15:01:59
8    document requires a 10% imputed license fee for each  15:02:03
9    foreign programing service on which Making the Band   15:02:07
10   aired?                              15:02:12
11       MR. SAMMATARO:  Objection to form.         15:02:12
12       THE WITNESS:  That's my opinion.  Plain      15:02:19
13   language is not what I would call it.           15:02:24
14   BY MR. EHRLICH:
15       Q.  The document doesn't in fact say MTV shall  15:02:28
16   credit to revenues amount equal to 10% of the final   15:02:31
17   production costs of the series upon airing on each    15:02:36
18   foreign programing service, right?  It says that      15:02:40
19   foreign programing service?                  15:02:42
20       A.  That's correct.                   15:02:45
21       Q.  So you are interpreting it to mean each,    15:02:47
22   fair?                               15:02:50
23       MR. SAMMATARO:  Objection to form.         15:02:50
24       THE WITNESS:  I'm reading it with my years    15:03:00
25   of experience and what I know about this case.  I'm   15:03:02

Page 127

1    not trying to interpret the contract, but that's my   15:03:06
2    opinion.                             15:03:14
3    BY MR. EHRLICH:
4        Q.  Is it in your opinion industry custom and   15:03:15
5    practice for a net profit participant like Transcon   15:03:17
6    to get imputed license fees for airing on each -- in  15:03:22
7    each foreign country in which a show airs?         15:03:27
8        MR. SAMMATARO:  Objection to form.         15:03:29
9    BY MR. EHRLICH:
10       Q.  Have you seen that formulation before?     15:03:30
11       A.  Again, this is a unique situation, pretty   15:03:40
12   idiosyncratic, an unusual contract.  I think you      15:03:44
13   look at it within its terms.  I know George Cheeks    15:03:46
14   testified to having remembered one deal where it was  15:03:52
15   calculated this way.  He didn't name it in his       15:03:56
16   deposition, but as I sit here right now I can't       15:04:06
17   think of any comparable paragraph like this that     15:04:08
18   I've seen.                            15:04:12
19       Q.  I believe you testified that you were aware  15:04:24
20   of one -- excuse me, two contracts roughly         15:04:27
21   contemporaneously to this one with the potential for  15:04:38
22   imputed license fee of 100%; is that right?        15:04:41
23       A.  You asked me about reality and I think      15:04:46
24   cable and I referred to Diddy and Jackass, I think,   15:04:49
25   yes.                                15:04:57

Page 128

1        Q.  I believe you also referred to the         15:04:57
2    Osbornes?                            15:05:00
3        A.  I don't think I did, but if I did.  The     15:05:00
4    Osbornes, they own the show, they own the copyright,  15:05:05
5    they own the show.  They were richly compensated.    15:05:08
6    That, again, in the era of the beginning of reality   15:05:13
7    and in this era of George Aiken at MTV, they were     15:05:18
8    unusual contracts, and The Osbornes, I don't think I  15:05:23
9    mentioned it, but it was an unusual contract.        15:05:27
10       Q.  Do you know the circumstances of the       15:05:29
11   negotiation of that contract?                 15:05:30
12       A.  I wasn't in the negotiation, but I know     15:05:36
13   through being in the industry and talking to         15:05:41
14   colleagues some of the circumstances, yes.         15:05:43
15       Q.  What circumstances are you aware of?       15:05:48
16       A.  That the show went on the air without      15:05:50
17   signed agreements with the Osbornes and all the      15:05:53
18   leverage shifted to them much like the leverage      15:05:57
19   shifting to Transcon when this show came off of ABC.  15:06:03
20       Q.  How did the leverage shift to Transcon when  15:06:07
21   the show came off ABC?                     15:06:09
22       A.  It was a partner, co-owner and didn't have  15:06:14
23   to sign this amendment if it didn't feel it was very  15:06:17
24   favorable to them, they could have lived with the     15:06:24
25   Joint Venture Agreement.  They were partners, they    15:06:34

32 (Pages 125 to 128)